JONATHAN SELBIN (Cal. Bar No. 170222)
jselbin@lchb.com
MICHELLE LAMY (Cal. Bar No. 308174)
mlamy@lchb.com
NIGAR A. SHAIKH (*to be admitted pro hac vice*)
nshaikh@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

ELIZABETH A. FEGAN (*to be admitted pro hac vice*)
beth@feganscott.com
FEGAN SCOTT LLC
150 S. Wacker Drive, 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100

LYNN A. ELLENBERGER (*to be admitted pro hac vice*)
lynn@feganscott.com
FEGAN SCOTT LLC
500 Grant Street, Suite 2900
Pittsburgh, PA 15219
Telephone: (412) 346-4104
Facsimile: (312) 264-0100

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN DOE 1, JOHN DOE 2, and JOHN DOE 3, individually and on behalf of all others similarly situated, | CASE NO. 22-1559 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, THE UNIVERSITY OF SAN FRANCISCO, ANTHONY N. (AKA NINO) GIARRATANO, and TROY NAKAMURA, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ....................................................................................................... 1

II.     JURISDICTION AND VENUE ................................................................................. 5

III.    INTRA-DISTRICT ASSIGNMENT ......................................................................... 7

IV.     PARTIES .................................................................................................................... 8

        A.      Plaintiffs ......................................................................................................... 8

        B.      Defendants ...................................................................................................... 9

V.      FACTS ...................................................................................................................... 10

        A.      Student-Athletes Are at Risk for Sexual Harassment, Exploitation, and
                Mental Abuse by Coaches.......................................................................... 10

        B.      By the 1990s, National Governing Bodies (NGBs) Prohibited Sexual
                Harassment by Coaches of Athletes, Recognizing the Power Disparities
                and Unequal Bargaining Positions. ............................................................ 14

                1.      In 1992, the United States Olympics Committee established a code
                        of ethics prohibiting sexual harassment. ................................... 15

                2.      In 1993, USA Hockey established a sexual abuse and harassment
                        policy. ......................................................................................... 16

                3.      Since 1998, USA Swimming has prohibited inappropriate sexual
                        conduct. ...................................................................................... 18

                4.      In 2007, the International Olympic Committee issued a consensus
                        statement on sexual abuse in sport. .......................................... 19

                5.      In 2018, the Energy and Commerce Committee investigated and set
                        out best practices for NGBs to prohibit coach misconduct and track
                        wrongdoing. ............................................................................... 20

        C.      Despite the Widespread Recognition that Protection of Student-Athletes Is
                Paramount, the NCAA Has Knowingly Declined to Act................................ 22

                1.      The NCAA has a duty to protect the physical and educational well-
                        being of student-athletes. .......................................................... 22

                2.      The NCAA regulates coaches in a myriad of ways—except when it
                        comes to sexual harassment and sexual abuse of student-athletes........... 24

                3.      In the vacuum of the NCAA's failure to regulate abuse by coaches,
                        student-athletes are the victims. ............................................... 25

                4.      Even when the NCAA addresses abuse, the NCAA's policies and
                        pronouncements lack teeth.......................................................... 29

                5.      Because of its keen awareness of the problem it fostered and its
                        desire to avoid liability, the NCAA continues to focus on
                        decentralization to the detriment of its student-athletes............. 34

        D.      With the NCAA's Tacit Blessing, the University of San Francisco
                Permitted Sexual Exploitation of Student-Athletes on and off the Field.............. 36

                1.      Neither the Archdiocese of San Francisco nor USF are strangers to
                        sexual abuse and abuse of power. ............................................. 36

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3

2.    Coach Naks created an intolerable sexualized environment at every
practice and Coach G participated. ........................................................ 40

4

3.    USF retaliated against the players who tried to stop the abusive
behavior or who did not condone it, running them off the team.............. 46

5

E.    Plaintiffs and the Class Were Damaged............................................................... 59

6

VI.    CLASS ALLEGATIONS ...................................................................................................... 60

7

VII.    CLAIMS AGAINST THE NCAA, USF, AND THE COACH DEFENDANTS ON
BEHALF OF THE USF BASEBALL SUBCLASS ............................................................ 64

8

VIII.    CLAIMS AGAINST THE NCAA ON BEHALF OF THE NATIONWIDE
CLASS AND CALIFORNIA SUBCLASS ........................................................................ 91

9

IX.    PRAYER FOR RELIEF...................................................................................................... 111

10

X.    DEMAND FOR TRIAL BY JURY .................................................................................. 112

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT
CASE NO. 22-1559

Plaintiffs John Doe 1, John Doe 2, and John Doe 3, on behalf of themselves and all others similarly situated, by and through their attorneys, bring this action against the National Collegiate Athletic Association ("NCAA"), the University of San Francisco ("USF"), Nino Giarratano ("Giarratano" or "Coach G"), and Troy Nakamura ("Nakamura" or "Coach Naks") (Coach G and Coach Naks may also be collectively referred to as the "Coach Defendants," and all defendants may also be collectively referred to as the "Defendants"). Plaintiffs' allegations are based upon information and belief.

## I.   **INTRODUCTION**

1.      The NCAA has a historical and ongoing duty to protect the health and safety of student-athletes. Indeed, its President and Board Member, Mark Emmert, testified before Congress that the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes."[1]

2.      In exercise of that duty, the NCAA has promulgated rules that require it to "adopt legislation to enhance member institutions' compliance with applicable gender-equity laws."[2] Gender equity includes the right to be free from sexual harassment and other sexualized conduct. When students suffer sexual abuse and harassment, they are deprived of equal access to education. Despite this duty to promulgate legislation to augment gender equity, however, the NCAA has failed to implement any rules prohibiting sexual harassment and retaliation.

3.      The NCAA's duty to protect the health and safety of student-athletes—and failure to discharge that duty—affects some of the most vulnerable individuals in our society. NCAA student-athletes are typically living away from home for the first time. Student-athletes arrive at college with the expectation that they will become the best athletes they possibly can be under the supervision of educated, skilled, and fully vetted athletics department personnel looking out for

---

[1] U.S. Senate, Comm. on Commerce, Science and Trans., *Promoting the Well-Being and Academic Success of College Athletes*, at 60-61 (July 9, 2014) available at https://bit.ly/3i596YO (last accessed Feb. 9, 2022).
[2] 2.3.2 NCAA Legislation (adopted Jan. 11, 1994), available at https://web3.ncaa.org/lsdbi/bylaw?bylawId=2461&division=1&adopted=0 (last accessed Feb. 9, 2022); https://www.ncaa.org/about/resources/inclusion/gender-equity-and-title-ix (last accessed Feb. 9, 2022).

their best interests. Many student-athletes dream of playing their sports professionally after college, and are taught from a young age that trusting and believing their coaches is the key to realizing that dream. The student-athletes therefore accord their coaches and trainers deference, respect, and loyalty. A tragic example is U.S.A. gymnastics, where the female gymnasts trusted their coaches, who sent them year after year to serial sexual predator Larry Nassar.

4.      This trust—coupled with the NCAA's failure to impose sanctions that would incentivize schools to report abuse and deter perpetrators—has created and perpetuated a continuing cycle of abusive coaches who move unchecked among schools. Without NCAA reporting requirements, colleges and universities can turn a blind eye to a coach's misconduct. Even if a school takes action, the NCAA permits the perpetrator to move to another college or university, and thereby grants the perpetrator access to a fresh population of student-athletes who are unaware of these prior allegations and primed to afford the perpetrator complete trust. Instead of a system that protects the well-being of student-athletes, the NCAA therefore oversees one that prioritizes the protection of athletic revenue, alumni donations, and tuition at the expense of student-athletes.

5.      Within this culture, the University of San Francisco employed two baseball coaches for 22 years, despite an awareness that these coaches created an intolerable sexualized environment within USF's Division I baseball team that included persistent psychological abuse and repeated inappropriate sexual conduct. For 22 years and counting, Head Coach Nino Giarratano and Assistant Coach Troy Nakamura have wielded their power to psychologically abuse their players, destroying their spirits to the point where multiple players have become suicidal.

6.      The Coach Defendants created a culture where, in the light of the day, it was "normal" to see Coach Naks naked on the field or in a window, swinging his penis in a helicopter fashion while the entire team—and Coach G—watched.

7.      The Coach Defendants created a culture where, under the guise of relaxing the student-athletes before practice, it was "normal" for Coach Naks to mime sexual acts with the players.

8.     The Coach Defendants created a culture where it was perfectly "normal" for the coaches to discuss their sexual preferences, the sexual acts they would like to engage in, and the bodily fluids they would like to drink with Plaintiffs and other members of the USF baseball team.

9.     Make no mistake: this case is not about the behavior of an overbearing coach or "locker room talk." Plaintiffs have spent their lives playing baseball, and the conduct at issue is profoundly more disturbing than anything they have experienced. The conduct was not "normal"—even in the realm of elite, competitive baseball—and USF and the Coach Defendants knew it was not normal. So, they took steps to cover it up.

10.    The Coach Defendants engaged in extreme retaliation and psychological abuse of any student-athlete, including Plaintiffs, who did not outwardly condone or participate in the sexualized atmosphere. The Coach Defendants berated, belittled, and disparaged student-athletes; threatened to take away their playing time and their scholarships; and told the student-athletes (who otherwise met all NCAA and academic requirements) to leave USF and not come back. The Coach Defendants tricked the student-athletes into signing forms to make it seem as though revocation of their scholarships was voluntary, when it was not.

11.    And, when USF—a Jesuit university whose mission is to create a more humane and just world, including by holding staff accountable to promote the common good and address inequities—was confronted with the Coach Defendants' wrongdoing through complaints made to the very highest levels of the Athletic Department, USF chose to back Coach G's decisions to run student-athletes off the baseball team.

12.    The Coach Defendants' psychological abuse and retaliation against Plaintiffs and the other student-athletes worked. Of the three Plaintiffs, only one plans to remain at USF. One transferred and another is in the process of transferring. Of the 13 freshman recruits in the 2020 USF baseball class, seven have transferred and one more is in the process of transferring. The fact that more than 60% of the 2020 recruiting class left or intends to leave is a testament to the coaching staff's illegal behavior, ruthlessness, retaliation, and callous treatment of its players. This transfer rate stands in stark contrast to the reported percentage of four-year college transfers

among Division I baseball players—just 2.3%, the fourth lowest rate out of 38 NCAA Division I sports.[3]

13.     Through this lawsuit, Plaintiffs seek to hold the NCAA and USF accountable, including through demands: (i) to make changes to the NCAA's policies and practices to ensure it fulfills its obligation to protect student-athletes from athletic department personnel's psychological abuse and repeated inappropriate sexual conduct that creates an intolerable sexualized environment now and in the future; and (ii) for compensation from the NCAA, USF, and the Coach Defendants for the psychological abuse, repeated inappropriate sexual conduct that created an intolerable sexualized environment, and retaliation Plaintiffs and members of the USF baseball team have suffered.

14.     First, Plaintiffs seek injunctive and equitable relief requiring the NCAA to implement and enforce rules and bylaws considered best practices. That includes, *inter alia*: prohibiting sexual harassment and/or sexual abuse of student-athletes by athletics department personnel; prohibiting romantic or sexual relationships between athletics department personnel and student-athletes; requiring NCAA member institutions to immediately report any allegations of harassment or abuse of a student-athlete by athletics department personnel; requiring that all reports be independently investigated; implementing public sanctions on member institutions and athletics department personnel where allegations are substantiated; banning athletics department personnel found to be in violation from further working or volunteering for any member institution; mandating training; and protecting student-athletes from retaliation and coercion to leave their teams, enter the NCAA transfer portal, and/or forego their scholarships without an independent ombudsman and advocate for the student-athletes.[4]

15.     Second, Plaintiffs seek damages from the NCAA, USF, and the Coach Defendants for the psychological abuse and repeated inappropriate sexual conduct they suffered, and

---

[3] NCAA, *Transfer Composition of Division I Teams*, 10 (July 2020), available at https://ncaaorg.s3.amazonaws.com/research/transfers/RES_TransCompD1TeamsSlides.pdf (last accessed Jan. 27, 2022).

[4] The transfer portal is an NCAA mechanism for players to make themselves available to other schools; however, to enter the transfer portal, the student-athletes must give up their current scholarships.

1    compensation for lost guaranteed scholarship money, other out-of-pocket costs, and impairment

2    of their baseball careers, including playing Major League Baseball.

3         16.    Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and/or (c)(4),

4    Plaintiffs bring this class action for violations of Title IX of the Education Amendments of 1972

5    ("Title IX"), as amended, 20 U.S.C. § 1681 *et seq.*, as well as various state statutory and common

6    laws.

7    **II.    JURISDICTION AND VENUE**

8         17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

9    1332, as amended by the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because: (a) there

10   are at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of

11   interest and costs; (c) at least one Plaintiff is a citizen of a different state than at least one

12   Defendant; and (d) at least one member of the Classes, including Plaintiffs, is a citizen of a

13   different state than at least one Defendant.

14        18.    This Court has personal jurisdiction over the NCAA because the NCAA has

15   contacts with California to render it "essentially at home" in California, such that the exercise of

16   personal jurisdiction is proper. Specifically, this Court has general personal jurisdiction because

17   of the NCAA's meaningful, continuous, and substantial economic, physical, and political

18   presence in California; the 58 NCAA member organizations located in California, including USF;

19   the NCAA's ability to influence the California legislature; the NCAA's attempts to influence the

20   California courts; and the NCAA's availment of the California courts.

21        19.    First, the NCAA engages in a continuous stream of activities in and directed

22   towards California, both directly and through its members, that exceed its activity in other states

23   and renders it at home in California.

24              a.    Since its founding in 1916, the NCAA has received substantial revenue

25                    directly tied to activities in California. California has the largest number of

26                    Division I member institutions in the country—the Division that generates

27                    virtually all NCAA revenue. California members are thus responsible for

28                    an outsized portion of the NCAA's over $1 billion annual revenue.

b.    California members contribute tens of thousands of dollars in membership dues to the NCAA.

c.    The NCAA affirmatively elects to sponsor many of its largest and most prominent revenue-minting events in California. For example, the oldest and most famous college football playoff game, the Rose Bowl, has been held in California continuously since 1916—evidencing more than 100 years of continuous and highly profitable commercial activity by the NCAA in the State.

d.    Overall, during the 2019 to 2020 academic year, California was slated to host 43 championship games—more than almost any other state. These games are attended by NCAA representatives, giving the NCAA a meaningful physical presence in the State throughout the year in addition to an economic one.

20.    Second, the NCAA members are heavily concentrated in California, with 58 members in California. Of these 58, 24 are Division I members—the most of any state. Moreover, the NCAA exercises significant control over its California members through the imposition of onerous requirements on members' athletic programs and operation of an expansive enforcement program.

21.    Third, the NCAA has engaged in sustained lobbying efforts specifically targeted at California. For example, on September 18, 2019, the NCAA Board wrote a letter to California Governor Gavin Newsom urging him to reject a bill called the Fair Play to Pay Act that would allow athletes in the state to be compensated for use of their name, image, and likeness. The NCAA spent $450,000 on lobbying efforts in 2019, much of it directed at California.

22.    Fourth, the NCAA has engaged in significant activities in an attempt to influence the California courts. In *Brown v. USA Taekwondo*, No. S259216, 2020 WL 5705929 (Cal., Sep. 22, 2020), the NCAA filed an amicus brief addressing what duty under California law, if any, the United States Olympic Committee has to protect an athlete from sexual abuse by third-parties. The NCAA deemed the issue as one of "great importance" to the NCAA.

23. Finally, the NCAA purposefully avails itself of California courts when it so chooses.[5] The NCAA even admitted that personal jurisdiction and venue are appropriate in California.[6]

24. This Court also has specific personal jurisdiction over the NCAA. First, as reflected above, the NCAA purposefully directed activities towards California or purposefully availed itself of the benefits of doing business in California. Second, the psychological abuse and repeated inappropriate sexual conduct that created an intolerable sexualized environment and retaliation at USF occurred in California and arises out of the NCAA's actions or inactions with respect to its oversight of USF and its coaching staff in California, and its failure to adopt formal policies to monitor, prohibit, or otherwise address rampant sexual misconduct. Third, and based on the above, it would not be unreasonable for this Court to exercise personal jurisdiction over the NCAA.

25. This Court has personal jurisdiction over Defendant USF because it is located in this District and the wrongdoing occurred in this District.

26. This Court has personal jurisdiction over Defendant Nino Giarratano because, based on information and belief, he resides in this District. Moreover, Coach G has coached in this District for 22 years.

27. This Court has personal jurisdiction over Defendant Troy Nakamura because, based on information and belief, he resides in this District. Moreover, Coach Naks coached in this District for 22 years.

28. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because: the NCAA resides in every district in which its members reside, including this District; all other defendants are residents of the State in which the District is located; and a substantial part of the events and omissions giving rise to the claims occurred in this District.

**III.    INTRA-DISTRICT ASSIGNMENT**

29. Assignment in the San Francisco Division is appropriate because USF, Coach G,

---

[5] *See, e.g., NCAA v. Ken Grody Mgmt.*, No. 8:18-cv-00153 (C.D. Cal.).
[6] *George v. NCAA*, 2008 WL 5422882, at *3 (C.D. Cal. Dec. 17, 2008).

and Coach Naks reside in this Division, as does Defendant NCAA, an unincorporated association whose member Defendant USF resides in this Division.

## IV.    PARTIES

### A.    Plaintiffs

30.    **John Doe 1** is a citizen and resident of California and citizen of the United States. John Doe 1 was a standout on his high school baseball team, was recruited by many schools, and given offers by multiple schools, including Ivy League schools.

31.    Coach Naks scouted and met John Doe 1 at a 2019 tournament in Arizona while John Doe 1 was in his junior year of high school. Coach Naks was accompanied by a former Major League baseball player who helped analyze the players. Impressed by John Doe 1's play, Coach Naks invited him to an official visit at USF two weeks later, where John Doe 1 met the entire coaching staff.

32.    USF heavily recruited John Doe 1 based on his baseball skills and experience. The coaches sold John Doe 1 on the notions that the Jesuit culture set the team apart from all others, all of the teammates loved each other, and the coaches treated the players as "family." Coach Naks emphasized four core values, including trust and accountability. He said that John Doe 1 would be a "cornerstone" of the USF baseball team.

33.    USF offered John Doe 1 guaranteed four-year athletic and academic grants-in-aid (scholarships) in the amount of approximately $60,000 per year ($240,000 total) to attend USF. On October, 7, 2019, Coach Naks sent a letter to John Doe 1 along with his official offer. In the letter Coach Naks wrote, "I do not believe I mentioned to you that we are one of the few schools out there that offer 4 year guaranteed contracts. If you sign a National Letter of Intent with the [USF] Dons, your scholarship is guaranteed to you for the entire time you are on the Hilltop. It cannot be reduced for any reason, only increased. Like I mentioned, we have a tradition of reinvesting in our family for guys that take care of business on the field, in the classroom and protect the culture." This guarantee was dispositive in John Doe 1's decision to sign with USF.

34.    John Doe 1 was a freshman at USF in the fall of 2020, and has been a member of the baseball team since then. He continues to attend USF as of the time of this Complaint.

1   Because of Defendants' attempt to force him to give up his scholarship and leave the baseball

2   team, however, he has recently entered the NCAA transfer portal.

3        35.     **John Doe 2** is a citizen and resident of California and citizen of the United States.

4   USF heavily recruited John Doe 2 based on his baseball skills and experience. The coaches at

5   USF portrayed the USF baseball team as a cohesive, caring culture where everyone cared about

6   each other's successes and had each other's backs.

7        36.     John Doe 2 committed to play baseball at USF in his senior year of high school,

8   and signed a National Letter of Intent. John Doe 2 was offered (and accepted) guaranteed four-

9   year athletic and academic grants-in-aid (scholarships) in an amount of $75,000 per year

10  ($300,0000 total) to attend USF. John Doe 2 received the largest scholarship ever awarded by

11  USF for an outfielder.

12       37.     John Doe 2 was a freshman at USF in the fall of 2020. John Doe 2 transferred in

13  January 2022 due to the actions of the Defendants described herein.

14       38.     **John Doe 3** is a citizen and resident of California and citizen of the United States.

15  John Doe 3 received approximately 10 offers, including from Ivy League schools as well as USF,

16  which heavily recruited John Doe 3 based on his baseball skills and experience.

17       39.     The coaches sold John Doe 3 on the USF baseball team through representations

18  that the baseball players were very close to each other, there was a family culture on the team,

19  John Doe 3 could leave a legacy on the program, and he would be the "foundation of the

20  program" for years to come.

21       40.     John Doe 3 committed to play baseball at USF in his junior year of high school,

22  and signed a National Letter of Intent. John Doe 3 was offered (and accepted) guaranteed four-

23  year athletic and academic grants-in-aid (scholarships) of more than $280,000, reportedly the

24  largest offer in 22 years.

25       41.     John Doe 3 was a freshman at USF in the fall of 2021. He continues to attend USF

26  as of the filing of this lawsuit, but hopes to transfer at the end of this academic year.

27       **B.     Defendants**

28       42.     **Defendant National Collegiate Athletic Association (NCAA)** is an

unincorporated association that acts as the governing body of college sports. Its principal office is located in Indianapolis, Indiana.

43.    **Defendant University of San Francisco (USF)** is a California corporation located at 2130 Fulton Street, San Francisco, CA 94117, with its agent for service of process, Donna J. Davis, at the same address. USF is a Division I member institution of the NCAA. It is the only Division I university in San Francisco.

44.    **Defendant Nino Giarratano** is a resident of San Francisco, California. Coach G is the head coach of the USF baseball team where he has coached since 1999.

45.    **Defendant Troy Nakamura** is a resident of Pacifica, California. Coach Naks was an assistant to Coach G for 15 years at USF until he was promoted to Associate Head Coach in the summer of 2013. USF announced on January 13, 2022 that Coach Naks is no longer associated with the USF baseball program

## V.    FACTS

### A.    Student-Athletes Are at Risk for Sexual Harassment, Exploitation, and Mental Abuse by Coaches.

46.    All college students are encouraged to develop a clear sense of self, commitment, and direction. Emerging adults engage in a variety of developmental tasks such as identity formation, becoming personally competent, developing interpersonal relationships, and planning for the future.[7]

47.    While engaged in this period of self-exploration, student-athletes must also balance a unique set of often-competing circumstances, including but not limited to their athletic and academic endeavors. They must: balance social activities against the isolation of athletic pursuits; maintain mental equilibrium in the face of athletic success or shortcomings; play

---

[7] Emily Benton. Heird  & Jesse A. Steinfeldt, An Interpersonal Psychotherapy Approach to Counseling Student-Athletes: Clinical Implications of Athletic Identity, JOURNAL OF COLLEGE COUNSELING, 16(2), 143-57 (2013).

CLASS ACTION COMPLAINT
CASE NO. 22-1559

notwithstanding physical infirmities and injuries; and, often, reconcile the termination of an

athletic career to set goals for the future.[8]

48.     The NCAA acknowledges the uniquely important process of identity formation for

NCAA student-athletes, because "NCAA research has shown academic outcomes (grades,

graduation and eventual graduate degree attainment) are strongly related to identity as a student

while in college, even after taking prior academic performance into account."[9]

49.     For student-athletes, then, this crucial developmental period necessarily includes

significant time spent with their teammates and coaches. When other college students might be

testing their emerging identity in school-based and friendship networks, the college athlete is

spending significant time separated from these networks while they train and compete. Student-

athletes often spend hours a day with their coaches on the practice field, in the training room, and

in meetings.

50.     This reality renders student-athletes uniquely vulnerable to sexual harassment and

abuse. Researchers suggest "the culture of sport, specifically the power invested in the coach,

facilitates an environment conducive to, and tolerant of, sexual exploitation."[10]

51.     This power imbalance is especially prevalent at the highest level of intercollegiate

athletics. One author explained that a student-athlete's susceptibility to the influence of his coach

is even greater for athletes close to the upper echelon of their sport:

> [A]thletes may be more susceptible to the grooming process which
> precedes actual sexual abuse when they have most at stake in terms
> of their sporting careers, that is when they have reached a high
> standard of performance but are just below the elite level. We call
> this the 'stage of imminent achievement' (SIA) (see Fig. 1). This
> stage might include athletes on national squads who have not yet
> been selected for the national/ international honours, those who
> occupy rankings just outside the top echelon for their sport and those

---

[8] Joy Gaston Gayles, *Engaging Student Athletes*, STUDENT ENGAGEMENT IN HIGHER EDUCATION: THEORETICAL PERSPECTIVES AND APPROACHES FOR DIVERSE POPULATIONS 209-21 (Stephen John Quaye, et al. eds., 2nd ed. 2015).
[9] NCAA, *Do NCAA Student-Athletes View Themselves As Students Or Athletes?* (Aug. 2013), available at http://www.ncaa.org/about/resources/research/do-ncaa-student-athletes-view-themselves-students-or-athletes (last accessed Jan, 29, 2022).
[10] Joy D. Bringer, Celia H. Brackenridge, and Lynn H. Johnston, *Defining Appropriateness in Coach-Athlete Sexual Relationships: The Voice of Coaches*, THE JOURNAL OF SEXUAL AGGRESSION, 8(2), 83-98 (2002).

