1  JONATHAN SELBIN (Cal. Bar No. 170222)
   jselbin@lchb.com
2  MICHELLE LAMY (Cal. Bar No. 308174)
   mlamy@lchb.com
3  NIGAR A. SHAIKH (Cal. Bar No. 343554)
   nshaikh@lchb.com
4  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   275 Battery Street, 29th Floor
5  San Francisco, CA 94111
   Telephone: (415) 956-1000
6  Facsimile: (415) 956-1008

7
   ELIZABETH A. FEGAN (*pro hac vice*)
8  beth@feganscott.com
   FEGAN SCOTT LLC
9  150 S. Wacker Drive, 24th Floor
   Chicago, IL 60606
10 Telephone: (312) 741-1019
   Facsimile: (312) 264-0100

11
   LYNN A. ELLENBERGER (*pro hac vice*)
12 lynn@feganscott.com
   FEGAN SCOTT LLC
13 500 Grant Street, Suite 2900
   Pittsburgh, PA 15219
14 Telephone: (412) 346-4104
   Facsimile: (312) 264-0100

15
   *Attorneys for Plaintiffs and the Proposed Classes*
16

17              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
18                  **SAN FRANCISCO DIVISION**

19 JOHN DOE 1, JOHN DOE 2, JOHN DOE 3,          CASE NO. 3:22-CV-01559-LB
   JOHN DOE 4, JOHN DOE 5, JOHN DOE 6,
20 JOHN DOE 7, JOHN DOE 8, JOHN DOE 9,
   JOHN DOE 10, JOHN DOE 11, and JOHN
21 DOE 12, individually and on behalf of all    **FIRST AMENDED CLASS ACTION**
   others similarly situated,                   **COMPLAINT**
22
            Plaintiffs,
23
   v.                                           **JURY TRIAL DEMANDED**
24
   NATIONAL COLLEGIATE ATHLETIC
25 ASSOCIATION, THE UNIVERSITY OF SAN
   FRANCISCO, ANTHONY N. (AKA NINO)
26 GIARRATANO, and TROY NAKAMURA,

27
            Defendants.
28

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................................................ 1

II.     JURISDICTION AND VENUE .................................................................... 6

III.    INTRA-DISTRICT ASSIGNMENT ............................................................ 9

IV.     PARTIES ...................................................................................................... 9

        A.      Plaintiffs ........................................................................................... 9

        B.      Defendants ...................................................................................... 10

V.      FACTS ........................................................................................................ 11

        A.      Student-Athletes Are at Risk for Sexual Harassment, Exploitation, and
                Mental Abuse by Coaches ............................................................. 11

        B.      By the 1990s, National Governing Bodies (NGBs) Prohibited Sexual
                Harassment by Coaches of Athletes, Recognizing the Power Disparities
                and Unequal Bargaining Positions ................................................ 15

                1.      In 1992, the United States Olympics Committee established a code
                        of ethics prohibiting sexual harassment. ........................... 16

                2.      Since 1998, USA Swimming has prohibited inappropriate sexual
                        conduct. ............................................................................. 17

                3.      In 2007, the International Olympic Committee issued a consensus
                        statement on sexual abuse in sport. .................................. 17

                4.      In 2018, the Energy and Commerce Committee investigated and set
                        out best practices for NGBs to prohibit coach misconduct and track
                        wrongdoing. ....................................................................... 18

        C.      Despite Widespread Recognition that Protection of Student-Athletes Is
                Paramount, the NCAA Knowingly Declined to Act .................... 20

                1.      The NCAA has a duty to protect the physical and educational well-
                        being of student-athletes. ................................................ 20

                2.      The NCAA regulates coaches in a myriad of ways—except when it
                        comes to sexual harassment and sexual abuse of student-athletes ....... 22

                3.      Student-Athletes suffer in the vacuum created by the NCAA's
                        failure to regulate abuse by coaches ................................ 23

                4.      Even when the NCAA addresses abuse, the NCAA's policies and
                        pronouncements lack teeth. ............................................. 27

                5.      Because of its keen awareness of the problem it fostered and its
                        desire to avoid liability, the NCAA continues to focus on
                        decentralization to the detriment of its student-athletes ....... 31

        D.      With the NCAA's Blessing, the University of San Francisco Permitted
                Sexual Exploitation of Student-Athletes on and off the Field. ....... 34

                1.      Neither the Archdiocese of San Francisco nor USF are strangers to
                        sexual abuse and abuse of power. .................................... 34

                2.      Coach Naks created an intolerable sexualized environment at every
                        practice and Coach G not only tolerated it, he participated in it ....... 38

**TABLE OF CONTENTS**
**(continued)**

Page

3. USF retaliated against the players who tried to stop the abusive behavior or who did not condone it, running them off the team............... 47

E. Plaintiffs and the Classes Were Injured and Continue to be Injured. ................... 90

VI.    TOLLING OF THE STATUTE OF LIMITATIONS ....................................................... 91

VII.   CLASS ALLEGATIONS ........................................................................................... 92

VIII.  CLAIMS AGAINST THE NCAA, USF, AND COACH DEFENDANTS ON BEHALF OF THE USF BASEBALL SUBCLASS ..................................................... 98

IX.    CLAIMS AGAINST THE NCAA ON BEHALF OF THE NATIONWIDE CLASS AND CALIFORNIA SUBCLASS .................................................................. 123

X.     PRAYER FOR RELIEF ............................................................................................ 143

XI.    DEMAND FOR TRIAL BY JURY ............................................................................ 144

Plaintiffs John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 7, John Doe 8, John Doe 9, John Doe 10, John Doe 11, and John Doe 12, on behalf of themselves and all others similarly situated, by and through their attorneys, bring this action against the National Collegiate Athletic Association ("NCAA"), the University of San Francisco ("USF"), Nino Giarratano ("Giarratano" or "Coach G"), and Troy Nakamura ("Nakamura" or "Coach Naks") (Coaches G and Naks collectively referred to as "Coach Defendants" and all defendants collectively referred to as "Defendants").

## I.    **INTRODUCTION**

1.    The NCAA has an ongoing duty to protect the health and safety of student-athletes at member institutions. Indeed, its President and Board Member, Mark Emmert, testified before Congress that the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes."[1]

2.    In exercise of that duty, the NCAA promulgated rules that require it to "adopt legislation to enhance member institutions' compliance with applicable gender-equity laws."[2] Gender equity includes the right to be free from sexual harassment and other sexualized conduct, which deprives students of equal access to education.[3] Despite this mandate to ensure gender equity, however, the NCAA has failed to implement any rules prohibiting sexual harassment and retaliation.

3.    The NCAA's duty—and failure—to protect the health and safety of student-athletes affects these athletes during an incredibly vulnerable period in their lives. NCAA student-athletes—who are typically living away from home for the first time—arrive at college expecting to develop into the best athletes they can under the supervision of educated, skilled, and fully vetted athletics department personnel committed to their best interests. Many student-athletes

---

[1] U.S. Senate, Comm. on Commerce, Science and Trans., *Promoting the Well-Being and Academic Success of College Athletes*, at 60:25-61:1 (July 9, 2014), https://bit.ly/3i596YO (last visited Feb. 9, 2022).
[2] 2.3.2 NCAA Legislation (adopted Jan. 11, 1994), https://web3.ncaa.org/lsdbi/bylaw?bylawId=2461&division=1&adopted=0 (last visited Feb. 9, 2022); https://www.ncaa.org/about/resources/inclusion/gender-equity-and-title-ix (last visited Feb. 9, 2022).
[3] *See* Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 *et seq.*

dream of playing their sports professionally after college and are taught from a young age to trust their coaches to help them realize those dreams. These student-athletes, therefore, accord their coaches, trainers, and team doctors deference, respect, and loyalty.

4.     This trust—coupled with the NCAA's failure to promulgate rules for schools to report abuse and deter perpetrators—created and perpetuated a continuing cycle of abusive coaches who move unchecked among NCAA member schools. Without NCAA reporting requirements, colleges and universities can ignore coach misconduct. Even if a school does take action against a coach, the NCAA takes no action against a perpetrator, who can then move on to another college or university, and gain access to a fresh population of unsuspecting student-athletes primed to afford that perpetrator complete trust. Instead of overseeing a system that prioritizes the protection of student-athletes' well-being, the NCAA oversees one that prioritizes the protection of athletic revenue, alumni donations, and tuition at the expense of student-athletes.

5.     Within this culture of impunity, USF employed two baseball coaches for over 22 years despite knowing that these coaches created an intolerable sexualized environment within USF's Division I ("DI") baseball team. From 1999 to 2022, Head Coach Nino Giarratano and Assistant Coach Troy Nakamura wielded their power to subject their players to recurring sexual harassment and psychological abuse resulting in emotional distress so severe that multiple players contemplated suicide.

6.     Coach Defendants created and perpetuated a culture that normalized seeing Coach Naks naked on the field or visible in a window at practice swinging his penis in a circular motion imitating a helicopter rotor while the entire team—including Coach G—watched.

7.     Coach Defendants created and perpetuated a culture that normalized handing out sex dolls or sex toys to the players as "awards," Coach Naks miming sexual acts with the players, and the Coach Defendants discussing their sexual preferences, sexual fantasies, and the bodily fluids they would like to drink with Plaintiffs and other members of the USF baseball team.

8.     Coach Defendants engaged in retaliation and psychological abuse of any student-athlete, including Plaintiffs, who did not outwardly condone or participate in the sexualized atmosphere. Coach Defendants berated, belittled,  and disparaged student-athletes; took away

their playing time and scholarships; and coerced student-athletes (who otherwise met all NCAA and academic requirements) into leaving USF through threats and misrepresentations. Coach Defendants tricked student-athletes into signing forms indicating that their relinquishment of their scholarships was voluntary when it was not.

9.      Make no mistake: this case is not about the behavior of an overbearing "hard-ass" coach or "locker room talk." Plaintiffs spent most of their lives playing baseball, and the conduct at issue is profoundly more disturbing than anything they experienced on any other baseball team. The conduct was not "normal"—even in the realm of elite, competitive baseball—and USF and the Coach Defendants knew it was not normal. So, they took steps to cover it up.

10.      When USF—a Jesuit university with a mission to create a more humane and just world, including by holding staff accountable to promote the common good and address inequities—was confronted with the Coach Defendants' wrongdoing through complaints made to the very highest levels of the Athletic Department, USF chose to back Coach G's decisions to run student-athletes off the baseball team.

11.      The intolerable sexualized environment, psychological abuse and retaliation against Plaintiffs and the other student-athletes was and is incredibly effective in driving players to leave the team.

12.      In the 1999 academic year, when Coach G first became head coach of the USF baseball program, only one of 15 players returned for their sophomore year.

13.      Of the 12 or 13 players who entered USF baseball program in 2013, only five played baseball at USF for all four years of college, and one of those players is Coach G's son. Every other player transferred.

14.      Of the three Plaintiffs who played in 2020-21, none plan to remain at USF. Of the 13 freshman recruits in the 2020 USF baseball class, seven transferred and one more is in the process of transferring. The fact that more than 60% of the 2020 recruiting class left or intends to leave is a testament to Coach Defendants' sexual misconduct, ruthlessness, retaliation, and callous treatment of the USF players. This transfer rate stands in stark contrast to the reported percentage of four-year college transfers among DI baseball players—just 2.3%, the fourth lowest

1    rate out of 38 NCAA DI sports.[4]

2         15.    On January 13, 2022, USF announced that Coach Naks was no longer on the

3    baseball team following "a human resources investigation into incidents in which 'the coaches'

4    language, behavior and/or actions were inappropriate.'"[5] On January 24, 2022, Coach G was

5    officially reprimanded, but allowed to keep his job.[6]

6         16.    John Does 1, 2, and 3 filed their original complaint against the NCAA, USF, and

7    Coach Defendants on March 11, 2022, and only because of that filing did USF take any further

8    action to address the situation and mitigate Plaintiffs' harms. Two days later, USF announced that

9    it had fired Coach G "effectively immediately."[7] And on June 10, 2022 USF's Athletic Director

10   ("AD"), Joan McDermott, announced her retirement "in the wake of lawsuits alleging coaching

11   misconduct in the baseball and women's basketball programs."[8]  McDermott's successor has yet

12   to be selected.

13        17.    This amended complaint adds nine more USF baseball players who were coached

14   by Coach Defendants from 1999 to 2018 and also experienced the intolerable sexualized

15   environment, psychological abuse, and retaliation Coach Defendants inflicted on John Does 1, 2,

16   and 3. Their stories substantiate the claims of John Does 1, 2, and 3, and reflect the fact that

17   Coach Defendants engaged in their misconduct at USF throughout their 22-year tenures.

18        18.    Through this lawsuit, Plaintiffs seek for themselves and all others similarly-

19   situated (i) to hold the NCAA accountable by requiring it to adopt practice and policy changes to

20   _____

21   [4] NCAA, *Transfer Composition of Division I Teams*, 10 (July 2020),
     https://ncaaorg.s3.amazonaws.com/research/transfers/RES_TransCompD1TeamsSlides.pdf (last
22   visited Jan. 27, 2022).
     [5] Ron Kroichick, *Intolerable Sexualized Environment': Ex-USF Baseball Players Sue Coaches,
23   School, NCAA,* SAN FRANCISCO CHRONICLE (Mar. 11, 2022, updated Mar. 13, 2022),
     https://www.sfchronicle.com/sports/college/article/Intolerable-sexualized-environment-Ex-USF-
24   16994972.php.
     [6] *Id.*
25   [7] Jessica Flores, *USF Baseball Coach Fired After Ex-players' Lawsuit Alleges 'Intolerable
     Sexualized Environment,'* SAN FRANCISCO CHRONICLE (Mar. 13, 2022),
26   https://www.sfchronicle.com/sports/college/article/USF-baseball-coach-fired-after-ex-players-
     16998516.php.
27   [8] Ron Kroichick, *USF's Joan McDermott Announces Her Retirement, Ending Turbulent Run as
     Athletic Director,* SAN FRANCISCO CHRONICLE (June 10, 2022, updated June 11, 2022),
28   https://www.sfchronicle.com/sports/college/article/USF-s-Joan-McDermott-to-announce-her-
     17233293.php.

protect student-athletes from sexual misconduct and psychological abuse by member institutions' athletic department personnel to ensure this does not happen again, (ii) to hold USF accountable by requiring it to adopt, implement, and enforce appropriate policies and procedures to prevent, or properly respond to, sexual misconduct and psychological abuse of students and student-athletes by USF personnel, and (iii) compensation from NCAA, USF, and the Coach Defendants for Plaintiffs' injuries from the intolerable sexualized environment, psychological abuse, and retaliation to which the Coach Defendants subjected Plaintiffs and other members of the USF baseball to during the relevant time period.

19.     First, Plaintiffs seek injunctive and equitable relief requiring the NCAA to implement and enforce rules and bylaws considered best practices. That includes, *inter alia*: prohibiting sexual harassment and/or sexual abuse of student-athletes by athletics department personnel; prohibiting romantic or sexual relationships between athletics department personnel and student-athletes; requiring NCAA member institutions to immediately report any allegations of harassment or abuse of a student-athlete by athletics department personnel; requiring that all reports be independently investigated; implementing public sanctions on member institutions and athletics department personnel where allegations are substantiated; banning athletics department personnel found to be in violation from further working or volunteering for any member institution; mandating training; and protecting student-athletes from retaliation and coercion to leave their teams, enter the NCAA transfer portal, and/or forego their scholarships without an independent ombudsman and advocate for the student-athletes.[9]

20.     Second, Plaintiffs seek injunctive and equitable relief requiring USF to adopt, implement, and enforce appropriate policies and procedures to prevent, or properly respond to, sexual misconduct and psychological abuse of students and student-athletes by USF personnel.

21.     Third, Plaintiffs seek money damages from the NCAA, USF, and the Coach Defendants for the psychological abuse and repeated inappropriate sexual conduct they suffered,

---

[9] The transfer portal is an NCAA mechanism for players to make themselves available to other schools; however, to enter the transfer portal, the student-athletes must give up their current scholarships.

and compensation for lost guaranteed scholarship money, other out-of-pocket costs, and impairment of their baseball careers, including playing Major League Baseball. Among other damages, as a result of Coach Defendants' conduct, Plaintiffs and Class members suffered and continue to suffer severe emotional and physical pain, including shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life and baseball; prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

22.     Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and/or (c)(4), Plaintiffs bring this as a class action for violations of Title IX of the Education Amendments of 1972 ("Title IX"), as amended, 20 U.S.C. § 1681 *et seq.*, as well as various state statutory and common laws.

## II.    <u>JURISDICTION AND VENUE</u>

23.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

24.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because: (a) there are at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; (c) at least one Plaintiff is a citizen of a different state than at least one Defendant; and (d) at least one member of the Classes, including Plaintiffs, is a citizen of a different state than at least one Defendant.

25.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims, because they arise from a common nucleus of operative facts with their federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

26.     This Court has personal jurisdiction over the NCAA because the NCAA has contacts with California to render it "essentially at home" in California, such that the exercise of personal jurisdiction is proper. Specifically, this Court has general personal jurisdiction because

of the NCAA's meaningful, continuous, and substantial economic, physical, and political

presence in California; the 58 NCAA member organizations located in California, including USF;

the NCAA's ability to influence the California legislature; the NCAA's attempts to influence the

California courts; and the NCAA's availment of the California courts.

27.    First, the NCAA engages in a continuous stream of activities in and directed

towards California, both directly and through its members, that exceeds its activity in other states

and renders it at home in California.

      a.    Since its founding in 1916, the NCAA has earned an outsized portion of its over $1 billion annual revenue directly from activities in California. California has the largest number of DI member institutions in the country—and DI members generate virtually all NCAA revenue.

      b.    California members contribute tens of thousands of dollars in membership dues to the NCAA every year.

      c.    The NCAA affirmatively elects to sponsor many of its largest and most prominent revenue-minting events in California. For example, the oldest and most famous college football playoff game, the Rose Bowl, has taken place in California annually since 1916—evidencing more than 100 years of continuous and highly profitable commercial activity by the NCAA in the State.

      d.    Overall, during the 2019 to 2020 academic year, California was slated to host 43 championship games—more than almost any other state. These games are attended by NCAA representatives, giving the NCAA a meaningful physical presence in the State throughout the year in addition to an economic one.

28.    Second, the NCAA members are heavily concentrated in California, with 58

members in California. Of these 58, 24 are DI members—the most of any state. Moreover, the

NCAA exercises significant control over its California members through the imposition of

onerous requirements on members' athletic programs and operation of an expansive enforcement

1    program.

2          29.    Third, the NCAA has engaged in sustained lobbying efforts specifically targeted at

3    California. For example, on September 18, 2019, the NCAA Board wrote a letter to California

4    Governor Gavin Newsom urging him to reject a bill called the Fair Play to Pay Act that would

5    allow athletes in the state to be compensated for use of their name, image, and likeness. The

6    NCAA spent $450,000 on lobbying efforts in 2019, much of it directed at California.

7          30.    Fourth, the NCAA has engaged in significant activities in an attempt to influence

8    the California courts. For example, in *Brown v. USA Taekwondo*, No. S259216, 2020 WL

9    5705929 (Cal., Sep. 22, 2020), the NCAA filed an amicus brief addressing what duty under

10   California law, if any, the United States Olympic Committee has to protect an athlete from sexual

11   abuse by third-parties. The NCAA deemed the issue as one of "great importance" to the NCAA.

12         31.    Finally, the NCAA purposefully avails itself of California courts when it so

13   chooses.[10] The NCAA even admitted that personal jurisdiction and venue are appropriate in

14   California.[11]

15         32.    This Court also has specific personal jurisdiction over the NCAA. First, as

16   reflected above, the NCAA purposefully directed activities towards California and purposefully

17   availed itself of the benefits of doing business in California. Second, the intolerable sexualized

18   environment, psychological abuse, and retaliation at USF occurred in California and arises out of

19   the NCAA's actions and inactions with respect to its oversight of USF and its coaching staff in

20   California, and its failure to adopt formal policies to monitor, prohibit, or otherwise address

21   rampant sexual misconduct. Third, and based on the above, it would not be unreasonable for this

22   Court to exercise personal jurisdiction over the NCAA.

23         33.    This Court has personal jurisdiction over Defendant USF because it is located in

24   this District and the wrongdoing occurred in this District.

25         34.    This Court has personal jurisdiction over Defendant Nino Giarratano because,

26   based on information and belief, he resides in this District. Moreover, Giarratano coached in this

27   _____

28   [10] *See, e.g., NCAA v. Ken Grody Mgmt.*, No. 8:18-cv-00153 (C.D. Cal.).
     [11] *George v. NCAA*, No. 08-3401, 2008 WL 5422882, at *3 (C.D. Cal. Dec. 17, 2008).

2435418.2

1   District for over 22 years.

2        35.    This Court has personal jurisdiction over Defendant Troy Nakamura because,

3   based on information and belief, he resides in this District. Moreover, Nakamura coached in this

4   District for over 22 years.

5        36.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2)

6   because the NCAA resides in every district in which its members reside, including this District;

7   all other defendants are residents of the State in which the District is located; and a substantial

8   part of the events and omissions giving rise to the claims occurred in this District.

9   **III.    INTRA-DISTRICT ASSIGNMENT**

10       37.    Assignment in the San Francisco Division is appropriate because USF and the

11   Coach Defendants reside in this Division, as does the NCAA, an unincorporated association

12   whose member USF resides in this Division.

13  **IV.    PARTIES**

14       **A.    Plaintiffs**

15       38.    **John Doe 1** is a citizen and resident of California and citizen of the United States.

16   John Doe 1 was a freshman at USF in the fall of 2020 and continues to attend USF by taking

17   classes remotely. After his freshman year, John Doe 1 was run off the baseball team and entered

18   the transfer portal in the winter of 2021 because of Defendants' actions; he is currently awaiting

19   the opportunity to play baseball at another institution.

20       39.    **John Doe 2** is a citizen and resident of California and citizen of the United States.

21   John Doe 2 was a freshman at USF in the fall of 2020. John Doe 2 transferred out of USF in

22   January 2022 due to the actions of the Defendants.

23       40.    **John Doe 3** is a citizen and resident of California and citizen of the United States.

24   John Doe 3 was a freshman at USF and member of the baseball team in the fall of 2021. He

25   continues to attend USF as of the filing of this lawsuit, but entered the transfer portal in March

26   2022 because of Defendants' actions.

27       41.    **John Doe 4** is a citizen of Washington and a citizen of the United States. John Doe

28   4 was a freshman at USF in the fall of 2017, but transferred out of USF after his freshman year

1    due to the actions of Defendants.

2         42.    **John Doe 5** is a citizen and resident of Washington and citizen of the United

3    States. John Doe 5 attended USF from 2012 to 2014. At the end of the spring season in 2014,

4    John Doe 5 quit USF's baseball team due to the actions of Defendants.

5         43.    **John Doe 6** is a citizen and resident of California and citizen of the United States.

6    Though John Doe 6 attended USF from 2012-15, he quit the baseball team after two years due to

7    the actions of Defendants.

8         44.    **John Doe 7** is a citizen and resident of California and citizen of the United States.

9    John Doe 7 committed to play baseball at USF in 2014, but only stayed one semester due to the

10   actions of Defendants.

11        45.    **John Doe 8** is a citizen and citizen and resident of Colorado and citizen of the

12   United States. John Doe 8 left USF in 2013 after only one semester because due to the actions of

13   Defendants.

14        46.    **John Doe 9** is a citizen and resident of California and a citizen of the United

15   States. John Doe 9 left USF after completing the 2000 academic year due to the actions of

16   Defendants.

17        47.    **John Doe 10** is a citizen and resident of California and a citizen of the United

18   States. John Doe 10 attended USF and was a member of the baseball team from 2017-18. John

19   Doe 10 transferred from USF after finishing his spring 2018 semester due to the actions of

20   Defendants.

21        48.    **John Doe 11** is a citizen and resident of Missouri and a citizen of the United

22   States. John Doe 11 attended USF only for the freshman year from 1999-2000, and then

23   transferred due to the actions of Defendants.

24        49.    **John Doe 12** is a citizen and resident of Texas and a citizen of the United States.

25   John Doe 12 attended USF his freshman year and was a member of the baseball team from 2017-

26   18; he transferred afterwards due to the actions of Defendants.

27        **B.    Defendants**

28        50.    **Defendant National Collegiate Athletic Association (NCAA)** is an

uncorporated association that acts as the governing body of college sports. The NCAA is comprised of 1,098 colleges and universities and 102 athletic conferences across three divisions: Division I, Division II and Division III.[12] DI institutions are the most visible collegiate athletic programs.[13] The NCAA's principal office is located in Indianapolis, Indiana.

51.     **Defendant University of San Francisco (USF)** is a California corporation located at 2130 Fulton Street, San Francisco, California 94117. Its agent for service of process, Donna J. Davis, is located at the same address. USF is a DI member institution of the NCAA and the only DI university in San Francisco.

52.     **Defendant Nino Giarratano** is a resident of San Francisco, California. Coach G was the head coach of the USF baseball team from 1999 until March 13, 2022, when USF announced Coach G had been fired.

53.     **Defendant Troy Nakamura** is a resident of Pacifica, California. Coach Naks was an assistant to Coach G for 15 years at USF until he was promoted to Associate Head Coach in the summer of 2013. USF announced on January 13, 2022 that Coach Naks is no longer associated with the USF baseball program.

## V.     FACTS

### A.     Student-Athletes Are at Risk for Sexual Harassment, Exploitation, and Mental Abuse by Coaches.

54.     Nancy Hogshead-Makar, a 1984 Olympic gold medalist in swimming and the CEO of Champion Women, a non-profit providing legal advocacy for athletes, explains the tremendous power differential present in relationships between coaches and athletes: "There's no balance of power, there's power one way, which is the coach has all the power and the athlete does not . . . . [The coach] has her scholarship, her ability to continue her education."[14]

---

[12] NCAA, *What is the NCAA?*, http://www.ncaa.org/about/resources/media-center/ncaa-101/what-ncaa (last visited Feb. 1, 2022).
[13] NCAA, *Overview*, https://www.ncaa.org/sports/2021/2/16/overview.aspx (last visited July 9, 2022).
[14] John Barr & Nicole Noren, *Outside the Lines: Track & Fear*, ESPN, http://www.espn.com/espn/feature/story/_/id/18900659/university-arizona-coach-threatened-one-athletes-blackmail-violence-death-school-stopped-him (quoting Nancy Hogshead-Makar).

2435418.2

55.     This power imbalance extends beyond the sport and to the personal: "[C]oaches have power over athletes' lives far exceeding the mechanics of practicing and competing in a sport. A coach's power over athletes can extend to virtually all aspects of the athlete's life in such ways that clear boundaries are hard to delineate. This near-total control is rarely questioned."[15]

56.     "The athlete's dependence on the coach makes it enormously difficult for the athlete to control the boundaries of the relationship or speak up to a coach who oversteps."[16] This dependency is often even more acute in student-athletes entering college for the first time.

57.     All college students are encouraged to develop a clear sense of self, commitment, and direction. Emerging adults engage in a variety of developmental tasks such as identity formation, becoming personally competent, developing interpersonal relationships, and planning for the future.[17]

58.     While engaged in this period of self-exploration, student-athletes must also balance a unique set of often-competing circumstances including, but not limited, to their athletic and academic endeavors. They must balance social activities against the isolation of athletic pursuits; maintain mental equilibrium in the face of athletic success or shortcomings; play notwithstanding physical infirmities and injuries; and, often, reconcile the termination of an athletic career to set goals for the future.[18]

59.     The NCAA acknowledges the uniquely important process of identity formation for NCAA student-athletes, because "NCAA research has shown academic outcomes (grades, graduation and eventual graduate degree attainment) are strongly related to identity as a student while in college, even after taking prior academic performance into account."[19]

---

[15] Deborah L. Brake, *Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds*, 22 MARQUETTE SPORTS L. REV. 395, 405 (Jan. 1, 2012) (footnotes omitted).
[16] *Id.* at 406.
[17] Emily Benton Heird  & Jesse A. Steinfeldt, *An Interpersonal Psychotherapy Approach to Counseling Student-Athletes: Clinical Implications of Athletic Identity*, 16 J. C. COUNSELING 143-57 (2013).
[18] Joy Gaston Gayles, *Engaging Student Athletes*, STUDENT ENGAGEMENT IN HIGHER EDUCATION: THEORETICAL PERSPECTIVES AND APPROACHES FOR DIVERSE POPULATIONS 209-21 (Stephen John Quaye et al. eds., 2nd ed. 2015).
[19] NCAA, *Do NCAA Student-Athletes View Themselves As Students Or Athletes?* (Aug. 2013), http://www.ncaa.org/about/resources/research/do-ncaa-student-athletes-view-themselves-students-or-athletes (last visited Jan, 29, 2022).

60.     For student-athletes, this crucial developmental period necessarily includes significant time spent with teammates and coaches. While other college students have the opportunity to test their emerging identities through school-based and friendship networks, the college athlete typically spends significant time separated from these networks while they train and compete. Student-athletes often spend hours a day with their coaches on the practice field, in the training room, and in meetings.

61.     This dynamic with their coaches renders student-athletes uniquely vulnerable to sexual harassment and abuse. As researchers suggest, "the culture of sport, specifically the power invested in the coach, facilitates an environment conducive to, and tolerant of, sexual exploitation."[20]

62.     This power imbalance is especially dangerous for athletes close to the upper echelon of their sport. As one author explains:

> [A]thletes may be more susceptible to the grooming process which precedes actual sexual abuse when they have most at stake in terms of their sporting careers, that is when they have reached a high standard of performance but are just below the elite level. We call this the 'stage of imminent achievement' (SIA). . . . For these athletes, the personal costs of dropping out of their sport might be deemed to be higher than for others. The novice athlete can drop out without loss of face, can leave to find another coach or another sport without loss of reputation and has invested least, in terms of time, effort, money and family sacrifices. The top athlete, on the other hand, has a proven record, has already attained some of the rewards of success, and may be less dependent upon his or her coach for continued achievement at that level. . . . The increased self esteem and personal confidence which accrues to the successful elite performer (after SIA) may provide them with the necessary personal resources to stand on their own[.]
>
> *       *       *
>
> The elite young athlete treads a fine line between success and failure. Physical injuries or illness can occur at any time, destroying years of training. Psychological damage can be caused by the withdrawal of the coach's attention of interest. In short, the young athlete often

[20] Joy D. Bringer, Celia H. Brackenridge, & Lynn H. Johnston, *Defining Appropriateness in Coach-Athlete Sexual Relationships: The Voice of Coaches*, 8 J. SEXUAL AGGRESSION, at 3 (2002), (unpublished manuscript), https://www.tandfonline.com/doi/abs/10.1080/13552600208413341.

- 13 -

needs the attention of the coach in order to maintain form and the chance to succeed. In these circumstances it is not difficult for a coach with sexual motives to groom and gain compliance from the athlete.[21]

63.     Furthermore, "[t]he style of coaching that is most conducive to forming coach-athlete sexual relationships is more closely associated with male coaches: authoritarian, requiring unquestioning submission to the coach's authority, and exercising near total control over athletes' lives."[22] Thus, "having a male coach with an authoritarian coaching style is a high risk factor for coach-athlete sexual abuse."[23]

64.     The fact that college athletes are over the age of 18, however, does not make any sexual relationship or sexual activity with a coach consensual. According to many experts, the implicit power in the coach-athlete relationship negates consent.[24]

65.     A coach with sexual motives is able to groom and gain his athlete's compliance because of the power differential between a coach and the student-athlete, which makes consent even between adults impossible. From a very young age, athletes are taught to look up to and respect their coaches, to view them as upstanding adults who serve as mentor, trainer, counselor, and sometimes even surrogate parent, and to accord them unquestioning authority.

66.     In 2012, the NCAA acknowledged a coach's ability to wield tremendous emotional control and power over his student-athletes:

> In the most tangible terms, the student-athlete depends on the coach for: a place on the roster; playing time; training and skills-building opportunities; visibility and references that can lead to professional opportunities; and, in Division I and II programs, scholarships that can mean the difference between being able to afford a college education or not. In exercising this power, the coach commonly exerts broad control over a student-athlete's life, including in such areas as physical fitness, diet, weight, sleep patterns, academic habits, and social life. For intercollegiate athletes, the magnitude of the coach's control will likely exceed that of any other single

---

[21] Celia Brackenridge & Sandra Kirby, *Playing Safe: Assessing the Risk of Sexual Abuse to Elite Child Athletes*, INT'L REVIEW FOR THE SOCIOLOGY OF SPORT: SPECIAL ISSUE ON YOUTH SPORT 13 (1997), https://bit.ly/3MBMlvJ.
[22] Brake, *supra* note 15, at 403.
[23] *Id.* & n.35 (citations omitted).
[24] Brake, *supra* note 15, at 399.

- 14 -

individual at that student-athlete's institution. For many, it will exceed the extent of control any individual has ever had over them at any point in their lives, with the exception of their parents.[25]

67.     This dependence and power differential created by the coach-athlete relationship enables predators who work with student-athletes (like Jerry Sandusky, Larry Nassar, Robert Anderson, and Coach Naks) to thrive.

**B.     By the 1990s, National Governing Bodies (NGBs)[26] Prohibited Sexual Harassment by Coaches of Athletes, Recognizing the Power Disparities and Unequal Bargaining Positions.**

68.     Historically, the NCAA and other sporting organizations ignored instances of coaches engaging in in sexual improprieties with their athletes. Karen Morrison, the NCAA director of gender inclusion, explained the "'hesitancy to prescribe what people consider to be the personal lives of their coaches,'" when both parties are consenting adults.[27] However, by the 1990s, multiple studies challenged organizations denying the existence of sexual abuse in sport.[28] The results of these studies "speak to the intensity of the coach-athlete bond, and the difficulty of setting boundaries in the relationship" which explain why many athletes do not recognize harassing or abusive behavior when they experience it.[29] In response to these findings, many sports organizations—but not the NCAA—adopted rules to: prohibit coaches from engaging in sexual relationships with athletes; to protect athletes from sexual harassment; and to preserve the safety and well-being of athletes.

