JONATHAN SELBIN (Cal. Bar No. 170222)
jselbin@lchb.com
MICHELLE LAMY (Cal. Bar No. 308174)
mlamy@lchb.com
NIGAR A. SHAIKH (Cal. Bar No. 343554)
nshaikh@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

ELIZABETH A. FEGAN (admitted *pro hac vice*)
beth@feganscott.com
FEGAN SCOTT LLC
150 S. Wacker Drive, 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100

*Attorneys for Plaintiffs and the Proposed Classes*
*(Additional Counsel on Signature Page)*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8, JOHN DOE 9, JOHN DOE 10, JOHN DOE 11, and JOHN DOE 12, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, THE UNIVERSITY OF SAN FRANCISCO, ANTHONY N. (AKA NINO) GIARRATANO, and TROY NAKAMURA,<br><br>Defendants | Case No. 3:22-cv-01559-LB<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

SUMMARY OF FACTS .....................................................................................................1

I.   The Coach Defendants subjected Plaintiffs to an intolerable sexualized environment....1

II.  USF and the NCAA knew about the Coach Defendants' inappropriate conduct, and the NCAA has long known that the power differential between coaches and student-athletes increases the risk of abuse. ..................................................................................3

III. The NCAA is "at home" in California. ..........................................................................4

LEGAL STANDARD..........................................................................................................4

ARGUMENT.......................................................................................................................4

I.   This Court has personal jurisdiction over the NCAA. .....................................................4

    A.   The NCAA is subject to general jurisdiction in California. .................................5

    B.   This Court has specific jurisdiction over the NCAA. ..........................................7

         1. The NCAA purposefully availed itself of California.............................8

         2. Plaintiffs' claims arise from and relate to NCAA's California contacts.......10

         3. Exercise of jurisdiction would be reasonable.................................. 11

    C.   Discovery could confirm the Court's exercise of jurisdiction. ..........................12

II.  Venue is proper in this District. ......................................................................................12

III. Does 1-4 have standing to seek injunctive relief. ..........................................................13

IV.  Does 4-12 bring timely claims. ......................................................................................14

    A.   The discovery rule tolled Plaintiffs' claims........................................................14

    B.   Equitable tolling applies to Plaintiffs' claims.....................................................17

    C.   Equitable estoppel (or fraudulent concealment) tolled Plaintiffs' claims...........19

    D.   Where there is sexual misconduct in a relationship with a power imbalance and youthful victims, principles of equity favor tolling. ...................................23

V.   Plaintiffs plausibly allege Title IX claims against USF.................................................24

    A.   Plaintiffs plausibly allege one or both Coach Defendants used sex-based pejorative statements and showed and asked to see private body parts..............24

    B.   Plaintiffs plausibly allege USF was deliberately indifferent and had actual knowledge..........................................................................................................26

    C.   Plaintiffs plausibly allege violations of Title IX for retaliation against USF where Plaintiffs engaged in a "protected activity." ...........................................28

- ii -

VI.    Plaintiffs adequately allege California statutory claims. ................................................29

    A.    Plaintiffs adequately allege discrimination claims under the California Equity in Higher Education Act, Cal. Edu. Code § 66270 because the claims are governed by the same elements as Title IX claims....................................29

    B.    Plaintiffs adequately allege a claim under the California Equity in Higher Education Act, Cal. Educ. Code § 66281.5 because the section supports a private cause of action. ..........................................................................29

VII.   Plaintiffs adequately allege negligence claims against all Defendants..........................30

    A.    Plaintiffs plausibly allege negligence claims against the NCAA. .....................30

        1. California law applies to the negligence claims against the NCAA............30

        2. The NCAA owed Plaintiffs a duty of care based on its special relationship...31

        3. The NCAA owed Plaintiffs a duty of care based on its special relationship ..33

        4. The Rowland factors supported the NCAA's duty of care.......................35

    B.    The NCAA voluntarily assumed its duty...........................................................36

    C.    Plaintiffs sufficiently allege negligence by USF and Nakamura. .......................37

VIII.  Plaintiffs adequately allege gross negligence against all Defendants............................38

IX.    Plaintiffs adequately allege a fiduciary relationship with the NCAA. ...........................39

X.     Plaintiffs adequately allege negligent misrepresentations and omissions claims against the NCAA. ......................................................................................................................40

XI.    Plaintiffs adequately allege negligent supervision and retention...................................41

    A.    Plaintiffs plausibly allege facts demonstrating that the Coach Defendants are agents of the NCAA.........................................................................................41

    B.    Plaintiffs adequately allege claims against USF for negligent supervision and retention of the Coach Defendants and negligent failure to warn...............42

XII.   Plaintiffs adequately allege claims for intentional infliction of emotional distress against all Defendants. ...................................................................................................43

XIII.  To the extent Plaintiffs' negligence claims survive, so do their claims for negligent infliction of emotional distress. ....................................................................................45

XIV.   Plaintiffs adequately allege that the NCAA and USF are vicariously liable. .................46

    A.    Respondeat Superior can be applied to the NCAA.............................................46

    B.    Plaintiffs adequately allege the NCAA ratified the Coach Defendants' actions. .............................................................................................................49

    C.    Plaintiffs adequately allege that USF ratified its employees' actions. ...............50

XV.    Plaintiffs adequately allege breach of contract claims against the NCAA. ....................50

    A.    Plaintiffs adequately allege express and implied contract claims against the NCAA. ............................................................................................................51

- iii -

1

B.      Plaintiffs adequately allege that they are third-party beneficiaries of an
implied contract with the NCAA. .........................................................................52

CONCLUSION ...............................................................................................................................53

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Aguilar v. Corral*,
2007 WL 2947557 (E.D. Cal. Oct. 9, 2007)................................................................29

*Aldrich v. Nat'l Collegiate Athletic Ass'n*,
484 F. Supp. 3d 779 (N.D. Cal. 2020)...............................................................*passim*

*Amcor Flexibles, Inc. v. Fresh Express, Inc.*,
2014 WL 2967909 (N.D. Cal. July 1, 2014) .............................................................11

*Amiri v. DynCorp Int'l, Inc.*,
2015 WL 166910 (N.D. Cal. Jan. 13, 2015) ...............................................................5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................................4

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
874 F.3d 1064 (9th Cir. 2017) ....................................................................................7

*Ayla, LLC v. Alya Skin Pty. Ltd.*,
11 F.4th 972 (9th Cir. 2021) .......................................................................................9

*Bailey v. Unocal Corp.*,
700 F. Supp. 396, 399 (N.D. Ill. 1988) .....................................................................44

*Baires v. United States*,
2010 WL 3515749 (N.D. Cal. Sept. 8, 2010) ....................................................8, 9, 10

*Beliveau v. Caras*,
873 F. Supp. 1393 (C.D. Cal. 1995) ..........................................................................48

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................4

*Bostock v. Clayton Cnty., Georgia*,
140 S. Ct. 1731, 1734 (2020)....................................................................................25

*Bradley v. Nat'l Collegiate Athletic Ass'n*,
No. 16-346 (D.D.C. April 12, 2017)..........................................................................33

*Bristol-Myers Squibb Co. v. Superior Court of California*,
S. Ct. 1773 (2017)......................................................................................................11

*Bromlow v. D & M Carriers*,
2020 WL 701979 (N.D. Cal. Feb. 11, 2020) .............................................................13

*Brown v. Napa Valley Unified Sch. Dist.*,
2012 WL 4364673 (N.D. Cal. Sept. 24, 2012) .......................................................19

*Burch v. Regents of Univ. of Cal.*,
433 F. Supp. 2d 1110 (E.D. Cal. 2006) .....................................................................28

*Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*,
947 F.3d 342 (6th Cir. 2020) .....................................................................................44

*Cover v. Windsor Surry Co.*,
2016 WL 520991 (N.D. Cal. Feb. 10, 2016) ............................................................................31

*Daimler AG v. Bauman*,
134 S. Ct. 746 (2014)...............................................................................................................5, 7

*Deirmenjian v. Deutsche Bank, A.G.*,
526 F. Supp. 2d 1068 (C.D. Cal. 2007) ..................................................................................22

*Doe 1 v. Baylor Univ Baylor Univ.*,
240 F.Supp.3d .........................................................................................................16, 26, 27

*Doe v. Pasadena Hosp. Ass'n, Ltd.*,
2020 WL 1244357 (C.D. Cal. Mar. 16, 2020) ..................................................................15, 17

*Doe v. Uber Techs.*,
184 F. Supp. 3d 774 (N.D. Cal. 2016) ..............................................................................48, 49

*Doe v. Univ. of S. Cal.*,
2019 WL 4228371 (C.D. Cal. Apr. 18, 2019) .........................................................................17

*Dole Food Co. v. Watts*,
303 F.3d 1104 (9th Cir. 2002) ...................................................................................................5

*Emeldi v. Univ. of Or.*,
698 F.3d 715 (9th Cir. 2012) ...................................................................................................28

*Ervin v. Cnty. of Los Angeles*,
848 F.2d 1018, 1020 (9th Cir. 1988) ......................................................................................19

*Escue v. N. OK College*,
450 F.3d 1146 (10th Cir. 2006) ...............................................................................................28

*Estate of Amaro v. City of Oakland*,
653 F.3d 808 (9th Cir. 2011) .............................................................................................19, 21

*Estate of Mejia v. United States*,
2022 WL 3209380 (S.D. Cal. Aug. 5, 2022) ...........................................................................43

*Flood v. Nat'l Collegiate Athletic Ass'n*,
2015 WL 5785801 (M.D. Pa. Aug. 26, 2015) ........................................................................40

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
141 S. Ct. 1017 (2021)........................................................................................................10, 11

*Ganezer v. DirectBuy, Inc.*,
2012 WL 12867971 (C.D. Cal. Jan. 30, 2012) .......................................................................13

*Garcia ex rel. Marin v. Clovis Unified Sch. Dist.*,
627 F. Supp. 2d 1187 (E.D. Cal. 2009) .............................................................................26, 42

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998)............................................................................................................26, 27

*Grant House v. Nat'l Collegiate Athletic Ass'n*,
545 F. Supp. 3d 804 (N.D. Cal. 2021) .....................................................................................13

*Green v. Bastyr Univ., LLC*,
295 F. App'x 128 (9th Cir. 2008). ...........................................................................................17

*Hairston v. Pac-10 Conference,*
101 F.3d 1315 (9th Cir. 1996). ................................................................. 53

*Hall v. Apollo Grp., Inc.,*
2014 WL 4354420 (N.D. Cal. Sept. 2, 2014). ......................................... 45

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
466 U.S. 408 (1984) ................................................................................. 10

*Hexcel Corp. v. Ineos Polymers, Inc.,*
681 F.3d 1055 (9th Cir. 2012) ................................................................. 20

*Huddleston v. John Christner Trucking, LLC,*
2017 WL 4310348 (E.D. Cal. Sept. 28, 2017) .......................................... 9

*In Re: USC Student Health Center Litig.,*
No. 2:18-cv-04258-SVW-GJS (C.D. Cal. Feb. 25, 2020) ........................ 17

*Int'l Shoe Co. v. Washington,*
326 U.S. 310 (1945) ................................................................................... 4

*James v. Childtime Childcare,*
2007 WL 1589543 (E.D. Cal. June 1, 2007) ........................................... 39

*Jarrett v. Kassel,*
972 F.2d 1415 (6th Cir. 1992) ................................................................. 22

*Jennings v. Univ. of North Carolina,*
482 F.3d 686 (4th Cir. 2007) ................................................................... 26

*Jones v. Blanas,*
393 F.3d 918 (9th Cir. 2004) ................................................................... 17

*Karasek v. Regents of the Univ. of Cal.,*
500 F. Supp. 3d 967 (N.D. Cal. 2020) ..................................................... 26

*Karasek v. Regents of the Univ. of Cal.,*
956 F.3d 1093 (9th Cir. 2020) ........................................................... 24, 26

*Knelman v. Middlebury*
898 F. Supp. 2d 697 (D. Vt. 2012) .......................................................... 53

*Kulko v. Superior Court of Cal.,*
436 U.S. 84 (1978) ................................................................................... 40

*Langston v. Mid-Am. Intercollegiate Ass'n ,*
448 F. Supp. 3d 938 (N.D. Ill. 2020) ................................................. 20, 23

*Langston v. Mid-Am. Intercollegiate Athletics Ass'n,*
2020 WL 1445631 (N.D. Ill. Mar. 25, 2020) ............................... 21, 33, 36

*Lindsey v. Clatskanie People's Util. Dist.,*
140 F. Supp. 3d 1077 (D. Or. 2015) ........................................................ 29

*Lopez v. Regents of Univ. of Cal.,*
5 F. Supp. 3d 1106 (N.D. Cal. 2013) ................................................. 27, 28

*Love v. United States,*
915 F.2d 1242 (9th Cir. 1989) ................................................................... 4

*Lu v. Powell*,
    621 F.3d 944 (9th Cir. 2010) ...................................................................................... 48

*Lukovsky v. City & Cnty. of S.F.*,
    535 F.3d 1044 (9th Cir. 2008) .................................................................................... 16

*M.D. v. Abbott*,
    907 F.3d 237 (5th Cir. 2018) ...................................................................................... 42

*Marsh v. Burrell*,
    805 F. Supp. 1493 (N.D. Cal. 1992) ......................................................................... 30

*Mayall v. USA Water Polo, Inc.*,
    909 F.3d 1055 (9th Cir. 2018) .................................................................................... 38

*McDonald v. ISK Biosciences, Inc.*,
    1999 WL 34590219 (S.D. Tex. June 21, 1999) ......................................................... 44

*Mehr v. Fed'n Int'l de Football Ass'n*,
    115 F. Supp. 3d 1035 (N.D. Cal. 2015) ....................................................................... 6

*Menken v. Emm*,
    503 F.3d 1050 (9th Cir. 2007) ............................................................................... 9, 11

*MN Inv. Inc. v. Nguyen*,
    2022 WL 3974263 (N.D. Cal. Aug. 31, 2022) .......................................................... 12

*Nat'l Union Fire Ins. Co. v. Shores*,
    2020 WL 2937801 (E.D. Cal. June 3, 2020) ............................................................. 39

*Nichols v. Azteca Rest. Enters., Inc.*,
    256 F.3d 864 (9th Cir. 2001) ...................................................................................... 25

*Nissan Motor Co. v. Nissan Comput. Corp.*,
    89 F. Supp. 2d 1154 (C.D. Cal.) ................................................................................ 12

*Noriesta v. Konica Minolta Bus. Sols. U.S.A., Inc.*,
    2019 WL 6482222 (C.D. Cal. July 8, 2019) ............................................................. 13

*Ollier v. Sweetwater Union High Sch. Dist.*,
    768 F.3d 843 (9th Cir. 2014) ................................................................................ 25, 28

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998) ...................................................................................................... 25

*Pecover v. Elecs. Arts Inc.*,
    633 F. Supp. 2d 976 (N.D. Cal. 2009) ....................................................................... 11

*Reese v. Jefferson Sch. Dist. No. 14J*,
    208 F.3d 736 (9th Cir. 2000) ...................................................................................... 24

*Richardson v. Nat'l Collegiate Athletic Ass'n*,
    No. 1:16-cv-09980 (N.D. Ill. Feb. 14, 2018) ............................................................. 51

*Ryan v. Microsoft Corp.*,
    147 F. Supp. 3d 868 (N.D. Cal. 2015) ....................................................................... 21

*Santa Maria v. Pac. Bell*,
    202 F.3d 1170 (9th Cir. 2000) .................................................................................... 20

*Schwarzenegger v. Fred Martin Motor Co.,*
  374 F.3d 797 (9th Cir. 2004) ................................................................................. 4, 7

*Stanley v. Trs. of the Cal. State Univ.,*
  433 F.3d 1129 (9th Cir. 2006) ..................................................................................... 16

*Steiner v. Showboat Operating Co.,*
  25 F.3d 1459 (9th Cir. 1994) ...................................................................................... 25

*Stoll v. Runyon,*
  165 F.3d 1238 (9th Cir. 1999) ............................................................................... 18, 19

*Strassberg v. New England Mut. Life Ins. Co.,*
  575 F.2d 1262 (9th Cir. 1978) ..................................................................................... 31

*Thorman v. Am. Seafoods Co.,*
  421 F.3d 1090 (9th Cir. 2005) ..................................................................................... 21

*Videckis v. Pepperdine Univ.,*
  100 F. Supp. 3d 927 (C.D. Cal. 2015) ......................................................................... 29

*Videckis v. Pepperdine Univ.,*
  150 F. Supp. 3d 1151 (C.D. Cal. 2015) ....................................................................... 25

*Volk v. D.A. Davidson & Co.,*
  816 F.2d 1406 (9th Cir. 1987) ..................................................................................... 21

*Walden v. Fiore,*
  571 U.S. 277 (2014) .................................................................................................... 10

*Weston v. Big Sky Conf.,*
  466 F. Supp. 3d 896 (N.D. Ill. June 12, 2020) ....................................................... 51, 52

*Young v. United States,*
  535 U.S. 43 (1992) ...................................................................................................... 17

*Zheng Liu v. Terry,*
  2021 WL 2688846 (N.D. Cal. 2021) ........................................................................... 45

**State Cases**

*Acuna v. Regents of Univ. of Cal.,*
  56 Cal. App. 4th 639 (1997) ........................................................................................ 19

*APSB Bancorp v. Thorton Grant,*
  26 Cal. App. 4th 926 (1994) ........................................................................................ 41

*Baker v. Beech Aircraft Corp.,*
  39 Cal. App. 3d 315 (1974) ......................................................................................... 16

*Belen v. Ryan Seacrest Prods., LLC,*
  65 Cal. App. 5th 1145, 280 Cal. Rptr. 3d 662 (2021) .................................................. 37

*Binder v. Aetna Life Ins. Co.,*
  75 Cal. App. 4th 832 (1999) ........................................................................................ 51

- ix -

*Bloom v. Nat'l Collegiate Athletic Ass'n*,
  93 P.3d 621 (Colo. App. 2004) ....................................................................52

*Brown v. USA Taekwondo*,
  40 Cal. App. 5th 1077 (2019) ......................................................................35

*Brown v. USA Taekwondo*,
  11 Cal. 5th 204 (2021). .........................................................................*passim*

*C.A. v. William S. Hart Union High Sch. Dist.*,
  53 Cal. 4th 861 (2012). .......................................................................42, 46

*C.R. v. Tenet Healthcare*,
  169 Cal. App. 4th 1094 (2009) ...............................................................49, 50

