1  CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
Carolyn.Luedtke@mto.com
2  MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
3  San Francisco, CA 94105-2907
Telephone: (415) 512-4000
4  Facsimile: (415) 512-4077

5  HAILYN J. CHEN (State Bar No. 237436)
Hailyn.Chen@mto.com
6  BRANDON E. MARTINEZ (State Bar No. 318749)
Brandon.Martinez@mto.com
7  ARIEL TESHUVA (State Bar No. 324238)
Ariel.Teshuva@mto.com
8  APRIL YOUPEE-ROLL (State Bar No. 331761)
April.Youpee-Roll@mto.com
9  MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
10  Los Angeles, California 90071-3426
Telephone: (213) 683-9100
11  Facsimile: (213) 687-3702

12  Attorneys for Defendant The National Collegiate
Athletic Association

13

14              UNITED STATES DISTRICT COURT

15      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

16

17  JOHN DOE 1, JOHN DOE 2, JOHN DOE 3,       Case No. 3:22-cv-01559-LB
JOHN DOE 4, JOHN DOE 5, JOHN DOE 6,
18  JOHN DOE 7, JOHN DOE 8, JOHN DOE 9,       **DEFENDANT THE NATIONAL
JOHN DOE 10, JOHN DOE 11, and JOHN        COLLEGIATE ATHLETIC
19  DOE 12, individually and on behalf of all     ASSOCIATION'S REPLY IN SUPPORT
others similarly situated,                OF MOTION TO DISMISS FIRST
20                                             AMENDED CLASS ACTION
Plaintiffs,           COMPLAINT**
21
vs.                          *[Filed Concurrently with Declaration of
22                                             Carolyn Hoecker Luedtke in Support of Reply
NATIONAL COLLEGIATE ATHLETIC             and Reply in Support of Request for
23  ASSOCIATION, THE UNIVERSITY OF           Application of the Incorporation by Reference
SAN FRANCISCO, ANTHONY N. (AKA           Doctrine or Judicial Notice]*
24  NINO) GIARRATANO, and TROY
NAKAMURA,                                Judge:  Hon. Magistrate Laurel Beeler
25                                             Trial Date:  None Set
Defendants.             Hearing Date: December 8, 2022
26                                             Hearing Time: 9:30 a.m.

27

28

1

## <u>TABLE OF CONTENTS</u>

2
<u>Page</u>

3 INTRODUCTION.....................................................................................................................1

4 ARGUMENT ........................................................................................................................2

5 I.  THE NCAA SHOULD BE DISMISSED FOR LACK OF PERSONAL
    JURISDICTION.............................................................................................................2

6
    A.  This Court Lacks General Personal Jurisdiction Over the NCAA...........................2

7
    B.  This Court Lacks Specific Personal Jurisdiction Over the NCAA. ..........................4

8
    C.  Exercising Specific Jurisdiction Over the NCAA Would Be Unreasonable.............9

9
    D.  Plaintiffs' Request for Jurisdictional Discovery Should Be Denied. ......................10

10
 II.  VENUE IN THIS COURT IS IMPROPER AS TO THE NCAA......................................11

11
III.  DOES 4-12 LACK STANDING TO SEEK AN INJUNCTION. ....................................11

12
 IV.  THE CLAIMS OF DOES 4-12 ARE UNTIMELY. ........................................................11

13
    A.  The Belated Discovery of "Legal Rights" Does Not Revive Claims......................12

14
    B.  Equitable Tolling Is Inapplicable Here. ................................................................14

15
    C.  Does 4-12 Fail to Allege Conduct or Ignorance of Material Facts Sufficient
16      to Invoke Equitable Estoppel/Fraudulent Concealment.........................................15

17
    D.  No Other Rule Renders These Claims Timely........................................................16

18 V.  THE NCAA OWES NO LEGALLY ACTIONABLE DUTY TO PLAINTIFFS. .............17

19
    A.  California Law Does Not Apply. ...........................................................................17

20
    B.  The NCAA Does Not Have a Duty Under Either Indiana or California Law..........18

21       1.  There Is No Special Relationship Between the NCAA and Coaches
             or Student-Athletes......................................................................................19

22
         2.  The *Rowland* Factors Weigh Against Duty.................................................20

23
    C.  The NCAA Did Not Voluntarily Assume a Duty. ..................................................22

24
    D.  The NCAA Is Not in a Fiduciary Relationship with Plaintiffs. ..............................22

25
    E.  Plaintiffs Fail to Allege a Negligent Misrepresentation by the NCAA...................23

26
 VI.  THE NCAA DOES NOT EMPLOY THE COACH DEFENDANTS AND
27      THEREFORE DID NOT NEGLIGENTLY SUPERVISE THEM......................................23

28

1

## <u>TABLE OF CONTENTS</u>
(Continued)

2

<u>Page</u>

3

VII.    THE NCAA IS NOT VICARIOUSLY LIABLE FOR THE COACH
        DEFENDANTS........................................................................................................23

4

VIII.   PLAINTIFFS' CONTRACT-BASED CLAIMS FAIL. ......................................25

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NCAA'S REPLY I/S/O MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**FEDERAL CASES**

4

*Aldrich v. National Collegiate Athletic Ass'n,*
    484 F. Supp. 3d 779 (N.D. Cal. 2020) .......................................................... 1, passim

5

6

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.,*
    874 F.3d 1064 (9th Cir. 2017).........................................................................................4

7

*Ayla, LLC v. Alya Skin Pty. Ltd.,*
    11 F.4th 972 (9th Cir. 2021)................................................................................4, 5, 6

8

9

*Baires v. United States,*
    2010 WL 3515749 (N.D. Cal. Sept. 8, 2010)..............................................................5, 6

10

*Beliveau v. Caras,*
    873 F. Supp. 1393 (C.D. Cal. 1995)...............................................................................24

11

*Bianco v. Warner,*
    562 F. Supp. 3d 526 (C.D. Cal. 2021).............................................................................17

12

13

*Boschetto v. Hansing,*
    539 F.3d 1011 (9th Cir. 2008)........................................................................................10

14

15

*Bromlow v. D & M Carriers, LLC,*
    438 F. Supp. 3d 1021 (N.D. Cal. 2020) ........................................................................11

16

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985) .......................................................................................6, 7, 9, 10

17

18

*Cervantes v. City of San Diego,*
    5 F.3d 1273 (9th Cir. 1993)............................................................................................14

19

20

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014) ...........................................................................................2, 3, 10, 11

21

22

*Doe v. Pasadena Hospital Ass'n,*
    2020 WL 1244357 (C.D. Cal. Mar. 16, 2020) ..............................................................13

23

*Doe v. Uber Techs. Inc.,*
    184 F. Supp. 3d 774 (N.D. Cal. 2016) .........................................................................24

24

25

*Doe v. Uber Techs., Inc.,*
    2019 WL 6251189 (N.D. Cal. Nov. 22, 2019)..............................................................24

26

*Equidyne Corp. v. Does,*
    279 F. Supp. 2d 481 (D. Del. 2003) .................................................................................9

27

28

*Flood v. NCAA*,
    2015 WL 5785801 (M.D. Pa. Aug. 26, 2015).........................................................................22

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
    141 S. Ct. 1017 (2021) ...........................................................................................................8, 9

*Fru-Con Const. Corp. v. Sacramento Mun. Util. Dist.*,
    2005 WL 1865499 (E.D. Cal. Aug. 3, 2005) ...........................................................................17

*Gianino v. Alacer Corp.*,
    846 F. Supp. 2d 1096 (C.D. Cal. 2012)....................................................................................18

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008)..................................................................................................12

*Goodyear Dunlop Tires Ops., S.A. v. Brown*,
    564 U.S. 915 (2011) ...................................................................................................2, passim

*Grace v. Apple, Inc.*,
    328 F.R.D. 320 (N.D. Cal. 2018) .............................................................................................18

*Green v. Bastyr University, LLC*,
    295 F. App'x 128 (9th Cir. 2008)........................................................................................14, 15

*Hairston v. Pac. 10 Conf.*,
    101 F.3d 1315 (9th Cir. 1996)..................................................................................................25

*Hepp v. Facebook*,
    14 F.4th 204 (3d Cir. 2021) .......................................................................................................9

*Huddleston v. John Christner Trucking, LLC*,
    2017 WL 4310348 (E.D. Cal. Sept. 28, 2017) ......................................................................5, 6

*Johnson v. TheHuffingtonPost.com, Inc.*,
    21 F.4th 314 (5th Cir. 2021) ..............................................................................................5, 8, 9

*Langston v. Mid-America Intercollegiate Athletics Ass'n*,
    448 F. Supp. 3d 938 (N.D. Ill. 2020) ................................................................................16, 22

*Lu v. Powell*,
    621 F.3d 944 (9th Cir. 2010)....................................................................................................24

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012)..............................................................................................18, 23

*Mehr v. Féderation Internationale de Football Ass'n*,
    115 F. Supp. 3d 1035 (N.D. Cal. 2015) .....................................................................................3

*Menken v. Emm*,
    503 F.3d 1050 (9th Cir. 2007)....................................................................................................6

*Noriesta v. Konica Minolta Business Solutions U.S.A., Inc.*,
  2019 WL 6482222 (C.D. Cal. July 8, 2019) ...............................................................11

*Remington v. Mathson*,
  42 F. Supp. 3d 1256 (N.D. Cal. 2012) .......................................................................12

*Richardson v. Se. Conf.*,
  No. 16-cv-09980 (N.D. Ill. Aug. 31, 2016)...............................................................25

*Rose v. NCAA*,
  346 F. Supp. 3d 1212 (N.D. Ill. 2018) .......................................................................25

*Sharma v. ARS Aleut Constr., LLC*,
  2021 WL 4554193 (N.D. Cal. Oct. 5, 2021) ..............................................................12

*Spierer v. Rossman*,
  798 F.3d 502 (7th Cir. 2015) .....................................................................................17

*Stoll v. Runyon*,
  165 F.3d 1238 (9th Cir. 1999) ...................................................................................14

*Tuazon v. R.J. Reynolds Tobacco Co.*,
  433 F.3d 1163 (9th Cir. 2006) ...................................................................................11

*Updike v. Multnomah Cnty.*,
  870 F.3d 939 (9th Cir. 2017)......................................................................................11

*Vachani v. Yakovlev*,
  2016 WL 1598668 (N.D. Cal. Apr. 21, 2016) .............................................................5

*Walden v. Fiore*,
  571 U.S. 277 (2014) .....................................................................................................6

*Weston v. Big Sky Conf., Inc.*,
  No. 17-cv-04975 (N.D. Ill. June 8, 2017) .................................................................25

