UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8, JOHN DOE 9, JOHN DOE 10, JOHN DOE 11, and JOHN DOE 12, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, THE UNIVERSITY OF SAN FRANCISCO, ANTHONY N. (AKA NINO) GIARRATANO, and TROY NAKAMURA,

Defendants.

Case No. 22-cv-01559-LB

**ORDER GRANTING MOTIONS TO DISMISS IN PART**

Re: ECF Nos. 64, 65, 67, 68

**INTRODUCTION**

The plaintiffs in this putative class action are former University of San Francisco Division I baseball players who are proceeding, respectively, as Does 1–3 (more recent players) and Does 4–12 (earlier players). The plaintiffs allege that since 1999, USF head coach Anthony Giarratano and assistant coach Troy Nakamura created a sexualized environment — by being naked, miming and discussing sexual acts, belittling players with vulgar names, and handing out sex toys, among other conduct — and then berating and punishing players who did not participate. They sued the coaches for their behavior and USF and the NCAA for allowing the behavior to persist.

United States District Court
Northern District of California

United States District Court
Northern District of California

There are three putative classes: a nationwide class of all student-athletes who participated in NCAA sports at NCAA member institutions in the last four years, a California subclass of all student-athletes who participated in NCAA sports at California-based NCAA member institutions in the last four years, and a USF Baseball subclass of all members of the USF baseball team since 2000. The plaintiffs claim Title IX discrimination and retaliation by USF, discrimination in violation of California Education Code § 66270 by USF, a failure by USF to identify its gender-discrimination policies in violation of California Education Code § 66281.5, negligence by all defendants, negligent supervision and training by USF and the NCAA, breach of fiduciary duty by the NCAA, breach of contract-based duties by the NCAA, and intentional and negligent infliction of emotional distress by all defendants.

The NCAA moved to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. All defendants moved to dismiss under Rule 12(b)(6) on the ground that the claims of Does 4–12 accrued outside the limitations period. All defendants moved to dismiss the claims under Rule 12(b)(6). The NCAA contends that it owed the plaintiffs no duty (for negligence or for breach of contract), and it is not vicariously liable. USF contends that (1) the plaintiffs alleged behavior that is not gender discrimination under Title IX or California Education Code § 66270 and also did not allege actual notice to USF, (2) the plaintiffs did not allege that they engaged in protected activity and thus do not state a Title IX retaliation claim, (3) the plaintiffs did not allege USF's failure to provide notice about the school's policies prohibiting gender discrimination and thus do not state a claim under California Education Code § 66281.5, and (4) the plaintiffs did not allege foreseeability for the negligence claims. The coaches generally contend that the plaintiffs did not plausibly plead their tort claims.

The court dismisses the claims against the NCAA for lack of personal jurisdiction: it is headquartered in Indianapolis, Indiana, and its activities here (including its regulation of athletes) are not the necessary minimum contacts with the forum. The statute of limitations bars the claims of Does 4–12 and is not tolled because they knew about the misconduct. The other plaintiffs plausibly alleged sex discrimination under Title IX and the California Education Code. They do not state a Title IX retaliation claim because they did not plead protected activity. They do not

state a claim under California Education Code § 66281.5 because they did not allege deficiencies in the policy or notice. The remaining tort claims survive.

**STATEMENT**

**1.  The Abusive Conduct**

The plaintiffs all played baseball on USF's NCAA Division I team: John Does 1–3 more recently (2020 on) and John Does 4–12 during earlier seasons (1999 through 2018).[1] (John Does 4–12 became plaintiffs when they "discover[ed] that they . . . had viable claims" after the San Francisco Chronicle published an article about the case.[2]) The coaches during their tenure were Head Coach Anthony Giarratano and Assistant Coach Troy Nakamura.[3]

The plaintiffs allege that the coaches subjected them to an "intolerable sexualized environment" — by being naked on the field or in windows, using abusive language, miming and discussing sexual acts, and handing out sex toys, among other conduct — and then punishing players who did not participate.[4] The sexualized conduct included the following:

- Coach Nakamura — during a 2013 practice — gestured to the undergraduate dorms and said, "Sometimes girls will stand at their windows, pull up their shirts, and show their boobs. We're here to play baseball, so just look at them and jerk off about it later. Trust me, I want to fuck them too." In fall 2020, he "persistently" encouraged the female students at the dorms to "flash their breasts by whistling and lifting his shirt to suggest the females do the same. Coach G[iarratano] would laugh."[5]

- In practice sessions, any pitcher who made an error had to take off an item of clothing. Sometimes, they had to strip down to their underwear, and the coaches and other players

---

[1] First Am. Compl. (FAC) – ECF No. 38 at 12–13 (¶¶ 38–49). Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 95 (¶ 463); *compare id.* at 12–13 (¶¶ 38–49) (Does 1–12), *with* Compl. – ECF No. 1 at 11–12 (¶¶ 30–41) (Does 1–3 only).

[3] FAC – ECF No. 38 at 5 (¶ 5).

[4] *Id.* at 43 (¶ 156).

[5] *Id.* (¶ 157).

would laugh. This happened to John Does 6, 7, and 8 in the 2012–2014 seasons and John Does 10 and 12 in the 2017–2018 season.[6]

- During a gift exchange during the 2011–2013 seasons, a coach gave a player a life-sized, blow-up female sex doll, telling him that he would "make him run" if he did not bring the doll to practice the next day. The player, forced to walk home from practice, encountered a police officer, who yelled at him and popped the doll.[7]

- Coach Nakamura began practices in 2020 and 2021 by having players identify what they would bring to a barbecue or fast-food meal. He sexualized the exercise, and encouraged players to do the same, by referring to woman's body parts, fluids, and excretions he wanted to eat ("Jennifer Aniston's boobs" or "whipped cream from Pamela Anderson's crotch"). Coach Giarratano did the same. The coaches demanded participation through laughter and pressure to participate.[8]

- In 2017–2018, when players were doing butterfly stretches, coaches asked John Does 4 and 12 on at least a weekly basis where their "butterflies were flying to." Coach Nakamura responded that they were going to get strippers and strippers' asses (or like comments). The players "felt extreme pressure" to respond in a "sexual manner" because Coach Nakamura became angry if they did not.[9]

- Coach Nakamura regularly talked about how he was bisexual, how little clothing women wore on campus during warm weather, and what sexual acts he would like to perform on them. When he moved on campus, his comments about campus women became increasingly sexual and distressing to players. Coach Giarratano "heard and participated in these conversations," which seemingly were an everyday event and a regular topic of conversation among the players.[10]

---

[6] *Id.* (¶ 158).

[7] *Id.* (¶ 159).

[8] *Id.* at 44 (¶¶ 160–63).

[9] *Id.* (¶ 164).

[10] *Id.* at 45 (¶¶ 166–68).

United States District Court
Northern District of California

United States District Court
Northern District of California

- Coach Nakamura engaged in calculated displays of nudity, exposing himself to players and coaches. He required sexualized skits before practice and would participate in them. For example, on multiple occasions in 2017, 2018, and 2021, he pretended that he was at a buffet, required a player to do a handstand, grabbed and split open the player's legs, and pretended to eat spaghetti from the genital area, to many players' disgust.[11]

- John Doe 12 (2017–2018) recalls Coach Nakamura's telling a player to get on his hands and knees and riding the player like a bull, as if Coach Nakamura were having sex.[12]

- During a practice, Coach Nakamura said that he would take care of the day's skit, crawled out of the dugout naked, knelt in front of the players, and swung his penis around, to the players' disbelief, embarrassment, and disgust.