CLASS ACTION COMPLAINT
CASE NO. 22-1559

for whom junior or age phase representative honours have been achieved. For these athletes, the personal costs of dropping out of their sport might be deemed to be higher than for others. The novice athlete can drop out without loss of face, can leave to find another coach or another sport without loss of reputation and has invested least, in terms of time, effort, money and family sacrifices. The top athlete, on the other hand, has a proven record, has already attained some of the rewards of success, and may be less dependent upon his or her coach for continued achievement at that level. In other words, they may have less to prove.

\*         \*         \*

The elite young athlete treads a fine line between success and failure. Physical injuries or illness can occur at any time, destroying years of training. Psychological damage can be caused by the withdrawal of the coach's attention of interest. In short, the young athlete often needs the attention of the coach in order to maintain form and the chance to succeed. In these circumstances it is not difficult for a coach with sexual motives to groom and gain compliance from the athlete.[11]

52.     "The style of coaching that is most conducive to forming coach-athlete sexual relationships is more closely associated with male coaches: authoritarian, requiring unquestioning submission to the coach's authority, and exercising near total control over athletes' lives."[12] Commentators have noted that having a male coach with an authoritarian coaching style is a high risk factor for coach-athlete sexual abuse.[13]

53.     A coach with sexual motives is able to groom and gain his athlete's compliance because of the power differential between a coach and the student-athlete, which makes consent even between adults impossible. From a very young age, athletes are taught to look up to and respect their coaches, to view them as upstanding adults who serve as mentor, trainer, counselor, and sometimes even surrogate parent, and to accord them unquestioning authority.

54.     In 2012, the NCAA acknowledged the coach's ability to wield tremendous emotional control and power over his student-athletes:

In the most tangible terms, the student-athlete depends on the coach

---

[11]Celia Brackenridge & Sandra Kirby, *Playing Safe: Assessing the Risk of Sexual Abuse to Elite Child Athletes*, INT'L REVIEW FOR THE SOCIOLOGY OF SPORT: SPECIAL ISSUE ON YOUTH SPORT 13 (1997), available at https://bit.ly/3MBMlvJ.
[12] Deborah L. Brake, *Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds*, 22 MARQUETTE SPORTS L. REV. 395, 403 (Jan. 1, 2012) (citation omitted).
[13] *Id.* & n.35 (citations omitted).

for: a place on the roster; playing time; training and skills-building opportunities; visibility and references that can lead to professional opportunities; and, in Division I and II programs, scholarships that can mean the difference between being able to afford a college education or not. In exercising this power, the coach commonly exerts broad control over a student-athlete's life, including in such areas as physical fitness, diet, weight, sleep patterns, academic habits, and social life. For intercollegiate athletes, the magnitude of the coach's control will likely exceed that of any other single individual at that student-athlete's institution. For many, it will exceed the extent of control any individual has ever had over them at any point in their lives, with the exception of their parents.[14]

55.     Nancy Hogshead-Makar, a 1984 Olympic gold medalist in swimming and the CEO of the non-profit Champion Women which provides legal advocacy for athletes in sport, has explained that the coach holds all the power in a relationship with the athlete, stating: "There's no balance of power, there's power one way, which is the coach has all the power and the athlete does not . . . . [The coach] has her scholarship, her ability to continue her education."[15]

56.     This power imbalance extends beyond the sport and to the personal: "[C]oaches have power over athletes' lives far exceeding the mechanics of practicing and competing in a sport. A coach's power over athletes can extend to virtually all aspects of the athlete's life in such ways that clear boundaries are hard to delineate. This near-total control is rarely questioned."[16]

57.     "The athlete's dependence on the coach makes it enormously difficult for the athlete to control the boundaries of the relationship or speak up to a coach who oversteps."[17] This dependence and power differential created by the coach-athlete relationship enables predators who work with student-athletes (like Jerry Sandusky, Larry Nassar, and Coach Naks) to thrive.

---

[14] Deborah L. Brake & Mariah Burton Nelson, *Staying in Bounds* 15 (citations omitted), available at http://ncaa.org.s3.amazonaws.com/documents/2021/1/18/Staying_2Bin_2BBounds _2BFinal.pdf (last accessed Feb. 3, 2022).

[15] John Barr & Nicole Noren, *Outside the Lines: Track & Fear*, ESPN, available at http://www.espn.com/espn/feature/story/_/id/18900659/university-arizona-coach-threatened-one-athletes-blackmail-violence-death-school-stopped-him (quoting Nancy Hogshead-Makar) (last accessed Feb. 9, 2022).

[16] Brake, *supra*, at 405 (footnotes omitted).

[17] *Id.* at 406.

**B.**     **By the 1990s, National Governing Bodies (NGBs) Prohibited Sexual Harassment by Coaches of Athletes, Recognizing the Power Disparities and Unequal Bargaining Positions.**

58.     Historically, the NCAA and other sporting organizations looked the other way when coaches became involved in sexual improprieties with their athletes. Karen Morrison, the NCAA director of gender inclusion, explained: "'I think there is some hesitancy to prescribe what people consider to be the personal lives of their coaches,' Morrison said. 'A lot of times there's a fallback to, 'Well, they're consenting adults.'"[18]

59.     The fact that college athletes are over the age of 18, however, does not make any sexual relationship or sexual activity with a coach consensual. According to many experts, the implicit power in the coach-athlete relationship negates consent.[19]

60.     By the 1990s, multiple studies challenged organizations that denied the existence of sexual abuse in sport.[20] The results of these studies "speak to the intensity of the coach-athlete bond, and the difficulty of setting boundaries in the relationship."[21] This also explains why, when confronted with sexual abuse, athletes do not recognize harassing or abusive behavior when they experience it.[22]

61.     Although belatedly, and without imposing mandates that would protect its student-athletes, in 2012, the NCAA finally acknowledged that "sexual relationships between coaches and student-athletes have become a serious problem."[23]

62.     In an NCAA publication, two experts explained that these same principles that forbid sexual relationships in other settings involving asymmetrical relationships—such as

---

[18] Allie Grasgreen, *Out-of-Bounds Relationships*, INSIDE HIGHER ED. (May 1, 2012), available at https://www.insidehighered.com/news/2012/05/01/ncaa-asks-colleges-prohibit-romantic-relationships-between-athletes-coaches (quoting Karen Morrison).
[19] Brake, *supra*, at 399.
[20] *See, e.g.*, Brackenridge, *supra*, at 9 (citing studies in the United States, including: Pike-Masteralexis, L., Sexual Harassment and Athletics: Legal and Policy Implications for Athletic Departments, JOURNAL OF SPORT AND SOCIAL ISSUES, 19(2), 141-156 (1995); Volkwein, K., Sexual Harassment in Sport - Perceptions and Experiences of Female Student-Athletes (1996) (paper presented at the Pre-Olympic Scientific Congress, Dallas, USA, July 11-14, 1996).
[21] Brake, *supra*, at 400.
[22] *Id*.
[23] Staying in Bounds, *supra*, at 4.

CLASS ACTION COMPLAINT
CASE NO. 22-1559

lawyer-client, physician-patient, judge-party/lawyer, or clergy-parishioner—should apply to coaches and players as well:

> All of these examples involve relationships that are too fraught with power imbalances for consent to be meaningfully and reliably given. While being a coach is, in many respects, different from other professions, it shares the defining features that make consent to enter into a sexual relationship inherently problematic. At the core of the coach-athlete relationship is a duty of care and an imbalance of power. In many respects, the relationship of dependence is even more acute here than it is in these other settings due to the breadth of control that the coach has over the life and education of the student-athlete.[24]

63. Thus, many sports organizations have adopted rules to prohibit coaches from engaging in sexual relationships with athletes, to prohibit sexual harassment, and to protect the safety and preserve the well-being of the athlete.

### 1. In 1992, the United States Olympics Committee established a code of ethics prohibiting sexual harassment.

64. In 1992, the United States Olympics Committee ("USOC," now called the "USOPC") developed a Coaching Ethics Code "to provide standards of professional conduct that can be applied by the USOC and its member organizations that choose to adopt them."[25] The USOPC intended that the code of ethics "provides a common set of values upon which coaches build their professional work" as "[i]t is the individual responsibility of each coach to aspire to the highest possible standards of conduct."[26]

65. The USOPC's Coaching Ethics Code includes Ethical Standard 1.08, titled "Sexual Harassment," which defines and prohibits sexual harassment by coaches as follows:

> (a) Coaches do not engage in sexual harassment. Sexual harassment is sexual solicitation, physical advances, or verbal or nonverbal conduct that is sexual in nature, and that either:

>> (1) is unwelcome, is offensive, or creates a hostile environment, and the coach knows or is told this;

---

[24] Staying in Bounds, *supra*, at 26.

[25] United States Olympic and Paralympic Committee Coaching Ethics Code, available at https://www.teamusa.org/USA-Karate/Officials-and-Coaches/Coaches-Resources/USOC-Coaching-Ethics-Code (Introduction) (last accessed Jan. 31, 2022).

[26] *Id.*, Introduction.

CLASS ACTION COMPLAINT
CASE NO. 22-1559

(2) is sufficiently severe or intense to be abusive to a reasonable person in the context. Sexual harassment can consist of a single intense or severe act or of multiple persistent or pervasive acts.

(b) Coaches accord sexual-harassment complaints and respondents dignity and respect. Coaches do not participate in denying an athlete the right to participate based upon their having made, or their being the subject of, sexual harassment charges.[27]

66.     Ethical Standard 1.14, titled "Exploitative Relationships," recognizes that because of the power differential, any relationship between a coach and athlete would likely impair judgment and become exploitative:

(a) Coaches do not exploit athletes or other participants over whom they have supervisory, evaluative, or other authority.[28]

**2.      In 1993, USA Hockey established a sexual abuse and harassment policy.**

67.     USA Hockey first established a Sexual Abuse Policy, Physical Abuse Policy, and Background Screening Policy in 1993.[29]

68.     USA Hockey's 1993 Sexual Abuse Policy provided that, upon proof of a violation, the perpetrator would be permanently banned or suspended from USA Hockey programs.

69.     To help guide USA Hockey programs and administrators of USA Hockey, Affiliates, and local programs, USA Hockey also published "Abuse and Screening Policies: Guidelines for Administrators" as early as 1997.

70.     USA Hockey established the USA Hockey SafeSport Program upon adoption by its Board of Directors in June 2012, updated December 22, 2021. This followed a mandate by USA Hockey's then President to immediately create a comprehensive athlete safety policy to protect USA Hockey members from abuse or misconduct. The USA Hockey Safe Sport Program Handbook incorporated:

---

[27] *Id.,* Standard 1.08.
[28] *Id.,* Standard 1.14.
[29] Letter dated March 21, 2018 from USA Hockey regarding "USA Hockey Response to House Committee on Energy and Commerce Letter of March 7, 2018," available at https://republicans-energycommerce.house.gov/wp-content/uploads/2018/12/U.S.A.-Hockey.pdf (last accessed Mar. 8, 2022).

CLASS ACTION COMPLAINT
CASE NO. 22-1559

a.    USA Hockey's previous Sexual Abuse, Physical Abuse, Hazing, Background Screening and Locker Room Supervision policies;

b.    new policies addressing Emotional Abuse, Bullying, Threats and Harassment, Electronic Communications, Travel and Billeting;

c.    already existing procedures for taking disciplinary action for violations of any of those policies;

d.    new education and training requirements for SafeSport Training of coaches, officials and other employees and volunteers in USA Hockey programs;

e.    a Reporting Policy making it mandatory to report all allegations of sexual abuse to both USA Hockey and the appropriate law enforcement authorities; and

f.    a mechanism to monitor the programs in USA Hockey, its affiliates and local programs.[30]

71.    Upon USA Hockey's receipt of any report with allegations or suspicions of sexual abuse, a report is made to the United States Center for SafeSport, and any allegations of sexual or physical abuse of a child are reported to law enforcement. In those cases, USA Hockey directs its affiliates to promptly issue a "summary suspension" prohibiting the person from participating in any USA Hockey programs until the allegation has been investigated by the appropriate agency. Summary suspensions are issued so that USA Hockey and its affiliates can take swift action in the event that SafeSport delays issuing its own interim suspension.[31]

72.    Importantly, USA Hockey's mandatory reporting policy applies to all members of USA Hockey and all employees and volunteers of USA Hockey and its member programs.[32]

---

[30] *See* USA Hockey Safe Sport Program Handbook (rev. Dec. 22, 2021), available at https://bit.ly/3tIMWCW (last accessed Jan. 31, 2022).
[31] *Id.,* at 36-41.
[32] *Id.,* at 36.

### 3. Since 1998, USA Swimming has prohibited inappropriate sexual conduct.

73. In 1998, USA Swimming adopted a code of conduct that provided for discipline in cases of "sexual contact or advances directed toward an athlete by a person who, in the context of swimming, was in a position of authority over that athlete."[33]

74. In 2002, the prohibition against sexual advances was modified to include "other inappropriate sexually oriented behavior or action." Specifically, Article 304.3.5 prohibited: "Any sexual contact or advance or other inappropriate sexually oriented behavior or action directed towards an athlete by a coach, official, trainer, or other person who, in the context of swimming, is in a position of authority over that athlete."[34]

75. Effective September 2008, this rule was amended to include language prohibiting sexual harassment and sexual misconduct by any "other adult" participating "in any capacity."[35]

76. In 2010 (effective 2011), USA Swimming added an "Athlete Protection Policy" and "Sexual Misconduct Reporting Requirement" to its rulebook. These changes required reports of sexual misconduct and prohibited retaliation for reporting.[36]

77. In 2012 (effective 2013), USA Swimming clarified that "sexual misconduct" included "other oral, written, visual, or physical conduct"[37] and added a prohibition against bullying.[38] The definition of physical abuse was also expanded to prohibit bullying by a coach.[39]

---

[33] Gunderson Nt'l Child Protection Training Cent., *When the Athlete Is a Child: An Assessment of USA Swimming's Safe Sport Program,* at 9 (Jan. 27, 2014), available at https://www.usaswimming.org/docs/default-source/safe-sportdocuments/safe-sport-basics/2014-vieth-report.pdf (quoting USA Swimming Code of Conduct, § 304.3 (1998 ed.)) (last accessed Feb. 1, 2022).
[34] *Id.* at 9 & n.30 (quoting USA Swimming Code of Conduct, § 304.3 (2002 ed.)).
[35] *Id.* at 9 & n.31 (quoting USA Swimming Code of Conduct, § 304.3.5 (2008 ed.)).
[36] *Id.* at 11-12 (quoting USA Swimming Code of Conduct, § 304.3.5 (2011 ed.)).
[37] *Id.* at 12 & n.45 (quoting USA Swimming Code of Conduct, § 304.3.5, which is now § 304.8 (2013 ed.)).
[38] *Id.* at 12 & n.46 (quoting USA Swimming Code of Conduct, § 304.3.7 (2013 ed.)).
[39] *Id.* at 12-13 & n.47 (quoting USA Swimming Code of Conduct, § 304.3.13 (2013 ed.))

1         **4.**      **In 2007, the International Olympic Committee issued a consensus statement on sexual abuse in sport.**

2

3       78.      In 2007, the International Olympic Committee (IOC) issued a "Consensus

4 Statement" on "Sexual Harassment and Abuse in Sport."[40]

5       79.      The statement cautioned that power differences between athletes and authority

6 figures in sport create the risk of sexual harassment and abuse, and exploitative sexual

7 relationships with athletes.[41] It urged **all sport organizations** to develop policies to protect

8 athletes from sexual abuse and harassment.

9       80.      The statement highlighted the power difference between authority figures and

10 athletes, and urged coaches and other authority figures to "stay . . . within the boundaries of a

11 professional relationship with the athlete."[42]

12       81.      The statement noted the profound, negative impact that sexual harassment and

13 abuse has on the athlete:

14             Research demonstrates that sexual harassment and abuse in sport
seriously and negatively impact on athletes' physical and
15             psychological health. It can result in impaired performance and lead
to athlete drop-out. Clinical data indicate that psychosomatic
16             illnesses, anxiety, depression, substance abuse, self-harm and suicide
are some of the serious health consequences. Passive attitudes/non-
17             intervention, denial and/or silence by people in positions of power in
sport (particularly bystanders) increases the psychological harm of
18             sexual harassment and abuse.  Lack of bystander action also creates
the impression for victims that sexually harassing and abusive
19             behaviours are legally and socially acceptable and/or that those in
sport are powerless to speak out against it.[43]
20

21

22

23

24

25    [40] *See* International Olympic Committee, *IOC Adopts Consensus Statement on "Sexual Harassment and Abuse in Sport"* at 3 (Feb. 8, 2007), available at https://bit.ly/3IUdlEg (last
26 accessed Jan. 31, 2022).
[41] *Id.* at 4.
27 [42] *Id.* at 5.
[43] *Id.* at 4.

28

CLASS ACTION COMPLAINT
CASE NO. 22-1559

**5.** **In 2018, the Energy and Commerce Committee investigated and set out best practices for NGBs to prohibit coach misconduct and track wrongdoing.**

82.     On December 20, 2018, the United States Energy and Commerce Committee (the "Committee") released a report entitled, "Nassar and Beyond: A Review of the Olympic Community's Efforts to Protect Athletes from Sexual Abuse" (the "Nassar and Beyond Report").[44] The report followed a yearlong investigation based on the scandals in gymnastics, swimming, and taekwondo.

83.     The Committee found a number of systemic failures at NGBs, like the NCAA, that contributed to the widespread instances of sexual abuse that "should be concerning not only to Olympic athletes, but also amateur athletes, parents, and anyone who has a loved one involved in amateur sports."[45]

84.     First, the Committee noted that its "most troubling" finding was that the Olympic community inappropriately prioritizes reputation and image—the "medals and money" mentality—rather than athlete safety.[46] This same criticism can be applied to the NCAA's placement of revenue above its duty to protect its student-athletes.

85.     Second, the Committee found an inconsistency in policies and procedures across NGBs. Despite the USOPC's effort to establish minimum standards and an NGB Athlete Safety Policy, each NGB continued to have its own governance structure and applicable bylaws and policies.  As a result, there are inconsistencies in publicly identifying those disciplined or banned and policies to handle reports, complaints or allegations of abuse to USOPC and law

---

[44] Energy & Commerce Comm. Press Release, *Committee Report Details Sexual Abuse in Organized Sports* (Dec. 20, 2018), available at https://republicans-energycommerce.house.gov/news/committee-report-details-sexual-abuse-in-organized-sports/ (last accessed Feb. 2, 2022).
[45] Energy & Commerce Comm., *Nassar and Beyond: A Review of the Olympic Community's Efforts to Protect Athletes from Sexual Abuse* at 3 (Dec. 20, 2018), available at https://republicans-energycommerce.house.gov/wp-content/uploads/2018/12/EC-USOC-Report-12.20.18-Final-REV.pdf (last accessed Feb. 3, 2022).
[46] *Id.*

CLASS ACTION COMPLAINT
CASE NO. 22-1559

enforcement.[47] Here, again, this criticism is applicable to the NCAA, which purports to push responsibility for sexual abuse policies on its 1,200 member institutions.

86.     Third, the Committee found that some NGBs did not employ simple measures, such as background checks and public banned lists.[48] The NCAA also fails to impose simple reporting and tracking procedures for coaches who abuse athletes.

87.     The Committee noted the creation of the United States Center for SafeSport ("USCSS") on March 3, 2017 to oversee education programs for safe sport and to adjudicate claims of sexual misconduct as a step toward establishing consistency and accountability, showing that best practices include a central and neutral oversight organization.[49]

88.     The USCSS itself created the SafeSport Code for the U.S. Olympic and Paralympic Movement (SafeSport Code), effective April 1, 2021.[50]

89.     The SafeSport Code sets out "expectations for Participants related to emotional, physical, and sexual misconduct in sport, including bullying, hazing, and harassment." Prohibited conduct in the SafeSport Code includes sexual misconduct, emotional and physical misconduct, including stalking, bullying, hazing, and harassment, aiding and abetting, and misconduct related to reporting.[51]

90.     In the SafeSport Code, "Sexual misconduct" is specifically defined to include sexual or gender-related harassment and bullying or hazing, or other inappropriate conduct of a sexual nature.[52] Misconduct related to reporting occurs when an adult participant in sport fails to report actual or suspected sexual misconduct to the Center.[53]

---

[47] *Id.*
[48] *Id.* at 3-4.
[49] U.S. Center for SafeSport, *About*, available at https://uscenterforsafesport.org/ (last accessed Jan. 31, 2022).
[50] United States Center for SafeSport, SafeSport Code for the U.S. Olympic and Paralympic Movement (effective Apr. 1, 2021), available at https://uscenterforsafesport.org/wp-content/uploads/2021/04/SafeSportCode2021_040121_V3.pdf (last accessed Jan. 31, 2022).
[51] *Id.,* § IX.
[52] *Id.,* § IX.C.1.
[53] *Id.,* § IX.F.

91.     But the NCAA has retreated from its ability, because of its reach and power, to set standards of conduct governing abusive coaches.

**C.     Despite the Widespread Recognition that Protection of Student-Athletes Is Paramount, the NCAA Has Knowingly Declined to Act.**

**1.     The NCAA has a duty to protect the physical and educational well-being of student-athletes.**

92.     The NCAA is comprised of 1,098 colleges and universities and 102 athletic conferences.[54] The NCAA schools are divided into Division I, Division II and Division III schools. Division I institutions are the most visible collegiate athletic programs.

93.     Each division within the NCAA is governed by rules applicable to all NCAA institutions, as well as rules unique to that division. The Division I Manual sets forth the Constitution, Operating Bylaws, and Administrative Bylaws for that division (at times referred to collectively as "Manual").[55]

94.     The current NCAA Constitution defines the NCAA's purposes and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and the participating student-athletes. The NCAA Constitution states in pertinent part:

> **1.2 Purposes.** The purposes of this Association are:
>
> (a) To initiate, stimulate and improve intercollegiate athletics programs for student athletes . . . ;
>
> (b) To uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this Association; . . . [and]
>
> (h) To legislate, through bylaws or by resolutions of a Convention, upon any subject of general concern to the members related to the administration of intercollegiate athletics[.][56]

---

[54] NCAA, *What is the NCAA?*, available at http://www.ncaa.org/about/resources/media-center/ncaa-101/what-ncaa (last accessed Feb. 1, 2022).
[55] NCAA Division I Manual (effective Aug. 1, 2021), available at https://web3.ncaa.org/lsdbi/reports/getReport/90008 (last accessed Feb. 1, 2022).
[56] NCAA Const., Art.1, §§ 1.2(a), (b) & (h).

95.     Article 2.2 of the current NCAA Constitution specifically provides for the well-being of the NCAA's student-athletes, including in the areas of health and safety and student-athlete/coach relationships:

> **2.2   The   Principle   of   Student-Athlete   Well-Being.**   [*] Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes. (Revised: 11/21/05)
>
> *          *          *
>
> **2.2.3 Health and Safety.** [*] It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. (Adopted: 1/10/95)
>
> **2.2.4   Student-Athlete/Coach   Relationship.**   [*]   It   is   the responsibility of each member institution to establish and maintain an environment that fosters positive relationship between the student-athlete and coach. (Adopted: 1/10/95)[57]

96.     Moreover, when it comes to gender equity, which includes sexual abuse and harassment, the NCAA has expressly undertaken the duty to adopt rules to ensure member institutions' compliance with gender equity laws. Article 2.3.2 of the NCAA Constitution provides in pertinent part:

> **2.3.2 NCAA Legislation.** [*] The Association should not adopt legislation that would prevent member institutions from complying with applicable gender-equity laws, and should adopt legislation to enhance member institutions' compliance with applicable gender-equity laws. (Adopted: 1/11/94)[58]

97.     In addition to its Constitution, the NCAA has consistently recognized and publicly proclaimed its duty to provide a safe environment for student-athletes. President and Board Member Mark Emmert proclaimed in Congressional testimony that the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes."[59]

---

[57] *Id.*, Art. 2, §§ 2.2, 2.2.3 & 2.2.3.
[58] *Id.*, Art. 2, § 2.3.2.
[59] U.S. Senate, Comm. on Commerce, Science and Transp., *Promoting the Well-Being and Academic Success of College Athletes* 60-61 (July 9, 2014) available at https://bit.ly/3i596YO (last accessed Feb. 9, 2022).

CLASS ACTION COMPLAINT
CASE NO. 22-1559

98.     In addition, the NCAA's website states that it was founded in 1906 "to keep college athletes safe." "We are working hard to protect them physically and mentally, on the field and off."[60]

**2.      The NCAA regulates coaches in a myriad of ways—except when it comes to sexual harassment and sexual abuse of student-athletes.**

99.     The NCAA expressly regulates the conduct of coaches in a myriad of ways.

100.     Article 10 of the NCAA Bylaws is titled "Ethical Conduct," and applies to coaches of intercollegiate athletics, among others. It provides a detailed list of unethical conduct.[61] That unethical conduct includes, among other things, sports wagering, providing banned substances, providing a prospective or current student-athlete with an improper inducement or extra benefit, and facilitating a meeting between a student-athlete and an agent.[62] Institutional members such as coaches who violate this provision are subject to disciplinary or corrective action.[63]

101.     Article 11 of the NCAA Bylaws, entitled "Conduct and Employment of Athletics Personnel," further explains the responsibilities and obligations of coaches and other athletics personnel. The section regulates coaching bonuses and other compensation, education requirements and compensation restrictions for certain types of coaching personnel, responsibility for violations of NCAA regulations, marketing to sports agents, the use of the NCAA name, the use of tobacco, required contractual provisions, recruiting, scouting, and limitations on the number and duties of coaching and other staff members.[64] Again, coaches and other athletic personnel are subject to disciplinary or corrective action for violating these Bylaws.[65]

102.     Yet, the Bylaws are utterly silent on limitations on coaches with respect to sexual harassment or abuse of student-athletes and sexual relationships with student-athletes; internal or external reporting of coaches who engage in such behavior; the necessity for an independent

---

[60] NCAA, *Well-Being*, available at http://www.ncaa.org/health-and-safety (last accessed Feb. 1, 2022).
[61] NCAA Bylaws, Art. 10.
[62] *Id.,* § 10.1-10.3.
[63] *Id.,* § 10.4.
[64] NCAA Bylaws, Art. 11, § 11.1.
[65] *Id.,* §11.1.1.

investigation of coaches who engage in such behavior; implementation of a centralized repository for reports so that complaints about a coach can be tracked between and among schools; and mandatory training of coaches relating sexual harassment or abuse of student-athletes.