---

[25] Deborah L. Brake & Mariah Burton Nelson, *Staying in Bounds* 15 (citations omitted), http://ncaa.org.s3.amazonaws.com/documents/2021/1/18/Staying_2Bin_2BBounds_2BFinal.pdf (last visited Feb. 3, 2022).
[26] NGBs are non-profit, non-governmental organizations responsible for promoting and developing a specific sport within a country.
[27] Allie Grasgreen, *Out-of-Bounds Relationships*, INSIDE HIGHER ED. (May 1, 2012), https://www.insidehighered.com/news/2012/05/01/ncaa-asks-colleges-prohibit-romantic-relationships-between-athletes-coaches.
[28] *See, e.g.*, Brackenridge, *supra* note 21, at 9 (citing studies in the United States, including: Lisa Pike-Masteralexis, S*exual Harassment and Athletics: Legal and Policy Implications for Athletic Departments*, 19 J. SPORT & SOCIAL ISSUES 141-156 (1995); Karen A.E.Volkwein et al., *Sexual Harassment in Sport - Perceptions and Experiences of Female Student-Athletes*, 32 INT'L REVIEW FOR THE SOCIOLOGY OF SPORT 283-295 (1997).
[29] Brake, *supra* note 15, at 400.

- 15 -

**1.      In 1992, the United States Olympics Committee established a code of ethics prohibiting sexual harassment.**

69.      In 1992, the United States Olympics Committee ("USOC," now the United States Olympics & Paralympic Committee or "USOPC") developed a Coaching Ethics Code to "provide[] a common set of values upon which coaches build their professional work" as "[i]t is the individual responsibility of each coach to aspire to the highest possible standards of conduct."[30]

70.      USOPC's Coaching Ethics Code includes Ethical Standard 1.08, "Sexual Harassment," which defines and prohibits sexual harassment as follows:

(a) Coaches do not engage in sexual harassment. Sexual harassment is sexual solicitation, physical advances, or verbal or nonverbal conduct that is sexual in nature, and that either:

(1) is unwelcome, is offensive, or creates a hostile environment, and the coach knows or is told this;

(2) is sufficiently severe or intense to be abusive to a reasonable person in the context. Sexual harassment can consist of a single intense or severe act or of multiple persistent or pervasive acts.

(b) Coaches accord sexual-harassment complaints and respondents dignity and respect. Coaches do not participate in denying an athlete the right to participate based upon their having made, or their being the subject of, sexual harassment charges.[31]

71.      Ethical Standard 1.14, "Exploitative Relationships," recognizes that because of the power differential, sexual or romantic relationships between a coach and athlete would likely impair judgment and become exploitative:

(a) Coaches do not exploit athletes or other participants over whom they have supervisory, evaluative, or other authority.[32]

---

[30]United States Olympic & Paralympic Committee Coaching Ethics Code, https://www.teamusa.org/USA-Karate/Officials-and-Coaches/Coaches-Resources/USOC-Coaching-Ethics-Code (Introduction) (last visited Jan. 31, 2022).
[31] *Id.,* Ethical Standard 1.08.
[32] *Id.,* Ethical Standard 1.14.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**2.     Since 1998, USA Swimming has prohibited inappropriate sexual conduct.**

72.     In 1998, USA Swimming adopted a code of conduct that provided for discipline in cases of "sexual contact or advances directed toward an athlete by a person who, in the context of swimming, was in a position of authority over that athlete."[33]

73.     In 2002, the prohibition against sexual advances was modified to include "other inappropriate sexually oriented behavior or action" and to explicitly apply to coaches. Specifically, Article 304.3.5 prohibited: "Any sexual contact or advance or other inappropriate sexually oriented behavior or action directed towards an athlete by a coach, official, trainer, or other person who, in the context of swimming, is in a position of authority over that athlete."[34]

74.     In 2010 (effective 2011), USA Swimming added an "Athlete Protection Policy" and "Sexual Misconduct Reporting Requirement" to its rulebook. These changes required reports of sexual misconduct and prohibited retaliation for reporting.[35]

75.     In 2012 (effective 2013), USA Swimming clarified that "sexual misconduct" included "other oral, written, visual, or physical conduct"[36] and added a prohibition against bullying.[37] The definition of physical abuse was also expanded to prohibit bullying by a coach.[38]

**3.     In 2007, the International Olympic Committee issued a consensus statement on sexual abuse in sport.**

76.     In 2007, the International Olympic Committee ("IOC") issued a "Consensus Statement" on "Sexual Harassment and Abuse in Sport" that highlighted the power differences between athletes and authority figures and recommended that ***all sport organizations*** develop

---

[33] Gunderson Nat'l Child Protection Training Ctr., *When the Athlete Is a Child: An Assessment of USA Swimming's Safe Sport Program,* at 9 (Jan. 27, 2014), https://www.usaswimming.org/docs/default-source/safe-sportdocuments/safe-sport-basics/2014-vieth-report.pdf (quoting USA Swimming Code of Conduct, § 304.3 (1998 ed.)) (last visited Feb. 1, 2022).
[34] *Id.* at 9 & n.30 (quoting USA Swimming Code of Conduct, § 304.3 (2002 ed.)).
[35] *Id.* at 11-12 (quoting USA Swimming Code of Conduct, § 304.3.5 (2011 ed.)).
[36] *Id.* at 12 & n.45 (quoting USA Swimming Code of Conduct, § 304.3.5, which is now § 304.8 (2013 ed.)).
[37] *Id.* at 12 & n.46 (quoting USA Swimming Code of Conduct, § 304.3.7 (2013 ed.)).
[38] *Id.* at 12-13 & n.47 (quoting USA Swimming Code of Conduct, § 304.3.13 (2013 ed.)).

2435418.2

1    policies to protect athletes from sexual abuse and harassment.[39]

2    　　　77.　　In urging coaches and other authority figures to "stay within the boundaries of a

3    professional relationship with the athlete[,]" the statement noted the profound, negative impacts

4    sexual harassment and abuse has on athletes' physical and psychological health, which can result

5    impaired performance and dropout:

6    　　　　　　Clinical data indicate that psychosomatic illnesses, anxiety,
          depression, substance abuse, self-harm and suicide are some of the
7    　　　　　　serious health consequences. Passive attitudes/non-intervention,
          denial and/or silence by people in positions of power in sport
8    　　　　　　(particularly bystanders) increases the psychological harm of sexual
          harassment and abuse. Lack of bystander action also creates the
9    　　　　　　impression for victims that sexually harassing and abusive
          behaviours are legally and socially acceptable and/or that those in
10   　　　　　　sport are powerless to speak out against it.[40]

11   　　　　　**4.　　In 2018, the Energy and Commerce Committee investigated and set
          out best practices for NGBs to prohibit coach misconduct and track
12   　　　　　wrongdoing.**

13   　　　78.　　On December 20, 2018, the United States Energy and Commerce Committee (the

14   "Committee") released a report entitled, "Nassar and Beyond: A Review of the Olympic

15   Community's Efforts to Protect Athletes from Sexual Abuse" (the "Nassar and Beyond

16   Report").[41] The report followed a yearlong investigation based on the scandals in gymnastics,

17   swimming, and taekwondo.

18   　　　79.　　The Committee found a number of systemic failures at NGBs contributing to the

19   widespread instances of sexual abuse that "should be concerning not only to Olympic athletes, but

20   also amateur athletes, parents, and anyone who has a loved one involved in amateur sports."[42]

21   _____

22   [39] *See* Int'l Olympic Comm., *IOC Adopts Consensus Statement on "Sexual Harassment and
     Abuse in Sport,"* at 3-5 (Feb. 8, 2007), https://bit.ly/3IUdlEg (last visited Jan. 31, 2022).
23   [40] *Id.* at 4-5.
     [41] Energy & Commerce Comm. Press Release, *Committee Report Details Sexual Abuse in
24   Organized Sports* (Dec. 20, 2018), https://republicans-
     energycommerce.house.gov/news/committee-report-details-sexual-abuse-in-organized-sports/
25   (last visited Feb. 2, 2022).
     [42] Energy & Commerce Comm., *Nassar and Beyond: A Review of the Olympic Community's
26   Efforts to Protect Athletes from Sexual Abuse,* at 3 (Dec. 20, 2018), https://republicans-
     energycommerce.house.gov/wp-content/uploads/2018/12/EC-USOC-Report-12.20.18-Final-
27   REV.pdf (last visited Feb. 3, 2022).

28

80.     First, the Committee noted that its "most troubling" finding was that the Olympic community inappropriately prioritizes reputation and image—the "medals and money" mentality—rather than athlete safety.[43] This same criticism can be applied to the NCAA's placement of revenue above its duty to protect its student-athletes.

81.     Second, despite USOPC's effort to establish minimum standards and an NGB Athlete Safety Policy, each NGB continued to have its own governance structure and applicable bylaws and policies resulting in inconsistencies in publicly identifying those disciplined or banned and policies to handle reports, complaints or allegations of abuse to USOPC and law enforcement.[44] Here, again, this criticism is applicable to the NCAA, which purports to push responsibility for sexual abuse policies on its 1,200 member institutions.

82.     Third, the Committee found that some NGBs did not employ simple measures, such as background checks and public banned lists.[45] The NCAA also fails to impose simple reporting and tracking procedures for coaches who abuse athletes.

83.     The Committee noted the creation of the United States Center for SafeSport ("USCSS") on March 3, 2017 as a centralized and neutral organization to oversee education programs for safe sports and to adjudicate claims of sexual misconduct as a step toward establishing consistency and accountability, showing that best practices include a central and neutral oversight organization.[46]

84.     USCSS created the SafeSport Code for the U.S. Olympic and Paralympic Movement ("SafeSport Code"), which sets out "expectations for Participants related to emotional, physical, and sexual misconduct in sport, including bullying, hazing, and harassment." Prohibited conduct in the SafeSport Code includes sexual misconduct, emotional and physical misconduct, including stalking, bullying, hazing, and harassment, aiding and abetting, and misconduct related

---

[43] *Id.*
[44] *Id.*
[45] *Id.* at 3-4.
[46] U.S. Center for SafeSport, *About*, https://uscenterforsafesport.org/ (last visited Jan. 31, 2022).

to reporting.[47]

85.     In the SafeSport Code, "Sexual misconduct" is defined to include sexual or gender-related harassment and bullying or hazing, or other inappropriate conduct of a sexual nature.[48] Misconduct related to reporting occurs when an adult participant in sport fails to report actual or suspected sexual misconduct to the Center.[49]

86.     Despite many NGBs' long-standing efforts to create and implement effective measures to address sexual abuse and harassment, the NCAA still has yet to set standards of conduct governing abusive coaches.

C.     **Despite Widespread Recognition that Protection of Student-Athletes Is Paramount, the NCAA Knowingly Declined to Act.**

1.     **The NCAA has a duty to protect the physical and educational well-being of student-athletes.**

87.     Founded in 1906 "to keep college athletes safe[,]" the NCAA's website notes that it is "working hard" to protect the hundreds of thousands of NCAA-affiliated athletes "physically and mentally, on the field and off."[50] Indeed, "[n]early half a million college athletes make up the 19,886 teams that send more than 57,661 participants to compete each year in the NCAA's 90 championships in 24 sports across 3 divisions."[51]

88.     Each NCAA division is governed by rules applicable to all NCAA institutions, as well as rules unique to that division. The NCAA's DI Manual sets forth the Constitution, Operating Bylaws, and Administrative Bylaws for that division (collectively, the "Manual").[52]

89.     The current NCAA Constitution states that the NCAA's purposes include maintaining control over and responsibility for intercollegiate sports and the participating student-athletes. The NCAA Constitution states in pertinent part:

---

[47] United States Center for SafeSport, SafeSport Code for the U.S. Olympic and Paralympic Movement § IX (effective Apr. 1, 2021), https://uscenterforsafesport.org/wp-content/uploads/2021/04/SafeSportCode2021_040121_V3.pdf (last visited Jan. 31, 2022).
[48] *Id.,* § IX.C.1.
[49] *Id.,* § IX.F.
[50] NCAA, *Well-Being*, http://www.ncaa.org/health-and-safety (last visited Feb. 1, 2022).
[51] NCAA, *supra* note 12.
[52] NCAA Division I Manual (effective Aug. 1, 2021), https://web3.ncaa.org/lsdbi/reports/getReport/90008 (last visited Feb. 1, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

**1.2 Purposes.** The purposes of this Association are:

(a) To initiate, stimulate and improve intercollegiate athletics programs for student athletes . . . ;

(b) To uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this Association; . . . [and]

(h) To legislate, through bylaws or by resolutions of a Convention, upon any subject of general concern to the members related to the administration of intercollegiate athletics[.][53]

90.   Article 2.2 of the current NCAA Constitution specifically provides for the well-being of the NCAA's student-athletes, including in the areas of health and safety and student-athlete/coach relationships:

**2.2 The Principle of Student-Athlete Well-Being.** [*] Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes. (Revised: 11/21/05)

\*          \*          \*

**2.2.3 Health and Safety.** [*] It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. (Adopted: 1/10/95)

**2.2.4 Student-Athlete/Coach Relationship.** [*] It is the responsibility of each member institution to establish and maintain an environment that fosters positive relationship between the student-athlete and coach. (Adopted: 1/10/95)[54]

91.   Moreover, when it comes to gender equity, which includes protection from sexual abuse and harassment, the NCAA has expressly undertaken the duty to adopt rules to ensure member institutions' compliance with gender equity laws. Article 2.3.2 of the NCAA Constitution provides in pertinent part:

**2.3.2 NCAA Legislation.** [*] The Association should not adopt legislation that would prevent member institutions from complying with applicable gender-equity laws, and should adopt legislation to enhance member institutions' compliance with applicable gender-equity laws. (Adopted: 1/11/94)[55]

92.   In addition to its Constitution, the NCAA has consistently recognized and publicly

---

[53] NCAA Const., Art.1, §§ 1.2(a), (b) & (h).
[54] *Id.*, Art. 2, §§ 2.2, 2.2.3 & 2.2.3.
[55] *Id.,* Art. 2, § 2.3.2.

proclaimed its duty to provide a safe environment for student-athletes. President and Board Member Mark Emmert proclaimed in Congressional testimony that the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes."[56]

2. **The NCAA regulates coaches in a myriad of ways—except when it comes to sexual harassment and sexual abuse of student-athletes.**

93. Despite its promises to protect student-athletes and its conscious decision to expressly regulate coaches' conduct in a myriad of other ways, the NCAA remains unwilling to address sexual misconduct in any meaningful way.

94. For example, Article 10 of the NCAA Bylaws, "Ethical Conduct," applies to coaches of intercollegiate athletics, among others. It provides a detailed list of unethical conduct, which includes, among other things, sports wagering, providing banned substances, providing a prospective or current student-athletes improper inducements or extra benefits, and facilitating a meeting between a student-athlete and an agent.[57] Institutional members such as coaches who violate this provision are subject to disciplinary or corrective action.[58]

95. Article 11 of the NCAA Bylaws, entitled "Conduct and Employment of Athletics Personnel," further explains the responsibilities and obligations of coaches and other athletics personnel. The section regulates coaching bonuses and other compensation, education requirements and compensation restrictions for certain types of coaching personnel, responsibility for violations of NCAA regulations, marketing to sports agents, the use of the NCAA name, the use of tobacco, required contractual provisions, recruiting, scouting, and limitations on the number and duties of coaching and other staff members. Again, coaches and other athletic personnel are subject to disciplinary or corrective action for violating these Bylaws.

96. Yet, the Bylaws are utterly silent on limitations on coaches with respect to: sexual harassment or abuse of student-athletes and sexual relationships with student-athletes; internal or external reporting of coaches who engage in such behavior; the necessity for independent investigation of coaches who engage in such behavior; a centralized reporting repository so that

---

[56] U.S. Senate, *supra* note 1, at 60:25-61:1.
[57] NCAA Bylaws, Art. 10.
[58] *Id.*, § 10.4.

2435418.2

complaints about coaches can be tracked between and among schools; and mandatory training of coaches relating sexual harassment or abuse of student-athletes.

97.     A recent example of the perils created by the NCAA's lack of a reporting policy involves former Baylor football coach Art Briles, who left Baylor in the midst of a scandal because he failed to report sexual assaults, but was hired recently by Grambling State after a stint as a high school coach.[59]

98.     While the NCAA freely metes out punishments for student-athletes for poor academic performance and disciplines athletes for profiting off their own likenesses, the NCAA's Bylaws do not contain any penalties for sexual, violent, or criminal conduct by coaches or personnel in their athletics programs.

### 3.     Student-Athletes suffer in the vacuum created by the NCAA's failure to regulate abuse by coaches.

99.     Despite USOPC's adoption of a coaching code of ethics in 1992 prohibiting sexual harassment and sexual relationship between coaches and athletes during the coaching relationship, the NCAA took no action for 20 years and then fell short once it did.

100.    Between 1992 and 2020, multiple accounts of inappropriate sexual conduct by athletics department personnel emerged. A sampling of non-exhaustive incidents follows.

101.    In 1998, two soccer players, Debbie Keller and Melissa Jennings, brought suit against University of North Carolina soccer coach Anson Dorrance alleging sexual misconduct including uninvited sexual comments, inappropriate advances, and retaliation. In denying Dorrance's Motion to Dismiss, the Fourth Circuit majority noted that Dorrance regularly "bombarded players with crude questions and comments about their sexual activities and made comments about players' bodies that portrayed them as sexual objects. In addition, Dorrance

---

[59] Alanis Thames, *Art Briles, Who Coached Baylor During Sexual Assault Scandal, Is Hired at Grambling State*, N.Y. TIMES (Feb. 24, 2022), https://www.nytimes.com/2022/02/24/sports/ncaafootball/art-briles-grambling-state-baylor.html. Briles resigned four days later in the midst of public outrage—but not because the NCAA had policies in place. Alanis Thames, *Art Briles Resigns From Grambling State*, N.Y. TIMES (Feb. 28, 2022), https://www.nytimes.com/2022/02/28/sports/football/art-briles-grambling-state.html.

1    expressed (once within earshot of Jennings) his sexual fantasies about certain players, and he

2    made, in plain view, inappropriate advances to another."[60] Keller settled in 2004; Jennings settled

3    for $385,000 in 2006 with an admission by the coach that he had "participated with members of

4    the UNC-Chapel Hill women's soccer team in group discussions of those team members' sexual

5    activities or relationships with men."[61]

6           102.    Also in 1998, two former tennis players sued Jesse Dwire, the women's tennis

7    coach at Syracuse University, alleging that Dwire massaged, fondled, and propositioned them,

8    and that Dwire and the university retaliated against the players after they pursued a complaint

9    through the school's grievance system. According to one news source: "the lawyer for [the

10   plaintiffs], said Syracuse officials, aware that the National Collegiate Athletic Association has no

11   policy on sexual harassment, had ignored complaints about Dwire's sexual improprieties for

12   years."[62]

13          103.    In 2011, a former University of South Carolina women's soccer player sued the

14   university, alleging she received unwanted sexual advances by the assistant coach and that her

15   academic advisor admitted that the coach had sexually harassed other students. She also alleged

16   that the university failed to renew her scholarship in retaliation for her complaint.[63]

17          104.    In June 2012, The Pennsylvania State University's ("Penn State") Jerry Sandusky

18   was convicted of 45 counts of child sexual abuse and sentenced to 30 to 60 years in prison.

19   Several top Penn State officials, including its president and athletic director, were also sentenced

20   to prison for their roles in covering up the crimes:

21                  a.      Since 2001, Penn State had been aware that Sandusky committed sexual

22

23   _____

24   [60] *Jennings v. Univ. of N.C.,* 482 F.3d 686, 691 (4th Cir. 2007).
     [61] Doug Lederman, *North Carolina and Coach Settle Sexual Harassment Suit*, INSIDE HIGHER ED.
25   (Jan. 15, 2008), https://www.insidehighered.com/news/2008/01/15/north-carolina-and-coach-
     settle-sexual-harassment-suit.
26   [62] Robin Finn, *Growth in Women's Sports Stirs Harassment Issue*, N.Y. TIMES (Mar. 7, 1999),
     https://www.nytimes.com/1999/03/07/sports/out-of-bounds-a-special-report-growth-in-women-s-
27   sports-stirs-harassment-issue.html.
     [63] WISNews, *Former USC Women's Soccer Player Files Lawsuit* (updated Dec. 21, 2011),
28   https://www.wistv.com/story/16301453/former-usc-womens-soccer-player-files-lawsuit/.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

1    acts on a young boy in a shower. Yet the university did nothing, which

2    allowed Sandusky to abuse ten young football players over at least a 15-

3    year period.[64]

4    b.    On July 23, 2012, in response to public pressure, the NCAA sanctioned

5    Penn State because of its "conspiracy of silence" relating to Jerry

6    Sandusky's sexual abuse of boys. The NCAA's penalties included a

7    $60,000,000 fine (equating to one year's gross revenue from the

8    university's football program) to endow a fund supporting sexual abuse

9    survivor assistance programs; a ban on Penn State's participation in post-

10    season football games for four years; a reduction in football scholarships

11    from 25 to 15 per year for four years; and vacating all the team's wins from

12    1998 (when university officials first heard Sandusky might be sexually

13    abusing young boys) to 2011.[65]

14    c.    The NCAA announced that its punishment of Penn State was intended to

15    "driv[e] cultural change," because of the "tragic damage that has been done

16    to the victims or their families." NCAA President Mark Emmert stated:

17        All involved in intercollegiate athletics must be watchful that
18        programs and individuals do not overwhelm the values of
           higher education.  In the Penn State case, the results were
19        perverse and unconscionable.  No price the NCAA can levy
           will repair the grievous damage inflicted by Jerry Sandusky
20        on his victims.  However, we can make clear that the culture,
           actions and inactions that allowed them to be victimized will
21        not be tolerated in collegiate athletics.[66]

22

23    [64] John Barr, *How Key Figures From Jerry Sandusky's Crimes View Joe Paterno's Legacy, 10 years after his downfall*, ESPN (Apr. 18, 2022), https://www.espn.com/college-
24    football/story/_/id/33743088/how-key-figures-jerry-sandusky-crimes-view-joe-paterno-legacy-10-years-downfall.
25    [65] Mark Memmott, *Penn State Fined $60M, Banned From Bowls, Wins From 1998 On Vacated*, NPR (July 23, 2021), https://www.npr.org/sections/thetwo-way/2012/07/23/157222533/penn-
26    state-fined-60m-banned-from-bowls-wins-from-1998-on-vacated.
    [66] Remarks by Mark Emmert, *Penn State Hit With Severe NCAA Sanctions: $60 Million Fine, Wins Vacated, 4-Year Bowl, Playoff Ban*, YOUTUBE (July 23, 2012),
27    https://www.youtube.com/watch?v=MGItBWWTN0k (last visited Feb. 9, 2022).

28

2435418.2

d.     Yet some of the penalties, "which came outside the typical enforcement process," were later rescinded when private emails released after the settlement "suggested the NCAA [] strong-armed the university into accepting the punishments." As Gabe Feldman, director of Tulane's Sports Law Program, noted: "'The lesson here is the N.C.A.A. needs to strictly follow its own rules, and making exceptions for exceptionally bad or criminal conduct can lead to problems.'" [67]

105.     Larry Nassar, like Sandusky, is also serving a prison sentence for sexually abusing hundreds of student-athletes under his care. Over 350 athletes, including Olympic champions Simone Biles, Gabby Douglas, and Aly Raisman, publicly accused the long-time doctor for USA Gymnastics and Michigan State University. Following numerous sexual assault charges, and emotional testimonies from many victims, Nassar received a sentence of up to 175 years in prison. Nassar, also like Sandusky, thrived unchecked for over twenty years:[68]

a.     At least 14 individuals at Michigan State, including its President Lou Anna Simon, athletic trainers, and assistant coaches, had been notified of sexual misconduct reports concerning Nassar as far back as 1988 but Michigan State took no action for years. Instead, it chose to protect its reputation (and endowments). [69]

b.     As with Penn State, the NCAA announced an investigation into Michigan State's handling of the allegations against Nassar in January 2018 only after Nassar was convicted and sentenced. The goal of the investigation

---

[67] Marc Tracy, *In Michigan State Investigation, N.C.A.A. Moves Beyond Its Comfort Zone*, NEW YORK TIMES (Jan. 24, 2018), https://www.nytimes.com/2018/01/24/sports/ncaa-investigation-michigan-state.html.

[68] In February 2019, Nassar was sentenced to 40-175 years after pleading guilty to seven counts of criminal sexual misconduct in Ingham County, Michigan. Two weeks later, he was sentenced to 40-125 years for pleading guilty to three counts of criminal sexual conduct in Eaton County, Michigan.

[69] Kim Kozlowski, *What MSU Knew: 14 Were Warned of Nassar Abuse*, THE DETROIT NEWS (Jan. 18, 2018), https://www.detroitnews.com/story/tech/2018/01/18/msu-president-told-nassar-complaint-2014/1042071001/.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

1   was to determine if Michigan State violated any NCAA rules.[70]

2          c.     In August 2018, the NCAA ended its investigation, finding that Michigan

3   State had not violated any of the NCAA's bylaws. The NCAA stated that

4   despite the allegations of abuse (and Nassar's criminal convictions), the

5   NCAA had "not substantiated violations of N.C.A.A. legislation."[71]

6        106.    In May 2019, an independent investigative report issued by the law firm Perkins

7   Coie revealed that Ohio State coaches and athletics administrators knew for two decades that a

8   team doctor, Richard Strauss, was molesting NCAA student-athletes on the wrestling team.[72]

9        107.    In August 2020, former NCAA student-athletes from the University of Michigan

10   alleged they were sexually abused by wrestling, football, hockey and track teams' physician Dr.

11   Robert Anderson during physical exams. He reportedly abused hundreds of student-athletes over

12   the course of 37 years.[73]

13   **4.    Even when the NCAA addresses abuse, the NCAA's policies and**
14   **pronouncements lack teeth.**

15        108.    Belatedly, and without imposing mandates that would protect its student-athletes,

16   in 2012, the NCAA finally acknowledged that "sexual relationships between coaches and student-

17   athletes have become a serious problem."[74]

18        109.    In an NCAA publication, two experts explained that these same principles that

19   forbid sexual relationships in other settings involving asymmetrical relationships—such as

20   lawyer-client, physician-patient, judge-party/lawyer, or clergy-parishioner—should apply to

21   

[70] Faith Karimi & Wayne Sterling, *NCAA Investigating Michigan State Over Larry Nassar Case*, CNN (Jan. 24, 2018) https://www.cnn.com/2018/01/24/us/ncaa-msu-nassar-investigation/index.html.
[71] Marc Tracy, *N.C.A.A. Drops Michigan State Inquiry Over Nassar*, NEW YORK TIMES (Aug. 30, 2018), https://www.nytimes.com/2018/08/30/sports/ncaa-michigan-state-nassar.html.
[72] Caryn Trombino & Markus Funk, Perkins Coie LLP, *Report of the Independent Investigation Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University* at 1 (May 15, 2019),https://compliance.osu.edu/assets/site/pdf/Revised_report.pdf (last visited Feb. 1, 2022).
[73] *37 Years of Sexual Abuse: This is the Dr. Robert Anderson Story*, THE MICHIGAN DAILY (Nov. 4, 2021), https://www.michigandaily.com/news/robertanderson/.
[74] Brake, *supra* note 25, at 4.

2435418.2

coaches and players as well:

> All of these examples involve relationships that are too fraught with power imbalances for consent to be meaningfully and reliably given. While being a coach is, in many respects, different from other professions, it shares the defining features that make consent to enter into a sexual relationship inherently problematic. At the core of the coach-athlete relationship is a duty of care and an imbalance of power. In many respects, the relationship of dependence is even more acute here than it is in these other settings due to the breadth of control that the coach has over the life and education of the student-athlete.[75]

110.    After 2014, though the NCAA ostensibly began taking an increasingly visible stance on sexual assault prevention, its policies and pronouncements were toothless. In 2014, the NCAA Executive Committee issued a Statement on Sexual Violence Prevention and Compliance Resolution:

**2014 NCAA EXECUTIVE COMMITTEE SEXUAL VIOLENCE PREVENTION AND COMPLIANCE RESOLUTION**

WHEREAS NCAA Constitution Article 4.1.2 charges the NCAA Executive Committee with identifying core issues that affect the Association as a whole and with overseeing Association-wide issues and ensuring that each division operates consistent with the basic purposes, fundamental policies and general principle of the Association;

WHEREAS the Executive Committee regularly takes action to preserve and enhance student-athlete health, safety and well-being and promote nondiscriminatory and effective learning and competitive environments;

WHEREAS NCAA Constitution Article 2.2.3 requires each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes;

WHEREAS the U.S. Department of Education Office for Civil Rights has issued guidance related to sexual harassment, bullying and violence against all students under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq, which applies to all educational activities, including athletics programs, of higher education institutions receiving federal financial assistance and which states that sexual violence includes rape, sexual assault, sexual battery, sexual coercion and gender-based harassment.

Now, Therefore, Be It Resolved, that the Executive Committee recognizes the importance of addressing the abhorrent societal issue of sexual violence, especially when it occurs on our campuses. The Executive Committee acknowledges

that it is our members' collective responsibility to maintain campuses as safe places to learn, live, work and play. The Executive Committee expects NCAA members to ensure that the values and principles articulated in the Constitution to protect the health and safety of student-athletes, operate fairly and ethically, and further to ensure that student-athletes are neither advantaged nor disadvantaged by special treatment and that institutions' athletics departments must:

- Comply with campus authorities and ensure that all athletics staff, coaches, administrators and student-athletes maintain a hostile-free environment for all student-athletes regardless of gender or sexual orientation; know and follow campus protocol for reporting incidents of sexual violence; report immediately any suspected sexual violence to appropriate campus offices for investigation and adjudication.

- Educate all student-athletes, coaches and staff about sexual violence prevention, intervention and response.

- Ensure compliance with all federal and applicable state regulations related to sexual violence prevention and response.

- Cooperate with, but not manage, direct, control or interfere with, college or university investigations into allegations of sexual violence, ensuring that investigations involving student-athletes and athletics department staff are managed in the same manner as all other students and staff on campus.

111.    Yet the resolution continues to lay responsibility for protecting NCAA student-athletes on colleges and universities: "[I]t is our members' collective responsibility to maintain

---

[75] *Id.*, at 26.

campuses as safe places to learn, live, work and play." [76] The resolution sets out four

unremarkable mandates for the institutions' athletics departments: (i) "Comply with campus

authorities and ensure that all athletics staff, coaches, administrators and student-athletes maintain

a hostile-free environment for all student-athletes;" (ii) "Educate all students-athletes, coaches

and staff about sexual violence prevention, intervention and response;" (iii) "Ensure compliance

with all federal and applicable state regulations related to sexual violence prevention and

response;" and (iv) "Cooperate with, but not manage, direct, control or interfere with, college or

university investigations."[77]

112.    In 2016 (updated 2022), and in furtherance of the above resolution, the NCAA's

Sport Science Institute published a document entitled "Sexual Violence Prevention: An Athletics'

Tool Kit for a Healthy and Safe Culture" ("Tool Kit").[78]

113.    In it, the NCAA broadly defines "sexual misconduct" to include "sexual and

gender-based harassment, sexual assault/sexual violence, stalking and intimate partner

violence."[79]  Again, however, the NCAA foists responsibility for ensuring college student-athlete

environments are safe and healthy solely on the institutions themselves: "Member schools have a

responsibility to protect the health of and provide a safe environment fo reach of their

participating student-athletes."[80]

114.    And even though the NCAA acknowledged that coaches have an "influential"

---

[76] NCAA, *Sexual Violence Prevention, An Athletics Took Kit for a Healthy and Safe Culture* (2d ed.), Appendix A, at 35 (Oct. 2016) ("Toolkit 2d ed."),
https://www.naspa.org/images/uploads/events/NCAA_2016_Sexual-Violence-Prevention-Tool-Kit.pdf.
[77] *Id.*
[78] NCAA, *Sexual Violence Prevention, An Athletics Took Kit for a Healthy and Safe Culture* (3d ed.) ("Toolkit 3d ed."),
https://ncaaorg.s3.amazonaws.com/ssi/violence/SSI_SexualViolencePreventionToolkit.pdf (last visited July 14, 2022). On its website, the NCAA states that the "NCAA Sports Science Institute promotes health and safety through research and training on . . . sexual assault and more." NCAA, *How We Support College Athletes*, https://www.ncaa.org/sports/2015/12/1/about-resources-media-center-ncaa-101-how-we-support-college-athletes.aspx (last visited Feb. 3, 2022).
[79] Tool Kit 2d ed.*, supra* note 76*,* at 3.
[80] Tool Kit 3d ed.*, supra* note 78*,* at History.

relationship over student-athletes,[81] the NCAA identifies coaches as those tasked with "preventing and responding to sexual violence,"[82] thereby ignoring the fact that coaches may very well be perpetrators of sexual harassment and other sexual misconduct.