*Castaneda v. Olsher*,
  41 Cal. 4th 1205 (2007) ...............................................................................30

*Christensen v. Superior Court*,
  54 Cal. 3d 868 (1991) ..................................................................................43

*Fox v. Ethicon Endo-Surgery*,
  35 Cal. 4th 797 (2005) .........................................................................14, 16

*Garcia v. Superior Court*,
  50 Cal. 3d 728 (1990) ..................................................................................40

*Gaston v. Doe 1*,
  2021 Cal. Super. LEXIS 55402 (Cal. Super. July 23, 2021) .................41, 43

*Geertz v. Ausonio*,
  4 Cal. App. 4th 1363 (1992) .......................................................................17

*Grappo v. McMills*,
  11 Cal. App. 5th 996 (2017) .......................................................................39

*Greiber v. Nat. Collegiate Athletic Ass'n*,
  2017 WL 6940498 (N.Y. Sup. Ct. Sep. 08, 2017) ......................................33

*Gutierrez v. Mofid*,
  39 Cal. 3d 892 (1985) ..................................................................................17

*Hill v. Slippery Rock Univ.*,
  138 A.3d 673 (Pa. Super. 2016) .................................................................32

*Howerton v. Harbin Clinic, LLC*,
  776 S.E.2d 288 (Ga. Ct. App. 2015) ..........................................................44

*Jimenez v. 24 Hour Fitness USA, Inc.*,
  237 Cal. App. 4th 546 (2015) .....................................................................38

*Jolly v. Eli Lilly & Co.*,
  44 Cal. 3d 1103 (1988) ................................................................................16

*Kelly-Zurian v. Wohl Shoe Co.*,
  22 Cal. App. 4th 397 (1994) .................................................................37, 45

*Lanni v. Nat'l Collegiate Athletic Ass'n*,
  42 N.E.3d 542 (Ind. Ct. App. 2015) ...........................................................33

- x -

*Lantzy v. Centex Homes*,
    31 Cal. 4th 363 (2003) .................................................................................................. 17, 20

*Lawson v. Superior Court*,
    180 Cal. App. 4th 1372 (2010). ............................................................................................ 43

*Malloy v. Fong*,
    37 Cal. 2d 356 (1951) ............................................................................................................ 47

*Mary M. v. City of Los Angeles*,
    54 Cal. 3d 202 (1991) ................................................................................................ 47, 48, 49

*McCann v. Foster Wheeler LLC*,
    48 Cal. 4th 68 (2010) ............................................................................................................ 31

*McCollum v. Friendly Hills Travel Ctr.*,
    172 Cal. App. 3d 83 (Ct. App. 1985) .................................................................................... 46

*Mills v. Forestex Co.*,
    108 Cal. App. 4th 625 (2003) ............................................................................................... 17

*Mktg. West, Inc. v. Sanyo Fisher (USA) Corp.*,
    6 Cal. App. 4th 603 (1992) ................................................................................................... 20

*Morin v. Henry Mayo Newhall Mem. Hospital*,
    29 Cal. App. 4th 473 (1994) ................................................................................................. 48

*Murillo v. Rite Stuff Foods*,
    65 Cal. App. 4th 833 (1998) ................................................................................................. 49

*Myers v. Trendwest Resorts*,
    148 Cal. App. 4th 1403 (2007) ............................................................................................. 47

*Norgart v. Upjohn Co.*,
    21 Cal. 4th 383 (1999) .................................................................................................... 16, 17

*Oliver v. Nat'l Collegiate Athletic Ass'n*,
    155 Ohio Misc. 2d 8 (2008) .................................................................................................. 52

*Paz v. California*,
    22 Cal. 4th 550 (2000) .......................................................................................................... 36

*Potter v. Firestone Tire & Rubber Co.*,
    6 Cal.4th 965 (1993) ............................................................................................................. 45

*Ratcliff v. The Roman Cath. Archbishop of Los Angeles*,
    79 Cal. App. 5th 982 (2022) ............................................................................................ 37, 43

*Regents of University of California v. Superior Court*,
    4 Cal. 5th 607 (2018) ...................................................................................................... *passim*

*Rosencrans v. Dover Images, Ltd.*,
    192 Cal. App. 4th 1072 (2011). ............................................................................................ 38

*Rowland v. Christian*,
    69 Cal. 2d 108 (1968) .................................................................................................... 30, 35

*Schmitz v. Nat'l Collegiate Athletic Ass'n*,
  863 N.E.2d 424 (Ind. Ct. App. 2007) ...................................................................39, 44

*Shaw v. LDC Enters.*,
  863 N.E.2d 424 (Ind. Ct. App. 2007) ...........................................................................31

*Tindall v. Enderle*,
  320 N.E.2d 764 (Ind. Ct. App. 1974) ...........................................................................41

*Wassmann v. S. Orange Cnty. Cmty. Coll. Dist.*,
  24 Cal. App. 5th 825 (2018) .........................................................................................17

*Wisniewski v. Diocese of Belleville*,
  406 Ill. App. 3d 1119 (Ill. App. 2011).........................................................................20

**Federal Statutes**

20 U.S.C. § 1681(a) ............................................................................................................24

28 U.S.C. § 1391(b) ............................................................................................................12

28 U.S.C. § 1391(c)(2).......................................................................................................13

**State Statutes**

Cal. Code Civ. Proc. § 340.16 ...........................................................................................23

Cal. Edu. Code § 66270 .....................................................................................................29

Cal. Evidence Code § 623 ..................................................................................................20

Cal. Gov. Code § 66281.5...................................................................................................29

**Federal Rules**

Fed. R. Civ. P. 15(a)(2)......................................................................................................53

Fed. R. Civ. P. 12(b)(6) .....................................................................................................19

**Other Authorities**

Comments, Assem. Bill. No. 1510 (Sept. 5, 2019)............................................................23

Restatement (Second) of Agency § 2 .................................................................................41

Restatement (Second) of Agency § 213 .............................................................................41

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

The National Collegiate Athletic Association ("NCAA") expressly promises to protect the health, safety, and welfare of its student-athletes. Indeed, the NCAA President proclaimed in testimony before Congress that the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes." Dkt. No. 38 ("FAC") ¶ 1. Yet, for decades—and to this day—it failed to uphold that promise with respect to sexual abuse of student-athletes by college coaches. In the vacuum created by the NCAA's failure to regulate such abuse, Plaintiffs were subjected to severe and pervasive sexual misconduct by two coaches from the University of San Francisco ("USF") Division I baseball team: Nino Giarratano and Troy Nakamura (the "Coach Defendants" or "Coaches"). For over 22 years, the NCAA and USF exposed student-athletes to these Coaches, despite knowing the Coaches subjected their players to an intolerable sexualized environment and psychological abuse—on the baseball field, in the locker room, in their offices, during baseball practice, and at games—causing emotional distress so severe that several Plaintiffs contemplated suicide. Now, each of these Defendants seeks to limit accountability for their conduct by dismissing a subset of Plaintiffs' complaints without even an opportunity to discover the full extent of Defendants' abuses. Each of their arguments fail. Plaintiffs respectfully request that Defendants' motions be denied in their entirety.[1]

**SUMMARY OF FACTS**

**I.      The Coach Defendants subjected Plaintiffs to an intolerable sexualized environment.**

Does 1-3 filed suit on March 11, 2022, complaining about the pervasive sexual environment and abuse they suffered at the hands of the Coach Defendants. Dkt. No. 1. At the time, Does 1-3 were NCAA Division I ("DI") baseball players at USF. After the suit was filed, the San Francisco Chronicle published a story entitled, "'Intolerable sexualized environment': Ex-USF baseball players sue coaches, school, NCAA." FAC ¶ 463. Thereafter, Does 4-12—upon discovering for

---

[1] Plaintiffs have compiled a chart of claims for this Court's ease of reference, attached to the Declaration of Jonathan Selbin ("Selbin Decl.") as Ex. E. Giarratano does not move to dismiss Plaintiffs' claims of negligent supervision and retention of Nakamura and negligence against him (Counts III and VIII). The NCAA does not move to dismiss the claims of intentional and negligent infliction of emotional distress except by denying *respondeat superior* liability (Counts X and XI).

the first time their causes of action against Defendants—joined the action in an Amended Complaint. FAC ¶ 463.

As detailed in the FAC, the Coach Defendants created and perpetuated a culture that normalized sexual misconduct. It was not unusual for Nakamura to expose his genitals to Plaintiffs, such as swinging his penis like a helicopter during practice while Giarratano kissed his cross and looked up to the sky or laughed. *Id.* ¶¶ 157, 174-76. It was not unusual for Nakamura to mime sexual acts with his players, or for the Coaches to require that players engage in sexual play—such as by gifting and then requiring them to bring sex toys to practice. *Id.* ¶¶ 7, 159. The Coach Defendants also showered with the players and walked around naked, talked about the players' penises, and asked the players who they were having sex with, and what sexual acts they were engaging in with their partners. *Id.* ¶¶ 161-62, 418, 437-38.

Plaintiffs were alarmed by and rejected this pervasive, sexual culture. In response, the Coach Defendants used the power they wielded to run them off the team, as evidenced by USF's abnormally high transfer rates among other NCAA DI baseball teams. FAC ¶ 10, 195-203. The Coach Defendants retaliated against Plaintiffs by subjecting them to regular insults and humiliation (*id.* ¶¶ 216, 256-57, 303, 314, 317-18, 372, 390, 405, 433-34) and threatening physical harm and sometimes even physically assaulting them. *Id.* ¶¶ 254, 321-22, 345, 435, 444. Once, instead of offering mental health resources to a suicidal player who had broken down in his office, Giarratano told the player that no one on the team liked him and that he (the player) was the problem on the team. *Id.* ¶ 408. The effect of the Coach Defendants' actions toward Plaintiffs was profound. Each reported near-identical symptomology that included anxiety, lack of sleep, depression, trauma, and suicidal ideation. *Id.* ¶¶ 229, 333, 360, 395, 411, 441, 243-44, 262, 280, 440, 262, 395, 262, 291, 306, 333, 352, 360, 396, 398, 408, 411-12, 424, 440, 308, 333, 366, 408, 411.

**II.     USF and the NCAA knew about the Coach Defendants' inappropriate conduct, and the NCAA has long known that the power differential between coaches and student-athletes increases the risk of abuse.**

USF and the NCAA knew that the power wielded by the Coach Defendants put Plaintiffs at an increased risk for exploitation and abuse, and even knew this risk had been realized at USF. FAC ¶¶ 54-77, 109-10, 606. Specifically, in May of 2014, John Doe 6's parents sent USF (through its Associate Athletic Director) and the NCAA (through its Faculty Athletics Representative) a letter complaining about a "hostile environment" in the USF baseball program, among other things. *Id.* ¶¶ 146, 379. No action was taken by USF or the NCAA. *Id.* In violation of USF's reporting and investigation policies (*id.* ¶ 458), and the NCAA's duty to protect student-athletes (*id.* ¶¶ 87-92), this complaint was swept under the rug. *Id.* ¶ 380.

USF also ignored the alarmingly high transfer rate in its baseball program that evidenced a problem warranting investigation. FAC ¶¶ 12-14, 198-203. It was only in January of 2022—after decades of misconduct by the Coach Defendants—that USF fired Nakamura. Even then, however, USF stood behind Giarratano and terminated him only after Does 1-3 filed suit. *Id.* ¶¶ 16, 52-53.

In addition to the above, it is well-studied and long-understood that power disparities in the coach-athlete relationship increase the risk for abuse. FAC § V.A-B. Beginning in 1990, numerous national governing bodies therefore began establishing policies prohibiting sexual abuse. *Id.* ¶¶ 68-86. Despite its own promises to protect its student-athletes—promises in its president's testimony before Congress, on its website, and in its by-laws (*id.* ¶¶ 1, 87-92)—and despite its tight regulation of coaches in countless other ways (*id.* ¶¶ 1, 93-98), the NCAA purposefully chose not to implement policies to monitor, prohibit, or otherwise address rampant sexual misconduct and abuse of student-athletes. *Id.* ¶¶ 87-132, 474, 621. Had the NCAA imposed measures to train, report, and monitor coaches, Plaintiffs' injuries would have been prevented or substantially reduced. *Id.* ¶¶ 82, 86, 563-68. USF is likewise not a stranger to a history of abuse in its athletics department (*id.* ¶¶ 139-40), but also failed to act on those warnings and prevent the abuse of Plaintiffs.

Despite the pervasiveness and seriousness of Coach Defendants' abuse and USF's and the NCAA's knowledge of that abuse, USF and the NCAA were deliberately indifferent to the heightened risk of sexual abuse to Plaintiffs.  *Id.* ¶¶ 16, 145, 348, 478, 483-95, 493-96.

**III.     The NCAA is "at home" in California.**

The NCAA has numerous and continuous contacts with California. FAC ¶¶ 26-32, 207, 233, 251, 298, 312. The NCAA has more DI members in California than in any other state. Selbin Decl., Ex. A. The NCAA promulgates requirements regarding scholarships for these California institutions, operation of a transfer portal for use by California athletes, and issues sanctions against California member institutions for non-compliance in California. *Id*. ¶¶ 196-97, 19, n.9, 346. To ensure compliance with its Constitution and by-laws which govern the conduct of California coaches and student-athletes, the NCAA has a 60-person enforcement staff. *Id.* ¶ 126. Indeed, the NCAA has previously sanctioned USF's baseball program under head coach Giarratano for using too much off-season time for practice. *Id.* ¶ 346.  Finally, the NCAA hosts many prominent, revenue-generating events in California and collects tens of thousands of dollars in membership dues from its California institutions each year. *Id.* ¶ 27.

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows for dismissal only if the complaint "fail[s] to state a claim upon which relief can be granted." A complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must accept all of the allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989).

## ARGUMENT

**I.      This Court has personal jurisdiction over the NCAA.**

For this Court to "exercise personal jurisdiction over a nonresident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of

- 4 -

jurisdiction 'does not offend traditional notions of fair play and substantial justice.'"

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Under this due process analysis, "a defendant may be subject to either general or specific personal jurisdiction." *Aldrich v. Nat'l Collegiate Athletic Ass'n*, 484 F. Supp. 3d 779, 789 (N.D. Cal. 2020) (the "Rembao" case). In either case, when this analysis is "based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002) (citation omitted).

Here, only the NCAA challenges this Court's jurisdiction. As set forth below, this Court has general jurisdiction over the NCAA.  Even if it did not, this Court unquestionably has specific jurisdiction over the NCAA under recent precedent from both this District and the Supreme Court.

### A.     The NCAA is subject to general jurisdiction in California.

General jurisdiction exists when a defendant's contacts "are so continuous and systematic as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014). While the NCAA emphasizes that the bar for establishing general jurisdiction outside a defendant's state of incorporation or principal place of business is "very high," NCAA Mot. at 6 (quoting *Amiri v. DynCorp Int'l, Inc.*, No. 14-cv-03333, 2015 WL 166910, at *2 (N.D. Cal. Jan. 13, 2015)), the NCAA ignores that, in light of its substantial California contacts, that high bar is met here.

The NCAA's motion is based on the faulty premise that personal jurisdiction cannot exist in California, because that would "subject the NCAA to jurisdiction in every state." NCAA Mot. at 7 (internal quotations and alterations omitted) (citing *Rembao*, 484 F. Supp. 3d at 793).  However, what the NCAA gets wrong, and the case on which it relies failed to appreciate, is that California *is* differently situated—and substantially so—from other states with NCAA member institutions.

First, the NCAA has more DI members in California than in any other state.[2] The NCAA currently has 57 members in California, 25 of which are DI programs. Selbin Decl., Ex. A. By comparison, the NCAA has only 10 DI members in Indiana, where it concedes jurisdiction exists. *Id*. Indeed, of the 50 states in which the NCAA has DI programs, 38 states have 10 or fewer programs (i.e., 60% fewer programs than California), and 27 states have five or fewer programs (i.e., 80% fewer programs than California). Selbin Decl. Ex. A. The NCAA's outsized presence in California is crucial, even (and especially) in a post-*Daimler* world. Indeed, the *Rembao* court noted that in the wake of *Daimler*, courts "must assess the forum contact in context," and "appraise the entity's activities in their entirety." 484 F. Supp. 3d at 794. Here, when considering the NCAA's "activities in their entirety," it is clear that the NCAA operates more extensively in California than other states. This is enough to establish general jurisdiction. *Cf. Mehr v. Fed'n Int'l de Football Ass'n*, 115 F. Supp. 3d 1035, 1048 (N.D. Cal. 2015) (declining to exercise personal jurisdiction where FIFA's contacts were "no more numerous in California than in any other state").

Second, through its outsized presence in California, the NCAA conducts substantial economic activity here. As just one prominent example, since 1916 the NCAA has hosted the Rose Bowl—the nation's oldest and most famous college football game—in California. Selbin Decl. Ex. C. The *Rembao* court dismissed the importance of this century-plus of in-state commercial activity on the basis that the NCAA also hosts several large (though less renowned) bowl games in other states. 484 F. Supp. 3d at 794 n.6. But those other bowls occur in states with substantially less of an NCAA presence than California: the Fiesta Bowl in Arizona (with 84% fewer DI programs than California); Peach Bowl (Georgia, 76% fewer); Iron Bowl (Alabama, 60% fewer); Sugar Bowl (Louisiana, 52% fewer); and Orange Bowl (Florida, 48% fewer). *Id*.;

---

[2] It is appropriate to focus on DI membership for the purposes of establishing the NCAA's contacts. According to the NCAA, the vast majority of the NCAA's annual revenue is reserved for DI programs: roughly 75% percent is reserved for DI—with 60% distributed directly to DI members and another 15% used to fund DI championships—while "Divisions II and III receive 4.37% and 3.18% of all NCAA revenue," from which those Divisions must fund their tournaments. Selbin Decl., Ex. B. And USF is a DI member. FAC ¶ 5.

Selbin Decl. Ex. A.[3] When assessed "in context," as *Daimler* requires, these out-of-state contacts underscore (not undercut) the relevance of the fact that the NCAA has hosted its most famous college football event in the state with its most extensive DI membership for more than a century. *Rembao*, 484 F. Supp. 3d at 794.