*Young v. United States*,
  535 U.S. 43 (1992) .....................................................................................................14

**STATE CASES**

*Addison v. Cal.*,
  21 Cal.3d 313 (1978)..................................................................................................14

*Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*,
  158 Cal. App. 4th 226 (2007).....................................................................................23

*Baker v. Beech Aircraft Corp.*,
  39 Cal. App. 3d 315 (1974)...................................................................................13, 14

*Barenborg v. Sigma Alpha Epsilon Fraternity*,
 33 Cal. App. 5th 70 (2019) ...................................................................19, 20, 22, 23

*Brown v. USA Taekwondo*,
 11 Cal. 5th 204 (2021) ....................................................................................17, 19

*Brown v. USA Taekwondo*,
 40 Cal. App. 5th 1077 (2019) .................................................................................20

*Daza v. L.A. Cmty. Coll. Dist.*,
 247 Cal. App. 4th 260 (2016) .................................................................................24

*Doe 1 v. City of Murrieta*,
 102 Cal. App. 4th 899 (2002) .................................................................................23

*Doe v. U.S. Youth Soccer Ass'n*,
 8 Cal. App. 5th 1118 (2017) ...................................................................................21

*Douchette v. Bethel Sch. Dist. No 403*,
 117 Wash. 2d 805 (1991) ........................................................................................15

*Edmunds v. Atchison, Topeka & Santa Fe Ry. Co.*,
 174 Cal. 246 (1917) ................................................................................................24

*Goldsberry v. Grubbs*,
 672 N.E.2d 475 (Ind. Ct. App. 1996) .....................................................................17

*Hill v. Slippery Rock University*,
 138 A.3d 673 (Pa. Super. Ct. 2016) .......................................................................22

*Javor v. Taggart*,
 98 Cal. App. 4th 795 (2002) ...................................................................................16

*John R. v. Oakland Unified School District*,
 48 Cal. 3d 438 (1989) .............................................................................................24

*Jolly v. Eli Lilly & Co.*,
 44 Cal. 3d 1103 (1988) ...........................................................................................12

*Lanni v. NCAA*,
 42 N.E.3d 542 (Ind. Ct. App. 2015) .........................................................18, 19, 24

*Lantzy v. Centex Homes*,
 31 Cal. 4th 363 (2003) ............................................................................................15

*Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*,
 12 Cal. 4th 291 (1995) ............................................................................................24

*Lisa M. v. Henry Mayo Newhall Memorial Hospital*,
 29 Cal. App. 4th 473 (1994) ...................................................................................24

*Mark K. v. Roman Catholic Archbishop of L.A.*,
    67 Cal. App. 4th 603 (1998)..................................................................................12, 13

*In re Marriage of Zimmerman*,
    183 Cal. App. 4th 900 (2010)........................................................................................15

*Martinez v. Bank of Am. Nat'l Tr. & Savings Ass'n*,
    82 Cal. App. 4th 883 (2000)..........................................................................................21

*Mary M. v. City of L.A.*,
    54 Cal. 3d 202 (1991)....................................................................................................24

*McGee v. Weinberg*,
    97 Cal. App. 3d 798 (1979)..........................................................................................14

*Milla v. Roman Catholic Archbishop*,
    187 Cal. App. 3d 1453 (1986)......................................................................................16

*Neverkovec v. Fredericks*,
    74 Cal. App. 4th 337 (1999).........................................................................................25

*Patterson v. Domino's Pizza, LLC*,
    60 Cal. 4th 474 (2014)..................................................................................................23

*Regents of University of California v. Superior Court*,
    4 Cal. 5th 607 (2018)....................................................................................................20

*Rowland v. Christian*,
    69 Cal. 2d 108 (1968)................................................................................17, 18, 20, 22

*Saint Francis Mem'l Hosp. v. State Dep't of Pub. Health*,
    59 Cal. App. 5th 965 (2021).........................................................................................14

*Schmitz v. NCAA*,
    67 N.E.3d 852 (Ohio Ct. App. 2016) ...........................................................................22

*Tibbs v. Huber, Hunt & Nichols, Inc.*,
    668 N.E.2d 248 (Ind. 1996)..........................................................................................17

*University of Southern California v. Superior Court*,
    30 Cal. App. 5th 429 (2018)..............................................................................20, 21, 22

*Vasilenko v. Grace Fam. Church*,
    3 Cal. 5th 1077 (2017)..................................................................................................21

*Webb v. Jarvis*,
    575 N.E.2d 992 (Ind. 1991)..........................................................................................17

*Wexler v. Cal. Fair Plan Ass'n*,
    63 Cal. App. 5th 55 (2021)............................................................................................25

*Williams v. Cingular Wireless*,
   809 N.E.2d 473 (Ind. Ct. App. 2004) ..................................................................... 18

**FEDERAL STATUTES**

28 U.S.C. § 1404 ........................................................................................................... 11

28 U.S.C. § 1406(a) ...................................................................................................... 11

Fair Labor Standards Act ............................................................................................... 6

**STATE STATUTES**

Cal. Civ. Proc. Code § 340.16 .............................................................................. 16, 17

**FEDERAL RULES**

Fed. R. Civ. P. 12(b)(3) ............................................................................................... 11

1

**INTRODUCTION**

2      Plaintiffs' Opposition ("Opp.") confirms that fatal defects in the First Amended Class Action

3   Complaint ("FAC") require dismissal of all claims against the NCAA.

4      *First*, Plaintiffs cannot explain why their claims against the NCAA should not be dismissed

5   for lack of general or specific jurisdiction as they were in *Aldrich v. National Collegiate Athletic*

6   *Ass'n* ("*Aldrich I*"), 484 F. Supp. 3d 779, 790–96 (N.D. Cal. 2020).  Plaintiffs recognize, as they

7   must, that the Supreme Court has set an extraordinarily high bar for general jurisdiction outside of a

8   party's place of incorporation or principal place of business, which for the NCAA is Indiana.  To

9   escape this precedent, they try unsuccessfully to fashion a new rule that there *also* should be general

10  jurisdiction where the NCAA is "more heavily concentrated."  This argument is unsupported by the

11  facts and precedent.  Nor are Plaintiffs able to show specific jurisdiction because the NCAA has not

12  purposefully directed suit-related conduct at California.  This case alleges a failure to act by the

13  NCAA that would have happened in Indiana, and any alleged suit-based acts in California were by

14  other Defendants, not the NCAA.  Without jurisdiction for the NCAA, venue is also improper.

15     *Second*, Plaintiffs concede that Does 5-12 lack standing to seek injunctive relief as former

16  student-athletes, and Plaintiffs fail to allege facts showing Doe 4 is a current student with standing.

17     *Third*, Does 4-12 assert time-barred claims.  Does 4-12 agree their claims are untimely absent

18  revival under the discovery rule, but do not address the dozens of allegations made in the FAC

19  showing they each were aware of the material facts underlying their causes of action in real time.

20  Does 4-12 likewise have not pleaded facts sufficient to avail themselves of any California doctrine

21  that would toll the statute of limitations.

22     If the Court gets past these procedural flaws (it should not), all of Plaintiffs' claims fail on

23  the substance.  Plaintiffs strive to paint the NCAA as not caring about student-athlete safety and

24  well-being.  That is not true.  The NCAA's mission includes providing support for its nearly 1,100

25  member institutions across the country so that over 400,000 student-athletes can compete fairly and

26  safely.  But the NCAA's efforts to promote fairness and safety in college athletics do not mean it has

27  assumed a legal duty to protect student-athletes from third-party harm, especially where its member

28  institutions have expressly retained that responsibility for themselves in the NCAA's Constitution.

1   Nor has the NCAA formed a contract with more than 400,000 student-athletes.  The NCAA also is

2   not responsible for the alleged torts of the Coach Defendants under principles of agency.  Thus, the

3   claims against the NCAA should be dismissed in their entirety.

4                                              **ARGUMENT**

5   **I.     THE NCAA SHOULD BE DISMISSED FOR LACK OF PERSONAL
           JURISDICTION.**

6          **A.     This Court Lacks General Personal Jurisdiction Over the NCAA.**

7          Plaintiffs acknowledge the "very high" bar a plaintiff must meet after the Supreme Court's

8   decision in *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014), to establish general jurisdiction

9   outside of a defendant's place of incorporation or principal place of business, which here is Indiana.

10  (Opp. 5.)  Such a finding is reserved for an "exceptional case."  *Daimler*, 571 U.S. at 139 n.19.

11  Indeed, Plaintiffs do not cite to any published Ninth Circuit case following *Daimler* conferring

12  general jurisdiction over an out-of-state corporation.  Faced with Judge Davila's clear, on-point

13  decision in *Aldrich I* that the NCAA is not subject to general jurisdiction in California, Plaintiffs are

14  left with no response except that Judge Davila was "simply wrong."  (Opp. 7.)  Then, Plaintiffs ask

15  this Court not to follow well-established law, as Judge Davila did, but instead to make new law—

16  advancing the novel argument that the NCAA is subject to general jurisdiction in California on the

17  theory that its "presence and associated economic impact" in this State is "more heavily

18  concentrated" than in others.  (Opp. 5–7 & n.4.)  There is no basis for this Court to craft a new

19  exception to *Daimler*, and Plaintiffs' argument is wrong on the law and the facts.

20         As a threshold matter, the legal premise of Plaintiffs' argument—that the NCAA is subject to

21  general jurisdiction here because, in Plaintiffs' telling, it "operates more extensively in California

22  than other states"—is incorrect and unsupported.  (Opp. 6.)  It is well established that an entity is

23  subject to general jurisdiction in a forum only if its contacts with the forum "are so 'continuous and

24  systematic' as to render [the entity] essentially at home" there.  *Daimler*, 571 U.S. at 127 (quoting

25  *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  Such a forum is the entity's

26  "formal place of incorporation or principal place of business" or, "in an exceptional case," another

27  State where its "operations" are "so substantial and of such a nature as to render the corporation at

28

home" there. *Id.* at 139 n.19.  Thus, it simply is wrong that an entity is necessarily subject to suit for

all purposes in the forum (or fora) in which its activities are more, or most, extensive relative to

other fora.  For parties with members or activities "in many places," Plaintiffs' recasting of the rule

would improperly transform *Daimler*'s "at home" test into the amorphous, pre-*Daimler* "'doing

business' tests" for personal jurisdiction which the Supreme Court has explicitly rejected.  *Id.* at 139

n.20 (citation omitted).  And it would subject the NCAA to general jurisdiction in a host of fora

beyond that in which it has its principal place of business—precisely the kind of "unacceptably

grasping" conception of general jurisdiction this Court and the Supreme Court have condemned.