- Coach Nakamura often was naked or holding a bat between his legs, pretending it was his penis. Another time, a player fielding balls heard Coach Nakamura calling his name, turned, and saw him standing on a table, naked, swinging his penis in a helicopter motion while yelling, hey, [Player X].[13]

- Coach Giarratano did not condemn Coach Nakamura's behavior but instead kissed the cross on his necklace and mimed looking at the sky to ask for God's forgiveness. He said to older players, "we could get fired for this," and said that his wife was "mad at him because his job was in jeopardy due to Coach Nak[amura's] nudity and behavior." But he normalized the behavior by playing along with it.[14]

- The coaches would shower with the players and walk around the locker room, naked or barely dressed. In fall 2000, Coach Nakamura asked a player if he could shower in his first-year dormitory. In 2021, he asked players if he could shower in their hotel room and, after he got out of the shower, walked around naked, talking about his bisexuality.[15]

---

[11] *Id.* (¶¶ 171–72).

[12] *Id.* (¶ 173).

[13] *Id.* at 45–46 (¶¶ 174–75, 177).

[14] *Id.* at 46 (¶¶ 175–76).

[15] *Id.* (¶¶ 178–80).

- In the 2017–2018 season, John Does 4 and 12 recall military-like training exercises at 6:00 a.m. on Saturday mornings where, at the beach, the players would strip to their underwear, float in the water with arms linked, and then emerge, when the coaches would comment that their penises were shriveled.[16]

- Degrading skits at the annual roast for incoming freshman included a skit in 2013 that depicted two players (John Doe 5 and another teammate, both gay, but not out at that time) biking to Whole Foods and having anal sex. Another teammate, who did not trim his pubic hair, was mocked in a presentation screen — with a graphic image of a bush over his genitals — and never showered with other players again. In 2014, a team-bonding session involved comments about a player who wore "tighty whities" and had a small penis. In 2017, a slide show had a naked picture of the Director of Operations, who had been catfished (presumably through a fake online profile) by several players.[17]

- There were annual hazing parties with lists of tasks for freshmen. In 2000, the tasks included "have sex with a fat woman, get a hickey from a girl, do a 30-second beer bong or keg stand, and get your girlfriend to blow you and swallow your load." The tasks were tied to drinking: the players would go to a bar called Steps of Rome with fake IDs. The checklists for hazing in 2013 and 2014 had similar activities, tied to mandatory drinking and worth points. The coaches encouraged the behavior and would cancel the next morning's practice.[18]

- In 2013, a USF baseball player injured and threw a student out of a team-hosted party because the student was gay. At a meeting (where a gay player-witness was not invited), Coach Giarratano told players that the incident needed to "stay in the house," implying a coverup. Later the incident was the source of locker-room humor.[19]

---

[16] *Id.* at 47 (¶ 182).

[17] *Id.* (¶ 183).

[18] *Id.* at 47–48 (¶ 184).

[19] *Id.* at 48 (¶ 185).

- Players experienced this as an intolerable sexual environment and regularly discussed how to stop the behavior and report what they deemed abnormal sexual conduct and psychological abuse. But they feared retaliation. In November 2021, to express their discomfort with the behavior (but in a way that was comical), eight players (including John Does 1–3) did a pre-workout skit where they feigned making a Title IX complaint about Coach Nakamura, putting him in handcuffs, and carrying him off to jail.[20]

When the players did not participate in the sexualized atmosphere, the coaches insulted, humiliated, and retaliated against them. They berated the players (telling them that they were worthless, toxic, a cancer, and fucking sucked, for example) and called them names (pussies, faggots, and — for one player — a fucking cunt). They forced players to practice when they were injured. They benched the players and took away playing time. They refused to coach them, calling it a waste of time and telling them that they weren't good enough, would never make it as Division I or professional baseball players, and should leave the team and give up their scholarships. Coach Giarratano told one player he might as well kill himself.[21]

As a result of the coaches' conduct, the players suffered anxiety, depression, panic attacks, sleeplessness, trauma, and suicidal ideation.[22] One player went to the emergency room five times in the fall of 2021 because he was physically ill from the stress.[23]

USF's and the NCAA's knowledge of the conduct is demonstrated by high player-attrition rates, parents' complaints, and the power disparity in the coach-athlete relationship.

First, the high player-attrition rate shows the effect on the team. Players (including the plaintiffs) left the team and USF because of the coaches' conduct.[24] Only one or two of the eleven

---

[20] *Id.* at 49–50 (¶¶ 189–92).

[21] *Id.* at 5–6 (¶¶ 5–9), 42 (¶ 154), 43 (¶ 155), 49 (¶ 187), 50–51 (¶¶ 195–98), 54–55 (¶¶ 216, 218), 59 (¶ 240), 71 (¶ 319).

[22] *Id.* at 59 (¶ 244), 62 (¶ 262), 73 (¶ 333), 76–77 (¶ 352), 78 (¶ 360), 84 (¶ 395), 86 (¶¶ 408, 411), 92 (¶¶ 443, 445), 93 (¶ 449).

[23] *Id.* at 59 (¶ 244).

[24] *Id.* at 57 (¶ 231) (John Doe 1), 64 (¶ 273) (John Doe 3), 69 (¶ 307) (John Doe 4), 76–77 (¶ 352) (John Doe 5), 81 (¶ 378) (John Doe 6), 84 (¶ 396) (John Doe 7), 86 (¶ 410) (John Doe 8), 89 (¶ 426) (John Doe 9), 67 (¶ 293) (John Doe 10), 92 (¶ 446) (John Doe 11), 71–72 (¶ 323) (John Doe 12).

1    or twelve recruits in the 2001 freshman class stayed for four years. Seventy-five percent (all but

2    five) of the twelve or thirteen 2013 recruits transferred to other schools in the following four years.

3    There were seventeen 2020 recruits: eight transferred and two more may.[25] This contrasts with the

4    low attrition rates of other programs: a 2018 study showed that thirteen percent of Division I

5    athletes transferred to another school, and a 2018–2019 study of four-year-college transfers

6    showed a 2.3-percent transfer rate for Division I athletes.[26]

7         Second, parents complained about the conduct. In May 2014, John Doe 6's parents sent a letter

8    to USF's Associate Athletic Director and USF's NCAA Faculty Athletic Representative

9    describing the "hostile environment" created by the coaches' telling players that they were

10   pathetic, weak-minded, a cancer to the team, and "need[ed] to understand that their baseball career

11   is over." USF's then Athletic Director participated in the subsequent conversations.[27] In 2021,

12   John Doe 1's mother left several voice messages for USF's Athletic Director Joan McDermott,

13   and John Doe 2's parents emailed her for an urgent in-person meeting (without specifying why).

14   Ms. McDermott did not respond. In John Doe 1's case, she did not give the complaint to USF's

15   Title IX office, as USF policy required, and (John Doe 1 believes) gave it to the coaches, who

16   escalated their abuse of him through summer 2021.[28] After the fall 2021 season, John Doe 1's

17   mother spoke to Ms. McDermott, who said that the Title IX office "had already been alerted to the

18   issues on the baseball team" and had opened an investigation.[29]

19        Third, the power disparity in the coach-athlete relationship increases the potential for sexual

20   harassment and abuse, especially for elite athletes and male coaches with an authoritarian

21   coaching style. Coaches control all aspects of elite athletes' lives: scholarships, training, playing

22

23

24   [25] *Id.* at 50–51 (¶ 198).

25   [26] *Id.* at 51–52 (¶¶ 199–203).

26   [27] *Id.* at 81 (¶¶ 378–80); Letter, Ex. 1 to Baum Decl. – ECF No. 70-3. To the extent excerpted in this order, the court considers Exhibits 1 and 2 to the Baum declaration under the incorporation-by-reference doctrine. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

27   [28] FAC – ECF No. 38 at 54 (¶¶ 212–14), 58–59 (¶ 239); Email, Ex. 2 to Baum Decl. – ECF No. 70-4.

28   [29] FAC – ECF No. 38 at 54 (¶¶ 212–14), 55 (¶¶ 221–22), 58–59 (¶ 239).