103.    A recent example of the perils created by the NCAA's lack of a reporting policy involves Art Briles, who coached at Baylor and left in the midst of a scandal because he failed to report sexual assaults, but was hired recently by Grambling State after a stint as a high school coach.[66]

104.    While the NCAA freely metes out punishments for student-athletes for poor academic performance and disciplines athletes for profiting off their own likenesses, the NCAA's Constitution and Bylaws simply do not contain any penalties for sexual, violent, or criminal conduct by coaches or personnel in the athletics programs.

### 3.    In the vacuum of the NCAA's failure to regulate abuse by coaches, student-athletes are the victims.

105.    Despite the USOPC's adoption of a coaching code of ethics in 1992, which prohibited sexual harassment and sexual relationship between coaches and athletes during the coaching relationship, the NCAA took no action for 20 years and then fell short.

106.    During that time, multiple reports of inappropriate sexual conduct by athletics department personnel emerged. A sampling of non-exhaustive reports follows.

107.    In 1998, a lawsuit was filed against University of North Carolina soccer coach Anbson Dorrance by two players who accused Dorrance of inappropriate behavior that included uninvited sexual comments and retaliation. As one court opinion characterized the allegations, Dorrance regularly "bombarded players with crude questions and comments about their sexual

---

[66] Alanis Thames, *Art Briles, Who Coached Baylor During Sexual Assault Scandal, Is Hired at Grambling State*, NEW YORK TIMES (Feb. 24, 2022), available at https://www.nytimes.com/2022/02/24/sports/ncaafootball/art-briles-grambling-state-baylor.html (last accessed Mar. 1, 2022).  Briles resigned four days later in the midst of public outrage—but not because the NCAA had polices in place. Alanis Thames, *Art Briles Resigns From Grambling State*, NEW YORK TIMES (Feb. 28, 2022), available at https://www.nytimes.com/2022/02/28/sports/football/art-briles-grambling-state.html (last accessed Mar. 8, 2022).

CLASS ACTION COMPLAINT
CASE NO. 22-1559

activities and made comments about players' bodies that portrayed them as sexual objects. In addition, Dorrance expressed (once within earshot of [plaintiff Melissa] Jennings) his sexual fantasies about certain players, and he made, in plain view, inappropriate advances to another."[67] One of the players settled in 2004. The second, Melissa Jennings, settled for $385,000 in 2006 with an admission by the coach that he had "participated with members of the UNC-Chapel Hill women's soccer team in group discussions of those team members' sexual activities or relationships with men."[68]

108.    Also in 1998, a lawsuit was filed against Jesse Dwire, the women's tennis coach at Syracuse University, alleging that Dwire massaged, fondled, and propositioned two scholarship tennis players, and that Dwire and the university retaliated against the players after they pursued a complaint through the school's grievance system. According to one report: "the lawyer for [the plaintiffs], said Syracuse officials, aware that the National Collegiate Athletic Association has no policy on sexual harassment, had ignored complaints about Dwire's sexual improprieties for years."[69]

109.    In 2011, a former University of South Carolina women's soccer player sued the university, alleging she received unwanted sexual advances by the assistant coach and that her academic advisor admitted that the coach had sexually harassed other students. She also alleged that the university failed to renew her scholarship in retaliation for her complaint.[70]

110.    In June 2012, Penn State's Jerry Sandusky was convicted on 45 counts relating to the sexual abuse of minors and was sentenced to 30 to 60 years in prison. Several top Penn State University officials, including its president and athletic director, were sentenced to prison for their roles in covering up the crimes.

---

[67] *Jennings v. Univ. of N.C.,* 482 F.3d 686, 691 (4th Cir. 2007).
[68] Doug Lederman, *North Carolina and Coach Settle Sexual Harassment Suit*, INSIDE HIGHER ED. (Jan. 15, 2008), available at https://www.insidehighered.com/news/2008/01/15/north-carolina-and-coach-settle-sexual-harassment-suit (last accessed Feb. 1, 2022).
[69] Robin Finn, *Growth in Women's Sports Stirs Harassment Issue*, NEW YORK TIMES (Mar. 7, 1999), available at https://www.nytimes.com/1999/03/07/sports/out-of-bounds-a-special-report-growth-in-women-s-sports-stirs-harassment-issue.html (last accessed Feb. 1, 2022).
[70] WISNews, *Former USC Women's Soccer Player Files Lawsuit* (Dec. 11, 2011), available at https://www.wistv.com/story/16301453/former-usc-womens-soccer-player-files-lawsuit/ (last accessed Feb. 1, 2022).

a.  Penn State had been aware since 2002 that Sandusky committed sexual acts on a young boy in a shower. Yet the university did nothing, which allowed Sandusky to abuse ten young football players over a 15-year period.

b.  On July 23, 2012, in response to public pressure, the NCAA imposed punishment on Penn State because of its "conspiracy of silence" relating to Jerry Sandusky's sexual abuse of minor boys. The penalties included a $60,000,000 fine (which equated to one year's gross revenue from the university's football program) to endow a fund to support programs to assist victims of sexual abuse; a ban on Penn State's participation in post-season football games for four years; a reduction in the number of football scholarships from 25 to 15 per year for four years; and vacating all of the team's wins from 1998 (when university officials first heard that Sandusky might be sexually abusing young boys) to 2011.[71]

c.  The NCAA announced that its punishment of Penn State was intended to "driv[e] cultural change," because of the "tragic damage that has been done to the victims or their families." In announcing the punishment, NCAA President Mark Emmert stated:

> This case involves tragic and tragically unnecessary circumstances. One of the grave dangers stemming from our love of sports is that the sports themselves can become too big to fail and indeed too big to even challenge. The result can be an erosion of academic values that are replaced by the value of hero worship and winning at all costs. All involved in intercollegiate athletics must be watchful that programs and individuals do not overwhelm the values of higher education. In the Penn State case, the results were perverse and unconscionable. No price the NCAA can levy will repair the grievous damage inflicted by Jerry Sandusky on his victims. However, we can make clear that the culture, actions and inactions that allowed them to be victimized will not be

---

[71] Mark Memmott, *Penn State Fined $60M, Banned From Bowls, Wins From 1998 On Vacated*, NPR (July 23, 2021), available at https://www.npr.org/sections/thetwo-way/2012/07/23/157222533/penn-state-fined-60m-banned-from-bowls-wins-from-1998-on-vacated (last accessed Feb. 9, 2022).

1        tolerated in collegiate athletics.[72]

2        d.      Yet some of the penalties were later rescinded because the NCAA was

3                accused of strong-arming Penn State into accepting the punishments.[73]

4    111.    Larry Nassar, like Sandusky, is also serving a prison sentence for the sexual abuse

5    he inflicted over decades. The long-time USA Gymnastics national team doctor and physician at

6    Michigan State University sexually abused hundreds of athletes under his care. Over 350 athletes,

7    including Olympic champions Simone Biles, Gabby Douglas, and Aly Raisman, publicly accused

8    Nassar of sexually abusing them. After numerous emotional testimonies from victims, the

9    disgraced physician was sentenced up to 175 years in prison on sexual assault charges.[74]

10        a.      Complaints were reportedly made to Michigan State University about

11                Larry Nassar as far back as 1988. But Michigan State did not take any

12                appropriate action, and instead, chose to protect its reputation (and

13                endowments) to the detriment of the victims, thereby allowing Nassar to

14                thrive unchecked for decades at the expense of his victims.

15        b.      At least 14 individuals at Michigan State, including its President Lou Anna

16                Simon, athletic trainers, and assistant coaches, had known about

17                complaints regarding Nassar, yet they allowed the abuse to continue

18                unabated for 20 years.[75]

19        c.      As with Penn State, it was only after Nassar was convicted and sentenced

20

21

22    [72] Remarks by Mark Emmert, *Penn State Hit With Severe NCAA Sanctions: $60 Million Fine, Wins Vacated, 4-Year Bowl, Playoff Ban*, YOUTUBE (July 23, 2021), available at https://www.youtube.com/watch?v=MGItBWWTN0k (last accessed Feb. 9, 2022).

23    [73] Marc Tracy, *In Michigan State Investigation, N.C.A.A. Moves Beyond Its Comfort Zone*, NEW

24    YORK TIMES (Jan. 24, 2018), available at https://www.nytimes.com/2018/01/24/sports/ncaa-investigation-michigan-state.html (last accessed Feb. 9, 2022).

25    [74] In February 2019, Nassar was sentenced to 40-175 years after pleading guilty to seven counts of criminal sexual misconduct in Ingham County, Michigan. Two weeks later, he was sentenced to 40-125 years for pleading guilty to three counts of criminal sexual conduct in Eaton County,

26    Michigan.

    [75] Kim Kozlowski, *What MSU Knew: 14 Were Warned of Nassar Abuse*, THE DETROIT NEWS

27    (Jan. 18, 2018), available at https://www.detroitnews.com/story/tech/2018/01/18/msu-president-told-nassar-complaint-2014/1042071001/ (last accessed Feb. 9, 2022).

28

CLASS ACTION COMPLAINT
                                                         CASE NO. 22-1559

1       that the NCAA announced an investigation into Michigan State's handling

2       of the allegations against Nassar in January 2018. The goal of the

3       investigation was to determine if Michigan State violated any NCAA

4       rules.[76]

5       d.    In August 2018, the NCAA dropped its investigation of Michigan State,

6       finding that Michigan State had not violated any of the NCAA's bylaws.

7       The NCAA stated that despite the allegations of abuse (and despite

8       Nassar's criminal convictions), the NCAA had "not substantiated

9       violations of N.C.A.A. legislation."[77]

10   112.    Reports of sexual abuse by athletics department personnel continued. In May

11   2019, an investigative report issued by the law firm Perkins Coie revealed that Ohio State coaches

12   and athletics administrators knew for two decades that a team doctor, Richard Strauss, was

13   molesting NCAA student-athletes on the wrestling team.[78]

14   113.    In August 2020, former NCAA student-athletes from the University of Michigan

15   alleged they were sexually abused by team physician Dr. Robert Anderson, under the guise of

16   physical exams. The team doctor for the wrestling, football, hockey and track teams, Dr.

17   Anderson reportedly abused hundreds of student-athletes over 37 years.[79]

18       **4.**    **Even when the NCAA addresses abuse, the NCAA's policies and**
19       **pronouncements lack teeth.**

20   114.    After 2014, the NCAA seemingly began to take a more visible stance on the topic

21   of sexual assault prevention, but its policies and pronouncements were without teeth. In 2014, the

---

23   [76] Faith Karimi & Wayne Sterling, *NCAA Investigating Michigan State Over Larry Nassar Case*,
24   CNN (Jan. 24, 2018) available at https://www.cnn.com/2018/01/24/us/ncaa-msu-nassar-investigation/index.html (last accessed Feb. 9, 2022).
25   [77] Marc Tracy, *N.C.A.A. Drops Michigan State Inquiry Over Nassar*, NEW YORK TIMES (Aug. 30, 2018), available at https://www.nytimes.com/2018/08/30/sports/ncaa-michigan-state-nassar.html (last accessed Feb. 9, 2022).
26   [78] Perkins Coie LLP, *Report of the Independent Investigation Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University* (May 15, 2019), available at
27   https://compliance.osu.edu/assets/site/pdf/Revised_report.pdf (last accessed Feb. 1, 2022).
28   [79] *37 Years of Sexual Abuse: This Is the Dr. Robert Anderson Story*, THE MICHIGAN DAILY (Nov. 4, 2021), available at https://www.michigandaily.com/news/robertanderson/ (last accessed Feb. 1, 2022).

NCAA Executive Committee issued a Statement on Sexual Violence Prevention and Compliance

Resolution:

**2014 NCAA EXECUTIVE COMMITTEE SEXUAL VIOLENCE PREVENTION AND COMPLIANCE RESOLUTION**

WHEREAS NCAA Constitution Article 4.1.2 charges the NCAA Executive Committee with identifying core issues that affect the Association as a whole and with overseeing Association-wide issues and ensuring that each division operates consistent with the basic purposes, fundamental policies and general principle of the Association;

WHEREAS the Executive Committee regularly takes action to preserve and enhance student-athlete health, safety and well-being and promote nondiscriminatory and effective learning and competitive environments;

WHEREAS NCAA Constitution Article 2.2.3 requires each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes;

WHEREAS the U.S. Department of Education Office for Civil Rights has issued guidance related to sexual harassment, bullying and violence against all students under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq, which applies to all educational entities, including athletics programs, of higher education institutions receiving federal financial assistance and which states that sexual violence includes rape, sexual assault, sexual battery, sexual coercion and gender-based harassment.

Now, Therefore, Be It Resolved, that the Executive Committee recognizes the importance of addressing the abhorrent societal issue of sexual violence, especially when it occurs on our campuses. The Executive Committee acknowledges

that it is our members' collective responsibility to maintain campuses as safe places to learn, live, work and play. The Executive Committee expects NCAA members to ensure that the values and principles articulated in the Constitution to protect the health and safety of student-athletes, operate fairly and ethically, and further to ensure that student-athletes are neither advantaged nor disadvantaged by special treatment and that institutions' athletics departments must:

- Comply with campus authorities and ensure that all athletics staff, coaches, administrators and student-athletes maintain a hostile-free environment for all student-athletes regardless of gender or sexual orientation; know and follow campus protocol for reporting incidents of sexual violence; report immediately any suspected sexual violence to appropriate campus offices for investigation and adjudication.

- Educate all student-athletes, coaches and staff about sexual violence prevention, intervention and response.

- Ensure compliance with all federal and applicable state regulations related to sexual violence prevention and response.

- Cooperate with, but not manage, direct, control or interfere with, college or university investigations into allegations of sexual violence, ensuring that investigations involving student-athletes and athletics department staff are managed in the same manner as all other students and staff on campus.

115. Yet the resolution puts responsibility for protecting NCAA student-athletes on the colleges and universities: "it is our members' collective responsibility to maintain campuses as safe places to learn, live, work and play."[80] The resolution sets out four unremarkable mandates for the institutions' athletics departments, to: (i) "Comply with campus authorities and ensure that all athletics staff, coaches, administrators and student-athletes maintain a hostile-free environment for all student-athletes;" (ii) "Educate all students-athletes, coaches and staff about sexual violence prevention, intervention and response;" (iii) "Ensure compliance with all federal and applicable state regulations related to sexual violence prevention and response;" and (iv)

---

[80] NCAA, *Sexual Violence Prevention, An Athletics Took Kit for a Healthy and Safe Culture* ((2d ed.), Appendix A, available at https://ncaaorg.s3.amazonaws.com/ssi/violence/SSI_SexualViolencePreventionToolkit.pdf (last accessed Feb. 3, 2022).

"Cooperate with, but not manage, direct, control or interfere with, college or university investigations."[81]

116.    In 2016 (updated 2019), and in furtherance on the above resolution, the NCAA's Sport Science Institute published a document entitled "Addressing Sexual Assault and Interpersonal Violence: An Athletics' Tool Kit for a Healthy and Safe Culture" ("Tool Kit").[82]

117.    In it, the NCAA broadly defines "sexual misconduct" to include "sexual and gender-based harassment, sexual assault/sexual violence, stalking and intimate partner violence."[83]

118.    Again, however, the NCAA foists responsibility for ensuring college student-athlete environments are safe and healthy solely on the institutions themselves: "Member schools have a responsibility to have healthy environments for prospective and current student-athletes both on and off campus."[84]

119.    Indeed, in his introduction, NCAA President Mark Emmert said, "The college sports community – including the college and university presidents and chancellors on the NCAA Board of Governors – recognize **member schools and conferences have a collective responsibility to maintain campuses as safe places to learn, live work and play.**"[85]

120.    And even though the NCAA acknowledged that coaches have an "influential" relationship over student-athletes,[86] the NCAA identifies coaches as those tasked with "preventing and responding to sexual violence,"[87] thereby ignoring the fact that coaches are equally likely to be perpetrators of sexual harassment and other sexual misconduct.

---

[81] *Id.*
[82] *Id.*. On its website, the NCAA states that the "NCAA's Sports Science Institute promotes health and safety through research and training on . . . sexual assault and more." NCAA, *How We Support College Athletes*, available at https://www.ncaa.org/sports/2015/12/1/about-resources-media-center-ncaa-101-how-we-support-college-athletes.aspx (last accessed Feb. 3, 2022).
[83] Tool Kit, *supra*, at 1.
[84] Tool Kit, *supra*, Call to Action.
[85] Tool Kit, *supra*, Introduction from the President (emphasis added).
[86] Tool Kit, *supra*, at 1; *see also* Tool Kit, *supra*, at 5 ("Coaches . . . directly influence student-athletes' attitudes and behaviors.").
[87] Tool Kit, *supra*, Call to Action & p.3.

121.    In 2017 (updated 2018), the NCAA adopted an association-wide policy on campus sexual violence. The NCAA noted that "[s]exual discrimination, sexual harassment and sexual violence violate human decency and the Association's core values."[88] Yet the goals outlined in the policy were called "aspirational," and the policy merely mandated annual attestations from each university chancellor/president, athletics director, and Title IX coordinator regarding compliance with the universities' own policies.[89]

122.    Despite the NCAA's awareness of the issue of sexual violence affecting its student-athletes, it has resisted any meaningful reforms despite calls by eight U.S. senators and its own commission. Instead, in 2018, the study group called the Commission to Combat Campus Sexual Violence was disbanded, and the NCAA merely promised only to continue to "monitor and track on sexual violence issues." No further action has been taken.[90]

123.    The *USA Today* reported on what it called the "Predator Pipeline," showing how sexually violent student-athletes (not unlike coaches) are allowed to migrate from one NCAA school to another and yet remain eligible to play:

> No matter if a school suspends, dismisses or expels athletes for sexual misconduct, NCAA rules provide avenues for them to return to the field on a new team within a year and sometimes immediately; players routinely exploit the NCAA's own loopholes to circumvent penalties; a handful of the NCAA's Division I conferences have adopted their own policies ban athletes with past behavioral problems, but definitions of culpability vary, and most rely on the honor system, not record checks, to verify recruits.[91]

---

[88] Tool Kit, *supra,* Appendix B.
[89] *Id.*
[90] *See* Kenny Jacoby, NCAA Board of Governors to Review Policies Regarding Sexual Assault Amid Congressional Pressure on 'Predator Pipeline,' USA TODAY (Jan. 16, 2020), available at https://www.usatoday.com/story/sports/college/2020/01/16/ncaa-predator-pipeline-focus-congressional-bill-athletes-sexual-assault/4492088002/ (citing NCAA committee minutes) (last accessed Feb. 1, 2022).
[91] Kenny Jacoby, *NCAA Looks the Other Way as College Athletes Punished for Sex Offenses Play On*, USA TODAY (Dec. 12, 2019) available at https://www.usatoday.com/in-depth/news/investigations/2019/12/12/ncaa-looks-other-way-athletes-punished-sex-offenses-play/4360460002/ (last accessed Feb. 1, 2022).

124.   Similarly, in the wake of the *USA Today* investigatory report and introducing legislation, U.S. Representative Donna Shalala stated:

> College sports, as overseen by the NCAA, have undergone a massive transformation in recent years . . . . As profits, compensation for coaches, and spending on luxurious athletic facilities have ballooned, the association has repeatedly failed to address systemic problems with respect to the health and well-being of student athletes . . . . It is time for Congress to intercede in order to protect college athletes and maintain the integrity of college sports once and for all.[92]

125.   In response to the *USA Today* investigation, starting with the 2021-22 school year, the NCAA requires college athlete transfers to disclose to schools whether their conduct has previously resulted in an investigation, discipline through a Title IX proceeding, or a criminal conviction for sexual violence. Schools will be required to take reasonable steps to confirm this information.[93]

126.   Yet the NCAA declines to impose such requirements on coaches and other athletics department personnel who commit the same or similar acts and continue to enjoy perhaps even greater immunity as they migrate from one NCAA institution to another for their entire careers.

---

[92] J. Brady Mccollough, *Congressional Commission Proposed to Address NCAA's 'Systemic Problems,'* LOS ANGELES TIMES (Dec. 19, 2018), available at https://www.latimes.com/sports/story/2019-12-19/congressional-commission-proposed-to-address-ncaas-systemic-problems (last accessed Feb. 3, 2022).
[93] Hulst & Handler, LLP, *Investigation Report Regarding Allegations of Sexual Misconduct Involving the University of San Francisco Men's Soccer Team* 43-44, n.67 (Jan. 11, 2021), available at https://bit.ly/3vN0wrB (last accessed Feb. 4, 2022).

CLASS ACTION COMPLAINT
CASE NO. 22-1559

1

2

**5.      Because of its keen awareness of the problem it fostered and its desire to avoid liability, the NCAA continues to focus on decentralization to the detriment of its student-athletes.**

3         127.    Despite its "clear, moral obligation" to protect the health and well-being of its

4    student-athletes, the NCAA's lawyers have created a strategy in an effort to avoid liability that is

5    directly contrary to the positions the NCAA uses to recruit student-athletes.

6         128.    For example, in the appeal to the California Supreme Court in the case of *Brown v.*

7    *USA Taekwondo*, No. S259216 (Cal.), the NCAA filed an amicus curiae brief in support of the

8    sports organization respondent.[94]

9         129.    In *Brown*, the California appellate court found that USA Taekwondo ("USAT")

10   owed a duty of care to plaintiffs who were sexually abused by a coach under the control of the

11   USAT, but the USOPC owed no similar duty.[95]

12        130.    In its amicus curiae brief filed before the California Supreme Court, the NCAA

13   posited that sports organizations have no duty at law to protect their athletes from sexual abuse by

14   coaches. Sidestepping the fact that it has not promulgated any policies prohibiting such abuse, the

15   NCAA argued that it has "limited ability" to "enforce appropriate policies and best practices."[96]

16   The NCAA also denied it could impose mandatory reporting of its member institutions regarding

17   abusive coaches, claiming that it cannot "monitor the day-to-day conduct of coaches."[97]

18        131.    In staking out this position, however, the NCAA omitted its detailed proscriptions

19   governing the day-to-day conduct of those very same coaches – including their tobacco use –

20   whom the NCAA can and does sanction.[98]

21        132.    The NCAA's argument that "the NCAA's members have decided that they—

22   rather than the NCAA itself—are better positioned to ensure the health and safety of the student-

23   _____

24   [94] Application to file Amicus Curiae Brief and Brief of Amicus Curiae of the National Collegiate Athletic Association in Support of Respondent the United States Olympic Committee, No.

25   S259216, 2020 WL 5705929 (Sept. 22, 2020) ("NCAA Brief").
     [95] *Brown v. USA Taekwondo*, 40 Cal. App. 5th 1077, *as modified on denial of reh'g*, (2019), *aff'd*

26   11 Cal. 5th 204 (2021).
     [96] NCAA brief, 2020 WL 5705929, at *27.

27   [97] *Id.,* at *26.
     [98] *See* NCAA Bylaws, Art. 10, §10.4 and Art. 11, §11.1.1.

28

CLASS ACTION COMPLAINT
CASE NO. 22-1559

athletes they enroll"[99] reveals the slippery slope on which the NCAA stands. This is because the NCAA member institutions have the strongest incentive to cover up coaches' bad behavior to preserve institutional reputations and the attendant alumni donations, athletic revenue, and enrollment.

133.    The examples of Penn State, Michigan State, Michigan, and Ohio State have proven this to be true. The NCAA's argument, that it has "limited ability to take on that burden" rings hollow in view of the NCAA's wealth, reach, micro-management of both coaches and athletes when it comes to minor infractions, and considering that it employs a nearly 60-member enforcement staff to investigate potential violations of amateurism and academic eligibility rules.[100]

134.    The NCAA's decentralization, giving responsibility to the institutions, divisions, and conferences to protect student-athletes from sexual harassment and abuse, is at odds with best practices on how to protect student-athletes from sexual harassment and abuse.

135.    As stated above, the United States Energy and Commerce Committee's 2018 Nassar and Beyond Report concluded that there has been a "systemic failure across the Olympic community to adequately protect athletes, particularly with respect to the case management of instances involving sexual misconduct or abuse." One "troubling" finding related to the USOPC's prioritizing reputation and image over athlete safety. This was because the USOPC determined that it "does not have athletes" to protect from sexual abuse, and instead, that protecting the athletes was the responsibility of each NGB. Yet the NGBs—not unlike the colleges and universities—have the greatest incentive to protect their reputations at the expense of the athletes.