115. Morever, the goals outlined in the policy are "aspirational," and the policy merely mandated annual attestations from each university chancellor/president, athletics director, and Title IX coordinator regarding compliance with the universities' own policies.[83]

116. Despite the NCAA's awareness of sexual violence affecting its student-athletes, it has resisted any meaningful reform despite calls by eight U.S. senators and its own Commission to Combat Campus Sexual Violence (the "Commission").[84] Instead, in 2018, the NCAA disbanded its Commission, and the NCAA promised only to continue to "monitor and track on sexual violence issues." No additional reform efforts have been made.[85]

117. The NCAA's unwillingness to effectively protect student-athletes from predatory coaches and trainers is even more egregious in light of its imposition of reporting requirements for student-athletes who have had claims of sexual misconduct against them investigated. In 2019, *USA Today* reported on what it termed the "Predator Pipeline," by which sexually violent student-athletes (not unlike coaches) are allowed to migrate from one NCAA school to another and remain eligible to play:

> No matter if a school suspends, dismisses or expels athletes for sexual misconduct, NCAA rules provide avenues for them to return to the field on a new team within a year and sometimes immediately; players routinely exploit the NCAA's own loopholes to circumvent penalties; a handful of the NCAA's Division I conferences have adopted their own policies ban athletes with past behavioral problems, but definitions of culpability vary, and most rely on the

---

[81] *Id.,* at 2.
[82] *Id.,* at History.
[83] *Id.,* at 4, 6, 23.
[84] *See* Kenny Jacoby, *NCAA Board of Governors to Review Policies Regarding Sexual Assault Amid Congressional Pressure on 'Predator Pipeline'*, USA TODAY (Jan. 16, 2020), https://www.usatoday.com/story/sports/college/2020/01/16/ncaa-predator-pipeline-focus-congressional-bill-athletes-sexual-assault/4492088002/ (citing NCAA committee minutes).
[85] *Id.*

2435418.2

honor system, not record checks, to verify recruits.[86]

118.    Similarly, in the wake of the *USA Today* investigatory report and introducing legislation, U.S. Representative Donna Shalala stated:

> College sports, as overseen by the NCAA, have undergone a massive transformation in recent years . . . . As profits, compensation for coaches, and spending on luxurious athletic facilities have ballooned, the association has repeatedly failed to address systemic problems with respect to the health and well-being of student athletes . . . . It is time for Congress to intercede in order to protect college athletes and maintain the integrity of college sports once and for all.[87]

119.    In response to *USA Today's* yearlong investigation, as of the 2021-22 school year, the NCAA requires college athlete transfers to disclose to schools whether their conduct has previously resulted in an investigation, discipline through a Title IX proceeding, or a criminal conviction for sexual violence. Schools are also required to take reasonable steps to confirm this information.[88]

120.    Yet, the NCAA declines to impose such requirements on coaches and other athletics department personnel who commit the same or similar acts and continue to enjoy perhaps even greater immunity as they migrate from one NCAA institution to another throughout their careers.

**5.    Because of its keen awareness of the problem it fostered and its desire to avoid liability, the NCAA continues to focus on decentralization to the detriment of its student-athletes.**

121.    Despite its "clear, moral obligation" to protect the health and well-being of its student-athletes, the NCAA's lawyers have created a strategy to avoid liability that directly

---

[86] Kenny Jacoby, *NCAA Looks the Other Way as College Athletes Punished for Sex Offenses Play On*, USA TODAY (Dec. 12, 2019), https://www.usatoday.com/in-depth/news/investigations/2019/12/12/ncaa-looks-other-way-athletes-punished-sex-offenses-play/4360460002/.

[87] J. Brady McCollough, *Congressional Commission Proposed to Address NCAA's 'Systemic Problems*,' L.A. TIMES (Dec. 19, 2018), https://www.latimes.com/sports/story/2019-12-19/congressional-commission-proposed-to-address-ncaas-systemic-problems.

[88] Hulst & Handler, LLP, *Investigation Report Regarding Allegations of Sexual Misconduct Involving the University of San Francisco Men's Soccer Team* 43-44, n.67 (Jan. 11, 2021), https://bit.ly/3vN0wrB.

2435418.2

1    contradicts positions the NCAA has taken to recruit student-athletes.

2           122.    For example, in the appeal to the California Supreme Court in *Brown v. USA*

3    *Taekwondo*, the NCAA filed an amicus curiae brief in support of the sports organization

4    respondent, USA Taekwondo ("USAT").[89] In *Brown*, the California appellate court found that

5    USAT owed a duty of care to plaintiffs who were sexually abused by a coach under USAT's

6    control, but that USOPC owed no similar duty.[90]

7           123.    In its amicus curiae brief, the NCAA took the position that sports organizations

8    have no legal duty to protect their athletes from sexual abuse by coaches. Sidestepping the fact

9    that it has not promulgated any policies prohibiting such abuse, the NCAA argued that it has

10   "limited ability" to "enforce appropriate policies and best practices."[91] The NCAA also denied it

11   could impose mandatory reporting on its member institutions regarding abusive coaches, claiming

12   that it cannot "monitor the day-to-day conduct of coaches."[92]

13          124.    In staking out this position, the NCAA omitted its detailed proscriptions governing

14   the day-to-day conduct of those very same coaches—including with regards their tobacco use—

15   whom the NCAA can and does sanction.[93]

16          125.    The NCAA's argument that "the NCAA's members have decided that they—

17   rather than the NCAA itself—are better positioned to ensure the health and safety of the student-

18   athletes they enroll"[94] reveals the slippery slope on which the NCAA stands. This is because the

19   NCAA member institutions have the strongest incentive to cover up coaches' bad behavior to

20   preserve institutional reputations and attendant alumni donations, athletic revenue, and

21   enrollment.

22

23   _____

24   [89] Application to File Amicus Curiae Brief & Brief of Amicus Curiae of the National Collegiate
     Athletic Association in Support of Respondent the United States Olympic Committee, 2020 WL
     5705929 ("NCAA Brief").

25   [90] *Brown v. USA Taekwondo*, 40 Cal. App. 5th 1077, *as modified on denial of reh'g*, (2019), *aff'd*
     11 Cal. 5th 204 (2021).

26   [91] NCAA Brief, 2020 WL 5705929, at *27.
     [92] *Id.,* at *26.

27   [93] *See, e.g.,* NCAA Bylaws, Art. 10, §10.4 and Art. 11, §11.1.1.
     [94] NCAA Brief, 2020 WL 5705929, at *27.

28

2435418.2

126.     The Penn State, Michigan State, Michigan, and Ohio State cases demonstrate that the NCAA's argument that it has "limited ability to take on that burden" [95] rings hollow in light of the NCAA's wealth, reach, micro-management of both coaches and athletes for minor infractions, and its nearly 60-member enforcement staff to investigate potential violations of amateurism and academic eligibility rules.[96]

127.     The NCAA's conscious decision to remain decentralized and foist responsibility over protecting student-athletes from sexual harassment and abuse at its member institutions, divisions, and conferences is at odds with best practices on how to protect student-athletes from sexual harassment and abuse.

128.     As stated above, one "troubling "finding the Committee's 2018 Nassar and Beyond Report related to USOPC's prioritizing reputation and image over athlete safety. USOPC determined that it "does not have athletes" to protect from sexual abuse, and instead, that protecting the athletes was the responsibility of each NGB. Yet the NGBs—like NCAA member institutions—are incentivized to protect their reputations at the expense of the athletes.

129.     Another finding of the Nassar and Beyond Report was that despite USOPC's governance support, each of the 48 NGBs had its own policies and procedures, creating inconsistencies in critical areas, such as whether to publish the names of those previously disciplined or banned from a sport and how to handle sexual abuse complaints.[97] Because of the disparate rules and enforcement thereof, abusers were able to thrive. This is not unlike the NCAA squarely placing student-athlete safety and policies in the hands of its 1,200 colleges and universities.

130.     Thus, the NCAA's decentralization is contrary to recent, empirical evidence concerning best practices, and will likely continue to lead to inadequate protection of student-athletes from sexual assault, abuse, and harassment.

131.     The NCAA's strategy in furtherance of its attempt to disavow liability is all the

---

[95] NCAA Brief, 2020 WL 5705929, at *27.
[96] Jacoby, *supra* note 85.
[97] Nassar and Beyond, *supra* note 42, at 45-61.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

1  more evident with the NCAA's enactment of a new constitution. Claiming to "better meet the

2  needs of our student-athletes," the NCAA announced the adoption of a new constitution on

3  January 20, 2022. The NCAA constitution supposedly "underscores the importance of both

4  physical and mental health and emphasizes diversity, inclusion and gender equity."[98]

5      132.    Yet the NCAA's new constitution is only 19 pages, as compared to the prior

6  constitution's 43 pages. While the preamble to the constitution states that the "basic purpose" of

7  the NCAA "is to support and promote healthy and safe intercollegiate athletics,"[99] this new

8  constitution decentralizes decision-making, and attempts to pin responsibility for student welfare

9  on the member institutions.

10      **D.    With the NCAA's Blessing, the University of San Francisco Permitted Sexual Exploitation of Student-Athletes on and off the Field.**

11

12          **1.    Neither the Archdiocese of San Francisco nor USF are strangers to sexual abuse and abuse of power.**

13      133.    The University of San Francisco is a Catholic, Jesuit institution.[100] One of its core

14  religious values is *cura personalis,* or "care of the whole person."[101]

15      134.    USF is part of the Catholic Archdiocese of San Francisco. Saint Ignatius Church is

16  located on the University of San Francisco campus. The church serves a parish of the Catholic

17  Archdiocese of San Francisco and is the university's chapel. [102]

18      135.    A 2018 report of alleged sexual assaults and misconduct among three Bay Area

19  dioceses, including the San Francisco Archdiocese, found that five alleged offenders were priests

20

21  _____

22  [98] Corbin McGuire, *NCAA Members Approve New Constitution*, NCAA (Jan. 20, 2022), https://www.ncaa.org/news/2022/1/20/media-center-ncaa-members-approve-new-constitution.aspx.

23  [99] NCAA Constitution, Preamble (effective Aug. 1, 2022),

24  https://ncaaorg.s3.amazonaws.com/governance/ncaa/constitution/NCAAGov_Constitution121421.pdf.

25  [100] USF, *Facts & Statistics*, https://www.usfca.edu/about-usf/what-you-need-to-know/facts-statistics (last visited Mar. 8, 2022).

26  [101] USF, *Our Values*, https://www.usfca.edu/about-usf/who-we-are/our-values (last visited Mar. 8, 2022).

27  [102] USF, *Facts & Statistics*, https://www.usfca.edu/about-usf/what-you-need-to-know/facts-statistics (last visited Mar. 8, 2022).

28

2435418.2

affiliated with USF at one point in their careers. Those priests were assigned to USF over a span of 32 years, from 1949 to 1981, though the report did not say whether the abuse occurred on the USF campus. Three of the priests faced legal proceedings that included criminal convictions.[103]

136.    Referring to the history of sexual abuse in the church, USF's president, Fr. Paul Fitzgerald, vowed to take sexual abuse matters seriously:

> But the cover-up by civil and religious authority figures allowed abusers to become repeat offenders; in my view, this is the heart of the scandal. Today, any abuse is promptly reported to the authorities, who take these matters extremely seriously.[104]

137.    After the report's revelations, Fr. Fitzgerald also promised to promote a better culture at USF that supports survivors and includes transparency:

> Abuse of power is at once infuriating and disillusioning.  We cannot become inured to these published reports and revelations, whether they occur within the Catholic Church, another organization or even our own community. We must all work to promote a culture that prevents abuse, hears and supports survivors, seeks transparency and advances reform. I write to assure you that I am committed to acting against all forms of abuse of power by any member of our community, including the Jesuits.[105]

138.    Despite Fr. Fitzgerald's public statements and the administration's knowledge of the issue, sexual abuse continues on USF's campus.

139.    In July of 2020, sexual assault and abuse allegations were revealed against members of the USF Men's Soccer Team.[106] A Change.org petition described a homophobic and misogynistic "toxic" sexual environment on the men's soccer team, which led to the suspension of a professional soccer player based on his conduct while at USF as a student-athlete.[107] The

---

[103] Izzie Hallock, *Alleged Sex Abusers Include USF Jesuits*, SAN FRANCISCO FOGHORN (Nov. 8, 2018), http://sffoghorn.com/alleged-sex-abusers-include-usf-jesuits/.
[104] *Id.*
[105] *Id.*
[106] Gabriel Greschler, *Sexual Assault Allegations Against Soccer Team Members Prompt a Reckoning For USF*, SF EXAMINER (July 19,2020), https://www.sfexaminer.com/sports/sexual-assault-allegations-against-soccer-team-force-a-reckoning-for-usf/.
[107] Petition, *USFCA TAKE ACTION NOW! Alleged Sexual Allegations on the USFCA Men's Soccer Team* (July 13, 2020), https://www.change.org/p/university-of-san-francisco-usfca-take-action-now-alleged-sexual-allegations-on-the-usfca-men-s-soccer-team?original_footer_petition_id=&grid_position=&pt=.

petition—signed by over 5,000 individuals—stated that USF's reporting system is ineffective and that USF diminishes and dismisses allegations of sexual misconduct against soccer players, and demanded that USF investigate sexual misconduct claims involving the men's soccer team.[108]

140.    In response to the petition, USF investigated the alleged misconduct on the men's soccer team, as well as USF's handling of such misconduct, and released a 53-page report on January 11, 2021.[109] Despite the graphic nature of the incidents reported, as well as the fact that 11 soccer players were accused of engaging in sexual misconduct over the past decade, the investigative report determined that it is more likely than not that sexual misconduct and/or disrespectful behavior towards women and/or LGBTQIA individuals was ***not*** pervasive among members of the USF men's soccer team over the past decade, and that USF had acted diligently in response to reported allegations of sexual misconduct involving soccer players over the past 10 years.[110]

141.    In response to the release of the report, Fr. Fitzgerald took a facially strong stance against sexual misconduct:

> Sexual misconduct and sex and gender discrimination are not tolerated at USF and we take all allegations of sexual assault seriously. Whether occurring days or decades ago, on or off-campus, all reports of sexual misconduct received by the university are investigated thoroughly.

> *        *        *

> Our goal is to equip students with the understanding that sexual misconduct is not tolerated at USF and with the tools to intervene if they see something that may cause harm to another person. USF offers employee educational programs with the goal of fostering a safe and supportive working and learning environment. Our policies are continually reviewed and refined to ensure that sexual assault, harassment, and discrimination have no place at USF.

> *        *        *

> Together with our staff in Title IX, we affirm our commitment to students, and all members of the USF community, to continue

---

[108] *Id.*
[109] Hulst & Handler, LLP, *supra* note 89.
[110] *Id.* at 3 (emphasis added).

1

2

3

4

working toward a more positive, safe, and healthy campus. We affirm our commitment to responding to all incidents of sex and gender discrimination, providing pathways of opportunities for victims and survivors to learn about resources, supportive measures, and accountability options. We invite students, faculty, and staff to join us in these efforts and reaffirm their commitments to the betterment of our community.[111]

5

6

7

8

9

10

11

12

142.    *Sports Illustrated* ("SI") found that the USF-commissioned investigative report's conclusions could not be squared with the facts. SI spoke to a former USF student who said that in 2003, she went to the administration with soccer players' concerns regarding the filming of women in intimate settings without their consent, and that there were other instances when the administration was aware of team members' behavior. SI's investigative reporting found that there was a "distinct culture of misconduct on the team that spanned three coaches, four athletic directors—though one, Scott Sidwell, was present for the majority of the time—and two school presidents." Thus, USF still fails to adequately address misconduct on its sports teams.[112]

13

14

15

16

17

18

19

143.    Notwithstanding USF's confounding finding that sexual misconduct was not pervasive, a new deputy Title IX coordinator position was filled to work directly with Athletics; a new Policy on Nondiscrimination Based on Sex and Gender, Sexual Harassment, and Sexual Misconduct for Students, Employees, and Third Parties was approved; and a review of Athletics was undertaken with every coach and team as a part of an extensive review of the Athletics Student Handbook as it pertains to sex and gender discrimination, harassing behavior, and sexual misconduct.[113] Yet, these responses appear to be just window dressing.

20

21

22

144.    As but one example of USF's continued failings in this area and relevant to the allegations of this Complaint, at the outset of the fall 2021 baseball season, members of the USF baseball team were required to attend a multi-hour session with the Title IX officers at the

23

24

25

26

27

28

---

[111] myUSF, *Men's Soccer Investigation: Update from President Fitzgerald Regarding the Sports Illustrated Story*, https://myusf.usfca.edu/title-ix/mens-soccer-investigation (last visited Mar. 8, 2022).
[112] Priya Desai & Jenny Vrentas, *A Predatory Culture, a Viral Reckoning—and Now What?*, SPORTS ILLUSTRATED (Sep. 30, 2021), https://www.si.com/college/2021/09/30/usf-mens-soccer-sexual-assault-and-harassment-reckoning-daily-cover.
[113] *Id.*

2435418.2

1   baseball field. However, neither Coach G nor Coach Naks attended.[114]

2   145.   Moreover, USF knew about the baseball coaches' harassment and abuse long

3   before the soccer scandal broke yet turned a blind eye. Upon information and belief, a number of

4   parents complained to both USF and NCAA about the USF baseball program before the

5   allegations against the USF Men's Soccer Team were revealed in 2020.

6   146.   For example, in May of 2014, John Doe 6's parents sent the USF Associate

7   Athletic Director and the NCAA Faculty Athletic Representative a letter describing the coaches'

8   conduct. The Athletic Director Scott Sidwell was also informed of the complaints. Again, USF

9   did nothing.

10   147.   Because neither USF nor the NCAA did anything about these reports, the abuse

11   continued for years thereafter, affecting countless other young men.

12   **2.   Coach Naks created an intolerable sexualized environment at every practice and Coach G not only tolerated it, he participated in it.**

13

14   148.   During the time Coach Naks was at USF, USF described his duties as follows: "In

15   addition to guiding the Dons[115] on the base paths, Nakamura's other on-field duties include

16   coaching third base, overseeing the team's SPARQ (Speed, Power, Agility, Reaction, and

17   Quickness) training and leading the team's visualization and imagery training program."[116]

18   149.   Further, in July 2020, USF's Executive Senior Associate Athletic Director

19   described Coach Naks as "an amazing man who truly defines what it means to be a Diamond

20   Don."[117]

21   150.   In a November 2020 interview, Coach G described Coach Naks as follows:

22   ─────────────────────

23   [114] Additionally, in June 2021, twin sisters and former USF basketball players Marta and Marija

24   Galic brought suit in San Francisco Superior Court against Molly Goodenbour, the head coach of the USF women's basketball team, and USF, challenging Coach Goodenbour's "archaic and abusive conduct" towards the twins from 2019 to 2021 and USF's awareness of the coach's

25   verbal and psychological abuse.
    [115] Members of USF baseball team are referred to as the Diamond Dons. *See, e.g.,* Diamond Dons

26   Take Two (Feb. 18, 2017), https://usfdons.com/news/2017/2/18/baseball-diamond-dons-take-two.aspx.

27   [116] Profile: Troy Nakamura, https://usfdons.com/sports/baseball/roster/coaches/troy-nakamura/66 (last visited Jan. 26, 2022).
    [117] Tuesday Testimonial: Troy Nakamura (July 28, 2020),

28   https://www.youtube.com/watch?v=Rtd_HrkWW9w (last visited Jan. 28, 2022).

Oh boy, Troy and I have you know we've been together for 22 years here at USF. So um what a great relationship and just Troy's loyalty to me is why he's here. Troy's had plenty of opportunities right and he's always wanted to stay and it's it's it's [*sic*] wonderful that he's wanted to be here in the Bay Area and be my right-hand man. I could never express how appreciative I am of Troy as a, as a person, as a friend, as a coach, uh as a mentor, as someone to to [*sic*] spend this time with. I mean he's just wonderful. He he leads in a lot of ways. He does a lot of things for me and I never have to question it . . . Me and Troy spend more time together than than [*sic*] me and my wife most of the time and more emotional wins and losses there too. A lot of times where we've been up at the top and we've been down and we've . . . . Oh it's it's [*sic*] I can't thank him enough. He's he's he's [*sic*] the best.[118]

151.   Coach Naks was also an integral part of recruiting high school players.   In fact, in 2013, Coach G promoted Coach Naks to associate head coach for "play[ing] a critical role in the recruitment and development of student-athletes."[119]

152.   Coach Naks had therefore established himself as a trusted coach and advisor before members of the USF Baseball Subclass even stepped on campus.

153.   Plaintiffs arrived on campus their freshman year ready to work and succeed. All had successful careers in high school and on travel teams that were touted by USF publicly when they committed. Coach G or Coach Naks assured all of them that they would be major additions to the USF baseball team, were integral to the team's future success, and had the skills to make it to the next level. All had aspirations of playing Major League Baseball.

154.   However, within the first couple of months of Plaintiffs' arrival on campus— sometimes days—the Coach Defendants' mental (and sometimes physical) abuse would escalate. Plaintiffs were isolated and told they were worthless or that they "fucking suck so much." The Coach Defendants told players they could not and would not succeed and were routinely called "pussies" and "faggots," and told they were throwing or hitting like a "pussy" or "bunch of pussies." One player was called a "fucking cunt," within earshot of the opposing team's fans.

---

[118] Tuesday Testimonial: Baseball Head Coach Nino Giarratano (Nov. 3, 2020), https://www.youtube.com/watch?v=tvdyIFXEYq0&list=PLQJ7Y9Sjcc_ivhkGCZkiQKJlfrE7Qll5D (last visited July 12, 2022).
[119] Profile: Troy Nakamura, *supra*.

2435418.2

They were repeatedly berated, beaten down, and forced to practice even when physically impaired.

155.    Each of the Plaintiffs desired to make it to the next level, so most independently asked the coaches for help and direction. But Coach G and Coach Naks regularly responded to these requests by telling Plaintiffs that these requests were a waste of time; that they were not good enough or that their personalities did not fit with the team; that they were toxic, a cancer, or worthless; that they would never make it in DI baseball; that they might as well leave; that they should give up their scholarships, and that they would never make it as professional baseball players. Coach G even told one player he might as well kill himself.

156.    Against this backdrop of mental abuse, the coaches also engaged in inappropriate sexual conduct, created an intolerable sexualized environment, and retaliated against the players.

157.    For example, at one of John Doe 8's first practices as a freshman in 2013, Coach Naks gestured to the undergraduate dormitories overlooking the baseball field and said: "Sometimes girls will stand at their windows, pull up their shirts, and show their boobs. We're here to play baseball, so just look at them and jerk off about it later. Trust me, I want to fuck them too." John Doe 9 also recalls, in the fall of 2000, Coach Naks persistently encouraging female students at these same open dorm windows to flash their breasts by whistling and lifting his shirt to suggest the females do the same. Coach G would laugh.

158.    The coaches also subjected the team's pitchers to strip games during practice. John Does 6, 7, and 8 recall that during the 2012-14 seasons, any pitcher who made an error at practice would have to take off an item of clothing. There were times the players had to strip down to their underwear and the coaches and other players would laugh. John Does 10 and 12 were also forced to participate in these strip games during the 2017-18 season.

159.    Another example involves a player who was on the USF baseball team from in or about 2011-13. During a gift exchange, a coach gave the player a life-sized, blow-up female sex doll. The coach told the player that if he did not bring the doll to practice the next day, he would make him run. The player was forced to walk home from practice with the doll, and on his way home, he was stopped by a police officer who yelled at him for possessing the doll and popped it.

160.    Yet another example is that, from the outset of John Does 1, 2, and 3's freshman years in 2020 and 2021, Coach Naks started practices or particular drills with a "café" exercise. The point of the exercise was to loosen up the players before they started practice. The café exercise involved Coach Naks identifying a dinner theme, such as a barbecue or fast food dinner. Then, each person, including both coaches and players, would go around the circle and identify what they would bring to the barbecue, such as a type of drink or food.

161.    The players quickly learned that Coach Naks would always sexualize the exercise—and that Coach Naks encouraged the other players and coaches to sexualize their answers, too. Coach Naks would refer to women's body parts he wanted to eat, bodily fluids and secretions he wanted to drink, or other sexual innuendo. For example, Coach Naks would say he wanted to eat "Jennifer Aniston's boobs" or "slurp whipped cream from Pamela Anderson's crotch."

162.    Coach G was included in these café exercises, witnessed the way Coach Naks spoke and encouraged sexual banter, and did nothing to stop it. In fact, Coach G engaged in the same behavior, naming women's body parts or fluids he wanted to eat or drink.

163.    All of the players were affected. For example, John Doe 1 was extremely bothered—and tried to stick to appropriate answers, such as milk or soda. When John Doe 1—or any other player—did not play along, however, he was laughed at by the coaches and others who were forced to join in the conduct and pressured to play along. Plaintiffs felt pressured to stay when these exercises were happening, given that the coaches demanded the players' participation.

164.    Coach Naks sexualized other exercises prior to John Does 1, 2, and 3's tenure on the team, as well. For example, during the 2017-18 season, while players would do their daily butterfly stretches, the coaches on at least a weekly basis would ask John Does 4 and 12, "Where are your butterflies flying to?"  Coach Naks would respond with sexual comments like, "They're going to get some strippers," or, "They're going to strippers' asses." The players felt extreme pressure from Coach Naks to respond to the coaches' question in a sexual manner because he would get angry with players who did not.

165.    Plaintiffs' discomfort and reluctance to participate in such bizarre behavior was

- 41 -

1    apparent to the Coach Defendants, whose abuse and taunting escalated as a result.

2        166.    Coach Naks' inappropriate sexual banter was not limited to the exercises. He

3    would also regularly talk about the fact that he was bisexual, how little clothing female students

4    on campus would wear during warm weather, and what sexual acts he would like to perform on

5    young women he saw on campus. At one point in time, Coach Naks moved to live on campus,

6    and his comments about the women on campus became increasingly sexual and distressing to the

7    players. Their discomfort with such conversation was apparent.

8        167.    Coach G heard and participated in these conversations.

9        168.    The inappropriate things Coach Naks did or said that day—and what seemed like

10   every day—was a regular topic of conversation among the players.

11       169.    Coach Naks' sexually charged behavior was not limited to the way he spoke. He

12   also engaged in calculated displays of nudity on and off the field, exposing himself to the players

13   and other coaches.

14       170.    For example, another exercise the coaches required before most practices was the

15   performance of skits. Players were split up into four groups at first, second, third, and home

16   bases, and had to improvise skits for the team judged by Coach G.

17       171.    As with the café exercises, Coach Naks would regularly sexualize the skits.  He

18   did so at least twice a week by instructing players to perform sexualized skits and/or by

19   participating in the skits in a sexual manner himself.

20       172.    For example, on multiple occasions in 2017, 2018, and 2021, Coach Naks would

21   pretend he was at a buffet by having a player do a handstand, grabbing that player's legs and

22   splitting them open, then pretending to eat spaghetti from that player's genital region. Many

23   players would be visibly disgusted and upset and would turn their heads away when Coach Naks

24   performed this skit.

25       173.    On another occasion, John Doe 12 recalls Coach Naks performed his own skit in

26   which he instructed a player to get on his hands and knees and then proceeded to ride that player

27   as though the player was a bull and Coach Naks was having sex with it.

28       174.    During another practice, Coach Naks told his group that he would take care of the

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

group's skit for the day. When it was Coach Naks' group's turn to perform, Coach Naks crawled out of the dugout naked, moved to a kneeling position in front of the players, and swung his penis around. Plaintiffs and some other players looked away in disbelief, embarrassment, and disgust.

175.     Rather than condem Coach Naks' actions, Coach G kissed the cross on his necklace and jokingly mimed looking up at the sky to ask God for forgiveness.

176.     Coach G knew that Coach Naks' actions were wrong. Coach G would say to older players, "We could get fired for this." He also told the players that his wife was mad at him because his job was in jeopardy due to Coach Naks' nudity and behavior on the field and around the players. Yet Coach G condoned and even facilitated Coach Naks' behavior by playing along with and normalizing it.

177.     This was not the first time Coach Naks crawled on to the field naked. All Plaintiffs report often seeing Coach Naks naked or holding a bat between his legs and pretending it was his erect penis. On another occasion, a player fielding ground balls after practice heard Coach Naks call his name and looked to see Coach Naks standing on a table completely naked and swinging his penis in a helicopter motion while yelling: "Hey, [Player X]!"[120]

178.     Coach Naks took these grooming actions on the field and extended them to more intimate settings. For example, the coaches would often shower with the players in the players' locker room. They would also walk around the player's locker room, either naked or barely dressed.

179.     In the fall of 2000, Coach Naks often asked John Doe 9 if he could shower in his dormitory, which was comprised of all first-year students.

180.     Players who attended an away game in the spring of 2021 reported that Coach Naks entered a group of players' hotel room and asked to use their shower. After Coach Naks got out of the shower, he walked around naked in the room, exposing himself to the players while talking about his bisexuality.

181.     No one was immune from the sexualized environment, which was used as a

---

[120] To protect their privacy, Plaintiffs do not use any USF baseball players' real names.

2435418.2

weapon to psychologically harass those who would not conform in order to force them off the team. In addition to the examples above, the sexualized environment became the centerpiece of so-called "team bonding" exercises and presentations the coaches endorsed. The coaches were present and participated in them at the expense of players who would not conform.

182.   For example, John Does 4 and 12 recall military training-type exercises at 6:00 a.m. on Saturday mornings where, at the beach, players would strip down to their underwear and float in the water with linked arms. Upon the players emerging from the water, Coach Defendants would comment on how shriveled up all the players' pensies were.

183.   The Coach Defendants were also present for and condoned sexualized and degrading skits and presentations roasting freshmen teammates every year at the team's annual Rookie Show, including the following incidents:

a.   During the 2013 Rookie Show, two players did a skit that depicted John Doe 5 and another teammate (who are both gay but were not out at that time) biking to Whole Foods and having anal sex.

b.   During John Doe 8's freshman year in 2013, one of his teammates did not trim his pubic hair. A picture of that teammate was broadcast on a presentation screen with a graphic of a large bush over his genital area. The room erupted with laughter. That player was so mortified, John Doe 8 never saw him take a shower with the other players again.

d.   During John Doe 7's freshman year in 2014, team bonding included comments about another player who wore "tighty whities" and had a small penis.

e.   During the 2017 Rookie Show, a slide show contained a naked picture of the then-current Director of Operations for the team, who had been cat-fished by several of the players.

184.   In addition to the team building events, there were annual hazing parties thrown at the expense of the incoming freshman. For example:

a.   During 2000, John Doe 9 recalls discussion of 25 tasks that the freshman

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

2435418.2

had to accomplish.  Some of the items on the list included: "have sex with a fat woman, get a hickey from a girl, do a 30-second beer bong or keg stand, and get your girlfriend to blow you and swallow your load."  This hazing was tied to drinking, where the players would go to a bar called "Steps of Rome," with fake identification.  The coaches were aware of and encouraged this behavior.

b.  During 2013, John Doe 8 recalls that freshman were given a checklist of 25 items worth certain points. For example, one item was to go to a strip club and take a picture with a stripper and another one was to get a hickey from a girl and take a picture of it. While all freshmen had to drink, the freshman with the most points had to drink the least, while the freshman with the least points had to drink the most. Upon information and belief, Coach Defendants were aware of these parties, their sexual content, and the fact that drinking was mandatory, as they would cancel practice the morning after the party.

c.  During 2014, John Doe 7 was given the list of 25 items during his freshman year, which included many of the above items. The drinking was also a part of it, and the freshman were forced into a contest to see who could drink the most before blacking out. The coaches knew about the hazing party, as they would cancel the next morning's practice.

185.  The hazing condoned by the Coach Defendants extended to physical abuse of others. One semester in or around 2013, a USF baseball player injured and threw a young man out of a party hosted by the baseball team because he was gay. The USF player slammed the young man, injuring him. At a team meeting following the incident, Coach G told all the players not to discuss what happened because "this needs to stay in house," suggesting that there would be an internal cover-up of the incident. However, John Doe 5 (who witnessed the incident and is gay) was not invited to this meeting. Later, the incident became a source of locker room humor for the coaches and the upperclassmen.

186.     Similarly, during a team Christmas banquet in or about 2017, one player was challenged to spank the female school nutritionist in front of her husband (and the team) to win a challenge.

187.     These are just a few examples of the completely inappropriate sexual misconduct that created an intolerable sexualized environment the players had to endure—and participate in to survive—on a near-daily basis. Rather than create fun, relax the players, or build rapport among teammates, this environment made the players stressed, upset, and unable to concentrate. This behavior occurred year after year, and any player who did not endorse this atmosphere or participate in the customs was singled out by the coaches for further abuse and retaliation (including being forced off the team).

188.     That players saw Coach Naks as a sexual predator encouraged by Coach G is evinced by an incident at a 2021 fall World Series game. While players were in the dugout, they saw Coach Naks interacting with a little girl next to the dugout, and one player remarked that if he saw Coach Naks interacting with his little sister, he would strangle him.

189.     Many players discussed not wanting to go to practice because of this intolerable sexualized environment or leaving practice as soon as it ended to avoid Coach Naks. The players also regularly discussed ways to get the Coach Defendants' behavior to stop. However, as set forth below, Coach Defendants retaliated against those who refused to play along or spoke up.

190.     For example, in his freshman year, John Doe 1 discussed reporting the Coach Defendants' behavior to the school's Title IX office with several older players. All agreed that none of their prior coaches acted like Coach Naks or Coach G, and that the sexual conduct and psychological abuse was not normal. One of the older players also told John Doe 1 that he had offered a player $100 to turn Coach Defendants in. John Doe 1 offered to contribute another $100 to get the same player to make a complaint.

191.     Another one of these older players told John Doe 1 and several other players not to be surprised if they were called in for interviews after that player graduated because he planned to file a Title IX complaint as soon as he could no longer be subject to retaliation.

192.     John Doe 3 also spoke with an older transfer player who assured John Doe 3 that

Coach Naks' behavior was not normal, that the sexualized environment "not the way college athletics was supposed to be," and that Coach Defendants were not "doing it right" at USF.

193.    In late November 2021, after the "skit" incidents, eight players—including John Does 1, 2, and 3—decided to express their discomfort with Coach Defendants' inappropriate behavior. Wary of retaliation, however, they determined it would be wisest to do so in a way Coach Defendants would find comical. Thus, during one pre-workout skit, the players pretended to make a complaint about Coach Naks to the Title IX Office. They feigned putting Coach Naks in handcuffs and carrying him off to jail (the "Title IX Skit").