In sum, the NCAA can be sued here—in California—because the NCAA's contacts here—in California—establish that the NCAA is "essentially at home" here—in California. *Daimler*, 134 S. Ct. at 761. A finding of personal jurisdiction here would *not* determine jurisdiction over the NCAA in any other state. The NCAA's authorities stating (correctly) that an entity cannot be sued *anywhere* it has members are therefore inapposite.[4] Given the NCAA's extensive presence and associated economic impact *in California*, the *Rembao* court was simply wrong to conclude that "the NCAA's contact with California is [not] 'special' as compared to its contact with other States." 484 F. Supp. 3d at 794. It is special, and the NCAA therefore should "reasonably anticipate being haled" into a California court. *Daimler*, 134 S. Ct. at 755 n.7.

### B.     This Court has specific jurisdiction over the NCAA.

There are three requirements for specific jurisdiction: "(1) the defendant must either 'purposefully direct his activities' toward the forum or 'purposefully avail himself of the privileges of conducting activities in the forum'; (2) 'the claim must be one which arises out of or relates to the defendant's forum-related activities'; and (3) 'the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.'" *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (citation omitted). Plaintiffs bear the burden of satisfying the first two prongs; if met, the burden shifts to the defendant to make a "compelling case" that exercise of jurisdiction would not be reasonable. *Id*. Here, the *Rembao*

---

[3] The only other bowl the *Rembao* court mentioned is in Texas. While the NCAA maintains a DI Texas presence lesser than in California, the question of jurisdiction in Texas is not at issue here.

[4] In *BNSF Ry. Co. v. Tyrrell*, for example, the Supreme Court held that a corporation "can scarcely be deemed at home" in all states where it operates. 137 S. Ct. 1549, 1559 (2017). There, however, the plaintiffs did not argue that BNSF was more heavily concentrated in Montana than any other state, and the Supreme Court did not determine whether general jurisdiction exists where, as here, an entity operates most extensively in a state other than where it is headquartered.

court's analysis commands a finding of personal jurisdiction over the NCAA, because the contractual and tortious actions at the heart of this case occurred in California.

### 1. The NCAA purposefully availed itself of California.

In contract and tort cases, like this one, the first prong can be satisfied by showing either purposeful availment of the benefit of doing business in the forum state or purposeful direction of activities toward the forum state. *Schwarzenegger*, 374 F.3d at 802. Purposeful availment "is most often used in suits sounding in contract," and arises when in exchange for "invoking the benefits and protections of [a state's] laws," a defendant "must—as a quid pro quo—'submit to the burdens of litigation in that forum.'" *Id.* (citation omitted). Purposeful direction "is most often used in suits sounding in tort," and "usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum." *Id.* at 802-03.

The first prong is met here. As set forth above, pursuant to its contracts with members and student-athletes, the NCAA has for more than a century purposefully, continuously, and tightly managed countless athletic activities in California. *See supra* Section I.A. For example, among the NCAA's many and continuous contacts with California, the NCAA: manages a National Letter of Intent program, through which student-athletes (including the Does) indicate their commitment to join NCAA member institutions in California, FAC ¶¶ 207, 233, 251, 298, 312; sets requirements regarding the receipt of athletic scholarships in California, *id.* ¶¶ 196-97; operates the transfer portal through which California athletes (including the Does) make themselves available to other schools, *id.* ¶ 19, n.9; and sanctions member institutions and coaches for non-compliance with its regulations in California. *Id.* ¶ 346. In the process, the NCAA makes millions of dollars in revenue from California. *Id.* ¶ 27. Yet, despite its contractual obligation to protect the health and safety of the student-athletes who generate revenues for the NCAA, the NCAA knowingly decided not to adopt policies to monitor, prohibit, or otherwise address rampant sexual abuse and harassment of these student-athletes, despite its own study reflecting the need for such policies *Id.* ¶¶ 87-132, 474. This is "more than sufficient" to establish purposeful conduct under the first prong. *Baires v. United States*, No. C 09-5171, 2010 WL 3515749, at *6 (N.D. Cal. Sept. 8, 2010). *See also id.* (exercising jurisdiction over individuals

1   involved in "setting the nationwide policies that . . . shape[d] the behavior . . . within the State of

2   California"); *Schwarzenegger*, 374 F.3d at 803 (declining jurisdiction where, unlike here,

3   defendant retained "no benefit, privilege, or protection from California").

4       The NCAA's arguments against purposeful availment fail. The NCAA argues that its

5   contracts with members and student-athletes may only serve as the basis for jurisdiction if it

6   "'envisioned continuing and wide-reaching contacts with' the plaintiff in the forum state.'"

7   NCAA Mot. at 11 (quoting *Burger King Corp.* at 476, 478-80). As an initial matter, this

8   misconstrues the law: even "a single forum state contact can support jurisdiction if the cause of

9   action arises out of that particular purposeful contact of the defendant with the forum state."

10   *Menken v. Emm*, 503 F.3d 1050, 1060 (9th Cir. 2007). As set forth below, Plaintiffs' claims *do*

11   arise out of the NCAA's in-forum contacts. And, the NCAA *did* envision—and has—a

12   "continuing and wide-reaching" relationship with California members and student-athletes

13   extending over many decades. To be clear, this included countless contacts not just with USF but

14   with the Coach Defendants in particular. *See, e.g.*, FAC ¶ 346 (the NCAA sanctioned Coach

15   Giarratano and USF for too much off-season practice time during John Doe 5's tenure).

16       The NCAA's arguments against purposeful direction likewise fail. The NCAA argues

17   Plaintiffs fail to allege the NCAA "expressly aimed" its tortious conduct at California because

18   "any alleged harm caused by the NCAA's supposed failure to enact particular legislation arises

19   out of Indiana, not California." NCAA Mot. at 9 (internal alterations, quotations, and citations

20   omitted). This is wrong. To the extent the NCAA owed a duty to Plaintiffs—and it did, *see infra*

21   Section VII.A—that duty was unquestionably targeted at California, to be discharged in

22   California, and was breached in California. This is sufficient to establish purposeful direction. *See*

23   *Baires*, 2010 WL 3515749, at *6 (exercising specific jurisdiction over individuals involved in

24   setting a *nationwide policy* that was ultimately inadequate to provide medical care to plaintiffs *in*

25   *California*); *Huddleston v. John Christner Trucking, LLC*, 2017 WL 4310348, at *5 (E.D. Cal.

26   Sept. 28, 2017) ("The policies at issue may have their origin in Oklahoma, but [defendant's]

27   decision to purposefully direct its activities toward California and apply those policies in this

28   forum give rise to specific personal jurisdiction."). This is therefore unlike cases where the

- 9 -

plaintiff is "the only link between the defendant and the forum." *Ayla, LLC v. Alya Skin Pty. Ltd.*,

11 F.4th 972, 980 (9th Cir. 2021). Here, the NCAA engaged in "conduct directly targeting the

forum," *id.*, by assuming the responsibility to regulate programs throughout California and to

protect student athletes in California, doing so in certain instances (e.g., through transfer rules,

concussion management and return to play protocols, and scholarship limits), and then

consciously disregarding those duties when they involved sexual harassment and abuse by

coaches.

The NCAA highlights one particular allegation, i.e. the report of the Coach Defendants'

sexual misconduct by John Doe 6's parents to USF's NCAA Faculty Athletics Representative

("FAR"), as insufficient to establish purposeful availment. NCAA Mot. at 11-12 (citing FAC ¶¶

146, 379, 456, 489). While the NCAA argues that FARs are not its employees or agents, NCAA

Mot. at 11-12, the NCAA's own factual statements and legal authorities contradict this argument:

the NCAA's Constitution *mandates* that member institutions designate FAR representatives, *id.* at

12 n.5, and a defendant's connection to the forum state may "arise out of contacts that the

'defendant *himself' creates* with the forum," *Walden v. Fiore*, 571 U.S. 277, 284 (2014)

(emphasis supplied). Moreover, what John Doe 6's family experienced was just one manifestation

of the NCAA's broader contractual breaches and tortious conduct. Plaintiffs anticipate that

discovery will yield many more equally troubling examples.

### 2.      Plaintiffs' claims arise from and relate to NCAA's California contacts.

The second prong—that the claims "arise out of" or "relate to" the NCAA's in-forum

activities—is likewise met here. This prong does not demand "a strict causal relationship between

the defendant's in-state activity and the litigation." *Ford Motor Co. v. Montana Eighth Jud. Dist.

Ct.*, 141 S. Ct. 1017, 1026 (2021). Rather, there must only exist "a strong 'relationship among the

defendant, the forum, and the litigation.'" *Id.* at 1028 (quoting *Helicopteros Nacionales de

Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

It is on this second prong that the *Rembao* court previously declined to exercise jurisdiction

over the NCAA through analysis that now squarely establishes jurisdiction here. In *Rembao*, the

court's decision not to exercise specific jurisdiction turned on the fact that the "Plaintiffs were not

- 10 -

abused in California," but elsewhere in the country. 484 F. Supp. 3d at 796. Here, unlike *Rembao*, essentially all (if not all) of the mistreatment occurred in California, at an NCAA member institution located in California, by coaches employed in California, and under the watchful eye of the NCAA. Therefore here, unlike *Rembao*, the Plaintiffs were harmed by the NCAA's willful inaction and lack of protections *in California*. With harm now alleged *in California*, "[t]his is nothing more than a standard minimum contacts analysis." *Baires*, 2010 WL 3515749, at *6.

The NCAA attempts to downplay this crucial distinction by suggesting the *Rembao* court had "multiple bases for his finding of lack of jurisdiction." NCAA Mot. at 10 n.3. This ignores the *Rembao* court's express conclusion: "To summarize, Plaintiffs were not abused in California." 484 F. Supp. 3d at 796. Here, Plaintiffs *were* abused in California. And even if the *Rembao* court had not so explicitly tied its specific jurisdictional holding to the presence of in-state abuse, the case would be distinguishable because it predated the Supreme Court's recent decision in *Ford*. There, the Court clarified its prior ruling in *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773 (2017), by explaining that "when a corporation has 'continuously and deliberately exploited [a State's] market, it must reasonably anticipate being haled into [that State's] court[s]' to defend actions 'based on' products causing injury there." *Ford Motor Co.*, 141 S. Ct. at 1027. The Court's analysis in *Ford* applies with full weight here: while Ford had 36 dealerships in Montana, 141 S. Ct. at 1028, the NCAA has 57 total programs and 25 DI programs in California, Selbin Decl. Ex. A; and while Ford had "advertised, sold, and serviced" cars in Montana "for many years," 141 S. Ct. at 1028, the NCAA has heavily regulated athletics at its California member institutions, promised to protect the health and welfare of student athletes at California institutions, sanctioned California schools for failing to abide by its policies, and taken revenues from California tournaments, for more than a century, *supra* Section I.A. Accordingly, as in *Ford Motor Co.*, specific jurisdiction is appropriate here because the NCAA has, and continues to, "systematically serve" the market where Plaintiffs were injured. 141 S. Ct. at 1028.

### 3.   Exercise of jurisdiction would be reasonable.

Finally, the NCAA fails to address its burden under the third prong to "present a compelling case" that exercising personal jurisdiction would be unreasonable. *Menken*, 503 F.3d at 1057.

- 11 -

Thus, the NCAA has conceded this point. *Pecover v. Elecs. Arts Inc*., 633 F. Supp. 2d 976, 984 (N.D. Cal. 2009) (conceding dismissal of claims by not addressing the issue in the brief); *Amcor Flexibles, Inc. v. Fresh Express, Inc*., No. C 14-01025 LB, 2014 WL 2967909, at *7 (N.D. Cal. July 1, 2014) (Beeler, J.). If, however, the NCAA attempts addresses the "reasonableness" factors for the first time in reply, Plaintiffs request the opportunity to respond. But briefly: if personal jurisdiction over the NCAA is reasonable in *any* state other than Indiana, then that state is California.

### C.   Discovery could confirm the Court's exercise of jurisdiction.

If the Court determines the public record is not sufficient to exercise personal jurisdiction over the NCAA, Plaintiffs request an opportunity to take limited discovery on this topic. *See, e.g.*, *MN Inv. Inc. v. Nguyen*, No. 22-cv-02814-LB, 2022 WL 3974263, at *1 (N.D. Cal. Aug. 31, 2022) (Beeler, J.) (ordering jurisdictional discovery so that personal jurisdiction could be decided on a full record). Among other things, jurisdictional discovery could reveal whether the revenue the NCAA generates from California is in fact greater than other states, information the *Rembao* court noted could have established general jurisdiction. 484 F. Supp. 3d at 794. Discovery may also reveal additional lobbying efforts by the NCAA to protect its California revenues (such as its 2019 effort to convince California Governor Gavin Newsom to reject a bill that will allow California athletes to be compensated for use of their name, image, and likeness), as well as facts relating to the NCAA's injection of itself into an appeal before the California Supreme Court— *Brown v. USA Taekwondo*, concerning the duty owed by sports organizations to athletes. Selbin Decl., Ex. D; FAC ¶¶ 122-23. *See also Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1174 (9th Cir. 2006) (citing defendant's lobbying efforts in forum state as supportive of general jurisdiction).

## II.   Venue is proper in this District.

Venue is also proper in this District under 28 U.S.C. § 1391. At the motion to dismiss stage, "[a] *prima facie* showing of proper venue is sufficient to defeat a motion to dismiss." *Nissan Motor Co. v. Nissan Comput. Corp.*, 89 F. Supp. 2d 1154, 1161 (C.D. Cal.), *aff'd*, 246 F.3d 675

1   (9th Cir. 2000). "As a result, at least until facts are resolved, in many cases the non-moving party

2   will survive the Rule 12(b)(3) motion." *Id.* at 1139.

3   Here, venue is appropriate for the same reasons the Court has personal jurisdiction over the

4   NCAA. A civil action may be brought in "a judicial district in which any defendant resides," 28

5   U.S.C. § 1391(b)(1), and for venue purposes, entities like the NCAA reside "in any judicial

6   district in which [they are] subject to the court's personal jurisdiction with respect to the civil

7   action in question," 28 U.S.C. § 1391(c)(2). "[T]hat [Indiana] has significant contacts with the

8   [NCAA] does not mean that [California] does not, and personal jurisdiction does not cease to

9   exist in [California] solely because it also exists in [Indiana]." *Ganezer v. DirectBuy, Inc.*, No. CV

10  08-8666, 2012 WL 12867971, at *4 (C.D. Cal. Jan. 30, 2012).

11  In the alternative to dismissal, the NCAA requests that the Court approve transfer to the

12  Southern District of Indiana. NCAA Mot. at 14. But the moving party "bears the burden of

13  showing that the inconvenience of litigating in this forum favors transfer," *Bromlow v. D & M*

14  *Carriers*, No. 19-cv-05358, 2020 WL 701979, at *2 (N.D. Cal. Feb. 11, 2020), and the fact that

15  the NCAA is headquartered elsewhere, standing alone, does not meet that burden. *See Noriesta v.*

16  *Konica Minolta Bus. Sols. U.S.A., Inc.*, No. EDCV 19-620, 2019 WL 6482222, at *2 (C.D. Cal.

17  July 8, 2019) (denying motion to transfer notwithstanding the defendants' headquarters and

18  witnesses in New Jersey). Should the court exercise personal jurisdiction over the NCAA, then

19  venue should remain in this District, where the misconduct occurred on a nearly daily basis

20  during the fall and spring baseball seasons; where USF, the Coach Defendants and majority of

21  witnesses reside; and where relevant documents are housed. *See* 28 U.S.C. § 1391(b)(2) (venue is

22  proper in "a judicial district in which a substantial part of the events or omissions giving rise to

23  the claim occurred").

24  **III.    Does 1-4 have standing to seek injunctive relief.**

25  To establish Article III standing, a plaintiff must show they (1) suffered an "injury in fact,"

26  (2) with "a causal connection [to] the conduct complained of," (3) that will likely be "redressed

27  by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). It is undisputed

28  that Does 1-4 (as current students) have standing to seek injunctive relief. Even if Does 5-12 lack

- 13 -

standing to enjoin the NCAA, however, this would likely have no practical significance given the uncontested standing of the current students, nor would it bear on the former students' demand for monetary relief. *Grant House v. Nat'l Collegiate Athletic Ass'n*, 545 F. Supp. 3d 804, 818-20 (N.D. Cal. 2021).

## IV.     Does 4-12 bring timely claims.

Statute of limitations is an affirmative defense that "may be upheld on a motion to dismiss only when [it is] established on the face of the complaint." *Lopes v. Vieira*, 488 F. Supp. 2d 1000, 1008 (E.D. Cal. 2007). Thus, dismissal is appropriate only if it can "be determined from the face of the Complaint that [plaintiff's] claims are time-barred as a matter of law." *Id.* at 1030. In other words, a motion to dismiss "can be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).

Here, Defendants do not argue that any statutes have run on claims by Does 1-3. Defendants argue only that claims by Does 4-12 are time-barred. Consistent with California "policy favoring disposition of cases on the merits rather than on procedural grounds," however, Plaintiffs adequately allege four independent bases to toll all statutes of limitation in this case: (1) the discovery rule; (2) equitable tolling; (3) equitable estoppel/fraudulent concealment; and (4) principles of equity. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005).[5]

### A.     The discovery rule tolled Plaintiffs' claims.

The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Fox*, 35 Cal. 4th at 807. Courts do not take a "hypertechnical approach" to the rule: "Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, [courts] look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." *Id.* at 807.

Here, Does 4-12 did not discover their causes of action until March 11, 2022, when the San Francisco Chronicle published a story entitled "'Intolerable sexualized environment': Ex-USF

_____

[5] Plaintiffs and all Defendants agree that California law governs tolling in this case.

baseball players sue coaches, school, NCAA." FAC ¶ 463. When Doe 5 read the complaint on March 11, 2022, for example, he suffered a panic attack upon realizing that he, too, had endured trauma at the hands of Defendants. FAC ¶ 366. The Does' reaction to this case is typical: it is well documented that survivors of sexual trauma may take years (sometimes decades) to acknowledge and understand their harms, particularly where (as here) there is a significant power imbalance between the assailant and the victim. *See* FAC ¶¶ 54-56 (alleging student-athletes are at an increased risk for sexual exploitation and abuse by coaches due to the power imbalance in the coach-athlete relationship). For this reason, courts consider the presence of any such power imbalance when determining if the discovery rule applies. *See Mark K. v. Roman Cath. Archbishop*, 67 Cal. App. 4th 603, 611 (1998) ("[C]ourts have relied on the nature of the relationship between defendant and plaintiff to explain application of the delayed accrual rule.").