*Aldrich I*, 484 F. Supp. 3d at 793 (quoting *Daimler*, 571 U.S. at 138).[1]

Moreover, even if Plaintiffs' backwards portrayal of the *Daimler* at-home test were correct

(and it is not), the facts alleged in the opposition about the NCAA's contacts with California are

wrong; fail to prove the existence of general jurisdiction over the NCAA here; or both.  Plaintiffs'

contention that "the NCAA operates more extensively in California than other states" (Opp. 6)

ignores critical facts showing the NCAA neither is "at home" here nor has greater membership here

relative to other fora.  Although Plaintiffs observe that the NCAA works with 57 member institutions

in California, but "has only 10 DI members in Indiana, where it concedes jurisdiction exists," (*id.*),

they do not address the undisputed facts that (1) the NCAA works with nearly 1,100 member

institutions in all 50 states, and (2) the NCAA has its headquarters in Indiana, where it employs

approximately 500 people, but has no offices in California.  (Richardson Decl. ¶¶ 4–6, ECF No. 65-

1.)  They also fail to mention that the NCAA's membership[2] in other populous states is

commensurate with or exceeds its membership in California.  For example, the NCAA works with

---

[1] *Mehr v. Féderation Internationale de Football Ass'n*, 115 F. Supp. 3d 1035, 1048 (N.D. Cal.
2015), does not support Plaintiffs' characterization of the general jurisdiction analysis.  (Opp. 6.)
There, the court held that FIFA, a foreign association registered and with its principal place of
business in Switzerland, was *not* subject to general jurisdiction in California because its California
contacts did not "'approximate physical presence' in the state . . . under the standards articulated
in *Daimler* and *Goodyear*."  115 F. Supp. 3d at 1048.  The court found that FIFA's California
contacts "primarily relate[d] to commercial or quasi-commercial activities" and were "no more
numerous in California than in any other state (or possibly elsewhere in the world)," but that
finding was relevant because it showed that FIFA was not "'essentially at home' in California,"
not because the *Mehr* court held or suggested that a defendant is automatically subject to general
jurisdiction in the state in which its activities are proven to be most extensive.  *Id.*

[2] Plaintiffs focus on Division I membership (Opp. 6 & n.2), yet they bring a putative class action
on behalf of all NCAA student-athletes, regardless of division.  FAC ¶¶ 467, 468.

1   99 member institutions in New York and 53 in Texas.  (*See* Declaration of Carolyn Hoecker Luedtke

2   ("Luedtke Decl.") ¶¶ 3–4 & Exs. 2–3.)  Far from showing that California is "differently situated"

3   from the other 49 states in which the NCAA has member institutions, these facts and figures are but

4   one example that the NCAA's contacts here are quite conventional compared to other States—and,

5   unsurprisingly, that the NCAA "operates more extensively" in Indiana, where it has its headquarters

6   and employs approximately 500 personnel, than in California, (Opp. 5–6).[3]

7               **B.       This Court Lacks Specific Personal Jurisdiction Over the NCAA.**

8           Plaintiffs also fail to meet their burden to show that the NCAA purposefully directed any

9   conduct at California or that Plaintiffs' claims "arise[] out of or relate to" any cognizable contacts by

10  the NCAA with California such that the NCAA is subject to specific jurisdiction here.  (Opp. 7);

11  *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017).

12          *First*, the NCAA has not purposefully directed any suit-related conduct at California.

13  Plaintiffs conclusorily assert that, "[t]o the extent the NCAA owed a duty to Plaintiffs . . . that duty

14  was unquestionably targeted at California, to be discharged in California, and was breached in

15  California," (Opp. 9–10), but they fail to explain how any of the NCAA's purported failures to

16  legislate were "expressly aimed" at California.  *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 980

17  (9th Cir. 2021) (citation omitted).  They were not.  As the NCAA has explained (*see* Mot. 9–11), the

18  FAC expressly bases all of Plaintiffs' claims against the NCAA on alleged inactions or omissions by

19  the NCAA in violation of an alleged duty.  *See, e.g.*, FAC ¶¶ 514, 516–519, 523, 525–528

20  (negligent-supervision claims).  Indeed, Plaintiffs' opposition contends that "Plaintiffs were harmed

21  by the NCAA's willful inaction and lack of protections." (Opp. 11)  But as Judge Davila explained,

22  the NCAA facilitates the implementation of nationwide "legislat[ion] in Indiana, where it is

23

24  [3] As the NCAA pointed out in *Aldrich I* (*see* NCAA MTD Reply 5, *Aldrich I*, ECF No. 65), the
    NCAA does not "host" the Rose Bowl as Plaintiffs allege (Opp. 6–7): the Pasadena Tournament

25  of Roses Association does.  (Luedtke Decl. ¶ 2 & Ex. 1.)  Indeed, the only purported evidence
    Plaintiffs cite—the NCAA's website describing "[m]emorable moments" at the Rose Bowl—does

26  not say who hosts the Rose Bowl, or say the NCAA does.  (*See* Selbin Decl., Ex. C, ECF No. 79-1
    at 10–21.)  And even were it true that the NCAA "hosts" the Rose Bowl or any other bowl (again,
    not true), that would not distinguish the NCAA's contacts with California from other States—such

27  as New York or Texas, in which, as explained, the NCAA has commensurate numbers of member
    institutions and in which significant bowl games, such as the Cotton Bowl Classic and Pinstripe

28  Bowl, are held annually.  (Luedtke Decl. ¶¶ 5–6 & Exs. 4–5.)  Judge Davila rejected Plaintiffs'
    argument on precisely the same grounds in *Aldrich I*.  484 F. Supp. 3d at 794 & n.6.

headquartered," not in California, and any alleged duty on the part of the NCAA "to legislate in ways to prevent alleged abusers from transferring schools" or to otherwise protect students from coaches employed by member institutions "arose in Indiana, not California." *Aldrich I*, 484 F. Supp. 3d at 795; *see also* (Richardson Decl. ¶¶ 3–4). Thus, any alleged "harm caused by the NCAA's [supposed] failure to enact particular legislation arises out of Indiana," not California, *Aldrich I*, 484 F. Supp. 3d at 795, and that supposed failure cannot as a matter of law constitute suit-related "conduct directly targeting the forum," *Ayla*, 11 F.4th at 980 (citation omitted); *see also, e.g.*, *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 321–22 (5th Cir. 2021) (Finding no express aiming at Texas where publisher of allegedly libelous ads "shows ads to all comers; it treats Texans like everyone else. To target every user everywhere, as those ads do, is to target no place at all." (cleaned up)), *petition for cert. filed*, No. 22-82 (U.S. July 28, 2022).

The absence of any suit-related conduct by the NCAA expressly aimed at California is only reinforced by the various NCAA activities to which Plaintiffs point as evidence of the NCAA having allegedly "purposefully, continuously, and tightly managed countless athletic activities in California," (Opp. 8, 10). The opposition alleges that the NCAA manages the National Letter of Intent program; facilitates the adoption of rules governing athletic scholarships granted by members institutions; operates an online portal to facilitate student-athlete transfers from one member institution to another; imposes sanctions on member institutions or their personnel who violate NCAA rules; and generates revenues from ticket sales and television and marketing rights for certain championship events. (*Id.*) But it is undisputed that the NCAA provides these resources and support to its nearly 1,100 members in every region of the country <u>from its headquarters in Indiana</u>. (Richardson Decl. ¶¶ 3–8.) These activities thus are not conduct "expressly aimed at the forum state." *Vachani v. Yakovlev*, 2016 WL 1598668, at *4 (N.D. Cal. Apr. 21, 2016). And just as importantly, none of these activities are <u>suit-related</u>. Indeed, if they were, the NCAA would be "improperly subject . . . to jurisdiction anywhere." *Aldrich I*, 484 F. Supp. 3d at 795.[4]

---

[4] Contrary to Plaintiffs' argument (Opp. 8–9), neither *Baires v. United States*, 2010 WL 3515749, at *6 (N.D. Cal. Sept. 8, 2010), nor *Huddleston v. John Christner Trucking, LLC*, 2017 WL 4310348, at *5 (E.D. Cal. Sept. 28, 2017), supports specific jurisdiction here. In *Baires*, the court found that it had specific jurisdiction over a series of federal immigration agency heads based in

Plaintiffs' theory (*see* Opp. 10) that the NCAA has purposefully directed its activities at California by requiring member institutions to appoint Faculty Athletics Representatives, or "FARs," is similarly unfounded.  As the NCAA has explained, under the NCAA's Division I Manual and Constitution, FARs are selected, employed, and controlled by member institutions and are neither employee nor agents of the NCAA.  (Mot. 11–12 & n.5.)  Plaintiffs have not and cannot allege any facts or arguments to support their conclusory (and incorrect) assertion to the contrary.  Recognizing that their FAR-based allegation does not confer jurisdiction in California, Plaintiffs speculate that if the case is allowed to proceed, "discovery will yield" examples of unspecified misconduct by the NCAA in California sufficient to give this Court jurisdiction.  (Opp. 10.)  This argument merely highlights the *lack* of evidence of suit-related conduct targeted at California by the NCAA and underscores the deficiency of the FAC's existing allegations.

*Second*, Plaintiffs are incorrect that their allegations that the NCAA entered into contracts with student-athletes in California, or entered into contracts with California member institutions of which student-athletes are third-party beneficiaries, show that the NCAA has purposefully availed itself of this State in a manner related to Plaintiffs' claims.  (*See* Opp. 9.)  On the law, Plaintiffs cannot and do not provide any good authority to contradict the principle that a "contract with an out-of-state party alone" does not "automatically establish sufficient minimum contacts in the other party's home forum."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478–79 (1985).  (Indeed, the only authority Plaintiffs cite on this point, *Menken v. Emm*, 503 F.3d 1050 (9th Cir. 2007), did not concern any contract between the plaintiff and defendant.)  And on the facts, Plaintiffs do not make

---

Washington, D.C., on the theory that policies "crafted" by those heads had "shape[d] the behavior of an enormous governmental entity" with immigration detention facilities heavily located "within the State of California."  2010 WL 3515749, at *1–4, 6.  In contrast, the NCAA lacks any facilities in California.  Moreover, *Baird* long pre-dated the Supreme Court and the Ninth Circuit's more recent admonitions that "[e]xpress aiming" for purposeful-direction purposes "requires more than the defendant's awareness that the plaintiff it is alleged to have harmed resides in or has strong ties to the forum, because the plaintiff cannot be the only link between the defendant and the forum." *Ayla*, 11 F.4th at 980 (cleaned up); *Walden v. Fiore*, 571 U.S. 277, 285 (2014).  In *Huddleston*, the court found that the plaintiff's claims arose from the defendant trucking company's contacts with California because the company had hired the plaintiff, a California-based trucker, and instructed him "to make pick-ups and drop-offs in California," services that gave rise to the plaintiff's Fair Labor Standards Act claims.  2017 WL 4310348, at *5.  But here, there is no evidence that the NCAA engages California-based agents to carry out business in California or instructs them to work in California, let alone in a manner bearing any relation to Plaintiffs' claims.