United States District Court
Northern District of California

time, fitness, diet, weight, sleep patterns, and academics. This allows predators (Jerry Sandusky, Larry Nassar, Robert Anderson, and Coach Nakamura) to thrive.[30]

Beginning in 1990, studies showed the intensity of the coach-athlete bond, the difficulty with setting boundaries, and the resulting inability of athletes to recognize abusive behavior. In response to the studies, sports organizations — the U.S. Olympic Committee in 1992, USA Swimming in 1998, the International Olympic Committee in 2007, and others (but not the NCAA) — developed rules to prohibit coach-athlete sexual relationships, protect athletes from sexual harassment, and preserve the athletes' safety and wellbeing.[31] The NCAA has recognized — on its website, in its constitution, and in public statements — its duty to provide a safe environment for student athletes.[32] But it has chosen not to implement policies to monitor, address, or prevent rampant sexual misconduct and abuse of student-athletes.[33] Had it done so, it might have prevented the plaintiffs' injuries.[34] Because it has not, students have suffered abuse.[35] Its policies and pronouncements about player safety and preventing abuse are toothless: it resists reform, focuses on decentralization to avoid liability, and shifts responsibility to member institutions.[36] Despite a history of abuse in its athletic program, USF also failed to act to prevent abuse.[37]

After an investigation, USF emailed the team on January 11, 2022, saying that it had suspended the coaches on December 17, 2022, "Coach Nakamura [was] no longer associated with the USF baseball program, effective immediately," and it "officially reprimanded" Coach Giarratano.[38]

---

[30] *Id.* at 14–18 (¶¶ 54–67).

[31] *Id.* at 18–23 (¶¶ 68–86).

[32] *Id.* at 23–25 (¶¶ 87–92).

[33] *Id.* at 22 (¶ 82), 23 (¶ 86), 25–26 (¶¶ 93–98).

[34] *Id.* at 111–12 (¶¶ 565–68).

[35] *Id.* at 26–30 (¶¶ 99–107).

[36] *Id.* at 30–37 (¶¶ 108–32). To the extent that the parties reference the NCAA Division I Manual, which they do to define the NCAA's duties and omissions and their incorporation into an alleged contract in the form of the NCAA Division I Student-Athlete Statement, the court judicially notices its existence and provisions (but not disputed inferences from them) and can consider it under the incorporation-by-reference doctrine. Fed. R. Evid. 201; *Knievel*, 393 F.3d at 1076–77.

[37] *Id.* at 37–41 (¶¶ 135–47).

[38] *Id.* at 56 (¶¶ 225–27).

### 2. The Claims

There are three putative classes: a nationwide class of all student-athletes who participated in NCAA sports at NCAA member institutions in the last four years, a California subclass of all student-athletes who participated in NCAA sports at California-based NCAA member institutions in the last four years, and a USF Baseball subclass of all members of the USF baseball team since 2000.[39] The complaint has twenty-four claims.

The plaintiffs and the USF baseball subclass assert seventeen claims (numbered as in the complaint): (1) discrimination by USF by an intolerable sexualized environment and emotional abuse, in violation of Title IX, 20 U.S.C §§ 1681–89; (2) retaliation by USF by the coaches' bullying the players to relinquish their scholarships and leave USF (known by USF because of parent complaints (John Does 6 and 8 in May 2014 and John Doe 1 in May 2021)), in violation of Title IX; (3) negligent supervision and retention of Coach Nakamura by USF and the NCAA; (4) negligent supervision and retention of Coach Giarratano by USF and the NCAA; (5) discrimination by USF in the form of an intolerable sexualized environment and emotional abuse, in violation of Cal. Educ. Code § 66270; (6) inadequate notice by USF of its harassment policy, in violation of Cal. Educ. Code § 66281.5; (7) gross negligence by all defendants by breaching their duty of care to ensure players' safety and freedom from sexual harassment and abuse; (8) negligence by all defendants on the same theory; (9) negligent failure to warn, train, and educate about the risks of sexual harassment and abuse by USF and the NCAA; (10) intentional infliction of emotional distress by all defendants; (11) negligent infliction of emotional distress by all defendants; (12) ratification of the coaches' behavior by USF and the NCAA; (13) breach of fiduciary duty by the NCAA; (14) negligent misrepresentations and omissions by the NCAA by its knowing concealment of the risk factors that attend the coach-athlete relationship and the resulting belief by athletes that they were safe and their justifiable reliance on the NCAA; (15) breach of contract by the NCAA by its failure to prohibit and prevent sexual harassment and abuse by athletics departments, in violation of NCAA rules and the NCAA Division Manual, which are incorporated in the mandatory form that

---

[39] *Id.* at 95–96 (¶¶ 466–68)

United States District Court
Northern District of California

players sign to affirm that they read and will abide by the rules and manual; (16) breach of an implied contract by the NCAA on the same theory; and (17) breach of contract as a third-party beneficiary against the NCAA.[40]

The plaintiffs, the nationwide class, and the California subclass assert seven claims (numbered as in the complaint) against the NCAA on the same theories as the corresponding claims by the USF player subclass (identified in parentheses): (18) gross negligence (claim seven); (19) negligence (claim eight); (20) breach of fiduciary duty (claim thirteen); (21) negligent misrepresentations and omissions (claim fourteen); (22) breach of contract (claim fifteen); (23) breach of an implied contract (claim sixteen); and (24) breach of contract as a third-party beneficiary (claim seventeen).[41]

### 3.  Other Jurisdictional Facts

The NCAA is an unincorporated association of 1,098 colleges and universities and 102 athletic conferences that acts as the governing body of college sports. It has three divisions: I, II, and III. Its principal office is in Indianapolis, Indiana.[42]

The complaint alleges general and specific personal jurisdiction.

### 3.1 General Personal Jurisdiction

The NCAA has fifty-seven California members (with a subset of twenty-five Division I members), including USF.[43] "Since its founding in 1916, the NCAA has earned an outsized portion of its over $1 billion annual revenue directly from activities in California." California has the largest number of Division I members in the country. Division I members generate "virtually all NCAA revenue." "California members contribute tens of thousands of dollars in membership dues to the NCAA every year." The NCAA "affirmatively elects" to sponsor many of its largest

---

[40] *Id.* at 101–126 (¶¶ 478–637) & NCAA Div. I Student-Athlete Statement, Ex. A to *id.* – ECF No. 38-1.

[41] FAC – ECF No. 38 at 126–46 (¶¶ 638–716).

[42] *Id.* at 13–14 (¶ 50).

[43] *Id.* at 9–10 (¶¶ 26, 28) (fifty-eight California members and twenty-four Division I members); Selbin Decl. – ECF No. 79-1 at 2 (¶ 2) & NCAA Online Directory, Ex. A to Selbin Decl. – ECF No. 79-1 at 4–7) (numbers are fifty-seven and twenty-five, respectively, as of October 26, 2022).

United States District Court
Northern District of California

United States District Court
Northern District of California

revenue-producing events in California, including the Rose Bowl (since 1916) and forty-three

championship games during the 2019–2020 academic year.[44]

The NCAA "exercises significant control over its California members," including through its

"onerous requirements" for members' athletic programs and its "expansive enforcement

program."[45] It promulgates requirements for scholarships for the California institutions, operates a

transfer portal that California athletes use to transfer to different schools, and sanctions its

California members if they don't comply with NCAA requirements. (For example, the NCAA

sanctioned Coach Giarratano and USF during John Doe 5's tenure (2011–2014) because he used

too much off-season time for practice.)[46] To ensure compliance with its rules, the NCAA has a

sixty-person enforcement team.[47]

The NCAA engages in sustained lobbying targeted at California: in a September 2019 letter, it

urged Governor Newsom to reject the Fair Pay to Play Act, a bill that would have allowed athletes

to be paid for the use of their names, images, and likenesses, and it spent $450,000 in 2019 on

lobbying, "much of it directed to California."[48] The NCAA "has engaged in significant activities"

to influence California courts, including by filing an amicus brief before the California Supreme

Court to address whether the U.S. Olympic Committee has a duty to protect athletes from sexual

abuse by third parties.[49] It purposefully avails itself of California courts and has admitted personal

jurisdiction and venue in a 2008 case in the Central District of California.[50]

### 3.2 Specific Personal Jurisdiction

The allegations in the previous section also support specific personal jurisdiction because they

show that the NCAA purposefully directed activities toward California and purposefully availed

---

[44] FAC – ECF No. 38 at 10 (¶ 27) (characterizing the forty-three games as being "slated" for California).