136.    Another finding of the Nassar and Beyond Report was that despite the USOPC's governance support, each of the 48 NGBs had its own policies and procedures which created inconsistencies. The Committee found inconsistencies in critical areas such as publishing the names (or not) of those previously disciplined or banned from sport and the handling of

---

[99] *Id.,* at *27.
[100] Predator Pipeline, *supra*.

complaints of sexual abuse.[101] Because of the disparate rules, and the difference in enforcement, abusers were allowed to exist and thrive without any oversight. This is not unlike the NCAA squarely placing student-athlete safety and policies in the hands its 1,200 colleges and universities.

137.    Thus, the NCAA's decentralization is contrary to recent, empirical evidence of best practices, and will likely lead to less protections for student-athletes from sexual assault, abuse, and harassment.

138.    The NCAA's strategy in furtherance of its attempt to disavow liability is all the more evident with the NCAA's enactment of a new constitution. Claiming to "better meet the needs of our student-athletes," the NCAA announced the adoption of a new constitution on January 20, 2022. The NCAA constitution supposedly "underscores the importance of both physical and mental health and emphasizes diversity, inclusion and gender equity."[102]

139.    Yet the NCAA's new constitution was whittled from 43 pages to 19. While the preamble to the constitution states that the "basic purpose" of the NCAA "is to support and promote healthy and safe intercollegiate athletics,"[103] this new constitution decentralizes decision-making, and attempts to pin responsibility for student welfare on the member institutions.

### D.    With the NCAA's Tacit Blessing, the University of San Francisco Permitted Sexual Exploitation of Student-Athletes on and off the Field.

#### 1.    Neither the Archdiocese of San Francisco nor USF are strangers to sexual abuse and abuse of power.

140.    The University of San Francisco is a Catholic, Jesuit institution.[104] One of its core

---

[101] Nassar and Beyond, *supra*, at 45-61.
[102] Corbin McGuire, *NCAA Members Approve New Constitution*, NCAA (Jan. 20, 2022), available at https://www.ncaa.org/news/2022/1/20/media-center-ncaa-members-approve-new-constitution.aspx (last accessed Feb. 1, 2022).
[103] NCAA Constitution, Preamble (effective Aug. 1, 2022), available at https://s3.amazonaws.com/governance/ncaa/constitution/NCAAGov_Constitution121421.pdf  (last accessed Feb. 1, 2022).
[104] USF, *Facts & Statistics*, available at https://www.usfca.edu/about-usf/what-you-need-to-know/facts-statistics (last accessed Mar. 8, 2022).

1  religious values is *cura personalis,* which translates to "care for the whole person."[105]

2       141.    USF is part of the Catholic Archdiocese of San Francisco. Saint Ignatius Church is

3  located on the University of San Francisco campus. The church serves a parish of the Catholic

4  Archdiocese of San Francisco and is the university's chapel. [106]

5       142.    A 2018 report of alleged sexual assaults and misconduct among three Bay Area

6  dioceses, including the San Francisco Archdiocese, found that five alleged offenders were priests

7  affiliated with USF at one point in their careers. Those priests were assigned to USF over a span

8  of 32 years, from 1949 to 1981, though the report did not say whether the abuse occurred on the

9  USF campus. Three of the priests faced legal proceedings that included criminal convictions.[107]

10       143.    Referring to the history of sexual abuse in the church, USF's president, Fr. Paul

11  Fitzgerald, vowed to take sexual abuse matters seriously:

12            But the cover-up by civil and religious authority figures allowed
abusers to become repeat offenders; in my view, this is the heart of
13            the scandal. Today, any abuse is promptly reported to the authorities,
who take these matters extremely seriously.[108]
14

15       144.    After the report's revelations, Fr. Fitzgerald also promised to promote a better

16  culture at USF that supports survivors and includes transparency:

17            Abuse of power is at once infuriating and disillusioning.  We cannot
become inured to these published reports and revelations, whether
18            they occur within the Catholic Church, another organization or even
our own community. We must all work to promote a culture that
19            prevents abuse, hears and supports survivors, seeks transparency and
advances reform. I write to assure you that I am committed to acting
20            against all forms of abuse of power by any member of our
community, including the Jesuits.[109]
21

22

23  ---

24  [105] USF, *Our Values*, available at https://www.usfca.edu/about-usf/who-we-are/our-values (last
accessed Mar. 8, 2022).
  [106] USF, *Facts & Statistics*, available at https://www.usfca.edu/about-usf/what-you-need-to-
25  know/facts-statistics (last accessed Mar. 8, 2022).
  [107] Izzie Hallock, *Alleged Sex Abusers Include USF Jesuits*, SAN FRANCISCO FOGHORN (Nov. 8,
26  2018), available at http://sffoghorn.com/alleged-sex-abusers-include-usf-jesuits/ (last accessed
Mar. 8, 2022).
27  [108] *Id.*
[109] *Id.*

28

CLASS ACTION COMPLAINT
CASE NO. 22-1559

145.    Despite Fr. Fitzgerald's public statements, sexual abuse has been a continuing problem on the USF campus – and one that is known to the administration.

146.    In July of 2020, allegations of sexual assault and abuse were revealed against the USF Men's Soccer Team.[110] A Change.org petition described a homophobic and misogynistic "toxic" sexual environment in the men's soccer team which led to the suspension of a professional soccer player based on his conduct while a student at USF.[111] The petition, signed by over 5,000 individuals, demanded that USF investigate claims of sexual misconduct involving the men's soccer team. The petition also claimed that USF's system for reporting is not effective and that USF diminishes and dismisses allegations of sexual misconduct against soccer players.[112]

147.    USF undertook an investigation involving the men's soccer team and USF's handling of such misconduct.[113] On January 11, 2021, a 53-page investigative report was released.

148.    Despite the graphic detail of the incidents revealed and its finding that 11 soccer players were accused of engaging in sexual misconduct over the past decade, the investigative report determined that it is more likely than not that sexual misconduct and/or disrespectful behavior toward women and/or LGBTQIA individuals was **not** pervasive among members of the USF men's soccer team over the past decade, and that USF had acted diligently in response to reported allegations of sexual misconduct involving soccer players over the past 10 years.[114]

149.    In response to the release of the report, Fr. Fitzgerald took a strong stance against sexual misconduct:

> Sexual misconduct and sex and gender discrimination are not tolerated at USF and we take all allegations of sexual assault seriously. Whether occurring days or decades ago, on or off-campus,

---

[110] Gabriel Greschler, *Sexual Assault Allegations Against Soccer Team Members Prompt a Reckoning For USF*, SF EXAMINER, available at https://www.sfexaminer.com/sports/sexual-assault-allegations-against-soccer-team-force-a-reckoning-for-usf/ (last accessed Mar. 8, 2022).
[111] Petition, *USFCA TAKE ACTION NOW! Alleged Sexual Allegations on the USFCA Men's Soccer Team*, available at https://www.change.org/p/university-of-san-francisco-usfca-take-action-now-alleged-sexual-allegations-on-the-usfca-men-s-soccer-team?original_footer_petition_id=&grid_position=&pt= (last accessed Mar. 8, 2022).
[112] *Id.*
[113] USF Investigative Report, *supra*.
[114] *Id.* at 3 (emphasis added).

CLASS ACTION COMPLAINT
CASE NO. 22-1559

all reports of sexual misconduct received by the university are investigated thoroughly.

*        *        *

Our goal is to equip students with the understanding that sexual misconduct is not tolerated at USF and with the tools to intervene if they see something that may cause harm to another person. USF offers employee educational programs with the goal of fostering a safe and supportive working and learning environment. Our policies are continually reviewed and refined to ensure that sexual assault, harassment, and discrimination have no place at USF.

*        *        *

Together with our staff in Title IX, we affirm our commitment to students, and all members of the USF community, to continue working toward a more positive, safe, and healthy campus. We affirm our commitment to responding to all incidents of sex and gender discrimination, providing pathways of opportunities for victims and survivors to learn about resources, supportive measures, and accountability options. We invite students, faculty, and staff to join us in these efforts and reaffirm their commitments to the betterment of our community.[115]

150.   As a result of the allegations, a new deputy Title IX coordinator position was filled to work directly with Athletics; a new Policy on Nondiscrimination Based on Sex and Gender, Sexual Harassment, and Sexual Misconduct for Students, Employees, and Third Parties was approved; and a review of Athletics was undertaken with every coach and team as a part of an extensive review of the Athletics Student Handbook as it pertains to sex and gender discrimination, harassing behavior, and sexual misconduct.[116]

151.   Yet *Sports Illustrated* ("SI") found that the USF-commissioned investigative report's conclusions could not be squared with the facts. SI talked to a former student who said that in 2003, she went to the administration with soccer players' concerns regarding the filming of women in intimate settings without their consent, and there were other instances when the administration was aware of team members' behavior. SI's investigative reporting found that

---

[115] myUSF, *Men's Soccer Investigation: Update from President Fitzgerald Regarding the Sports Illustrated Story*, available at https://myusf.usfca.edu/title-ix/mens-soccer-investigation (last accessed Mar. 8, 2022).
[116] *Id.*

CLASS ACTION COMPLAINT
CASE NO. 22-1559

there was a "distinct culture of misconduct on the team that spanned three coaches, four athletic directors—though one, Scott Sidwell, was present for the majority of the time—and two school presidents." Thus, USF still has not taken the problem seriously enough.[117]

152.   As but one example of USF's failings in this area and relevant to the allegations of this Complaint, at the outset of the Fall 2021 baseball season, the members of the USF baseball team were required to attend a several hour session with the Title IX officers at the baseball field. However, neither Coach G nor Coach Naks attended.

### 2.   Coach Naks created an intolerable sexualized environment at every practice and Coach G participated.

153.   During the time Coach Naks was at USF, USF described his duties as follows: "In addition to guiding the Dons on the base paths, Nakamura's other on-field duties include coaching third base, overseeing the team's SPARQ (Speed, Power, Agility, Reaction, and Quickness) training and leading the team's visualization and imagery training program."[118]

154.   Further, in July 2020, USF's Executive Senior Associate Athletic Director described Coach Naks as "an amazing man who truly defines what it means to be a Diamond Don [USF's mascot]."[119]

155.   In a November 2020 interview, Coach G described Coach Naks as follows:

> Q.   . . . Troy Nakamura is like a second son to you. Tell me about that relationship and what makes you two so successful.
>
> A.   Oh boy, Troy and I have you know we've been together for 22 years here at USF. So um what a great relationship and just Troy's loyalty to me is why he's here. Troy's had plenty of opportunities right and he's always wanted to stay and it's it's it's [sic] wonderful that he's wanted to be here in the Bay Area and be my right-hand man. I could never express how

---

[117] Priya Desai & Jenny Vrentas, *A Predatory Culture, a Viral Reckoning—and Now What?*, SPORTS ILLUSTRATED (Sep. 30, 2021), available at https://www.si.com/college/2021/09/30/usf-mens-soccer-sexual-assault-and-harassment-reckoning-daily-cover (last accessed Mar. 8, 2022).
[118] Profile: Troy Nakamura, available at https://usfdons.com/sports/baseball/roster/coaches/troy-nakamura/66 (last accessed Jan. 26, 2022).
[119] Tuesday Testimonial: Troy Nakamura (July 28, 2020), available at https://www.youtube.com/watch?v=Rtd_HrkWW9w (last accessed Jan. 28, 2022).

appreciative I am of Troy as a, as a person, as a friend, as a coach, uh as a mentor, as someone to to [*sic*] spend this time with. I mean he's just wonderful. He he leads in a lot of ways. He does a lot of things for me and I never have to question it . . . Me and Troy spend more time together than than [*sic*] me and my wife most of the time and more emotional wins and losses there too. A lot of times where we've been up at the top and we've been down and we've . . . . Oh it's it's [*sic*] I can't thank him enough. He's he's he's [*sic*] the best.[120]

156.    Coach Naks was also an integral part of bonding with the high school baseball prospects during recruitment. USF promoted Coach Naks for "play[ing] a critical role in the recruitment and development of student-athletes."[121]

157.    Coach Naks had therefore established himself as a trusted coach and advisor before the members of the USF Baseball Subclass stepped on campus.

158.    Plaintiffs arrived at campus their freshman year ready to work and succeed. Each had a successful career in high school and on travel teams that was touted by USF publicly when they committed. Each was promised by Coach G or Coach Naks that they would be major additions to the USF baseball team and were integral to the team's future success. Each was told that they had the skills to make it to the next level. Each had aspirations of playing Major League Baseball.

159.    Coach G's and Coach Nak's manipulation, grooming, and abuse of power began not long after Plaintiffs arrived on campus. For example, John Does 1 and John Doe 2 chose to live together off campus because of the uncertainties of COVID-19. Once John Doe 1 found the place to live and told Coach G, he responded to John Doe 1, "Wonderful, if you can secure this it's better than any I have seen and the commute to school is very easy. Clean!! Should lock it up if you can." Yet later, Coach G would criticize the players for choosing to live off campus.

160.    As another example, one coach would tell Plaintiffs and their roommates (also members of the baseball team) to work harder on the field, while the other coach would tell them

---

[120] Tuesday Testimonial: Baseball Head Coach Nino Giarratano (Nov. 3, 2020), available at https://www.youtube.com/watch?v=tvdyIFXEYq0&list=PLQJ7Y9Sjcc_ivhkGCZkiQKJlfrE7Qll5 D (last accessed Jan. 28, 2022).
[121] Profile: Troy Nakamura, *supra*.

that they needed to "have more fun" and integrate with other kids on the campus, rather than spending so much time on the field. Whichever path they took—Coach G's or Coach Naks'—they were called in and berated for it.

161.    Within the first couple of months of their freshman year, the mental abuse escalated. Plaintiffs were isolated and told they were worthless. Coach G and Coach Naks told them they could not and would not succeed. The coaches regularly called each of them a "pussy" or told them they hit like a "pussy." One was called a "fucking cunt," within earshot of the opposing team's fans. They were repeatedly berated and beaten down.

162.    They were told to work harder, to work more, or to work differently, but always given conflicting directions. They were told to go to physical therapy, or to skip it, or to do it differently. Yet, other than being berated (and being sexually harassed as described below), Coach G and Coach Naks largely ignored their requests for coaching help and instructions, telling them it was a waste of time, or that they were toxic, or that their personalities were not a fit.

163.    Each of the Plaintiffs desired to make it to the next level, so each independently asked the coaches for help and direction. But Coach G and Coach Naks regularly responded to these requests by telling Plaintiffs they were not good enough, they would never make it in Division I baseball, they might as well leave, they should give up their scholarships, and they would never make it as professional baseball players.

164.    One Plaintiff was even told by Coach G: "I wish I could hit you with a bat right in the middle of the forehead but that would be illegal." Coach G was not joking.

165.    Against this backdrop of this mental abuse, the coaches also engaged in inappropriate sexual conduct, created an intolerable sexualized environment, and retaliated against the players.

166.    From the outset of Plaintiffs' freshman years, Coach Naks would start practices or particular drills with a "Café" exercise. The point of the exercise was to loosen up the players before they started practice. The Café exercise involved Coach Naks identifying a dinner theme, such as a barbecue or fast food dinner. Then, each person, including both coaches and players, would go around the circle and identify what they would bring to the barbecue, such as a type of

1    drink or food.

2          167.    The players quickly learned that Coach Naks would always find a way to make the

3    exercise sexual—and that Coach Naks encouraged the other players and coaches to be sexual in

4    their answers, too. Coach Naks would refer to women's body parts he wanted to eat, bodily fluids

5    and secretions he wanted to drink, and other sexual innuendo. For example, Coach Naks would

6    say he wanted to eat "Jennifer Aniston's boobs" or "slurp whipped cream from Pamela

7    Anderson's crotch."

8          168.    Coach G was included in these Café exercises, saw and heard the way Coach Naks

9    spoke and encouraged sexual banter, and did nothing to stop it. In fact, Coach G engaged in the

10   same behavior, naming women's body parts or fluids he wanted to eat or drink.

11         169.    All of the players were affected. For example, John Doe 1 was extremely

12   bothered—and tried to stick to appropriate answers, such as milk or soda. When John Doe 1—or

13   any other player—did not play along, however, he was laughed at by the coaches and others who

14   were forced to join in the conduct and pressured to play along. Plaintiffs felt pressured to stay

15   when these exercises were happening, given that the coaches demanded the players' participation.

16         170.    Plaintiffs' discomfort and/or reluctance to participate in such bizarre behavior was

17   apparent to the coaches, and their abuse and taunting escalated as a result.

18         171.    Coach Naks' inappropriate sexual banter was not limited to the Café exercises. He

19   would also regularly talk about the fact that he was bisexual, how little (in clothing) the girls on

20   campus were wearing during warm weather, and what sexual acts he would like to perform on

21   girls he saw on campus. At one point in time, Coach Naks moved to live on campus, and his

22   comments about the girls on campus became increasingly sexual and distressing to the players.

23   Their discomfort with such conversation was apparent.

24         172.    Coach G heard and participated in these conversations.

25         173.    The inappropriate things Coach Naks did or said that day—and what seemed like

26   every day—was a regular topic of conversation among the players.

27         174.    Coach Naks' sexually charged behavior was not limited to the way he spoke. He

28   also engaged in calculated displays of nudity on and off the field, exposing himself to the players

1    and other coaches.

2          175.    For example, another exercise the coaches required before certain practices

3    involved skits. The players were split up into four groups at first, second, third, and home bases.

4    They would have to come up with an improvisational skit for the team to be judged by Coach G.

5          176.    Again, Coach Naks would regularly find ways to make the skits sexual.

6          177.    On one occasion (in early November 2021), Coach Naks pretended to be at a

7    buffet. He had a player do a handstand, grabbed the player's legs, split them open, and then

8    pretended to eat spaghetti out of the player's genital region. Many of the players, visibly

9    disgusted and upset, turned away.

10         178.    On another occasion (just a week or two after the handstand incident), Coach Naks

11   told his group that he would take care of that day's skit. When it was his group's turn, Coach

12   Naks crawled out of the dugout completely naked on all fours. He then proceeded to move to a

13   kneeling position in front of the players and swing his penis around. Plaintiffs and some other

14   players looked away in disbelief, embarrassment, and disgust.

15         179.    Rather than condemning Coach Naks' actions, Coach G kissed the cross on his

16   necklace and mimed as if he were looking up at the sky at God in a joking way, asking for

17   forgiveness.

18         180.    Dormitories overlook the baseball field where this incident occurred, and so other

19   USF students in the dormitories were also able to witness this conduct.

20         181.    Coach G knew that Coach Naks' actions were wrong. Coach G would say to older

21   players, "We could get fired for this." He also told the players that his wife was mad at him

22   because his job was in jeopardy as a result of Coach Naks' nudity and behavior on the field and

23   around the players. Yet Coach G facilitated and condoned Coach Naks' behavior, playing along

24   with and normalizing it.

25         182.    On another occasion, a player fielding ground balls after practice heard Coach

26   Naks call his name. He looked over to the press box and saw Coach Naks standing on a table

27   completely naked, swinging his penis in a helicopter motion while yelling "Hey [player's name]!"

28         183.    Coach Naks took these grooming actions on the field and extended them to more

-44-

intimate settings. For example, players who attended an away game in the spring of 2021 reported that Coach Naks entered a group of players' hotel room and asked to use their shower. After Coach Naks got out of the shower, he walked around naked in the room, exposing himself to the players while talking about his bisexuality.

184.     These are just a few examples of the gross and completely inappropriate sexual harassment and sexual misconduct that created an intolerable sexualized environment the players had to endure on a near-daily basis. Rather than create fun or relax the players as the exercises were supposed to do, the players became stressed, upset, and unable to concentrate as a result. Plaintiffs' discomfort was obvious to the coaches.

185.     Many of the players discussed that they did not even want to go to practice. Many players would go to practice and leave immediately, not wanting to do extra work or be caught alone with Coach Naks.

186.     The players saw Coach Naks as a sexual predator, encouraged by Coach G. The fact that Coach Naks was viewed as a sexual predator is demonstrated by an incident at a 2021 Fall World Series game. The players were in the dugout and Coach Naks was interacting with a little girl next to the dugout. One of the players remarked that if he saw Coach Naks interacting with his little sister, he would strangle him.

187.     The players regularly discussed ways to get the Coaches' behavior to stop. However, as set forth below, those who refused to play along or who spoke up were retaliated against.

188.     John Doe 1 discussed reporting the behavior to the school's Title IX office with several older players. One of the older players told John Doe 1 he had offered a player $100 to turn the coaches in. John Doe 1 offered to contribute another $100 to get the former player to make a complaint.

189.     John Doe 1 asked older transfer players about their experiences with college coaches at their prior teams. All agreed that none of their prior coaches acted like Coach Naks or Coach G, and that the sexual conduct and psychological abuse was not normal.

190.     One of those players told John Doe 1 and several other players not to be surprised

if they were called in for interviews after that player graduated, because he planned to file a Title IX complaint as soon as he could no longer be subject to retaliation.

191.    John Doe 3 talked with an older transfer player who assured John Doe 3 that Coach Naks' behavior was not normal, that coaches acting in this way was not the way college athletics was supposed to be, and that the coaches were not "doing it right" at USF.

192.    In late November 2021, after the "skit" incidents, eight players, including John Does 1, 2, and 3, decided to express their discomfort with the coaches' inappropriate behavior. Wary of retaliation, however, they determined that it would be wisest to do so in a way that the coaches would think is funny, while still alerting the coaches to the impropriety of their behavior. During one pre-workout skit, the players therefore pretended to make a complaint about Coach Naks to the Title IX office. They feigned putting Coach Naks in handcuffs and carrying him off to jail (the "Title IX Skit").

193.    During and after the Title IX Skit, both Coach G and Coach Naks looked extremely uncomfortable. Yet neither followed up with the players after practice to determine whether the skit was performed seriously or in jest, nor did either take any action to change his behavior.

**3.    USF retaliated against the players who tried to stop the abusive behavior or who did not condone it, running them off the team.**

194.    Coaches in the NCAA can "run off" players they do not like or they are retaliating against for reasons stated in this lawsuit. Being run off the team occurs when a coach kicks the player off the team for reasons other than those that are academic or disciplinary, i.e. reasons not within the student-athlete's control.

195.    Prior to January 2015, NCAA schools were required to give scholarships that were renewable each year. In other words, a student-athlete was not guaranteed a four-year scholarship. Thus, it was much easier for a coach to pull a scholarship from a student-athlete and force him to transfer.

196.    In January 2015, the NCAA permitted conferences to start providing four-year guaranteed scholarships. The problem for coaches is that these guaranteed scholarships took away

their ability to not renew a scholarship, thus making it harder to run a student-athlete off their team to free up the scholarship money for someone else.

197.    Coach G and Coach Naks avoided this limitation by implementing a system of emotional abuse intended to get rid of players who did not play along or fit within the sexually charged culture they created.

198.    The Coach Defendants' mental and psychological abuse worked. Of the 17 recruits in the 2020 USF baseball class, eight have transferred and two more may transfer. The fact that almost 60% of the 2020 recruiting class has left or is likely to leave is a testament to the coaching staff's illegal behavior, ruthlessness, retaliation, and callous player treatment.

199.    According to the NCAA, based on a 2018 study from the National Student Clearinghouse, just 13% of then-current Division I student-athletes transferred from another school.[122]

200.    The percentage of four-year college transfers among Division I student-athletes on baseball teams was even lower—just 2.3%, the fourth lowest rate out of 38 NCAA Division I sports:[123]

---

[122] NCAA, *Research on Student-Athlete Transfers*, available at https://www.ncaa.org/sports/2019/8/5/research-on-student-athlete-transfers.aspx (last accessed Jan. 27, 2022).
[123] NCAA, *Transfer Composition of Division I Teams*, available at https://ncaaorg.s3.amazonaws.com/research/transfers/RES_TransCompD1TeamsSlides.pdf (last accessed Jan. 27, 2022).

1
2
3
4
5
6
7
8
9
10



11    201.    In fact, the overall trend since 2004 was a significant decrease in the transfer rate

12    among NCAA Division I baseball teams:[124]

13
14
15
16
17
18
19
20
21
22

23    202.    One of the largest amateur baseball scouting organizations ranked USF's 2020

24    recruiting class #80 in the nation among Division I baseball programs.[125] USF was one of only

25

26    [124] Id.

27    [125] Perfect Game, *College Recruiting Rankings: Class of 2020*, available at
      https://www.perfectgame.org/rankings/Recruiting/Rankings.aspx?g=2020 (last accessed Mar. 11,
      2022).

28

two West Coast Conference baseball programs ranked in the top 100 and USF was ranked higher than programs such as Michigan State, Rice, and UCSB.[126]

203.    The data demonstrates that these well-regarded recruits have since transferred out of USF at an abnormally high transfer rate as a direct result of USF and the Coach Defendants' wrongdoing.

a.    ***USF and the Coach Defendants subjected John Doe 1 to extreme psychological abuse and retaliated against him.***

204.    The retaliation and emotional abuse against John Doe 1 began as soon as it became apparent to the coaches that he would not play along with the sexually charged behavior on the field and/or that John Doe 1 was discussing ways to get the behavior to stop.

205.    John Doe 1 was injured in the fall of his freshman year. When he returned following surgery, the coaches, including Coach G, would yell at him for doing too much physical therapy or not the right kind (despite his doctor's orders otherwise). He would show up to practice early before anyone else—and then be yelled at for being tardy. Coach G demanded that he practice 100% with the team even though it was against John Doe 1's doctor's orders.