194.    During and after the Title IX Skit, both Coach Defendants looked extremely uncomfortable. Yet neither followed up with the players after practice to determine whether the skit was performed seriously or in jest, nor did either take any action to change their behavior.

### 3.    USF retaliated against the players who tried to stop the abusive behavior or who did not condone it, running them off the team.

195.    Coaches in the NCAA can "run off" players they do not like or they are retaliating against for reasons stated in this lawsuit. Being run off the team occurs when a coach kicks the player off the team for reasons other than those that are academic or disciplinary, i.e., reasons not within the student-athlete's control.

196.    Prior to January 2015, NCAA schools were required to give scholarships that were renewable each year rather than guaranteed four-year scholarships. Thus, it was much easier for a coach to pull a scholarship from a student-athlete to force him to transfer. Nevertheless, even that involved paperwork and red tape, so it was easiest for the coaches to force players to resign their scholarship themselves.

197.    In January 2015, the NCAA permitted conferences to start providing four-year guaranteed scholarships, which took away the coaches' ability to not renew scholarships (thus making it harder to run a student-athlete off their team to free up the scholarship money for someone else).

198.    Coach G and Coach Naks avoided this limitation by implementing a system of emotional abuse intended to get rid of players who did not play along or fit within the sexually

charged culture they created. Coach Defendants' mental and psychological abuse worked. Of the 11 or 12 recruits in the 2001 freshman class, only one or two stayed for all four years.  Of the 12 or 13 recruits in the 2013 USF baseball class, 75%, or all but five, transferred in the following four years. Of the 13 recruits in the 2017 class, only five stayed for four years. Of the 17 recruits in the 2020 USF baseball class, eight transferred and two more may transfer. These statistics are a testament to the ruthlessness of Coach Defendants' illegal abuse and retaliation.

199.    According to the NCAA, based on a 2018 study from the National Student Clearinghouse, just 13% of then-current DI student-athletes in all sports transferred from another school.[121]

200.    The 2018-19 percentage of four-year college transfers among DI student-athletes on baseball teams was even lower—just 2.3%, or the fourth lowest rate out of all 38 NCAA DI men and women's sports:[122]

**2018-19 Percentage of <u>Four-Year College Transfers</u> among Division I Student-Athletes**

| Men's Sport | 4-year | | Women's Sport | 4-year |
|---|---|---|---|---|
| Soccer | 18.6% | | Beach Volleyball | 18.4% |
| Basketball | 15.3% | | Tennis | 14.1% |
| Tennis | 13.8% | | Basketball | 11.9% |
| Golf | 8.3% | | Volleyball | 9.7% |
| Track and Field | 8.1% | | Golf | 9.0% |
| Cross Country | 7.2% | | Softball | 8.5% |
| Football (FCS) | 7.2% | | Track and Field | 7.1% |
| Wrestling | 6.8% | | Soccer | 7.0% |
| Ice Hockey | 6.7% | | Cross Country | 6.3% |
| Skiing | 6.1% | | Bowling | 5.5% |
| Swimming | 5.7% | | Skiing | 4.8% |
| Volleyball | 5.4% | | Water Polo | 4.6% |
| Football (FBS) | 4.6% | | Fencing | 4.4% |
| Lacrosse | 3.6% | | Ice Hockey | 4.4% |
| Fencing | 2.8% | | Swimming | 4.4% |
| Rifle (co-ed) | 2.4% | | Field Hockey | 4.0% |
| Baseball | 2.3% | | Lacrosse | 3.1% |
| Gymnastics | 2.0% | | Rowing | 3.0% |
| Water Polo | 1.8% | | Gymnastics | 1.6% |

---

[121] NCAA, *Research on Student-Athlete Transfers*, https://www.ncaa.org/sports/2019/8/5/research-on-student-athlete-transfers.aspx (last visited Jan. 27, 2022).
[122] NCAA, *Transfer Composition of Division I Teams*, *supra* note 4, at 10.

2435418.2

201.    In fact, the overall trend from 2004 to 2019 was a significant decrease in the transfer rate among NCAA DI baseball teams:[123]



202.    One of the largest amateur baseball scouting organizations ranked USF's 2020 recruiting class #80 in the nation among DI baseball programs.[124] USF was one of only two West Coast Conference baseball programs ranked in the top 100 and USF was ranked higher than programs such as Michigan State, Rice, and UCSB.[125]

203.    The data show that these well-regarded recruits transferred out of USF at an abnormally high transfer rate as a direct result of USF and Coach Defendants' wrongdoing.

**a.    2020-22: John Doe 1's experience was typical.**

204.    John Doe 1 was a standout on his high school baseball team, was recruited by many schools, and given offers by multiple schools, including Ivy League schools.

205.    Coach Naks scouted and met John Doe 1 at a 2019 tournament in Arizona while John Doe 1 was in his junior year of high school. Impressed by John Doe 1's play, Coach Naks invited him to an official visit at USF two weeks later, where John Doe 1 met the entire coaching staff.

---

[123] *Id.* at 13.
[124] Perfect Game, *College Recruiting Rankings: Class of 2020*, https://www.perfectgame.org/rankings/Recruiting/Rankings.aspx?g=2020 (last visited Mar. 11, 2022).
[125] *Id.*

2435418.2

206.    USF heavily recruited John Doe 1 based on his baseball skills and experience. The coaches sold John Doe 1 on representations that USF's Jesuit culture set the team apart from all others, all the teammates loved each other, and the coaches treated the players as "family." Coach Naks emphasized four core values, including trust and accountability. He said that John Doe 1 would be a "cornerstone" of the USF baseball team.

207.    USF offered John Doe 1 guaranteed four-year athletic and academic grants-in-aid (scholarships) of approximately $60,000 per year. On October 7, 2019, Coach Naks sent a letter to John Doe 1 along with his official offer. In the letter Coach Naks wrote, "I do not believe I mentioned to you that we are one of the few schools out there that offer 4-year guaranteed contracts. If you sign a National Letter of Intent with the [USF] Dons, your scholarship is guaranteed to you for the entire time you are on the Hilltop. It cannot be reduced for any reason, only increased. Like I mentioned, we have a tradition of reinvesting in our family for guys that take care of business on the field, in the classroom and protect the culture." This guarantee was dispositive in John Doe 1's decision to sign with USF.

208.    The retaliation and emotional abuse against John Doe 1 began as soon as it became apparent to the coaches that he would not play along with the sexually charged behavior on the field and/or that John Doe 1 was discussing ways to get the behavior to stop.

209.    Though John Doe 1 injured his hand the fall of his freshman year, he was told to continue playing. Eight days later, he injured his ACL and meniscus and underwent surgery to repair both injuries.

210.    When John Doe 1 returned following surgery, the coaches, including Coach G, would interfere with his doctor's orders and yell at him for either doing too much physical therapy or not the right kind of therapy. Despite his injury, John Doe 1 would show up to practice early and before anyone else—yet he was yelled at for being tardy. Coach G demanded that John Doe 1 practice 100% with the team even though John Doe 1's doctor prohibited that.

211.    Coach Defendants regularly told John Doe 1 that he was not working hard enough and that would never be good enough. Coach Naks regularly berated John Doe 1 at practice and in his office.

212.     At the end of his freshman year, and after John Doe 1's parents learned of several of the above-described incidents, John Doe 1's mom left several voicemails for USF's AD at the time, Joan McDermott, which were not returned.

213.     Under the USF Nondiscrimination Based on Sex and Gender, Sexual Harassment, and Sexual Misconduct Policy ("Title IX Policy"), the AD is considered a "Mandatory Reporter" and should have immediately followed up with John Doe 1's mother and reported the substance of John Doe 1's complaints to USF's Title IX office.[126] The AD's failure to do so was, itself, a violation of USF's Title IX Policy.[127]

214.     Not only did the AD not report John Doe's mother's complaint, John Doe 1 believes the AD shared the complaint with Coach G and Coach Naks because the abuse then escalated throughout the summer of 2021.

215.     Specifically, during the summer between his freshman and sophomore year, Coach Naks called John Doe 1 multiple times and told him not to come back. Every time, John Doe 1 told Coach Naks he intended to return to school as he had a four-year scholarship and wanted to honor his commitment to the team. In response, Coach Naks told him he was "the most irrational person he had ever met." Coach Naks also said, "The people here don't believe in you." Coach Naks told him he was "tearing up the fabric of the program and not protecting the culture." Coach Naks threatened, "I am going to make sure it is not an enjoyable experience for you." He would keep John Doe 1 on the phone for 30 minutes at a time, relentlessly threatening and berating him if he would not agree to transfer from USF. He also refused to allow John Doe 1 to discuss the matter with his parents, demanding an immediate answer.

216.     Coach G also called John Doe 1 several times that summer. He told John Doe 1 that he would never play at USF again, that he was "toxic" to the program, and that he might as well leave. Coach G called him a "fucking pussy," told him he was being "fucking selfish for

---

[126] USF, Nondiscrimination Based on Sex and Gender, Sexual Harrassment, and Sexual Misconduct for All Students, Employees, and Third-Parties, Title IX Policy 2 (effective Aug. 14, 2020), https://myusf.usfca.edu/sites/default/files/users/jvarga/Interim%20Policy%20and%20Procedures%2008.14.2020.pdf (last visited Feb. 9, 2022).
[127] *Id.* at 21.

2435418.2

keeping his scholarship," and that he was hurting the rest of the team by not agreeing "to give his scholarship to someone who would buy into the culture of the program."

217.   John Doe 1 did not want to leave USF. He liked his teammates, and if John Doe 1 chose to leave, he would lose his scholarship and valuable playing time under the NCAA's transfer rules. Staying and succeeding at USF both academically and on the baseball team was also important to John Doe 1 because he wanted to become the best possible player and aspired to play professional baseball.

218.   John Doe 1 returned for the fall season his sophomore year. Both Coach G and Coach Naks largely ignored John Doe 1 from a coaching perspective, refusing to help him. At the end of the fall season (and after the Title IX Skit described above), all the coaches held exit interviews with every player to discuss their futures.

219.   At John Doe 1's exit interview, each coach told him that he should leave. Coach G told him that the relationship between the coaches and John Doe 1 had become "toxic." Coach G told him that he was being "very selfish" for staying at USF and not agreeing to enter the transfer portal and relinquish his scholarship. John Doe 1 insisted he was not going to leave.

220.   Shortly after the exit interview, the AD reached out to John Doe 1 and told him she understood he was going to enter the transfer portal to leave USF. John Doe 1 was surprised by the AD's call, given that he had not agreed to go into the portal nor to give up his scholarship.

221.   John Doe 1's mom spoke with the AD and reminded the AD that she had tried to contact her in the spring of 2021 about the problems her son was experiencing on the baseball team, but the AD had never responded.

222.   During one of the calls between John Doe 1's mom and the AD in December of 2021, the AD disclosed that the Title IX office had already been alerted to issues on the baseball team and that John Doe 1 would be contacted and interviewed as part of the investigation.

223.   After that call, John Doe 1 learned he was excluded from an upcoming team meeting where the AD shared the status of the investigation and suspension of the coaches with the other players.

224.   Three weeks later (in January 2022), neither John Doe 1 (nor many of the other

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

players) had been contacted regarding the Title IX investigation. John Doe 1 contacted the AD to express concern that he had not yet been interviewed. He was only called for a cursory interview after his mom inquired with the AD herself.

225.   On January 11, 2022, USF issued the following statement to student-athletes via email:

> Dear Members of the USF Baseball Team,
>
> On Dec. 17, 2021, after receiving complaints from members of the USF community, USF baseball head coach Nino Giarratano and associate coach Troy Nakamura were suspended with pay, pending results of an internal investigation. Conducted by USFs Office of Human Resources, the investigation was focused on reports of incidents within the baseball program when the coaches [*sic*] language, behavior, and/or actions were inappropriate and did not reflect USFs mission and values.
>
> As a result of that investigation, Coach Nakamura is no longer associated with the USF baseball program, effective immediately. Coach Giarratano was officially reprimanded for inappropriate behavior related to the reported incidents.
>
> While the investigation did not find evidence of a widespread harmful culture within the baseball program, the reported incidents indicated that coaches showed poor judgment and lack of supervision. The university has taken immediate action to address this. Procedures are being put in place to ensure baseball team members are ensured a respectful, safe environment with proper oversight, direction, and mentoring by their coaches. The wellbeing of all students at USF is our highest priority.
>
> The Athletic Department and the university is grateful to members of the community who came forward with concerns, and provided information. We are also grateful to the staff in Human Resources who conducted a thorough, swift and comprehensive investigation.

226.   In light of USF's attempt to close out these issues without acknowledging that sexually abusive behavior was indeed widespread on the baseball team and that its investigation was not thorough, it is unsurprising that USF's administration has continued to engage in retaliation.

227.   For example, right after the above announcement, the AD contacted John Doe 1 to inform him that while Coach Naks had been terminated, Coach G would stay on. She stated that Coach G would be on a year-to-year contract and would not be allowed to travel or hold meetings without an administrator present. John Doe 1 asked the AD how Coach G felt about John Doe 1

1    remaining on the team, and the AD said she would speak to Coach G and follow up with John
2    Doe 1 "in a couple of days."

3    228.    In the interim, USF posted a message on Instagram, congratulating John Doe 1 and
4    three other players for maintaining a 4.0 GPA in the fall semester. Just an hour later, the post was
5    taken down. On information and belief, it was taken down because Coach G continued his
6    campaign of retaliation and wanted to force John Doe 1 to leave USF by discrediting his
7    accomplishments and deflating his confidence.

8    229.    Given his anxiety about returning to USF's campus, John Doe 1 tried to register
9    for online classes for the spring 2021 semester but was unable to register for a full course load.
10   He signed up for class waitlists, emailed professors, and had multiple calls with his advisor, but
11   was still unable to register for enough classes. After additional complaints, USF finally helped
12   John Doe 1 by assigning him an academic success coach.

13   230.    After almost two weeks, John Doe 1 still had not heard back from the AD, so John
14   Doe 1 called her. The AD told John Doe 1 that Coach G did not want him to return to the team,
15   and that she was going to stand behind Coach G's decision that John Doe 1 should leave the team.
16   The AD thus adopted and furthered the abusive coach's retaliation against a student-athlete brave
17   enough to call out the coaches for their illegal behavior.

18   231.    USF encouraged John Doe 1 to sign a document to enter the transfer portal so he
19   could play baseball at another college or university. Contrary to the assertions USF made to John
20   Doe 1, that document contained a location for John Doe 1's signature, agreeing that USF could
21   revoke his scholarship. John Doe 1 refused to sign that portion of the document. In January 2022,
22   John Doe 1 entered the transfer portal, and is still in it.

23                    **b.    2020-22: John Doe 2's experience was typical.**

24   232.    USF heavily recruited John Doe 2 based on his baseball skills and experience. The
25   coaches at USF portrayed the USF baseball team as a cohesive, caring culture where everyone
26   cared about each other's successes and had each other's backs.

27   233.    John Doe 2 committed to play baseball at USF in his senior year of high school
28   and signed a National Letter of Intent. John Doe 2 was offered (and accepted) guaranteed four-

1  year athletic and academic grants-in-aid (scholarships) in an amount of $75,000 per year to attend

2  USF. John Doe 2 received the largest scholarship ever awarded by USF for an outfielder.

3         234.    The retaliation and emotional abuse against John Doe 2 began as soon as it became

4  apparent to the coaches that he would not play along with the sexually charged behavior on the

5  field and/or that he and his teammates were discussing ways to stop the behavior.

6         235.    Throughout the fall of 2020, Coach G and Coach Naks did not provide John Doe 2

7  with opportunities to play, nor did they provide coaching direction. While Coach G texted John

8  Doe 2 that he was doing great, those accolades did not transfer to opportunities to practice or

9  playing time on the field.

10        236.    At the time, in the fall of 2020, John Doe 2 did not understand why he was not

11  afforded playing time and practice opportunities. John Doe 2 had dreams of playing baseball

12  professionally, and he wanted to do all that he could to better himself as a ball player and athlete

13  while at USF.

14        237.    During the spring of 2021, Coach Naks began verbally abusing John Doe 2. By

15  way of example only, at an away game, Coach Naks screamed at John Doe 2, calling him a

16  "fucking cunt" while they were in the dugout. Parents from the opposing team reported the event

17  to several USF parents, and John Doe 2's parents learned about the shocking conduct. John Doe 2

18  was humiliated.

19        238.    In the spring of 2021, Coach G brought John Doe 2 in for an early exit interview.

20  Coach G told John Doe 2 that he wanted him gone from the team because John Doe 2 was "too

21  nice and too respectful," presumably for the intolerable sexualized environment Coach

22  Defendants had created. Coach G told John Doe 2 that he did not like him and that John Doe 2

23  did not have the type of personality Coach G wanted. Coach G tried to force John Doe 2 to

24  verbally agree to leave the team and to give up his scholarship. John Doe 2 was stunned and

25  upset. He was not prepared to leave the team or give up his scholarship, particularly without

26  speaking with his parents.

27        239.    On May 30, 2021, John Doe 2's parents requested "an urgent in person meeting"

28  with USF's AD. The subject line of the email stated, "URGENT MEETING REQUEST." The

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

1  AD never responded to this email.

2  240.   Shortly after his early exit interview, John Doe 2 showed up to take the bus to an

3  away game, but the team did not have him on the player list or assigned seating chart. John Doe 2

4  understood this was because Coach G was retaliating against him by trying to run him off the

5  team.

6  241.   In the summer of 2021, Coach G repeatedly called John Doe 2, asking him if he

7  was returning to the team. John Doe 2 told him he was. Coach G became very upset, telling John

8  Doe 2 that he was making a terrible decision, that he did not belong at USF, and that he was

9  going to be cut from the team as soon as he got back to campus.

10  242.   In the fall of 2021, Coach G largely ignored John Doe 2 when it came to providing

11  coaching direction. John Doe 2 would ask Coach G what he could do to get more playing time

12  and how he could improve. Coach G would respond that John Doe 2's playing ability was fine,

13  but that he just did not have room for him.

14  243.   Coach G and Coach Naks clearly communicated that they hated John Doe 2, that

15  they wanted him to leave, and that they would not give him any coaching direction. John Doe 2

16  became extremely stressed. He was upset that no matter how hard he worked—and even though

17  his playing ability was not in question—the coaches wanted him to leave. His grades suffered,

18  and he began isolating himself. He felt degraded given that he had to suffer through the

19  sexualized conduct and harassment at practice, with little to no coaching, and then be told his

20  personality was the problem because he would not play along.

21  244.   John Doe 2 became physically ill from the stress, resulting in five emergency room

22  visits during the fall of 2021; by the end of fall 2021, Coach G's campaign to force John Doe 2 of

23  the team succeeded. John Doe 2 determined that his physical and mental health was suffering too

24  much and advised USF that he intended to transfer and lose his scholarship.

25  245.   John Doe 2 spoke with both the AD and assistant AD regarding his reasons for

26  leaving USF. During his call with the AD, the AD told John Doe 2 that she knew things were

27  going on with the coaches on the team and implied that both Coach G and Coach Naks were

28  going to be terminated.

2435418.2

246.    In December 2021, John Doe 2 learned of a Zoom meeting the AD was holding with the team that he had not been invited to. Like John Doe 1, he reached out to the AD seeking to be included.

247.    During this Zoom meeting, which was attended by over 40 people, the AD acknowledged how angry and distraught the team must be, and that she felt the same, alluding to Coach Naks' behavior and the complaints about him. She told the team that Coach G was a "great guy," that she and Coach G had been friends for years, and that they all would get through this together. She told the team that the events that had transpired were hard on her, too. She said she had hardly slept and she loves "those guys."

248.    John Doe 2 understood from the team meeting that the AD intended to protect Coach G, despite the fact that Coach G had normalized and participated in Coach Naks' sexual harassment. John Doe 2 was upset that the AD minimized the players' experiences, including the inappropriate sexual conduct that created an intolerable sexualized environment and psychological abuse in which Coach G had engaged.

### c.    2021-22: John Doe 3's experience was typical.

249.    John Doe 3 received approximately 10 offers, including from Ivy League schools as well as USF, which heavily recruited John Doe 3 based on his baseball skills and experience.

250.    The coaches sold John Doe 3 on the USF baseball team through representations that the baseball players were very close to each other, there was a family culture on the team, John Doe 3 could leave a legacy on the program, and he would be the "foundation of the program" for years to come.

251.    John Doe 3 committed to play baseball at USF in his junior year of high school and signed a National Letter of Intent. John Doe 3 was offered (and accepted) guaranteed four-year athletic and academic grants-in-aid (scholarships) of more than $280,000.

252.    Afterwards, John Doe 3 was injured during his senior year of high school and worked extensively with a physical therapist to be ready to play baseball for USF.

253.    The summer before John Doe 3 was to begin his fall semester at USF, John Doe 3 was invited to work out with Coach G on campus numerous times. During this time, several

coaches praised John Doe 3 and said they were excited to get him on campus.

254.    Just weeks later, when John Doe 3 started at USF in the fall of 2021, Coach Defendants began constantly verbally abusing him for being injured and for having to rehabilitate his arm. Coach G would yell "you pussy" at John Doe 3, and demand he throw the ball harder or differently, causing John Doe 3's arm injury to worsen. John Doe's worsening injury made him unable to throw at all for more than a month, spurring additional criticism from Coach G.

255.    Just three weeks into school, John Doe 3 asked Coach G for help. John Doe 3 wanted to become a standout player on the USF team, as he had aspirations of one day playing professional baseball. Coach G responded that it would be a waste of his time, pointless for him to help John Doe 3 out with coaching, that John Doe 3 was not and never would be one of his top five players, and so he refused to work with him.

256.    During practice, Coach G would verbally abuse John Doe 3 in front of the other players, threatening to hit him on the head with a baseball bat, and telling him he was the problem with the team. Despite Coach Defendants' treatment, John Doe 3 strived to be successful. Every day from 7 a.m. to 6 p.m., John Doe 3 was either in class, on the baseball field, or in physical therapy. He showed up at practice, even when he could not participate in certain drills due to his injury.

257.    In a subsequent meeting in Coach G's office, Coach G called John Doe 3 a liar, when John Doe 3 told him that he had not been late for physical therapy. When John Doe 3 tried to defend himself, Coach G told him that none of his teammates or coaches liked him, that he was a waste of space, and that he was a problem for "everyone." Coach G told John Doe 3 to "get the fuck out" of the school because he did not belong there. Coach G also said that he wished he could take John Doe 3's scholarship away more than anything, and that he was the biggest mistake he had made in 22 years of coaching. Coach G called John Doe 3 a "pussy" repeatedly during this meeting.

258.    When John Doe 3 reinjured his arm soon thereafter, Coach G became angry and told John Doe 3 that there was "something seriously wrong" with John Doe 3's head.

259.    Because of his injury, Coach G told John Doe 3 not to do anything during

practices, and sarcastically said that John Doe 3 could have fun and watch his teammates improve. At an away game, while John Doe 3 was observing his teammates practice, Coach G called John Doe 3 over and began yelling at him for not joining practice. When John Doe 3 responded that he (Coach G) told him not to do anything, Coach G responded, "Can't you even think? I've never in my life had someone make me so angry every day. You can't go a day without pissing me off."

260.    No matter what John Doe 3 did, the coaches berated him. For example, for one game, the players were supposed to arrive at 8 a.m. John Doe 3 showed up at 7:53 a.m. and was the first to take batting practice. A little while later, Coach G made him leave the game because he "had arrived 10 minutes late" (which was obviously not true). Later in the game, Coach G badmouthed John Doe 3 to his teammates, asking, "Where's [John Doe 3]? He must be home taking a long nap since he's not here."

261.    The following Monday, the coaches sent John Doe 3 for a blood draw to test for drugs. John Doe 3 had not been taking drugs and understood that no other baseball player had been sent for drug testing, ever. John Doe 3 believed Coach Defendants were singling him out for abuse to get him to leave the team, and of course, John Doe 3 tested negative for drugs.[128]

262.    John Doe 3 became increasingly anxious and depressed as the semester progressed. When not in class or at practice, he stayed in his room distressed. He could not sleep or eat and felt very anxious at practices, waiting to be singled out and abused, and hoping for the practices to end.

263.    John Doe 3 was retaliated against for not participating in the sexually charged behavior in which the coaches were engaged. Most times, when a sexual conversation was occurring, John Doe 3 would distance himself by walking or turning away.

264.    During the semester, John Doe 3 complained to the Director of Player Development, who is responsible for safeguarding players' mental health. He spoke with the

---

[128] Notably, the NCAA Drug-Testing Program for 2020-2021 specifies urine collection, not blood draws.  *See* https://ncaaorg.s3.amazonaws.com/ssi/substance/2020-21SSI_DrugTestingProgramBooklet.pdf (last visited March 27, 2022).

director for a week about the abuse before he was sent to a USF sports therapist. That USF sports therapist told John Doe 3 that his experience and those events occurring with the team were normal, and that is how most coaches act.

265.    In advance of his exit interview after the season, the coaches told the players that they needed to fill out their personal evaluation forms in advance, but that they needed to be filled out in the way that the coaches wanted them to. If they did not, the players were told that their subsequent "conversation would not be pleasant and would involve a lot of yelling." Fearing further verbal abuse, John Doe 3 complied with Coach G's order to fill out the form as directed.

266.    At John Doe 3's Fall 2021 season exit interview, the coaches told John Doe 3 that his scholarship was revoked and that he would not be at USF next semester. They demanded that John Doe 3 enter the transfer portal immediately and forced him to fill out another form stating that he (John Doe 3) was being cut from the team.

267.    John Doe 3 left the meeting upset and confused. He had chosen USF because of the guaranteed four-year scholarship. He did not understand how the coaches could revoke it. So, he undertook his own research online and learned that the coaches had lied about their ability to revoke the scholarship and had tricked him into writing that he was leaving on the form.

268.    John Doe 3 contacted the Associate AD. The Associate AD confirmed that the coaches could not take away his scholarship.

269.    John Doe 3 then contacted Coach Naks and asked how his guaranteed scholarship could be taken away. Coach Naks told him to come by the office. Coach G told John Doe 3 at that meeting that he understood John Doe 3 wanted to leave. He asked: "Are you leaving?" When John Doe 3 said he did not know, Coach G looked surprised and told him there was no point in staying as he would never be part of the baseball team. Coach G demanded an immediate answer and would not allow John Doe 3 to discuss the matter with his parents.

270.    John Doe 3 was then contacted by USF's NCAA representative, Jeremy Howell by phone, to discuss why he was leaving the team. At that meeting, John Doe 3 received confirmation that USF does not drug test its players and spoke about his plans if he left USF.

271.    Following the meeting and phone calls, Coach Defendants sent John Doe 3 text

1    messages about other schools interested in him and with requests to return his equipment.

2         272.    During winter break, John Doe 3 spoke with the AD, who told John Doe 3 that he

3    could stay and finish the school year and that USF does not have pre-exit interview forms. The

4    guaranteed scholarship was important to John Doe 3, and he did not want to relinquish it.

5         273.    Nevertheless, in March of 2022, John Doe 3 entered the transfer portal because of

6    the abuse inflicted upon him by the Defendants.

7              **d.      2017-18: John Doe 10's experience was typical.**

8         274.    John Doe 10 was a talented baseball player in high school. In 2016, after his junior

9    year, he was named to the all-state baseball team by Cal-Hi Sports, a prestigious honor for a high

10   school baseball player. John Doe 10 graduated in 2017 and was drafted by a Major League

11   Baseball team, but decided to attend college before going to the major leagues.

12        275.    John Doe 10 knew it was important to pick the right college on his path to the

13   major leagues. His grandfather had been inducted into the Professional Baseball Scouts Hall of

14   Fame, and his father worked as a scout for over a decade for several Major League Baseball

15   organizations.

16        276.    John Doe 10 was heavily recruited but decided to attend USF based on Coach G's

17   representations that the team was a "family," that it was built on certain pillars of faith and

18   morals, and that Coach G cared about the players as people.

19        277.    John Doe 10 also established an excellent rapport with the pitching coach. Coach

20   G and the pitching coach convinced John Doe 10 that he was the future of the USF program.

21        278.    John Doe 10 received an athletic and academic grants-in-aid (scholarships) valued

22   at $200,000 guaranteed for four years to play baseball at USF and earned one of three coveted

23   starting weekend pitching spots as a freshman in 2018.

24        279.    John Doe 10 had been diagnosed with ADHD, executive functioning disorder, and

25   verbal dyslexia. During his first semester of his freshman year at USF, John Doe 10 struggled

26   with the academic workload on top of the training schedule, and his learning disabilities

27   contributed to his difficulties.

28        280.    During this time, his learning disabilities became known to the team, and John Doe

2435418.2

10's stress was exacerbated because Coach G and Coach Naks called him a loser, made fun of his learning disabilities, and told him that ADHD is not "real".

281.   Additionally, John Doe 10 was subjected to the intolerable sexualized environment Coach Defendants created and perpetuated. For example, during practice for the pitchers, the coaches made them play a strip game they called flinch or balk. Each pitcher would have to take off a layer of clothing during practice when they made an error. There were times when the players stripped down to their compression shorts, and the coaches and other players would laugh. John Doe 10 recalls thinking, "What are we doing?" but the coaches acted as if it was normal, and John Doe 10 was scared that the coaches would penalize him if he complained.

282.   The coaches would also make the players perform skits on the field during practice that were judged by Coach G. The coaches encouraged these skits to be sexual in nature. In one example, a group of players "dry hump[ed]" each other; Coach G pointed at them and yelled, "Winner!"

283.   Coach Naks would also talk about female athletes in a sexualized and offensive manner in front of the team. Coach G would talk with the players about the size or shape of individual players' penises.

284.   John Doe 10 was disgusted by the coaches' conduct, which was so distracting that he struggled to consistently performance on the mound. During a February 20, 2018 meeting, John Doe 10 shared with Coach G that he was struggling and felt like he was blacking out on the mound. Rather than help John Doe 10, Coach G berated him, telling him he was "a piece of shit," "a fuck-wit-freshman," and "a nobody."

285.   Coach G told John Doe' 10, "your family isn't shit and you aren't shit," referring to John Doe 10's grandfather and father. Coach G said: "Suck my cock," adding, "You aren't a winner, you know nothing about winning, I know everything about winning, I'm a winner, you aren't close. You're lucky I even let you be a part of this program."

286.   During Coach G's tirade, John Doe 10 asked how Coach G could say these harsh things about him when had hadn't taken the time to get to know John Doe 10 or what he was dealing with on a day-to-day basis (including with respect to his ADHD, executive functioning

disorder, and verbal dyslexia) over the last seven months. In response, Coach G told John Doe 10 to "shut the fuck up," and said: "ADHD is a hoax, and you just use it as an excuse when you fail."

287.    In another example, after a Saturday doubleheader, Coach G told John Doe 10 that he was a "fucking embarrassment" and a "fucking loser" in front of the team. John Doe 10 was so visibly upset that the pitching coach told him to come to his room after the game. There, while crying hysterically, John Doe 10 confided in the pitching coach about Coach G's abuse. The following Tuesday, Coach G yelled at John Doe 10 to stop talking to the pitching coach and said, "If you can't throw strikes, you might as well fucking kill yourself." The pitching coach was not the only staff member with whom John Doe 10 shared the abuse that Coach G inflicted.

288.    During one game, Coach G became so incensed at John Doe 10 that he physically abused John Doe 10, throwing him against the wall in the dugout.

289.    Coach G's abuse and retaliation of John Doe 10 extended beyond USF. In the summer of 2018, John Doe 10 was accepted to play with a collegiate summer baseball league known for its association with top prospects and draftees to the MLB.

290.    At the end of the USF season, Coach G told John Doe 10 that he had notified the summer baseball league that he was withdrawing his referral. Coach G told John Doe 10 that there was "no way" John Doe 10 would be good enough to play in that league and that he wasn't "going to ruin [his] relationship with" the team. This caused John Doe 10 to miss a once-in-a-lifetime opportunity that would have advanced his professional baseball career.

291.    John Doe 10 was devastated by the combination of psychological and physical abuse, combined with the sexualized environment. He began to believe what the coaches said about him—that he was a loser, worthless, and a bad baseball player—and to hate himself. Because John Doe 10 was depressed, he began struggling to perform and as punishment, he was not allowed to travel and received minimal play time. When he did play, and Coach G began forcing John Doe 10 to throw only fastballs, preventing him from throwing other pitches. One time John Doe 10 attempted to "shake a pitch," which means to ignore the catcher's call for the next pitch and throw a different pitch; Coach G yelled at him, saying words to the effect that if John Doe 10 did that again, Coach G would throw him off the team.

292.    John Doe 10's parents were extremely worried about him. He would call them crying, and they were concerned he would harm himself. On one occasion, he was so upset that they stayed on the phone with him until he fell asleep. On numerous occasions, John Doe 10's father would make the nearly two-hour drive to San Francisco to check on him. He would sometimes stay into the early morning hours to console John Doe 10 and ensure he would not harm himself.

293.    By the end of the year, John Doe 10 and his parents agreed that John Doe 10 needed to leave in order to protect his mental health and get the coaching support he deserved. At the exit meeting at the end of the season, John Doe 10 asked for a release from the team because of the abuse.

294.    After leaving USF, John Doe 10 focused on his mental and physical health and was able to find his passion for baseball again. He played summer ball, while he sent text messages and emails, and made phone calls to dozens of colleges in an attempt to transfer. He wrongly assumed that there would be the same interest in him as there was when he was recruited from high school, but that was not so. He only received a few walk-on offers.  He discovered that Coach G was "blackballing" him when one DI coach told John Doe 10:  "I like you, but I am friends with Nino [Giarratano], so I am not interested."

295.    John Doe 10 decided to attend a DI school where he would have to pay his own tuition and sit out for one year due to the NCAA's transfer rules. Based on his new coach's statements, it was clear that Coach G had also tried to blackball John Doe 10 from this school.