Plaintiffs' allegations regarding this triggering event are sufficient "to rely on the discovery rule for delayed accrual of [this] cause of action." *Fox*, 35 Cal. 4th at 808. As required to satisfy the rule, Plaintiffs both identify the "time and manner of discovery"—a publication on May 11, 2022—and allege that Does 4-12 exercised diligence following the discovery—by filing their complaint *only four months* after discovering their harms. *Id*. Other courts have upheld similar allegations on a motion to dismiss. In *Doe v. Pasadena Hosp. Ass'n, Ltd.*, for example, the court held that plaintiffs "sufficiently alleged both of the discovery rule prongs" by (1) alleging "they only became aware of [gynecologist Dr. Patrick Sutton's] misconduct in October 2018, after the Los Angeles Times published a story revealing it," and (2) filing their complaint three months later. No. 2:18-cv-08710, 2020 WL 1244357, at *5 (C.D. Cal. Mar. 16, 2020). In *Pasadena*, as here, plaintiffs had been led to believe the defendant's predatory conduct was "legitimate" and not abusive, and learned otherwise only through publication of his widespread abuses. *Id*.

Nevertheless, each Defendant attacks the sufficiency of these allegations to allege equitable tolling, and each Defendant fails. The NCAA contends the discovery rule should not apply because Does 4-12 "all appreciated the wrongfulness of the conduct alleged, and were aware of the actual injury at the time it happened." NCAA Mot. at 17. While the NCAA is correct that Does 4-12 *now* appreciate the wrongfulness of Defendants conduct, and *now* understand their

feelings of shame, depression, and anxiety were caused by Defendants' misconduct, Does 4-12 explicitly allege that this discovery did not occur until the triggering event of March 11, 2022. FAC ¶ 463. Inclusion of this allegation, which must be taken as true, undercuts the NCAA's argument. *Pasadena Hospital*, 2020 WL 1244357, at *5; *see also Mark K.*, 67 Cal. App. 4th at 612 (declining to apply discovery rule where plaintiff had "not alleged that he . . . failed to appreciate the wrongfulness of [the abuser's] conduct until some subsequent event triggered his memory and/or made him realize that [defendant] had acted inappropriately"). None of the NCAA's cases include similar circumstances, or sexual misconduct at all.[6]

USF makes a similar argument, citing *Stanley v. Trs. of the Cal. State Univ.*, 433 F.3d 1129 (9th Cir. 2006). In *Stanley*, however, there was no dispute about when the plaintiff discovered her harms because she had detailed those harms in a complaint she had filed with the State Board of Control more than a year before filing her lawsuit. *Id*. at 1136. Because the *Stanley* plaintiff did not allege the Board complaint tolled the statute of limitations, her lawsuit was untimely under the applicable one-year statute. *Id*. Here, by contrast, Plaintiffs allege Does 4-12 did not discover their causes of action until March 11, 2022, and then filed the FAC only four months later. FAC ¶ 463. USF also cites *Doe 1 v. Baylor Univ.*, which actually supports Plaintiffs on the question of tolling. In *Baylor Univ.*, the court found that the plaintiffs' claims—brought against the university in 2016, despite the underlying assaults occurring back in 2004—were *not* time-barred even though "Plaintiffs were aware of their injuries from the time the assaults occurred" because "they had no reason to know of Baylor's alleged causal connection to their assaults until the spring of 2016, when media reports regarding the rampant nature of sexual assault on Baylor's campus first

---

[6] None of the NCAA's cases involved an allegation that victims of sexual abuse were unaware of their harms until a triggering event years later. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797 (2005) (medical malpractice); *Norgart v. Upjohn Co.*, 21 Cal. 4th 383 (1999) (death from drug overdose); *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103 (1988) (injury from defective drug); *Lukovsky v. City & Cnty. of S.F.*, 535 F.3d 1044 (9th Cir. 2008) (race and national origin discrimination). Moreover, even cases that do not involve sexual misconduct—but do involve a belated and public disclosure of misconduct—favor application of the discovery rule here.  See, e.g., *Baker v. Beech Aircraft Corp*., 39 Cal. App. 3d 315, 324 (1974) (reversing dismissal of plaintiff-passengers' claims against airplane manufacturer more than one year after the airplane they were riding in had crashed, because they learned of their claims "only as a result of the expose appearing in the Wall Street Journal").

came to light." 240 F. Supp. 3d 646, 663 (W.D. Tex. 2017). That is *precisely* the allegation Does 4-12 make here. FAC ¶ 463.

Giarratano and Nakamura likewise fail to rebut application of the discovery rule because they make the same faulty arguments and cite the same inapposite case law.[7] Nakamura also cites *Doe v. Univ. of S. Cal.*, No. 2:18-cv-09530, 2019 WL 4228371 (C.D. Cal. Apr. 18, 2019). However, the *Doe* plaintiff, who was one of thousands of women abused by a student health center gynecologist, admitted "she was aware" of the doctor's abuse "at the time of her examination." *Doe*, 2019 WL 4228371, at *4.  Here, by comparison, Does 4-12 explicitly disavow real-time awareness of their causes of action. FAC ¶ 463. Further, the court's decision on tolling is wrong.[8]  *See Pasadena Hospital*, 2020 WL 1244357, at *5 (reaching the opposite conclusion).

## B.   Equitable tolling applies to Plaintiffs' claims.

"It is hornbook law that limitations periods are 'customarily subject to equitable tolling.'" *Young v. United States*, 535 U.S. 43, 49 (1992). Equitable tolling is a "judge-made doctrine" that suspends or extends a statute of limitations as necessary to ensure fairness. *Lantzy v. Centex Homes,* 31 Cal. 4th 363, 370 (2003). The purpose of the doctrine "is to soften the harsh impact of technical rules which might otherwise prevent a good faith litigant from having a day in court." *Jones v. Blanas*, 393 F.3d 918, 928 (9th Cir. 2004). The doctrine applies when a plaintiff "diligently pursue[s] his claims" and has "show[n] that the defendant engaged in [] deception that caused him to miss the statutory deadline." *Green v. Bastyr Univ., LLC*, 295 F. App'x 128, 129 (9th Cir. 2008). The doctrine "requires a balancing of the injustice to the plaintiff occasioned by

---

[7] *See* Giarratano Mot. at 6 & Nakamura Mot. at 6-8 (citing *Jolly*, *Norgart*, or *Fox*). They also cite *Gutierrez v. Mofid*, 39 Cal. 3d 892 (1985) (medical malpractice); *Geertz v. Ausonio*, 4 Cal. App. 4th 1363, 1369 (1992) (construction defect); *Mills v. Forestex Co.*, 108 Cal. App. 4th 625 (2003) (construction defect); *Wassmann v. S. Orange Cnty. Cmty. Coll. Dist.*, 24 Cal. App. 5th 825 (2018) (race discrimination). None involved allegations of trauma or a triggering event.

[8] The decision also carries little weight, as the University of California agreed in 2018 to settle class claims for victims whose abuse had occurred decades earlier. *See* Final Approval Order and Judgment, Dkt. No. 172, *In Re: USC Student Health Center Litig.*, No. 2:18-cv-04258-SVW-GJS (C.D. Cal. Feb. 25, 2020).

- 17 -

the bar of his claim against the effect upon the important public interest or policy expressed by the . . . limitations statute." *Lantzy*, 31 Cal. 4th at 371.

Here, there will be clear injustice to Does 4-12 if they are barred from bringing their claims. All four Defendants engaged in conduct designed to convince Plaintiffs they lacked meritorious claims. Plaintiffs allege USF and NCAA failed to act on their knowledge of the Coach Defendants' misconduct, in an effort to convince Plaintiffs and their parents that what they had experienced at the hands of the Coach Defendants were innocent, isolated incidents and not actionable, systemic violations of the law. FAC ¶¶ 456-57. This inaction ran directly contrary to USF's mandatory reporting and investigation policies, *id*. ¶ 458, and the NCAA's duty to protect student-athletes, *id*. ¶¶ 87-92. For their part, the Coach Defendants retaliated against any player who challenged (or even declined to condone) their abusive behavior, by running those players off the USF baseball team. *Id*. ¶¶ 195-453. Through this abuse, the Coach Defendants sowed anxiety and self-doubt into the Does, in an effort to discourage them from speaking up and out about the Coaches' abusive behavior. *Id*. Doe 10, for example, "began to believe what the coaches said about him—that he was a loser, worthless, and a bad baseball player—and to hate himself." *Id*. ¶ 291. The Coaches' argument that none of the tolling allegations concern their conduct is therefore flatly contradicted by the FAC, including the above allegations.[9] *See Rembao*, 484 F. Supp. 3d at 800 (finding that "[w]hile there are no allegations that Defendant [Coach] Rembao was involved in UT Austin's 'whitewashing'" of the investigation into plaintiffs' complaints, the coach was still subject to equitable tolling because he, too, had engaged in "manipulation" of the plaintiffs).

Collectively, Defendants' behavior gaslighted Plaintiffs into believing Defendants had done nothing wrong, and that Plaintiffs were overreacting. This is precisely the scenario equitable tolling is designed to redress. *See, e.g.*, *Stoll v. Runyon,* 165 F.3d 1238, 1242 (9th Cir. 1999) (finding that equitable tolling applied to sexual abuse where "plaintiff is prevented from asserting a claim by wrongful conduct on the part of the defendant"); *Rembao*, 484 F. Supp. 3d at 800

---

[9] *See* Nakamura Mot. at 9; Giarratano Mot. at 5 n.4.

1  ("[W]ithout equitable tolling to protect sexual abuse survivors' access to justice, the intimidation

2  tactics allegedly used by UT Austin would be condoned. This is another interest to consider. As

3  society progresses and the acts of the past are condoned, it seems unjust to deprive a plaintiff of

4  her day in court.").

5      The NCAA and Nakamura argue that equitable tolling is limited to instances "where the

6  injured person has several legal remedies for the same harm and in good faith pursues one."

7  NCAA Mot. at 20 (quoting *Acuna v. Regents of Univ. of Cal.*, 56 Cal. App. 4th 639, 647 (1997));

8  Nakamura Mot. at 12-13 (same). While that is *an* application of the doctrine, neither the NCAA

9  nor Nakamura cites any authority for the assertion that it is the *only* application of the doctrine.

10 And none exists, because it is not. *See, e.g.*, *Stoll,* 165 F.3d at 1242 (9th Cir. 1999) (applying

11 equitable tolling where plaintiffs' mental state prevented her from timely filing). USF argues it

12 would be prejudiced by equitable tolling "because this lengthy delay has greatly limited USF's

13 ability to investigate these allegations and take appropriate action." USF Mot. at 11. But USF's

14 *own decision* not to investigate the Coaches' misconduct in real-time in the face of complaints—

15 and to instead minimize that conduct in an attempt to gaslight Plaintiffs—cannot now be used as a

16 shield against equitable tolling. Moreover, USF will not be prejudiced by proceeding against Does

17 4-12 because unless the Court dismisses Does 1-3 on other Rule 12(b)(6) grounds, USF will

18 proceed against Does 1-3 on identical claims.[10]

19      **C.    Equitable estoppel (or fraudulent concealment) tolled Plaintiffs' claims.**

20      "The doctrine of equitable estoppel, often referred to as fraudulent concealment, is based on

21 the principle that a party 'should not be allowed to benefit from its own wrongdoing.'" *Estate of*

22

23 [10] USF cites two cases in support of its prejudice argument regarding the potential for memories
   fading or witness unavailability. But USF provides the Court no reason to believe will be an issue
24 here. In any event, *Ervin v. Cnty. of Los Angeles* does not even mention these concerns. Instead,
   the plaintiff in *Ervin* failed to show she acted reasonably and in good faith when voluntarily
25 delaying her lawsuit while conducting her own investigation into the facts. 848 F.2d 1018, 1020
   (9th Cir. 1988). Similarly, in *Brown v. Napa Valley Unified Sch. Dist.*, the court declined to apply
26 equitable tolling where the plaintiff waited two years after filing an administrative charge to file a
   lawsuit. No. 3:11-cv-05673, 2012 WL 4364673, at *5 (N.D. Cal. Sept. 24, 2012). In both *Ervin*
27 and *Brown*, it was undisputed that the plaintiffs knowingly sat on investigations into their own
   claims for years before filing. That is not the case here.
28

*Amaro v. City of Oakland*, 653 F.3d 808, 813 (9th Cir. 2011) (citation omitted). Equitable

estoppel is wholly independent of the limitations period itself and comes into play only after the

limitations period has run. *Lantzy*, 31 Cal. 4th at 383. "[A] party will be estopped from asserting

the statute of limitations as a defense to an admittedly untimely action because his conduct has

induced another into forbearing suit within the applicable limitations period." *Id.* Fraudulent

concealment applies where there is an intentional concealment or suppression of the facts. *Mktg.*

*West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603, 612-13 (1992). Here, there are three

bases for application of equitable estoppel and fraudulent concealment.

First, the NCAA has known for years that coaches often wield their power over student-

athletes to engage in sexual misconduct. FAC § V.C. The NCAA chose to ignore this widespread

problem, even though other sports organizations adopted policies to prevent sexual abuse and

prohibit sexual relationships between coaches and athletes. *Id.* § V.B. In a similar context, another

court found this sort of knowledge and inaction on the part of the NCAA to qualify for estoppel.

In *Langston v. Mid-Am. Intercollegiate Ath. Ass'n*, plaintiffs brought suit against the NCAA for

brain injuries that caused a former college football player to commit suicide. 448 F. Supp. 3d 938

(N.D. Ill. 2020). The court applied the doctrine of equitable estoppel on a motion to dismiss,

crediting plaintiffs' allegations that the NCAA knew but did not disclose the risks of developing

degenerative brain diseases. *Id.* at 950. In other words, the court applied the doctrine in response

to the NCAA's *silence*, which undercuts any argument that equitable estoppel can never be

predicated upon a failure to act. *Id.*[11] Similarly, in *Wisniewski v. Diocese of Belleville*, the court

held that "when there is a fiduciary or trust or other confidential relationship . . . . the person

occupying the position of fiduciary or of confidence is under a duty to reveal the facts to the

plaintiff, and his silence is as fraudulent as an actual affirmative false representation or act." 406

---

[11] *See* NCAA Mot. at 19 (arguing that the doctrine "necessarily requires active conduct by a
defendant") (quoting *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1177 (9th Cir. 2000)); USF Mot. at
8 (arguing that the doctrine requires a "showing that [the defendant] affirmatively misled it")
(quoting *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012)). In fact,
Plaintiffs' allegations are consistent with both *Santa Maria* and *Hexcel*: Plaintiffs allege the
NCAA's *choice* to ignore the epidemic of coach-on-athlete sexual misconduct *is* the active and/or
affirmative conduct required to satisfy the doctrine.

1   Ill. App. 3d 1119, 1154 (Ill. App. 2011). Plaintiffs allege such a relationship with the NCAA,

2   FAC ¶ 596, such that the NCAA's inaction is enough to qualify for estoppel.

3       The NCAA is also incorrect that Plaintiffs cannot allege equitable estoppel because they

4   had either "actual" or "constructive notice" of their harms. NCAA Mot. at 20. For one, the NCAA

5   is incorrect that the focus is on the plaintiffs' knowledge or conduct. Rather, "the focus of the

6   equitable estoppel analysis is not whether the plaintiff knew she had a cause of action—or even

7   pursued some other form of litigation based on that knowledge—but whether the defendant's

8   fraudulent concealment or misrepresentation deprived the plaintiff of a full understanding of the

9   true facts, and thus, dissuaded the plaintiff from filing the claim at issue within the limitations

10  period." *Amaro*, 653 F.3d at 813.  Does 4-12 did *not* possess either actual or constructive

11  knowledge of their legal rights until March 11, 2022. *Supra* § IV.A. Finally, contrary to the

12  NCAA's assertions, Plaintiffs *do* plead the NCAA's concealment with particularity: as in

13  *Langston*, Plaintiffs allege with specificity that the NCAA became keenly aware of the risks of

14  sexual exploitation facing student-athletes, assumed a duty to protect those athletes, and yet failed

15  to discharge that duty. *Compare* FAC §V.C. *with* 448 F. Supp. 3d at 950 (finding estoppel alleged

16  where the NCAA "knew better" about the "risks of developing CTE or other degenerative brain

17  diseases," and "had a duty to speak about the danger," yet "remained silent"). As in *Langston*,

18  "whether the nature and circumstances surrounding this alleged conduct give rise to estoppel is a

19  question of fact, and [Plaintiffs'] claims cannot be dismissed at the pleading stage." *Id.*

20      Second, as set forth *supra*, Plaintiffs allege USF and NCAA failed to act on their specific

21  knowledge of the Coach Defendants' misconduct, in an effort to mislead Plaintiffs about the

22  strength of their claims. FAC ¶¶ 456-57. USF argues, along the same lines as NCAA, that

23  declining to investigate cannot constitute an "affirmative act" for the purposes of. USF Mot. at 8-

24  9. These arguments are no more successful for USF than they were for NCAA. As discussed

25  above, this case is much closer to *Langston* and *Wisniewski* than to the cases USF cites, which all

26

27

28

concerned withholding of a specific piece of information in a commercial transaction.[12] Here USF had a special relationship with Plaintiffs, yet deliberately refused to investigate following complaints regarding the Coaches.

In the alternative, USF argues that the "only circumstance" where courts have held that inaction constitutes concealment is "where the relationship imposes a fiduciary duty that requires disclosure." USF Mot. at 9 (citing *Deirmenjian v. Deutsche Bank, A.G.*, 526 F. Supp. 2d 1068, 1090 (C.D. Cal. 2007)). But Plaintiffs *do* allege a fiduciary relationship, rooted in Plaintiffs' "acceptance of USF's offers to join the baseball team and seek out coaching from Coach Defendants in the course of their employment, agency, and/or representation of USF and the NCAA." FAC ¶ 545.[13] Finally, perhaps recognizing the strength of the allegations regarding USF's fraudulent treatment of Doe 6, USF claims that "[e]ven if Doe 6 were able to make out a fraudulent concealment claim . . . that claim would not extend to Does 4-5 and 7-12." USF Mot. at 10. This is wrong. *See, e.g., Jarrett v. Kassel*, 972 F.2d 1415, 1428 (6th Cir. 1992) (concluding that because a named plaintiffs' actions are attributable to the class for the purposes of tolling, if "plaintiffs prove the remaining elements of their claim of fraudulent concealment," the statute would be tolled for the class). USF also misunderstands the nature of Plaintiffs' allegations regarding concealment, which extend far beyond the conduct John Doe 6 and include a decades-long effort to minimize the Coach Defendants' misconduct and discourage complaints.