Case No. 3:22-cv-01559-LB

1   any allegation to show, as they must, that when the NCAA allegedly entered into its purported

2   contracts with Plaintiffs or member institutions, the NCAA did or reasonably should have expected

3   the contracts to result in "continuing and wide-reaching contacts" with <u>Plaintiffs</u> in <u>California</u>, as the

4   law requires. *Burger King*, 471 U.S. at 478–80.  If anything, that the FAC asserts the exact same

5   contract claims on behalf of Plaintiffs, the California Subclass, and the <u>National</u> Subclass (*compare*

6   FAC ¶¶ 613–629, 631–637, *with id.* ¶¶ 690–707, 709–716) shows exactly the opposite: that the

7   NCAA's alleged contractual obligations to implement policies and legislation regarding coach

8   misconduct arose and were breached in Indiana, not California, and that the NCAA's purported

9   contracts with student-athletes and member institutions did <u>not</u> "envision[] continuing and wide-

10  reaching contacts with" student-athletes in California as opposed to student-athletes in the other

11  forty-nine states in which the NCAA has member institutions. *Burger King*, 471 U.S. at 478–80.

12          *Third*, Plaintiffs' contention that Judge Davila anchored his specific jurisdiction analysis in

13  *Aldrich I* to the fact that the plaintiffs in that case "were not abused in California" (Opp. 10–11)

14  grossly miscasts Judge Davila's decision.  Judge Davila broke down the *Aldrich I* plaintiffs' claims

15  against the NCAA into "three categories"—all of which, he said, were "related: but-for the NCAA's

16  failure to legislate appropriately, Plaintiffs (and their putative class) would not have been harmed by

17  coaches like" the coach defendant.  *Aldrich I*, 484 F. Supp. 3d at 795.  Analyzing the purported

18  forum contacts giving rise to these claims, Judge Davila held that none were sufficient to confer

19  specific jurisdiction because (as the NCAA has explained) the NCAA's alleged omissions occurred

20  in Indiana, not California:  "The NCAA legislates in Indiana, where it is headquartered.  Thus, the

21  harm caused by the NCAA's failure to enact particular legislation arises out of Indiana."  *Id.*  Further

22  analyzing the alleged contacts giving rise to the plaintiffs' third category of claims—"that the NCAA

23  failed to protect them from" a coach defendant—Judge Davila was explicit that those contacts failed

24  to confer specific jurisdiction for <u>two</u> independent reasons—the "[f]irst" of which was that, "to the

25  extent the NCAA had a duty to legislate in ways to prevent alleged abusers from transferring

26  schools, that duty arose in Indiana, not California."  *Id.*  Thus, Plaintiffs are simply wrong that Judge

27  Davila's finding of no specific jurisdiction "turned on the fact that the [*Aldrich I*] 'Plaintiffs were not

28  abused in California,' but elsewhere in the country."  (Opp. 10–11 (quoting 484 F. Supp. 3d at 796).)

1   Judge Davila found no specific jurisdiction on multiple grounds, the first of which explicitly was that

2   the NCAA's purported "duty to legislate in ways to prevent alleged abusers from transferring

3   schools" or otherwise harming student-athletes "arose" and was breached "in Indiana, not

4   California." *Aldrich I*, 484 F. Supp. 3d at 795.  That same reasoning applies with equal force here.

5          *Fourth*, and finally, *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct.

6   1017 (2021), does not create specific jurisdiction where Judge Davila found none.  (Opp. 10–11.)

7   *Ford* did not address purposeful availment or direction.  141 S. Ct. at 1026.  *Ford* does reaffirm

8   that specific jurisdiction requires "that the suit 'arise out of *or relate to* the defendant's contacts

9   with the forum'" and made clear that the "relate to" language "does not mean anything goes" and

10  rather "incorporates real limits, as it must to adequately protect defendants foreign to a forum."

11  *Id.* (citation omitted).  *Ford* changes nothing about the fact that Plaintiffs' claims here do not arise

12  out of or relate to any conduct by the NCAA expressly aimed at California.  As the NCAA has

13  explained (Mot. 9–11 & n.4), the NCAA is headquartered in Indiana and has no facilities in

14  California.  (Richardson Decl. ¶¶ 3–4.)  Its approximately 500 employees in Indiana provide the

15  resources and professional support to which the opposition refers (*see* Opp. 4, 8, 11);

16  communicates with its nearly 1,100 member institutions in all 50 states from Indiana; and

17  facilitate the drafting and adoption of legislation by those members from Indiana.  (Richardson

18  Decl. ¶¶ 2–8.)  Thus, as Judge Davila found in *Aldrich I*, none of these activities provides a basis

19  for specific jurisdiction here.  Moreover, the NCAA does not "ha[ve] 57 total programs and 25 DI

20  programs in California," as Plaintiffs misleadingly contend (Opp. 11); rather, 57 of the NCAA's

21  member institutions reside in California (Richardson Decl. ¶ 5), and any forum contacts by those

22  institutions are not attributable to the NCAA (*see* Mot. 6–7 & n.2).

23          Moreover, even if the NCAA's work from Indiana with its member institutions in California

24  qualified as purposeful direction or availment, which it does not, those contacts would not confer

25  personal jurisdiction because they do not relate to Plaintiffs' claims.  Put differently, "[m]ere market

26  exploitation" by the defendant of the forum state "will not suffice."  *Johnson*, 21 F.4th at 324.  In

27  *Johnson*, which cites *Ford*, the Fifth Circuit held that, although a libel claim by a Texas Plaintiff

28  related generally to content on HuffPost, the HuffPost's contacts with Texas—such as its sales of

1   merchandise to Texans, its extensive advertising to Texans, or its "use[] [of] visitors' location data to

2   tailor advertising"—were not specific to the allegedly libelous content and thus lacked the necessary

3   "link" to the claim.  *Id.* at 320–21, 324–25.  "*Ford Motor* does not say," the Fifth Circuit cautioned,

4   "that any commercial activities in a state support specific jurisdiction over a defendant there";

5   instead, the "only relevant activities of the defendant are those that relate to the plaintiff's suit."  *Id.*

6   at 325 (cleaned up); *see also, e.g.*, *Hepp v. Facebook*, 14 F.4th 204, 208 (3d Cir. 2021) (citing *Ford*

7   to hold that websites' many contacts with Pennsylvania—"targeted . . . advertising" to Pennsylvania,

8   "an online merchandise store," a "premium membership business," and hosting "an online

9   community organized around Philadelphia"—bore no relation to claim for misappropriation of

10  likeness).  As in *Johnson* and *Hepp*, the NCAA's supposed contacts with California are unlike the

11  market exploitation in *Ford* that provided the necessary link between Ford's forum contacts and the

12  plaintiff's claims.  Here, there is no allegation that the NCAA acted in California in a manner

13  forming a basis for the claims.  That the NCAA may have facilitated a transfer portal from Indiana

14  (which is unrelated to this case and not an action in California), or that its membership issued

15  sanctions against other California-based member institutions for rule violations bearing no

16  connection to this case, does not "relate to" the causes of action here.

17      ### C.   **Exercising Specific Jurisdiction Over the NCAA Would Be Unreasonable**.

18          Even if Plaintiffs could show suit-related, expressly aimed contacts by the NCAA with

19  California, exercising jurisdiction would nonetheless be unreasonable and contravene "fair play and

20  substantial justice."[5]  *Burger King*, 471 U.S. at 477–78 (cleaned up).  To evaluate the reasonableness

21  of asserting jurisdiction over a defendant, courts consider "the burden on the defendant, the forum

22  State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and

23  effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of

24

---

25  [5] The opposition is wrong that the NCAA has waived this argument.  As Plaintiffs acknowledge,
    they bear the burden of showing suit-related purposeful direction or availment, and only then does
26  the "burden shift[] to the defendant" to show that the exercise of specific jurisdiction would be
    unreasonable.  (Opp. 7.)  Because Plaintiffs bear the antecedent burden under this burden-shifting
27  framework, it is wholly appropriate for the NCAA to address its subsequent burden in its reply
    brief, and Plaintiffs' request for a surreply should be denied.  *See, e.g.*, *Equidyne Corp. v. Does*,
28  279 F. Supp. 2d 481, 486 (D. Del. 2003) (no waiver of improper-venue defense argued in reply
    because plaintiff bore the initial "burden of proving proper venue").

1    controversies, and the shared interest of the several States in furthering fundamental substantive

2    social policies." *Id.* (cleaned up).  These factors weigh against exercising jurisdiction over the

3    NCAA.  The NCAA is headquartered in Indiana, and its alleged policymaking failures occurred

4    there, not California.  (Richardson Decl. ¶¶ 3–8.)  Nearly half of the named Plaintiffs are citizens of

5    States other than California.  (FAC ¶¶ 41–42, 45, 48–49.)  California's interest in adjudicating this

6    dispute as against the NCAA is thus inferior to Indiana's.  Meanwhile, it would be unfairly

7    burdensome to force the NCAA, an Indiana entity, to litigate here.

8              **D.    <u>Plaintiffs' Request for Jurisdictional Discovery Should Be Denied</u>.**

9              Recognizing that Plaintiffs' jurisdictional arguments founder on the shoals, the opposition

10   proposes a fishing expedition, requesting that the Court order discovery on general jurisdiction.