[45] *Id.* at 10–11 (¶ 28).

[46] *Id.* at 50 (¶¶ 196–97), 8 (¶ 19 & n.9).

[47] *Id.* at 36 (¶ 126).

[48] *Id.* at 11 (¶ 29).

[49] *Id.* (¶ 32) (citation omitted).

[50] *Id.* (¶ 31) (two citations omitted).

itself of the privilege of doing business here. The NCAA has other contacts too. First, "the intolerable sexualized environment, psychological abuse, and retaliation at USF occurred in California and arises out of the NCAA's actions and inactions with respect to its oversight of USF and its coaching staff in California, and its failure to adopt formal policies to monitor, prohibit, or otherwise address rampant sexual misconduct." Second, "based on the above [presumably the general and specific personal jurisdictional facts in the preceding sections], it would not be unreasonable for this Court to exercise personal jurisdiction over the NCAA."[51]

### 3.3 Additional Jurisdictional Facts Identified by the NCAA

The NCAA has no offices in California.[52] Its 1,100 member institutions (colleges and universities) reside in all 50 states.[53] It has 500 employees (often called its "national office staff"), who work from NCAA headquarters in Indianapolis, Indiana, to provide professional support and resources for member institutions.[54]

"NCAA legislation is adopted by its member institutions, who consider the legislation either from their respective campuses, at NCAA Conventions at venues across the country, or at meetings and conferences at NCAA headquarters in Indiana. Legislation includes the NCAA Constitution, operating bylaws, administrative bylaws, and statements of division philosophy. These are all contained in what we sometimes refer to . . . as the Division I Manual."[55]

"The NCAA national office staff communicates with member institutions about legislation proposed by the membership, works with the membership and governance committees to draft the proposed legislation, disseminates the draft legislation among member institutions, and schedules meetings for the membership to vote on specific legislation. These activities are conducted by the national office staff from the NCAA's headquarters in Indianapolis, Indiana."[56]

---

[51] Id. (¶ 32).

[52] Richardson Decl. – ECF No. 65-1 at 2 (¶ 4).

[53] Id. (¶ 5).

[54] Id. (¶ 6).

[55] Id. (¶ 7).

[56] Id. at 3 (¶ 8).

1

**4.  Procedural History**

2

   The parties do not dispute the court's federal-question jurisdiction under 28 U.S.C. § 1331,

3

CAFA diversity jurisdiction under 28 U.S.C. § 1332(d)(2), and supplemental jurisdiction over the

4

state claims under 28 U.S.C. § 1367. All parties consented to magistrate-judge jurisdiction under 28

5

U.S.C. § 636.[57] The court held a hearing on December 8, 2022.

6

7

**STANDARDS**

8

**1.  Rule 12(b)(2) — Personal Jurisdiction**

9

   "In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff

10

bears the burden of establishing that jurisdiction is proper." *Ranza v. Nike, Inc.*, 793 F.3d 1059,

11

1068 (9th Cir. 2015) (cleaned up). The parties may submit, and the court may consider,

12

declarations and other evidence outside the pleadings in determining whether it has personal

13

jurisdiction. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001), *abrogated on other grounds*

14

*as recognized in Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1024 (9th Cir. 2001).

15

   "Where, as here, the defendant's motion is based on written materials rather than an

16

evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to

17

withstand the motion to dismiss." *Ranza*, 793 F.3d at 1068 (cleaned up). "Uncontroverted

18

allegations must be taken as true, and conflicts between parties over statements contained in

19

affidavits must be resolved in the plaintiff's favor." *Id.* (cleaned up). But courts "may not assume

20

the truth of allegations in a pleading which are contradicted by affidavit." *Mavrix Photo, Inc. v.*

21

*Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011) (cleaned up); *accord Ranza*, 793 F.3d at

22

1068 ("A plaintiff may not simply rest on the bare allegations of the complaint.") (cleaned up).

23

24

**2.  Rule 12(b)(6) — Failure to State a Claim**

25

   A complaint must contain a "short and plain statement of the claim showing that the pleader is

26

entitled to relief" to give the defendant "fair notice" of (1) what the claims are and (2) the grounds

27

28

[57] Consents – ECF Nos. 15, 30, 35, 42, 48.

*United States District Court*
*Northern District of California*

upon which they rest. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, "[a] complaint may fail to show a right to relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory." *Woods v. U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016).

A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (cleaned up). A complaint must contain sufficient factual allegations, which when accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 838 F. App'x 231, 234 (9th Cir. 2020). "[O]nly the *claim* needs to be plausible, and not the facts themselves. . . ." *NorthBay*, 838 F. App'x at 234 (citing *Iqbal*, 556 U.S. at 696); *see Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886–87 (9th Cir. 2018) (the court must accept the factual allegations in the complaint "as true and construe them in the light most favorable to the plaintiff") (cleaned up).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (cleaned up).

If a court dismisses a complaint because of insufficient factual allegations, it should give leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). If a court dismisses a complaint because its legal theory is not cognizable, the court should give leave to amend if the plaintiff could "articulate a cognizable legal theory if given the opportunity." *Steele-Klein v. Int'l Bhd. of Teamsters, Loc. 117*, 696 F. App'x 200, 202 (9th. Cir. 2017).

**ANALYSIS**

**1.  Personal Jurisdiction Over the NCAA**

The plaintiffs contend that the court has general and specific personal jurisdiction over the NCAA. It has neither. The NCAA has its principal place of business in Indiana, and its activities here (including its regulation of athletes) are not the necessary minimum contacts with the forum.

The court's "inquiry centers on whether exercising jurisdiction comports with due process," which requires that defendants have "certain minimum contacts with the State such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Daimler AG v. Bauman*, 571 U.S. 117, 125–26 (2014) (cleaned up); *Franey v. Am. Battery Sols., Inc.*, No. 22-cv-03457-LB, 2022 WL 4280638, at *4–10 (N.D. Cal. Sept. 15, 2022) (fuller analysis of specific personal jurisdiction in a diversity case).

Personal jurisdiction is general or specific. *Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773, 1779–80 (2017)*.* A court with general jurisdiction can hear any claim against the defendant, even if the incidents underlying the claim took place in a different state. *Id.* at 1779–80; *Walden v. Fiore*, 571 U.S. 277, 283 n.6 (2014). Specific jurisdiction exists when the suit arises out of or relates to the defendant's contacts with the forum. *Walden*, 571 U.S. at 284; *Bristol-Myers*, 137 S. Ct. at 1780. Another court in this district has considered personal jurisdiction over the NCAA in a case involving the NCAA's duty to prevent collegiate coaches' sexual assaults of student athletes. *Aldrich v. NCAA*, 484 F. Supp. 3d 779, 783–96 (N.D. Cal. 2020). It held that there was no general or specific personal jurisdiction. *Id.* at 788–96. The court follows that analysis as persuasive.

First, there is no general jurisdiction over the NCAA, which has its principal place of business in Indianapolis, Indiana.

General jurisdiction exists when a non-resident defendant's contacts "are so continuous and systematic as to render [it] essentially at home in the forum State." *Daimler*, 571 U.S. at 127; *Aldrich*, 484 F. Supp. 3d at 791 (a defendant's ties to the forum must be "so strong and significant (as compared to its other non-forum connections) as to render its connection with the forum unique"). "If the goal of personal jurisdiction is to ensure that a defendant can foreseeably be 'hailed into court' in a forum, that goal is at its most vulnerable when a defendant is subject to

jurisdiction on grounds unconnected to the forum. Perhaps for this reason, there is a long history of courts 'training on the relationship among the defendant, the forum, and the litigation, *i.e.*, specific jurisdiction." *Aldrich*, 484 F. Supp. 3d at 790 (cleaned up) (quoting *Daimler*, 571 U.S. at 132).