206.    Coach G and Coach Naks regularly told John Doe 1 he was not working hard enough and would never be good enough. Coach Naks regularly berated John Doe 1 at practice and in his office.

207.    At the end of his freshman year, and after John Doe 1's parents learned of several of the above-described incidents, John Doe 1's mom left several voicemails for USF's Athletic Director ("AD"), which were not returned. On May 30, 2021, she also sent an email to USF's AD. She stated that she was concerned "with the culture of the baseball program," "the constant bullying, harassment, and intimidation" of her son, and the "sexual misconduct by coach Naks":

---

[126] *Id.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



16    208.    The AD never responded to John Doe 1's mother's email.

17    209.    Under the USF Nondiscrimination Based on Sex and Gender, Sexual Harassment,

18   and Sexual Misconduct Policy ("Title IX Policy"), the AD is considered a "Mandatory Reporter"

19   and should have immediately reported the substance of John Doe 1's mother's email to USF's

20   Title IX office.[127] The AD's failure to do so was, itself, a violation of the USF Title IX Policy.[128]

21    210.    John Doe 1 believes that not only did the AD not report his mother's complaint,

22   but she instead shared the complaint with Coach G and Coach Naks, because the abuse escalated

23   and continued throughout the summer of 2021.

24    211.    Specifically, during the summer between his freshman and sophomore year, Coach

25   Naks called John Doe 1 multiple times and told him not to come back. Every time, John Doe 1

26   _____

27   [127] USF, Title IX Policy 2 (effective Aug. 14, 2020), available at
      https://myusf.usfca.edu/sites/default/files/users/jvarga/Interim%20Policy%20and%20Procedures
28   %2008.14.2020.pdf (last accessed Feb. 9, 2022).
      [128] *Id.*, at 21.

CLASS ACTION COMPLAINT
CASE NO. 22-1559

told Coach Naks he intended to return to school as he had a four-year scholarship and wanted to honor his commitment to the team. In response, Coach Naks told him he was "the most irrational person he had ever met." Coach Naks also said, "The people here don't believe in you." Coach Naks told him he was "tearing up the fabric of the program and not protecting the culture." Coach Naks threatened, "I am going to make sure it is not an enjoyable experience for you." He would keep John Doe 1 on the phone for 30 minutes at a time, relentlessly threatening and berating him if he would not agree to transfer from USF. He also refused to allow John Doe 1 to discuss the matter with his parents, demanding an immediate answer.

212.    Coach G also called John Doe 1 several times that summer. He told John Doe 1 that he would never play at USF again, that he was "toxic" to the program, and that he might as well leave. Coach G called him a "fucking pussy," told him he was being "fucking selfish for keeping his scholarship," and that he was hurting the rest of the team by not agreeing "to give his scholarship to someone who would buy into the culture of the program."

213.    John Doe 1 did not want to leave. He liked his teammates, and his scholarship was important to him and his family. If he chose to leave, he would lose his scholarship and valuable playing time under the NCAA's transfer rules.

214.    John Doe 1 returned for the fall season his sophomore year. Both Coach G and Coach Naks largely ignored John Doe 1 from a coaching perspective, refusing to help him. At the end of the fall season (and after the Title IX Skit described above), all the coaches held exit interviews with every player to discuss their futures.

215.    At John Doe 1's exit interview, each coach told him that he should leave. Coach G told him that the relationship between the coaches and John Doe 1 had become "toxic," again using that same word. They told him that he was being "very selfish" for staying at USF and not agreeing to enter the transfer portal and relinquish his scholarship. John Doe 1 insisted he was not going to leave.

216.    Shortly after the exit interview, the AD reached out to John Doe 1 and told him she understood he was going to enter the transfer portal to leave USF.

217.    John Doe 1 was surprised by the AD's call, given that he had not agreed to go into

CLASS ACTION COMPLAINT
CASE NO. 22-1559

the portal nor to give up his scholarship.

218.    John Doe 1's mom spoke with the AD, and reminded the AD that she had tried to contact the AD in the spring of 2021 about the problems on the baseball team, but that the AD had never responded.

219.    During one of the calls between John Doe 1's mom and the AD in December of 2021, after sharing John Doe 1's experience, the AD disclosed that the Title IX office had already been alerted to problems on the baseball team and that John Doe 1 would be contacted and interviewed as part of the investigation.

220.    After that call, John Doe 1 learned he was being excluded from an upcoming team meeting where the AD shared the status of the investigation and suspension of the coaches with the other players.

221.    Three weeks later (in January 2022), neither John Doe 1 (nor many of the other players) had been contacted regarding the Title IX investigation. John Doe 1 contacted the AD to express concern that he had not yet been interviewed. He was only called for a cursory interview after his mom inquired with the AD herself.

222.    On January 11, 2022, USF issued the following statement to student-athletes via email:

> Dear Members of the USF Baseball Team,
>
> On Dec. 17, 2021, after receiving complaints from members of the USF community, USF baseball head coach Nino Giarratano and associate coach Troy Nakamura were suspended with pay, pending results of an internal investigation. Conducted by USFs Office of Human Resources, the investigation was focused on reports of incidents within the baseball program when the coaches [*sic*] language, behavior, and/or actions were inappropriate and did not reflect USFs mission and values.
>
> As a result of that investigation, Coach Nakamura is no longer associated with the USF baseball program, effective immediately. Coach Giarratano was officially reprimanded for inappropriate behavior related to the reported incidents.
>
> While the investigation did not find evidence of a widespread harmful culture within the baseball program, the reported incidents indicated that coaches showed poor judgment and lack of supervision. The university has taken immediate action to address this. Procedures are being put in place to ensure baseball team

members are ensured a respectful, safe environment with proper oversight, direction, and mentoring by their coaches.  The wellbeing of all students at USF is our highest priority.

The Athletic Department and the university is grateful to members of the community who came forward with concerns, and provided information.  We are also grateful to the staff in Human Resources who conducted a thorough, swift and comprehensive investigation.

223.    Notwithstanding USF's attempt to close out the issues without acknowledging that the sexually abusive behavior was indeed widespread and that its investigation was not thorough, USF's administration has continued to engage in retaliation.

224.    Right after the announcement was sent, the AD contacted John Doe 1. The AD told John Doe 1 that Coach Naks had been terminated, but that Coach G would stay on. She stated that Coach G would be on a year-to-year contract and would not be allowed to travel or hold meetings without an administrator present.

225.    John Doe 1 asked the AD how Coach G felt about John Doe 1 staying on the team. Staying and succeeding at USF both academically and on the baseball team was important to John Doe 1, as he wanted to become the best possible player and had aspirations of playing professional baseball. The AD said she would talk to Coach G about his return to the baseball team and would follow up with John Doe 1 in a couple of days.

226.    In the interim, USF posted a message on Instagram, congratulating John Doe 1 and three other players for maintaining a 4.0 GPA in the fall semester. Just an hour later, the post was taken down. On information and belief, it was taken down because Coach G continued his campaign of retaliation and wanted to force John Doe 1 to leave USF by discrediting his accomplishments and deflating his confidence.

227.    John Doe 1 tried to register for online classes for Spring 2021 due to anxiety about returning to USF, but was unable to register for a full course load. He signed up for class waitlists and emailed professors and had multiple calls with his advisor, but with no response or resolution. After additional complaints, USF finally helped John Doe 1 by assigning him an academic success coach.

228.    After almost two weeks, John Doe 1 still had not heard back from the AD, so John

1  Doe 1 called her. The AD told John Doe 1 that Coach G did not want him to return to the team,

2  and that she was going to stand behind Coach G's decision that John Doe 1 should leave the team.

3  The AD thus adopted and furthered the abusive coach's retaliation against a student-athlete brave

4  enough to call out the coaches for their illegal behavior.

5      229.    USF encouraged John Doe 1 to sign a document to enter the transfer portal so he

6  could play baseball at another college or university. Contrary to the assertions USF made to John

7  Doe 1, that document contained a location for John Doe 1's signature, agreeing that USF could

8  revoke his scholarship. John Doe 1 refused to sign that portion of the document. In January 2022,

9  John Doe 1 entered the transfer portal, and is still in it now.

**b.    *John Doe 2 suffered extreme emotional abuse, repeated inappropriate sexualized conduct, and retaliation, and was forced to leave USF.***

12      230.    The retaliation and emotional abuse against John Doe 2 began as soon as it became

13  apparent to the coaches that he would not play along with the sexually charged behavior on the

14  field and/or that he and his teammates were discussing ways to stop the behavior.

15      231.    Throughout the fall of 2020, Coach G and Coach Naks did not provide John Doe 2

16  with opportunities to play, nor did they provide coaching direction. While Coach G texted John

17  Doe 2 that he was doing great, those accolades did not transfer to opportunities to practice or

18  playing time on the field.

19      232.    At the time, in the fall of 2020, John Doe 2 did not understand why he was not

20  afforded playing time and practice opportunities. John Doe 2 had dreams of playing baseball

21  professionally, and he wanted to do all that he could to better himself as a ball player and athlete

22  while at USF.

23      233.    During the spring of 2021, Coach Naks began verbally abusing John Doe 2. By

24  way of example only, at an away game, Coach Naks screamed at John Doe 2, calling him a

25  "fucking cunt" while they were in the dugout. Parents from the opposing team reported the event

26  to several USF parents, and John Doe 2's parents learned about the shocking conduct. John Doe 2

27  was humiliated and embarrassed.

28      234.    In the spring of 2021, Coach G brought John Doe 2 in for an early exit interview.

1   Coach G told John Doe 2 that he wanted him gone from the team because John Doe 2 was too

2   nice and too respectful. Coach G told John Doe 2 that he did not like him and that John Doe 2 did

3   not have the type of personality Coach G wanted. Coach G tried to force John Doe 2 to verbally

4   agree to leave the team and to give up his scholarship. John Doe 2 was stunned and upset. He was

5   not prepared to leave the team or give up his scholarship, particularly without speaking with his

6   parents.

7       235.    Coach G's comments reflect that John Doe 2 did not fit within the sexually explicit

8   environment in which the coaches were engaged.

9       236.    On May 30, 2021, John Doe 2's parents requested "an urgent in person meeting"

10  with USF's AD. The subject line of the email stated, "URGENT MEETING REQUEST." This

11  email was wholly ignored and never responded to by the AD.

12      237.    Shortly after his early exit interview, John Doe 2 showed up to take the bus to an

13  away game, but the team did not have him on the player list or assigned bus seating chart. John

14  Doe 2 understood this was because Coach G was retaliating against him by trying to run him off

15  the team.

16      238.    In the summer of 2021, Coach G repeatedly called John Doe 2, asking him if he

17  was returning to the team. John Doe 2 told him he was. Coach G became very upset, telling John

18  Doe 2 that he was making a terrible decision, that he did not belong at USF, and that he was

19  going to be cut from the team as soon as he got back to campus.

20      239.    In the fall of 2021, Coach G largely ignored John Doe 2 when it came to providing

21  coaching direction. John Doe 2 would ask Coach G what he could do to get more playing time

22  and how he could improve. Coach G would respond that John Doe 2's playing ability was fine,

23  but that he just didn't have room for him.

24      240.    Coach G and Coach Naks made it clear that they hated John Doe 2, that they

25  wanted him to leave, and that they would not give him any coaching direction. John Doe 2

26  became extremely stressed. He was upset that no matter how hard he worked—and even though

27  his playing ability was not in question—the coaches wanted him to leave. His grades suffered,

28  and he began isolating himself. He felt degraded as a human—he had to suffer through the

1   sexualized conduct and harassment at practice, with little to no coaching, and then was told his

2   personality was the problem because he would not play along.

3       241.    John Doe 2 became physically ill from the stress, resulting in five emergency room

4   visits during the fall of 2021.

5       242.    By the end of fall 2021, Coach G's campaign to force John Doe 2 to leave

6   succeeded. John Doe 2 determined that his physical and mental health was suffering, and advised

7   USF that he intended to leave and lose his scholarship. John Doe 2 spoke with both the AD and

8   assistant AD regarding the reasons for his departure.

9       243.    During his call with the AD, the AD told John Doe 2 that she knew things were

10  going on with the coaches on the team and implied that both Coach G and Coach Naks were

11  going to be terminated.

12      244.    In December 2021, John Doe 2 learned of a Zoom meeting the AD was holding

13  with the team that he had not been invited to. He reached out to the AD seeking to be included (as

14  did John Doe 1, who was also initially excluded).

15      245.    During this Zoom meeting, which was attended by over 40 people, the AD

16  acknowledged how angry and distraught the team must be, and that she felt the same, alluding to

17  Coach Naks' behavior and complaints that had been made about him. She told the team that

18  Coach G was a "great guy." She told the team that she and Coach G had been friends for years,

19  and that they would get through this together. She told the team that the events that had transpired

20  were hard on her, too. She said she had hardly slept and she loves "those guys."

21      246.    John Doe 2 understood from the team meeting that the AD intended to protect

22  Coach G, despite the fact that Coach G had normalized and participated in Coach Naks' sexual

23  harassment. John Doe 2 was upset that the AD minimized the players' experiences, including the

24  inappropriate sexual conduct that created an intolerable sexualized environment and

25  psychological abuse in which Coach G had engaged.

26          **c.    *John Doe 3 was subjected to extreme psychological abuse, and***
            ***the Coach Defendants retaliated against him by trying to trick***
27          ***him into foregoing his scholarship.***

28      247.    John Doe 3 was injured during his senior year of high school, and worked

CLASS ACTION COMPLAINT
CASE NO. 22-1559

extensively with a physical therapist to be ready to play baseball for USF.

248.    But when John Doe 3 started at USF in the fall of 2021, he was subject to constant verbal abuse by the Coach Defendants.

249.    Just three weeks into school, John Doe 3 asked Coach G for help. John Doe 3 wanted to become a standout player on the USF team, as he had aspirations of one day playing professional baseball. Coach G responded that it would be a waste of his time, pointless for him to help John Doe 3 out with coaching, that John Doe 3 was not and never would be one of his top 5 players, and so he refused to work with him.

250.    Despite the coaches' treatment of him, John Doe 3 strived to be successful on the field. Every day from 7 a.m. to 6 p.m., John Doe 3 was either in class, on the baseball field, or doing physical therapy. He showed up at practice, even when he could not participate in certain drills due to his injury.

251.    Because of his injury, Coach G told John Doe 3 not to do anything during practices, and sarcastically said that John Doe 3 could have fun and watch his teammates improve. At an away game, John Doe 3 was observing his teammates catch pop ups. Coach G called John Doe 3 over and began yelling, asking why he was not joining. When John Doe 3 responded that he (Coach G) told him not to do anything, Coach G responded, "Can't you even think? I've never in my life had someone make me so angry every day. You can't go a day without pissing me off."

252.    No matter what John Doe 3 did, the coaches berated him. For example, for one game, the players were supposed to arrive at 8 a.m. John Doe 3 showed up at 7:53 a.m., and was the first to take batting practice. A little while later, Coach G made him leave the game because he "had arrived 10 minutes late" (which was obviously not true). Later in the game, Coach G badmouthed John Doe 3 to his teammates, asking "Where's [John Doe 3]? He must be home taking a long nap since he's not here."

253.    The following Monday, the coaches sent John Doe 3 for a blood draw to test for drugs. John Doe 3 was not taking drugs, and understood that no other baseball player had been sent for drug testing—ever. John Doe 3 believed that the coaches were singling him out for abuse

1    to get him to leave the team but did not understand why. John Doe 3 tested negative for drugs.

2         254.    In a subsequent meeting in Coach G's office after the above-mentioned game,

3    Coach G called John Doe 3 a liar when he tried to defend himself, told him none of his teammates

4    or coaches liked him, that he was a waste of space, and that he was a problem for everyone.

5    Coach G told John Doe 3 to "get the f%&$ out" of the school because he did not belong there.

6    Coach G said that he wishes that he could take John Doe 3's scholarship away more than

7    anything. Coach G called him a "pussy" repeatedly. Coach G even said: "I wish I could take my

8    bat and hit your head as hard as I can and maybe I can get your brain to work."

9         255.    When John Doe 3 reinjured his arm soon thereafter, Coach G became angry and

10   told him there was "something seriously wrong" with his head.

11        256.    John Doe 3 became increasingly anxious and depressed as the semester

12   progressed. When not in class or at practice, he stayed in his room distressed. He could not sleep

13   or eat, and felt very anxious at practices, waiting for them to end.

14        257.    John Doe 3 was retaliated against for not participating in the sexually charged

15   behavior in which the coaches were engaged. Most times when a sexual conversation was

16   occurring, John Doe 3 would distance himself by walking or turning away.

17        258.    During the semester, John Doe 3 complained to a representative of the baseball

18   team responsible for mental health. He was sent to a USF sports therapist. However, the therapist

19   told John Doe 3 his experience and those events occurring with the team were normal, and that is

20   how most coaches act.

21        259.    In advance of his exit interview after the season, the coaches told the players that

22   they needed to fill out a form in advance in the way that the coaches wanted them to, and that if

23   they did not, the conversation would not be pleasant and would involve a lot of yelling. Fearing

24   further verbal abuse and assaults, John Doe 3 complied with Coach G's order to fill out the form

25   to state that he (John Doe 3) was being cut from the team.

26        260.    At John Doe 3's Fall 2021 season exit interview, the coaches told John Doe 3 they

27   were cutting him. They told him that his scholarship was revoked, and that he would not be at

28   USF the next semester. They demanded that he enter the transfer portal immediately.

261.    John Doe 3 left the meeting upset and confused. He had chosen USF because of the guaranteed four-year scholarship. He did not understand how the coaches could revoke it. So he undertook his own research online and learned that the coaches had lied about their ability to revoke it and had tricked him into writing on the form that he was leaving.

262.    John Doe 3 contacted the Associate AD. The Associate AD confirmed that there is no such thing as pre-exit interview forms, and definitively told him that the coaches could not take away his scholarship.

263.    John Doe 3 then contacted Coach Naks, and asked how his guaranteed scholarship could be taken away. Coach Naks told him to come by the office and see Coach G. Coach G told John Doe 3 that he understood John Doe 3 wanted to leave. He asked: "Are you leaving?" When John Doe 3 said he did not know, Coach G looked surprised, and told him there was no point in staying as he would never be part of the baseball team. Coach G demanded an answer and would not allow John Doe 3 to discuss the matter with his parents.

264.    Following the meeting, the coaches sent John Doe 3 text messages about other schools that were interested in him, and with requests to return his equipment.

265.    During Winter Break, John Doe 3 spoke with the AD, who told John Doe 3 that he could stay and finish the school year. The guaranteed scholarship is important to John Doe 3 and he will not voluntarily relinquish it.

**E.    Plaintiffs and the Class Were Damaged.**

266.    Plaintiffs' damages stem from the fact that the NCAA and its member institutions—including USF—have created a system that places a higher value on institutional reputations, at the expense of the student-athletes' well-being.

267.    The sexual, physical, and mental harassment and abuse many student-athletes— including the Plaintiffs in this case—have suffered is accompanied by self-doubt, shame, blame, and guilt, and oftentimes requires years of reflection, meditation, counseling, medication, and psychotherapy. All the while, many of these young lives are plagued with depression, anxiety,

1    and suicidal thoughts.[129]

2          268.    Sexual and mental harassment and abuse of athletes results in long-term

3    posttraumatic symptomology, with core symptoms including re-experiencing, avoidance, and

4    hyperarousal. Furthermore, disclosing or recounting the experience of sexual abuse can be

5    traumatic and lead to a "double-trauma," which can cause intense ruptures in day-to-day life.[130]

6          269.    In addition to psychological injury, Plaintiffs and the Class suffered out of pocket

7    losses from the loss of scholarships, payments of costs-of-attendance, payments for medical and

8    psychiatric treatment, damage to their careers as college baseball players that directly impacts

9    their prospects of becoming professional baseball players, and other compensatory and

10   consequential damages.

11   **VI.    CLASS ALLEGATIONS**

12         270.    Plaintiffs bring this action against the NCAA on behalf of the following

13   "Nationwide Class" pursuant to Federal Rules of Civil Procedure ("Rules") 23(a), 23(b)(2),

14   and/or 23(c)(4): "All student-athletes who participated in NCAA sports at NCAA member

15   institutions during the past four years."

16         271.    Plaintiffs also bring this action against the NCAA on behalf of the following

17   "California Subclass" pursuant to Rules 23(a), 23(b)(2), and/or 23(c)(4): "All student-athletes

18   who participated in NCAA sports at California-based NCAA member institutions during the past

19   four years."

20         272.    Plaintiffs also bring this action against USF and the Coach Defendants on behalf of

21   the following "USF Baseball Subclass" pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and/or

22   23(c)(4): "All members of the University of San Francisco baseball team during the past four

23   years."

24         273.    Plaintiffs reserve the right to modify or amend the class definitions, including the

25   addition of one or more subclasses, after having the opportunity to conduct discovery.

26   _____

27   [129] Ingunn Bjørnseth & Attila Szabo, *Sexual Violence Against Children in Sports and Exercise: A Systematic Literature Review*, JOURNAL OF CHILD SEXUAL ABUSE, 27:4, 365-385, 365 (2018).
28   [130] Helen Owton & Andrew C. Sparkes, *Sexual Abuse and the Grooming Process in Sport: Learning from Bella's Story*, SPORT EDUCATION AND SOCIETY, 22:6, 732-743, 733 (2017).

274.    Excluded from the Classes are Defendants and any of their affiliates, parents,

subsidiaries, officers, and directors; any entity in which Defendants have a controlling interest; all

persons who make a timely election to be excluded from the class; governmental entities; and all

judges assigned to hear any aspect of this litigation, including their immediate family members.

275.    Numerosity: The NCAA reports that there are more than 460,000 NCAA student-

athletes competing in 24 sports every year.[131]Similarly, there is an average of 35 players per year

on a Division I baseball roster.[132] As such, the members of the Classes are so numerous that

joinder is impractical.

276.    Typicality: Plaintiffs' claims are typical of the claims of each class member in that

Plaintiffs, like all class members, were NCAA student-athletes. Plaintiffs and the class members

were injured through the NCAA's failure to protect them, and Plaintiffs are advancing the same

legal theories on behalf of themselves and the Classes.

277.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Classes.

Plaintiffs' interests and the interests of all other members of the Classes are identical, and

Plaintiffs are cognizant of their duty and responsibility to the Classes. Accordingly, Plaintiffs can

fairly and adequately represent the interests of the Classes. Moreover, Plaintiffs' counsel are

competent and experienced in litigating class actions, including litigation of this kind. Plaintiffs

and counsel intend to vigorously prosecute this case and will fairly and adequately protect the

Classes' interests.

278.    Commonality and Predominance: There are numerous questions of law and fact

common to the Classes, and these common questions predominate over any issues affecting only

individual Class members.  Questions common to the Classes include:

       a.    Whether the NCAA had a duty to implement and enforce rules and bylaws

          to, *inter alia*:

---

[131] NCAA, Student-Athletes, available at http://www.ncaa.org/student-athletes (last accessed Feb. 9, 2022).

[132] Aria Gerson, *NCAA Provides Relief on Division I Baseball Roster Limits in Wake of Shorter MLB Draft*, USA TODAY (June 10, 2020), available at https://www.usatoday.com/story/sports/2020/06/10/ncaa-division-i-baseball-roster-limits-relief/5335956002/ (last accessed Feb. 9, 2022).

1         •  prohibit sexual harassment and/or sexual abuse of student-athletes by

2           athletics department personnel;

3         •  prohibit romantic and sexual relationships between coaches and

4           student-athletes;

5         •  prohibit grooming and other sexually-exploitative behavior by athletics

6           department personnel of student-athletes;

7         •  require NCAA member institutions to immediately report any

8           allegations of sexual harassment or abuse of a student-athlete by

9           athletics department personnel;

10       •  maintain all reports of sexual relationships, harassment, or abuse of a

11         student-athlete by athletics department personnel in a centralized

12         repository so that they can be tracked by the NCAA and its member

13         institutions;

14       •  require that all reports of sexual relationships, harassment, or abuse of a

15         student-athlete by athletics department personnel be independently

16         investigated;

17       •  implement public sanctions on member institutions and athletics

18         department personnel where allegations of sexual relationships,

19         harassment, or abuse of a student-athlete by athletics department

20         personnel are substantiated;

21       •  ban athletics department personnel from working or volunteering for

22         any member institution where allegations of sexual relationships,

23         harassment, or abuse of a student-athlete by such athletics department

24         personnel are substantiated;

25       •  mandate training of athletics department personnel regarding grooming,

26         sexual relationships with student-athletes, sexual abuse and harassment,

27         the prohibition thereof, and reporting obligations;

28

- mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

- protect Plaintiffs and members of the Classes from such abuse and other known and/or foreseeable risks, including the loss of scholarships; and

- provide a safe environment for NCAA student-athletes free from sexual abuse and/or sexual harassment:

b. Whether the NCAA breached the foregoing duties;

c. Whether the NCAA and the student-athletes entered into a contract requiring the NCAA to abide by, implement, and enforce rules concerning gender equity, including with respect to the prohibition of sexual relationships between coaches and student-athletes, and the sexual abuse and harassment of student-athletes;

d. Whether the NCAA breached the foregoing express or implied contract;

e. Whether Coach G and Coach Naks sexually harassed and retaliated against Plaintiffs and the USF Baseball Subclass;

f. Whether the NCAA, USF, Coach G, and Coach Naks intentionally or negligently inflicted emotional distress on Plaintiffs and the USF Baseball Subclass;

g. Whether the NCAA and USF should be held vicariously liable for the tortious conduct of Coach G and Coach Naks;

h. Whether the NCAA and USF ratified the tortious conduct of Coach G and Coach Naks; and

i. The scope of declaratory and/or injunctive relief and damages to which the Plaintiffs and the Classes are entitled.