296.    John Doe 10 worked hard to recover from the abuse and setbacks USF inflicted and had a successful year at his new school and a promising summer in 2019 with his summer league team. However, because of the NCAA's transfer rule at that time, John Doe 10 had no body of work to show after his initial season at his new school. This changed his career trajectory for the MLB draft, as he was relegated to sign as an undrafted free agent by an MLB team and currently fights to be seen in the minor leagues.

### e.    2017-18: John Doe 4's experience was typical.

297.    Being offered a spot on the USF baseball team was a dream come true for John

Doe 4. He was recruited his senior year of high school and had offers to play at many DI schools but was persuaded to attend USF because Coach Defendants sold him on the school's Jesuit values and Coach G "rolled out the red carpet" during John Doe 4's visit to USF.

298.    During this visit, Coach G showed John Doe 10 and his parents his house and spoke to them about the team being a "big family" in which everyone gets along. Coach G told them that if a player cannot "go home for a holiday, there's always a seat at the [Giarratano] dinner table." John Doe 4 signed a National Letter of Intent committing to play baseball as a freshman at USF in the fall of 2017.

299.    John Doe 4's dream quickly became a nightmare once John Doe 4 arrived on campus. Coach Defendants were often nude around players and would shower with them. Though John Doe 4 thought this was very strange, he attempted to accept the behavior as it was portrayed as "normal" within the team culture. This also applied to Coach Naks' more frequent nudity, for which the players even had the expression: "If Coach Naks whips his dick out, you know he's in a good mood."

300.    John Doe 4 also recalls Coach Defendants constantly talking with the players about the shape and size of the players' penises.

301.    John Doe 4 did not participate in the sexualized behaviors, and Coach Defendants noticed. So, they constantly belittled him throughout the school year in an effort to force John Doe 4 off the team.

302.    For example, when John Doe 4 would make a mistake, Coach G would immediately berate him, saying, for example: "Hey, [John Doe 4], why don't you just try to do one thing right instead of everything wrong. You're such a stupid fucking idiot."

303.    While at bat during a scrimmage, John Doe 4 moved out of the way of a pitch. Coach G stopped the game and said, "You can't hit anyway so [getting hit by a pitch] might be your only shot to get on base. Toughen up and don't be a pussy." Later that day, with the entire team in the dugout, Coach G said, "[John Doe 4], you played like a scared bitch today. What happened? [Another teammate], too, you guys both looked like scared girls running the bases." While the team laughed, John Doe 4, mortified, was nearly brought to tears.

304.    One day Coach G said to the entire team, "Last night I laid in bed and thought to myself: Tomorrow I'm going to try and not be mean to [John Doe 4]. Then I thought, no, it's just too easy to be mean to him, I don't know what it is about that guy but it's so easy to be mean to him."

305.    During a rain delay affecting one game, a senior captain picked up and threw John Doe 4 on the field, then forced him to dance on the field in front of the entire USF team, the coaches, and the opposing team. Everyone, including Coach Defendants, laughed. John Doe 4 was humiliated.

306.    The incessant, degrading treatment and comments worked: after his freshman year, John Doe 4 was crushed. He lost all confidence, dreaded going to practice, and wanted off the team. He was severely depressed, could not complete his homework, and would call his mother every day in tears. His parents worried that he might harm himself.

307.    John Doe 4 left USF after his freshman year, played baseball near his home for two years, then transferred to another DII university to continue playing baseball.

308.    In 2019, John Doe 4 sought counseling to help overcome the trauma caused by Defendants' conduct.

**f.    2017-18: John Doe 12's experience was typical.**

309.    Baseball meant everything to John Doe 12 as a child and young adult: he was the youngest of three brothers—all of whom played baseball—and began playing baseball at the age of three on a select team coached by his father. John Doe 12's childhood dream before starting at USF was to join a DI school and then play baseball professionally.

310.    John Doe 12 was a gifted baseball player. In high school, he started varsity at shortstop all four years; played on three prestigious traveling teams; and led the state's batting statistics when he was a member of his home state's all-state team his junior and senior years.

311.    Because of his baseball skills and experience, John Doe 12 was heavily recruited by over 40 college baseball programs, including 22 NCAA DI baseball programs and five Top 20 NCAA DI baseball programs.

312.    John Doe 12 signed a National Letter of Intent after his junior year of high school

2435418.2

(July 2016) committing to USF because USF offered him a 4-year guaranteed scholarship $256,000 after he was told that many other schools do not offer this kind of guarantee, which could not be taken away from him, and was an investment in him and his family. John Doe 12 also chose USF because he had been told that USF was recruiting him to be a starting player.

313.     However, once John Doe 12 moved into his dormitory in August 2017, Coach Defendants immediately began abusing John Doe 12. Coach G constantly cursed at John Doe 12 and forced him to play even when he was injured or physically unwell.

314.     For example, within John Doe 12's first two weeks of practice as a freshman, John Doe 12 recalls Coach G telling John Doe 12 how much he sucked at fielding the baseball and that he was "the biggest pussy" he'd seen. Coach G told John Doe 12 that John Doe 12 "had no dick, so even if the ball did hit" him, "it wouldn't hurt" in response to John Doe 12 not fielding the ball the way Coach G wanted him to. At a practice later that fall, when John Doe 12 missed a ground ball considered unfieldable because it was hit so hard, Coach G stalked over to John Doe 12 at third base, and said, "You have no fucking balls. I have more balls than you and I have one fucking testicle, you pussy."

315.     Another incident took place in the spring of 2018 at a pre-game practice at Saint Mary's College of California ("St. Mary's"). In response to John Doe 12 missing a ground ball at third base, Coach G stopped the entire batting practice. In front of the USF baseball team, St. Mary's baseball team, and staff from both schools watching the practice, Coach G walked slowly over to John Doe 12 while cursing at him and stating: "How embarrassing is it that I have to come over here just to teach you how to field a fucking ground ball."

316.     Coach G came up behind John Doe 12, and grabbed him by the waist, which made John Doe 12 extremely uncomfortable, especially in light of the abusive environment he and other teammates had been subjected to all year. Coach G then patronizingly "taught" John Doe 12 how to field a ground ball as though John Doe 12 was a small child. This incident lasted for about 5-7 minutes, during which the St. Mary's team and staff, as well as USF's team and staff, watched and laughed at John Doe 12. After Coach G was done humiliating John Doe 12, he said, "See now, you've ruined our whole entire batting practice, look what you did[]" and walked off.

317.    It was an exception for John Doe 12 to be able to leave a practice or game without getting railed against by the coaches. Statements such as "you fucking suck so much today," "you're a fucking terrible baseball player," and "you're a pussy" were common. The coaches made these statements to John Doe 12 regardless of whether John Doe 12 was performing well that day.

318.    Coach G would also pull John Doe 12 out of games or no apparent reason. For example, in the spring of 2018 at a game against Reno, Nevada, despite John Doe 12 executing two plays perfectly, Coach G called John Doe 12 over, questioned how he could have put John Doe 12 in a game if John Doe 12 was "such an incompetent pussy," and pulled him out of the game.

319.    Additionally, despite the fact that in the spring of 2018, John Doe was batting .400 after the first five games, the second best average on the team at the time, Coach G benched him for the next 15 games with no explanation.

320.    Instead, Coach G put a fifth-year senior second baseman in who had never batted over .250. Upon information and John Doe 12's belief, Coach G played that second baseman because he had a better relationship with that second baseman than he did with John Doe 12. That second baseman batted below .200 during those 15 games John Doe 12 was benched.

321.    The night before another practice John Doe 12's freshman year, John Doe 12 came down with food poisoning. Despite the fact that he told Coach Naks that he had vomited many times the night before and could not practice, Coach Naks called John Doe 12 a "completely ball-less pussy" and said that if John Doe 12 did not practice, he would be "looked at like a pussy by everyone, especially Coach G." Because of Coach Naks' statements to John Doe 12, John Doe 12 felt the need to try to practice; John Doe 12 threw up for hours after practice and ultimately lost eight pounds in 48 hours.

322.    At a practice game towards the end of John Doe 12's freshman year, after John Doe 12 broke this throwing hand thumb, Coach G called John Doe 12 a "big pussy" and forced him to continue throwing because John Doe 12 "needed to get better" according to Coach G.

323.    The incident with his throwing hand thumb catalyzed John Doe 12's decision to

1   quit the USF baseball team. John Doe 12 attended his exit interview at the end of his freshman

2   year and told Coach G that he felt Coach G had treated him poorly and did not like how Coach G

3   stripped John Doe 12 of his "confidence and dignity all-year long."

4          324.    In response, Coach G aggressively came at John Doe 12 and began yelling at him

5   in a manner that made John Doe 12 fear harm from Coach G. Coach G told John Doe 12 that he

6   had never been "worthy" of his USF scholarship and had to give it back, and that he needed to

7   leave because there was no place left for John Doe 12 at USF; John Doe, did not fit into USF's

8   baseball program. Coach G also told John Doe 12 that he did not deserve to play at USF and

9   called John Doe 12 "stupid" and "incapable."

10         325.    That meeting made John Doe 12 feel unwanted, and as though he had no choice

11  but to relinquish his scholarship and leave USF. At the time of his exit interview, John Doe 12

12  was not comfortable openly discussing the sexual abuse he had been subjected to, but he is now.

13         326.    Most memorable for John Doe 12 were the comments Coach Defendants would

14  make about each other's penises, as well as those of the other players. For example, two minutes

15  into John Doe 12's first practice with the USF team, Coach G asked John Doe 12 if he had "seen

16  [Player Y's] piece yet." When John Doe 12 expressed confusion over what Coach G was

17  referring to, Coach G said: "Ohhh, you'll see it soon, you better watch out." Upon information

18  and John Doe 12's belief, Coach G had been referring to teammate Player Y's penis size.

19         327.    During John Doe 12's first month at USF, Coach G began talking about how small

20  Coach Naks' penis is on the baseball mound at practice, noting that he could "barely see it."

21  Coach G then imitated Coach Naks urinating by holding his penis with only his thumb and one

22  finger to indicate how small it was. Coach Naks laughed and repeated the same imitation vis-à-vis

23  Naks.

24         328.    After an away game at Oregon in 2018, the USF players showered in the Oregon

25  visitors' locker room. The coaches showered with them. Coach G and Naks also waited in line to

26  shower, with towels on their shoulders and genitals uncovered. They both, without refrain, looked

27  and commented on the players' private parts. Coach G would say things such as: "How's it

28  hanging today?" "Is it a cold one today for you? "Oh come on, you don't even use that thing."

"You need a lawn mower down there." Coach Naks also laughed and swung his penis around during that time.

329.    Because of Coach Defendants' abuse, John Doe 12's father flew across state lines to USF 16 times over the course of John Doe 12's freshman year to provide his son emotional support out of concern for how isolating Coach Defendants' abuse was for John Doe 12 and fear that his son would harm himself.

330.    Because of the NCAA's rules, once John Doe 12 quit the USF baseball team, he had to go back to a junior college for a year. After that year, he then went back to a DI school—this time without any financial assistance—and continued to play baseball.

331.    It was only after John Doe 12 experienced the abuse-free environments at his junior college and new DI school that he truly began to understand how egregious Coach Defendants' behavior was.

332.    John Doe 12 stopped playing baseball in June 2021, and then finished his last semester at his new DI school.

333.    Because of Coach Defendants' abuse, John Doe 12 ultimately gave up his lifelong dream to play professional baseball and now plans to attend law school. John Doe 12 felt Coach Defendants' emotional and sexual abuse wore him down to the point where he "could no longer become what [he] wanted to be." John Doe 12 has not yet recovered from the trauma to which Coach Defendants subjected him and still experiences the anxiety and depression he began feeling his freshman year at USF.

**g.      2011-14: John Doe 5's experience was typical.**

334.    John Doe 5 received numerous offers, including from USF, which heavily recruited John Doe 5 based on his baseball skills and experience. Coach Defendants sold John Doe 5 on the USF baseball team through representations that the baseball players were very close to each other, there was a family culture on the team, and John Doe 5 would be an important member of the team.

335.    John Doe 5 was offered (and accepted) a renewable annual scholarship of athletic and academic grants-in-aid (scholarships), starting at 25% his freshman year which increased

over time to nearly 100% based on his performance. In 2013, he received the Con Dempsey Jr. Award,[129] named for a former USF baseball player who played in the MLB in the 1950s. The award is given every year to the USF baseball player "who comes on late in the season to make a significant impact."[130] Although John Doe 5's scholarship amount increased over the years, the Coach Defendants treated him worse each year.

336.    John Doe 5 soon learned that there was no family culture and that a player's staying power on the team was dependent on participating in the coaches' sexualized environment. For example, in November 2011, Coach Naks emailed John Doe 5 a visualization technique that was supposed to "free you up to attack like a rabid, horny Rottweiler."

337.    On multiple occasions, John Doe 5 witnessed Coach Naks exposing himself as a joke in front of players, which was accepted as a normal part of team culture. Coach Naks also frequently asked John Doe 5 and other teammates sexual questions about women. This made John Doe 5, a gay man not yet out, incredibly uncomfortable. Further, John Doe 5's lack of responses often resulted in his teammates ridiculing him and invasively questioning his sexuality.

338.    On another occasion, a pitching coach (now head coach at another university) exposed himself in front of the team to pee on a scouting report of USF players to demonstrate that the opinions of other teams in those scouting reports did not matter to him.

339.    Coach Defendants and several teammates who knew John Doe 5 is gay would also single him out because of his sexuality and make him feel unsafe. For instance, each year, Coach Defendants organized a "Rookie Show" and encouraged players to provide sexualized entertainment. During John Doe 5's freshman year, two players performed a skit depicting John Doe 5 and the only other gay teammate (also not out at the time) biking to Whole Foods and having anal sex. The coaches laughed at this skit.

340.    Coach Defendants were aware that one of the baseball players who acted in the above skit punched a gay student physically threw him out of a USF baseball party because there

---

[129] The award is named after a former USF baseball player who played in the MLB in the 1950s.
[130] SF Baseball, *BASE: Dons Hand Out Annual End-of-Year Awards* (May 20, 2019), https://usfdons.com/news/2019/5/20/baseball-base-dons-hand-out-annual-end-of-year-awards (last visited July 7, 2022).

1    were no "faggots" allowed at the party.

2        341.    John Doe 5 heard about the assault from other players and was very upset that

3    Coach G condoned the incident by covering it up. In fact, Coach G went out of his way to cater to

4    this player, who became a first-round MLB draft pick.

5        342.    Coach G and John Doe 5's teammates also often made jokes about John Doe 5 and

6    his straight roommate dating.

7        343.    Because John Doe 5 saw that no one was punished after these events, John Doe 5

8    no longer felt safe. As a result, he began volunteering less for optional team activities, which

9    Coach G seized on to vocalize John Doe 5's lack of commitment to the entire team on multiple

10   occasions. For example, Coach G selected John Doe 5 to host the Rookie Show his sophomore

11   year, but John Doe 5 declined. Coach G became irate, belittling John Doe 5 for not being a good

12   teammate.

13       344.    Coach G also isolated John Doe 5 during multiple one-on-one meetings in which

14   he told John Doe 5 that he had mental issues and needed to see a sports psychologist provided to

15   him by USF.

16       345.    During batting practice freshman year, John Doe 5 was joking around with a few

17   of his teammates while another player took batting practice from one of the other coaches in the

18   team's batting cage. When it was John Doe 5's turn, a coach threw a hard and fast pitch at John

19   Doe 5's face, striking him in the neck. He then called John Doe 5 a "pussy" and said that he

20   deserved the hit for joking around.

21       346.    The NCAA sanctioned Coach G and USF for using too much off-season practice

22   time during John Doe 5's tenure at USF.[131] In response to the sanctions, USF staff replaced

23   practices with additional workouts and "non-team practices" that were ostensibly optional.

24   However, players including John Doe 5, felt forced to go to them to avoid Coach G's retaliation

25

26   _____

27   [131] Though not the subject of this litigation, John Does 4 and 12 recall that during one of their first
     practices in 2017, the coaches made all players pre-sign their weekly NCAA practice hour logs
     for the entire semester. Though the coaches explained they did this to avoid forgetting to turn any

28   logs in, John Does 4 and 10 later learned that the coaches did this because they made the players
     practice more hours each week than allowed by the NCAA.

1  for not attending. These additional unconventional practices, which included long marches and

2  hikes, caused John Doe 5 to develop a wear and tear injury in his hip.

3      347.    Following his injury, USF coaching staff intimidated John Doe 5 into having hip

4  surgery so that he could get back onto the field as soon as possible. The coaches then forced John

5  Doe 5 to play summer baseball before recovering from the surgery. This injury, which included

6  torn cartilage, a torn hip flexor, and hip damage, has caused life-long problems for John Doe 5.

7      348.    John Doe 5 did not feel comfortable talking with the AD because the AD, as it is

8  now widely known, was already covering up a major sexual abuse scandal relating to the men's

9  soccer team. Coach G knew this and used this information against the team to make them feel

10  unsafe and unsupported.

11      349.    After one game where John Doe 5 and the only other gay player on the team

12  played poorly, Coach G told the team that "they played like a bunch of faggots" and challenged

13  them to tell the AD if they had a problem with how Coach G was speaking to the players, while

14  looking directly at John Doe 5. After this game, Coach G had a meeting with both John Doe 5 and

15  the other gay player and told them he only had room for one of them on the team—even though

16  they played different positions and were both starters. John Doe 5 thinks Coach G said this

17  because both players were gay, making John Doe 5 feel even more isolated and threatened.

18      350.    During the spring of his junior year, John Doe 5 was batting over .300 in

19  conference play during his first season back since his hip surgery. Despite performing well, he

20  started to notice that (along with the consistent verbal abuse from Coach G) Coach G was now

21  starting to regularly bench John Doe 5 in front of the team during the 7th or 8th inning of games

22  whose outcomes were already determined to demoralize John Doe 5 and single him out because

23  of his sexuality. However, because Coach G was not willing to risk losing a game by replacing

24  John Doe 10, he did not do this during close or important games.

25      351.    John Doe 5 continued to try to ignore these events and Coach G used John Doe 5's

26  lack of reaction to point out to the team how little John Doe 5 cared, furthering his argument that

27  John Doe 5 was "toxic" and a "cancer" to the team as a whole.

28      352.    Coach Defendants' jokes about John Doe 5's sexuality, sexually inappropriate

actions, mentally and physically abusive behavior towards the team, and verbal and physical assaults of gay players in particular made John Doe 5 feel so extremely unsafe, he felt forced to quietly quit the program at the end of the spring 2014 season. During his time on the team, John Doe 5 become depressed and suicidal and witnessed other players become depressed and suicidal.

353.    Many teammates who were not aware of the full scope of the abuse did not understand why John Doe 5 had left the team, and Coach G used this as further proof that John Doe 5 was not committed to the team and that Coach G had effectively excised a "cancer" from the team.

354.    John Doe 5's academic advisor was Coach G's wife, Brenda Giarratano. She used her advisory time with John Doe 5 to question what was going on with his relationship with Coach G and why it was bad.

355.    After John Doe 5 quit the team, he applied to graduate early using college credits he accumulated during high school through the "Running Start" program, which allowed him to take college courses at Washington community and technical colleges. Though these records were provided to USF when John Doe 5 was admitted and used to place him in certain USF classes, when John Doe 5 applied to graduate early, Coach G's wife claimed that she could not locate John Doe 5's transcripts.

356.    Upon information and belief, Coach G's wife used her power as a USF staff member with access to John Doe 5's academic records to try and prevent him from applying for and receiving early graduation as a punishment for perceived wrongs against her husband and the USF baseball program. Coach G and his family used their power to manipulate and punish USF players who they did not like and were willing to go to great lengths to assert their authority.

357.    Prior to USF, John Doe 5 had aspirations of playing MLB, and his performance during his college career certainly pointed in the direction of him being selected in the MLB draft, but Coach G told John Doe 5 that he had informed scouts that John Doe 5 had no interest in playing professionally, and that he didn't really care about baseball in general.

358.    Coach G systematically destroyed John Doe 5's love for the game and destroyed any professional prospects John Doe 5 had, thus ensuring that John Doe 5 would never play

1     baseball again.

2          359.    John Doe 5 had planned to get his MBA from USF while on scholarship but lost

3 his scholarship when he was forced to quit the program because of concerns for his personal

4 safety. As a result, he had to pay out of pocket to continue his education.

5          360.    Since 2012, John Doe 5 has suffered from recurring nightmares about USF

6 baseball, frequent anxiety attacks, and bouts of depression affecting his personal and professional

7 relationships, as well as his ability to stay employed. He feels unable to rekindle previously

8 significant friendships with many of his teammates who continued to play after John Doe 5 left

9 USF. He was made to feel as though he was a pariah and would not be welcomed back because

10 he was told that the way he left the program was disgraceful and harmful to the team.

11          361.    In early December of 2021, John Doe 5 finally felt he had the capacity to begin to

12 address his mental health and began discussing his experience at USF with some of his former

13 teammates.

14          362.    In December of 2021, John Doe 5 also reached out to Coach G on LinkedIn and

15 asked him to catch up. That same day, over the phone, John Doe 5 explained to Coach G how the

16 incidents of abuse and the intolerable sexualized environment he experienced on the baseball

17 team made him feel at the time, and how they continue to affect him to this day. John Doe 5

18 mentioned Coach G saying the team "played like faggots," and his teammate's assault of the gay

19 student at the USF baseball party as examples.

20          363.    When John Doe 5 expressed to Coach G that Coach G's failure to punish the

21 player who had assaulted the gay student was upsetting and contributed to his feeling that he was

22 not safe on the team, Coach G said he could not apologize for other people's actions. Coach G's

23 lack of remorse shocked John Doe 5.

24          364.    After this conversation, John Doe 5 learned of Coach G's suspension and Coach

25 Naks' termination and realized that there were other instances of Coach Defendants' abuse he had

26 not known about.

27          365.    Learning that Coach G would not be fired because USF took the positions that

28 only Coach Naks was a problem and that there was no proof of a problematic culture on the

1    baseball team was incredibly upsetting for John Doe 5, because he knew both Coach Naks and

2    Coach G created and fostered the pervasive abuse Plaintiffs suffered.

3        366.    On Friday, March 11, 2022, when John Doe 5 read the filed Complaint brought

4    against Defendants, he suffered a panic attack because of the trauma he endured at the hands of

5    Coach Defendants.

6                  **h.    2012-14: John Doe 6's experience was typical.**

7        367.    John Doe 6 was recruited by USF as a sophomore during high school based on his

8    baseball skills and experience. John Doe 6 backed out of an offer he had from another DIII

9    school, and instead went to a community college for his freshman year pursuant to an agreement

10   with USF to accept him afterwards. John Doe 6 picked USF because he was told that the

11   "culture" on the baseball team was such that the team is very close and supportive of each other

12   so that each member becomes the best player that he can.

13       368.    After that one year, during which he was awarded Junior College All American,

14   John Doe 6 transferred to USF for his sophomore year in the fall of 2012 and accepted an annual

15   renewable scholarship of athletic and academic grants-in-aid (scholarships) of 35%.

16       369.    When John Doe 6 arrived on campus, there were many sexualized events

17   constituting part of the team's culture. For example, Coach Naks sometimes showered at the same

18   time the players did. John Doe 6 thought it was highly inappropriate but felt he could not speak

19   up because this behavior appeared "normal" to the others. One time, John Doe 6 recalls seeing

20   Coach Naks crawling on the field naked, which he found extremely bizarre.

21       370.    Coach Naks also spoke about trying to get the female students in the overlooking

22   dorm rooms to flash their breasts.

23       371.    And although, as a pitcher, he was not required to participate in the skits, John Doe

24   6 would often see Coach Naks performing skits and Coach G grinning. Coach Naks was often

25   grunting and making animal sounds. Coach Naks would sometimes hold a bat between his legs

26   like it was a penis.

27       372.    John Doe 6 played baseball at USF for two years. His first year, he spent under the

28   supervision and protection of the pitching coach, who never endorsed Coach Defendants' sexual

abuse. However, after the pitching coach left following John Doe 6's first year, John Doe 6 had a drastically different experience in his second (junior) year because he was now subject to abuse, harassment, and retaliation. For example, Coach G often called John Doe 6 a "pussy." Coach G would also say that the pitchers were throwing "like a bunch of pussies."

373.    The fall of 2013 saw a large incoming freshman class on the baseball team, and one of the freshmen was Coach G's son. John Doe 6 and other players believe Coach Defendants began to take steps to force the current players off the team to make space for the freshmen.

374.    For example, although John Doe 6 had a stress fracture in his back from his youth that the coaches and trainers knew about, the coaches and trainers demanded he do strength-building exercises incompatible with his injury. Not wanting to contradict the authority figures he trusted, John Doe 6 followed USF staff's exercise protocol. One day while doing the exercises, he heard a pop in his back, felt a tingling sensation in his legs, and fell over. An MRI revealed a slipped disk and a herniated disk. Even though his injury was documented by an MRI, John Doe 6 had to convince the Coach Defendants that he was indeed injured.

375.    John Doe 6 worked hard at rehabilitating his injury in the off-season and was cleared to start the 2014 season in the spring. Even though he had not pitched much, he was brought in to pitch in the second game of the season and, unsurprisingly, did not perform well. Coach G walked out on the mound and said, "Get off my fucking mound; you're a piece of shit and an embarrassment to the program."

376.    The next time John Doe 6 pitched, he performed very well, evidenced by a scoreless inning. Despite this, Coach G later called him into his office and said, "Unless anything drastic changes, we're going to go in another direction next year. We don't think your heart is in it. You don't have the ability to play on this team. We found our pitchers that we're going to use, and you're not one of them. You're still on the team and can come to practices, but you can't go on road trips." Though he was not permitted to travel, John Doe 6 continued to attend practices and to rehabilitate his back because he wanted to succeed on the team.

377.    At John Doe 6's exit interview with Coach G at the end of that season, Coach G said that he found John Doe 6 a summer league in the Bay Area. John Doe 6 was astounded, as he

had previously understood that he was going to be cut from the team. John Doe 6 told Coach G

that he got an internship in Los Angeles and found a summer league there in which to play. Coach

G responded, "If you're going to do this internship and not play ball in the Bay Area, you're not

going to be on the team next year," even though he had told him previously he was not on the

team. Coach G added: "Since you have a career-ending injury, you should approach the NCAA to

give your scholarship to them next year."

378.    John Doe 6 quit the team due to Coach G's constant abuse and belittlement

throughout that year. However, he was allowed to keep his scholarship and graduate from USF

because his parents complained to the school and the NCAA faculty representative of the "hostile

environment."

379.    Specifically, in May of 2014, John Doe 6's parents sent the Associate Athletic

Director and the NCAA Faculty Athletic Representative a letter. The NCAA Faculty Athletic

Representative brought the Athletic Director, Scott Sidwell, into the conversation. Among other

things, John Doe 6's parents wrote:

> **Hostile Environment**
>
> With the change in the coaching personnel this year there has been a
> significant change in the way the program has been managed, and
> this has created a 'hostile environment' for the athletes, especially
> the Pitching Squad. Players are being called out and they are told
> they are 'pathetic', 'weak-minded', 'a cancer to the team', and that
> they 'need to understand that their baseball career is over'. This is
> completely unacceptable behavior from any coach, especially a
> college coach at an institution such as USF, which subscribed to fair
> play, high values and ethics.

380.    In the face of these complaints, Scott Sidwell, USF's AD at the time, offered to

continue John Doe 6's partial scholarship, but only if he did an "internship" for the baseball team.

Though John Doe 6 declined the offer because he no longer wanted to be around Coach

Defendants, USF continued to provide John Doe 6 his scholarship. Upon information and belief,

USF continued to provide John Doe 6 a scholarship because John Doe 6 and his parents

possessed information that Coach G had been falsifying baseball players' statistics.

381.    During one of the several conversations with USF, John Doe 6's parents

mentioned their awareness that Coach G had been falsifying his son's baseball performance

statistics. These falsified statistics had been used to the detriment of John Doe 6 and other players.

382.    Until that point in time, Coach G's wife had been John Doe 6's academic advisor and told him that he was on track to graduate. But at the beginning of his senior year, he was told by his new academic advisor that he did not have enough credits to graduate. John Doe 6 had to take an overload of classes his senior year and paid extra to do so in order to graduate on time because of the misinformation provided by Coach G's wife.

383.    Though John Doe 6 was no longer an active player on the baseball team, during his last year at USF, Coach Naks called John Doe 6 into his office and told him that he had been randomly selected for a drug screening test to be administered by the NCAA.  Curiously, none of the players selected for the "random drug test" were starting players.

384.    Because of Defendants' actions, John Doe 6 suffered an avoidable physical injury; lost all will, ambition, and love for the game of baseball; and gave up on his dream to one day play professional baseball.

### i.    2014: John Doe 7's experience was typical.

385.    John Doe 7 was a legacy USF baseball player and student: his grandfather played baseball at USF; and his father, uncle, and cousin attended USF. While John Doe 7 had opportunities to play baseball elsewhere, he only wanted to play at USF because of this legacy. While recruiting him, Coach G told John Doe 7 that he would be treated "like family" and that "we take care of each other" and "we build people up."

386.    When John Doe 7 arrived on campus, it was apparent that the team was not like a family. Instead, there was a great divide between the players who parroted Coach G and Coach Naks' conduct—including the sexualized activities and the unrelenting cruelty—to stay in the coaches' good graces, and everyone else.

387.    In fact, those players who were not a part of the "in group" were not even allowed to sit at the same table with the others and would sometimes be forced to pay for those other players' meals. John Doe 7 and his roommate would eat dinner at different times to avoid paying for other players' meals. There were also rumors that, in prior years, players had to serve meals in

1    French maids' costumes.

2        388.    Another activity to keep the divide between the players was called "Kangaroo

3    Court." Senior players would call out younger players' mistakes and impose "fines" that had to be

4    paid on the spot. For example, they would announce, "[John Doe 7] owes $15 for missing a

5    ground ball." The senior players would take the money for themselves. Coach G and Coach Naks

6    participated and laughed.

7        389.    During his freshman year, John Doe 7 was assigned the same jersey number of a

8    former USF player who went on to play Major League Baseball. A senior later told John Doe 7

9    that Coach Naks made another teammate take John Doe 7's jersey out of his locker because John

10   Doe 7 "didn't deserve to wear that number." John Doe 7 was fined in Kangaroo Court for

11   "losing" the jersey.

12       390.    If John Doe 7 did well, it was not good enough for Coach G. If he performed

13   poorly, Coach G would say words to the effect of, "You suck and that's what I expected."  Coach

14   G often told him, "You're a pussy. You're letting your family down. You're not capable of

15   playing baseball at this level."

16       391.    Coach G also used "team building" events as a tool to degrade players. In a skit

17   teammates performed about John Doe 7 when he was a freshman in 2014, another player

18   portrayed John Doe 7 as the intellectually disabled character Lenny from *Of Mice and Men*. At

19   the end of the skit, Lenny/John Doe 7 was killed with a baseball bat. Following the skit,

20   upperclassmen showed John Doe 7 a series of video clips from all his teammates about why they

21   hated John Doe 7, why he sucked at baseball, and why he is a bad person. This was the worst

22   night of John Doe 7's life.

23       392.    John Doe 7 also endured Coach Naks' sexual displays and efforts to persuade

24   females to expose themselves in front of dorm windows. At the time, John Doe 7 minimized these

25   incidents because Coach G did not seem bothered by them.

26       393.    John Doe 7 was also mandated to participate in stripping drills where players

27   would have to remove articles of clothing during practice when they made errors.

28       394.    Despite this unrelenting abuse, John Doe 7 continued to work hard. Taking Coach

G upon his professed open door policy, John Doe 7 attempted to meet with him on several occasions to discuss how to improve his performance. Each time, Coach G brushed him off by telling him that he was too busy and would catch up with him later. He never did.

395.     John Doe 7 began experiencing anxiety and sleep deprivation. He dreaded attending practice because he feared being targeted. Older players on multiple occasions threatened him with violence in front of the whole team, yet Coach Defendants did nothing. He was afraid for his safety given the violent culture Coach Defendants created and perpetuated on the team.

396.     John Doe 7 was so depressed he transferred out of USF after only one semester, as did his roommate, also a freshman on the baseball team. When John Doe 7 told Coach G about his plans to transfer, Coach G responded, "I knew you weren't capable of playing here. Thank you for wasting our time."

397.     John Doe 7 then attended a local community college, yet even there, Coach G's reach extended, and John Doe 7's new teammates (who were friends with Coach G's son) were told, "[John Doe 7]'s a pussy who sucked at baseball and couldn't hang at USF."

398.     Based upon these events, John Doe 7 became severely depressed and had to work hard to overcome the emotional injuries that Defendants inflicted. To this day, regrets his decision to attend USF.

### j.     2013: John Doe 8's experience was typical.

399.     John Doe 8 was recruited by USF during his junior year of high school based on his baseball skills and fand other experience. He was also actively recruited by several other schools and received an offer his junior year from Pepperdine University, another school in the same conference as USF. However, the summer after his junior year, John Doe 8 bonded with the USF pitching coach and verbally committed to USF based on the representations the pitching coach made about the USF baseball team.

400.     The pitching coach called John Doe 8 weekly as part of the recruiting process, consistently spoke about how much John Doe 8 was wanted at USF, and how USF would help him make it to the major leagues. He told John Doe 8 that the USF baseball team is a

2435418.2

"brotherhood" in which teammates are very close, build each other up, and spend time together off the field.

401.     John Doe 8 was offered and accepted USF's renewable annual scholarship of athletic and academic grants-in-aid (scholarships) of 25%. However, right before John Doe 8 arrived on campus, the pitching coach left USF to serve as a DI head coach in Southern California and John Doe 8 soon learned that everything he was told about the baseball program's culture was untrue.