As with the NCAA and USF, Nakamura argues that Plaintiffs fail to plead estoppel with particularly. Nakamura Mot. at 10. However, the Coaches created an environment of secrecy and retaliation to prevent Plaintiffs from recognizing and asserting their legal claims, in an effort to protect themselves from scrutiny for their misconduct. FAC § D.2-3. Plaintiffs identify specific

---

[12] *See Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir. 1987) (finding no estoppel where a party to a business transaction declined to disclose "certain geological reports known to him"); *Thorman v. Am. Seafoods Co.*, 421 F.3d 1090, 1095-96 (9th Cir. 2005) (finding no estoppel where fishing company declined to disclose internal compensation methodology to employees); *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 875 (N.D. Cal. 2015) (finding no estoppel where Microsoft did not volunteer that the company used non-solicitation agreements).
[13] USF's cases about the "contractual, normal" relationship between a typical student and their university are therefore inapposite. USF Mot. at 9-10.

details about how the Coach Defendants protected themselves from liability by retaliating against any player who spoke out against their misconduct: they "berated, belittled, and disparaged student-athletes; took away their playing time and scholarships; and coerced student-athletes (who otherwise met all NCAA and academic requirements) into leaving USF through threats and misrepresentations." FAC ¶ 8. *See also id.* § V.D.3 (detailing examples of this conduct for each of the Does). It is therefore clear from the face of the complaint that Plaintiffs at least *allege* "facts showing that [things] Nakamura did or said [were] the cause of Plaintiffs' failure to file suit within the statute of limitations." Nakamura Mot. at 12. Accordingly, because "estoppel is a question of fact, [Plaintiffs'] claims cannot be dismissed at the pleading stage." *Langston*, 448 F. Supp. 3d at 950.

> **D.** **Where there is sexual misconduct in a relationship with a power imbalance and youthful victims, principles of equity favor tolling.**

This case calls for application of equitable principles because it concerns the sensitive topic of sexual misconduct of young victims in relationships involving a power imbalance. Indeed, the California legislature has acknowledged that the trauma associated with sexual abuse in such situations sometimes requires an extension of limitations for victims. For example, California Code of Civil Procedure § 340.16, which created a revival window for survivors of sexual assault, was passed directly in response to "the egregious and decades-long sexual assaults committed, for over three decades, by Dr. George Tyndall, a physician at the University of Southern California (USC)," where the victims were "young women…." Comments, Assem. Bill. No. 1510 (Sept. 5, 2019).[14] The bill was in recognition of the fact that "typical statutes of limitation—which require a plaintiff to bring an action within a reasonable period of time—fail to accommodate the complex and delayed process of dealing with, and sometimes even remembering, sexual abuse and assault." *Id.* Notably, the statute was not limited to sexual assault, but also captured "inappropriate contact, communication, or activity of a sexual nature."

Here, Plaintiffs are still grappling with the psychological impact of recognizing and accepting the trauma they suffered at the hands of the Coach Defendants during their formative,

---

[14] *Available at* https://bit.ly/31lt9eI (last accessed Oct. 19, 2022).

college years. They were traumatized because the Coach Defendants mercilessly wielded and abused their position of power they held over the Plaintiffs (FAC § V.D.3), and the institutions in which they placed their trust did not protect them. An equitable exception is especially appropriate because of the Plaintiffs' age at the time of the events. While legally adults, legislatures across the country are recognizing a victim's young age (under 25) in fashioning exceptions to limitations periods.[15] Plaintiffs therefore respectfully submit that this Court should apply equitable principles pertaining to cases of sexual misconduct involving youthful individuals where there is a power imbalance, and permit the claims of Does 4-12 to proceed.

**V.      Plaintiffs plausibly allege Title IX claims against USF.**

    **A.      Plaintiffs plausibly allege one or both Coach Defendants used sex-based pejorative statements and showed and asked to see private body parts.**

Title IX prohibits federally-funded educational institutions like USF from discriminating on the basis of sex. 20 U.S.C. § 1681(a). A claim under Title IX requires that a school had (1) substantial control over the perpetrator; (2) abuse must be so severe, pervasive, and objectively offensive that it deprived victims of access to educational opportunities or benefits provided by the school; (3) actual notice or knowledge of the abuse; and (4) deliberate indifference to the abuse. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000). The Ninth Circuit also recognizes a second theory of liability for a school under Title IX that obviates actual notice if it has an "official policy" that violates Title IX. *Karasek v. Regents of U. of Cal.*, 956 F.3d 1093, 1112 (9th Cir. 2020).

Here, Plaintiffs allege that (1) USF had substantial control over both Coach Defendants and Giarratano had substantial control over Nakamura; (2) the abuse Plaintiffs endured under Nakamura, in which Giarratano participated, was severe, pervasive, and objectively offensive depriving Plaintiffs of equal access to educational benefits and opportunities; (3) Giarratano as well as the USF Athletic Director and assistant had actual knowledge of the abuse; (4) USF's

---

[15] *See* 42 Pa. Cons. Stat. § 5533(b)(2)(i.1) ("If an individual entitled to bring a civil action arising from sexual abuse is at least 18 and less than 24 years of age at the time the cause of action occurs, the individual shall have until attaining 30 years of age to commence an action for damages regardless of whether the individual files a criminal complaint regarding the sexual abuse.").

actions and inactions, including its failure to respond constituted deliberate indifference of the Coach Defendants' abuse of Plaintiffs and the class; and (5) USF maintained an official policy of deliberate indifference. FAC ¶¶ 16, 145, 348, 478, 483-95, 493-96. Plaintiffs therefore state a claim under Title IX.

USF argues for dismissal of Plaintiffs' Title IX claims because USF fails to see the causal nexus to sex in Plaintiffs' allegations. USF's Mot. at 12-13. However, Plaintiffs' FAC is replete with allegations of Defendants' severe and pervasive abuse of them on the basis of sex, including gender-based bullying, sexism, and sex stereotyping resulting in such a hostile environment that it deprived Plaintiffs of equal access to educational opportunities and benefits USF provides. *See, e.g.*, FAC ¶¶ 154, 183-84, 216, 257, 303, 314, 317-18, 371, 434, 480, 484-85 (routinely called Plaintiffs "pussies," "faggots," and "fucking cunt"); 300 (constantly talked about the shape and size of players' penises); 6, 172, 174, 177 (appeared naked on the field and mimed sexual acts using the players' bodies). These examples are "not merely tinged with offensive sexual connotations" but rather included very sexually explicit displays and "sex-specific terms" that constitute discrimination because of sex and sexual orientation in violation of Title IX. *See, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-82 (1998) (distinguishing "simple teasing" from conduct that creates a hostile environment); *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 874 (9th Cir. 2001) (concluding that vulgar name-calling cast in female terms was "because of sex"); *Videckis v. Pepperdine Univ.*, 150 F. Supp. 3d 1151, 1160 (C.D. Cal. 2015) (holding that plaintiffs stated claim for discrimination where school treated them differently due to their perceived lack of conformity with gender stereotypes). Plaintiffs' "sex need not be the sole or primary cause" of their mistreatment under the "but for" standard. *See Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1734 (2020). Thus, Plaintiffs have sufficiently stated Title IX claims on the basis of sex.[16]

---

[16] Title VII jurisprudence is instructive in construing Title IX cases. *See, e.g.*, *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 853 (9th Cir. 2014) (affirming judgment for plaintiff-student-athletes on Title IX claims where district court had "[b]orrow[ed] from 'Title VII cases to define Title IX's applicable legal standards'").

Further, USF's "equal opportunity harassers" defense—that the Coach Defendants treated males and females equally badly—has been uniformly rejected by the Supreme Court and the Ninth Circuit. *See, e.g., Bostock*, 140 S. Ct. at 1741, 1742-43 (noting it is not a defense "for an employer to say it discriminates against both men and women because of sex" but instead it doubles the liability); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463-64 (9th Cir. 1994) (harassing language directed at men cannot "cure" improper conduct toward women).  USF's citation to *Jennings v. Univ. of North Carolina*, is likewise misguided and actually supports Plaintiffs' position. *See Jennings v. Univ. of North Carolina*, 482 F.3d 686, 698-99 (4th Cir. 2007) (holding that plaintiff met burden, at summary judgment, where the evidence showed the coach's severe and pervasive verbal sexual abuse deprived her of access to education opportunities or benefits in violation of Title IX). Indeed, Plaintiffs' allegations do not undermine their claims against USF, but instead show how pervasive Defendants' misconduct was.

### B.    Plaintiffs plausibly allege USF was deliberately indifferent and had actual knowledge.

Plaintiffs sufficiently allege USF is liable under Title IX for either its deliberate indifference to abuse, actual knowledge of abuse, or both. First, Plaintiffs plausibly allege that USF's failure to remedy the Coach Defendants' misconduct and failure to even respond to complaints amounted to an official policy of deliberate indifference to sexual abuse, which created a heightened risk of sexual abuse that was known or obvious. FAC ¶¶ 16, 145, 348, 485, 493-96. This is sufficient to state a claim. *See Karasek v. Regents of the Univ. of Cal.*, 500 F. Supp. 3d 967, 977 (N.D. Cal. 2020) (holding that plaintiffs plausibly alleged general policy of deliberate indifference toward sexual misconduct on campus). Indeed, USF's failure to respond or take any meaningful action to address Plaintiffs' harms until this suit was filed reflects USF's *de facto* policy of condoning sexual abuse. *See Garcia ex rel. Marin v. Clovis Unified Sch. Dist.*, 627 F. Supp. 2d 1187, 1196 (E.D. Cal. 2009) ("[C]ourts have indicated that continuing to utilize the same response after it has been shown to be ineffective, *or not responding at all*, or utilizing a 'minimalist response' may demonstrate 'deliberate indifference.'") (emphasis added). Thus, Plaintiffs need not allege actual knowledge of a specific incident of abuse, and USF's attempt to

- 26 -

1    analogize this case to *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) fails. *See*

2    *Karasek*, 956 F.3d at 1111-13 (allegations of a school's actual knowledge is not necessary to

3    survive a motion to dismiss for a pre-harassment/assault claim); *Baylor Univ.*, 240 F.Supp.3d at

4    661 ("The Supreme Court has repeatedly explained that where the Title IX violation in question is

5    caused by an institution's discriminatory policy or custom, courts need not apply the actual notice

6    and deliberate indifference framework . . . ."); *see also id.* (finding plaintiffs plausibly alleged

7    Baylor's policy or custom of inadequately handling reports of sexual assault created a heightened

8    risk of sexual assault). Even USF's briefing on the present motion—in which it attempts to

9    downplay the Coach Defendants' misconduct as simply "boorish behavior" and "inappropriate

10   conduct . . . generally" (USF's Mot. at 13), reflects its continued deliberate indifference to serious

11   sexual misconduct.

12       Second, Plaintiffs *do* plausibly allege actual knowledge under a post-harassment/assault

13   theory. USF does not contest that Giarratano is an appropriate official for such purposes. *See*

14   *Lopez v. Regents of Univ. of Cal.*, 5 F. Supp. 3d 1106, 1122 (N.D. Cal. 2013) (actual notice is

15   satisfied where an "appropriate official possessed enough knowledge of the harassment that it

16   reasonably could have responded with remedial measures to address the kind of harassment upon

17   which plaintiff's legal claim is based"). Plaintiffs allege that Giarratano, the head coach, could

18   have responded with corrective measures but not only tolerated the sexualized environment, but

19   actively participated in it. FAC ¶¶ 6; 157; 162; 167; 175-76, 184-88; 193-94; 216, 487.  In fact,

20   Giarratano acknowledged: "We could get fired for this." *Id.* ¶ 176. That alone satisfies any actual

21   knowledge requirement.

22       Plaintiffs also plausibly allege that USF's then-Athletic Director and assistant Athletic

23   Director knew or otherwise had notice. *See, e.g.*, FAC ¶¶ 10; 145-47, 379-80, 456, 488-90 (no

24   response after Doe 6's parents complained of a hostile environment to USF Associate Athletic

25   Director (and the NCAA FAR)); 212-14, 222, 503-04 (no response after Doe 1's mother left

26   voicemails to the Athletic Director regarding hostile culture, abuse, and sexual misconduct); 245,

27   248, 491 (no response to Doe 2's parents' urgent meeting request; Athletic Director spoke with

28   Doe 2 regarding his reasons for leaving and implied Coach Defendants' terminations but later

- 27 -

1    protected, and even lauded, Giarratano); 461, 502 (Doe 8's father met with the Athletic Director

2    about the mistreatment of his son and USF did nothing).

3        Again, USF's reliance on *Gebser* is unavailing. Although *Gebser* notes that "actual notice

4    requires more than a simple report of inappropriate conduct by a teacher . . . the actual notice

5    standard does not set the bar so high that a school district is not put on notice until it receives a

6    clearly credible report of sexual abuse from the plaintiff-student." *Escue v. N. OK College*, 450

7    F.3d 1146, 1154 (10th Cir. 2006) (citing *Gebser*).  Likewise, USF's reliance on *Lopez*, 5 F. Supp.

8    3d 1106, is misplaced, because unlike here, the plaintiffs there failed to allege the student

9    informed school officials of sexual harassment incidents. *Id.* at 1123. Here, Plaintiffs plausibly

10   allege that USF knew and failed to address their abuse and that USF's actions and inactions are

11   plainly unreasonable in light of the circumstances. That constitutes deliberate indifference of the

12   abuse suffered by Plaintiffs, and is sufficient to state a claim under Title IX.

13       **C.    Plaintiffs plausibly allege violations of Title IX for retaliation against USF
              where Plaintiffs engaged in a "protected activity."**

14

15       Plaintiffs plausibly allege retaliation. To state a claim for retaliation under Title IX, plaintiff

16   must allege he engaged in a protected activity, suffered an adverse action, and a causal link

17   between the two. *Ollier*, 768 F.3d at 867.[17] Here, at the motion to dismiss stage and without the

18   benefit of discovery, USF argues no such protected activity occurred because not every Plaintiff

19   filed a formal complaint.[18] However, no such requirement exists. It is protected activity to protest

20   or otherwise oppose unlawful discrimination, and even "speak[ing] out against sex discrimination

21   . . . is protected activity. *Emeldi v. Univ. of Or.*, 698 F.3d 715, 725 (9th Cir. 2012), *see also Burch*

22   *v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1126 (E.D. Cal. 2006) ("Significantly,

23

24   [17] USF argues that *Ollier* supports its view that Does 1, 2, and 6's protected activities are
     insufficient to support other Does' retaliation claims. However, this misconstrues Plaintiffs'

25   retaliation claim and limits protected activities to formal complaints. Does need not fall within the
     "zone of interests" of the protected activities of Does 1, 2, and 6 because Plaintiffs allege they

26   themselves engaged in oppositional activities and were retaliated against by Defendants. As set
     forth above, this constitutes protected activity under Title IX.

27   [18] USF cites to *Emeldi*, 698 F.3d 715, but *Emeldi* was decided on summary judgment, and even in
     that context the court noted that "[t]he requisite degree of proof necessary. . . is minimal . . . and

28   does not even need to rise to the level of a preponderance of the evidence." *Id.* at 724.

complaining informally to a supervisor is a protected activity, as is complaining about the discriminatory treatment of others.").

Plaintiffs allege that they engaged in the protected activity by complaining about their abuse. FAC ¶ 498. Plaintiffs also allege that their failure to participate in the hostile, sexualized environment that the Coach Defendants built and USF tolerated was viewed as and akin to protest and opposition to Defendants' misconduct, causing Defendants to bully each Plaintiff into leaving USF. *Id.* ¶¶ 8, 163-65, 174, 193, 507-08. Additionally, each Plaintiff alleges such protest and opposition, formal and informal. *Id.* ¶¶ 208, 212, 234, 243, 263, 284, 289, 301, 336, 351, 379, 386-87, 408, 419, 425, 437-38.  This is sufficient to state a claim for retaliation. *See, e.g.*, *Lindsey v. Clatskanie People's Util. Dist.*, 140 F. Supp. 3d 1077, 1087 (D. Or. 2015) (refusing to carry out or participate in defendants' alleged discrimination policy was protected activity) (citing numerous cases of informal opposition to perceived discrimination). Plaintiffs have therefore far exceeded the low bar for stating retaliation claims against USF, and its motion to dismiss must be denied.

**VI.    Plaintiffs adequately allege California statutory claims.**

**A.    Plaintiffs adequately allege discrimination claims under the California Equity in Higher Education Act, Cal. Edu. Code § 66270 because the claims are governed by the same elements as Title IX claims.**

For the same reasons their Title IX claims survive, Plaintiffs also plausibly allege claims for discrimination under California's Equity in Higher Education Act in Count V. *See Videckis v. Pepperdine Univ.*, 100 F. Supp. 3d 927, 935 (C.D. Cal. 2015) ("Plaintiffs' claims . . . are governed by the same elements as a federal cause of action under Title IX.").

**B.    Plaintiffs adequately allege a claim under the California Equity in Higher Education Act, Cal. Educ. Code § 66281.5 because the section supports a private cause of action.**

USF argues that Count VI must be dismissed because Cal. Gov. Code § 66281.5 merely contains a statement of legislative intent. USF Mot. at 18. However, it then (accurately) states that "[c]ourts have held that this section *does* support a separate cause of action for discrimination." *Id.* (emphasis added); *see also Aguilar v. Corral*, No. CIVS 07-1601, 2007 WL 2947557, at *4 (E.D. Cal. Oct. 9, 2007) (granting leave to plaintiff "to amend her complaint to state a claim

- 29 -

pursuant to section 66281.5"). The purpose of the section "is to provide notification of the prohibition against sexual harassment as a form of sexual discrimination and to provide notification of available remedies." Cal. Gov. Code § 66281.5(a). Plaintiffs allege that USF failed to adopt and implement appropriate policies and procedures to prevent, or properly respond to the abuse Plaintiffs suffered. FAC ¶¶ 143, 496. The Court may further infer that the USF did not adhere to all parts of Cal. Gov. Code § 66281.5(b)-(g) because, for example, players were unsure whether the abuse was in violation of the law, but all agreed it was not normal. FAC ¶ 190. Plaintiffs have thus plausibly pled this claim, but if this Court is inclined to dismiss it, Plaintiffs request leave to amend.