11   (Opp. 12.)  But such discovery will not be granted on "a hunch that it might yield jurisdictionally

12   relevant facts" and instead is appropriate only on a showing that "pertinent facts bearing on the

13   question of jurisdiction are controverted or [that] a more satisfactory showing of the facts is

14   necessary." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (citation omitted).  Plaintiffs

15   fail to carry this burden because they seek to discover facts that are irrelevant to the jurisdictional

16   inquiry, even if discovered to be true.  As the NCAA has explained (*see* Part I.A above; Mot. 7–8),

17   even were it correct that "the revenue the NCAA generates from California is in fact greater than

18   other states," and even were Plaintiffs to develop facts concerning "lobbying efforts by the NCAA"

19   here or its submission of an amicus brief before the California Supreme Court (Opp. 12), none of

20   that discovery would change the fact that the NCAA has its offices and personnel and conducts its

21   business in Indiana, not California (*see* Richardson Decl. ¶¶ 3–8), or transform this into an

22   "exceptional case" of a defendant being subject to suit for all purposes in a place outside of the

23   "paradigm" bases for general jurisdiction, *Daimler*, 571 U.S. at 137, 139 n.19.  Plaintiffs filed this

24   lawsuit nine months ago after their counsel filed a similar lawsuit in this district over 2.5 years ago,

25   and their FAC asserts claims for twelve plaintiffs.  They have had ample opportunity to develop

26   facts that could subject the NCAA to jurisdiction here, yet they have none.  Their last-ditch request

27

28

1   for further time to shore up their arguments should be denied.[6]

2   **II.   <u>VENUE IN THIS COURT IS IMPROPER AS TO THE NCAA.</u>**

3       Plaintiffs agree that venue here turns on whether this Court has personal jurisdiction over

4   the NCAA and advance no argument to otherwise support venue.  (Opp. 12–13.)  Thus, as set

5   forth in the NCAA's opening brief (Mot. 12–14), if this Court finds no personal jurisdiction, then

6   it should dismiss this case as against the NCAA for improper venue.  *See* Fed. R. Civ. P. 12(b)(3);

7   28 U.S.C. § 1406(a).  Alternatively, if the Court finds that the "interest of justice" so requires, it

8   should transfer the case under Section 1406(a) to the Southern District of Indiana, where the

9   NCAA is headquartered and from where Plaintiffs allege that it failed to promulgate rules.[7]

10  **III.   <u>DOES 4-12 LACK STANDING TO SEEK AN INJUNCTION.</u>**

11      ***Does 5-12.***  Plaintiffs do not defend Does 5-12's standing to seek injunctive relief.

12      ***Doe 4.***  To the extent the opposition means to suggest that Doe 4 is a current student-

13  athlete at USF and thus has standing (*see* Opp. 13), Plaintiffs have made no allegation and

14  submitted no evidence to that effect.  Indeed, as the NCAA has explained (Mot. 15), the FAC

15  alleges that Doe 4 began playing baseball at USF as a freshman in 2017 before transferring

16  elsewhere in 2018, FAC ¶¶ 41, 298, 307, and it alleges no facts to indicate that he is still a

17  collegiate athlete at an NCAA member institution.  Thus, the FAC fails to plead facts that could

18  show "a real and immediate threat of repeated injury" to Doe 4 traceable to any allegedly unlawful

19  inactions by the NCAA, and he lacks standing to seek injunctive relief against it.  *Updike v.*

20  *Multnomah Cnty.*, 870 F.3d 939, 948 (9th Cir. 2017) (cleaned up); *see also* (Mot. 14–16).

21  **IV.   <u>THE CLAIMS OF DOES 4-12 ARE UNTIMELY.</u>**

22      Plaintiffs concede that Does 4-12's claims accrued outside the limitations periods.  (Opp. 14.)

23

---

24  [6] Plaintiffs cite *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1174 (9th Cir. 2006), to say
    that any NCAA "lobbying efforts" in California may show general jurisdiction over it here.  (Opp.
25  12.)  But *Tuazon* referred to lobbying as one of several "factors" to be "balance[d]" to determine if
    a party's forum contacts "approximate physical presence," 433 F.3d at 1169, 1172—a mode of
26  analysis *Goodyear*, 564 U.S. at 924, and *Daimler*, 571 U.S. at 137–39, have now abrogated.
    [7] The NCAA requests transfer in the alternative to dismissal under 28 U.S.C. § 1406(a) and only if
27  the Court determines that venue is improper here.  It does not seek transfer under 28 U.S.C.
    § 1404, a different transfer statute addressed in the *Bromlow v. D & M Carriers, LLC*, 438 F.
28  Supp. 3d 1021 (N.D. Cal. 2020), and *Noriesta v. Konica Minolta Business Solutions U.S.A., Inc.*,
    2019 WL 6482222 (C.D. Cal. July 8, 2019), decisions cited by Plaintiffs (Opp. 13).

1    The discovery rule and equitable doctrines and principles do not revive their untimely claims.

2        **A.    The Belated Discovery of "Legal Rights" Does Not Revive Claims.**

3        Does 4-12 do not contest that they contemporaneously appreciated the wrongfulness of the

4    Coach Defendants' alleged conduct.  (Opp. 15–16.)  Nor could they: the FAC contains dozens of

5    factual allegations showing each Plaintiff's awareness at the time of the wrongfulness of the alleged

6    conduct, their injuries, and a causal relationship between the two.  (Mot. 17–18 (providing detailed

7    catalog of allegations showing awareness of wrongdoing more than four years prior to filing FAC).)

8    Plaintiffs offer <u>no explanation</u> of how the discovery rule remains viable in light of these specific

9    allegations.  This is fatal where the "statute of limitations begins to run when the plaintiff suspects or

10   should suspect that her injury was caused by wrongdoing, that someone has done something wrong

11   to her."  *Jolly v. Eli Lilly & Co*., 44 Cal. 3d 1103, 1110 (1988); *id*. at 1110 n.7 ("'wrong,'

12   'wrongdoing,' and 'wrongful' are used in their lay understanding").[8]

13       Nevertheless, Does 4-12 purport to invoke the discovery rule based on allegedly discovering

14   that they have a cause of action after reading a *San Francisco Chronicle* article in 2022.  (Opp. 14–

15   16); FAC ¶ 463.[9]  But Plaintiffs' own case citations show a delay in discovering a basis for a legal

16   claim is insufficient to invoke the discovery rule.  (*See* Mot. 17 (citing *Jolly*, 44 Cal. 3d at 1110)

17   ("'[I]gnorance of the legal significance of known facts' does not delay accrual.").)

18       Plaintiffs also invoke *Mark K. v. Roman Catholic Archbishop of L.A.*, 67 Cal. App. 4th 603

19   (1998), (Opp. 15–16), but this case is not helpful for the Plaintiffs.  In *Mark K.*, the court declined to

---

[8] Plaintiffs do not address the NCAA's authority on this point, arguing only that the NCAA's cases—which provide a statement of the rule—do not involve sexual misconduct.  (Opp. 16 n.6.) Plaintiffs provide no authority supporting the contention that a different discovery rule exists for sexual misconduct.  Plaintiffs cite to cases that apply the same discovery rule cited by the NCAA.
[9] The Court should disregard Plaintiffs' attempt to amend the FAC by now claiming that they failed to appreciate Defendants' conduct caused their injuries.  (*See* Opp. 15–16 ("Does 4-12 . . . *now* understand their feelings of shame, depression, and anxiety were caused by Defendants' misconduct").)  "A Complaint cannot be amended through allegations made in an opposition to a motion to dismiss."  *Remington v. Mathson*, 42 F. Supp. 3d 1256, 1278 n.3 (N.D. Cal. 2012), *aff'd*, 575 F. App'x 808 (9th Cir. 2014).  And, such claims are contradicted by the many allegations that Does 4-12 contemporaneously appreciated the wrongfulness of the alleged conduct *and* its relationship to their alleged injuries.  *See, e.g.,* FAC ¶ 293 ("John Doe 10 and his parents agreed that [he] needed to leave in order to protect his mental health.").  Thus, even if the Plaintiffs had made such claims in the FAC, the Court need not accept them as true.  *Sharma v. ARS Aleut Constr., LLC*, 2021 WL 4554193, at *2 (N.D. Cal. Oct. 5, 2021) (citing *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008)) ("While the Court is required to assume plaintiff's allegations are true, the Court may disregard statements that are contradictory and implausible.").

1   apply the discovery rule because, *inter alia,* the plaintiff had not alleged "that he was at any time

2   unaware of [his abuser's] identity or of his connection with the church," or "of the fact that he had

3   been molested," or "that he failed to appreciate the wrongfulness of [his abuser's] conduct until

4   some subsequent event triggered his memory and/or made him realize that [the abuser] had acted

5   inappropriately."  67 Cal. App. 4th at 612.  So, too, here: Plaintiffs do not allege they were unaware

6   of the Coach Defendants' identities or their employers', of the fact that they were allegedly subjected

7   to harassing conduct, or that they failed to appreciate the wrongfulness of the Coach Defendants'

8   conduct.  *Mark K.*'s analysis simply illustrates the discovery rule: a claim accrues when a Plaintiff

9   has notice of the facts underlying his cause of action, regardless of his awareness of their legal

10  significance.  To the extent *Mark K.* also calls for consideration of the power dynamic at play, the

11  result reached by the court demonstrates that such consideration does not alter the discovery rule.

12      *Doe v. Pasadena Hospital Ass'n*, 2020 WL 1244357 (C.D. Cal. Mar. 16, 2020), also cited by

13  Plaintiffs, further illustrates the FAC's deficiencies.  The court applied the discovery rule to sexual

14  assault claims because a gynecologist concealed the wrongfulness of his conduct by misrepresenting

15  that there was a legitimate medical purpose for it.  *Id*. at *6.  The court reasoned that a physician's

16  authority and surrounding circumstances made the failure to discover the wrongfulness reasonable.

17  *Id*.  The FAC here contains no such allegations.  What is more, the *Doe* court dismissed the

18  plaintiffs' sexual harassment claim with prejudice, because, as here, the *Doe* plaintiffs perceived the

19  verbal sexual harassment in real time.  *Id*. at *5.  The court deemed the allegations invoking the

20  discovery rule "implausible" and insufficient to withstand dismissal.  *Id*.

21      Finally, Plaintiffs' reliance on *Baker v. Beech Aircraft Corp.*, 39 Cal. App. 3d 315 (1974)[10]

22  illustrates another fatal deficiency: the *San Francisco Chronicle* article[11] could not have provided

23  Does 4-12 with any information relevant to application of the discovery rule because it did not

24  inform them of the material facts underlying their claims.[12]  By contrast, in *Baker*, plaintiffs in a

25  wrongful death and personal injury action arising out of a plane crash pleaded that the defendant

26

27  ────────────────
    [10] *Baker* is a fraudulent concealment case, though Plaintiffs cite it in discussing the discovery rule.
    (Opp. 16 n.6.)
28  [11] *See* FAC p.4 n.5 (providing a hyperlink to the *Chronicle* article).
    [12] Even if the *Chronicle* article could have done so, the FAC contains no allegations to this effect.

1  airplane manufacturer concealed and failed to warn of defects, which prevented the plaintiffs from

2  obtaining information about the cause of the crash until after the statute of limitations had run.  *Id*. at

3  320.  Only after the *Wall Street Journal* published "a detailed expose of a number of fatal crashes . . .