The plaintiffs contend that the NCAA's contacts with California are unique. Its 1,098 members include fifty-seven California members (including twenty-five Division I members).[58] They contrast this with other states: the NCAA has fifty states with Division I programs, thirty-eight have ten or fewer programs, and twenty-seven have five or fewer programs.[59] The NCAA conducts substantial economic activity in California, such as the Rose Bowl. By contrast, other bowls are in states with fewer Division I programs than California: the Fiesta Bowl in Arizona (eighty-four percent fewer), the Peach Bowl in Georgia (seventy-six percent fewer), the Iron Bowl in Alabama (sixty percent fewer), the Sugar Bowl in Louisiana (fifty-two percent fewer), and the Orange Bowl in Florida (forty-eight percent fewer).[60] The *Aldrich* court held that these contacts were insufficient under *Daimler*: having members in a forum is insufficient, and holding the Rose Bowl and generating revenues were not continuous and systematic contacts rendering the NCAA at home in California (as compared to its other contacts with other states). 484 F. Supp. 3d at 994.

The analysis in *Aldrich* is persuasive. The NCAA has members in other states commensurate with its membership in California: ninety-nine members in New York and fifty-three in Texas.[61] California is not the NCAA's principal place of business. This is not the "exceptional case" where the NCAA's operations are substantial and of such a nature as to render the NCAA at home here. *Daimler*, 571 U.S. at 139 n.19.

---

[58] FAC – ECF No. 38 at 9–10 (¶¶ 26, 28), 13–14 (¶ 50); Opp'n – ECF No. 79 at 17–18; Selbin Decl. – ECF No. 79-1 at 2 (¶ 2) & NCAA Online Directory, Ex. A to Selbin Decl. – ECF No. 79-1 at 4–7 (updating numbers in the FAC as of October 26, 2022).

[59] Opp'n – ECF No. 79 at 18; NCAA Online Directory, Ex. A to Selbin Decl. – ECF No. 79-1 at 4–7.

[60] NCAA Online Directory, Ex. A to Selbin Decl. – ECF No. 79-1 at 4–7.

[61] Luedtke Decl. – ECF No. 82-1 at 2 (¶¶ 3–4) & NCAA Online Directory, Exs. 2–3 to *id.* – ECF Nos. 82-3–82-4.

Second, there is no specific jurisdiction because the claims do not arise from the NCAA's forum contacts. *Bristol-Myers*, 137 S. Ct. at 1780. The Ninth Circuit analyzes specific jurisdiction under a three-prong test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015); *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017). "The plaintiff has the burden of proving the first two prongs." *Picot*, 780 F.3d at 1211–12. "If he does so, the burden shifts to the defendant to set forth a compelling case that the exercise of jurisdiction would not be reasonable." *Id.* at 1212 (cleaned up).

A plaintiff satisfies the first prong by "demonstrating that the defendant either purposefully availed itself of the privilege of conducting activities in the forum or purposefully directed its activities at the forum." *Washington Shoe Co. v. A–Z Sporting Goods, Inc.*, 704 F.3d 668, 672 (9th Cir. 2012), *abrogated on other grounds by Axiom Foods*, 874 F.3d 1064. Courts apply a "purposeful availment" analysis in suits sounding in contract or involving business transactions and a "purposeful direction" analysis (known as the effects test) in suits sounding in tort. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). The claims here are tort and contract claims but they sound primarily in tort. Under either analysis, the plaintiffs do not establish prong one.

In tort cases, courts in the Ninth Circuit "typically inquire whether a defendant purposefully direct[ed] his activities at the forum state, applying an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Washington Shoe Co.*, 704 F.3d at 672–73 (cleaned up). Purposeful direction exists if the defendant (1) commits an intentional act (2) expressly aimed at the forum (3) that causes harm that the defendant knows is likely to be suffered in the forum. *Id.* at 673; *Calder v. Jones*, 465 U.S.

United States District Court
Northern District of California

1    783, 788–90 (1984).

2         The assertion of specific jurisdiction against the NCAA cannot rest on the coaches' actions:

3    the NCAA's actions must establish the contacts. *Aldrich*, 484 F. Supp. 3d at 794 (analyzing cases).

4    (There are no allegations that the NCAA controlled the coaches' behavior.) The NCAA's

5    actionable conduct is its violation of its duty — grounded in tort by its ignoring a known risk and

6    in contract by the NCAA Division I Student-Athlete Statement that incorporates NCAA rules —

7    to promulgate rules to protect student-athletes from abusive coaches.[62] But the NCAA's activities

8    took place in Indiana, where the NCAA has its principal place of business and transacts its work,

9    not here, where the NCAA has no offices.[63] *Id.* at 795 (making this point).

10        The plaintiffs also assert purposeful availment based on the alleged contracts and the NCAA's

11   management of athletic activities in California.[64] Even assuming that there is a contract, a contract

12   alone does not establish purposeful availment. *Picot*, 780 F.3d at 1212. Rather, whether a

13   defendant has purposefully availed itself of the privilege of doing business in the forum by

14   contracting with a forum resident turns on the parties' negotiations, the contemplated

15   consequences, the contract's terms, and the parties' actual course of dealing. *Burger King Corp. v.*

16   *Rudzewicz*, 471 U.S. 462, 478–80 (1985). Put another way, a contract is an intermediate step that

17   "connects prior negotiations with future consequences, the real object of a business transaction."

18   *Long v. Authentic Athletix, LLC*, No. 16-cv-03129-JSC, 2016 WL 6024591, at *3 (N.D. Cal. Oct.

19   14, 2016). For example, if an employer opens an office in the forum and hires employees in the

20   forum, that is the type of business transaction that can give rise to purposeful availment.

21   *Mewawalla v. Middleman*, No. 21-cv-09700-EMC, 2022 WL 1304474, at *9 (N.D. Cal. May 2,

22   2022) (out-of-state defendant purposefully availed itself of California's protections and benefits by

23   hiring the plaintiff because of his California connections and allowing him to be based in

24

25

26

27

---

[62] *See supra* Statement (summarizing allegations about the NCAA's breach of its duties).

[63] Richardson Decl. – ECF No. 65-1 at 2 (¶¶ 3–4).

28   [64] Opp'n – ECF No. 79 at 20–21.

United States District Court
Northern District of California

California). The contract and related activities must advance the defendant's business interests in the state. *Franey*, 2022 WL 4280638, at *5–6 (analyzing cases).

The alleged contracts here are a standard form for all Division I athletes to acknowledge and agree to NCAA rules. The form does not establish that the NCAA "deliberately reached out beyond" Indianapolis with a contract that "envisioned continuing and wide-reaching contacts" with California. *Id.*

The plaintiffs rest their assertion of jurisdiction on the NCAA's management of student athletics in California, including managing the recruitment and scholarship process, managing transfers to other schools via the transfer portal, imposing sanctions for NCAA rules violations (including against USF and Coach Giarratano), and generating revenues.[65] But that management is the same for all NCAA members throughout the country and is not suit-related. The plaintiffs do not establish the NCAA's purposeful availment of the benefits of the California forum by activity related to this lawsuit.

The plaintiffs also do not establish prong two of the analysis: whether the plaintiffs' claims arise out of or are related to the NCAA's contacts with the forum. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021); *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 983 (9th Cir. 2021). "In other words, there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Bristol-Myers Squibb*, 137 S. Ct. at 1780.

Ninth Circuit precedents before *Ford* required a showing of but-for causation. *Ayla*, 11 F.4th at 983 n.5 (collecting cases). Now, that narrower test is not exclusive. *Id.* ("a strict causal relationship is not required") (citing *Ford*, 141 S. Ct. at 1026). Earlier precedents "permit, but do not require, a showing of but-for causation to satisfy the nexus requirement." *Id.* (collecting cases).

As discussed in the prong-one analysis, there are no suit-related contacts by the NCAA with the forum that satisfy due process. *Burger King*, 471 U.S. at 478–80.

---

[65] *See supra* Statement (summarizing jurisdictional allegations).