279. Superiority: A class action is superior to any other available means for the fair and

efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of a class action is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Individual litigation by each class member would also strain the court system, create the potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. Moreover, the highly sensitive and traumatic nature of the facts involved here makes a class action superior, because in circumstances like these, there will be some victims who are emotionally ready and able to come forward and bring suit on behalf of the many others who are not able or ready to come forward to bring suit on their own. In sum, the class action presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

280.    Declaratory/Equitable Relief: Class certification is also appropriate under Rule 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the Classes as a whole, such that final injunctive relief is appropriate with respect to the Classes as a whole. Such injunctive relief includes, but is not limited to, the implementation of systemic changes to prevent such conduct in the future as mentioned above.

281.    This action is also properly maintainable under Rule 23(c)(4) in that particular issues common to the class, as set out above, are most appropriately and efficiently resolved through a class action, and would advance the disposition of this matter and the parties' interests.

## VII.    CLAIMS AGAINST THE NCAA, USF, AND THE COACH DEFENDANTS ON BEHALF OF THE USF BASEBALL SUBCLASS

### COUNT I

**VIOLATION OF TITLE IX [20 U.S.C. § 1681 *et seq.*] FOR DISCRIMINATION (PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST USF)**

282.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

283.    Title IX of the Education Amendments of 1972 ("Title IX"), as amended, 20 U.S.C. § 1681 *et seq.*, provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

284.    Title IX bars gender-based discrimination by federally funded educational institutions.

285.    USF receives federal funding, including but not limited to financial aid and grants, and grants from the Higher Education Emergency Relief Fund (authorized by the American Rescue Plan (ARP), Public Law 117-2, signed into law on March 11, 2021).

286.    At the time of the events in question, Plaintiffs were enrolled as undergraduate students at USF.

287.    USF exercised substantial control over its baseball program, as well as over its coaching staff, including Coaches Giarratano and Nakamura.

288.    Plaintiffs suffered sexual harassment by Coach Naks, facilitated and condoned by Coach G, that was so severe, pervasive, and objectively offensive that it deprived Plaintiffs of access to the educational opportunities and benefits provided by USF.

289.    Specifically, the sexual language, actions, and conduct Plaintiffs were forced to endure since the beginning of their time at USF was continuous and unrelenting, thereby violating Title IX.

290.    Coach G oversaw, participated in, and approved of this culture of harassment and abuse in the baseball program.

291.    The conduct was so extreme and outrageous that two Plaintiffs have been forced to leave USF, at great personal and financial losses for each, including damage to their baseball careers. Furthermore, USF has attempted to force the remaining Plaintiff to leave.

292.    Coach G, as the head coach of the baseball program, had actual knowledge of the harassment that was occurring, and indeed, condoned, approved, and participated in the harassment.

293.    The Athletic Director, who is in a position of oversight and control of USF's baseball program including its coaching staff, had actual knowledge of the harassment that was occurring.

294.    Specifically, on May 30, 2021, John Doe 1's mother advised the AD in writing of the "culture" of the baseball team that included "constant bullying, harassment and intimidation"

as well as "continuous stores of sexual misconduct by coach Naks . . . ." The AD ignored John

Doe 1's mother's email.

295.    The AD is a Mandatory Reporter under the USF Title IX Policy and had a duty to

report the complaint to the USF Title IX Officer. Thus, the AD's failure to report the complaint

was, itself, a violation of the USF Title IX Policy.

296.    The AD also ignored an "URGENT MEETING REQUEST" from John Doe 2's

parents on that same day, May 20, 2021.

297.    The AD's failures allowed the severe and pervasive harassment to continue

through the end of 2021.

298.    The AD's actions constituted deliberate indifference on the part of USF to the

harassment, and USF's failure to respond to the complaint was clearly unreasonable in light of the

circumstances.

299.    USF's actions allowed the bullying, harassment, intimidation, and sexual

misconduct to continue.

300.    As a direct and proximate result of USF's actions and/or inactions, Plaintiffs and

the USF Baseball Subclass were damaged.

## COUNT II

**VIOLATION OF TITLE IX [20 U.S.C. § 1681 *et seq.*] FOR RETALIATION
(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST USF)**

301.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

302.    Retaliation against an individual for complaining of sex discrimination, including

sexual harassment, constitutes prohibited sex discrimination under Title IX.

303.    USF receives federal funding, including but not limited to financial aid and grants,

and grants from the Higher Education Emergency Relief Fund (authorized by the American

Rescue Plan (ARP), Public Law 117-2, signed into law on March 11, 2021).

304.    At the time of the events in question, Plaintiffs were enrolled as undergraduate

students at USF.

305.    The Athletic Director had actual knowledge of the harassment occurring in the

1    USF baseball program.

2         306.    Specifically, on May 30, 2021, John Doe 1's mother advised the AD of the

3    "culture" of the baseball team that included "constant bullying, harassment and intimidation" as

4    well as "continuous stores of sexual misconduct by coach Naks…."

5         307.    The AD ignored John Doe 1's mother, in violation of the USF Title IX Policy,

6    allowing the severe and pervasive harassment to continue through the end of 2021.

7         308.    The AD also never responded to and ignored John Doe 2's parents' request for an

8    urgent in-person meeting.

9         309.    Coach G, as the head coach of the baseball program, had actual knowledge of the

10   harassment that was occurring, and indeed, condoned, approved, and participated in the

11   harassment.

12        310.    Coach G was also a witness to John Doe 1's Title IX Skit that occurred in October

13   or November of 2021. Yet Coach G never questioned John Doe 1 about the reasons underlying

14   the skit.

15        311.    The retaliation included a relentless campaign to bully and demean each Plaintiff,

16   causing severe depression and anxiety in each, in an effort to cause them to leave USF and

17   damage to their baseball careers. By way of example only:

18              a.    Not long after the Title IX Skit, each coach told John Doe 1 that he should

19                    leave. Coach G told him that the relationship between the coaches and John

20                    Doe 1 had become "toxic." They told him that by staying at USF, he was

21                    being "very selfish."

22              b.    Soon after, the AD contacted John Doe 1 and told him that she understood

23                    he was going to enter the transfer portal to leave USF when he had no such

24                    plans.

25              c.    John Doe 1 was also excluded from a player's meeting, which John Doe 1

26                    believes was intentional.

27              d.    The baseball team's post about John Doe 1's 4.0 GPA was immediately

28                    taken down, which John Doe 1 believes was done at Coach G's insistence.

e.     The AD told John Doe 1 that she is standing behind Coach G's decision not wanting John Doe 1 on the USF baseball team.

f.     Despite John Doe 1 negotiating a promise from USF that he would not lose his scholarship if he transferred, USF presented him with a transfer portal document that said otherwise; John Doe 1 refused to sign it.

g.     John Doe 2 was told that he was not liked and that he could not succeed on the team.  Coach G told him that he did not like his personality because he was too nice.

h.     John Doe 2 was excluded from the seating chart for an away game, and not invited to a player's meeting, both of which John Doe 2 believes was intentional.

i.     John Doe 3 was similarly called names, such as liar and pussy, and berated him in front of the team for "napping" when Coach G told him to leave practice.

j.     Coach G threatened to hit him John Doe 3 in the head with a bat.

k.     John Doe 3 was mandated to take a blood draw drug test, for which he was singled out.

l.     Coach G told John Doe 3 that his scholarship was revoked, and when John Doe 3 questioned the AD about USF's ability to do so in light of the guarantee, Coach G said that his statement about revoking John Doe 3's scholarship was a mistake.

312.     All of the above are merely examples, and were part of a concerted action by USF, including Coaches G and Naks, to isolate all Plaintiffs and bully them to force them to leave the school and give up their scholarships and to ruin their baseball careers.

313.     Such retaliation caused two out of the three plaintiffs to leave USF, at considerable personal and financial expense to each, including damage to their baseball careers, and USF continues to try to force the remaining Plaintiff to leave.

314.     As a direct and proximate result of USF's actions and/or inactions, Plaintiffs and

CLASS ACTION COMPLAINT
CASE NO. 22-1559

1    the USF Baseball Subclass were damaged.

2                                   **COUNT III**

3        **NEGLIGENT SUPERVISION AND RETENTION OF TROY NAKAMURA**
         **(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST THE NCAA, USF,**
4                               **AND NINO GIARRATANO)**

5        315.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

6        316.    The USF Baseball Subclass brings this claim pursuant to California law.

7        317.    At all times material since 2000 and until Coach Naks was removed in 2022, USF

8    employed Coach Naks and had the right to control Coach Naks and the manner and methods in

9    which he fulfilled his duties as an NCAA baseball coach.

10       318.    At all times since 2000, the NCAA had the right to control Coach Naks and the

11   manner and methods in which he fulfilled his duties as an NCAA baseball coach.

12       319.    At all times since 2000, Coach G had the right to control Coach Naks and the

13   manner and methods in which he fulfilled his duties as an NCAA baseball coach.

14       320.    Coach Naks was unfit or incompetent to work directly with student-athletes and

15   posed a particular risk of sexually harassing and mentally abusing them.

16       321.    USF knew or should have known that Coach Naks was unfit or incompetent to

17   work directly with student-athletes and posed a particular risk of sexually harassing or mentally

18   abusing them, and that this unfitness created a particular risk to Plaintiffs and the USF Baseball

19   Subclass.

20       322.    The NCAA knew or should have known that Coach Naks was unfit or incompetent

21   to work directly with student-athletes and posed a particular risk of sexually harassing or mentally

22   abusing them, and that this unfitness created a particular risk to Plaintiffs and the USF Baseball

23   Subclass.

24       323.    Coach G knew or should have known that Coach Naks was unfit or incompetent to

25   work directly with student-athletes and posed a particular risk of sexually harassing or mentally

26   abusing them, and that this unfitness created a particular risk to Plaintiffs and the USF Baseball

27   Subclass.

28       324.    Coach Naks' unfitness and particular risk to student-athletes on USF's baseball

1   team harmed Plaintiffs and the USF Baseball Subclass.

2       325.    USF's negligence in supervising and/or retaining Coach Naks was a substantial

3   factor in causing harm to Plaintiffs and the USF Baseball Subclass.

4       326.    The NCAA's negligence in supervising and/or retaining Coach Naks was a

5   substantial factor in causing harm to Plaintiffs and the USF Baseball Subclass.

6       327.    Coach G's negligence in supervising and/or retaining Coach Naks was a

7   substantial factor in causing harm to Plaintiffs and the USF Baseball Subclass.

8       328.    As a direct and proximate result of Defendants' actions and/or inactions, Plaintiffs

9   and the USF Baseball Subclass were damaged.

10                                  **COUNT IV**

11  **NEGLIGENT SUPERVISION AND RETENTION OF NINO GIARRATANO
    (PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST USF AND THE
12                                  NCAA)**

13      329.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

14      330.    The USF Baseball Subclass brings this claim pursuant to California law.

15      331.    At all times material since 1999, USF employed Coach G and had the right to

16  control Coach G and the manner and methods in which he fulfilled his duties as an NCAA

17  baseball coach.

18      332.    At all times since 1999, the NCAA had the right to control Coach G and the

19  manner and methods in which he fulfilled his duties as an NCAA baseball coach.

20      333.    Coach G was unfit or incompetent to work directly with student-athletes and posed

21  a particular risk of sexually harassing and mentally abusing them and/or allowing Coach Naks to

22  sexually harass and mentally abuse the student-athletes.

23      334.    USF knew or should have known that Coach G was unfit or incompetent to work

24  directly with student-athletes and posed a particular risk of sexually harassing or mentally abusing

25  them, and that this unfitness created a particular risk to Plaintiffs and the USF Baseball Subclass.

26      335.    USF knew or should have known that Coach G was protecting Coach Naks, and

27  facilitating Coach Naks' sexual harassment or mental abuse of student-athletes, and that Coach

28  Naks' unfitness created a particular risk to Plaintiffs and the USF Baseball Subclass.

336.    The NCAA knew or should have known that Coach G was unfit or incompetent to work directly with student-athletes and posed a particular risk of sexually harassing or mentally abusing them, and that this unfitness created a particular risk to Plaintiffs and the USF Baseball Subclass.

337.    The NCAA knew or should have known that Coach G was protecting Coach Naks, and facilitating Coach Naks' sexual harassment or mental abuse of student-athletes, and that Coach Naks' unfitness created a particular risk to Plaintiffs and the USF Baseball Subclass

338.    Coach G's unfitness and particular risk to student-athletes on USF's baseball team harmed Plaintiffs and the USF Baseball Subclass.

339.    USF's negligence in supervising and/or retaining Coach G was a substantial factor in causing harm to Plaintiffs and the USF Baseball Subclass.

340.    The NCAA's negligence in supervising and/or retaining Coach G was a substantial factor in causing harm to Plaintiffs and the USF Baseball Subclass.

341.    As a direct and proximate result of Defendants' actions and/or inactions, Plaintiffs and the USF Baseball Subclass were damaged.

## <u>COUNT V</u>

**SEXUAL HARASSMENT IN THE EDUCATIONAL SETTING
[CAL. EDUC. CODE § 66270]
(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST USF AND THE
COACH DEFENDANTS)**

342.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

343.    Section 66270 of the California Education Code provides in pertinent part: "No person shall be subjected to discrimination on the basis of disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any characteristic listed or defined in Section 11135 of the Government Code or any other characteristic that is contained in the prohibition of hate crimes set forth in subdivision (a) of Section 422.6 of the Penal Code, including immigration status, in any program or activity conducted by any postsecondary educational institution that receives, or benefits from, state financial assistance or enrolls students who receive state student financial aid."

344.     Plaintiffs and the USF Baseball Subclass members were harmed by being subjected to psychological abuse and repeated inappropriate sexual conduct that created an intolerable sexualized environment at USF because of Plaintiffs and the USF Baseball Subclass members' gender and Defendant USF is responsible for that harm.

345.     Plaintiffs and the USF Baseball Subclass members suffered harassment that was so severe, pervasive, and offensive that it effectively deprived Plaintiffs and the Class members of the right of equal access to educational benefits and opportunities.

346.     As a result of Defendant USF's conduct, Plaintiffs and the USF Baseball Subclass have been damaged in an amount to be proven at trial.

347.     Further, Defendant USF acted willfully and maliciously with the intent to harm Plaintiffs and the USF Baseball Subclass members, and in conscious disregard of the rights of Plaintiffs and the Class members, so as to constitute malice and oppression under California Civil Code Section 3294. Plaintiffs and the USF Baseball Subclass members are therefore entitled to the recovery of punitive damages, in an amount to be determined at trial.

## COUNT VI

### VIOLATION OF THE CALIFORNIA EQUITY IN HIGHER EDUCATION ACT
**[CAL. EDUC. CODE § 66250]**
**(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST USF)**

348.     Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

349.     Section 66281.5 of the California Equity in Higher Education Act provides in pertinent part: "(a) It is the policy of the State of California, pursuant to Section 66251, that all persons, regardless of their sex, should enjoy freedom from discrimination of any kind in the postsecondary educational institution of the state. The purpose of this section is to provide notification of the prohibition against sexual harassment as a form of sexual discrimination and to provide notification of available remedies."

350.     USF's conduct as alleged herein constitutes sexual harassment as a form of sexual discrimination against Plaintiffs and the USF Baseball Subclass, and violated the Equity in Higher Education Act. Plaintiffs are entitled to enforce the Act through a civil action pursuant to Education Code Section 66292.4.

351.    As a result of Defendants' conduct, Plaintiffs and the USF Baseball Subclass have been damaged in an amount to be proven at trial.

## COUNT VII

### GROSS NEGLIGENCE
### (PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST THE NCAA, USF, AND THE COACH DEFENDANTS)

352.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

353.    The USF Baseball Subclass brings this claim pursuant to California law.

354.    The NCAA, USF, Coach G, and Coach Naks owed Plaintiffs and the USF Baseball Subclass a duty to use due care to ensure their safety and freedom from sexual harassment or abuse while interacting with their employees, representatives, and/or agents, including Coach G and Coach Naks.

355.    Coach G and Coach Naks owed Plaintiffs a duty of due care in carrying out their coaching responsibilities as employees, agents, and/or representatives of the NCAA and USF.

356.    The Plaintiffs and the USF Baseball Subclass' acceptance of USF's offer to join the baseball team, including seeking out coaching from Coach G and Coach Naks in the course of their employment, agency, and/or representation of USF and the NCAA, created a special, confidential, and fiduciary relationship between Plaintiffs and Coach G, and between Plaintiffs and Coach Naks, resulting in Coach G and Coach Naks owing Plaintiffs a duty to use due care.

357.    The NCAA and USF's failure to adequately supervise Coach G, especially after the NCAA and USF knew or should have known of complaints regarding his sexual harassment and abuse while coaching was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

358.    The NCAA and USF's failure to adequately supervise Coach Naks, especially after the NCAA and USF knew or should have known of complaints regarding his sexual harassment and abuse while coaching was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

359.    Coach G's conduct in sexually harassing Plaintiffs in the course of his employment, agency, and/or representation of USF and the NCAA under the guise of coaching

1  was so reckless as to demonstrate a substantial lack of concern for whether an injury would result

2  to Plaintiffs.

3       360.    Coach Naks' conduct in sexually harassing Plaintiffs in the course of his

4  employment, agency, and/or representation of USF and the NCAA under the guise of coaching

5  was so reckless as to demonstrate a substantial lack of concern for whether an injury would result

6  to Plaintiffs.

7       361.    The NCAA and USF's conduct demonstrated a willful disregard for precautions to

8  ensure Plaintiffs' safety.

9       362.    The NCAA and USF's conduct as described above demonstrated a willful

10  disregard for substantial risks to Plaintiffs and the USF Baseball Subclass.

11      363.    The NCAA and USF breached duties owed to Plaintiffs and the USF Baseball

12  Subclass and were grossly negligent when they conducted themselves as described above, said

13  acts having been committed with reckless disregard for Plaintiffs and the USF Baseball Subclass'

14  health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to

15  whether an injury would result.

16      364.    The NCAA and USF are liable and vicariously liable for the Coach Defendants'

17  conduct.

18      365.    As a direct and/or proximate result of Defendants' actions and/or inactions,

19  Plaintiffs and the USF Baseball Subclass were damaged.

20                          **COUNT VIII**

21                          **NEGLIGENCE**
22  **(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST THE NCAA, USF,**
    **AND THE COACH DEFENDANTS)**

23      366.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

24      367.    The USF Baseball Subclass brings this claim pursuant to California law.

25      368.    The NCAA, USF, Coach G, and Coach Naks owed Plaintiffs and the USF

26  Baseball Subclass a duty to use due care to ensure their safety and freedom from sexual

27  harassment or abuse while interacting with their employees, representatives, and/or agents,

28  including Coach G and Coach Naks.

1     369.    Coach G and Coach Naks owed Plaintiffs a duty of due care in carrying out their

2  coaching responsibilities as employees, agents, and/or representatives of the NCAA and USF.

3     370.    The Plaintiffs and the USF Baseball Subclass' acceptance of USF's offer to join

4  the baseball team, including seeking out coaching from Coach G and Coach Naks in the course of

5  their employment, agency, and/or representation of USF and the NCAA, created a special,

6  confidential, and fiduciary relationship between Plaintiffs and Coach G, and between Plaintiffs

7  and Coach Naks, resulting in Coach G and Coach Naks owing Plaintiffs a duty to use due care.

8     371.    The NCAA and USF's negligence in supervising Coach G, especially after the

9  NCAA and USF knew or should have known of complaints regarding his sexual harassment and

10  abuse while coaching was a substantial factor in causing harm to Plaintiffs and the USF Baseball

11  Subclass.

12     372.    The NCAA and USF's negligence in supervising Coach Naks, especially after the

13  NCAA and USF knew or should have known of complaints regarding his sexual harassment and

14  abuse while coaching was a substantial factor in causing harm to Plaintiffs and the USF Baseball

15  Subclass.

16     373.    Coach G's negligent conduct in sexually harassing Plaintiffs in the course of his

17  employment, agency, and/or representation of USF and the NCAA under the guise of coaching

18  was a substantial factor in causing harm to Plaintiffs and the USF Baseball Subclass.

19     374.    Coach Naks' negligent conduct in sexually harassing Plaintiffs in the course of his

20  employment, agency, and/or representation of USF and the NCAA under the guise of coaching

21  was a substantial factor in causing harm to Plaintiffs and the USF Baseball Subclass.

22     375.    The NCAA and USF's conduct demonstrated a negligent disregard for precautions

23  to ensure Plaintiffs' safety.

24     376.    The NCAA and USF's conduct as described above demonstrated a negligent

25  disregard for substantial risks to Plaintiffs and the USF Baseball Subclass.

26     377.    The NCAA and USF breached duties owed to Plaintiffs and the USF Baseball

27  Subclass and were negligent when they conducted themselves as described above, said acts

28  having been committed with disregard for Plaintiffs and the USF Baseball Subclass' health,

safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

378.    The NCAA and USF are liable and vicariously liable for the Coach Defendants' conduct.

379.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs and the USF Baseball Subclass were damaged.

## COUNT IX

### NEGLIGENT FAILURE TO WARN, TRAIN, OR EDUCATE
### (PLAINTIFFS AND THE USF BASEBALL SUBCLASS
### AGAINST THE NCAA AND USF)

380.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

381.    The USF Baseball Subclass brings this claim pursuant to California law.

382.    The NCAA and USF owed Plaintiffs and the Class members a duty to take reasonable protective measures to protect them and other student-athletes from the risk of sexual harassment and abuse by the Coach Defendants by properly warning, training or educating Plaintiffs and the Class members and others about how to avoid such a risk.

383.    The NCAA and USF breached their duty to take reasonable protective measures to protect Plaintiffs and other student-athletes from the risk of sexual harassment and abuse by the Coach Defendants, such as the failure to properly warn, train or educate Plaintiffs and the Class members and other student-athletes about how to avoid such a particular risk that the Coach Defendants posed of sexual misconduct.

384.    The NCAA and USF breached their duties to take reasonable protective measures to protect Plaintiffs, Class members, and other student-athletes from the risk of sexual harassment and abuse by the Coach Defendants, by failing to supervise and stop their employees, agents and representatives, including the Coach Defendants, from committing wrongful harassment and abuse of student-athletes, including Plaintiffs and Class members.

385.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs and Class members were damaged.

**COUNT X**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST THE NCAA, USF,**
**AND THE COACH DEFENDANTS)**

386.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

387.    The USF Baseball Subclass brings this claim pursuant to California law.

388.    USF, Coach G, and Coach Naks' extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiffs and the Subclass members.

389.    USF, Coach G, and Coach Naks' outrageous conduct was not the type of ordinary rude or obnoxious behavior that student-athletes should be expected to weather.  Rather, USF, Coach G, and Coach Naks' conduct exceeded all possible bounds of decency.

390.    USF, Coach G and Coach Naks acted with intent or recklessness, knowing that the student-athletes were likely to endure emotional distress.

391.    Indeed, they used this distress to subdue and threaten the student-athletes, to force them to leave USF, to force them to give up their scholarships, to force them into the NCAA transfer portal, and to prevent them from complaining or suing based on their actions. They did so with deliberate disregard as to the high possibility that severe emotional distress would occur.

392.    USF and the Coach Defendants' conduct caused suffering for Plaintiffs and the USF Baseball Subclass at levels that no reasonable person should have to endure.

393.    The Coach Defendants' conduct was committed within the scope of their positions as NCAA and USF coaches.

394.    A causal nexus existed between (i) the Coach Defendants' recruitment and grooming of student-athletes to participate in the NCAA and at USF; and (ii) their abuse of power to coerce and harass those student-athletes.

395.    Each act of harassment and abuse was foreseeable given, *inter alia*, the use of NCAA and USF materials to lure the victims and the commission of the acts on the property of NCAA member institutions or with the chattels of the NCAA or NCAA member institutions.

396.    The Coach Defendants' conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the NCAA or USF's business.

1   Assaults in the context of NCAA and USF athletics by coaches and other athletics department

2   personnel are exactly why student-athletes would expect the NCAA and USF to take extra

3   precautions, or would expect the NCAA to require member institutions to implement extra

4   precautions, to ensure that they are protected from abuse by athletics department personnel.

5          397.    Holding the NCAA and USF liable furthers the policy goals of *respondeat*

6   *superior*, including the prevention of future injuries and the assurance of compensation to victims,

7   given that Plaintiffs and the USF Baseball Subclass do not have separate remedies under Title VII

8   because they are not (currently) considered employees of the NCAA or USF, or under Title IX as

9   to the NCAA because the NCAA does not receive federal funding. The Coach Defendants'

10  conduct was committed within the scope of their positions as NCAA and USF coaches.

11  **COUNT XI**

12  **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
13  **(PLAINTIFFS AND USF BASEBALL SUBCLASS AGAINST THE NCAA, USF, AND THE COACH DEFENDANTS)**

14         398.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

15         399.    The USF Baseball Subclass brings this claim pursuant to California law.

16         400.    USF and the Coach Defendants' conduct negligently caused emotional distress to

17  Plaintiffs and the USF Baseball Subclass.

18         401.    USF and the Coach Defendants could reasonably foresee that their actions would

19  have caused emotional distress to Plaintiffs and the USF Baseball Subclass.