402.     At one of John Doe 8's first practices as a freshman in 2013, Coach Naks referenced the undergraduate dormitories overlooking the baseball field and said: "Sometimes girls will stand at their windows, pull up their shirts, and show their boobs. We're here to play baseball, so just look at them and jerk off about it later. Trust me, I want to fuck them too."

403.     John Doe 8 was also subjected to strip games where each pitcher had to take an item of clothing off when they made an error during practice.

404.     During John Doe 8's freshman year in 2013, a picture of John Doe 8's girlfriend, an elite athlete, was posted on the same screen alongside a picture of a famous athlete and word to the effect of "Your girlfriend is now fucking him. Not sure why she was ever with you." John Doe 8 was appalled that he and his girlfriend were the brunt of cruel and sexualized humor condoned by the coaches.

405.     Additionally, Coach G constantly berated John Doe 8 on the field, no matter how hard he tried. Coach G used insulting phrases including, "something is wrong with you;" "you will never go anywhere in baseball;" "we don't want you here, you need to leave;" "you are selfish;" "you are a pussy;" and "no one wants you on the team."

406.     Almost immediately, Coach G suggested John Doe 8 should give up his USF scholarship. This constant barrage of insults, no matter what John Doe 8 did, soon destroyed his confidence and his mental state. Nevertheless, John Doe 8 was determined to succeed. Coach G professed an open door policy, and several times, John Doe 8 would ask Coach G how to take his game to the next level. Coach G's response was always the same: "I don't have time for you." Coach G called John Doe 8 "useless" and told him that he regretted awarding him a partial

scholarship.

407.    John Doe 8 began hating going to the field each day because he was anxious about the abuse Coach G would inflict on him. Coach G would say things such as: "Don't do it like [John Doe 8]," in front of the entire team. John Doe 8 walked on eggshells at each practice, not wanting to make any mistakes, knowing that if he did, Coach Defendants would call him out in front of everybody and they would all laugh at him.

408.    John Doe 8 became severely depressed and suicidal because he was constantly berated and told that he was a failure. One day, John Doe 8 went to Coach G in tears and told him that while he was trying his hardest on the field, he was struggling with the baseball program's culture and "not in a good head space." Instead of offering even a modicum of support, Coach G responded by telling John Doe 8 that he was the problem, that his teammates did not like him, and that Coach G wished he had never offered John Doe 8 a scholarship.

409.    Coach G demanded that John Doe 8 sign papers to relinquish his scholarship. When John Doe 8 told Coach G that he wanted to talk to his parents first, Coach G responded: "You're 18 years old. Be a man and make a decision. You don't need to talk to your parents."

410.    After only one semester, John Doe 8 decided to transfer. And even though Coach G told John Doe 8 that he did not have a place on the team, Coach G refused to release him, preventing John Doe 8 from being able to talk to other DI schools and explore other options.

411.    Prior to USF, John Doe 8 never required counseling or medication. He was an upbeat positive young man when he arrived at USF. However, during his one semester at USF, John Doe 8 sought counseling, was diagnosed with severe depression and anxiety, and started taking anti-depressant medication that he continues to take. On his darkest day, John Doe 8 called a suicide hotline.

412.    Because John Doe 8 was so depressed and desperate to leave USF, John Doe 8 considered transferring to a school without a baseball program because Coach G refused to release him. However, John Doe 8's high school baseball coach was able to convince John Doe 8 to continue playing college baseball at a lower division outside USF's conference.

413.    Not only did USF force John Doe 8 to give up his scholarship, Coach Defendants

made efforts to sabotage his new opportunity. In the transition to his new school, John Doe 8 learned that Coach G made an unsolicited call to John Doe 8's new coach to express his opinions to the effect of John Doe 8 being "at the bottom of USF's depth chart" and "not a fit for their program." John Doe 8 also learned that during a college baseball showcase, another USF coach made comments to one of John Doe 8's new coaches, claiming that John Doe 8 "lacked energy and competitiveness" and "was not DI material."

414.     None of these comments about John Doe 8's ability and skills were true. John Doe 8 set a record at his new school for most wins as a pitcher and was named him an All-American and an All-Conference player for three years. After college, John Doe 8 was signed by an MLB team as an undrafted free agent and played professional baseball for four years.

415.     Upon information and belief, had John Doe 8 been able to continue his college career at a DI university, he would have had a greater chance of being drafted by an MLB team, and thus would have had greater earning potential.

**k.     2000: John Doe 9's experience was typical.**

416.     USF heavily recruited John Doe 9 based on his baseball skills and experience. During his junior year of high school, USF offered John Doe 9 an annual renewable scholarship of over 60% of to play on the baseball team.

417.     Though St. Mary's, Cal Poly, and other DI and DII universities also offered John Doe 9 scholarships, John Doe 9 chose to attend USF because Coach G told him the baseball team was a unified brotherhood in which players supported each other to bring forth the best each could be and because of USF's Jesuit mission statement communicating Christian beliefs and a moral culture welcoming all.

418.     Upon arriving on campus, John Doe 9 soon learned this was not true. In addition to observing Coach Naks regularly encourage females in nearby dorms to flash their breasts while Coach G laughed, John Doe 9 recalls Coach Naks constantly talking about sexual topics, including his sexual escapades with his girlfriend, sexual positions, oral sex, and sexual fantasies. Coach Naks also attempted to engage John Doe 9 in discussions about John Doe 9's sexuality and his sexual experiences, asking questions like: "Tell me what your tongue did" and "What

positions did you do?" Coach G also once said, "There's a lot of pussy on campus."

419.    John Doe 9 was very uncomfortable with these types of conversations, and it soon became evident to Coach Defendants that John Doe 9 would not participate in their intolerable sexualized environment. As a result, they began ostracizing John Doe 9 and tried to run him off the team. For example, once when John Doe 9 was sick and presented Coach G a doctor's note excusing him from practice, Coach G became enraged and told him that he was going to "rip his ass."

420.    John Doe 9 came to dread the nearly weekly meetings he had with Coach G in Coach G's office because he was afraid of Coach G's volatility. During these meetings, Coach G would typically threaten John Doe 9 with what he could to do John Doe 9 and his baseball career.

421.    At one of their last meetings, Coach G called John Doe 9 into his office and told him that he needed to work harder and that he (Coach G) "didn't believe his commitment to the team." John Doe 9 responded that he had been working very hard, which incensed Coach G, who jumped up, lunged across the desk, grabbed a report card from John Doe 9's hand, and ripped it up. He told John Doe 9, "You're the most condescending piece of shit I've ever met."

422.    No matter how hard John Doe 9 tried on the field, he was bullied and harassed. For example, one of John Doe 9's roles on the team was to put the baseballs away at the end of practice. Coach G's son, a young child at the time, asked John Doe 9 to leave a few balls out so that he could play with them. John Doe 9 did, and the next day, Coach G verbally attacked him for not completing his job. To this day, John Doe 9 has never been yelled at as Coach G did that day. When John Doe 9 explained that he left the balls out for Coach G's son, Coach G said, "Leave my son alone."

423.    Coach G also unrelentingly abused John Doe 9's teammates. At their first team meeting of the season, Coach G yelled at all the players, including John Doe 9, calling them a "disgrace" and stating that he should strip them of their scholarships. He often called players "faggots," both in meetings and on the field.

424.    John Doe 9 no longer wanted to be around Coach G because he was afraid of him. By October of his freshman year, John Doe 9 was severely depressed. He stopped going to class,

rarely left his dormitory, and gained weight.

425.    When John Doe 9 told his mother about Coach G's bullying behavior, John Doe 9's mother called Coach G to tell Coach G that her son was struggling and to demand the abuse stop. Coach G claimed he had no idea what John Doe 9's mother was talking about and told her she was wasting his time. When John Doe 9's mother threatened to complain to Coach G's supervisors, Coach G said, "If you say anything to the people above me, I will make sure your son never puts a uniform on again." The next day, Coach G told John Doe 9 that he would be kicked off the team if he or his mother called the athletic department.

426.    John Doe 9 decided to give up his scholarship and leave USF to maintain his mental health. When John Doe 9 told Coach G that he wanted to retrieve his personal equipment, Coach G told him to come back later that evening, which John Doe 9 thought strange.  When John Doe 9 did come back, he noticed several of his baseball gloves had been stolen from his locker.

427.    Additionally, Coach G promised John Doe 9 an "A" for his physical education class (baseball), but retaliated and gave him a failing grade, which lowered John Doe 9's GPA and it more difficult for John Doe 9 to transfer.

428.    Because Coach G would not release John Doe 9 to a four-year university, John Doe 9 could only transfer to a junior college and he became a "4-2-4 Transfer." [132] The NCAA's policies concerning such transfers made it impossible for John Doe 9 to finish his college education. To return to a 4-year school, he would have to take and pay for extra classes, as he no longer had a scholarship. So, he played baseball at a junior college for one year, where he became an All-American player. However, without the ability to finish his college education, he was forced to sign a low value contract with an MLB team.

429.    In his second year of spring training for MLB, John Doe 9 suffered a serious injury to his right arm, which left him unable to continue playing baseball. As such, he became a 22-

---

[132] Planning to go Division I – 4-2-4 Transfer,
http://fs.ncaa.org/Docs/eligibility_center/Transfer/DI_4-2-4_Transfer.pdf (last visited April 8, 2022).

2435418.2

year old unable to complete his college education and unable to earn a living playing baseball.

**l.      1999-2000: John Doe 11's experience was typical**

430.     In 1998 during his senior year of High School and based on his baseball skills and experience, John Doe 11 was recruited heavily by Coach G, who at the time was an assistant coach at Arizona State. In 1999, Coach G became the head coach at USF and continued recruiting John Doe 11.

431.     Coach G scheduled a USF visit for John Doe 11. John Doe 11 enjoyed the atmosphere of the university and its location, and chose to play baseball there, as opposed to any of the other schools where he could have played.

432.     John Doe 11 was offered a scholarship to play on the USF baseball team.

433.     When John Doe 11 arrived on campus, "it all began." Coach G would go on vicious tirades, constant yelling and screaming. Name-calling was a daily thing.  If Coach G did not like how a player was performing, he would say things such as, "You're a piece of shit" or "You're a fucking pussy."

434.     During one game, in which John Doe 11 was delayed in putting his shin guards on, Coach G screamed the following at him the entire time it took John Doe 11 to put the shin guards on: "You son-of-a-bitch. You lazy motherfucker. I don't know why you're on this team." Everyone in the dugout at the time stared at John Doe 11 during Coach G's tirade.

435.     Coach G required all players use a certain type of baseball bat because, upon information and belief, USF had a contract with that bat manufacturer. During one practice while John Doe 11 was in the batting cage and Coach G was pitching balls, Coach G noticed John Doe 11 using his own bat (which John Doe 11 preferred and was manufactured by a different company). Coach G then threw a pitch to hit John Doe 11, which struck John Doe 11 in the back as he turned away to avoid the ball. After commenting that John Doe 11 was not a "team player," Coach G threw another pitch hitting John Doe 11 again while making a similar comment. Coach G's third pitch hit John Doe 11 in the head, stunning him. Coach G called him a "fucking pussy" and kicked him out of the batting cage. John Doe 11 was in shock that his coach was trying to injure him with his pitches.

436.    The abuse continued at every practice. Nothing was off-limits and John Doe 11's personal life outside of baseball became the subject of Coach G's intense and inappropriate interest. For example, John Doe 11 began dating another student during the fall of 1999. Supposedly, another player asked this student why she was dating John Doe 11, and she responded, "Because he has a big dick."

437.    Whether she said this or not, word spread throughout the team. After one away game when John Doe 11 was in the shower and Coach G was taking a shower with the players, Coach G said, "Turn around. Let me see it. Let me see what you're working with," referring to John Doe 11's penis. The rest of the players in the shower erupted in laughter, but John Doe 11 was mortified. John Doe 11 refused to turn around and faced the wall until Coach G left the shower.

438.    After that, Coach G persistently asked John Doe 11 about his sex life in front of the other players. John Doe 11 became highly uncomfortable during practices, as Coach G would ask about the women John Doe 11 was seeing and say things like, "I heard you got some pussy last night, she's hot," or, "Tell me what you did last night." "Everything always related back to sex."

439.    Coach G's angry outbursts continued. A rumor had spread about an extra-marital affair in which Coach G was involved with an assistant coach's girlfriend. Coach G gathered the whole team to an indoor meeting and started screaming and threatening them, saying that what he did in his private life was none of their business and that if anyone said anything more, he would ruin their career. He said, "If you're man enough to come talk to me one-on-one, you know where my office is," which John Doe 11 took as a challenge not to talk, but to fight.

440.    John Doe 11's mental, emotional, and physical condition declined because of Coach Defendants' constant belittling. He did not want to go to practices to get screamed at, or to hear other players get screamed at. He was not excited to play baseball anymore. He lost the love of the sport. Coach G would criticize him, no matter how hard he worked, and would hurl insults all the time. He was anxious and depressed and began to suffer from panic attacks, which continue to this day. John Doe 11 began seeing a therapist early in his freshman year.

441.    For example, one day John Doe 11 missed a weightlifting practice because of his anxiety. Furious, Coach G punished John Doe 11 by making him run "pole to pole" 80 times, which is more than 100 yards 80 times over. Coach G threatened: "If you stop, you'll be off the team." John Doe 11 knew that Coach's G's home was within eyesight of the field, so John Doe 11 ran for what seemed to be hours. Even though John Doe 11 was suffering from Coach G's constant abuse, John Doe 11 wanted to succeed with the hopes of one day playing MLB.  As he ran into the evening, his roommate brought him a hamburger, which he ate while he was running.

442.    In his second semester, John Doe 11 injured his back and was immediately ostracized. Coach G told him he was not worth playing and subsequently ignored him; the rest of his team followed Coach G's lead.

443.    John Doe 11's panic attacks became more prevalent during his second semester at USF. John Doe 11 recalls his heart racing while he hid in his dorm room to avoid practice. Coach G would then call his dorm room, sometimes around 10:00 or 11:00 p.m., yelling, "Where were you? What were you doing?" At times John Doe 11 would see Coach G walking on campus and turn the other way to avoid him.

444.    After the pitching incident, John Doe 11 began feeling unsafe around Coach G. During weightlifting workouts, Coach G would periodically say he wanted to fight John Doe 11 one day. Although Coach G would make the statement in a joking manner, John Doe 11 felt that Coach G was attempting to assert his dominance by challenging John Doe 11 to a fight.

445.    Depression and anxiety spread through the team. The incoming freshmen began discussing dropping out, and after the winter break, many did not return. Out of the 18 incoming freshmen in 1999, 17 did not return for their sophomore year. Upon information and belief, the one player who stayed on the team had a full academic scholarship and tolerated the abuse because he did not want to forfeit that scholarship.

446.    John Doe 11 chose to drop out of the program after his freshman year. He transferred to a junior college and played one more year of baseball before sustaining a career-ending arm injury.

447.    John Doe 11 worked hard to overcome the severe emotional injuries Defendants

1   inflicted and to come to terms with the fact that he would never be able to realize his dream of

2   playing professional baseball.

3        **E.        Plaintiffs and the Classes Were Injured and Continue to be Injured.**

4        448.    Plaintiffs' harms stem from the fact that the NCAA and its member institutions—

5   including USF—created a system that places a higher value on institutional reputations, at the

6   expense of the student-athletes' well-being.

7        449.    The sexual, physical, and mental harassment and abuse many student-athletes—

8   including the Plaintiffs in this case—have suffered has been accompanied by self-doubt, shame,

9   blame, and guilt, and oftentimes requires years of reflection, meditation, counseling, medication,

10  and psychotherapy. All the while, many continue to be plagued with depression, anxiety, and

11  suicidal thoughts.[133]

12       450.    Sexual and mental harassment and abuse of athletes results in long-term

13  posttraumatic symptomology, with core symptoms including re-experiencing, avoidance, and

14  hyperarousal symptoms.[134] Furthermore, recounting sexual abuse can lead to "double-trauma,"

15  which can cause intense ruptures in day-to-day life.[135]

16       451.    Psychological damage from sexual abuse is especially harmful when the

17  perpetrator is known and trusted by the victim.[136]

18       452.    In addition to psychological injury, Plaintiffs and the Classes suffered out-of-

19  pocket losses from the loss of scholarships, payments of costs-of-attendance, payments for

20  medical and psychiatric treatment, damage to their careers as college baseball players directly

21  ─────────────────────

22  [133] Ingunn Bjørnseth & Attila Szabo, *Sexual Violence Against Children in Sports and Exercise: A Systematic Literature Review*, JOURNAL OF CHILD SEXUAL ABUSE, 27:4, 365-385, 365 (2018).
[134] Helen Owton & Andrew C. Sparkes, *Sexual Abuse and the Grooming Process in Sport: Learning from Bella's Story*, SPORT EDUC. AND SOCIETY, at 5 (July 2015) (unpublished manuscript), https://www.researchgate.net/publication/281771790_Sexual_abuse_and_the_grooming_process_in_sport_Learning_from_Bella's_story.
[135] *See id.*
[136] *See* Gloria Dura-Vila & Roland Littlewood, *Integration of Sexual Trauma in a Religious Narrative:  Transformation, Resolution and Growth among Contemplative Nuns* 50 TRANSCULT PSYCHIATRY 21–46 (2013); Kimberly A. Lonsway & Sgt. Joann Archambault (Ret.), *Victim Impact: How Victims are Affected by Sexual Assault and How Law Enforcement Can Respond* 33-37 (Apr. 2006, updated Nov. 2020) https://evawintl.org/wp-content/uploads/Module-2_Victim-Impact.pdf  (last visted July 14, 2022).

2435418.2

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

affecting their prospects of becoming professional baseball players, and other compensatory and consequential damages.

453.    Unless the NCAA and USF are required to adopt, implement, and enforce appropriate policies and procedures to prevent, or properly respond to, sexual misconduct and psychological abuse of students and student-athletes by institution personnel, current and future students and student-athletes will continue to suffer these injuries.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

454.    All statutes of limitations are tolled based on the doctrines of equitable estoppel, fraudulent concealment, and/or equitable tolling.

455.    The Defendants' unlawful conduct has also been continuing.  Upon information and belief, sexual, emotional, and/or physical abuse of Plaintiffs occurred as early as 2000 and continued into at least 2022, if not the present.

456.    In May of 2014, John Doe 6's parents sent the USF Associate Athletic Director and the NCAA Faculty Athletic Representative a letter describing Coach Defendants' conduct. The Athletic Director Scott Sidwell was also informed of the complaints. USF and the NCAA intentionally ignored these Plaintiffs' complaints to protect reputations and to cause those Plaintiffs to believe they did not have any legal rights.

457.    USF's failure to act was intended to deceive and silence those Plaintiffs and their parents to make them believe that their complaints were isolated, not actionable, and not a systemic problem, so they would not make their experiences public by complaining in other fora or otherwise filing suit. USF's actions were also intended to ensure that other USF baseball players would not make their experiences public or file suit.

458.    USF's failure to investigate these complaints or notify students and the public of the persistent abuse, was also contrary to USF's mandatory reporting and investigation policies. Plaintiffs' complaints should have been investigated yet were not so that USF could continue to ignore Defendants' misconduct, which it effectively did until 2022 when John Does 1, 2, and 3 brought suit.

459.    The NCAA's failure to act on Plaintiffs' complaints, including directing John

2435418.2

1    Doe's 8's parents to complain to the school, were also intended to divert Plaintiffs so they would

2    not make the events public or otherwise bring suit.

3         460.    These actions and failings effectively tolled the statutes of limitations for the

4    claims alleged by Plaintiffs herein based on the doctrines of equitable estoppel, fraudulent

5    concealment, and/or equitable tolling.

6         461.    USF and NCAA should be equitably estopped from relying on any statutes of

7    limitations defenses because of their gross negligence and silence, as well as their active and

8    deliberate efforts to deceive Plaintiffs and conceal their unlawful and grossly negligent conduct.

9    Defendants also knew about Coach Defendants' conduct based on John Does 8 and 6's parents'

10   complaints, yet did nothing to suppress the truth.

11        462.    Plaintiffs relied on Defendants' failure to take action to their detriment.

12        463.    Plaintiffs John Does 4-12 did not discover that they had viable claims until March

13   11, 2022, when the *San Francisco Chronicle* published a story entitled "'Intolerable sexualized

14   environment': Ex-USF baseball players sue coaches, school, NCAA."

15        464.    It would be fundamentally unfair to allow USF and the NCAA to rely on a statute

16   of limitations defense against Plaintiffs' claims based on the above facts. Thus, equitable tolling

17   also tolled the accrual of Plaintiffs John Does 4-12's claims.

18        465.    Once Plaintiffs John Does 4-12 found out the truth, they exercised diligence in

19   filing this Amended Complaint as soon as possible.

20   **VII.    CLASS ALLEGATIONS**

21        466.    Plaintiffs bring this action against the NCAA on behalf of the following

22   "Nationwide Class" pursuant to Federal Rules of Civil Procedure ("Rules") 23(a), 23(b)(2),

23   and/or 23(c)(4): "All student-athletes who participated in NCAA sports at NCAA member

24   institutions during the past four years."

25        467.    Plaintiffs also bring this action against the NCAA on behalf of the following

26   "California Subclass" pursuant to Rules 23(a), 23(b)(2), and/or 23(c)(4): "All student-athletes

27   who participated in NCAA sports at California-based NCAA member institutions during the past

28   four years."

- 92 -

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

468.    Plaintiffs also bring this action against USF and Coach Defendants on behalf of the following "USF Baseball Subclass" pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4): "All members of the University of San Francisco baseball team since 2000."

469.    Plaintiffs reserve the right to modify or amend the class definitions, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

470.    Excluded from the Classes are Defendants and any of their affiliates, parents, subsidiaries, officers, and directors; any entity in which Defendants have a controlling interest; all persons who make a timely election to be excluded from the class; governmental entities; and all judges assigned to hear any aspect of this litigation, including their immediate family members.

471.    Numerosity: The NCAA reports that there are more than 460,000 NCAA student-athletes competing in 24 sports every year.[137] Similarly, there are an average of 35 players per year on a DI baseball roster.[138] As such, the members of the Classes are so numerous joinder is impractical.

472.    Typicality: Plaintiffs' claims are typical of the claims of each class member in that Plaintiffs, like all class members, are or were NCAA student-athletes. Plaintiffs and the class members were injured through the NCAA and USF's failure to protect them, and Plaintiffs are advancing the same legal theories on behalf of themselves and the Classes.

473.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests and the interests of all other members of the Classes are identical, and Plaintiffs are cognizant of their duty and responsibility to the Classes. Accordingly, Plaintiffs can fairly and adequately represent the interests of the Classes. Moreover, Plaintiffs' counsel are competent and experienced in litigating class actions, including litigation of this kind. Plaintiffs and counsel intend to vigorously prosecute this case and will fairly and adequately protect the Classes' interests.

---

[137] NCAA, *Student-Athletes*, http://www.ncaa.org/student-athletes (last visited Feb. 9, 2022).
[138] Aria Gerson, *NCAA Provides Relief on Division I Baseball Roster Limits in Wake of Shorter MLB Draft*, USA TODAY (June 10, 2020), https://www.usatoday.com/story/sports/2020/06/10/ncaa-division-i-baseball-roster-limits-relief/5335956002/ (last visited Feb. 9, 2022).

2435418.2

474.    Commonality and Predominance: There are numerous questions of law and fact common to the Classes, and these common questions predominate over any issues affecting only individual Class members.  Questions common to the Classes include:

a.    Whether the NCAA had a duty to implement and enforce rules and bylaws to, *inter alia*:

- prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;
- prohibit romantic and sexual relationships between coaches and student-athletes;
- prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;
- require NCAA member institutions to immediately report any allegations of sexual harassment or abuse of a student-athlete by athletics department personnel;
- maintain all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel in a centralized repository so they can be tracked by the NCAA and its member institutions;
- require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently investigated;
- implement public sanctions on member institutions and athletics department personnel where allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel are substantiated;
- ban athletics department personnel from working or volunteering for any member institution where allegations of sexual relationships,

2435418.2

harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

- mandate training of athletics department personnel regarding grooming, sexual relationships with student-athletes, sexual abuse and harassment, the prohibition thereof, and reporting obligations;

- mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

- provide an independent ombudsman when student-athletes seek to leave their teams, enter the NCAA transfer portal, and/or forego their scholarships;

- protect Plaintiffs and members of the Classes from such abuse and other known and/or foreseeable risks, including the loss of scholarships; and

- provide a safe environment for NCAA student-athletes free from sexual abuse and/or sexual harassment;

b.    Whether the NCAA breached the foregoing duties;

c.    Whether the NCAA and the student-athletes entered into a contract requiring the NCAA to abide by, implement, and enforce rules concerning gender equity, including with respect to the prohibition of sexual relationships between coaches and student-athletes, and the sexual abuse and harassment of student-athletes;

d.    Whether the NCAA breached the foregoing express or implied contract;

e.    Whether USF had a duty to implement and enforce policies to, *inter alia*:

- prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

- prohibit romantic and sexual relationships between coaches and

- 95 -

student-athletes;

- prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;
- require mandatory reporting to higher levels of the institution of any allegations of sexual harassment or abuse of a student-athlete by athletics department personnel;
- maintain all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;
- require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently investigated;
- implement public sanctions on athletics department personnel where allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel are substantiated;
- mandate training of athletics department personnel regarding grooming, sexual relationships with student-athletes, sexual abuse and harassment, the prohibition thereof, and reporting obligations;
- mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;
- provide an independent ombudsman when student-athletes seek to leave their teams, enter the NCAA transfer portal, and/or forego their scholarships;
- protect Plaintiffs and members of the Classes from such abuse and other known and/or foreseeable risks, including the loss of scholarships; and
- provide a safe environment for USF student-athletes free from

sexual abuse and/or sexual harassment;

f.    Whether USF breached the foregoing duties;

g.    Whether Coach Defendants sexually harassed and retaliated against Plaintiffs and the USF Baseball Subclass;

h.    Whether the NCAA, USF, and Coach Defendants intentionally or negligently inflicted emotional distress on Plaintiffs and the USF Baseball Subclass;

i.    Whether the NCAA and USF should be held vicariously liable for Coach Defendants' tortious conduct;

j.    Whether the NCAA and USF ratified Coach Defendants' tortious conduct; and

k.    The scope of declaratory and/or injunctive relief and the nature and amount of damages to which Plaintiffs and the Classes are entitled.

475.    Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individual litigation by each class member would also strain the court system, create the potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. Moreover, the highly sensitive and traumatic nature of the facts involved here makes a class action superior, because in circumstances like these, there will be some survivors who are emotionally ready and able to come forward and bring suit on behalf of the many others who are not able or ready to come forward to bring suit on their own. In sum, the class action presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

476.    Declaratory/Equitable Relief: Class certification is also appropriate under Rule 23(b)(2) because Defendants acted and refused to act on grounds generally applicable to the Classes as a whole, such that final injunctive relief is appropriate with respect to the Classes as a whole. Such injunctive relief includes, but is not limited to, requiring the NCAA and USF to

1    adopt, implement, and enforce appropriate policies and procedures to prevent, or properly

2    respond to, sexual misconduct and psychological abuse of students and student-athletes.

3           477.    In the alternative, this action is also properly maintainable under Rule 23(c)(4) in

4    that particular issues common to the class, as set out above, are most appropriately and efficiently

5    resolved through a class action and would advance the disposition of this matter and the parties'

6    interests.

7    **VIII.   CLAIMS AGAINST THE NCAA, USF, AND COACH DEFENDANTS ON**
     **BEHALF OF THE USF BASEBALL SUBCLASS**

8                                              **COUNT I**

9    **VIOLATION OF TITLE IX [20 U.S.C. § 1681 *et seq.*] FOR DISCRIMINATION**
     **(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST USF)**

10

11          478.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

12          479.    Title IX of the Education Amendments of 1972 ("Title IX"), as amended, 20

13   U.S.C. § 1681 *et seq.*, provides that "[n]o person in the United States shall, on the basis of sex, be

14   excluded from participation in, be denied the benefits of, or be subjected to discrimination under

15   any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

16          480.    Title IX bars gender-based discrimination and discrimination based on sexual

17   orientation by federally funded educational institutions.

18          481.    USF receives federal funding, including but not limited to financial aid and grants,

19   and grants from the Higher Education Emergency Relief Fund (authorized by the American

20   Rescue Plan (ARP), Public Law 117-2, signed into law on March 11, 2021).

21          482.    At the time of the events in question, Plaintiffs were enrolled as undergraduate

22   students at USF.

23          483.    USF exercised substantial control over its baseball program, as well as over its

24   coaching staff, including Coach Defendants.

25          484.    Plaintiffs suffered sexual harassment by Coach Naks, facilitated and condoned by

26   Coach G, and/or by Coach G that was so severe, pervasive, and objectively offensive it deprived

27   Plaintiffs access to educational opportunities and benefits USF provides.

28          485.    Specifically, the intolerable sexualized environment and emotional abuse Plaintiffs

2435418.2

1    were forced to endure since the beginning of their time at USF was continuous and unrelenting,

2    thereby violating Title IX.

3          486.    Coach G oversaw, participated in, and approved of this culture of harassment and

4    abuse in the baseball program, which was so extreme and outrageous that several Plaintiffs had to

5    leave USF at great personal and financial losses, including damage to each of their elite baseball

6    careers.

7          487.    Coach G, as the head coach of the baseball program, had actual knowledge of the

8    harassment and physical and mental abuse that was occurring, and indeed, condoned and

9    participated in the conduct.

10         488.    The Athletic Director, who is in a position of oversight and control of USF's

11   baseball program including its coaching staff, had actual knowledge of the harassment that was

12   occurring.

13         489.    In May of 2014, John Doe 6's parents advised the USF Athletic Director, the

14   assistant Athletic Director, and the NCAA Faculty Athletic Representative that the baseball

15   program contained a "hostile environment" that included mental abuse, favoritism, and nepotism.

16   USF's response was that John Doe 6 was allowed to retain his partial scholarship for his last year

17   in college and not play baseball. USF did nothing, and the abuse continued.

18         490.    The AD is a Mandatory Reporter under the USF Title IX Policy and had a duty to

19   report the complaint to the USF Title IX Officer. Thus, the AD's failure to report the complaint

20   was, itself, a violation of the USF Title IX Policy.

21         491.    The AD also ignored an "URGENT MEETING REQUEST" from John Doe 2's

22   parents on that same day, May 20, 2021.

23         492.    The AD's failures allowed the severe and pervasive harassment to continue

24   through the end of 2021.

25         493.    The AD's actions constituted deliberate indifference on the part of USF to the

26   harassment, and USF's failure to respond to the complaint was clearly unreasonable in light of the

27   circumstances.

28         494.    USF's actions allowed the bullying, harassment, intimidation, and sexual

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

1 misconduct to continue.

2     495.   As a direct and proximate result of USF's actions and inactions, Plaintiffs and the

3 USF Baseball Subclass were damaged and continue to be damaged.

4     496.   Because Plaintiffs and the USF Baseball Subclass are at continuing risk of harm,

5 Plaintiffs seek injunctive or equitable relief requiring USF to adopt, implement, and enforce

6 appropriate policies and procedures to prevent, or properly respond to, sexual misconduct and

7 psychological abuse of students and student-athletes, including ones that:

8         a.    prohibit sexual harassment and/or sexual abuse of student-athletes by

9                athletics department personnel;

10         b.    prohibit romantic or sexual relationships between athletics department

11                personnel and student-athletes;

12         c.    prohibit grooming and other sexually-exploitative behavior by athletics

13                department personnel of student-athletes;

14         d.    require mandatory reporting of any allegations of sexual relationships,

15                harassment, or abuse of a student-athlete by athletics department personnel;

16         e.    maintain all reports of sexual relationships, harassment, or abuse of a

17                student-athlete by athletics department personnel;

18         f.    require that all reports of sexual relationships, harassment, or abuse of a

19                student-athlete by athletics department personnel be independently

20                investigated;

21         g.    implement public sanctions on athletics department personnel where

22                allegations of sexual relationships, harassment, or abuse of a student-

23                athlete by athletics department personnel are substantiated;

24         h.    mandate training of athletics department personnel regarding grooming,

25                sexual relationships with student-athletes, sexual abuse and harassment, the

26                prohibition thereof, and reporting obligations;

27         i.    mandate training of athletics department personnel and student-athletes to

28                recognize the signs of grooming and sexual abuse and harassment by

athletics department personnel, and to provide confidential avenues to

report the abuse;

j.    provide an independent ombudsman when student-athletes seek to leave

their teams, enter the NCAA transfer portal, and/or forego their

scholarships;

k.    protect Plaintiffs and members of the USF Baseball Subclass from such

abuse and other foreseeable risks, including the loss of scholarships; and

l.    provide a safe environment for USF student-athletes free from sexual abuse

and/or sexual harassment.

## **COUNT II**

**VIOLATION OF TITLE IX [20 U.S.C. § 1681 *et seq.*] FOR RETALIATION
(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST USF)**

497.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

498.    Retaliation against an individual for complaining of sex discrimination, including

sexual harassment, constitutes prohibited sex discrimination under Title IX.

499.    USF receives federal funding, including but not limited to financial aid and grants,

and grants from the Higher Education Emergency Relief Fund (authorized by the American

Rescue Plan (ARP), Public Law 117-2, signed into law on March 11, 2021).

500.    At the time of the events in question, Plaintiffs were enrolled as undergraduate

students at USF.

501.    The Athletic Director had actual knowledge of the harassment occurring in the

USF baseball program.

502.    Specifically, as alleged above, John Doe 6's parents complained in May of 2014

about the "hostile environment" Coach Defendants created. Additionally, John Doe 8's father met

with the then-AD, because he was concerned about this son's treatment. USF did nothing and the

abuse continued.