## VII.   Plaintiffs adequately allege negligence claims against all Defendants.

### A.   Plaintiffs plausibly allege negligence claims against the NCAA.

The NCAA has long known its coaches wield power over student-athletes that allows those coaches who are sexual predators to groom, sexually harass, and abuse NCAA student-athletes with impunity. While many other sports-governing bodies adopted polices prohibiting sexual contact between coaches and athletes since at least the 1990s, the NCAA deliberately chose not to enact any such rules. And now, the NCAA baldly asserts it owes no duty to protect student-athletes—despite its express promises to do just that, and despite promulgation of hundreds of pages of rules that regulate the lives of coaches and student-athletes in countless ways. The NCAA is wrong.

#### 1.   California law applies to the negligence claims against the NCAA.

There is no conflict in the laws of Indiana or California regarding the existence of a duty for purposes of the choice of law analysis. As the NCAA points out, each state's test has a different number of factors (NCAA Mot. at 21-22), but both states balance foreseeability, the parties' relationship, and various public policy considerations. *Rowland v. Christian*, 69 Cal. 2d 108, 112-13 (1968); *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991); *see also Castaneda v. Olsher*, 41 Cal. 4th 1205, 1214 (2007) ("the balance of burdens and foreseeability is generally primary to the analysis"). Thus, there is no conflict on the question of duty, and the law of the forum, California, applies. *See Parrish v. Nat'l Football League Players Inc.*, No. C 07-00943, 2007 WL 1624601

1    (N.D. Cal. June 4, 2007) ("When there is no true conflict of laws, the forum may apply its own

2    law" (citing *Ins. Co. of N. Am. v. Fed. Express Corp.*, 189 F.3d 914, 921 (9th Cir. 1999)).

3         Should this Court perceive a conflict and undertake a comparison of the states' laws, then

4    California's interest in seeing its law applied far outweighs Indiana's, especially where there is a

5    presumption that California law applies. *Marsh v. Burrell,* 805 F. Supp. 1493, 1496 (N.D. Cal.

6    1992). The majority of the complained-of conduct occurred in California, injuring students who

7    chose to attend a California school, most of whom then and now are California residents.

8    California has a strong interest in protecting its youth and in regulating conduct which occurred

9    within its borders. *See McCann v. Foster Wheeler LLC,* 48 Cal. 4th 68, 97-98 (2010) (citing cases

10   for the proposition that California choice-of-law rules "recognize that a jurisdiction ordinarily has

11   'the predominant interest' in regulating conduct that occurs within its borders" but applying

12   Oklahoma law because the injuries occurred in Oklahoma). Indiana's interest, on the other hand,

13   is marginal. Other than the fact that the NCAA is headquartered in Indiana—from which its

14   policies have a *national* reach, including affecting the 57 NCAA member institutions *in*

15   *California*[19]—there are no allegations that any relevant events occurred in Indiana.[20] Thus, the

16   NCAA cannot meet its burden to establish that the application of Indiana law will "significantly

17   advance the interests of the foreign state," *Strassberg v. New England Mut. Life Ins. Co.*, 575 F.2d

18   1262, 1264 (9th Cir. 1978), especially if Indiana law, according to the NCAA, would leave

19   Plaintiffs without a remedy. *See Shaw v. LDC Enters.*, 863 N.E.2d 424, 433 (Ind. Ct. App. 2007)

20   (Indiana will not apply another state's law if plaintiff would be without a remedy).

21                           **2.       The NCAA owed Plaintiffs a duty of care based on its special
                                        relationship with the foreseeable victims of coach misconduct.**

22
23        Under California law, a duty to protect a plaintiff from the conduct of third parties can be

24   imposed pursuant to the "special relationship" doctrine. *Regents of Univ. of California v. Superior*

25   ──────────────
26   [19] NCAA Directory, available at https://bit.ly/3F44lNU (last accessed Oct. 23, 2022); Selbin Decl.
     Ex. A.

27   [20] *Cover v. Windsor Surry Co.*, No. 14-cv-05262, 2016 WL 520991, at *7 (N.D. Cal. Feb. 10,
     2016), cited by the NCAA, supports Plaintiffs' argument because the plaintiff was from Rhode
     Island, and in applying Rhode Island law, the court recognized that "[e]very state has an interest
28   in having its law applied to its resident claimants."

1  *Court,* 4 Cal. 5th 607, 627 (2018); *Brown v. USA Taekwondo,* 11 Cal. 5th 204, 215 (2021). "[A]

2  duty to . . . protect may be found if the defendant has a special relationship with the potential

3  victim that gives the victim a right to expect protection." *Regents,* 4 Cal. 5th at 619; *see also*

4  *Brown,* 11 Cal.5th at 216.

5      In *Regents,* the court found that universities have a special relationship with their students

6  and a duty to protect them from foreseeable violence during school activities. *Id.* at 625. In

7  evaluating the question of duty, the court noted that special relationships have "an aspect of

8  dependency in which one party relies to some degree on the other for protection." *Id.* at 620. The

9  corollary to this principle is control, *i.e.*, where one party is dependent and the other has superior

10  control over the means of protection or over the plaintiff's welfare. *Id.* Another aspect of a special

11  relationship is defined boundaries such that the "duty of care [is] owed to a limited community,

12  not the public at large." *Id.* at 621. The court imposed a special relationship because "[s]tudents

13  are comparatively vulnerable and dependent on their colleges for a safe environment. Colleges

14  have a superior ability to provide that safety with respect to activities they sponsor or facilities

15  they control." *Id.* at 625.

16      These same considerations require an imposition of a limited duty on the NCAA to protect

17  its student-athletes. Vulnerable student-athletes, typically living away from home for the first

18  time, are dependent on the NCAA to make their sport a safe environment, and the NCAA is in the

19  best position to ensure that it is. FAC ¶ 3. In fact, the NCAA promises to protect the health and

20  welfare of student athletes (FAC ¶¶ 1-3), and has promulgated extensive rules to do so, such as

21  rules governing practice hours, drug testing, and ability to transfer.[21] Given the NCAA's role as

22  the governing body and its promises to protect them, it is objectively reasonable for student-

23  athletes to expect that the NCAA would protect them from harm inflicted by NCAA coaches. The

24

25

26

---

27  [21] FAC ¶ 346 & n.131 (NCAA sanctioned USF's baseball team for too much off season practice
during Doe 5's tenure); ¶¶ 261 & n.128, 383 (Does 3 and 6 were drug tested); ¶¶ 261 & n.128,

28  383 (Does 3 and 6 were drug tested); ¶¶ 217, 295-96, 330, 428 & n. 132 (Does 1, 10, 12, and 9
were negatively impacted by the NCAA's transfer rules).

student-athletes' reasonable belief that the NCAA has a duty to protect them is further evidenced in Doe 6's parents' complaints to the NCAA FAR at USF.[22]

Courts consistently find that resolving whether the NCAA *in particular* had a duty to protect student-athletes is not appropriate on a motion to dismiss. *See Hill v. Slippery Rock Univ.,* 138 A.3d 673, 679 (Pa. Super. Ct. 2016) (reversing trial court's decision and finding plaintiffs sufficiently alleged duty on the part of NCAA to withstand a motion to dismiss); *Langston v. Mid-Am. Intercollegiate Athletics Ass'n*, 448 F. Supp. 3d 938, 949-50 (N.D. Ill. 2020) (denying NCAA's motion to dismiss negligence claim); *Greiber v. Nat. Collegiate Athletic Ass'n*, No. 600400/17, 2017 WL 6940498, at *5 (N.Y. Sup. Ct. Sept. 5, 2017) (same); *Schmitz v. NCAA*, 67 N.E.3d 852, 867 (Ohio Ct. App. 2016) (same), *aff'd* 122 N.E.3d 80 (Ohio 2018); *Bradley v. NCAA.*, No. 16-346 (D.D.C. April 12, 2017) (Dkt. No. 36, pp.21-22) (same).

Relying on Indiana law, the NCAA asserts that it did not assume any duty to Plaintiffs and points to *Lanni v. NCAA*, 42 N.E.3d 542 (Ind. Ct. App. 2015). NCAA Mot at 27-28. In *Lanni,* however, the court granted the NCAA's motion for summary judgment after development of the factual record, whereas no such development has occurred here. Further, that case is distinctly different because the injury at issue was a random accident that occurred while plaintiff was watching a fencing bout. Here, and in the above-cited cases, there are allegations of the NCAA's extensive and long-standing knowledge, study, and documentation of the risk of harm to student-athletes at the hands of coaches, its failure to respond in light of that knowledge, and the student-athletes' dependency. FAC ¶¶ 66, 109. Plaintiffs plausibly allege the NCAA owed them a duty based on its special relationship with them as student-athletes.

### 3. The NCAA owed Plaintiffs a duty of care based on its special relationship with the coaches—the perpetrators of the misconduct.

A duty of care also exists because the NCAA has a special relationship with and is in the best position to control coaches' conduct toward student-athletes. "A duty to control, warn, or protect may be based on the defendant's relationship with the person whose conduct needs to be

---

[22] FAC ¶¶ 378-79, 456. Regardless of the FAR's legal status as the NCAA's agent, Doe 6's parents believed that the FAR had the ability to stop the coaches' abuse. *Id.*

1    controlled . . . ." *Regents of Univ. of Cal.*, 4 Cal. 5th at 619. "[A] duty to control may arise if the

2    defendant has a special relationship with the foreseeably dangerous person that entails an ability

3    to control that person's conduct." *Id.* "The existence of such a special relationship puts the

4    defendant in a unique position to protect the plaintiff from injury." *Brown*, 11 Cal. 5th at 216.

5           In *Brown*, the court affirmed the lower court's finding that USA Taekwondo ("USAT")

6    owed a duty to plaintiffs who were sexually abused by a coach under USAT's control. *Id.* at 222.

7    The court agreed that USAT had the ability to control its coaches as demonstrated by the fact that

8    the abuser was a registered coach with USAT, USAT took disciplinary action against him, and

9    USAT ultimately barred him from coaching. *Id.* at 211. After reaching this conclusion, the court

10   also agreed with the lower court's determination that the *Rowland* factors (discussed, *infra*) did

11   not limit USAT's duty of care to plaintiffs. *Id.* at 222.

12          Here, as in *Brown*, the NCAA is in the best position to protect against the risk of harm to

13   NCAA student-athletes by its coaches because it can and does regulate the conduct of NCAA

14   coaches in a myriad of ways. The NCAA's Bylaws prohibit all types of conduct for coaches,

15   proscribing activities such as sports wagering and supplying banned substances and imposing

16   disciplinary or corrective action for violations. FAC ¶¶ 94-95 (citing NCAA Bylaws). To ensure

17   compliance, the NCAA employs a 60-member enforcement staff, and has sanctioned coaches

18   following investigations. *Id.* ¶ 126. Because the NCAA has the ability to control the conduct of

19   NCAA coaches, and because it can and does sanction and penalize them, a special relationship

20   exists that imposes a duty on the NCAA to protect its student-athletes from abusive coaches.

21          Relying on Indiana law, the NCAA points to *Yost v. Wabash Coll.,* 3 N.E.3d 509 (Ind.

22   2014) (NCAA Mem. at 17), yet another case decided on summary judgment. *Id.* at 520. There, the

23   court declined to find a duty on the part of the fraternity to a plaintiff who was injured during a

24   hazing incident because "[t]he national fraternity lacked any direct oversight and control of the

25   individual fraternity members." *Id.* at 521. Here, as Plaintiffs allege, the relationship between the

26   NCAA and its members and coaches is dramatically different: the NCAA can and does control

27   the conduct of its coaches. Plaintiffs plausibly allege the NCAA owed Plaintiffs a duty based on

28   its special relationship with the Coach Defendants.

                                                    - 34 -

**4.      The Rowland factors support the NCAA's duty of care.**

When deciding whether to impose a duty of care based on either or both of the special

relationships identified above, a court must also consider the *Rowland* factors. *Brown,* 11 Cal. 5th

at 222. Those factors evaluate "the foreseeability of harm to the plaintiff, the degree of certainty

that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct

and the injury suffered, the moral blame attached to the defendant's conduct, the policy of

preventing future harm, the extent of the burden to the defendant and consequences to the

community of imposing a duty to exercise care with resulting liability for breach, and the

availability, cost, and prevalence of insurance for the risk involved." *Rowland*, 69 Cal. 2d at 112-

13. "In considering [the *Rowland* factors], [courts] determine 'not whether they support an

exception to the general duty of reasonable care on the facts of the particular case before us, but

whether carving out an entire category of cases from that general duty rule is justified by clear

considerations of policy." *Brown*, 11 Cal. 5th at 221.

Here, the first three *Rowland* foreseeability factors support imposition of a duty because

harm to NCAA student-athletes due to coaches' sexual misconduct is foreseeable given the

coaches' power over student-athletes. FAC ¶¶ 5, 54-77. Had the NCAA imposed measures to

train, report, and monitor coaches, Plaintiffs' injuries would have been prevented or

substantially reduced. FAC ¶¶ 82, 86, 563-68. The *Rowland* public policy factor also supports a

duty here because it expressly considers the moral blame attached to the defendant's conduct.

*See Regents of Univ. of Cal.*, 4 Cal. 5th at 631 ("Some measure of *moral blame* does attach to a

university's negligent failure to prevent violence against its students.") (emphasis original);

*Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1091 (2017) ("[I]f there were reasonable

ameliorative steps the defendant could have taken, there can be moral blame attached to the

defendants' failure to take steps to avert the foreseeable harm."). Here, even the NCAA's

President has conceded that its failure to protect its student-athletes violates a moral code,

testifying the NCAA has "a clear, moral obligation to make sure that we do everything we can to

support and protect student-athletes." FAC ¶¶ 1, 92.

The next two applicable *Rowland* factors consider the policy of preventing future harm, the burden on defendant to do so, and the consequences to the community of imposing a duty to exercise care. Here, imposing a duty on NCAA to protect student-athletes from coaches is a worthwhile and limited one, encompassing a narrow subset of individuals. Any burden on the NCAA is outweighed by the benefit to NCAA students-athletes as a whole. *Brown v. USA Taekwondo*, 40 Cal. App. 5th 1077, 1100 (2019) ("the societal goal of safeguarding youth athletes from sexual abuse weighs in favor of imposing a duty on USAT to implement and enforce policies and procedures to protect the athletes"), *aff'd*, 11 Cal. 5th at 204. These final factors confirm the propriety of imposing a duty on the NCAA. Thus, Plaintiffs have established the NCAA owed them a duty of care.

### B.      The NCAA voluntarily assumed its duty.

A duty of care must also be imposed for a separate and independent reason: the NCAA expressly undertook a duty to protect its student-athletes. "[O]ne who undertakes to aid another is under a duty to exercise due care in acting and is liable if the failure to do so increases the harm or if the harm is suffered because the other relied on the undertaking." *Paz v. California*, 22 Cal. 4th 550, 558 (2000). The NCAA's undertaking to protect its student-athletes is based on the NCAA's own pledges. The NCAA's promise to its student-athletes is contained in its Constitution and Bylaws (the "Manual"), where it vows that "athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes." FAC ¶ 90. Its website trumpets this promise to provide a safe environment for student-athletes. *Id.* ¶ 87. And NCAA President and Board Member Mark Emmert reiterated that promise before the U.S. Senate. *Id.* ¶¶ 1, 92. Under these facts, the NCAA voluntarily or gratuitously assumed a duty of care to Plaintiffs, and the NCAA's motion to dismiss must be denied. *See Langston*, 448 F. Supp. 3d at 944-45 (pointing to the NCAA's website, its Constitution, and handbooks to establish a duty of care); *see also Hill,* 138 A.3d at 680 (holding plaintiffs sufficiently alleged duty by NCAA based on NCAA's "gratuitously" undertaking services); *Schmitz*, 67 N.E.3d at 867 (same). Thus, Plaintiffs' negligence claims against the NCAA at Counts VIII and XIX should not be dismissed.

1

**C.      Plaintiffs sufficiently allege negligence by USF and Nakamura.[23]**

2       USF does not dispute that it owes a duty to students who are harmed by the negligence or

3   intentional conduct of supervisory or administrative personnel but contends that Plaintiffs'

4   negligence claim must be dismissed because the Coach Defendants' actions were not

5   foreseeable to USF. USF Mot. at 17. In examining foreseeability, the court's task is not to

6   decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular

7   defendant's conduct, but rather to evaluate more generally whether the category of negligent

8   conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may

9   appropriately be imposed. *Regents*, 4 Cal. 5th at 629 (quotations and citation omitted). Plaintiffs

10   allege that it has been known that for decades that student-athletes are at risk for sexual

11   harassment, exploitation, and mental abuse by coaches because of the power imbalance. FAC ¶¶

12   54-67. Thus, the Coach Defendants' actions were not only foreseeable, but USF had actual

13   notice of their improper conduct by way of the 2014 complaint from Doe 6's parents (*id.* ¶¶

14   378-79), and the disproportionately high transfer rates since Giarratano became head coach. *Id.*

15   ¶¶ 198-203. Thus, Plaintiffs have plausibly pled foreseeability. *Regents of Univ. of Cal.*, 4 Cal.

16   5th at 633 (finding that a violent student in the classroom was foreseeable); *Ratcliff v. The*

17   *Roman Catholic Archbishop of L.A.*, 79 Cal. App. 5th 982, 1009 (2022) (the complaint

18   sufficiently alleges that the Archdiocese knew or should have known of the priests dangerous

19   and exploitive propensities and that he was an unfit agent) (cited by USF).

20       Nakamura challenges Plaintiffs' negligence claim in Count VIII, arguing that even if he

21   did breach a legal duty, Plaintiffs "do not allege this breach threatened physical injury or caused

22   them to reasonably fear for their physical safety." Nakamura Mot. at 22. While Plaintiffs dispute

23   this standard, they do allege physical injuries caused by the Coach Defendants' improper

24   actions. FAC ¶¶ 209-210, 244, 346-47, 374, 435. Plaintiffs also adequately allege emotional

25   injuries to support their claims. "[T]o recover damages for emotional distress on a claim of

26   negligence where there is no accompanying personal, physical injury, the plaintiff must show

27

28   ---
[23] Giarratano does not move to dismiss Plaintiffs' negligence claim against him in Count VIII.

that the emotional distress was 'serious.'" *Belen v. Ryan Seacrest Prods., LLC*, 65 Cal. App. 5th 1145, 1166, 280 Cal. Rptr. 3d 662 (2021) (citation and internal quotations omitted). Here, as a result of the Coach Defendants' sexual misconduct, many of the Plaintiffs suffered from anxiety (FAC ¶¶ 229, 333, 360, 395, 411, 441), stress (*id.* ¶¶ 243-44, 262, 280, 440), lack of sleep (*id.* ¶¶ 262, 395), depression (*id.* ¶¶ 262, 291, 306, 333, 352, 360, 396, 398, 408, 411-12, 424, 440), trauma (*id.* ¶¶ 308, 333, 366), and suicidal ideation. *Id.* ¶¶ 352, 408, 411. The above, coupled with the allegations of physical injuries, are sufficient to state a claim of negligence against the Coach Defendants. *See Kelly-Zurian v. Wohl Shoe Co.,* 22 Cal. App. 4th 397, 410 (1994) (judgment affirmed where there was substantial evidence of significant emotional distress where plaintiff suffered from panic attacks consisting of anxiety, tightness in the chest and heart palpitations, depression, sleeplessness, PTSD, and nightmares); *Saari v. Jongordon Corp.*, 5 Cal. App. 4th 797, 806 (1992) (sufficient evidence to support jury verdict for emotional distress where mother was shaking, crying, nervous, and depressed).  Plaintiffs plausibly allege injuries as a result of the Coach Defendants' actions.