4  because of the faulty fuel system," "despite warnings [to the manufacturer] years in advance of the

5  crashes," *id*. at 320 n.4, did the plaintiffs learn of the very defect and concealment that engendered

6  their cause of action.  The *Wall Street Journal* article in *Baker* informed the plaintiffs of material

7  facts concerning the wrongful conduct itself.  Here, Does 4-12 contend only that they "did not

8  possess either actual or constructive knowledge of their legal rights until March 11, 2022."  (Opp. 21

9  (emphasis added).)  Unlike in *Baker*, the FAC here contains dozens of allegations that Does 4-12

10  perceived the alleged conduct as it occurred, appreciated it was wrongful, and attributed their

11  injuries to it.  (*See* Mot. 17–18.)  These allegations prevent application of the discovery rule; as the

12  California Supreme Court "repeatedly has explained . . . it is the knowledge of facts rather than

13  discovery of legal theory, that is the test."  *McGee v. Weinberg*, 97 Cal. App. 3d 798, 803 (1979).

14  **B.**   **Equitable Tolling Is Inapplicable Here.**

15  Plaintiffs "agree that California law governs tolling in this case," yet they attempt to invoke

16  federal common law to claim that they may avail themselves of equitable tolling.  (Opp. 14 n.5, 17–

17  18 (citing *Young v. United States*, 535 U.S. 43, 49 (1992), and *Stoll v. Runyon*, 165 F.3d 1238, 1242

18  (9th Cir. 1999), both relying on federal common law).)  Equitable tolling under federal common law

19  differs from California law and is inapplicable here.  *See Saint Francis Mem'l Hosp. v. State Dep't

20  of Pub. Health*, 59 Cal. App. 5th 965, 821 n.10 (2021) ("We note, however, that equitable tolling

21  under federal common law has different elements than that under California common law.").

22  "Under California law, equitable tolling 'reliev[es] plaintiff from the bar of a limitations statute

23  when, possessing several legal remedies he, reasonably and in good faith, pursues one designed to

24  lessen the extent of his injuries or damage.'"  *Cervantes v. City of San Diego*, 5 F.3d 1273, 1275 (9th

25  Cir. 1993) (quoting *Addison v. Cal.*, 21 Cal.3d 313, 317 (1978)).  The FAC alleges no such facts.

26  Plaintiffs also rely on *Green v. Bastyr University, LLC*, 295 F. App'x 128 (9th Cir. 2008)

27  (Opp. 17), which is inapplicable and irrelevant.  First, *Green* applies neither California law nor

28  federal common law but rather the law of Washington state.  *See* 295 F. App'x at 129 (quoting

1   *Douchette v. Bethel Sch. Dist. No 403*, 117 Wash. 2d 805 (1991)).  Second, Plaintiffs cite *Green* for

2   the proposition that equitable tolling "applies when a plaintiff 'diligently pursue[s] his claims' and

3   has 'show[n] that the defendant engaged in [] deception that caused him to miss the statutory

4   deadline.'"  (Opp. 17 (quoting *Green*, 295 F. App'x at 129).)  Under California law such conduct

5   falls under the distinct doctrine of equitable estoppel.  *Lantzy v. Centex Homes*, 31 Cal. 4th 363, 383

6   (2003) ("Equitable tolling and equitable estoppel are distinct doctrines. . . . Equitable estoppel . . .

7   addresses . . . the circumstances in which a party will be estopped from asserting the statute of

8   limitations as a defense to an admittedly untimely action because his conduct has induced another

9   into forbearing suit."); *see* (Opp. 20 (quoting same)).  As discussed below, Plaintiffs' equitable

10  estoppel arguments fare no better.

11       Even if Plaintiffs' formulation of California's equitable tolling rule were correct, they have

12  neither pleaded nor argued that the NCAA would not suffer prejudice from the adjudication of stale

13  claims, some more than twenty years old.  *See Lantzy*, 31 Cal. 4th at 370 (collecting cases to show

14  California Supreme Court has applied equitable tolling "in carefully considered situations to prevent

15  the unjust technical forfeiture of causes of action, where the defendant would suffer no prejudice");

16  *see also In re Marriage of Zimmerman*, 183 Cal. App. 4th 900, 912 (2010) (plaintiffs burden to

17  prove applicability of equitable tolling).  Additionally, although they now purport to rely on

18  supposed "[c]ollective[]" behavior to justify equitable tolling, (*see* Opp. 18), Plaintiffs make no

19  allegations about the NCAA specifically that would merit tolling even under their (incorrect)

20  framing of the rule.  The only relevant allegation in the FAC alleges that Doe 6's parents shared

21  information about the facts underlying their causes of action with the NCAA through the FAR.  *See*

22  FAC ¶¶ 379, 456; (Mot. 20 (discussing same)).  Even assuming *arguendo* that this allegation were

23  sufficient to merit equitable tolling—which it is not because the FAR is not an NCAA employee or

24  agent (Mot. 11–12 & n.5)—the FAC is devoid of any allegation, and the opposition makes no

25  argument, that the NCAA took actions that would justify equitable tolling for Does 4-5 and 7-12.

26  **C.   Does 4-12 Fail to Allege Conduct or Ignorance of Material Facts Sufficient to Invoke Equitable Estoppel/Fraudulent Concealment.**

27       Plaintiffs fail to justify application of equitable estoppel.  Plaintiffs do not even attempt to

1  show that Does 4-12 were "ignorant of the true state of facts."  *Javor v. Taggart*, 98 Cal. App. 4th

2  795, 804 (2002) (citation omitted), *as modified* (May 23, 2002); *see also Milla v. Roman Catholic*

3  *Archbishop*, 187 Cal. App. 3d 1453, 1461 (1986) (fraudulent concealment inapplicable because

4  plaintiff was "at all times aware of the relevant facts").  As in *Javor*, the FAC shows that Does 4-12

5  were "keenly aware of the wrong done to" them.  *Javor*, 98 Cal. App. 4th at 804; (*see* Mot. 17–18

6  (cataloguing Does 4-12's contemporaneous appreciation of wrongful conduct)).  Plaintiffs fail to

7  address these allegations, reiterating instead their claimed lack of "knowledge of their legal rights."

8  (Opp. 21.)  As in *Javor*, this is insufficient to invoke the discovery rule.  And Plaintiffs point to no

9  authority for the proposition that equitable estoppel can be invoked where Plaintiffs are simply

10  unaware of the legal significance of well-known (and exhaustively pleaded) material facts.

11  Plaintiffs rely on *Langston v. Mid-America Intercollegiate Athletics Ass'n*, 448 F. Supp. 3d

12  938 (N.D. Ill. 2020), (Opp. at 20–21), but that case is distinguishable.  *Langston* found that a

13  plaintiff adequately pleaded equitable estoppel under Kansas law where he alleged that the NCAA

14  had concealed facts from football players regarding risks of concussive hits—and that, as compared

15  to players, the NCAA was "in a superior position to know of and mitigate the risks of concussions."

16  448 F. Supp. 3d at 945, 950.  Plaintiffs do not allege or argue the NCAA concealed anything, but

17  rather that the NCAA "failed to act" on generalized allegations of sexual misconduct.  (*See* Opp. at

18  21.)  Unlike plaintiffs in *Langston*, Does 4-12 do not and cannot allege that the NCAA had <u>superior</u>

19  knowledge regarding any risk that they would experience the allegedly wrongful conduct.  Again,

20  Plaintiffs' only claim that NCAA possessed any knowledge of the alleged conduct at issue is

21  premised on an allegation that Doe 6's parents attempted to inform the NCAA through the FAR,

22  who is not an NCAA employee or agent.  *See* FAC ¶¶ 379, 456; (Mot. 20 (discussing same); Mot.

23  11–12 & n.5 (discussing the FAR's role)).  Not only does this demonstrate the superior knowledge

24  of Doe 6, but it is again silent to any of the other Plaintiffs seeking to revive their lapsed claims.

25  **D.       No Other Rule Renders These Claims Timely.**

26  Plaintiffs' request for a *sui generis* tolling rule to revive their untimely claims is unsupported.

27  The only support Plaintiffs provide is a facially inapplicable statute, citing Cal. Civ. Proc. Code

28  § 340.16(a) ("In any civil action for . . . damages suffered as a result of sexual assault . . . .").  Here,

1   Plaintiffs do not allege sexual assault, and their bald claim that Section 340.16 is "not limited to

2   sexual assault, but also captured 'inappropriate contact, communication, or activity of a sexual

3   nature,'" (Opp. 23), is both unsupported by any citation and contradicts the plain text of the statute.

4   And even in cases where Section 340.16 does apply, it "does not apply retroactively to revive lapsed

5   claims." *Bianco v. Warner*, 562 F. Supp. 3d 526, 533 (C.D. Cal. 2021).

6   **V.      THE NCAA OWES NO LEGALLY ACTIONABLE DUTY TO PLAINTIFFS.**

7           Whether the NCAA owes a duty to protect student-athletes like Plaintiffs is "a question of

8   law to be determined by the trial judge." *See Tibbs v. Huber, Hunt & Nichols, Inc.*, 668 N.E.2d 248,

9   250 (Ind. 1996); *accord Brown v. USA Taekwondo*, 11 Cal. 5th 204, 213, *reh'g denied* (May 12,

10  2021).  Contrary to Plaintiffs' contention, and regardless of what law applies, the Court may resolve

11  this legal question on a motion to dismiss.  *See, e.g.*, *Spierer v. Rossman*, 798 F.3d 502, 513 (7th Cir.

12  2015) (affirming dismissal of negligence claim for failure to allege duty under Indiana law); *Fru-*

13  *Con Const. Corp. v. Sacramento Mun. Util. Dist.*, 2005 WL 1865499, at *2 (E.D. Cal. Aug. 3, 2005)

14  ("[I]t is appropriate for this court to decide the question of duty in a motion to dismiss.").

15          **A.      California Law Does Not Apply.**

16          Plaintiffs' assertion that there is no conflict between California and Indiana law on duty,

17  (Opp. 30), elides the fact that the "public policy considerations" in California's analysis are seven

18  particular, enumerated factors that are not required by Indiana's analysis.  *See Rowland v. Christian*,

19  69 Cal. 2d 108, 112–13 (1968).  In contrast, Indiana's rule calls for courts to consider broadly

20  defined "public policy concerns," which vary by case. *See, e.g.*, *Webb v. Jarvis*, 575 N.E.2d 992,

21  997 (Ind. 1991).  Indiana's flexible approach contrasts with California's rigid approach: indeed, the

22  California Supreme Court recently "decline[d] [plaintiff's] invitation" to adopt a "more flexible and

23  holistic approach to duty." *Brown v. USA Taekwondo*, 11 Cal. 5th at 220.  In California, a plaintiff

24  <u>must</u> prove that a special relationship exists for the court to find a duty to prevent harm to third

25  parties. *Id.* at 220–22.  Indiana's test, by contrast, is a balancing test, and a court may conclude that

26  a duty exists even if some factors are weak. *Goldsberry v. Grubbs*, 672 N.E.2d 475, 479 n.2 (Ind.