The plaintiffs ask for jurisdictional discovery.[66] A court has the discretion to allow a plaintiff to conduct limited discovery when a defendant contests personal jurisdiction. *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008). But generally, there must be some colorable basis for the discovery. *Id.* (there is no abuse of discretion in denying limited discovery when the request was based on "little more than a hunch that it might yield jurisdictionally relevant facts"). Here, there is no basis for the discovery — even if it revealed more detail about the NCAA's revenue here — because it would not change the analysis that the NCAA conducts its business in Indiana, not California, and that there is no basis for personal jurisdiction in this district.

The court dismisses the claims against the NCAA for lack of personal jurisdiction.

## 2. Statute of Limitations

The remaining tort claims have a two-year statute of limitations. Cal. Civ. Proc. Code § 335.1; *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006) (Title IX claims borrow the state statute of limitations; federal law determines when the cause of action accrues).[67] Thus, the claims by John Does 4–12 are barred unless they are tolled. The plaintiffs assert four bases for tolling: the discovery rule, equitable tolling, equitable estoppel, and principles of equity.[68] The tolling doctrines do not suspend the statute of limitations because the plaintiffs knew about the misconduct when it occurred.

First, the discovery rule does not toll the claims.

The discovery rule is a narrow exception: it postpones the accrual of a cause of action until a plaintiff knows or has reason to know of the injury that is the basis of the lawsuit. *Stanley*, 433 F.3d at 1136; *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005). The plaintiff must plead facts about the time and manner of discovery and the inability to make an earlier discovery despite reasonable diligence. *Fox*, 35 Cal. 4th at 807–08.

---

[66] Opp'n – ECF No. 79 at 24.

[67] NCAA Mot. – ECF No. 65 at 26 (collecting cases applying Cal. Civ. Proc. Code § 335.1 and the two-year statute of limitations to the state claims at issue in this case).

[68] Opp'n – ECF No. 79 at 26–36.

The plaintiffs contend that they did not learn about their claims until March 11, 2022, when the San Francisco Chronicle published an article about the case. This, they contend, is a triggering event, likening their reaction to survivors of sexual abuse who take years to acknowledge and understand their harms, especially when there is a power imbalance between the assailant and the victim.[69] But the plaintiffs knew about the wrongful conduct when it occurred: they allege that they were humiliated, isolated, threatened, destroyed, and uncomfortable.[70] The coaches' misconduct caused them to leave the team or transfer to another school.[71] The abuse they experienced, while significant, is not like the trauma and the suppression of memories that victims of physical sexual abuse can experience, resulting in the victim's denial and lack of understanding of legal rights (and thus the tolling of the statute of limitations). *Aldrich*, 484 F.3d at 788–89 (sexual-assault victim's repression of memories, and her later recovery of them by the triggering event of watching a Michael Jackson documentary, meant that it was not apparent from the face of the complaint that the statute of limitations barred the suit); *Doe v. Pasadena Hosp. Ass'n*, No. 2:18-cv-08710-ODW (MAAx), 2020 WL 1244357, at *5 (C.D. Cal. Mar. 16, 2020) (court tolled the statute for sexual-assault claims when a university gynecologist misrepresented that his misconduct conformed to accepted medical practice and the university knew of misconduct and

---

[69] *Id.* at 27.

[70] FAC – ECF No. 38 at 68–69 (¶¶ 303, 305–07) (John Doe 4) (humiliated, crushed, called his mother daily in tears), 74–78 (¶¶ 339, 340, 343, 349, 352, 360, 363) (John Doe 5) (felt unsafe, very upset, isolated and threatened, and suffered nightmares about USF since 2012), 81 (¶ 379) (John Doe 6) (parents wrote letter in May 2014 describing conduct as completely unacceptable behavior that created a hostile environment), 83–84 (¶¶ 391, 395–96) (John Doe 7) (describing worst night of his life in 2014 and resulting development that year of anxiety, sleep deprivation, and fear for his safety), 86–87 (¶¶ 406–07, 410–11, 415) (John Doe 8) (confidence and mental state were destroyed during his tenure in 2013, sought counseling, hated going to the field each day), 88–89 (¶¶ 420, 424–25) (John Doe 9) (experienced dread and severe depression, and his mother called a coach to demand stopping the abuse), 65–67 (¶¶ 284–87, 293) (John Doe 10) (disgusted by conduct, confided in pitching coach while crying hysterically, left team at the end of the year to protect his mental health), 91–93 (¶¶ 438, 440, 443–44, 447) (John Doe 11) (uncomfortable during practices, panic attacks, felt unsafe, severe emotional injuries), 73 (¶ 329) (John Doe 12) (father flew to USF sixteen times during freshman year 2017–18 to provide emotional support for how isolating the abuse was and out of fear that John Doe 12 would harm himself).

[71] *Id.* at 69 (¶ 307) (John Doe 4), 76–77 (¶ 352) (John Doe 5), 81 (¶ 378) (John Doe 6), 84 (¶ 396) (John Doe 7), 86 (¶ 410) (John Doe 8), 89 (¶ 426) (John Doe 9), 67 (¶ 293) (John Doe 10), 92 (¶ 446) (John Doe 11), 71–72 (¶ 323) (John Doe 12).

1    allowed the doctor to continue practicing after his probationary period). Instead, what the plaintiffs

2    describe is a lack of understanding of their legal rights. That does not toll the statute. *Lukovsky v.*

3    *City & Cnty. of San Francisco*, 535 F.3d 1044, 1049–50 (9th Cir. 2008); *Jolly v. Eli Lilly & Co.*,

4    44 Cal. 3d 1103, 1110 (1988).

5        Second, equitable tolling does not suspend the statute of limitations.

6        Equitable tolling is a "judge-made" doctrine that suspends or extends the statute of limitations

7    "as necessary to ensure fundamental practicality and fairness." *Lantzy v. Centex Homes*, 31 Cal.

8    4th 363, 370 (2003). It applies "in carefully considered situations to prevent the unjust technical

9    forfeiture of causes of action, where the defendant would suffer no prejudice." *Id.* Applying the

10    doctrine "requires a balancing of the injustice to the plaintiff occasioned by the bar of his claim

11    against the effect of the important public interest or policy expressed by the . . . limitations

12    statute." *Id.* at 371; *St. Francis Mem. Hosp. v. State Dep't of Public Health*, 9 Cal. 5th 710, 724–

13    25 (2020). The doctrine stops the limitations period during the tolling event and restarts it when

14    the tolling event is over. *Id.* The tolled interval is tacked onto the end of the limitations period,

15    thus extending the statute by the length of time of the tolling event. *Id.*

16        The plaintiffs contend that the doctrine applies because all defendants "engaged in conduct

17    designed to convince Plaintiffs [that] they lacked meritorious claims." USF knew about the

18    misconduct and did not address it "in an effort to convince Plaintiffs and their parents that what

19    they had experienced at the hands of the Coach Defendants were innocent, isolated incidents and

20    not actionable, systemic violations of the law." This violated USF's mandatory reporting and

21    investigation policies. The coaches retaliated against any players who challenged the abuse or

22    refused to participate by running them off the team. Through the abuse, they "sowed anxiety and

23    self-doubt into the" players to discourage them from speaking up about the behavior.[72]

24

25

26    ――――――――――――――
      [72] Opp'n – ECF No. 79 at 30 (citing FAC – ECF No. 38 at 94 (¶¶ 456–58) (¶ 456 discusses the May
27    2014 letter from John Doe 6's parents complaining about the conduct to the USF Athletic Department
      and the NCAA faculty-athletic representative; ¶ 457 alleges that the failure to act was to deceive the
      plaintiffs and parents to make them believe the coaches' actions were isolated, not actionable, and not
28    a systemic problem; ¶ 458 discusses the USF mandatory reporting-and-investigation policies)).

United States District Court
Northern District of California

1    A defendant's fraudulent concealment of a claim can toll a statute of limitations. The tolling lasts

2    as long as the plaintiff's reasonable reliance on the misrepresentations. *Grisham v. Philip Morris*

3    *U.S.A., Inc.*, 40 Cal. 4th 623, 637 (2007). But "[a] defendant's fraudulent concealment tolls the

4    statute of limitations only when, as a result of that concealment, the plaintiff fails to discover some

5    critical fact." *Goldrich v. Natural Y Surgical Specialties, Inc.*, 25 Cal. App. 4th 772, 784 (1994).