20         402.    Plaintiffs and the USF Baseball Subclass were in a specific zone of danger meeting

21  with the Coach Defendants and at risk of physical harm, causing their fear.

22         403.    Plaintiffs and the USF Baseball Subclass, immediately or shortly after meeting

23  with the Coach Defendants, suffered distress and emotional harm.

24         404.    The Coach Defendants' conduct was committed within the scope of their position

25  as NCAA and USF coaches.

26         405.    A causal nexus existed between (i) the Coach Defendants' recruitment and

27  grooming of student-athletes to participate in the NCAA and at USF; and (ii) their abuse of power

28  to coerce and harass those student-athletes.

406.     Each act of harassment and abuse was foreseeable given, *inter alia*, the use of NCAA and USF materials to lure the victims and the commission of the acts on the property of NCAA member institutions or with the chattels of the NCAA or NCAA member institutions.

407.     The Coach Defendants' conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the NCAA's or USF's business. Assaults in the context of NCAA and USF athletics by coaches and other athletics department personnel are exactly why student-athletes would expect the NCAA and USF to take extra precautions, or would expect the NCAA to require member institutions to implement extra precautions, to ensure that they are protected from abuse by athletics department personnel.

408.     Holding the NCAA and USF liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the USF Baseball Subclass do not have separate remedies under Title VII because they are not (currently) considered employees of the NCAA or USF, or under Title IX as to the NCAA because the NCAA does not receive federal funding. The Coach Defendants' conduct was committed within the scope of their positions as NCAA and USF coaches.

## COUNT XII

### RATIFICATION
### (PLAINTIFFS AND THE USF BASEBALL SUBCLASS
### AGAINST THE NCAA AND USF)

409.     Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

410.     The USF Baseball Subclass brings this claim pursuant to California law.

411.     The Coach Defendants were NCAA and USF coaches for several decades.

412.     At the time of the acts alleged herein, there was an actual or assumed agency relationship between the Coach Defendants and the NCAA, the Coach Defendants and USF, and USF and the NCAA.

413.     All acts or omissions alleged herein were ratified by the NCAA and USF. The NCAA and USF had knowledge that coaches like the Coach Defendants were in sexual relationships with student-athletes and/or were sexually abusing or harassing student-athletes and refused to take any action to stop him or other predators like him. Moreover, USF hid this

1   information so that the Coach Defendants could continue to work for the NCAA and its member

2   institutions.

3         414.    Despite knowledge of the Coach Defendants' sexual misconduct by the NCAA,

4   USF, and/or their agents, no disciplinary action was taken and they were allowed to be alone with

5   student-athletes while on NCAA and USF business.

6         415.    The NCAA and USF are thus responsible for the Coach Defendants' actions.

7   **COUNT XIII**

8   **BREACH OF FIDUCIARY DUTY**
9   **(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST THE NCAA)**

10         416.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

11         417.    The USF Baseball Subclass brings this claim pursuant to California law.

12         418.    The NCAA owed a fiduciary duty to Plaintiffs and the USF Baseball Subclass that

13   arose out of the special relationship founded upon trust and confidence between the NCAA and

14   its student-athletes. A fiduciary duty was formed because the NCAA actively promoted itself as

15   providing a safe and nurturing environment for its student-athletes, and intended that Plaintiffs

16   and the USF Baseball Subclass believe this to be true so as to participate in NCAA sports.

17         419.    Plaintiffs and the USF Baseball Subclass believed and trusted the NCAA that its

18   member institutions would employ skilled, trained, competent, and ethical coaches and trainers in

19   connection with NCAA sports, who would carry out said coaching and training without sexual

20   assault, sexual, physical, and psychological abuse, and molestation.

21         420.    Plaintiffs and the USF Baseball Subclass believed and trusted that the NCAA

22   would inform Plaintiffs and the public of any allegations and concerns relating to sexual

23   harassment, sexual, physical, and psychological abuse, and molestation committed by NCAA

24   coaches and trainers.

25         421.    The NCAA owed Plaintiffs the highest duty to protect them and other student-

26   athletes from sexual predator coaches and trainers like the Coach Defendants.

27         422.    The NCAA breached its fiduciary duty to Plaintiffs and the USF Baseball Subclass

28   by failing to protect them from sexual predators such as the Coach Defendants, and failing to

1    warn them regarding the same.

2          423.    NCAA's breaches of its fiduciary duties were substantial contributing causes of

3    Plaintiffs' injuries and played a substantial part in bringing about the harm to Plaintiffs and the

4    USF Baseball Subclass.

5          424.    As a direct and proximate result of NCAA's breaches of its fiduciary duties,

6    Plaintiffs suffered and continue to suffer from emotional distress, physical manifestations of

7    emotional distress, loss of self-esteem, fright, anxiety, grief, humiliation and loss of enjoyment of

8    life; were prevented and will continue to be prevented from performing their daily activities and

9    obtaining the full enjoyment of life; and have sustained financial losses including but not limited

10   to the amounts of tuition and costs-of-attendance paid because of loss of scholarship due to

11   NCAA's actions and inactions, as well as out-of-pocket costs for therapy, counseling, and

12   medication to address the mental anguish and despair caused by NCAA's actions.

13         425.    Because Plaintiffs and the USF Baseball Subclass are at a continuing risk of harm,

14   Plaintiffs seek injunctive or equitable relief.

15                                    **COUNT XIV**

16              **NEGLIGENT MISREPRESENTATIONS AND OMISSIONS**
         **(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST NCAA)**
17

18         426.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

19         427.    The USF Baseball Subclass brings this claim pursuant to California law.

20         428.    The NCAA negligently concealed facts and information which were material to

21   Plaintiffs and the USF Baseball Subclass. As more fully described above, the NCAA knew or

22   should have known that its actions or inactions in the area of gender equity, including with

23   respect to sexual harassment, sexual, physical, and psychological abuse, and molestation of its

24   student-athletes by coaches or trainers, would cause harm to Plaintiffs and the USF Baseball

25   Subclass.

26         429.    The NCAA knew or should have known but negligently concealed the following

27   facts:

28              a.    The power differential between coaches and trainers and student-athletes

                                         -81-                    CLASS ACTION COMPLAINT
                                                                 CASE NO. 22-1559

exists and/or that certain coaching styles create a disparity of power, which would make student-athletes vulnerable to coaches or trainers who take advantage of the power differential for improper purposes, including sexual harassment, physical, sexual, or psychological abuse, and molestation;

b.   College athletics attracts sexual predators who secure jobs as coaches and trainers at NCAA member institutions to have nearly unfettered access to victims, which would make student-athletes vulnerable to such predators; and

c.   An extremely high incidence of marriages between coaches or trainers and student-athletes/former student-athletes, which indicates the existence of improper relationships between coaches and trainers and student-athletes, making student-athletes vulnerable to such inappropriate relationships.

430.   Through negligent concealment of material facts, the NCAA intended to induce a false belief in its student-athletes that NCAA sports were safe from sexual relationships, abuse or harassment by athletics department personnel, and that NCAA sports were a safe and nurturing environment for student-athletes. It failed to provide Plaintiffs and other student-athletes with a reasonably safe place for NCAA sports activities and interactions with coaches and trainers of NCAA member institutions.

431.   Plaintiffs justifiably relied on the misrepresentations. Plaintiffs and the USF Baseball Subclass were lulled into a false sense of belief that NCAA member institutions employed skilled, trained, competent, and ethical coaches and trainers in connection with NCAA sports, who would carry out said coaching and training without sexual harassment, sexual, physical, and psychological abuse, and molestation.

432.   Plaintiffs could not have discovered the truth through a reasonable inquiry and/or were prevented from doing so, because (1) the NCAA did not require nor encourage member institutions to publicly or privately report sexual abuse or harassment by athletics department personnel and thus fraudulently concealed the true nature and scope of the problem; (2) coaches demand unquestioning loyalty, and the NCAA and member institutions knowingly empowered

1  the coaches with full discretion over the student-athlete's scholarship and, hence, academic and

2  athletic careers.

3       433.    The concealed information was such that Plaintiffs would have acted differently,

4  including with respect to their college and coaching choices, had they been aware of all material

5  facts.

6       434.    As a proximate cause of NCAA's concealment, Plaintiffs and the USF Baseball

7  Subclass suffered harm described above.

8       435.    Because Plaintiffs and members of the USF Baseball Subclass are at a continuing

9  risk of harm, Plaintiffs seek injunctive or equitable relief.

10                                    **COUNT XV**

11                              **BREACH OF CONTRACT**
12              **(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST NCAA)**

13      436.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

14      437.    The USF Baseball Subclass brings this claim pursuant to California law.

15      438.    Each Plaintiff and class member entered into a contract with the NCAA. The

16  NCAA required that each student-athlete, prior to participation as an NCAA athlete, affirm in

17  writing that they read the NCAA regulations and the respective NCAA Division Manual, each of

18  which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative

19  Bylaws (collectively "Manual"). The contract for Division I is called a Form 19-1a, and the most

20  recent version is attached as Exhibit A. Based upon information and belief, the NCAA and USF

21  have Plaintiffs' contracts.

22      439.    The NCAA required that each student-athlete affirm in writing to having "read the

23  Summary of NCAA Regulations, or another outline or summary of NCAA legislation provided

24  by your director of athletics (or his or her designee) or read the bylaws of the NCAA Division I

25  Manual that address your eligibility. You are responsible for knowing and understanding the

26  application of all NCAA Division I bylaws related to your eligibility."

27      440.    For its part, in the Manual, the NCAA promised the following for the student-

28  athletes' benefit:

a.   "To initiate, stimulate and improve intercollegiate athletics programs for student athletes . . . . " NCAA Const., Art.1, § 1.2(a);

b.   "To uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," NCAA Const., Art.1, § 1.2(b);

c.   "To legislate, through bylaws or by resolutions of a Convention, upon any subject of general concern to the members related to the administration of intercollegiate athletics . . . . " NCAA Const., Art.1, § 1.2(h);

d.   To conduct intercollegiate athletics programs "in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes," NCAA Const., Art. 2, § 2.2 (Revised: 11/21/05);

e.   To require "each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3 (Adopted: 1/10/95);

f.   To require "each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach," NCAA Const., Art. 2, § 2.2.4 (Adopted: 1/10/95);

g.   To require that "each member institution to establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," NCAA Const., Art. 2, § 2.2 (Adopted: 1/10/95); and

h.   To "assist the institution in its efforts to achieve full compliance with all rules and regulations and shall afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance," NCAA Const., Art. 2, § 2.8.2.

441.   For consideration in return for the NCAA's undertakings, each student-athlete agrees to abide by the Manual and any other NCAA rules, participates in an NCAA sport which provides a benefit to the NCAA and its member institutions, and agrees to waive certain rights,

1     including the right to profit from participation.

2          442.    The Manual thus constitutes a contract between the NCAA and Plaintiffs and the

3     Class members.

4          443.    Plaintiffs have fulfilled their obligations under the contract by providing their

5     services as student-athletes in the NCAA.

6          444.    The NCAA has breached its contractual obligations to Plaintiffs and the USF

7     Baseball Subclass by failing to:

8               a.     prohibit sexual harassment and/or sexual abuse of student-athletes by

9                      athletics department personnel;

10              b.     prohibit any romantic or sexual relationships between athletics department

11                     personnel and student-athletes;

12              c.     prohibit grooming and other sexually-exploitative behavior by athletics

13                     department personnel of student-athletes;

14              d.     require NCAA member institutions to immediately report any allegations

15                     of sexual relationships, harassment, or abuse of a student-athlete by

16                     athletics department personnel;

17              e.     maintain about sexual relationships, harassment, or abuse of a student-

18                     athlete by athletics department personnel all reports in a centralized

19                     repository so that all complaints can be tracked by the NCAA and its

20                     member institutions;

21              f.     require that all reports of sexual relationships, harassment, or abuse of a

22                     student-athlete by athletics department personnel be independently

23                     investigated;

24              g.     implement public sanctions on member institutions and athletics

25                     department personnel where allegations of sexual relationships,

26                     harassment, or abuse of a student-athlete by athletics department personnel

27                     are substantiated;

28              h.     ban athletics department personnel from working or volunteering for any

1     member institution where allegations of sexual relationships, harassment,

2     or abuse of a student-athlete by such athletics department personnel are

3     substantiated;

4    i. mandate training of athletics department personnel regarding grooming,

5     sexual relationships with student-athletes, sexual abuse and harassment, the

6     prohibition thereof, and reporting obligations;

7    j. mandate training of athletics department personnel and student-athletes to

8     recognize the signs of grooming and sexual abuse and harassment by

9     athletics department personnel, and to provide confidential avenues to

10     report the abuse;

11    k. protect Plaintiffs and members of the USF Baseball Subclass from such

12     abuse and other foreseeable risks; and

13    l. provide a safe environment for NCAA student-athletes free from sexual

14     abuse and/or sexual harassment.

15   445. As a direct result of those breaches, Plaintiffs and the USF Baseball Subclass have

16 suffered harm as described above, including but not limited to the amounts of tuition and costs-

17 of-attendance paid because of loss of scholarship due to NCAA's actions and inactions, as well as

18 out-of-pocket costs for therapy, counseling, and medication to address the mental anguish and

19 despair caused by NCAA's actions.

20   446. Because Plaintiffs and the USF Baseball Subclass are at a continuing risk of harm,

21 Plaintiffs seek injunctive or equitable relief.

22          **<u>COUNT XVI</u>**

23        **BREACH OF IMPLIED CONTRACT**
      **(PLAINTIFFS AND THE USF SUBCLASS AGAINST NCAA)**
24

25   447. Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

26   448. The USF Baseball Subclass brings this claim pursuant to California law.

27   449. To the extent an express contract does not exist, the facts and circumstances set

28 forth above establish an implied contract wherein student-athletes, in return for participation,

agreed to be bound by NCAA rules and expected the NCAA to provide appropriate rules and regulations so as to protect their health and safety to the extent possible.

450.    The NCAA has breached its contractual obligations to Plaintiffs and the USF Baseball Subclass by failing to:

      a.    prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

      b.    prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

      c.    prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

      d.    require NCAA member institutions to immediately report any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

      e.    maintain all reports complaints about sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel in a centralized repository so that all can be tracked by the NCAA and its member institutions;

      f.    require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently investigated;

      g.    implement public sanctions on member institutions and athletics department personnel where allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel are substantiated;

      h.    ban athletics department personnel from working or volunteering for any member institution where allegations of sexual relationships, harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

i.      mandate training of athletics department personnel regarding grooming,

sexual relationships with student-athletes, sexual abuse and harassment, the

prohibition thereof, and reporting obligations;

j.      mandate training of athletics department personnel and student-athletes to

recognize the signs of grooming and sexual abuse and harassment by

athletics department personnel, and to provide confidential avenues to

report the abuse;

k.      protect Plaintiffs and members of the USF Baseball Subclass from such

abuse and other foreseeable risks; and

l.      provide a safe environment for NCAA student-athletes free from sexual

abuse and/or sexual harassment.

451.    As a direct result of those breaches, Plaintiffs and the USF Baseball Subclass have

suffered harm described above, including but not limited to the amounts of tuition and costs-of-

attendance paid because of loss of scholarship due to NCAA's actions and inactions, as well as

out-of-pocket costs for therapy, counseling, and medication to address the mental anguish and

despair caused by NCAA's actions.

452.    Because Plaintiffs and the USF Baseball Subclass re at a continuing risk of harm,

Plaintiffs seek injunctive or equitable relief.

## **COUNT XVII**

### **BREACH OF CONTRACT AS THIRD-PARTY BENEFICIARIES**
### **(PLAINTIFFS AND THE USF SUBCLASS AGAINST THE NCAA)**

453.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

454.    The USF Baseball Subclass brings this claim pursuant to California law.

455.    To the extent the Court finds no contract exists, either express or implied, between

Plaintiffs and the USF Baseball Subclass and the NCAA, then the NCAA and its member

institutions were parties to a contract. As an express condition of their membership in the NCAA,

each institution must agree to abide by the respective NCAA Division Manual, each of which

expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws

(collectively "Manual"). The Manual thus constitutes a contract between the NCAA and its member institutions.

456.   Plaintiffs and the USF Baseball Subclass are third-party beneficiaries of the contract between the NCAA and its members because the parties to the contract intended to benefit the student-athletes.

457.   In the Manual, the NCAA promises the following for the student-athlete's benefit:

a.   "to initiate, stimulate and improve intercollegiate athletics programs for student athletes . . . ," NCAA Const., Art.1, § 1.2(a);

b.   "to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," NCAA Const., Art.1, § 1.2(b);

c.   to conduct intercollegiate athletics programs "in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes," NCAA Const., Art. 2, § 2.2 (Revised: 11/21/05);

d.   to require "each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3 (Adopted: 1/10/95);

e.   to require "each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach," NCAA Const., Art. 2, § 2.2.4 (Adopted: 1/10/95);

f.   to require that "each member institution to establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," NCAA Const., Art. 2, § 2.2 (Adopted: 1/10/95);

g.   to "assist the institution in its efforts to achieve full compliance with all rules and regulations and shall afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance," NCAA Const., Art. 2, § 2.8.2.

458.   The NCAA has breached its contractual obligations to Plaintiffs and the USF Baseball Subclass by failing to:

    a.   prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

    b.   prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

    c.   prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

    d.   require NCAA member institutions to immediately report any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

    e.   maintain all reports about sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel in a centralized repository so that all complaints can be tracked by the NCAA and its member institutions;

    f.   require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently investigated;

    g.   implement public sanctions on member institutions and athletics department personnel where allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel are substantiated;

    h.   ban athletics department personnel from working or volunteering for any member institution where allegations of sexual relationships, harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

    i.   mandate training of athletics department personnel regarding grooming, sexual relationships with student-athletes, sexual abuse and harassment, the

1        prohibition thereof, and reporting obligations;

2            j.        mandate training of athletics department personnel and student-athletes to

3                      recognize the signs of grooming and sexual abuse and harassment by

4                      athletics department personnel, and to provide confidential avenues to

5                      report the abuse;

6            k.        protect Plaintiffs and members of the USF Baseball Subclass from such

7                      abuse and other foreseeable risks; and

8            l.        provide a safe environment for NCAA student-athletes free from sexual

9                      abuse and/or sexual harassment.

10       459.    As a direct result of those breaches, Plaintiffs and the USF Baseball Subclass have

11  suffered harm described above, including but not limited to the amounts of tuition and costs-of-

12  attendance paid because of loss of scholarship due to NCAA's actions and inactions, as well as

13  out-of-pocket costs for therapy, counseling, and medication to address the mental anguish and

14  despair caused by NCAA's actions.

15       460.    Because Plaintiffs and the USF Baseball Subclass are at a continuing risk of harm,

16  Plaintiffs seek injunctive or equitable relief.

**VIII.    CLAIMS AGAINST THE NCAA ON BEHALF OF THE NATIONWIDE CLASS
           AND CALIFORNIA SUBCLASS**

**COUNT XVIII**

**GROSS NEGLIGENCE**
**(PLAINTIFFS, THE NATIONWIDE CLASS, AND THE CALIFORNIA SUBCLASS
AGAINST THE NCAA)**

22       461.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

23       462.    The Nationwide Class brings this claim pursuant to Indiana law.

24       463.    The California Subclass brings this claim pursuant to California law.

25       464.    At all relevant times, the NCAA owed a duty to Plaintiffs, the Nationwide Class,

26  and the California Subclass to implement and enforce rules and bylaws to, *inter alia*:

27           a.        prohibit sexual harassment and/or sexual abuse of student-athletes by

28                     athletics department personnel;

b.  prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

c.  require NCAA member institutions to immediately report any allegations of sexual harassment, or abuse of a student-athletes by athletics department personnel;

d.  maintain all reports about sexual harassment or abuse of a student-athlete by athletics department personnel in a centralized repository so that all complaints can be tracked by the NCAA and its member institutions;

e.  require that all reports of sexual harassment or abuse of a student-athlete by athletics department personnel be independently investigated;

f.  implement public sanctions on member institutions and athletics department personnel where allegations of sexual harassment or abuse of a student-athlete by athletics department personnel are substantiated;

g.  ban athletics department personnel from working or volunteering for any member institution where allegations of sexual harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

h.  mandate training of athletics department personnel regarding grooming, sexual abuse and harassment, the prohibition thereof, and reporting obligations;

i.  mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

j.  protect Plaintiffs, the Nationwide Class, and the California Subclass from such abuse and other foreseeable risks;

k.  protect Plaintiffs, the Nationwide Class, and the California Subclass from coercion to leave their teams, enter the NCAA transfer portal, and/or forego their scholarships without an independent ombudsman and advocate

1          for the student-athletes; and

2              l.     provide a safe environment for NCAA student-athletes free from sexual

3                     abuse and harassment.

4      2.     The NCAA's duty arose from the following:

5              a.     The NCAA's Constitution and Bylaws, which, among other things,

6                     establish a duty to protect the health and well-being of NCAA student-

7                     athletes, including in the areas of health and safety and in gender equity,

8                     which includes student-athlete/coach relationships;

9              b.     The NCAA's website, which establishes a duty to exercise reasonable care

10                    concerning the health and well-being of its student-athletes in connection

11                    with its sports; and

12             c.     The NCAA's positioning of itself as the exclusive authority in

13                    intercollegiate athletics to preserve its goal of preserving amateurism.

14     465.   The NCAA acted recklessly and indifferently in its position as the regulatory body

15  for college athletics among its members institutions and its student-athletes, including Plaintiffs,

16  the Nationwide Class, and the California Subclass.

17     466.   The NCAA knew or should have known that its actions or inactions in the area of

18  gender equity with respect to sexual abuse and harassment by athletics department personnel of

19  student-athletes created an unreasonable risk of harm to Plaintiffs, the Nationwide Class, and the

20  California Subclass, such that the risk was so great that it was highly probable that the harm

21  would result.

22     467.   The NCAA has been aware of the issue for years, and has ignored previous calls

23  by eight United States senators and its own study commission to fix the problem. In fact, the

24  NCAA disbanded the NCAA study group called the Commission to Combat Campus Sexual

25  Violence in 2018, promising only to continue to "monitor and track on sexual violence issues."

26     468.   The NCAA knew or should have known that the power differential between

27  coaches, trainers and other athletics department personnel on the one hand, and student-athletes

28  on the other, so favors the athletics department personnel that student-athletes cannot effectively

protect themselves from inappropriate conduct or from retaliation. Moreover, this disparity of power negates any purported consent by the student-athlete when confronted by inappropriate conduct or retaliation.

469.    The NCAA thus owed its student-athletes a duty to protect them from the foreseeable risk of coaches or trainers who take advantage of the power differential for improper purposes.

470.    The NCAA knew or should have known that college athletics attracts sexual predators who secure jobs as coaches and trainers at NCAA member institutions to have nearly unfettered access to victims, and so owed its student-athletes a duty to protect them from the foreseeable risk of such coaches or trainers.

471.    Plaintiffs had a reasonable expectation that the NCAA would require its member institutions to employ (and the member institutions would employ) skilled, trained, competent, and ethical coaches and trainers in connection with NCAA sports, who would carry out said coaching and training without sexual harassment, sexual, physical, and psychological abuse, and molestation.

472.    Plaintiffs also had a reasonable expectation that the NCAA would inform Plaintiffs and the public of sexual harassment, sexual, physical, and psychological abuse, and molestation committed by NCAA coaches and trainers.

473.    The NCAA willfully disregarded precautions that would reasonably protect Plaintiffs, the Nationwide Class, and the California Subclass and their safety and well-being in the following, including but not limited to by failing to:

        a.      prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

        b.      prohibit sexual and romantic relationships between student-athletes and athletics department personnel;

        c.      prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

        d.      require NCAA member institutions to immediately report any allegations

1    of sexual harassment, or abuse of a student-athletes by athletics department

2    personnel;

3    e.    maintain all reports about sexual harassment or abuse of a student-athlete

4    by athletics department in a centralized repository so that all complaints

5    can be tracked by the NCAA and its member institutions;

6    f.    require that all reports of sexual harassment or abuse of a student-athlete by

7    athletics department personnel be independently investigated;

8    g.    implement public sanctions on member institutions and athletics

9    department personnel where allegations of sexual harassment or abuse of a

10    student-athlete by athletics department personnel are substantiated;

11    h.    ban athletics department personnel from working or volunteering for any

12    member institution where allegations of sexual harassment, or abuse of a

13    student-athlete by such athletics department personnel are substantiated;

14    i.    mandate training of athletics department personnel regarding grooming,

15    sexual abuse and harassment, the prohibition thereof, and reporting

16    obligations;

17    j.    mandate training of athletics department personnel and student-athletes to

18    recognize the signs of grooming and sexual abuse and harassment by

19    athletics department personnel, and to provide confidential avenues to

20    report the abuse;

21    k.    protect Plaintiffs, the Nationwide Class, and the California Subclass from

22    such abuse and other foreseeable risks;

23    l.    protect Plaintiffs, the Nationwide Class, and the California Subclass from

24    coercion to leave their teams, enter the NCAA transfer portal, and/or

25    forego their scholarships without an independent ombudsman and advocate

26    for the student-athletes; and

27    m.    provide a safe environment for NCAA student-athletes free from sexual

28    abuse and harassment.

474.    The NCAA's conduct described above demonstrated a willful disregard for substantial risks to Plaintiffs, the Nationwide Class, and the California Subclass.