503.    On May 30, 2021, John Doe 1's mother advised the AD of the "culture" of the

baseball team that included "constant bullying, harassment and intimidation" as well as

1    "continuous stories of sexual misconduct by coach Naks. . . ."

2        504.    The current AD ignored John Doe 1's mother, in violation of the USF Title IX

3    Policy, allowing the severe and pervasive harassment to continue through the end of 2021.

4        505.    The AD also never responded to John Doe 2's parents' March 30, 2021 request for

5    an urgent in-person meeting.

6        506.    Coach G, as the head coach of the baseball program, had actual knowledge of the

7    harassment that was occurring, and indeed, condoned and participated in the harassment. Coach

8    G was also a witness to John Doe 1's Title IX Skit that occurred in October or November of

9    2021. Yet Coach G never questioned John Doe 1 about the reasons underlying the skit.

10       507.    Coach Defendants' retaliation included a relentless campaign to bully and demean

11   each Plaintiff into to leaving USF, resulting in severe depression and anxiety among all Plaintiffs,

12   as well as damage to their baseball careers.

13       508.    The examples in this Complaint are part of a concerted practice by USF

14   administration—including Coach Defendants—to isolate and bully Plaintiffs into relinquishing

15   their scholarships and leaving USF, and to ruin their baseball careers.

16       509.    Such retaliation caused all Plaintiffs to leave or want to leave USF, at considerable

17   personal and financial expense to each, including damage to their baseball careers.

18       510.    As a direct and proximate result of USF's actions and inactions, Plaintiffs and the

19   USF Baseball Subclass were damaged and continue to be damaged.

20                                    **COUNT III**

21       **NEGLIGENT SUPERVISION AND RETENTION OF TROY NAKAMURA**
     **(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST THE NCAA, USF,**
22                        **AND NINO GIARRATANO)**

23       511.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

24       512.    The USF Baseball Subclass brings this claim pursuant to California law.

25       513.    Since 2000 and until USF removed Coach Naks in 2022, USF employed Coach

26   Naks and had the right to control him and the manner and methods in which he fulfilled his duties

27   as an NCAA baseball coach.

28       514.    During this same period, the NCAA had the right to control Coach Naks and the

1    manner and methods in which he fulfilled his duties as an NCAA baseball coach.

2            515.    During this same period, Coach G had the right to control Coach Naks and the

3    manner and methods in which he fulfilled his duties as an NCAA baseball coach.

4            516.    Coach Naks was unfit or incompetent to work directly with student-athletes and

5    posed a particular risk of sexually harassing and mentally abusing them.

6            517.    USF, the NCAA, and Coach G knew or should have known that Coach Naks was

7    unfit or incompetent to work directly with student-athletes and posed a particular risk of sexually

8    harassing or mentally abusing them, and that this unfitness created a particular risk to Plaintiffs

9    and the USF Baseball Subclass.

10           518.    Coach Naks' unfitness and particular risk to student-athletes on USF's baseball

11   team harmed Plaintiffs and the USF Baseball Subclass.

12           519.    USF, the NCAA, and Coach G's negligence in supervising and/or retaining Coach

13   Naks were substantial factors in causing harm to Plaintiffs and the USF Baseball Subclass.

14           520.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs

15   and the USF Baseball Subclass were damaged.

16                                          **COUNT IV**

17   **NEGLIGENT SUPERVISION AND RETENTION OF NINO GIARRATANO**
     **(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST USF AND THE**
18                                          **NCAA)**

19           521.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

20           522.    The USF Baseball Subclass brings this claim pursuant to California law.

21           523.    Since 1999 and until USF fired Coach G in 2022, USF employed Coach G and had

22   the right to control him and the manner and methods in which he fulfilled his duties as an NCAA

23   baseball coach. During this same period, the NCAA also had the right to control Coach G and the

24   manner and methods in which he fulfilled his duties as an NCAA baseball coach.

25           524.    Coach G was unfit or incompetent to work directly with student-athletes because

26   he sexually harassed and mentally abused them and/or allowed Coach Naks to sexually harass

27   and mentally abuse the student-athletes.

28           525.    USF and the NCAA knew or should have known that Coach G was unfit or

incompetent to work directly with student-athletes because he was sexually harassing and

mentally abusing them, and that this unfitness created a particular risk to Plaintiffs and the USF

Baseball Subclass.

526.    USF and the NCAA knew or should have known that Coach G was protecting

Coach Naks and facilitating Coach Naks' sexual harassment and mental abuse of student-athletes,

and that Coach Naks' unfitness created a particular risk to Plaintiffs and the USF Baseball

Subclass.

527.    Coach G's unfitness and particular risk to student-athletes on USF's baseball team

harmed Plaintiffs and the USF Baseball Subclass.

528.    USF and the NCAA's negligence in supervising and/or retaining Coach G were

substantial factors in causing harm to Plaintiffs and the USF Baseball Subclass.

529.    As a direct and proximate result of Defendants' actions and/or inactions, Plaintiffs

and the USF Baseball Subclass were damaged and continue to be damaged.

## COUNT V

### DISCRIMINATION IN THE EDUCATIONAL SETTING
### [CAL. EDUC. CODE § 66270]
### (PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST USF)

530.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

531.    Section 66270 of the California Education Code provides in pertinent part: "No

person shall be subjected to discrimination on the basis of disability, gender, gender identity,

gender expression, nationality, race or ethnicity, religion, [or] sexual orientation . . . in any

program or activity conducted by any postsecondary educational institution that receives, or

benefits from, state financial assistance or enrolls students who receive state student financial

aid."

532.    Upon information and belief, USF receives state financial assistance and enrolls

students who receive state student financial aid.

533.    Plaintiffs and the USF Baseball Subclass members were harmed by the

psychological and physical abuse, as well as intolerable sexualized environment, Coach

Defendants subjected them to at USF because of Plaintiffs and the USF Baseball Subclass

1    members' gender, sexual orientation, and disability status; and Defendant USF is responsible for

2    that harm.

3           534.    Plaintiffs and the USF Baseball Subclass members suffered harassment that was so

4    severe, pervasive, and offensive it effectively deprived Plaintiffs and the Class members the right

5    of equal access to educational benefits and opportunities.

6           535.    Because of Defendant USF's conduct, Plaintiffs and the USF Baseball Subclass

7    have been damaged and continue to be damaged in an amount to be proven at trial.

8           536.    Further, Defendant USF acted willfully and maliciously with the intent to harm

9    Plaintiffs and the USF Baseball Subclass members, and in conscious disregard of the rights of

10   Plaintiffs and the Class members, so as to constitute malice and oppression under California Civil

11   Code Section 3294. Plaintiffs and the USF Baseball Subclass members are therefore entitled to

12   the recovery of punitive damages, in an amount to be determined at trial.

13                                          **COUNT VI**

14   **VIOLATION OF THE CALIFORNIA EQUITY IN HIGHER EDUCATION ACT**
                            **[CAL. EDUC. CODE § 66250]**
15       **(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST USF)**

16          537.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

17          538.    Section 66281.5 of the California Equity in Higher Education Act provides in

18   pertinent part: "(a) It is the policy of the State of California, pursuant to Section 66251, that all

19   persons, regardless of their sex, should enjoy freedom from discrimination of any kind in the

20   postsecondary educational institution of the state. The purpose of this section is to provide

21   notification of the prohibition against sexual harassment as a form of sexual discrimination and to

22   provide notification of available remedies."

23          539.    USF's conduct as alleged herein constitutes sexual harassment as a form of sexual

24   discrimination against Plaintiffs and the USF Baseball Subclass and violated the Equity in Higher

25   Education Act. Plaintiffs are entitled to enforce the Act through a civil action pursuant to

26   Education Code Section 66292.4.

27          540.    Because of Defendants' conduct, Plaintiffs and the USF Baseball Subclass have

28   been damaged and continue to be damaged in an amount to be proven at trial.

2435418.2

**COUNT VII**

**GROSS NEGLIGENCE**
**(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST THE NCAA, USF,
AND COACH DEFENDANTS)**

541.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

542.    The USF Baseball Subclass brings this claim pursuant to California law.

543.    The NCAA, USF, and Coach Defendants owed Plaintiffs and the USF Baseball Subclass a duty to use due care to ensure their safety and freedom from sexual harassment and abuse while interacting with their respective employees, representatives, and/or agents, including Coach Defendants.

544.    Coach Defendants owed Plaintiffs a duty of due care in carrying out their coaching responsibilities as employees, agents, and/or representatives of the NCAA and USF.

545.    The Plaintiffs and the USF Baseball Subclass' acceptance of USF's offers to join the baseball team and seek out coaching from Coach Defendants in the course of their employment, agency, and/or representation of USF and the NCAA created a special, confidential, and fiduciary relationship between Plaintiffs and Coach Defendants, resulting in both Coach Defendants owing Plaintiffs a duty to use due care.

546.    The NCAA and USF's failure to adequately supervise Coach Defendants, especially after the NCAA and USF knew or should have known of complaints regarding their sexual harassment and abuse while coaching was so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs would be injured as a result.

547.    Coach Defendants' conduct in sexually harassing Plaintiffs in the course of their employment, agency, and/or representation of USF and the NCAA as baseball coaches was so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs would be injured as a result.

548.    The NCAA and USF's conduct as described above demonstrated a willful disregard for precautions to ensure Plaintiffs' safety, as well as a willful disregard for substantial risks to Plaintiffs and the USF Baseball Subclass.

549.    The NCAA and USF breached duties owed to Plaintiffs and the USF Baseball

Subclass and were grossly negligent when they conducted themselves as described above, said

acts having been committed with reckless disregard for Plaintiffs and the USF Baseball Subclass'

health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to

whether Plaintiffs would be injured as a result.

550.    The NCAA and USF are liable and vicariously liable for Coach Defendants'

conduct.

551.    As a direct and/or proximate result of Defendants' actions and inactions, Plaintiffs

and the USF Baseball Subclass were damaged and continue to be damaged.

### COUNT VIII

**NEGLIGENCE**
**(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST THE NCAA, USF,**
**AND COACH DEFENDANTS)**

552.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

553.    The USF Baseball Subclass brings this claim pursuant to California law.

554.    The NCAA, USF, and Coach Defendants owed Plaintiffs and the USF Baseball

Subclass a duty to use due care to ensure their safety and freedom from sexual harassment and

abuse while interacting with their respective employees, representatives, and/or agents, including

Coach Defendants.

555.    Coach Defendants owed Plaintiffs a duty of due care in carrying out their coaching

responsibilities as employees, agents, and/or representatives of the NCAA and USF.

556.    The Plaintiffs and the USF Baseball Subclass' acceptance of USF's offers to join

the baseball team and seek out coaching from Coach Defendants in the course of their

employment, agency, and/or representation of USF and the NCAA created a special, confidential,

and fiduciary relationship between Plaintiffs and Coach Defendants, resulting in both Coach

Defendants owing Plaintiffs a duty to use due care.

557.    The NCAA and USF's negligence in supervising Coach Defendants, especially

after the NCAA and USF knew or should have known of complaints regarding their sexual

harassment and abuse while coaching were substantial factors in causing harm to Plaintiffs and

the USF Baseball Subclass.

558.    Coach Defendants' negligent conduct in sexually harassing Plaintiffs in the course of their employment, agency, and/or representation of USF and the NCAA as baseball coaches was so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs would be injured as a result.

559.    The NCAA and USF's conduct as described above demonstrated a negligent disregard for precautions to ensure Plaintiffs' safety, as well as a negligent disregard for substantial risks to Plaintiffs and the USF Baseball Subclass.

560.    The NCAA and USF breached duties owed to Plaintiffs and the USF Baseball Subclass and were negligent when they conducted themselves as described above, said acts having been committed with disregard for Plaintiffs and the USF Baseball Subclass' health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether Plaintiffs would be injured as a result.

561.    The NCAA and USF are liable and vicariously liable for Coach Defendants' conduct.

562.    As a direct and/or proximate result of Defendants' actions and inactions, Plaintiffs and the USF Baseball Subclass were damaged and continue to be damaged.

## COUNT IX

### NEGLIGENT FAILURE TO WARN, TRAIN, OR EDUCATE
### (PLAINTIFFS AND THE USF BASEBALL SUBCLASS
### AGAINST THE NCAA AND USF)

563.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

564.    The USF Baseball Subclass brings this claim pursuant to California law.

565.    The NCAA and USF owed Plaintiffs and Class members a duty to take reasonable protective measures to protect them and other student-athletes from the risk of sexual harassment and abuse by Coach Defendants by properly warning, training, and educating Plaintiffs and the Class members and others about how to avoid such a risk.

566.    The NCAA and USF breached their duty to take reasonable protective measures to protect Plaintiffs and other student-athletes from the risk of sexual harassment and abuse by Coach Defendants, such as the failure to properly warn, train or educate Plaintiffs and Class

2435418.2

members and other student-athletes about how to avoid the particular risk Coach Defendants

posed of sexual misconduct.

567.    The NCAA and USF breached their duties to take reasonable protective measures

to protect Plaintiffs, Class members, and other student-athletes from the risk of sexual harassment

and abuse by Coach Defendants, by failing to supervise and stop their employees, agents and

representatives, including Coach Defendants, from committing wrongful harassment and abuse of

student-athletes, including Plaintiffs and Class members.

568.    As a direct and/or proximate result of Defendants' actions and/or inactions,

Plaintiffs and Class members were damaged and continue to be damaged.

**COUNT X**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST THE NCAA, USF,**
**AND COACH DEFENDANTS)**

569.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

570.    The USF Baseball Subclass brings this claim pursuant to California law.

571.    USF and Coach Defendants' extreme and outrageous conduct intentionally or

recklessly Plaintiffs and the Subclass members to suffer severe emotional distress. This conduct

was not the type of ordinary rude or obnoxious behavior student-athletes should be expected to

weather—it exceeded all possible bounds of decency.

572.    USF and Coach Defendants acted with the intention of causing, or with reckless

disregard for the probability of causing, Plaintiffs to endure extreme emotional distress.

573.    Indeed, USF and Coach Defendants used student-athletes' severe distress to

subdue and threaten them; to force them to leave USF, give up their scholarships, and enter the

NCAA transfer portal; and to prevent them from complaining or suing over Coach Defendants'

misconduct. They did so with deliberate disregard as to the high possibility such actions would

result in Plaintiffs and the USF Baseball Subclass experiencing additional severe emotional

distress.

574.    USF and Coach Defendants' conduct intended to cause and caused Plaintiffs and

the USF Baseball Subclass suffering exceeding all bound that are usually tolerated in a civilized

1    community.

2        575.    A causal nexus existed between (i) Coach Defendants' recruitment and grooming

3    of student-athletes to participate in the NCAA and at USF; and (ii) their abuse of power to coerce

4    and harass those student-athletes.

5        576.    Each act of harassment and abuse was foreseeable given, *inter alia*, the use of

6    NCAA and USF materials to lure victims and the commission of the acts on NCAA member

7    institutions' property or with NCAA or NCAA member institutions' chattels.

8        577.    Coach Defendants' conduct is not so unusual or startling that it would seem unfair

9    to include the loss resulting from it among other costs of the NCAA or USF's business. Assaults

10   in the context of NCAA and USF athletics by coaches and other athletics department personnel

11   are exactly why student-athletes would expect the NCAA and USF to take extra precautions, or

12   would expect the NCAA to require member institutions to implement extra precautions to ensure

13   that they are protected from abuse by athletics department personnel.

14       578.    Coach Defendants' conduct was committed within the scope of their positions as

15   NCAA and USF coaches. Holding the NCAA and USF liable furthers the policy goals of

16   *respondeat superior*, including the prevention of future injuries and the assurance of

17   compensation to victims, given that Plaintiffs and the USF Baseball Subclass do not have separate

18   remedies under Title VII because they are not (currently) considered employees of the NCAA or

19   USF, or under Title IX as to the NCAA because the NCAA does not receive federal funding.

20                                    **COUNT XI**

21               **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
             **(PLAINTIFFS AND USF BASEBALL SUBCLASS AGAINST THE NCAA, USF, AND**
22                                  **COACH DEFENDANTS)**

23       579.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

24       580.    The USF Baseball Subclass brings this claim pursuant to California law.

25       581.    USF and Coach Defendants' conduct negligently caused emotional distress to

26   Plaintiffs and the USF Baseball Subclass, and USF and Coach Defendants could reasonably

27   foresee that their actions would cause Plaintiffs and the USF Baseball Subclass to suffer

28   emotional distress.

2435418.2

582.    Plaintiffs and the USF Baseball Subclass were in a specific zone of danger training with Coach Defendants and at risk of physical harm, causing their fear.

583.    Plaintiffs and the USF Baseball Subclass, immediately or shortly after training with Coach Defendants, suffered distress and emotional harm.

584.    A causal nexus existed between (i) Coach Defendants' recruitment and grooming of student-athletes to participate in the NCAA and at USF; and (ii) their abuse of power to coerce and harass those student-athletes.

585.    Each act of harassment and abuse was foreseeable given, *inter alia*, the use of NCAA and USF materials to lure victims and the commission of the acts on NCAA member institutions' property or with NCAA or NCAA member institutions' chattels.

586.    Coach Defendants' conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the NCAA's or USF's business. Assaults in the context of NCAA and USF athletics by coaches and other athletics department personnel are exactly why student-athletes would expect the NCAA and USF to take extra precautions or would expect the NCAA to require member institutions to implement extra precautions to ensure that they are protected from abuse by athletics department personnel.

587.    Coach Defendants' conduct was committed within the scope of their positions as NCAA and USF coaches. Holding the NCAA and USF liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the USF Baseball Subclass do not have separate remedies under Title VII because they are not (currently) considered employees of the NCAA or USF, or under Title IX as to the NCAA because the NCAA does not receive federal funding.

## COUNT XII

### RATIFICATION
**(PLAINTIFFS AND THE USF BASEBALL SUBCLASS
AGAINST THE NCAA AND USF)**

588.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

589.    The USF Baseball Subclass brings this claim pursuant to California law.

590.    Coach Defendants were NCAA and USF coaches for several decades.

591.    At the time of the acts alleged herein, there was an actual or assumed agency relationship between Coach Defendants and the NCAA, Coach Defendants and USF, and USF and the NCAA.

592.    All acts or omissions alleged herein were ratified by the NCAA and USF. The NCAA and USF had knowledge that Coach Defendants and/or other coaches like Coach Defendants were in sexual relationships with student-athletes and/or were sexually abusing or harassing student-athletes but refused to take any action to Coach Defendants or other predators like them. Moreover, USF hid this information from the public so that Coach Defendants could continue to work for the NCAA and its member institutions until at least 2022.

593.    Despite the NCAA, USF, and/or their agents' knowledge of Coach Defendants' sexual misconduct, Coach Defendants were allowed to be alone with student-athletes while on NCAA and USF business during the relevant time period.

## COUNT XIII

**The NCAA and USF are thus responsible for Coach Defendants' actions.**

**BREACH OF FIDUCIARY DUTY**
**(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST THE NCAA)**

594.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

595.    The USF Baseball Subclass brings this claim pursuant to California law.

596.    The NCAA owed a fiduciary duty to Plaintiffs and the USF Baseball Subclass arising out of the special relationship of trust and confidence its student-athletes placed in the NCAA. This fiduciary duty formed because the NCAA actively promoted itself as providing a safe and nurturing environment for its student-athletes and intended for Plaintiffs and the USF Baseball Subclass to believe this so they would participate in NCAA sports.

597.    Plaintiffs and the USF Baseball Subclass trusted that the NCAA and its member institutions would employ skilled, trained, competent, and ethical coaches and trainers in connection with NCAA sports who would coach and train student-athletes without committing sexual assault; sexual, physical, and psychological abuse; and molestation against them.

598.    Plaintiffs and the USF Baseball Subclass trusted that the NCAA would inform

2435418.2

Plaintiffs and the public of any concerns relating to sexual harassment; sexual, physical, and psychological abuse; and molestation committed by NCAA coaches and trainers.

599.    The NCAA owed Plaintiffs and the USF Baseball Subclass the highest duty to protect them and other student-athletes from sexual predators such as Coach Defendants; the NCAA breached its fiduciary duty to Plaintiffs and the USF Baseball Subclass by failing to protect them from sexual predators such as Coach Defendants, and by failing to warn them regarding the same.

600.    NCAA's breaches of its fiduciary duties were substantial contributing causes of Plaintiffs and the USF Baseball Subclass' injuries.

601.    As a direct and proximate result of NCAA's breaches of its fiduciary duties, Plaintiffs and the USF Baseball Subclass suffered and continue to suffer from emotional distress, physical manifestations of emotional distress, loss of self-esteem, fright, anxiety, grief, humiliation and loss of enjoyment of life; were prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life; and have sustained financial losses including, but not limited, to the amounts of tuition and costs-of-attendance paid because of loss of scholarship due to the NCAA's actions and inactions, as well as out-of-pocket costs for therapy, counseling, and medication to address the mental anguish and despair caused by the NCAA.

602.    Because Plaintiffs and the USF Baseball Subclass are at continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

## **COUNT XIV**

### **NEGLIGENT MISREPRESENTATIONS AND OMISSIONS**
### **(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST THE NCAA)**

603.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

604.    The USF Baseball Subclass brings this claim pursuant to California law.

605.    The NCAA negligently concealed facts and information material to Plaintiffs and the USF Baseball Subclass. As more fully described above, the NCAA knew or should have known that its actions or inactions in the area of gender equity, including with respect to sexual

harassment, sexual, physical, and psychological abuse, and molestation of its student-athletes by coaches or trainers, would cause harm to Plaintiffs and the USF Baseball Subclass.

606.    The NCAA knew or should have known, but negligently concealed, the following facts regarding student-athletes' risk of sexual exploitation:

        a.    The power differential between coaches and trainers and student-athletes makes student-athletes more vulnerable to sexual harassment; physical, sexual, or psychological abuse; and molestation;

        b.    College athletics attracts sexual predators who secure jobs as coaches and trainers at NCAA member institutions to have nearly unfettered access to victims;

        c.    An extremely high incidence of marriage between coaches or trainers and student-athletes/former student-athletes indicates the existence of improper relationships between coaches and trainers and student-athletes.

607.    Through negligent concealment of material facts, the NCAA intended to induce the false belief in its student-athletes that NCAA sports were safe from inappropriate sexual relationships, abuse or harassment by athletics department personnel; and that NCAA sports provided a safe and nurturing environment for student-athletes. However, the NCAA failed to provide Plaintiffs and other student-athletes a reasonably safe place for NCAA sports activities and interactions with member institution coaches and trainers.

608.    Plaintiffs and the USF Baseball subclass justifiably relied on the NCAA's misrepresentations. They participated in NCAA sports because the NCAA lulled them into believing that NCAA member institutions employed skilled, trained, competent, and ethical coaches and trainers in connection with NCAA sports, who would coach and train student-athletes without committing sexual harassment; sexual, physical, and psychological abuse; and molestation against them.

609.    Furthermore, Plaintiffs could not have discovered the truth through a reasonable inquiry and/or were prevented from doing so, because: (1) the NCAA did not require or encourage member institutions to report sexual abuse or harassment by athletics department

1  personnel and thus fraudulently concealed the true nature and scope of the problem; and (2) the

2  NCAA and its member institutions knowingly empowered coaches with full discretion over

3  student-athletes' academic and athletic careers.

4        610.   Plaintiffs would have acted differently, including with respect to their college and

5  coaching choices, had they been aware of all material facts.

6        611.   As a proximate cause of NCAA's concealment, Plaintiffs and the USF Baseball

7  Subclass suffered harm as described above.

8        612.   Because Plaintiffs and USF Baseball Subclass members are at continuing risk of

9  harm, Plaintiffs seek injunctive or equitable relief.

10                                       **COUNT XV**

11                              **BREACH OF CONTRACT**
    **(PLAINTIFFS AND THE USF BASEBALL SUBCLASS AGAINST THE NCAA)**
12
         613.   Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.
13
         614.   The USF Baseball Subclass brings this claim pursuant to California law.
14
         615.   Each Plaintiff and Class member entered into a contract with the NCAA. The
15
    NCAA requires all student-athletes, prior to participation in the NCAA, affirm in writing that
16
    they read NCAA regulations and their respective NCAA Division Manual, which expressly
17
    encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws.
18
         616.   DI student-athletes each sign a contract substantially the same as the Form 19-1a
19
    John Does 1 and 2 signed, attached to this complaint as Exhibit A. Upon information and belief,
20
    the NCAA and USF possess Plaintiffs' contracts.
21
         617.   The NCAA also requires each student-athlete affirm in writing that they "read the
22
    Summary of NCAA Regulations, or another outline or summary of NCAA legislation, provided
23
    to you by your director of athletics (or his or her designee) or read the bylaws of the NCAA
24
    Division I Manual that address your eligibility."[139]
25
         618.   In the Manual, the NCAA promises to do the following for student-athletes:
26
    _____
27
    [139] NCAA Division I Student-Athlete Statement, Academic Year 2019-20,
28  https://ncaaorg.s3.amazonaws.com/compliance/d1/2019-20D1Comp_Form19-1a-
    StudentAthleteStatement.pdf (last visited July 13, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT
                                        CASE NO. 3:22-CV-01559-LB

a.  "initiate, stimulate and improve intercollegiate athletics programs;"

b.  "uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;"

c.  "legislate . . . upon any subject of general concern to the members related to the administration of intercollegiate athletics;"

d.  conduct intercollegiate athletics programs "in a manner designed to protect and enhance" student-athletes' physical and educational wellbeing;

e.  require each member institution "protect the health of, and provide a safe environment for, each of its participating student-athletes;"

f.  require each member institution "establish and maintain an environment that fosters a positive relationship between the student-athlete and coach;"

g.  require each member institution "establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience;"

h.  "assist the institution in its efforts to achieve full compliance with all rules and regulations and . . . afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance."[140]

619.  In consideration of the NCAA's undertakings, each student-athlete agrees to abide by the Manual and any other NCAA rules; to participate in an NCAA sport, which provides a benefit to the NCAA and its member institutions; and to waive certain rights, including the right to profit from participation.

620.  The Manual thus constitutes a contract between the NCAA and Plaintiffs and the Baseball Subclass members, and Plaintiffs have fulfilled their obligations under the contract by providing their services as student-athletes in the NCAA.

---

[140] *See* NCAA Const., Arts. 1& 2.

2435418.2

621.   The NCAA breached its contractual obligations to Plaintiffs and the USF Baseball Subclass by failing to:

      a.    prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

      b.    prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

      c.    prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

      d.    require NCAA member institutions to immediately report any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

      e.    maintain all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel in a centralized repository so they can be tracked by the NCAA and its member institutions;

      f.    require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently investigated;

      g.    implement public sanctions on member institutions and athletics department personnel where allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel are substantiated;

      h.    ban athletics department personnel from working or volunteering for any member institution where allegations of sexual relationships, harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

      i.    mandate training of athletics department personnel regarding grooming, sexual relationships with student-athletes, sexual abuse and harassment, the prohibition thereof, and reporting obligations;

2435418.2

j.      mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

k.      protect Plaintiffs and members of the USF Baseball Subclass from such abuse and other foreseeable risks; and

l.      provide a safe environment for NCAA student-athletes free from sexual abuse and/or sexual harassment.

622.    As a direct result of these breaches, Plaintiffs and the USF Baseball Subclass have suffered harm as described above including, but not limited, to the amounts of tuition and costs-of-attendance paid because of their loss of scholarships due to NCAA's actions and inactions, as well as out-of-pocket costs for therapy, counseling, and medication to address the mental anguish and despair caused by the NCAA.

623.    Because Plaintiffs and the USF Baseball Subclass are at continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

## COUNT XVI

### BREACH OF IMPLIED CONTRACT
### (PLAINTIFFS AND THE USF SUBCLASS AGAINST THE NCAA)

624.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

625.    The USF Baseball Subclass brings this claim pursuant to California law.

626.    To the extent an express contract does not exist, the facts and circumstances set forth above establish an implied contract wherein student-athletes, in return for participation under the NCAA's governance, agreed to be bound by the NCAA's rules and expected the NCAA to provide appropriate rules and regulations to protect their health and safety to the extent possible.

627.    The NCAA breached its contractual obligations to Plaintiffs and the USF Baseball Subclass by failing to:

a.      prohibit sexual harassment and/or sexual abuse of student-athletes by

athletics department personnel;

b.     prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

c.     prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

d.     require NCAA member institutions to immediately report any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

e.     maintain all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel in a centralized repository so that they can be tracked by the NCAA and its member institutions;

f.     require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently investigated;

g.     implement public sanctions on member institutions and athletics department personnel where allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel are substantiated;

h.     ban athletics department personnel from working or volunteering for any member institution where allegations of sexual relationships, harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

i.     mandate training of athletics department personnel regarding grooming, sexual relationships with student-athletes, sexual abuse and harassment, the prohibition thereof, and reporting obligations;

j.     mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to

1    report the abuse;

2        k.    provide an independent ombudsman when student-athletes seek to leave

3              their teams, enter the NCAA transfer portal, and/or forego their

4              scholarships;

5        l.    protect Plaintiffs and members of the USF Baseball Subclass from such

6              abuse and other foreseeable risks; and

7        m.    provide a safe environment for NCAA student-athletes free from sexual

8              abuse and/or sexual harassment.

9        628.    As a direct result of these breaches, Plaintiffs and the USF Baseball Subclass have

10   suffered harm described above, including, but not limited to the amounts of tuition and costs-of-

11   attendance paid because of loss of scholarships due to NCAA's actions and inactions, as well as

12   out-of-pocket costs for therapy, counseling, and medication to address the mental anguish and

13   despair caused by the NCAA.

14       629.    Because Plaintiffs and the USF Baseball Subclass are at continuing risk of harm,

15   Plaintiffs seek injunctive or equitable relief.

16                                        **COUNT XVII**

17                **BREACH OF CONTRACT AS THIRD-PARTY BENEFICIARIES**
                  **(PLAINTIFFS AND THE USF SUBCLASS AGAINST THE NCAA)**
18

19       630.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

20       631.    The USF Baseball Subclass brings this claim pursuant to California law.

21       632.    To the extent the Court finds no contract exists, either express or implied, between

22   Plaintiffs and the USF Baseball Subclass and the NCAA, then the NCAA and its member

23   institutions are contractual parties. As an express condition of its membership in the NCAA, each

24   institution must agree to abide by its respective NCAA Division Manual, which expressly

25   encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. The

26   Manual thus constitutes a contract between the NCAA and its member institutions.

27       633.    Plaintiffs and the USF Baseball Subclass are third-party beneficiaries of the

28   contract between the NCAA and its members because the parties to the contract intended to

- 120 -

1   benefit the student-athletes.

2   634.   In the Manual, the NCAA promises to do the following for student-athletes:

3   a.   "initiate, stimulate and improve intercollegiate athletics programs;"

4   b.   "uphold the principal of institutional control of, and responsibility for, all

5   intercollegiate sports in conformity with the constitution and bylaws of this

6   association;"

7   c.   "legislate . . . upon any subject of general concern to the members related

8   to the administration of intercollegiate athletics;"

9   d.   conduct intercollegiate athletics programs "in a manner designed to protect

10   and enhance" student-athletes' physical and educational wellbeing;

11   e.   require each member institution "protect the health of, and provide a safe

12   environment for, each of its participating student-athletes;"

13   f.   require each member institution "establish and maintain an environment

14   that fosters a positive relationship between the student-athlete and coach;"

15   g.   require each member institution "establish and maintain an environment in

16   which a student-athlete's activities are conducted as an integral part of the

17   student-athlete's educational experience;"

18   h.   "assist the institution in its efforts to achieve full compliance with all rules

19   and regulations and . . . afford the institution, its staff and student-athletes

20   fair procedures in the consideration of an identified or alleged failure in

21   compliance."[141]

22   635.   The NCAA breached its contractual obligations to Plaintiffs and the USF Baseball

23   Subclass by failing to:

24   a.   prohibit sexual harassment and/or sexual abuse of student-athletes by

25   athletics department personnel;

26   b.   prohibit any romantic or sexual relationships between athletics department

27

28

---

[141] *See* NCAA Const., Arts. 1 & 2.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

1    personnel and student-athletes;

2    c.    prohibit grooming and other sexually-exploitative behavior by athletics
3          department personnel of student-athletes;

4    d.    require NCAA member institutions to immediately report any allegations
5          of sexual relationships, harassment, or abuse of a student-athlete by
6          athletics department personnel;

7    e.    maintain all reports of sexual relationships, harassment, or abuse of a
8          student-athlete by athletics department personnel in a centralized repository
9          so they can be tracked by the NCAA and its member institutions;

10   f.    require that all reports of sexual relationships, harassment, or abuse of a
11         student-athlete by athletics department personnel be independently
12         investigated;

13   g.    implement public sanctions on member institutions and athletics
14         department personnel where allegations of sexual relationships,
15         harassment, or abuse of a student-athlete by athletics department personnel
16         are substantiated;

17   h.    ban athletics department personnel from working or volunteering for any
18         member institution where allegations of sexual relationships, harassment,
19         or abuse of a student-athlete by such athletics department personnel are
20         substantiated;

21   i.    mandate training of athletics department personnel regarding grooming,
22         sexual relationships with student-athletes, sexual abuse and harassment, the
23         prohibition thereof, and reporting obligations;

24   j.    mandate training of athletics department personnel and student-athletes to
25         recognize the signs of grooming and sexual abuse and harassment by
26         athletics department personnel, and to provide confidential avenues to
27         report the abuse;

28   k.    provide an independent ombudsman when student-athletes seek to leave

2435418.2

1    their teams, enter the NCAA transfer portal, and/or forego their

2    scholarships;

3        l.    protect Plaintiffs and members of the USF Baseball Subclass from such

4    abuse and other foreseeable risks; and

5        m.   provide a safe environment for NCAA student-athletes free from sexual

6    abuse and/or sexual harassment.