Accordingly, plausibly allege negligence claims against USF and Nakamura.

**VIII.   Plaintiffs adequately allege gross negligence against all Defendants.[24]**

Plaintiffs allege extreme conduct on the part of the Coach Defendants and vicarious liability on the part of the NCAA and USF sufficient to support Plaintiffs' gross negligence claims in Counts VII and XVIII.[25]

USF claims that Plaintiffs fail to allege "extreme" conduct on its part, citing *Rosencrans v. Dover Images, Ltd.*, 192 Cal. App. 4th 1072, 1082 (2011). USF Mot. at 19. Yet *Rosencrans* confirms that conduct rising to the level of "either a want of even scant care or an extreme departure from the ordinary standard of conduct" is sufficient to state such a claim, and that such are questions to be resolved at trial. *Id.* at 1082, 1088 (cleaned up). *See also Jimenez v. 24 Hour Fitness USA, Inc.*, 237 Cal. App. 4th 546, 555 (2015) (gross negligence is generally a question of

---

[24] The NCAA does not contest Plaintiffs' gross negligence claim outside of its negligence arguments which, as shown above, are without merit.
[25] Vicarious liability is addressed in Section XIV, *infra*.

fact; citing cases). Thus, in analogous cases, courts have found that dismissal of such claims is improper. *See, e.g.*, *Mayall v. USA Water Polo, Inc.*, 909 F.3d 1055, 1068 (9th Cir. 2018) ("USA Water Polo's inaction in the face of substantial evidence of risk of harm, constitutes 'an extreme departure from the ordinary standard of conduct,' and amounts to gross negligence under California law.").

Taking a different tack, the Coach Defendants argue that California law does not support an independent claim for gross negligence. Giarratano Mot. at 7-8; Nakamura Mot. at 13. First, California law does recognize such a claim as evidenced by the above cases. *See, e.g., Mayall*, 909 F.3d at 1068 ("California law defines 'gross negligence' as 'either a 'want of even scant care' or 'an extreme departure from the ordinary standard of conduct.'"). Second, none of the cases cited by the Coach Defendants involved the dismissal of the gross negligence claims without an examination as to whether the requisite outrageous conduct was pled. *See, e.g., Grappo v. McMills,* 11 Cal. App. 5th 996, 1015 (2017) (holding that "an extreme departure from the ordinary standard of conduct . . . is not alleged here"). In fact, *Eriksson v. Nunnink supports* Plaintiffs' position. There, the court confirmed the existence of a duty and triable issues as to whether the defendant-coaches' conduct was grossly negligent. 191 Cal. App. 4th 826, 857 (2011). The motion to dismiss should be denied.

## IX.    Plaintiffs adequately allege a fiduciary relationship with the NCAA.

Under California law, a fiduciary relationship is "any relation existing between parties to a transaction wherein one of the parties is [] duty bound to act with the utmost good faith for the benefit of the other party." *Wolf v. Superior Court*, 107 Cal. App. 4th 25, 29 (2003). Plaintiffs allege that NCAA owed them a fiduciary duty based on the special relationship that exists between the NCAA and its student-athletes, as described above. FAC ¶ 596. Again, the NCAA actively promoted itself as providing a safe environment for its student-athletes and intended that student-athletes rely on this promise. *Id.* ¶¶ 596-97. Plaintiffs allege this special relationship is fiduciary in nature because the NCAA is in the best position to protect against the risk of harm, and student-athletes depend on it to do so. *Id.* ¶¶ 597-98. Because this "special relationship" is fiduciary in nature, the NCAA is duty bound to act for the benefit of its student

athletes to protect them from the coaches' sexual misconduct. *See Nat'l Union Fire Ins. Co. v. Shores*, No. 1:19-cv-01113, 2020 WL 2937801, at *6-7 (E.D. Cal. June 3, 2020) (at the pleading stage, plaintiff-employee stated a claim for breach of fiduciary duty against her manager); *James v. Childtime Childcare, Inc.* No. S-06-2676, 2007 WL 1589543, at *3 (E.D. Cal. June 1, 2007) (at the pleading stage, an employer alleged a breach of fiduciary duty claim against its employee).[26] Here, based on the NCAA's promises in its governing documents, its website and its president's own words, Plaintiffs plausibly allege facts sufficient to show a fiduciary relationship to support Counts XIII and XX.

## X.    Plaintiffs adequately allege negligent misrepresentations and omissions claims against the NCAA.

The NCAA argues that Plaintiffs' claim for negligent misrepresentations and omissions in Counts XIV and XXI must be dismissed because Indiana does not recognize negligent misrepresentation claims outside of the context of professionals or an employer/employee relationship, and even if it did, Plaintiffs have not identified any affirmative misrepresentations by the NCAA. NCAA Mot. at 28-29. First, Plaintiffs specifically allege that the NCAA concealed various facts, including that "[t]he power differential between coaches and trainers and student-athletes makes student-athletes more vulnerable to sexual harassment; physical, sexual, or psychological abuse; and molestation." FAC ¶ 606.a. Second, even accepting the NCAA's argument that a conflict of laws exists where Indiana only recognizes a duty in limited circumstances, a conflicts analysis shows that California has the stronger interest in applying its laws where California "has long manifested a strong public policy of protecting the interests of its youth." *Kulko v. Superior Court of Cal.*, 436 U.S. 84, 100 (1978); *see also Scott v. Superior Court*, 156 Cal. App. 3d 577, 583 (1984) (applying California law). Moreover, California courts

---

[26] In an attempt to disavow its duty, the NCAA relies on *Schmitz v. NCAA*. However, *Schmitz* held plaintiff had not pled facts with the particularity required to support a constructive fraud claim under Ohio or Indiana law. 67 N.E.3d at 870. Here, Plaintiffs have not pled a constructive fraud claim under Ohio or Indiana law. The NCAA's citation to *Flood v. NCAA*, No. 1:15-CV-890, 2015 WL 5785801 (M.D. Pa. Aug. 26, 2015), *report and recommendation adopted*, 2015 WL 5783373 (M.D. Pa. Sept. 30, 2015), is even more removed. There, plaintiff was not a student-athlete, but a Penn State football fan who attempted to bring *pro se* claims on behalf of Penn State football players. Not surprisingly, the court found that a football fan did not have standing to sue the NCAA on behalf of football players. *Flood*, 2015 WL 5785801, at *4-5.

apply the duty of care "more broadly when physical safety is involved." *Garcia v. Superior Court*, 50 Cal. 3d 728, 735 (1990). Under California law, "[o]ne who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results . . . to the other." *Id.* For the reasons set forth above, Plaintiffs sufficiently allege the existence of a duty on the part of NCAA to protect student-athletes, and that the NCAA concealed facts and material information. FAC ¶ 205. Plaintiffs sufficiently allege that NCAA was aware of the risk to student-athletes of sexual misconduct by coaches and concealed this information from Plaintiffs. This is sufficient to allege a plausible claim of negligent misrepresentations and omissions.

## XI.    Plaintiffs adequately allege negligent supervision and retention.

### A.    Plaintiffs plausibly allege facts demonstrating that the Coach Defendants are agents of the NCAA.

Citing Indiana law, the NCAA contends that the negligent supervision and retention claims (Counts III and IV) must be dismissed for lack of an agency or employment relationship between the NCAA and the Coach Defendants. NCAA Mot. at 29. Because both Indiana and California law apply negligent supervision and retention claims to agents and servants, there is no conflict in the laws and California law should apply, *Tindall v. Enderle*, 320 N.E.2d 764, 766 (Ind. Ct. App. 1974); *Juarez v. Boy Scouts of Am., Inc*., 81 Cal. App. 4th 377, 395 (2000), *rev'd on other grounds sub nom. Brown,* 11 Cal. 5th 204 (2021).

California looks to the Restatement (Second) of Agency § 213. *Sills v. Siller*, 218 Cal. App. 2d 735, 739 (1963). The Restatement provides that "[a] person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless . . . in failing to make proper regulations; or . . . in the supervision of the activity; or . . . in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control." A "servant" is "used to distinguish a group of persons for whose physical conduct the master is responsible to third persons." Restatement (Second) of Agency § 2, *comment.* Under California law, the "the primary right of control is particularly persuasive." *APSB Bancorp v. Thorton Grant*, 26 Cal. App.

4th 926, 932 (1994). Here, Plaintiffs have plausibly pled that NCAA coaches are servants of the NCAA because the NCAA has the ability and does control the coaches' conduct, and subjects those coaches to disciplinary or corrective action (FAC ¶¶ 93-94, 124), including these specific Coach Defendants. *Id.* ¶ 346. Thus, because the NCAA can and does control coaches, and can and did control the Coach Defendants, Plaintiffs plausibly allege negligent supervision and retention by the NCAA. *See, e.g., Gaston v. Doe 1*, No. 20STCV29802, 2021 Cal. Super. LEXIS 55402, *16 (Cal. Super. July 23, 2021) (not available on Westlaw) (denying motion to dismiss where plaintiff alleged the American Horse Shows Association had practical control over coaches and members at equestrian events, controlled event access, and required all athletes and coaches to sign entry forms; failed to supervise the abuser; and was on notice of the abuser's sexual misconduct). *See also C.A. v. William S. Hart Union High Sch. Dist.,* 53 Cal. 4th 861, 879 (2012) (reversing trial court's dismissal and finding that a school district may be vicariously liable for the negligence of administrators or supervisors in hiring, supervising and retaining a school employee who sexually harasses and abuses a student); *S.G. v. S.F. Unified Sch. Dist*., No. 17-cv-05678-EMC, 2018 WL 1876875, at *8 (N.D. Cal. Apr. 19, 2018) (denying motion to dismiss school district where student was sexually abused by a teacher).

**B.     Plaintiffs adequately allege claims against USF for negligent supervision and retention of the Coach Defendants[27] and negligent failure to warn.[28]**

USF moves to dismiss the negligent supervision and retention and negligent failure to warn claims in counts III, IV, and VIII, arguing that Plaintiffs failed to allege that the harm they suffered was foreseeable by USF because "[P]laintiffs fail to allege any complaint was ever made regarding misconduct by the coaches." USF Mot. at 17.  Yet Plaintiffs allege that in 2014, Doe 6's parents sent an email to USF's Associate Athletic Director as well as the NCAA FAR, complaining of, among other things, a "hostile environment" in the baseball program (FAC ¶¶ 378-79), and in May 2021, Doe 2's mother sent an email to USF Athletic Director requesting an

---

[27] Giarrantano does not move to dismiss Plaintiffs negligent supervision of Nakamura claim at Count III.

[28] The NCAA does not challenge Count IX for negligent failure to warn and train outside of the duty element which, for the reasons set out above, must fail.

urgent meeting. *Id.* ¶¶ 245, 248.[29] Moreover, Plaintiffs allege that the transfer rates of the baseball team—well in excess of the NCAA average—put USF on notice that there were serious issues, and yet USF turned a blind eye. FAC ¶¶ 198-203. This is sufficient to state a claim. *See M.D. v. Abbott*, 907 F.3d 237, 260 (5th Cir. 2018) (state was deliberately indifferent regarding caseworker's case load in light of high attrition rates); *Garcia v. Clovis Unified Sch. Dist.*, 627 F. Supp. 2d 1187, 1207 (E.D. Cal. 2009) (plaintiff plausibly pled a negligent supervision claim after school district was on notice of teacher's conduct when employee of school was informed about it); *Estate of Mejia v. United States*, No. 20-cv-2454-L-KSC, 2022 WL 3209380, at *4 (S.D. Cal. Aug. 5, 2022) (refusing to dismiss negligent supervision claim where defendants knew that medical staff could not be trusted in light of prior detainee's death); *Gaston v. Doe 1, supra,* 2021 Cal. Super. LEXIS 55402, *16 (Cal. Super. July 23, 2021) ("[a] claim for negligent supervision does not include a particularity requirement").[30]

## XII. Plaintiffs adequately allege claims for intentional infliction of emotional distress against all Defendants.[31]

"The elements of the tort of intentional infliction of emotional distress (IIED) are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991) (internal quotations and citation omitted).

---

[29] These emails are the subject of USF's request for judicial notice (Dkt. No. 69), and the emails have been provided to this Court under seal by agreement of Plaintiffs and USF.

[30] *Ratcliff*, 79 Cal. App. 5th at 1007 (2022), relied on by USF, supports Plaintiffs' position because there, the court found that plaintiffs sufficiently pled the duty of school personnel to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally.

[31] The NCAA challenges Plaintiffs' claims for intentional and negligent infliction of emotional distress at Counts X and XI under respondeat superior, addressed herein. The NCAA adds that if its conduct was intentional, it cannot also be negligent. NCAA Mot. at 36. It is well established, however, that a plaintiff may plead inconsistent facts and legal theories in alternative counts. *Lawson v. Superior Court*, 180 Cal. App. 4th 1372, 1385 n.13 (2010).

Giarrantano and USF challenge the first element of Plaintiffs' claims at Count X, arguing that Plaintiffs failed to allege "extreme and outrageous conduct." Outrageous conduct is that which exceeds all bounds usually tolerated by a decent society, of a nature which is especially calculated to cause, and does cause, mental distress. *See Wallis v. Superior Court*, 160 Cal. App. 3d 1109, 1120 (1984) (reversing dismissal of plaintiff's IIED claim where plaintiff alleged that defendant knew of his vulnerable position, intended to cause him harm by terminating monthly payments without good reason, and that plaintiff suffered emotional distress). In assessing allegations on a motion to dismiss, California courts consider if a plaintiff is in vulnerable state or position, because of age or other factors. *Id.*

Plaintiffs here were college students in a position of dependence on their coaches, who wielded immense power over their baseball careers and college life. FAC ¶¶ 3-4. As much as Giarratano would liken his behavior to the "foul-mouthed coach" in *Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 345 (6th Cir. 2020), his conduct was far more than belittling and name calling, which itself was common and pervasive, extending from 1999 until his termination in 2022. FAC ¶¶ 216, 254, 257, 303, 314, 317-18, 321-22, 345, 372, 390, 397, 405, 433, 435. Instead, Giarratano's abuse included threats of physical injury and actual physical assaults (*id.* ¶¶ 256, 435, 444), and refusal to offer resources or support when Plaintiffs were suicidal or beaten down (thereby exacerbating those emotional states). FAC ¶ 408. Giarratano also condoned and participated in Nakamura's offensive sexualized misconduct, which makes this case distinctly different than *Chisholm*.

Plaintiffs' allegations are more akin to *Howerton v. Harbin Clinic, LLC*, 776 S.E.2d 288, 302 (Ga. Ct. App. 2015), where the court found that the trial court improperly granted summary judgment on plaintiff's IIED claim where the operating room in which plaintiff worked was "overly sexual" because the doctor made lewd comments and, on one occasion, exposed his pubic hair and the top of his penis. *See also Bailey v. Unocal Corp.,* 700 F. Supp. 396, 399 (N.D. Ill. 1988) (despite Illinois' "high bar" as to what constitutes outrageous conduct, "[w]e cannot presently conclude that the alleged course of sexual harassment, with its various forms ranging from innuendo to exposure, is not extreme and outrageous"); *McDonald v. ISK Biosciences, Inc.*,

- 44 -

No. H-95-4730, 1999 WL 34590219, at *5 (S.D. Tex. June 21, 1999) ("Plaintiff has submitted sufficient evidence from which the jury could, and did, find that McGrew's conduct [of exposing himself and chasing plaintiff naked] was intended or primarily likely to produce severe emotional distress").

Plaintiffs also allege outrageous conduct on USF's part based on its failure to conduct an investigation and decision to keep the Coach Defendants on the payroll despite complaints about the Coach Defendants and the high transfer rates. FAC ¶¶ 12-14, 146, 198-203, 379-380, 445. In fact, despite its termination of Nakamura in 2021, Giarratano remained employed until this lawsuit was filed. FAC ¶ 16. Plaintiffs plausibly allege the requisite outrageous conduct.

USF and Nakamura also challenge the second element of Plaintiff's IIED claim, arguing that Plaintiffs have not shown that the emotional distress was "serious."[32] As shown above in Section VII.C, Plaintiffs' resulting anxiety, stress, lack of sleep, depression, trauma, physical manifestations of stress, and suicidal ideation are sufficiently serious to withstand dismissal. *Kelly-Zurian v. Wohl Shoe Co.,* 22 Cal. App. 4th at 410 (substantial evidence of emotional distress include anxiety, depression, and physical manifestations of stress); *Saari*, 5 Cal. App. 4th at 806 (crying, nervousness, lack of sleep over mishandling of son's ashes evidence of emotional distress). Based on the above, Plaintiffs plausibly allege claims for intentional infliction of emotional distress.

**XIII.   To the extent Plaintiffs' negligence claims survive, so do their claims for negligent infliction of emotional distress.**

Under California law, negligent infliction of emotional distress ("NIED") alleged at Count XI is a subset of negligence where a plaintiff must allege (1) the defendant engaged in negligent conduct; (2) the plaintiff suffered serious emotional distress; and (3) the defendants' negligent conduct was a cause of the serious emotional distress. *Hall v. Apollo Grp., Inc*., No. 14-cv-01404, 2014 WL 4354420, at *6 (N.D. Cal. Sept. 2, 2014). If Plaintiffs' negligence claims survive, so do

---

[32] Nakamura specifically alleges that Does 1, 3, 6, 7, 9, and 11 have not alleged serious emotional distress and so their specific claims should be dismissed. On a motion to dismiss, all inferences must be drawn in favor of Plaintiffs. *See, e.g., Zheng Liu v. Terry*, No. 21-cv-01179, 2021 WL 2688846 (N.D. Cal. June 30, 2021). Nonetheless, if this Court finds that the allegations of distress are not sufficiently severe, Plaintiffs respectfully request leave to amend.

their NIED claims. *Vago v. Cnty. of L.A.*, No. CV 13-00868, 2015 WL 10945575, at *11 n.2 (C.D. Cal. July 10, 2015). A duty to establish NIED may be imposed by law, be assumed by defendant, or exist by virtue of a special relationship. *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 985 (1993).