27  Ct. App. 1996) ("foreseeability in the duty analysis is but one of three factors to be balanced," and a

28  court may find a duty if one factor strongly favors duty while the others do not, and vice versa).

1    An Indiana court thus will consider factors *not* considered by California courts and impose

2    (or not impose) a duty when some California factors are missing. *E.g. Williams v. Cingular*

3    *Wireless*, 809 N.E.2d 473, 479 (Ind. Ct. App. 2004) (considering pending legislation as reason not to

4    impose a duty); *Rowland*, 69 Cal. 2d at 112-13 (considering availability of insurance as a factor in

5    duty analysis).  An Indiana court is also free to discount some factors more heavily than others.

6    These differences are material for purposes of the choice of law analysis. *Gianino v. Alacer Corp.*,

7    846 F. Supp. 2d 1096, 1102 (C.D. Cal. 2012) (finding material difference in part because some states

8    prescribed a method for calculating damages and others used a "flexible" approach).

9    Plaintiffs also fail to show that California holds the predominant interest in application of its

10   laws, as all of the "complained-of conduct" in California is that of the Coach Defendants, not the

11   NCAA.  "[T]he place of the wrong has the predominant interest," and "the 'place of the wrong' is

12   the state where the last event necessary to make the actor liable occurred." *Mazza v. Am. Honda*

13   *Motor Co.*, 666 F.3d 581, 593 (9th Cir. 2012) (citations omitted); *Grace v. Apple, Inc.*, 328 F.R.D.

14   320, 348 (N.D. Cal. 2018).  Plaintiffs fail to allege that the NCAA took any actions in California

15   constituting the breaches of duty alleged here, and the only place where the NCAA could have

16   breached its alleged "duty to implement and enforce rules and bylaws," FAC ¶ 474, is where it

17   implements and enforces rules and bylaws: its headquarters in Indiana. *Mazza*, 666 F.3d at 593.

18   Indiana therefore is "the place of the wrong." *Id.*

19   Plaintiffs also fail to address Indiana's interest in "setting the appropriate level of liability for

20   companies conducting business within its territory" in order to "create a more favorable business

21   climate for the companies that the state seeks to attract to do business in the state." *Mazza*, 666 F.3d

22   at 592.  Indiana, the state where the NCAA is headquartered, certainly has an interest in what

23   protective measures an incorporated governing body operating within its borders must take.

24   Plaintiffs have failed to make the antecedent showing that California has the predominant interest, a

25   showing "necessary to ensure that application of California law is constitutional." *Id.* at 589–90.

26   **B.    <u>The NCAA Does Not Have a Duty Under Either Indiana or California Law</u>.**

27   Plaintiffs attempt to distinguish *Lanni v. NCAA*, 42 N.E.3d 542 (Ind. Ct. App. 2015), as

28   involving "a random accident."  (*See* Opp. 33.)  But the court's holding did not turn on the

1    accident's randomness.  Instead, the court reasoned that the fact that the NCAA provided guidance

2    to its member institutions and student-athletes in avoiding unsafe practices did not mean the NCAA

3    exercised actual oversight and control over them.  *Lanni*, 42 N.E.3d at 549–50.

4           Even should the Court rule that California law applies—and it does not—the NCAA

5    argues in the alternative that no duty exists under California law.

6           **1.      There Is No Special Relationship Between the NCAA and Coaches or
                        Student-Athletes.**

7           Plaintiffs contend that the NCAA owes Plaintiffs a duty based on its special relationship

8    with student-athletes and coaches, (Opp. 31–34), but California cases hold that national

9    organizations that "cannot monitor the day-to-day activities of local chapters contemporaneously"

10   do not have the requisite control over its members to impose a special relationship.  *Barenborg v.*

11   *Sigma Alpha Epsilon Fraternity*, 33 Cal. App. 5th 70, 79 (2019).

12          Plaintiffs point to the NCAA's rules and regulations promulgated for the benefit of student-

13   athletes and to monitor coaches, (Opp. 32–34), but California courts reject the notion that such rules

14   and regulations are sufficient to create a special relationship.  In *Barenborg*, plaintiff argued that the

15   defendant, a national fraternity, was liable for harm he experienced at a party hosted by the local

16   chapter.  The court rejected the notion that the "many disciplinary tools at [the defendant's]

17   disposal" and that the national fraternity "promulgated rules on social events, risk management, and

18   alcohol use" were sufficient to create a special relationship with the plaintiff.  33 Cal. App. 5th at 80,

19   83.  Just like the *Barenborg* defendant, the NCAA is "unable to monitor and control" coaches and

20   student-athletes' "day-to-day operations," and it thus owed no duty to protect Plaintiffs from the

21   coaches' conduct.  *Id.* at 81-82.

22          The NCAA's inability to control college coaches' day-to-day conduct is unlike that of the

23   USAT in *Brown v. USA Taekwondo*, 11 Cal. 5th at 222.  In the appellate decision affirmed by the

24   California Supreme Court in *Brown*, the court noted that the USAT's ability to discipline coaches for

25   rule violations, without more, was insufficient to impose a duty.  Unlike the national fraternity in

26   *Barenborg*, "which could only control its local chapter by disciplining it after learning of a violation

27   of the fraternity's policies," the USAT could have "taken additional steps to protect youth athletes by

28

prohibiting coaches from traveling alone to competitions with youth athletes, barring coaches from staying in hotel rooms at competitions with youth athletes, and providing guards or chaperones at hotels and dormitories." *Brown v. USA Taekwondo*, 40 Cal. App. 5th 1077, 1094–95 (2019).  With respect to the USOC, *Brown*, like *Barenborg*, held that the ability to impose post-conduct discipline, without day-to-day control, does not create a special relationship.  *Id.*  The USOC had policies to protect youth athletes from abuse by coaches, but had no ability to control coaches' day-to-day conduct.  *Id.* at 1103.  Plaintiffs have not alleged day-to-day control, and the NCAA thus has no special relationship with the Coach Defendants or with Plaintiffs.

*Regents of University of California v. Superior Court*, 4 Cal. 5th 607, 620 (2018), only underscores the difference between this case and those in which courts have recognized special relationships.  The Court held that a university had a duty to prevent an attack on a student because colleges "have superior control over the environment and the ability to protect students." *Id.* at 625-26.  To avoid imposing liability when the school lacked the ability to prevent harm, the Court limited the scope of the duty to students engaged in curricular activities.  *Id.* at 625.  That limited scope was important because schools only "have a superior ability to provide . . . safety with respect to activities they sponsor or facilities they control." *Id.*  Consistent with *Brown* and *Barenborg*, *Regents* recognized a limited duty to students in specific contexts where the university has day-to-day control—which the NCAA lacks here.  Under California law, the NCAA is not in a special relationship with Coach Defendants are with Plaintiffs.

### 2. The *Rowland* Factors Weigh Against Duty.

Even if the Court were to conclude that a special relationship existed, it should find that the public policy factors in *Rowland* weigh against imposing a duty.

One of the factors, "the closeness of the connection between the defendant's conduct and the injury suffered," weighs against imposing a duty because California courts have consistently held that there is no duty to protect based on a failure to adequately enforce high-level policies.  In *University of Southern California v. Superior Court* ("*USC*"), 30 Cal. App. 5th 429, 453 (2018), a plaintiff argued USC was liable for an injury she suffered at a fraternity party based on USC's alleged duty to enforce its alcohol and social event policies.  *Id.*  The court refused to recognize such

a duty based on "[t]he attenuated connection between USC's failure to enforce its policies and the independent conduct by [those that more directly caused the plaintiff's harm]," and the many layers of "intervening conduct" between USC and plaintiff's harm, including a fraternity "hosting an unauthorized party," the plaintiff "attending the party," and an individual at the party causing the plaintiff's injury. *Id.* at 453–54. Here, the connection is just as attenuated: the layers of intervening conduct include that of the Coach Defendants and of their USF supervisors, who enforce and implement USF's sexual misconduct policies and Title IX obligations.

The "moral blame" factor favors imposing a duty only when a defendant engages in conduct with a "higher degree of moral culpability" than ordinary negligence, *Martinez v. Bank of Am. Nat'l Tr. & Savings Ass'n*, 82 Cal. App. 4th 883, 896 (2000), and the NCAA's efforts to prevent sexual misconduct at member schools are not morally blameworthy. Plaintiff's argument that the NCAA is morally blameworthy for failing to prevent violence to plaintiffs misses the point. First, there is no allegation that the NCAA knew of the specific allegations against the Coach Defendants. *See Doe v. U.S. Youth Soccer Ass'n*, 8 Cal. App. 5th 1118, 1137, *as modified on denial of reh'g* (Mar. 16, 2017) (no moral blame where no allegations that defendants participated in assault or knew of dangerous propensities beforehand). Nor do courts ascribe moral blame to entities that, like the NCAA, have policies to prevent misconduct, just because those policies do not ultimately prevent all harm. *Id.* (no moral blame when organization adopted policies to prevent the harm plaintiff suffered, even though policies did not prevent actual harm).

The policy of preventing future harm also weighs against the imposition of a duty, as imposing a duty would <u>discourage</u> organizations like the NCAA from promulgating guidance relating to sexual misconduct. "[T]he policy of preventing future harm is ordinarily served by allocating costs to those responsible for the injury and thus best suited to prevent it." *Vasilenko v. Grace Fam. Church*, 3 Cal. 5th 1077, 1087 (2017). Here, the NCAA lacks day-to-day oversight over coaches and student-athletes and is not best suited to preventing the harm at issue here. Finding a duty based on the NCAA's existing efforts and policies regarding sexual misconduct would discourage organizations like the NCAA from enacting similar policies for fear of incurring liability. *See USC*, 30 Cal. App. 5th at 454–55 ("[F]inding a duty in these circumstances could

1  create a disincentive for universities to regulate alcohol use and social activities and provide

2  security patrols, which to some degree could frustrate the policy of preventing future harm.").