6    The defendants did not conceal critical facts that prevented the plaintiffs from learning the

7    facts underlying their claims: the plaintiffs knew about the conduct and left the team because of it.

8    This landscape contrasts with *Aldrich*, where the court applied equitable tolling for the period of

9    the University of Texas's investigation into the sexual abuse because the investigation allegedly

10   was a sham. 484 F.3d at 800.

11   *Aldrich* is closer to the more classic iteration of the equitable-tolling doctrine: equitable

12   tolling can apply if a person has several legal remedies and in good faith pursues one. *Addison v.*

13   *California*, 21 Cal. 3d 313, 317 (1978); *Elkins v. Derby*, 12 Cal. 3d 410, 414 (1974); *Cervantes v.*

14   *City of San Diego*, 5 F.3d 1273, 1275 (9th Cir. 1993) (the plaintiff's pursuit of a remedy in another

15   forum equitably tolls the limitations period if "the plaintiff's actions satisfy these factors: (1)

16   timely notice to the defendants in filing the first claim; (2) lack of prejudice to the defendants in

17   gathering evidence for the second claim; and (3) good faith and reasonable conduct in filing the

18   second claim"). There is no similar alternative forum here.

19   Moreover, the *Aldrich* investigation allegedly was a whitewash: the investigators cross-

20   examined the plaintiffs, dismissed allegations as boorish, not sexual, and intimidated the plaintiffs,

21   who thus believed that they did not have a claim. These were facts that pleaded equitable tolling

22   sufficiently at the motion-to-dismiss phase. *Aldrich*, 484 F.3d at 800. The plaintiffs here

23   characterize the defendants' collective behavior as gaslighting the plaintiffs into thinking that the

24   coaches did nothing wrong and the plaintiffs were overreacting.[73] But the abusive atmosphere here

25   is not equivalent to *Aldrich*'s whitewashed investigation into sexual assaults concealed as

26   romantic relationships, beginning for some plaintiffs in high school, that involved intimidation and

27

28   [73] *Id.*

caused the victims to believe that no wrong occurred. There is no similar concealment or misrepresentation here. The plaintiffs were adults who knew about the sexualized conduct when it happened, and while they suffered from the abuse, they left the team because of it.

Finally, balancing the injustice to the plaintiffs against the public interest or policy expressed by the limitations statute does not favor applying the doctrine. *Lantzy*, 31 Cal. 4th at 371. The injustice that would result from not tolling the statute was great for the victims of sexual assault in *Aldrich*, given the nature of the conduct and the University's complicity through its sham investigation. 484 F. Supp. 3d at 800. The injustice here is different: the nature of the abuse is different, and USF was not complicit in a manner akin to a sham investigation.

Third, equitable estoppel does not toll the accrual of the claims.

Equitable estoppel, also referred to as fraudulent concealment, addresses "the circumstances in which a party will be estopped from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forbearing suit within the applicable limitations period." *Lantzy*, 31 Cal. 4th at 383. It is "wholly independent of the limitations period itself and takes its life . . . from the equitable principle that no man may profit from his own wrongdoing in a court of justice." *Id.* (cleaned up). "A defendant will be estopped to assert the statute of limitations if the defendant's conduct, relied on by the plaintiff, has induced the plaintiff to postpone filing the legal action until after the statute has run." *Honig v. San Francisco Planning Dep't*, 127 Cal. App. 4th 520, 529 (2005) (cleaned up). "The defendant's statement or conduct must amount to a misrepresentation bearing on the *necessity* of bringing a timely suit; the defendant's mere denial of *legal liability* does not set up an estoppel." *Lantzy*, 31 Cal. 4th at 384 n.18. The plaintiff must plead with particularity the facts supporting fraudulent concealment. *Guerrero v. Gates*, 442 F.3d 697, 706–07 (9th Cir. 2006) (affirming district court's dismissal because the plaintiff did not plead fraudulent concealment with particularity).

The plaintiffs raise two estoppel arguments: USF knew about the coach misconduct and failed to act on it in order to mislead the plaintiffs about the strength of their claims, and USF had a fiduciary duty to the players that required disclosure.[74] Neither merits application of the doctrine.

Again, there was no misrepresentation or actionable omission. The plaintiffs knew about the abusive conduct and left the team because of it. The plaintiffs point to USF's failure to address the situation after John Doe 6's parents complained in May 2014 that the coaches were creating a hostile environment by calling the players pathetic, weak-minded, and a cancer and telling them that their baseball careers were over.[75] USF's conduct did not induce another to forbear a lawsuit. *Lantzky*, 31 Cal. 4th at 381.

The plaintiffs contend that USF had a duty to act, relying on *Langston v. Mid-Am. Intercollegiate Athletics Ass'n*, 448 F. Supp. 3d 938 (N.D. Ill. 2020), and *Wisniewski v. Diocese of Belleville*, 406 Ill. App. 3d 1119 (2011). The cases involve defendants with a legal duty to disclose. In *Langston*, the plaintiff pleaded equitable estoppel sufficiently under Kansas law because he alleged that the NCAA and another athletic association concealed facts about the risk of concussive hits. They had a duty to disclose because they were in a superior position to know about and mitigate the risks, and the players relied on them to protect them from physical injury. 448 F. Supp. at 945, 950–51. *Wisniewski* held that the Diocese's special relationship with a minor parishioner allowed application of the fraudulent-concealment statute: "the relationship between a priest and a parishioner reflects many aspects of a special or fiduciary relationship. . . [,] and it is those aspects of the relationship that are relevant to the application of the fraudulent concealment statute." 406 Ill. App. 3d at 1160. USF's knowledge of the abusive behavior based on the May 2014 letter is not equivalent to concealing risks from concussive head injuries, and it is not equivalent to a priest-parishioner relationship. It thus does not estop USF from invoking the statute of limitations. Moreover, unlike the plaintiffs in *Langston*, the players were aware of the facts.

---

[74] *Id.* at 33–34.

[75] FAC – ECF No. 38 at 81 (¶¶ 378–80).

Finally, the plaintiffs contend that sexual misconduct in a relationship with a power imbalance is an equity that favors tolling. They cite California Code of Civil Procedure § 340.16, which extends the limitations period for victims of sexual assault. This case does not involve sexual assault, an uneven knowledge of the relevant facts, or other factors supporting delayed accrual of the statute of limitations.

### 3.   Discrimination by USF —Title IX and Cal. Educ. Code § 66270 (Claims One and Five)

Title IX prohibits discrimination based on sex: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). California Education Code § 66270 similarly prohibits discrimination based on gender. The Title IX analysis governs the § 66270 claim.[76] *Videckis v. Pepperdine Univ.*, 100 F. Supp. 3d 927, 935 (C.D. Cal. 2015) (a claim under the Education Code has the same elements as a federal claim under Title IX). The issue is whether the plaintiffs plausibly alleged that USF discriminated against the plaintiffs based on sex. Because the plaintiffs alleged a sexualized environment that was severe, persistent, and pervasive, the court denies the motion to dismiss.

Title IX prohibits programs like USF's athletic program from discriminating based on sex. 20 U.S.C. § 1681(a). No case has addressed whether a sexualized coaching environment — lewd talk about women, pantomimed behavior of sex acts, calling players pussies, faggots and cunts, disparaging penis size, Coach Nakamura's lifting his shirt to encourage female students to flash their breasts, and his discussing his bisexuality in circumstances like those here (for example, while walking around naked) — is discrimination on the basis of sex in violation of Title IX.

The analysis turns on the meaning of discrimination "on the basis of sex." Title IX's "on the basis of sex" has the same meaning as Title VII's "because of sex." *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) (the Ninth Circuit "construes Title IX's protections consistently with those of Title VII"). The Supreme Court construed Title VII's "because of" as "by reason of" or "on

---

[76] The parties agree on this point. USF Mot. – ECF No. 68 at 24; Opp'n – ECF No. 79 at 41.

1    account of." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020). The "because of test

2    incorporates the simple and traditional standard of but-for causation." *Id.* (cleaned up). To

3    "discriminate" against a person "would seem to mean treating that individual worse than others

4    who are similarly situated." *Id.* at 1740.

5         In the Title VII employment context, the Supreme Court has said, "The critical issue . . . is

6    whether members of one sex are exposed to disadvantageous terms or conditions of employment

7    to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*,

8    523 U.S. 75, 80 (1998). "Courts and juries have found the inference of discrimination easy to draw

9    in most male-female harassment situations, because the challenged conduct typically involves

10   explicit or implicit proposals of sexual activity . . . ." *Id.* But the standard applies to same-sex

11   harassment: a female supervisor who harasses female victims by sex-specific derogatory terms

12   commits a Title VII violation if she is motivated by hostility to the presence of women in the

13   workplace. *Id.* A plaintiff "must always prove that the conduct at issue was not merely tinged with

14   offensive sexual connotations, but actually constituted discrimination because of sex.'" *Id.* at 81

15   (cleaned up). In all harassment cases, the objective severity of the harassment is judged from the

16   perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

17   That inquiry "requires careful consideration of the social context in which particular behavior

18   occurs and is experienced by its target." *Id.*

19        The coaches' behavior here plausibly was discrimination based on sex in violation of Title IX.

20   It was abusive, bullying, and offensive behavior that is actionable under state law. But it also —

21   especially given Coach Nakamura's conduct and Coach Giarrantano's tolerance of it — was

22   directed against the plaintiffs because of their gender. *Nichols v. Azteca Rest. Enters.*, 256 F.3d

23   864, 874 (9th Cir. 2001) (verbal abuse, including vulgar name-calling cast in female terms, was

24   actionable harassment under Title VII as an attack on the plaintiff for being effeminate and not

25   conforming to gender stereotypes).

26        Citing *Gebser v. Lago Vista Indep. Sch. Dist.*, USF also contends that the plaintiffs did not

27   plausibly plead that USF had actual notice of the coaches' conduct. 524 U.S. 274, 275 (1998).

28   *Gebser* and the other case cited — *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th

United States District Court
Northern District of California

Cir. 2000) — are summary-judgment cases. This is a motion to dismiss. Also, the complaint alleges complaints to USF and public abusive behavior, including in front of an opposing team. For the reasons discussed at the hearing, the issue is more appropriately addressed at summary judgment and is not a basis for dismissing the claims at the pleadings stage.

### 4.   Retaliation by USF — Title IX (Claim Two)

The elements of a Title IX retaliation claim are (1) the claimant engaged in protected activity, (2) the claimant suffered an adverse action by the defendant, and (3) there is a causal connection between the two. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014). "Protected activity" is "protesting or otherwise opposing unlawful activity," including (relevantly here) "speaking out against sex discrimination." *Emeldi v. Univ. of Oregon*, 673 F.3d 1218, 1225 (9th Cir. 2012) (complaints about gender-based institutional bias and unequal treatment of female students were Title IX protected activity).

The complaints here were about pervasive abuse and bullying, not a sexualized environment that was sex discrimination. They thus are not actionable under Title IX because they are not protected activity.

### 5.   Discrimination by USF — Cal. Educ. Code § 66281.5 (Claim Six)

Section 66281.5 requires postsecondary schools like USF to have a written policy on sexual harassment — including information about how to report charges and available remedies and resources (on and off campus) — and to provide notice of it by posting it on the institution's website, displaying it prominently, and including it in any orientation program. Despite saying that it takes sexual abuse seriously, USF allegedly failed to adopt appropriate policies to prevent or respond to the abuse here.[77] The plaintiffs suggest that court can infer that USF did not comply with § 66281.5 because players knew that the abuse was not normal but did not know whether it

---

[77] FAC – ECF No. 38 at 37–41 (¶¶ 133–47) (USF's inaction), 103–04 (¶ 496) (injunctive relief).

violated the law.[78] There are no allegations about deficiencies in the policy or the notice procedures. The court dismisses the § 66281.5 claim.

### 6. Negligence Claims Against USF Only (Claims Three, Four, and Nine)

The negligence claims against USF are as follows: (3) negligent supervision and retention of Coach Nakamura; (4) negligent supervision and retention of Coach Giarratano; and (9) negligent failure to warn, train, and educate about the risks of sexual harassment and abuse. USF moved to dismiss on the ground that the plaintiffs did not allege that the harm that they suffered from the coaches was foreseeable to USF.[79] Like the Title IX defense of lack of notice, and for the reasons discussed at the hearing, the issue is better addressed at summary judgment because there were complaints and public abusive behavior. The claims survive at the motion-to-dismiss phase.

### 7. Negligence and Gross Negligence Claims Against all Defendants (Claims Seven and Eight)

The defendants' challenges to the negligence claims turn on the sufficiency of the complaint's allegations: USF's alleged liability for its employees' conduct (hinging on notice), the defendants' view that the plaintiffs did not allege extreme conduct to support a claim of gross negligence, and the coaches' contention that the plaintiffs did not plead negligent conduct sufficiently.[80] For similar reasons, these claims survive at the pleadings stage. The plaintiffs allege pervasive abusive conduct, including forcing players to practice through injuries. The plaintiffs allege notice to USF through complaints and public, pervasive abuse. Any issues are better addressed at summary judgment and through jury instructions.

---

[78] Opp'n – ECF No. 79 at 42.

[79] USF Mot. – ECF No. 68 at 23.

[80] *Id.* at 25–30; Nakamura Reply – ECF No. 80 at 12, 17–19; Giarratano Reply – ECF No. 81 at 15–17.

United States District Court
Northern District of California

**8.  Infliction of Emotional Distress by all Defendants (Claims Ten and Eleven)**

The claim for intentional infliction of emotional distress survives: the plaintiffs allege abusive behavior and severe distress. As for emotional distress predicated on negligence, whether couched as a standalone theory of liability or a measure of damages, the plaintiffs plead it sufficiently.

**9.  Ratification by USF (Claim Twelve)**

The remaining claim is that USF ratified the coaches' behavior. Ratification, like vicarious liability, is a means to hold a principal liable for an agent's torts, generally through the principal's adoption of the agent's action as the principal's own. *Rakestraw v. Rodrigues*, 8 Cal. 3d 67, 73 (1972); *Baptist v. Robinson*, 143 Cal. App. 4th 151, 169 (2006). The doctrine can apply when an employer does not investigate or address charges of an employee's intentional tort or misconduct. *Ratcliff v. The Roman Cath. Archbishop of L.A.*, 79 Cal. App. 5th 982, 1002 (2022). USF contends that the plaintiffs did not allege that USF had notice of the misconduct or ratified it as its own.[81] Whether as a standalone claim or a theory of liability, and for the reasons that the court did not dismiss other claims for lack of notice or foreseeability, the court denies the motion to dismiss. The issue is better addressed at summary judgment or through jury instructions on theories of liability, whether based on vicarious liability or ratification.

**CONCLUSION**

The court dismisses the claims against the NCAA for lack of personal jurisdiction without prejudice to filing the case in the Southern District of Indiana, dismisses the claims of Does 4–12 because they are barred by the statute of limitations, denies the motion to dismiss the discrimination claims under Title IX and the California Education Code, grants the motion to dismiss the Title IX retaliation claim, grants the motion to dismiss the California Education Code § 66281.5 claim, and denies the motion to dismiss the tort claims. The dismissal of all claims (except for lack of personal jurisdiction) is without prejudice to filing an amended complaint within twenty-eight days. Any

---

[81] USF Mot. – ECF No. 68 at 28.

amended complaint must have as an exhibit a blackline of the amended complaint against the operative complaint. This resolves ECF Nos. 64, 65, 67, and 68.

**IT IS SO ORDERED.**

Dated: January 4, 2023

_____

LAUREL BEELER
United States Magistrate Judge