475.    The NCAA's reckless conduct exhibited a willful disregard for necessary precautions to reasonably protect Plaintiffs, the Nationwide Class, and the California Subclass, which was a substantial contributing cause of Plaintiffs' sexual harassment, and sexual and psychological abuse.

476.    Because Plaintiffs, the Nationwide Class, and the California Subclass are at a continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

**COUNT XIX**

**NEGLIGENCE**
**(PLAINTIFFS, THE NATIONWIDE CLASS, AND THE CALIFORNIA SUBCLASS**
**AGAINST THE NCAA)**

477.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

478.    The Nationwide Class brings this claim pursuant to Indiana law.

479.    The California Subclass brings this claim pursuant to California law.

480.    At all relevant times, the NCAA owed a duty to Plaintiffs, the Nationwide Class, and the California Subclass to implement and enforce rules and bylaws to, *inter alia*:

      a.    prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

      b.    prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

      c.    require NCAA member institutions to immediately report any allegations of sexual harassment, or abuse of a student-athletes by athletics department personnel;

      d.    maintain all reports about sexual harassment or abuse of a student-athlete by athletics department personnel in a centralized repository so that all complaints can be tracked by the NCAA and its member institutions;

      e.    require that all reports of sexual harassment or abuse of a student-athlete by athletics department personnel be independently investigated;

1        f.      implement public sanctions on member institutions and athletics

2              department personnel where allegations of sexual harassment or abuse of a

3              student-athlete by athletics department personnel are substantiated;

4        g.      ban athletics department personnel from working or volunteering for any

5              member institution where allegations of sexual harassment, or abuse of a

6              student-athlete by such athletics department personnel are substantiated;

7        h.      mandate training of athletics department personnel regarding grooming,

8              sexual abuse and harassment, the prohibition thereof, and reporting

9              obligations;

10      i.      mandate training of athletics department personnel and student-athletes to

11            recognize the signs of grooming and sexual abuse and harassment by

12            athletics department personnel, and to provide confidential avenues to

13            report the abuse;

14      j.      protect Plaintiffs, the Nationwide Class, and the California Subclass from

15            such abuse and other foreseeable risks;

16      k.      protect Plaintiffs, the Nationwide Class, and the California Subclass from

17            coercion to leave their teams, enter the NCAA transfer portal, and/or

18            forego their scholarships without an independent ombudsman and advocate

19            for the student-athletes; and

20      l.      provide a safe environment for NCAA student-athletes free from sexual

21            abuse and harassment.

22   481.   The NCAA's duty arose from the following:

23      a.      The NCAA's Constitution and Bylaws, which, among other things,

24            establish a duty to protect the health and well-being of NCAA student-

25            athletes, including in the areas of health and safety and in gender equity,

26            which includes student-athlete/coach relationships;

27      b.      The NCAA's website, which establishes a duty to exercise reasonable care

28            concerning the health and well-being of its student-athletes in connection

1      with its sports;

2            c.      The NCAA's positioning of itself as the exclusive authority in

3                    intercollegiate athletics to preserve its goal of preserving amateurism.

4      482.    The NCAA acted negligently, carelessly, and indifferently in its position as the

5      regulatory body for college athletics among its members' institutions and its student-athletes,

6      including Plaintiffs, the Nationwide Class, and the California Subclass.

7      483.    The NCAA knew or should have known that its actions or inactions in the area of

8      gender equity with respect to sexual abuse and harassment by athletics department personnel of

9      student-athletes created an unreasonable risk of harm to Plaintiffs, the Nationwide Class, and the

10     California Subclass, such that the risk was so great that it was highly probable that the harm

11     would result.

12     484.    The NCAA has been aware of the issue for years, and has ignored previous calls

13     by eight United States senators and its own study commission to fix the problem. In fact, the

14     NCAA disbanded the NCAA study group called the Commission to Combat Campus Sexual

15     Violence in 2018, promising only to continue to "monitor and track on sexual violence issues."

16     485.    The NCAA knew or should have known that the power differential between

17     coaches, trainers and other athletics department personnel on the one hand, and student-athletes

18     on the other hand, so favors the athletics department personnel that student-athletes cannot

19     effectively protect themselves from inappropriate conduct. Moreover, this disparity of power

20     negates any purported consent by the student-athlete when confronted by inappropriate conduct.

21     486.    The NCAA thus owed its student-athletes a duty to protect them from the

22     foreseeable risk of coaches or trainers who take advantage of the power differential for improper

23     purposes.

24     487.    The NCAA knew or should have known that college athletics attracts sexual

25     predators who secure jobs as coaches and trainers at NCAA member institutions to have nearly

26     unfettered access to victims, and so owed its student-athletes a duty to protect them from the

27     foreseeable risk of such coaches or trainers.

28     488.    Plaintiffs had a reasonable expectation that the NCAA would require its member

CLASS ACTION COMPLAINT
CASE NO. 22-1559

1  institutions to employ (and the member institutions would employ) skilled, trained, competent,

2  and ethical coaches and trainers in connection with NCAA sports, who would carry out said

3  coaching and training without sexual harassment, sexual, physical, and psychological abuse, and

4  molestation.

5         489.    Plaintiffs also had a reasonable expectation that the NCAA would inform Plaintiffs

6  and the public of sexual harassment, sexual, physical, and psychological abuse, and molestation

7  committed by NCAA coaches and trainers.

8         490.    The NCAA willfully disregarded precautions that would reasonably protect

9  Plaintiffs, the Nationwide Class, and the California Subclass and their safety and well-being in

10  the following, including but not limited to by failing to:

11         a.    prohibit sexual harassment and/or sexual abuse of student-athletes by

12              athletics department personnel;

13         b.    prohibit grooming and other sexually-exploitative behavior by athletics

14              department personnel of student-athletes;

15         c.    require NCAA member institutions to immediately report any allegations

16              of sexual harassment, or abuse of a student-athletes by athletics department

17              personnel;

18         d.    maintain all reports about sexual harassment or abuse of a student-athlete

19              by athletics department personnel in a centralized repository so that all

20              complaints can be tracked by the NCAA and its member institutions;

21         e.    require that all reports of sexual harassment or abuse of a student-athlete by

22              athletics department personnel be independently investigated;

23         f.    implement public sanctions on member institutions and athletics

24              department personnel where allegations of sexual harassment or abuse of a

25              student-athlete by athletics department personnel are substantiated;

26         g.    ban athletics department personnel from working or volunteering for any

27              member institution where allegations of sexual harassment, or abuse of a

28              student-athlete by such athletics department personnel are substantiated;

h.    mandate training of athletics department personnel regarding grooming, sexual abuse and harassment, the prohibition thereof, and reporting obligations.;

i.    mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

j.    protect Plaintiffs, the Nationwide Class, and the California Subclass from such abuse and other foreseeable risks;

k.    protect Plaintiffs, the Nationwide Class, and the California Subclass from coercion to leave their teams, enter the NCAA transfer portal, and/or forego their scholarships without an independent ombudsman and advocate for the student-athletes; and

l.    provide a safe environment for NCAA student-athletes free from sexual abuse and harassment.

491.    The NCAA's conduct described above demonstrated a negligent disregard for substantial risks to Plaintiffs, the Nationwide Class, and the California Subclass.

492.    The NCAA's negligent conduct exhibited a disregard for necessary precautions to reasonably protect Plaintiffs, the Nationwide Class, and the California Subclass, which was a substantial contributing cause of Plaintiffs' sexual and psychological abuse, and molestation.

493.    Because Plaintiffs, the Nationwide Class, and the California Subclass are at a continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

## COUNT XX

### BREACH OF FIDUCIARY DUTY
**(PLAINTIFFS, THE NATIONWIDE CLASS, AND THE CALIFORNIA SUBCLASS AGAINST THE NCAA)**

494.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

495.    The Nationwide Class brings this claim pursuant to Indiana law.

496.    The California Subclass brings this claim pursuant to California law.

497.    The NCAA owed a fiduciary duty to Plaintiffs, the Nationwide Class, and the California Subclass that arose out of the special relationship founded upon trust and confidence between the NCAA and its student-athletes. A fiduciary duty was formed because the NCAA actively promoted itself as providing a safe and nurturing environment for its student-athletes, and intended that Plaintiffs, the Nationwide Class, and the California Subclass believe this to be true so as to participate in NCAA sports.

498.    Plaintiffs, the Nationwide Class, and the California Subclass believed and trusted the NCAA that its member institutions would employ skilled, trained, competent, and ethical coaches and trainers in connection with NCAA sports, who would carry out said coaching and training without sexual assault, sexual, physical, and psychological abuse, and molestation.

499.    Plaintiffs, the Nationwide Class, and the California Subclass believed and trusted that the NCAA would inform Plaintiffs and the public of any allegations and concerns relating to sexual harassment, sexual, physical, and psychological abuse, and molestation committed by NCAA coaches and trainers.

500.    The NCAA owed Plaintiffs the highest duty to protect them and other student-athletes from sexual predator coaches and trainers like the Coach Defendants.

501.    The NCAA breached its fiduciary duty to Plaintiffs, the Nationwide Class, and the California Subclass by failing to protect them from sexual predators such as the Coach Defendants, and failing to warn them regarding the same.

502.    NCAA's breaches of its fiduciary duties were substantial contributing causes of Plaintiffs' injuries and played a substantial part in bringing about the harm to Plaintiffs.

503.    Because Plaintiffs, the Nationwide Class, and the California Subclass are at a continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

## COUNT XXI

**NEGLIGENT MISREPRESENTATIONS AND OMISSIONS**
**(PLAINTIFFS, THE NATIONWIDE CLASS, AND CALIFORNIA SUBCLASS AGAINST NCAA)**

504.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

505.    The Nationwide Class brings this claim pursuant to Indiana law.

506.    The California Subclass brings this claim pursuant to California law.

507.    The NCAA negligently concealed facts and information which were material to Plaintiffs, the Nationwide Class, and the California Subclass. As more fully described above, the NCAA knew or should have known that its actions or inactions in the area of gender equity, including with respect to sexual harassment, sexual, physical, and psychological abuse, and molestation of its student-athletes by coaches or trainers, would cause harm to Plaintiffs, the Nationwide Class, and the California Subclass.

508.    The NCAA knew or should have known but negligently concealed the following facts:

    a.    The power differential between coaches and trainers and student-athletes exists and/or that certain coaching styles create a disparity of power, which would make student-athletes vulnerable to coaches or trainers who take advantage of the power differential for improper purposes, including sexual harassment, physical, sexual, or psychological abuse, and molestation;

    b.    College athletics attracts sexual predators who secure jobs as coaches and trainers at NCAA member institutions to have nearly unfettered access to victims, which would make student-athletes vulnerable to such predators; and

    c.    An extremely high incidence of marriages between coaches or trainers and student-athletes/former student-athletes, which indicates the existence of improper relationships between coaches and trainers and student-athletes, making student-athletes vulnerable to such inappropriate relationships.

509.    Through negligent concealment of material facts, the NCAA intended to induce a false belief in its student-athletes that NCAA sports were safe from sexual relationships, abuse or harassment by athletics department personnel, and that NCAA sports were a safe and nurturing environment for student-athletes. It failed to provide Plaintiffs and other student-athletes with a reasonably safe place for NCAA sports activities and interactions with coaches and trainers of NCAA member institutions.

510.     Plaintiffs justifiably relied on the misrepresentations. Plaintiffs, the Nationwide Class, and the California Subclass were lulled into a false sense of belief that NCAA member institutions employed skilled, trained, competent, and ethical coaches and trainers in connection with NCAA sports, who would carry out said coaching and training without sexual harassment, sexual, physical, and psychological abuse, and molestation.

511.     Plaintiffs could not have discovered the truth through a reasonable inquiry and/or were prevented from doing so, because (1) the NCAA did not require nor encourage member institutions to publicly or privately report sexual abuse or harassment by athletics department personnel and thus fraudulently concealed the true nature and scope of the problem; (2) coaches demand unquestioning loyalty, and the NCAA and member institutions knowingly empowered the coaches with full discretion over the student-athlete's scholarship and, hence, academic and athletic careers.

512.     The concealed information was such that Plaintiffs would have acted differently, including with respect to their college and coaching choices, had they been aware of all material facts.

513.     As a proximate cause of NCAA's concealment, Plaintiffs, the Nationwide Class, and the California Subclass suffered harm described above.

514.     Because Plaintiffs, the Nationwide Class, and the California Subclass are at a continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

## COUNT XXII

### BREACH OF CONTRACT
### (PLAINTIFFS, THE NATIONWIDE CLASS, AND
### CALIFORNIA SUBCLASS AGAINST NCAA)

515.     Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

516.     The Nationwide Class brings this claim pursuant to Indiana law.

517.     The California Subclass brings this claim pursuant to California law.

518.     Each Plaintiff and class member entered into a contract with the NCAA. The NCAA required that each student-athlete, prior to participation as an NCAA athlete, affirm in writing that they read the NCAA regulations and the respective NCAA Division Manual, each of

which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws (collectively "Manual"). The contract for Division I is called a Form 19-1a, and the most recent version is attached as Exhibit A. Based upon information and belief, the NCAA and USF have Plaintiffs' contracts.

519.    The NCAA required that each student-athlete affirm in writing to having "read the Summary of NCAA Regulations, or another outline or summary of NCAA legislation provided by your director of athletics (or his or her designee) or read the bylaws of the NCAA Division I Manual that address your eligibility. You are responsible for knowing and understanding the application of all NCAA Division I bylaws related to your eligibility."

520.    For its part, in the Manual, the NCAA promised the following for the student-athletes' benefit:

    a.    "To initiate, stimulate and improve intercollegiate athletics programs for student athletes . . . . " NCAA Const., Art.1, § 1.2(a);

    b.    "To uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," NCAA Const., Art.1, § 1.2(b);

    c.    "To legislate, through bylaws or by resolutions of a Convention, upon any subject of general concern to the members related to the administration of intercollegiate athletics . . . . " NCAA Const., Art.1, § 1.2(h);

    d.    To conduct intercollegiate athletics programs "in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes," NCAA Const., Art. 2, § 2.2 (Revised: 11/21/05);

    e.    To require "each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3 (Adopted: 1/10/95);

    f.    To require "each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach," NCAA Const., Art. 2, § 2.2.4 (Adopted: 1/10/95);

g.    To require that "each member institution to establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," NCAA Const., Art. 2, § 2.2 (Adopted: 1/10/95); and

h.    To "assist the institution in its efforts to achieve full compliance with all rules and regulations and shall afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance," NCAA Const., Art. 2, § 2.8.2.

521.    For consideration in return for the NCAA's undertakings, each student-athlete agrees to abide by the Manual and any other NCAA rules, participates in an NCAA sport which provides a benefit to the NCAA and its member institutions, and agrees to waive certain rights, including the right to profit from participation.

522.    The Manual thus constitutes a contract between the NCAA and Plaintiffs, the Nationwide Class, and the California Subclass.

523.    Plaintiffs have fulfilled their obligations under the contract by providing their services as student-athletes in the NCAA.

524.    The NCAA has breached its contractual obligations to Plaintiffs, the Nationwide Class, and the California Subclass by failing to:

a.    prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

b.    prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

c.    prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

d.    require NCAA member institutions to immediately report any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

e.    maintain about sexual relationships, harassment, or abuse of a student-

1        athlete by athletics department personnel all reports in a centralized

2        repository so that all complaints can be tracked by the NCAA and its

3        member institutions;

4    f.   require that all reports of sexual relationships, harassment, or abuse of a

5        student-athlete by athletics department personnel be independently

6        investigated;

7    g.   implement public sanctions on member institutions and athletics

8        department personnel where allegations of sexual relationships,

9        harassment, or abuse of a student-athlete by athletics department personnel

10       are substantiated;

11   h.   ban athletics department personnel from working or volunteering for any

12       member institution where allegations of sexual relationships, harassment,

13       or abuse of a student-athlete by such athletics department personnel are

14       substantiated;

15   i.   mandate training of athletics department personnel regarding grooming,

16       sexual relationships with student-athletes, sexual abuse and harassment, the

17       prohibition thereof, and reporting obligations;

18   j.   mandate training of athletics department personnel and student-athletes to

19       recognize the signs of grooming and sexual abuse and harassment by

20       athletics department personnel, and to provide confidential avenues to

21       report the abuse;

22   k.   protect Plaintiffs, the Nationwide Class, and the California Subclass from

23       such abuse and other foreseeable risks; and

24   l.   provide a safe environment for NCAA student-athletes free from sexual

25       abuse and/or sexual harassment.

26   525.   As a direct result of those breaches, Plaintiffs, the Nationwide Class, and the

27   California Subclass have suffered harm as described above.

28   526.   Because Plaintiffs, the Nationwide Class, and the California Subclass are at a

continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

## COUNT XXIII

### BREACH OF IMPLIED CONTRACT
### (PLAINTIFFS, THE NATIONWIDE CLASS, AND
### CALIFORNIA SUBCLASS AGAINST NCAA)

527.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

528.    The Nationwide Class brings this claim pursuant to Indiana law.

529.    The California Subclass brings this claim pursuant to California law.

530.    To the extent an express contract does not exist, the facts and circumstances set forth above establish an implied contract wherein student-athletes, in return for participation, agreed to be bound by NCAA rules and expected the NCAA to provide appropriate rules and regulations so as to protect their health and safety to the extent possible.

531.    The NCAA has breached its contractual obligations to Plaintiffs, the Nationwide Class, and the California Subclass by failing to:

    a.    prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

    b.    prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

    c.    prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

    d.    require NCAA member institutions to immediately report any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

    e.    maintain all reports complaints about sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel in a centralized repository so that all can be tracked by the NCAA and its member institutions;

    f.    require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently

1    investigated;

2    g.    implement public sanctions on member institutions and athletics

3    department personnel where allegations of sexual relationships,

4    harassment, or abuse of a student-athlete by athletics department personnel

5    are substantiated;

6    h.    ban athletics department personnel from working or volunteering for any

7    member institution where allegations of sexual relationships, harassment,

8    or abuse of a student-athlete by such athletics department personnel are

9    substantiated;

10    i.    mandate training of athletics department personnel regarding grooming,

11    sexual relationships with student-athletes, sexual abuse and harassment, the

12    prohibition thereof, and reporting obligations;

13    j.    mandate training of athletics department personnel and student-athletes to

14    recognize the signs of grooming and sexual abuse and harassment by

15    athletics department personnel, and to provide confidential avenues to

16    report the abuse;

17    k.    protect Plaintiffs, the Nationwide Class, and the California Subclass from

18    such abuse and other foreseeable risks; and

19    l.    provide a safe environment for NCAA student-athletes free from sexual

20    abuse and/or sexual harassment.

21    532.    As a direct result of those breaches, Plaintiffs, the Nationwide Class, and the

22    California Subclass have suffered harm described above.

23    533.    Because Plaintiffs, the Nationwide Class, and the California Subclass are at a

24    continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

25    <u>**COUNT XXIV**</u>

26    **BREACH OF CONTRACT AS THIRD-PARTY BENEFICIARIES**
**(PLAINTIFFS, THE NATIONWIDE CLASS,**

27    **AND CALIFORNIA SUBCLASS AGAINST THE NCAA)**

28    534.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

535. The Nationwide Class brings this claim pursuant to Indiana law.

536. The California Subclass brings this claim pursuant to California law.

537. To the extent the Court finds no contract exists, either express or implied, between Plaintiffs, the Nationwide Class, and the California Subclass and the NCAA, then the NCAA and its member institutions were parties to a contract. As an express condition of their membership in the NCAA, each institution must agree to abide by the respective NCAA Division Manual, each of which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws (collectively, the "Manual"). The Manual thus constitutes a contract between the NCAA and its member institutions.

538. Plaintiffs, the Nationwide Class, and the California Subclass are third-party beneficiaries of the contract between the NCAA and its members because the parties to the contract intended to benefit the student-athletes.

539. In the Manual, the NCAA promises the following for the student-athlete's benefit:

a. "to initiate, stimulate and improve intercollegiate athletics programs for student athletes . . . ," NCAA Const., Art.1, § 1.2(a);

b. "to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," NCAA Const., Art.1, § 1.2(b);

c. to conduct intercollegiate athletics programs "in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes," NCAA Const., Art. 2, § 2.2 (Revised: 11/21/05);

d. to require "each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3 (Adopted: 1/10/95);

e. to require "each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach," NCAA Const., Art. 2, § 2.2.4 (Adopted: 1/10/95);

f. to require that "each member institution to establish and maintain an

environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," NCAA Const., Art. 2, § 2.2 (Adopted: 1/10/95);

g.    to "assist the institution in its efforts to achieve full compliance with all rules and regulations and shall afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance," NCAA Const., Art. 2, § 2.8.2.

540.    The NCAA has breached its contractual obligations to Plaintiffs, the Nationwide Class, and the California Subclass by failing to:

a.    prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

b.    prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

c.    prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

d.    require NCAA member institutions to immediately report any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

e.    maintain all reports about sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel in a centralized repository so that all complaints can be tracked by the NCAA and its member institutions;

f.    require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently investigated;

g.    implement public sanctions on member institutions and athletics department personnel where allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel

1    are substantiated;

2    h.    ban athletics department personnel from working or volunteering for any

3    member institution where allegations of sexual relationships, harassment,

4    or abuse of a student-athlete by such athletics department personnel are

5    substantiated;

6    i.    mandate training of athletics department personnel regarding grooming,

7    sexual relationships with student-athletes, sexual abuse and harassment, the

8    prohibition thereof, and reporting obligations;

9    j.    mandate training of athletics department personnel and student-athletes to

10    recognize the signs of grooming and sexual abuse and harassment by

11    athletics department personnel, and to provide confidential avenues to

12    report the abuse;

13    k.    protect Plaintiffs, the Nationwide Class, and the California Subclass from

14    such abuse and other foreseeable risks; and

15    l.    provide a safe environment for NCAA student-athletes free from sexual

16    abuse and/or sexual harassment.

17    541.    As a direct result of those breaches, Plaintiffs, the Nationwide Class, and the

18    California Subclass have suffered harm described above.

19    542.    Because Plaintiffs, the Nationwide Class, and the California Subclass are at a

20    continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

21    **IX.    PRAYER FOR RELIEF**

22    WHEREFORE, Plaintiffs, individually and on behalf of the Nationwide Class, the USF

23    Subclass, and the California Subclass, respectfully request that the Court enter a judgment on

24    their behalf and against the NCAA, the University of San Francisco, Nino Giarratano, and Troy

25    Nakamura, and further grant the following relief:

26    A.    Certify the proposed Class and Subclasses pursuant to the Rules 23(a), (b)(2),

27    (b)(3) and/or (c)(4);

28    B.    Designate Plaintiffs as representatives of the proposed Class and Subclasses and

1    Plaintiffs' counsel as Class counsel;

2        C.      Declare that the NCAA owes a legal duty to protect student-athletes enrolled at

3    member institutions;

4        D.      Award injunctive relief requiring the NCAA to implement and enforce rules and

5    bylaws that are considered consensus best practices, including those set out above because: (1)

6    there is a substantial likelihood that Plaintiffs and Classes will prevail on the merits; (2) there is a

7    real and substantial threat that the Classes will suffer irreparable injury if the injunction is not

8    granted; (3) the Classes' threatened injury outweighs any threatened harm to the NCAA; and (4)

9    granting the injunction will serve the public interest.

10       E.      Award Plaintiffs and Classes compensatory damages, punitive damages, pain and

11   suffering, and any other relief to which they are entitled under the law;

12       F.      Award Plaintiffs and the Classes prejudgment interest, costs and attorneys' fees;

13   and

14       G.      Award Plaintiffs and Classes for such other and further relief as the Court deems

15   just and proper.

16   **X.      <u>DEMAND FOR TRIAL BY JURY</u>**

17       Plaintiffs, individually and on behalf of the proposed Classes, respectfully request a trial

18   by jury as to all matters so triable.

19   Dated: March 11, 2022              Respectfully submitted,

20

21                                     By:    */s/ Jonathan Selbin*

22                                     Jonathan Selbin (Cal. Bar No. 170222)
                                       jselbin@lchb.com
23                                     Michelle Lamy (Cal. Bar No. 308174)
                                       mlamy@lchb.com
24                                     Nigar A. Shaikh (to be *admitted pro hac vice*)
                                       nshaikh@lchb.com
25                                     LIEFF CABRASER HEIMANN
                                         & BERNSTEIN, LLP
26                                     275 Battery Street, 29th Floor
                                       San Francisco, CA 94111
27                                     Telephone: (415) 956-1000
                                       Facsimile: (415) 956-1008

28

-112-                                  CLASS ACTION COMPLAINT
                                       CASE NO. 22-1559

1

Elizabeth A. Fegan (to be *admitted pro hac vice*)
beth@feganscott.com

2

FEGAN SCOTT LLC
150 S. Wacker Drive, 24th Floor

3

Chicago, IL 60606
Telephone: (312) 741-1019

4

Facsimile: (312) 264-0100

5

Lynn A. Ellenberger (to be *admitted pro hac vice*)
lynn@feganscott.com

6

FEGAN SCOTT LLC
500 Grant Street, Suite 2900

7

Pittsburgh, PA 15219
Telephone: (412) 346-4104

8

Facsimile: (312) 264-0100

9

*Attorneys for Plaintiffs and the Proposed Classes*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT
CASE NO. 22-1559