7        636.   As a direct result of these breaches, Plaintiffs and the USF Baseball Subclass have

8    suffered harm as described above, including, but not limited, to the amounts of tuition and costs-

9    of-attendance paid because of loss of scholarships due to the NCAA's actions and inactions, as

10    well as out-of-pocket costs for therapy, counseling, and medication to address the mental anguish

11    and despair caused by the NCAA.

12        637.   Because Plaintiffs and the USF Baseball Subclass are at continuing risk of harm,

13    Plaintiffs seek injunctive or equitable relief.

14    **IX.    CLAIMS AGAINST THE NCAA ON BEHALF OF THE NATIONWIDE CLASS AND CALIFORNIA SUBCLASS**

### COUNT XVIII

**GROSS NEGLIGENCE**
**(PLAINTIFFS, THE NATIONWIDE CLASS, AND THE CALIFORNIA SUBCLASS AGAINST THE NCAA)**

19        638.   Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

20        639.   The Nationwide Class brings this claim pursuant to Indiana law.

21        640.   The California Subclass brings this claim pursuant to California law.

22        641.   At all relevant times, the NCAA owed a duty to Plaintiffs, the Nationwide Class,

23    and the California Subclass to implement and enforce rules and bylaws to, *inter alia*:

24        a.    prohibit sexual harassment and/or sexual abuse of student-athletes by

25    athletics department personnel;

26        b.    prohibit grooming and other sexually-exploitative behavior by athletics

27    department personnel of student-athletes;

28        c.    require NCAA member institutions to immediately report any allegations

of sexual harassment, or abuse of a student-athletes by athletics department personnel;

d. maintain all reports of sexual harassment or abuse of a student-athlete by athletics department personnel in a centralized repository so that they can be tracked by the NCAA and its member institutions;

e. require that all reports of sexual harassment or abuse of a student-athlete by athletics department personnel be independently investigated;

f. implement public sanctions on member institutions and athletics department personnel where allegations of sexual harassment or abuse of a student-athlete by athletics department personnel are substantiated;

g. ban athletics department personnel from working or volunteering for any member institution where allegations of sexual harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

h. mandate training of athletics department personnel regarding grooming, sexual abuse and harassment, the prohibition thereof, and reporting obligations;

i. mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

j. protect Plaintiffs, the Nationwide Class, and the California Subclass from such abuse and other foreseeable risks;

k. protect Plaintiffs, the Nationwide Class, and the California Subclass from coercion to leave their teams, enter the NCAA transfer portal, and/or forego their scholarships without an independent ombudsman and advocate for the student-athletes; and

l. provide a safe environment for NCAA student-athletes free from sexual abuse and harassment.

2435418.2

2.      The NCAA's duty arose from the following:

      a.      The NCAA's Constitution and Bylaws, which, among other things, establish a duty to protect the health and well-being of NCAA student-athletes, including in the areas of health and safety and in gender equity, which includes student-athlete/coach relationships;

      b.      The NCAA's website, which establishes a duty to exercise reasonable care concerning the health and well-being of its student-athletes in connection with its sports; and

      c.      The NCAA positioning itself as the exclusive authority in intercollegiate athletics to preserve amateurism.

642.     The NCAA acted recklessly and indifferently in its position as the regulatory body for college athletics among its member institutions and its student-athletes, including Plaintiffs, the Nationwide Class, and the California Subclass.

643.     The NCAA knew or should have known that its actions and inactions in the area of gender equity with respect to sexual abuse and harassment by athletics department personnel of student-athletes created an unreasonable risk of harm to Plaintiffs, the Nationwide Class, and the California Subclass, such that the risk was so great that it was highly probable that harm would result.

644.     The NCAA has been aware of sexual misconduct by its coaches for decades, yet has ignored previous calls by eight United States senators and its own Commission to fix the problem. In fact, the NCAA disbanded the Commission in 2018, promising only to continue to "monitor and track on sexual violence issues."

645.     The NCAA knew or should have known that the power differential between coaches and trainers on the one hand, and student-athletes on the other, so favors athletics department personnel that student-athletes cannot effectively protect themselves from inappropriate conduct or from retaliation. This power disparity negates any purported consent by the student-athlete.

646.     The NCAA thus owed its student-athletes a duty to protect them from the

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

1   foreseeable risk of coaches or trainers taking advantage of the power differential for improper

2   purposes.

3       647.   The NCAA knew or should have known that college athletics attracts sexual

4   predators who secure jobs as coaches and trainers at NCAA member institutions to have nearly

5   unfettered access to victims, and so owed its student-athletes a duty to protect them from the

6   foreseeable risk of such coaches or trainers.

7       648.   Plaintiffs had a reasonable expectation that the NCAA would require its member

8   institutions to employ (and that its member institutions would actually employ) skilled, trained,

9   competent, and ethical coaches and trainers in connection with NCAA sports, who would coach

10  and train student-athletes without committing sexual harassment; sexual, physical, and

11  psychological abuse; or molestation against them.

12      649.   Plaintiffs also had a reasonable expectation that the NCAA would inform Plaintiffs

13  and the public of sexual harassment, sexual, physical, and psychological abuse, and molestation

14  committed by NCAA coaches and trainers.

15      650.   The NCAA willfully disregarded precautions that would reasonably protect

16  Plaintiffs, the Nationwide Class, and the California Subclass and their safety and well-being by

17  failing to:

18          a.    prohibit sexual harassment and/or sexual abuse of student-athletes by

19                athletics department personnel;

20          b.    prohibit sexual and romantic relationships between student-athletes and

21                athletics department personnel;

22          c.    prohibit grooming and other sexually-exploitative behavior by athletics

23                department personnel of student-athletes;

24          d.    require NCAA member institutions to immediately report any allegations

25                of sexual harassment, or abuse of a student-athletes by athletics department

26                personnel;

27          e.    maintain all reports of sexual harassment or abuse of a student-athlete by

28                athletics department in a centralized repository so they complaints can be

1    tracked by the NCAA and its member institutions;

2    f.    require that all reports of sexual harassment or abuse of a student-athlete by

3          athletics department personnel be independently investigated;

4    g.    implement public sanctions on member institutions and athletics

5          department personnel where allegations of sexual harassment or abuse of a

6          student-athlete by athletics department personnel are substantiated;

7    h.    ban athletics department personnel from working or volunteering for any

8          member institution where allegations of sexual harassment, or abuse of a

9          student-athlete by such athletics department personnel are substantiated;

10   i.    mandate training of athletics department personnel regarding grooming,

11         sexual abuse and harassment, the prohibition thereof, and reporting

12         obligations;

13   j.    mandate training of athletics department personnel and student-athletes to

14         recognize the signs of grooming and sexual abuse and harassment by

15         athletics department personnel, and to provide confidential avenues to

16         report the abuse;

17   k.    protect Plaintiffs, the Nationwide Class, and the California Subclass from

18         such abuse and other foreseeable risks;

19   l.    protect Plaintiffs, the Nationwide Class, and the California Subclass from

20         coercion to leave their teams, enter the NCAA transfer portal, and/or

21         forego their scholarships without an independent ombudsman and advocate

22         for the student-athletes; and

23   m.    provide a safe environment for NCAA student-athletes free from sexual

24         abuse and harassment.

25   651.  The NCAA's reckless conduct as described above demonstrated a willful disregard

26   for substantial risks to Plaintiffs, the Nationwide Class, and the California Subclass; as well as a

27   willful disregard for necessary precautions to reasonably protect Plaintiffs, the Nationwide Class,

28   and the California Subclass; and were substantial contributing causes of Plaintiffs' sexual

harassment, and sexual and psychological abuse.

652.    Because Plaintiffs, the Nationwide Class, and the California Subclass are at continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

**COUNT XIX**

**NEGLIGENCE**
**(PLAINTIFFS, THE NATIONWIDE CLASS, AND THE CALIFORNIA SUBCLASS**
**AGAINST THE NCAA)**

653.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

654.    The Nationwide Class brings this claim pursuant to Indiana law.

655.    The California Subclass brings this claim pursuant to California law.

656.    At all relevant times, the NCAA owed a duty to Plaintiffs, the Nationwide Class, and the California Subclass to implement and enforce rules and bylaws to, *inter alia*:

        a.    prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

        b.    prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

        c.    require NCAA member institutions to immediately report any allegations of sexual harassment, or abuse of a student-athletes by athletics department personnel;

        d.    maintain all reports of sexual harassment or abuse of a student-athlete by athletics department personnel in a centralized repository so that they can be tracked by the NCAA and its member institutions;

        e.    require that all reports of sexual harassment or abuse of a student-athlete by athletics department personnel be independently investigated;

        f.    implement public sanctions on member institutions and athletics department personnel where allegations of sexual harassment or abuse of a student-athlete by athletics department personnel are substantiated;

        g.    ban athletics department personnel from working or volunteering for any member institution where allegations of sexual harassment, or abuse of a

1    student-athlete by such athletics department personnel are substantiated;

2    h.   mandate training of athletics department personnel regarding grooming,

3         sexual abuse and harassment, the prohibition thereof, and reporting

4         obligations;

5    i.   mandate training of athletics department personnel and student-athletes to

6         recognize the signs of grooming and sexual abuse and harassment by

7         athletics department personnel, and to provide confidential avenues to

8         report the abuse;

9    j.   protect Plaintiffs, the Nationwide Class, and the California Subclass from

10        such abuse and other foreseeable risks;

11   k.   protect Plaintiffs, the Nationwide Class, and the California Subclass from

12        coercion to leave their teams, enter the NCAA transfer portal, and/or

13        forego their scholarships without an independent ombudsman and advocate

14        for the student-athletes; and

15   l.   provide a safe environment for NCAA student-athletes free from sexual

16        abuse and harassment.

17   657.   The NCAA's duty arose from the following:

18   a.   The NCAA's Constitution and Bylaws, which, among other things,

19        establish a duty to protect the health and well-being of NCAA student-

20        athletes, including in the areas of health and safety and in gender equity,

21        which includes student-athlete/coach relationships;

22   b.   The NCAA's website, which establishes a duty to exercise reasonable care

23        concerning the health and well-being of its student-athletes in connection

24        with its sports;

25   c.   The NCAA's positioning itself as the exclusive authority in intercollegiate

26        athletics to preserve amateurism.

27   658.   The NCAA acted negligently, carelessly, and indifferently in its position as the

28   regulatory body for college athletics among its member institutions and its student-athletes,

- 129 -

1   including Plaintiffs, the Nationwide Class, and the California Subclass.

2          659.    The NCAA knew or should have known that its actions and inactions in the area of

3   gender equity with respect to sexual abuse and harassment by athletics department personnel of

4   student-athletes created an unreasonable risk of harm to Plaintiffs, the Nationwide Class, and the

5   California Subclass, so great it was highly probable harm would result.

6          660.    The NCAA has been aware of sexual misconduct by its coaches for decades, yet

7   has ignored previous calls by eight United States senators and its own Commission to fix the

8   problem. In fact, the NCAA disbanded the Commission in 2018, promising only to continue to

9   "monitor and track on sexual violence issues."

10         661.    The NCAA knew or should have known that the power differential between

11  coaches and trainers on the one hand, and student-athletes on the other, so favors athletics

12  department personnel that student-athletes cannot effectively protect themselves from

13  inappropriate conduct or from retaliation. This power disparity negates any purported consent by

14  the student-athlete.

15         662.    The NCAA thus owed its student-athletes a duty to protect them from the

16  foreseeable risk of coaches or trainers taking advantage of the power differential for improper

17  purposes.

18         663.    The NCAA knew or should have known that college athletics attracts sexual

19  predators who secure jobs as coaches and trainers at NCAA member institutions to have nearly

20  unfettered access to victims, and so owed its student-athletes a duty to protect them from the

21  foreseeable risk of such coaches or trainers.

22         664.    Plaintiffs had a reasonable expectation that the NCAA would require its member

23  institutions to employ (and that its member institutions would actually employ) skilled, trained,

24  competent, and ethical coaches and trainers in connection with NCAA sports, who would coach

25  and train student-athletes without committing sexual harassment; sexual, physical, and

26  psychological abuse; or molestation against them.

27         665.    Plaintiffs also had a reasonable expectation that the NCAA would inform Plaintiffs

28  and the public of sexual harassment, sexual, physical, and psychological abuse, and molestation

committed by NCAA coaches and trainers.

666.    The NCAA willfully disregarded precautions that would reasonably protect Plaintiffs, the Nationwide Class, and the California Subclass and their safety and well-being by failing to:

        a.      prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

        b.      prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

        c.      require NCAA member institutions to immediately report any allegations of sexual harassment, or abuse of a student-athletes by athletics department personnel;

        d.      maintain all reports of sexual harassment or abuse of a student-athlete by athletics department personnel in a centralized repository so they can be tracked by the NCAA and its member institutions;

        e.      require that all reports of sexual harassment or abuse of a student-athlete by athletics department personnel be independently investigated;

        f.      implement public sanctions on member institutions and athletics department personnel where allegations of sexual harassment or abuse of a student-athlete by athletics department personnel are substantiated;

        g.      ban athletics department personnel from working or volunteering for any member institution where allegations of sexual harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

        h.      mandate training of athletics department personnel regarding grooming, sexual abuse and harassment, the prohibition thereof, and reporting obligations;

        i.      mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to

report the abuse;

j.     protect Plaintiffs, the Nationwide Class, and the California Subclass from such abuse and other foreseeable risks;

k.     protect Plaintiffs, the Nationwide Class, and the California Subclass from coercion to leave their teams, enter the NCAA transfer portal, and/or forego their scholarships without an independent ombudsman and advocate for the student-athletes; and

l.     provide a safe environment for NCAA student-athletes free from sexual abuse and harassment.

667.    The NCAA's conduct as described above demonstrated a negligent disregard for substantial risks to Plaintiffs, the Nationwide Class, and the California Subclass; and a negligent disregard for necessary precautions to reasonably protect Plaintiffs, the Nationwide Class, and the California Subclass; which were substantial contributing causes of Plaintiffs' sexual and psychological abuse, and molestation.

668.    Because Plaintiffs, the Nationwide Class, and the California Subclass are at continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

## COUNT XX

### BREACH OF FIDUCIARY DUTY
### (PLAINTIFFS, THE NATIONWIDE CLASS, AND THE CALIFORNIA SUBCLASS AGAINST THE NCAA)

669.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

670.    The Nationwide Class brings this claim pursuant to Indiana law.

671.    The California Subclass brings this claim pursuant to California law.

672.    The NCAA owed a fiduciary duty to Plaintiffs, the Nationwide Class, and the California Subclass arising out of the special relationship of trust and confidence its student-athletes placed in the NCAA. This fiduciary duty formed because the NCAA actively promoted itself as providing a safe and nurturing environment for its student-athletes, and intended for Plaintiffs, the Nationwide Class, and the California Subclass to believe this so they would participate in NCAA sports.

673.     Plaintiffs, the Nationwide Class, and the California Subclass trusted that the NCAA and its member institutions would employ skilled, trained, competent, and ethical coaches and trainers in connection with NCAA sports, who would coach and train student-athletes without committing sexual assault; sexual, physical, and psychological abuse; and molestation against them.

674.     Plaintiffs, the Nationwide Class, and the California Subclass trusted that the NCAA would inform Plaintiffs and the public of any concerns relating to sexual harassment, sexual, physical, and psychological abuse, and molestation committed by NCAA coaches and trainers.

675.     The NCAA owed Plaintiffs the highest duty to protect them and other student-athletes from sexual predators such as Coach Defendants.

676.     The NCAA breached its fiduciary duty to Plaintiffs, the Nationwide Class, and the California Subclass by failing to protect them from sexual predators such as Coach Defendants, and by failing to warn them regarding the same.  These breaches were substantial contributing causes of Plaintiffs' injuries.

677.     Because Plaintiffs, the Nationwide Class, and the California Subclass are at continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

## COUNT XXI

### NEGLIGENT MISREPRESENTATIONS AND OMISSIONS
### (PLAINTIFFS, THE NATIONWIDE CLASS, AND CALIFORNIA SUBCLASS AGAINST THE NCAA)

678.     Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

679.     The Nationwide Class brings this claim pursuant to Indiana law.

680.     The California Subclass brings this claim pursuant to California law.

681.     The NCAA negligently concealed facts and information material to Plaintiffs, the Nationwide Class, and the California Subclass. As more fully described above, the NCAA knew or should have known that its actions and inactions in the area of gender equity, including with respect to sexual harassment, sexual, physical, and psychological abuse, and molestation of its student-athletes by coaches or trainers, would cause harm to Plaintiffs, the Nationwide Class, and

1    the California Subclass.

2        682.    The NCAA knew or should have known, but negligently concealed, the following

3    facts regarding student-athletes' risk of sexual exploitation:

4            a.    The power differential between coaches and trainers and student-athletes

5                  makes student-athletes more vulnerable to sexual harassment; physical,

6                  sexual, or psychological abuse; and molestation;

7            b.    College athletics attracts sexual predators who secure jobs as coaches and

8                  trainers at NCAA member institutions to have nearly unfettered access to

9                  victims;

10           c.    An extremely high incidence of marriage between coaches or trainers and

11                 student-athletes/former student-athletes indicates the existence of improper

12                 relationships between coaches and trainers and student-athletes.

13       683.    Through negligent concealment of material facts, the NCAA intended to induce

14   the false belief in its student-athletes that NCAA sports were safe from inappropriate sexual

15   relationships, abuse or harassment by athletics department personnel; and that NCAA sports

16   provided a safe and nurturing environment for student-athletes. However, the NCAA failed to

17   provide Plaintiffs and other student-athletes a reasonably safe place for NCAA sports activities

18   and interactions with member institution coaches and trainers.

19       684.    Plaintiffs, the Nationwide Class, and the California Subclass justifiably relied on

20   the NCAA's misrepresentations. They participated in NCAA sports because the NCAA lulled

21   them into believing that NCAA member institutions employed skilled, trained, competent, and

22   ethical coaches and trainers in connection with NCAA sports, who would coach and train student-

23   athletes without committing sexual harassment; sexual, physical, and psychological abuse; and

24   molestation against them.

25       685.    Furthermore, Plaintiffs could not have discovered the truth through a reasonable

26   inquiry and/or were prevented from doing so, because: (1) the NCAA did not require or

27   encourage member institutions to report sexual abuse or harassment by athletics department

28   personnel and thus fraudulently concealed the true nature and scope of the problem; and (2) the

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

NCAA and its member institutions knowingly empowered coaches with full discretion over student-athletes' academic and athletic careers.

686.    Plaintiffs would have acted differently, including with respect to their college and coaching choices, had they been aware of all material facts.

687.    As a proximate cause of NCAA's concealment, Plaintiffs, the Nationwide Class, and the California Subclass suffered harm as described above.

688.    Because Plaintiffs, the Nationwide Class, and the California Subclass are at continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

### COUNT XXII

### BREACH OF CONTRACT
### (PLAINTIFFS, THE NATIONWIDE CLASS, AND THE
### CALIFORNIA SUBCLASS AGAINST THE NCAA)

689.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

690.    The Nationwide Class brings this claim pursuant to Indiana law.

691.    The California Subclass brings this claim pursuant to California law.

692.    Each Plaintiff and Class member entered into a contract with the NCAA. The NCAA requires all student-athletes, prior to participation in the NCAA, affirm in writing that they read NCAA regulations and their respective NCAA Division Manual, which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws.

693.    DI student-athletes each sign a contract substantially the same as Form 19-1a (Ex. A). Upon information and belief, the NCAA and USF possess Plaintiffs' contracts.

694.    The NCAA also requires each student-athlete affirm in writing that they "read the Summary of NCAA Regulations, or another outline or summary of NCAA legislation, provided to you by your director of athletics (or his or her designee) or read the bylaws of the NCAA Division I Manual that address your eligibility."[142]

695.    In the Manual, the NCAA promises to do the following for student-athletes:

---

[142] NCAA Division I Student-Athlete Statement, Academic Year 2019-20, https://ncaaorg.s3.amazonaws.com/compliance/d1/2019-20D1Comp_Form19-1a-StudentAthleteStatement.pdf (last visited July 13, 2022).

a.  "initiate, stimulate and improve intercollegiate athletics programs;"

b.  "uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;"

c.  "legislate . . . upon any subject of general concern to the members related to the administration of intercollegiate athletics;"

d.  conduct intercollegiate athletics programs "in a manner designed to protect and enhance" student-athletes' physical and educational wellbeing;

e.  require each member institution "protect the health of, and provide a safe environment for, each of its participating student-athletes;"

f.  require each member institution "establish and maintain an environment that fosters a positive relationship between the student-athlete and coach;"

g.  require each member institution "establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience;"

h.  "assist the institution in its efforts to achieve full compliance with all rules and regulations and . . . afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance."[143]

696.    In consideration of the NCAA's undertakings, each student-athlete agrees to abide by the Manual and any other NCAA rules; to participate in an NCAA sport, which provides a benefit to the NCAA and its member institutions; and to waive certain rights, including the right to profit from participation.

697.    The Manual thus constitutes a contract between the NCAA and Plaintiffs, the Nationwide Class, and the California Subclass, and Plaintiffs have fulfilled their obligations under the contract by providing their services as student-athletes in the NCAA.

---

[143] *See* NCAA Const., Arts. 1& 2.

1    698.    The NCAA breached its contractual obligations to Plaintiffs, the Nationwide

2 Class, and the California Subclass by failing to:

3           a.    prohibit sexual harassment and/or sexual abuse of student-athletes by

4                 athletics department personnel;

5           b.    prohibit any romantic or sexual relationships between athletics department

6                 personnel and student-athletes;

7           c.    prohibit grooming and other sexually-exploitative behavior by athletics

8                 department personnel of student-athletes;

9           d.    require NCAA member institutions to immediately report any allegations

10                of sexual relationships, harassment, or abuse of a student-athlete by

11                athletics department personnel;

12          e.    maintain all reports of sexual relationships, harassment, or abuse of a

13                student-athlete by athletics department personnel in a centralized repository

14                so they can be tracked by the NCAA and its member institutions;

15          f.    require that all reports of sexual relationships, harassment, or abuse of a

16                student-athlete by athletics department personnel be independently

17                investigated;

18          g.    implement public sanctions on member institutions and athletics

19                department personnel where allegations of sexual relationships,

20                harassment, or abuse of a student-athlete by athletics department personnel

21                are substantiated;

22          h.    ban athletics department personnel from working or volunteering for any

23                member institution where allegations of sexual relationships, harassment,

24                or abuse of a student-athlete by such athletics department personnel are

25                substantiated;

26          i.    mandate training of athletics department personnel regarding grooming,

27                sexual relationships with student-athletes, sexual abuse and harassment, the

28                prohibition thereof, and reporting obligations;

2435418.2

1         j.      mandate training of athletics department personnel and student-athletes to

2               recognize the signs of grooming and sexual abuse and harassment by

3               athletics department personnel, and to provide confidential avenues to

4               report the abuse;

5         k.      provide an independent ombudsman when student-athletes seek to leave

6               their teams, enter the NCAA transfer portal, and/or forego their

7               scholarships;

8         l.      protect Plaintiffs, the Nationwide Class, and the California Subclass from

9               such abuse and other foreseeable risks; and

10        m.     provide a safe environment for NCAA student-athletes free from sexual

11               abuse and/or sexual harassment.

12      699.    As a direct result of these breaches, Plaintiffs, the Nationwide Class, and the

13 California Subclass have suffered harm as described above.

14      700.    Because Plaintiffs, the Nationwide Class, and the California Subclass are at

15 continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

16                              **<u>COUNT XXIII</u>**

17                    **BREACH OF IMPLIED CONTRACT**
**(PLAINTIFFS, THE NATIONWIDE CLASS, AND**

18              **CALIFORNIA SUBCLASS AGAINST THE NCAA)**

19      701.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

20      702.    The Nationwide Class brings this claim pursuant to Indiana law.

21      703.    The California Subclass brings this claim pursuant to California law.

22      704.    To the extent an express contract does not exist, the facts and circumstances set

23 forth above establish an implied contract wherein student-athletes, in return for participation,

24 agreed to be bound by NCAA rules and expected the NCAA to provide appropriate rules and

25 regulations so as to protect their health and safety to the extent possible.

26      705.    The NCAA breached its contractual obligations to Plaintiffs, the Nationwide

27 Class, and the California Subclass by failing to:

28         a.      prohibit sexual harassment and/or sexual abuse of student-athletes by

2435418.2

1    athletics department personnel;

2    b.    prohibit any romantic or sexual relationships between athletics department

3    personnel and student-athletes;

4    c.    prohibit grooming and other sexually-exploitative behavior by athletics

5    department personnel of student-athletes;

6    d.    require NCAA member institutions to immediately report any allegations

7    of sexual relationships, harassment, or abuse of a student-athlete by

8    athletics department personnel;

9    e.    maintain all reports of sexual relationships, harassment, or abuse of a

10    student-athlete by athletics department personnel in a centralized repository

11    so they can be tracked by the NCAA and its member institutions;

12    f.    require that all reports of sexual relationships, harassment, or abuse of a

13    student-athlete by athletics department personnel be independently

14    investigated;

15    g.    implement public sanctions on member institutions and athletics

16    department personnel where allegations of sexual relationships,

17    harassment, or abuse of a student-athlete by athletics department personnel

18    are substantiated;

19    h.    ban athletics department personnel from working or volunteering for any

20    member institution where allegations of sexual relationships, harassment,

21    or abuse of a student-athlete by such athletics department personnel are

22    substantiated;

23    i.    mandate training of athletics department personnel regarding grooming,

24    sexual relationships with student-athletes, sexual abuse and harassment, the

25    prohibition thereof, and reporting obligations;

26    j.    mandate training of athletics department personnel and student-athletes to

27    recognize the signs of grooming and sexual abuse and harassment by

28    athletics department personnel, and to provide confidential avenues to

report the abuse;

k.   provide an independent ombudsman when student-athletes seek to leave their teams, enter the NCAA transfer portal, and/or forego their scholarships;

l.   protect Plaintiffs, the Nationwide Class, and the California Subclass from such abuse and other foreseeable risks; and

m.   provide a safe environment for NCAA student-athletes free from sexual abuse and/or sexual harassment.

706.   As a direct result of these breaches, Plaintiffs, the Nationwide Class, and the California Subclass have suffered harm described above.

707.   Because Plaintiffs, the Nationwide Class, and the California Subclass are at continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

## COUNT XXIV

### BREACH OF CONTRACT AS THIRD-PARTY BENEFICIARIES
### (PLAINTIFFS, THE NATIONWIDE CLASS,
### AND CALIFORNIA SUBCLASS AGAINST THE NCAA)

708.   Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

709.   The Nationwide Class brings this claim pursuant to Indiana law.

710.   The California Subclass brings this claim pursuant to California law.

711.   To the extent the Court finds no contract exists, either express or implied, between Plaintiffs, the Nationwide Class, and the California Subclass and the NCAA, then the NCAA and its member institutions were parties to a contract. As an express condition of their membership in the NCAA, each institution must agree to abide by its respective NCAA Division Manual, which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. The Manual thus constitutes a contract between the NCAA and its member institutions.

712.   Plaintiffs, the Nationwide Class, and the California Subclass are third-party beneficiaries of the contract between the NCAA and its members because the parties to the contract intended to benefit the student-athletes.

713.   In the Manual, the NCAA promises to do the following for student-athletes:

2435418.2

a.   "initiate, stimulate and improve intercollegiate athletics programs;"

b.   "uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;"

c.   "legislate . . . upon any subject of general concern to the members related to the administration of intercollegiate athletics;"

d.   conduct intercollegiate athletics programs "in a manner designed to protect and enhance" student-athletes' physical and educational wellbeing;

e.   require each member institution "protect the health of, and provide a safe environment for, each of its participating student-athletes;"

f.   require each member institution "establish and maintain an environment that fosters a positive relationship between the student-athlete and coach;"

g.   require each member institution "establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience;"

h.   "assist the institution in its efforts to achieve full compliance with all rules and regulations and . . . afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance."[144]

714.   The NCAA breached its contractual obligations to Plaintiffs, the Nationwide Class, and the California Subclass by failing to:

a.   prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

b.   prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

c.   prohibit grooming and other sexually-exploitative behavior by athletics

---

[144] *See* NCAA Const., Arts. 1& 2.

1                department personnel of student-athletes;

2     d.      require NCAA member institutions to immediately report any allegations

3                of sexual relationships, harassment, or abuse of a student-athlete by

4                athletics department personnel;

5     e.      maintain all reports of sexual relationships, harassment, or abuse of a

6                student-athlete by athletics department personnel in a centralized repository

7                so they can be tracked by the NCAA and its member institutions;

8     f.      require that all reports of sexual relationships, harassment, or abuse of a

9                student-athlete by athletics department personnel be independently

10                investigated;

11     g.      implement public sanctions on member institutions and athletics

12                department personnel where allegations of sexual relationships,

13                harassment, or abuse of a student-athlete by athletics department personnel

14                are substantiated;

15     h.      ban athletics department personnel from working or volunteering for any

16                member institution where allegations of sexual relationships, harassment,

17                or abuse of a student-athlete by such athletics department personnel are

18                substantiated;

19     i.      mandate training of athletics department personnel regarding grooming,

20                sexual relationships with student-athletes, sexual abuse and harassment, the

21                prohibition thereof, and reporting obligations;

22     j.      mandate training of athletics department personnel and student-athletes to

23                recognize the signs of grooming and sexual abuse and harassment by

24                athletics department personnel, and to provide confidential avenues to

25                report the abuse;

26     k.      provide an independent ombudsman when student-athletes seek to leave

27                their teams, enter the NCAA transfer portal, and/or forego their

28                scholarships;

2435418.2

1           l.      protect Plaintiffs, the Nationwide Class, and the California Subclass from

2                   such abuse and other foreseeable risks; and

3           m.      provide a safe environment for NCAA student-athletes free from sexual

4                   abuse and/or sexual harassment.

5       715.    As a direct result of these breaches, Plaintiffs, the Nationwide Class, and the

6   California Subclass have suffered harm as described above.

7       716.    Because Plaintiffs, the Nationwide Class, and the California Subclass are at

8   continuing risk of harm, Plaintiffs seek injunctive or equitable relief.

9   X.      **PRAYER FOR RELIEF**

10          WHEREFORE, Plaintiffs, individually and on behalf of the Nationwide Class, the USF

11  Baseball Subclass, and the California Subclass, respectfully request that the Court enter a

12  judgment on their behalf and against the NCAA, the University of San Francisco, Nino

13  Giarratano, and Troy Nakamura, and further grant the following relief:

14          A.      Certify the proposed Class and Subclasses pursuant to the Rules 23(a), (b)(2),

15  (b)(3) and/or (c)(4);

16          B.      Designate Plaintiffs as representatives of the proposed Class and Subclasses and

17  Plaintiffs' counsel as Class counsel;

18          C.      Declare that the NCAA owes a legal duty to protect student-athletes enrolled at

19  member institutions;

20          D.      Award injunctive relief requiring the NCAA to adopt, implement, and enforce

21  appropriate policies and procedures to prevent, or properly respond to, sexual misconduct and

22  psychological abuse of students and student-athletes, because: (1) there is a substantial likelihood

23  that Plaintiffs and the Classes will prevail on the merits; (2) there is a real and substantial threat

24  that the Classes will suffer irreparable injury if the injunction is not granted; (3) the Classes'

25  threatened injury outweighs any threatened harm to the NCAA; and (4) granting the injunction

26  will serve the public interest.

27          E.      Award injunctive relief requiring USF to adopt, implement, and enforce

28  appropriate policies and procedures to prevent, or properly respond to, sexual misconduct and

2435418.2

1   psychological abuse of students and student-athletes, because: (1) there is a substantial likelihood

2   that Plaintiffs and the Classes will prevail on the merits; (2) there is a real and substantial threat

3   that the Classes will suffer irreparable injury if the injunction is not granted; (3) the Classes'

4   threatened injury outweighs any threatened harm to USF; and (4) granting the injunction will

5   serve the public interest.

6          F.      Award Plaintiffs and the Classes compensatory damages, punitive damages,

7   damages for pain and suffering and emotional distress, and any other relief to which they are

8   entitled under the law;

9          G.      Award Plaintiffs and the Classes prejudgment interest, costs and attorneys' fees;

10  and

11         H.      Award Plaintiffs and the Classes such other and further relief as the Court deems

12  just and proper.

13  XI.    **DEMAND FOR TRIAL BY JURY**

14         Plaintiffs, individually and on behalf of the proposed Classes, respectfully request a trial

15  by jury as to all matters so triable.

16   Dated: July 15, 2022                    Respectfully submitted,

17

18                                           By:    */s/Jonathan Selbin*

19                                           Jonathan Selbin (Cal. Bar No. 170222)
                                             jselbin@lchb.com
20                                           Michelle Lamy (Cal. Bar No. 308174)
                                             mlamy@lchb.com
21                                           Nigar A. Shaikh (Cal. Bar. No. 343554)
                                             nshaikh@lchb.com
22                                           LIEFF CABRASER HEIMANN
                                               & BERNSTEIN, LLP
23                                           275 Battery Street, 29th Floor
                                             San Francisco, CA 94111
24                                           Telephone: (415) 956-1000
                                             Facsimile: (415) 956-1008

25

26

27

28

2435418.2

1
2
3
4

Elizabeth A. Fegan (*admitted pro hac vice*)
beth@feganscott.com
FEGAN SCOTT LLC
150 S. Wacker Drive, 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100

5
6
7
8

Lynn A. Ellenberger (*admitted pro hac vice*)
lynn@feganscott.com
FEGAN SCOTT LLC
500 Grant Street, Suite 2900
Pittsburgh, PA 15219
Telephone: (412) 346-4104
Facsimile: (312) 264-0100

9

*Attorneys for Plaintiffs and the Proposed Classes*

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2435418.2