USF argues that Plaintiffs cannot establish they had any sort of special relationship with their school. USF Mot. at 21-22. This argument, however, flies in the face of well-established case law that a university does indeed have a special relationship with their enrolled students in curricular activities. *Regents of Univ. of Cal.*, 4 Cal. 5th at 633.

Giarratano misapprehends Plaintiffs' allegations, claiming that Plaintiffs do not allege that they were direct victims of the Coach Defendants' negligence. Giarratano Mot. at 9. Not so. Plaintiffs allege the Coach Defendants owed them a duty of care and they breached the duty which directly caused Plaintiffs' emotional distress. Contrary Giarratano's argument that there is no special relationship between a coach and athlete to establish a duty of care (Giarratano Mot. at 9-10), California courts have held that there is indeed a special relationship between school personnel and students to protect against foreseeable injury. *William S. Hart Union High Sch. Dist.*, 53 Cal. 4th at 870.

Nakamura again argues that Plaintiffs did not suffer from severe emotional distress (Nakamura Mot. at 23) which, for the reasons set out above in Section VII.C, is misplaced. Based on the above, Plaintiffs have plausibly pled claims for negligent infliction of emotional distress.

**XIV.   Plaintiffs adequately allege that the NCAA and USF are vicariously liable.**

Plaintiffs seek to hold the NCAA and USF liable under theories of *respondeat superior* in Counts VII, VIII, X-XI and ratification at Count XII.

**A.      Respondeat Superior can be applied to the NCAA.[33]**

The NCAA first contends that *respondeat superior* is inapplicable because USF, not the NCAA, employed and controlled the Coach Defendants, such that Plaintiffs cannot establish an employment or other agency relationship between the NCAA and Coaches. NCAA Mot. at 33.

---

[33] Plaintiffs agree with the NCAA that California law applies.

Even if this question were fit for resolution on a motion to dismiss, which it is not,[34] Plaintiffs plainly allege an actual or assumed agency relationship between the Coach Defendants and the NCAA. FAC ¶ 592. As discussed in Section XI.A, the NCAA exercised substantial control over material terms of the Coach Defendants' employment. The NCAA promulgates and enforces extensive policies governing the conduct of college coaches, including salary limitations; outside employment; promotion or endorsement of NCAA competitors; contact with prospective college student-athletes; use of tobacco products; and reimbursement policies. FAC ¶¶ 95, 124. Further, an agency relationship can be established on the basis of "[t]he power of the principal to terminate the services of the agent," which "[gave] him the means of controlling the agent's activities." *Malloy v. Fong*, 37 Cal. 2d 356, 370 (1951). The NCAA Bylaws provide not only that coaches may be suspended or terminated if they violate NCAA regulations, but also that any "contractual agreement or appointments between" a member institution and a coach stipulate that "[a]n individual who is found in violation of NCAA regulations shall be subject to disciplinary or corrective action as set forth in the provisions of the NCAA infractions process . . . including suspension without pay or termination of employment." FAC ¶ 94. Thus, Plaintiffs adequately allege an agency relationship.

The NCAA next argues that even assuming an agency relationship, the Coach Defendants' misconduct was outside of the scope of their employment. Under the doctrine of *respondeat superior*, an employer or principle may be held vicariously liable for torts committed by an employee or agent acting within the scope of the employment or agency relationship. *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 208 (1991). The "scope of employment has been interpreted broadly under the *respondeat superior* doctrine in California." *Myers v. Trendwest Resorts, Inc.*, 148 Cal. App. 4th 1403, 1429 (2007). Tortious conduct that disregards the employer's orders or does not benefit the employer may nonetheless fall "within the scope of employment" for purposes of *respondeat superior*, as may willful, malicious, or even criminal conduct. *Mary M.*, 54 Cal. 3d at 208.

---

[34] The "question of whether there exists an agency relationship is one of fact." *McCollum v. Friendly Hills Travel Ctr.*, 172 Cal. App. 3d 83 (Ct. App. 1985).

Here, the Coach Defendants' actions were not, as the NCAA charges, "entirely unrelated to [their] coaching duties." NCAA Mot. at 36. To the contrary, the Coach Defendants' behavior occurred during practices, during games, in the dugout, on the field, in Giarratano's office, in the locker room, in hotel rooms at away games, and during team-related activities. FAC ¶¶ 6, 157-164, 178-180, 237. In fact, there are scant allegations, if any at all, that the Coach Defendants actions did *not* occur during official team activities. *See Mary M.*, 54 Cal. 3d at 219 ("[T]he proper inquiry is not whether the wrongful act itself was authorized but whether it was committed in the course of a series of acts of the agent which were authorized by the principal.").

In *Mary M.*, the California Supreme Court held the city of Los Angeles liable when a police officer, after detaining a woman during a traffic stop, followed the woman to her home and raped her. *Id.* at 207. The court found that "[i]n view of the considerable power and authority that police officers possess, it is neither startling nor unexpected that on occasion an officer will misuse that authority by engaging in assaultive conduct." *Id.* at 217. The *Mary M.* court did not limit its analysis to tortious conduct by police alone. Instead, it focused on the authority and physical control exercised by the tortfeasor generally as being fundamental to the imposition of vicarious liability, recognizing that such authority and control "carries with it the risk of abuse," as well as the policy justifications underlying *respondeat superior. Id.*

Further, "[i]n view of the considerable power and authority" that college coaches possess over student-athletes, "it is neither startling nor unexpected that on occasion [a coach] will misuse that authority by engaging in assaultive conduct." *Id.* at 208. Thus, abuse such as alleged by Plaintiffs was foreseeable given the nature of the coach/student-athlete power disparity and the attendant risk sexual abuse that has been widely acknowledged by sporting organizations, including by the NCAA itself. FAC ¶¶ 55-56, 61-62, 109-10. *See also Morin v. Henry Mayo Newhall Mem. Hospital*, 29 Cal. App. 4th 473 (1994) (hospital could be liable under *respondeat superior* for the sexual battery committed by its ultrasound technician on a patient based on "indicia of authority" he possessed and foreseeability of abuse); *Beliveau v. Caras*, 873 F. Supp. 1393 (C.D. Cal. 1995) (denying building owner's motion to dismiss *respondeat superior* claims where the plaintiff alleged that a resident manager employed by building owner had sexually

- 48 -

assaulted her while in her apartment to repair a faucet); *Xue Lu v. Powell*, 621 F.3d 944 (9th Cir. 2010) (asylum officer acted within the course and scope of his employment when he sexually assaulted two asylum seekers); *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774 (N.D. Cal. 2016) ("foreseeability and policy rationales weigh[ed] in favor of allowing the complaint to move forward on the scope of employment question," where plaintiff plausibly alleged that an Uber driver was acting within the scope of his employment when he sexually assaulted plaintiff during a ride).

Holding the NCAA liable would also advance the policy goals underlying *respondeat superior*, which include preventing future injuries, assuring compensation to victims, and spreading the losses caused by an enterprise equitably. *Mary M.*, 54 Cal. 3d at 214-17. "Assaults of this nature are exactly why" student-athletes would expect the NCAA to promulgate rules protecting them from sexual abuse by coaches. *Uber*, 184 F. Supp. 3d at 778. In sum, this Court cannot determine that *as a matter of law* that the Coach Defendants' sexual misconduct was outside the scope of their employment or agency.

### B.   Plaintiffs adequately allege the NCAA ratified the Coach Defendants' actions.

In Count XII, Plaintiffs plausibly allege that the NCAA ratified the Coach Defendants' actions. A principal is liable to a third party harmed by an agent's conduct when the principal later ratifies the agent's conduct, including an originally unauthorized tort. *Murillo v. Rite Stuff Foods, Inc.*, 65 Cal. App. 4th 833, 852 (1998). Such ratification may occur expressly or "by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred." *C.R. v. Tenet Healthcare Corp.*, 169 Cal. App. 4th 1094, 1111 (2009), *as modified on denial of reh'g* (Feb. 3, 2009). "The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort, such as assault or battery." *Id*. at 1110. Additionally, "[w]hether an employer has ratified an employee's conduct is generally a factual question." *Id*.

The NCAA again argues, first, that Plaintiffs failed to allege a plausible relationship between the NCAA and the Coach Defendants because there was no actual or assumed agency relationship. NCAA Mot. at 37-38. For the reasons set out above, this argument lacks merit.

- 49 -

The NCAA next asserts that Plaintiffs failed to show that the NCAA knew of the Coach Defendant's misconduct. NCAA Mot. at 38. Yet, Doe 6's parents complained to the NCAA FAR about the coaches' misconduct. FAC ¶¶ 146, 379, 489. While the NCAA argues that there are no allegations that this letter was about sexual abuse as opposed to other alleged wrongful conduct, the letter suggests to the contrary as it contains phrases such as "hostile environment." *Id.* ¶ 379. *See also Murillo*, 65 Cal. App. 4th at 852 (plaintiff stated a ratification claim where she complained to a supervisor about another employee's sexual harassment, but the employer did nothing to further investigate or remedy the situation); *S.G. v. San Francisco Unified Sch. Dist.*, No. 17-CV-05678, 2018 WL 1876875, at *4 (N.D. Cal. Apr. 19, 2018) (denying school district's motion to dismiss where plaintiff alleged she had been subject to a teacher's "undue attention, stalking, and sexual abuse in plain view" of district personnel).

Even though the NCAA disputes the role of the FAR, based on Plaintiffs' allegations, the Court may draw a plausible inference that the NCAA chose not to investigate the complaint about the Coach Defendants' sexual misconduct. *C.R.*, 169 Cal. App. 4th at 1112 (finding "sufficient allegations defendant ratified Mr. Gaspar's alleged sexual misconduct" where "'managing agents and supervisors' knew Mr. Gaspar was sexually abusing patients" but still allowed him to be alone with female patients and "hid" the information so he could "work for it"). At a minimum, Plaintiffs plausibly allege that the NCAA was on notice as to the Coach Defendants' misconduct due to its agency relationship with USF, and so Plaintiffs need not demonstrate specific knowledge by the NCAA. Thus, Plaintiffs have alleged a viable ratification claim.

### C.   Plaintiffs adequately allege that USF ratified its employees' actions.

USF argues that Plaintiffs failed to allege facts that it was ever informed of the Coaches' misconduct. USF Mot. at 22. That is simply wrong:  Plaintiffs specifically allege multiple complaints. FAC ¶¶ 212, 239, 378-79. Because USF's contention is inconsistent with the alleged facts, Plaintiffs' claims for ratification against USF must stand.

### XV.   Plaintiffs adequately allege breach of contract claims against the NCAA.[35]

---

[35] Plaintiffs agree with the NCAA that California law applies to the issue of contract validity.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## A.   Plaintiffs adequately allege express and implied contract claims against the NCAA.

Plaintiffs plausibly allege the existence of valid express and implied contract claims in Counts XV-XVI and XXII-XXIII. Plaintiffs allege that, prior to participation as an NCAA athlete, each student, including each Plaintiff, was required to affirm in writing that he had read the NCAA regulations and the DI Manual, and agree to be bound by them. FAC ¶ 615-17. In return, the NCAA agreed, among other things, to conduct intercollegiate athletics in a manner designed to protect and enhance the physical well-being of Plaintiffs and other student-athletes, and to require that each member institution protect the well-being of, and provide a safe environment for, Plaintiffs and all student-athletes. *Id.* ¶ 618. Finally, Plaintiffs allege that the NCAA breached this agreement by failing to ensure that student-athletes were protected from predatory behavior by coaches. *Id.* ¶ 621. Plaintiffs thus allege the nature of the contract, the consideration exchanged by the parties, and the manner of the NCAA's breach.

The NCAA argues that the Form 19-1a is not a contract because it "does not contain *any* affirmative commitment by the NCAA to do anything." NCAA Mot. at 30. Yet the Form 19-1A[36] refers to and incorporates the NCAA DI Constitution and Bylaws (*see* Dkt. No. 38-1), which Plaintiffs claim impose obligations on the NCAA to protect its student-athletes. The NCAA, however, attempts to distance itself from its own Constitution and Bylaws, suggesting that it did *not* author those documents, but merely "published" them. NCAA Mot. at 31. Yet, the NCAA uses the Manual to wield control over institutions, coaches, athletics department personnel, and student-athletes. *See* FAC ¶¶ 89-98. The NCAA should not be allowed to run away from the contract that it created and *regularly enforces* when doing so is legally convenient. Indeed, other courts have rejected the very arguments the NCAA makes again here. *See, e.g.*, *Weston v. Big Sky Conf.*, 466 F. Supp. 3d 896, 909 (N.D. Ill. June 12, 2020) (denying NCAA's motion to dismiss breach of contract claims where plaintiff entered into "written agreement with the NCAA that he would comply with the NCAA's Constitution, bylaws, and regulations").

---

[36] The contract for DI athletes, Form 19-1a, is attached to the FAC as Exhibit A, Dkt. No. 38-1.

- 51 -

The NCAA's efforts to deny the existence of an implied contract must also fail. An implied contract is formed based on the conduct of the parties and, specifically, whether their actions reflect an intent to enter into a contract. *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999). The NCAA contends that the implied contract claim must be dismissed for the same reasons as the express contact, which Plaintiffs have shown are without merit. Accordingly, Plaintiffs state a claim for breach of express and implied contract. *See, e.g.*, *Richardson v. Nat'l Collegiate Athletic Ass'n*, No. 1:16-cv-09980 (N.D. Ill. Feb. 14, 2018) (Dkt. No. 48) (denying NCAA's motion to dismiss student's breach of express and implied contract claims).

### B. Plaintiffs adequately allege that they are third-party beneficiaries of an implied contract with the NCAA.

The NCAA does not dispute that the Manual (its Constitution and Bylaws) constitutes a valid contract between each University and the NCAA, but claims that Plaintiffs cannot show that they were third-party beneficiaries of that contract. NCAA Mot. at 30. Yet the intent to benefit student-athletes is clear and unambiguous in the NCAA Manual. The NCAA promises that "[i]ntercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes." FAC ¶ 90 (quoting Manual ¶ 2.2). It repeats this commitment to student-athlete well-being throughout its Constitution and Bylaws. For example, it commits to, *inter alia*, "initiate, stimulate and improve intercollegiate athletics programs for student athletes," to conduct intercollegiate athletics programs "in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes", and to require "each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes." *Id.* ¶¶ 89-90 (quoting Manual §§ 1.2(a); 2.22; 2.2.3). There is no doubt that the clearly expressed intent of the Manual is to benefit student-athletes.

This view is supported by the overwhelming weight of case law, in which courts have recognized a student-athlete plaintiff's intended third-party beneficiary status based upon the contract between a member institution and the NCAA. *See, e.g.*, *Bloom v. Nat'l Collegiate Athletic Ass'n*, 93 P.3d 621, 623-24 (Colo. App. 2004) (finding third-party beneficiary standing because "the NCAA's constitution, bylaws, and regulations evidence a clear intent to benefit

1    student-athletes"); *Oliver v. NCAA*, 920 N.E.2d 196, 200 (Ohio Com. Pleas 2008) ("[t]he

2    [student-athlete] plaintiff, who is not a party to the contract between NCAA and [the student's

3    university], stands to benefit from the contract's performance, and thus he acquires rights under

4    the contract"); *Weston*, 466 F. Supp. 3d at 910 (same). By contrast, the NCAA fails to identify a

5    single case holding otherwise. *Knelman v. Middlebury College* was decided on a motion for

6    summary judgment after discovery completed, and the court expressly did "not decide the issue"

7    of whether the student filing suit constituted a third-party beneficiary. 898 F. Supp. 2d 697, 715

8    (D. Vt. 2012), *aff'd*, 570 F. App'x 66 (2d Cir. 2014). And in *Hairston v. Pac-10 Conference,* the

9    court found the intended third-party beneficiary relationship could not be inferred from the

10   "vague, hortatory pronouncements" of a different athletic conference's constitution or mission

11   statement. 101 F.3d 1315, 1320 (9th Cir. 1996). Here, on the other hand, the NCAA has made

12   specific commitments to its student-athletes through its contracts, and multiple courts have

13   confirmed that students were the third-party beneficiaries of these contracts.  The NCAA's

14   motion to dismiss the third-party beneficiary claim should be denied.

15                                      **<u>CONCLUSION</u>**

16

17       Plaintiffs respectfully request that this Court deny Defendants' motions to dismiss. Should

the Court grant the motions in any respect, Plaintiffs request leave to amend pursuant to Fed. R.

18
     Civ. P. 15(a)(2).
19
     Dated: October 27, 2022                         Respectfully submitted,
20

21

22                                            */s/ Jonathan D. Selbin*_____
                                              JONATHAN D. SELBIN (Cal. Bar No. 17022)
23                                            jdselbin@lchb.com
                                              MICHELLE LAMY (Cal. Bar No. 308174)
24                                            mlamy@lchb.com
                                              NIGAR A. SHAIKH (Cal. Bar No. 343554)
25                                            nshaikh@lchb.com
                                              LIEFF CABRASER HEIMANN & BERNSTEIN
26                                            275 Battery Street, 29th Floor
                                              San Francisco, CA  94111-3339
27                                            Telephone: (415) 956-1000
                                              Facsimile: (415) 956-1008
28
                                         - 53 -

ELIZABETH A. FEGAN *(admitted pro hac vice)*
beth@feganscott.com
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100

LYNN A. ELLENBERGER *(admitted pro hac vice)*
lynn@feganscott.com
FEGAN SCOTT LLC
500 Grant St., Suite 2900
Pittsburgh, PA 15219
Telephone: (412) 346-4104
Facsimile: (312) 264-0100

LING S. WANG *(admitted pro hac vice)*
ling@feganscott.com
FEGAN SCOTT LLC
100 S. Fifth St., Suite 1900
Minneapolis, MN 55402
Telephone: (651) 432-4468
Facsimile: (312) 264-0100

*Attorneys for Plaintiffs and the Proposed Class*