3       Finally, the burden of such a duty would be limitless.  In *USC*, the court found that the

4  burden factor weighed against the imposition of a duty because "effective control of off-campus

5  fraternity parties, if achievable, would require close monitoring and considerable resources."  *Id.*

6  Here, it would be impossible for the NCAA to monitor the day-to-day activities of the many

7  thousands of coaches and student-athletes, as well as member institutions, to ensure compliance with

8  NCAA bylaws and guidance.  The *Rowland* factors weigh against imposing a duty.

9      **C.**    **The NCAA Did Not Voluntarily Assume a Duty.**

10       Courts have rejected Plaintiffs' argument that the NCAA voluntarily assumed a duty to

11  protect student-athletes through the Manual.  *Barenborg* held that a national organization does not

12  undertake to provide "direct day-to-day oversight and control of [a local entity's] activities or the

13  conduct of its members" by promulgating "rules, policies, and guidelines."  *Barenborg*, 33

14  Cal.App.5th at 84.  Plaintiffs cite *Langston*, 448 F. Supp. 3d 938, but that case did not address the

15  NCAA's duty to prevent injuries to students at all.  Both *Schmitz v. NCAA*, 67 N.E.3d 852 (Ohio Ct.

16  App. 2016), and *Hill v. Slippery Rock University*, 138 A.3d 673 (Pa. Super. Ct. 2016), are inapposite,

17  as both found a duty based on the NCAA's superior knowledge of risk of injury, which it allegedly

18  failed to disclose or act on in some cases but not others.  Plaintiffs make no such allegations here.

19      **D.**    **The NCAA Is Not in a Fiduciary Relationship with Plaintiffs.**

20       Plaintiffs do not address the fact that neither Indiana nor California has recognized fiduciary

21  relationships between national associations of universities and student-athletes.  (Opp. 39–40.)  Nor

22  could they:  it is implausible that the NCAA maintains a fiduciary relationship with 400,000 student-

23  athletes on nearly 1,100 campuses in 50 states.  Plaintiffs dismiss *Schmitz*, 67 N.E.3d at 870, as

24  based on a heightened standard for fraud, but its core premise has been accepted by courts under

25  ordinary pleading standards.  *See Flood v. NCAA*, 2015 WL 5785801, at *11 (M.D. Pa. Aug. 26,

26  2015), *report and recommendation adopted*, 2015 WL 5783373 (Sept. 30, 2015) ("[C]ourts have

27  flatly rejected the notion that the relationship between student-athletes, colleges, and the NCAA

28  somehow rises to the level of a fiduciary relationship.").

**E.**     **Plaintiffs Fail to Allege a Negligent Misrepresentation by the NCAA.**

First, Plaintiffs' argument that California law applies because California applies a duty of care "more broadly [than does Indiana] when physical safety is involved," (Opp. 41 (cleaned up)), ignores the Ninth Circuit's directive that California's more plaintiff-friendly law does not grant it a greater interest in applying its law to a case. *See Mazza*, 666 F.3d at 592 (district court erred in applying California law when it provided "more comprehensive consumer protection"). Second, Plaintiffs allege that the NCAA "concealed various facts, including that '[t]he power differential between coaches . . . and student athletes makes student-athletes more vulnerable'" to abuse, (Opp. 41 (citation omitted)), but this is belied by the FAC itself, which points to NCAA publications discussing the risks of amorous relationships between coaches and students. *E.g.*, FAC ¶ 66. Moreover, this allegation does not concern an affirmative misrepresentation—that is, "a positive assertion"—and at most alleges "an omission or an implied assertion or representation," which is not sufficient. *Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 158 Cal. App. 4th 226, 243 (2007).

**VI.     THE NCAA DOES NOT EMPLOY THE COACH DEFENDANTS AND THEREFORE DID NOT NEGLIGENTLY SUPERVISE THEM.**

Plaintiffs fail to allege an employment or agency relationship between the NCAA and the Coach Defendants, which they concede is required for negligent supervision. (Opp. 41.) Plaintiffs allege that the NCAA controls coaches' conduct through "disciplinary . . . action," (Opp. 42), but courts have consistently held such powers insufficient to create an agency relationship. *See Patterson v. Domino's Pizza, LLC*, 60 Cal. 4th 474, 498 (2014); *Barenborg*, 33 Cal. App. 5th at 85 (rules, regulations, and ability to impose post-conduct discipline held insufficient).

**VII.     THE NCAA IS NOT VICARIOUSLY LIABLE FOR THE COACH DEFENDANTS.**

Plaintiffs fail to establish that the NCAA is vicariously liable for the Coach Defendants' actions. *First*, Plaintiffs do not allege that the NCAA is in an employment relationship with the Coach Defendants, as is required for respondeat superior. *Second*, even if they had alleged an employment relationship, the Coach Defendants' alleged conduct was outside the scope of that relationship, for "[g]enerally, the courts have not imposed vicarious liability for sexual assaults or misconduct of employees." *Doe 1 v. City of Murrieta*, 102 Cal. App. 4th 899, 907 (2002). Courts

have rejected attempts to expand *Mary M. v. City of L.A.*, 54 Cal. 3d 202 (1991), beyond the

unique context of police officers, and it is inapplicable here.  *See Daza v. L.A. Cmty. Coll. Dist.*,

247 Cal. App. 4th 260, 269 (2016) (guidance counselor's assault of student during counselling

session was outside the scope of employment).  *Lu v. Powell*, 621 F.3d 944 (9th Cir. 2010), which

Plaintiffs cite, (Opp. 49), is consistent with this rule.  *See Doe v. Uber Techs., Inc.*, 2019 WL

6251189, at *5 (N.D. Cal. Nov. 22, 2019) (explaining that *Lu* does not expand California law

because asylum officers exercise similar coercive power as the police).

Moreover, the California Supreme Court has rejected Plaintiffs' argument that there is

vicarious liability for sexual misconduct during "official" activities.  In *John R. v. Oakland

Unified School District*, 48 Cal. 3d 438 (1989), the Court rejected vicarious liability where a

teacher sexually assaulted a student in an "officially sanctioned, extracurricular program." *Id.* at

441, 449.  In *Lisa M.*, the Court reasoned that an ultrasound technician's assault of a patient "did

not *arise out of* the performance of the examination, although the circumstances of the

examination made it possible." *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291,

301 (1995).  Plaintiffs make no attempt to distinguish this controlling authority.  Instead, Plaintiffs

rely on *Lisa M. v. Henry Mayo Newhall Memorial Hospital*, 29 Cal. App. 4th 473 (1994), which

the California Supreme Court *reversed* in *Lisa M.*; and *Beliveau v. Caras*, 873 F. Supp. 1393,

1400 (C.D. Cal. 1995), which relied on that since-reversed holding; and other cases that have been

criticized or limited in application.  *Compare Doe v. Uber Techs. Inc.*, 184 F. Supp. 3d 774 (N.D.

Cal. 2016), *with Doe v. Uber Techs., Inc.*, 2019 WL 6251189, at *5 (criticizing the former case as

a misapplication of *Lisa M.*); *see also Uber Techs.*, 2019 WL 6251189, at *5 (distinguishing *Lu*

based on officer's sexual assault).

*Finally*, Plaintiffs ignore that the NCAA could not have ratified the Coach Defendants'

conduct, as any complaint about it was made to USF, not the NCAA.  They fail to provide any

reason why the actions of the FAR, a USF employee, can be attributed to the NCAA.  (Opp. 50;

Mot. 11–12 & n.5.)  The FAC alleges no facts that put the <u>NCAA</u> on notice of any need to

investigate the Coach Defendants, so it thus cannot have ratified their conduct.  *See Edmunds v.

Atchison, Topeka & Santa Fe Ry. Co.*, 174 Cal. 246, 250 (1917) (no ratification on a failure to

discipline theory where principal has no notice and opportunity to investigate wrongful conduct).

## VIII.   PLAINTIFFS' CONTRACT-BASED CLAIMS FAIL.

Plaintiffs' opposition does nothing to salvage their contract claims.

**Express/Implied Contract.**  Neither the Student-Athlete Statement form nor the Division I Manual contains any promises from the NCAA to student-athletes, and Plaintiffs merely repeat the conclusory allegations that are contradicted by the very documents they reference.  The cases Plaintiffs cite are inapposite.  (Opp. 51–52.)  In those cases, neither the form nor Manual were considered by courts on motions to dismiss.[13]  Here, the Court has the benefit of the actual documents Plaintiffs contend are contracts.  The documents do not create contractual obligations.

**Third-Party Beneficiaries.**  The Manual does not include any affirmative promises to student-athletes.  Rather, it contains rules and bylaws passed by member institutions to govern their relationship with the NCAA.  Whether student-athletes benefit from those rules and bylaws is irrelevant, as "a literal contract interpretation [that] would result in a benefit to the third party is not enough to entitle that party to demand enforcement." *Neverkovec v. Fredericks*, 74 Cal. App. 4th 337, 348 (1999).  The question here is whether the "motivating purpose" of the NCAA and member institutions was to assume an individual obligation to student-athletes as third-parties.  *Wexler v. Cal. Fair Plan Ass'n*, 63 Cal. App. 5th 55, 65 (2021).  Plaintiffs have not alleged any such intent.  Instead, they rely on broad statements of principle, such as to "improve intercollegiate athletics programs for student athletes," (Opp. 52), but courts have held these sorts of broad statements insufficient to confer third-party beneficiary status on student-athletes.  *See Hairston v. Pac. 10 Conf.*, 101 F.3d 1315, 1320 (9th Cir. 1996).[14]  "[C]ourts resolve doubts against the existence of a third party beneficiary." *Wexler*, 63 Cal. App. 5th at 66.  This claim should be dismissed.

---

[13] *See* Compl. ¶¶ 25–27, *Weston v. Big Sky Conf., Inc.*, No. 17-cv-04975 (N.D. Ill. June 8, 2017), ECF No. 1; *id.*, Motion to Dismiss at 16–18 (N.D. Ill. Dec. 14, 2017), ECF No. 19; Compl. ¶¶ 29–31, *Richardson v. Se. Conf.*, No. 16-cv-09980 (N.D. Ill. Aug. 31, 2016), ECF No. 1; *id.*, Motion to Dismiss at 15–17 (N.D. Ill. Dec. 14, 2017), ECF No. 23.  Plaintiffs also fail to address *Rose v. NCAA*, 346 F. Supp. 3d 1212 (N.D. Ill. 2018), which dismissed similar implied contract and third-party beneficiary claims but not the express contract claim.  *Id.* at 1228.  *Rose*, like the cases Plaintiffs rely on, is irrelevant because it does not consider the language of the Manual or Student-Athlete Statement.  *Id.* at 1227 (noting the "sparse" allegations regarding an express contract).

[14] Plaintiffs cite *Weston*, but *Weston* did not analyze whether the Manual creates third-party beneficiary obligations.  Plaintiffs' other cases analyze eligibility requirements not relevant here.

Case No. 3:22-cv-01559-LB

1   DATED:  November 11, 2022      MUNGER, TOLLES & OLSON LLP

2

3                                 By:     */s/ Carolyn Hoecker Luedtke*
                                            CAROLYN HOECKER LUEDTKE

4

5                                   Attorneys for Defendant The National Collegiate
                                     Athletic Association

NCAA'S REPLY I/S/O MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT