1   JONATHAN SELBIN (Cal. Bar No. 170222)
    jselbin@lchb.com
2   MICHELLE LAMY (Cal. Bar No. 308174)
    mlamy@lchb.com
3   275 Battery Street, 29th Floor
    San Francisco, CA 94111
4   Telephone: (415) 956-1000
    Facsimile: (415) 956-1008
5

6   ELIZABETH A. FEGAN (admitted *pro hac vice*)
    beth@feganscott.com
    FEGAN SCOTT LLC
7   150 S. Wacker Drive, 24th Floor
    Chicago, IL 60606
8   Telephone: (312) 741-1019
    Facsimile: (312) 264-0100
9

10  *Attorneys for Plaintiffs and the Proposed Classes*

11  (Additional Counsel on Signature Page)

12              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
13                **SAN FRANCISCO DIVISION**

14

15  JOHN DOE 1, JOHN DOE 2, JOHN DOE       Case No. 3:22-cv-01559-LB
    3, JOHN DOE 4, JOHN DOE 5, JOHN
16  DOE 6, JOHN DOE 7, JOHN DOE 8,         **PLAINTIFFS' OPPOSITION TO**
    JOHN DOE 9, JOHN DOE 10, JOHN          **DEFENDANTS' MOTIONS TO DISMISS**
17  DOE 11, and JOHN DOE 12, DOE 13,       **AND UNIVERSITY OF SAN**
    DOE 14 individually and on behalf of all   **FRANCISCO'S MOTION TO STRIKE**
    others similarly situated,
18                                         Hearing:    May 18, 2023
19              Plaintiffs,                Time:       9:30 a.m.
                                           Courtroom:  B
20  v.
                                           Judge:      Hon. Laurel Beeler
21  THE UNIVERSITY OF SAN                  Trial Date: None Set
    FRANCISCO, ANTHONY N. (AKA
22  NINO) GIARRATANO, and TROY
    NAKAMURA,,
23
                Defendants.
24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

SUMMARY OF FACTS ....................................................................................................... 3

I.     The Coach Defendants Subjected Plaintiffs to an Intolerable Sexualized Environment and Retaliated Against Plaintiffs for Their Opposition to that Environment. ........................................................................................................ 3

II.    Because the Coach Defendants' Conduct Was Normalized and Covered Up by USF, Does 4-14 Did Not Know They Were Victims of Pervasive Institutionalized Indifference to Sexual Misconduct and Abuse Until this Case Was filed. ......... 4

LEGAL STANDARDS ......................................................................................................... 6

I.     Motion to Dismiss. ................................................................................................. 6

II.    Motion to Strike. ................................................................................................... 7

ARGUMENT ........................................................................................................................ 7

I.     Plaintiffs John Does 4-14 Bring Timely Claims. ................................................ 7

     A.    As a result of Defendants' conduct, Plaintiffs did not know—and could not have known, until this case was filed—that others had complained to USF. ......... 8

     B.    Plaintiffs' allegations are sufficient to support tolling against all Defendants and on behalf of the entire Class. ....................................................... 13

II.    Plaintiffs Plausibly Allege Claims for Retaliation Under Title IX Because Plaintiffs Engaged in a "Protected Activity." ..................................................... 13

III.   Plaintiffs Plausibly Allege Violations of California Education Code § 66281.5 Because the Exhaustion Requirement Does Not Apply Here. .......................... 16

IV.   Plaintiffs Plausibly Allege Contract Claims Against USF ............................... 17

     A.    Plaintiffs adequately allege claims against USF for breach of express and oral contracts. ........................................................................................... 17

     B.    Plaintiffs adequately allege that they are third-party beneficiaries of a contract between USF and the NCAA. ............................................................... 21

V.    Plaintiffs Concede Dismissal of Tortious Interference with Contract and Tortious Interference with Prospective Economic Advantage Against the Coach Defendants. ......................................................................................................... 24

VI.   USF's Motion to Strike Must Be Denied. .......................................................... 24

     A.    Motions to strike injunctive relief are not permitted. ............................ 25

     B.    John Doe 1 has standing to seek injunctive relief because he was a current student when he filed the complaint. ................................................... 25

     C.    Allegations regarding the Catholic Archdioceses are relevant to USF's official policy of deliberate indifference to sexual abuse. ......................... 28

CONCLUSION ................................................................................................................... 29

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aldrich v. Nat'l Collegiate Athletic Ass'n*,
484 F. Supp. 3d 779 (N.D. Cal. 2020) ................................................................. 13, 28

*Am. Civil Liberties Union of Nev. v. Lomax*,
471 F.3d 1010 (9th Cir. 2006) ................................................................................... 26

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
7 Cal. 4th 503 (1994) ............................................................................................... 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................... 7

*B.C. v. Plumas Unified Sch. Dist.*,
192 F.3d 1260 (9th Cir. 1999) .................................................................................. 27

*Baas v. Dollar Tree Stores, Inc.*,
No. C 07-03108 JSW, 2009 WL 1765759 (N.D. Cal. June 18, 2009) ....................... 28

*Bates v. United Parcel Serv.*,
511 F.3d 974 (9th Cir. 2007) .................................................................................... 26

*Bayer v. Neiman Marcus Grp., Inc.*,
861 F.3d 853 (9th Cir. 2017) .................................................................................... 28

*Belgau v. Inslee*,
975 F.3d 940 (9th Cir. 2020) .................................................................................... 28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................... 6

*Bibeau v. Pac. Nw. Rsch. Found. Inc.*,
188 F.3d 1105 (9th Cir. 1999) .................................................................................... 9

*Bloom v. Nat'l Collegiate Athletic Ass'n*,
93 P.3d 621 (Colo. App. 2004) ................................................................................ 22

*Byrd v. Masonite Corp.*,
215 F. Supp. 3d 859 (C.D. Cal. 2016) ...................................................................... 25

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ................................................................................................... 27

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ................................................................................................. 28

*Cnty. of Riverside v. McLaughlin*,
500 U.S. 44 (1991) ................................................................................................... 28

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018) .................................................................................... 25

*Doe 1 v. Baylor Univ.*,
240 F. Supp. 3d 646  (W.D. Tex. 2017) .................................................................... 10

*Doe v. Wolf*,
424 F. Supp. 3d 1028 (S.D. Cal. 2020) ............................................................... 27, 28

*Eberz v. CitiMortgage, Inc.*,
No. 2:12-CV-4746-SVW-MRW, 2012 WL 12897373 (C.D. Cal. Sept. 12, 2012) ...... 18

*Emeldi v. Univ. of Oregon*,
698 F.3d 715 (9th Cir. 2012) ............................................................................... 13, 15

*Fernandez v. CoreLogic Credco, LLC.*,
593 F. Supp. 3d 974 (S.D. Cal. 2022) ........................................................................ 7

# TABLE OF AUTHORITIES
## (continued)

Page

*Fox v. Ethicon Endo-Surgery, Inc.*,
  35 Cal. 4th 797 (2005) ............................................................................................................. 8

*Geertz v. Ausonio*,
  4 Cal. App. 4th 1363 (1992) ..................................................................................................... 9

*Grant House v. Nat'l Collegiate Athletic Ass'n*,
  545 F. Supp. 3d 804 (N.D. Cal. 2021) .............................................................................. 27, 28

*Griffin v. Gomez*,
  No. C 98-21038 JW (NJV), 2010 WL 4704448 (N.D. Cal., 2010) ......................................... 7

*Guerrero v. Halliburton Energy Servs., Inc.*,
  231 F. Supp. 3d 797 (E.D. Cal. 2017) ................................................................................... 25

*Gutierrez v. Mofid*,
  39 Cal. 3d 892 (1985) ............................................................................................................... 9

*Hairston v. Pacific 10 Conference*,
  101 F.3d 1315 (9th Cir. 1996) ................................................................................................ 23

*Hall v. National Collegiate Athletic Association*,
  985 F. Supp. 782 (N.D. Ill. 1997) .......................................................................................... 23

*Holmes v. Lerner*,
  74 Cal. App. 4th 442 (1999) ................................................................................................... 23

*In re 2TheMart.com, Inc. Sec. Litig.*,
  114 F. Supp. 2d 955 (C.D. Cal. 2000) .................................................................................... 29

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*,
  311 F.R.D. 532 (N.D. Cal. 2015) ........................................................................................... 28

*Jablon v. Dean Witter & Co.*,
  614 F.2d 677 (9th Cir. 1980) .................................................................................................... 7

*Jarrett v. Kassel*,
  972 F.2d 1415 (6th Cir. 1992) ................................................................................................ 13

*Jolly v. Eli Lilly & Co.*,
  44 Cal. 3d 1103 (1988) ............................................................................................................. 9

*Kaiser Found. Hosps. v. California Nurses Ass'n*,
  No. 11-5588 SC, 2012 WL 440634 (N.D. Cal. Feb. 10, 2012) .............................................. 29

*Knapp v. Nw. Univ.*,
  No. 95 C 6454, 1996 WL 495559 (N.D. Ill. Aug. 28, 1996) .................................................. 18

*Knelman v. Middlebury College*,
  898 F. Supp. 2d 697 (D. Vt. 2012) ......................................................................................... 23

*Lopes v. Vieira*,
  488 F. Supp. 2d 1000 (E.D. Cal. 2007) .................................................................................... 7

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................................ 26

*Lukovsky, Doe v. Univ. S. Cal.*,
  No. 2:18-cv-09530-SVW-GJS, 2019 WL 4228371 (C.D. Cal. Apr. 18, 2019) ........................ 9

*MacIntyre v. Carroll College*,
  48 F.4th 950 (9th Cir. 2022) ................................................................................................... 13

*Mills v. Forestex Co.*,
  108 Cal. App. 4th 625 (2003) ................................................................................................... 9

*Moore v. Mars Petcare US, Inc.*,
  966 F.3d 1007 (9th Cir. 2020) .................................................................................................. 7

- iii -

# TABLE OF AUTHORITIES
**(continued)**

**Page**

*Moyo v. Gomez*,
40 F.3d 982 (9th Cir. 1994) .................................................................................................. 15

*Newman-Green, Inc. v. Alfonzo- Larrain*,
490 U.S. 826 (1989) ............................................................................................................ 26

*Nomadix, Inc. v. Guest-Tek Interactive Ent. Ltd.*,
No. CV1608033ABFFMX, 2017 WL 11049752 (C.D. Cal. Sept. 6, 2017) ........................... 19

*Norgart v. Upjohn Co.*,
21 Cal. 4th 383 (1999) .......................................................................................................... 9

*O'Brien v. Ohio State Univ.*,
2007-Ohio-4833 (Ohio Ct. App. 2007) ................................................................................ 18

*O'Connor v. Boeing N. Am., Inc.*,
311 F.3d 1139 (9th Cir. 2002) ............................................................................................... 9

*Oliver v. NCAA*,
920 N.E.2d 190 (Ohio Ct. Com. Pl. 2008) ..................................................................... 20, 22

*Ollier v. Sweetwater Union High Sch. Dist.*,
768 F.3d 843 (9th Cir. 2014) .............................................................................. 13, 14, 15, 16

*Ouellette v. Beaupre*,
977 F.3d 127 (1st Cir. 2020) ................................................................................................ 10

*Platte Anchor Bolt, Inc. v. IHI, Inc.*,
352 F. Supp. 2d 1048 (N.D. Cal. 2004) .................................................................................. 7

*Polaris PowerLED Techs., LLC v. Nintendo Co.*,
No. C22-0386JLR, 2022 WL 3646575 (W.D. Wash. Aug. 24, 2022) ................................... 29

*Powell v. Wells Fargo Home Mortg.*,
No. 14-CV-04248-MEJ, 2017 WL 2720182 (N.D. Cal. June 23, 2017) ................................ 25

*Power Probe, Inc. v. Sullivan*,
No. SACV 15–1404–JLS, 2016 WL 7496865 (C.D. Cal. 2016) ........................................... 25

*R.G. v. Koller*,
415 F. Supp. 2d 1129 (D. Haw. 2006) .................................................................................. 26

*S.L. ex rel. Mary L. v. Downey Unified Sch. Dist.*,
No. CV 13-06050 DDP PJWX, 2014 WL 934942 (C.D. Cal. Mar. 10, 2014) ....................... 29

*Saroya v. Univ. of the Pac.*,
503 F. Supp. 3d 986 (N.D. Cal. 2020) .................................................................................. 17

*Slayman v. FedEx Ground Package Sys., Inc.*,
765 F.3d 1033 (9th Cir. 2014) ........................................................................................ 26, 27

*Snyder-Hill v. Ohio State University*,
48 F.4th 686 (6th Cir. Sept. 14, 2022) .......................................................................... passim

*Snyder-Hill v. Ohio State University*,
Nos. 21-3981/3991 (6th Cir. Dec. 14, 2022) .................................................................. passim

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ............................................................................................................ 26

*Susilo v. Wells Fargo Bank, N.A.*,
796 F. Supp. 2d 1177 (C.D. Cal. 2011) ................................................................................ 25

*Thomas v. City of Beaverton*,
379 F.3d 802  (9th Cir. 2004) ............................................................................................... 15

*United States v. Kubrick*,
444 U.S. 111 (1979) .............................................................................................................. 9

- iv -

**TABLE OF AUTHORITIES**
(continued)

Page

*Updike v. Multnomah Cnty.*,
  870 F.3d 939 (9th Cir. 2017)..............................................................................27

*Varsam v. Lab. Corp. of Am.*,
  120 F.Supp.3d 1173 (S.D. Cal. 2015)................................................................25

*Wade v. Kirkland*,
  118 F.3d 667 (9th Cir. 1997)..............................................................................28

*Walker v. McCoud Cmty. Servs. Dist.*,
  No. 2:16–61 WBS CMK, 2016 WL 951635 (E.D. Cal. Mar. 14, 2016) ...............25

*Walsh v. Nev. Dep't of Hum. Res.*,
  471 F.3d 1033 (9th Cir. 2006)............................................................................27

*Weston v. Big Sky Conference*,
  466 F. Supp. 3d 896 (N.D. Ill. 2020) .................................................................22

*Whittlestone, Inc. v. Handi-Craft Co.*,
  618 F.3d 970 (9th Cir. 2010)..........................................................................7, 25

*Williams v. Univ. of Cincinnati*,
  752 N.E.2d 367 (Ohio Ct. Cl. 2001) ..................................................................18

*Wolf v. Superior Court*,
  114 Cal. App. 4th 1343 (2004) ..........................................................................19

**Statutes**
Cal. Education Code
  § 66281.5..........................................................................................................16
  § 66281.8(d)......................................................................................................16
  § 66292.3......................................................................................................16, 17
  § 66292.3(c)......................................................................................................16
  § 66292.3(d)..................................................................................................16, 17
  § 66292.4..........................................................................................................16

1

## **INTRODUCTION**

2      In blatant disregard of its mission "to create a more humane and just world,"[1] the

3  University of San Francisco ("USF") enabled two coaches from its Division I baseball team to

4  engage in decades of severe and pervasive sexual misconduct against its student-athletes. Despite

5  multiple parental complaints, at least one Title IX investigation, and a disproportionately high

6  attrition rate on the baseball team, USF exposed its student-athletes to coaches Nino Giarratano

7  and Troy Nakamura (the "Coach Defendants") (together with USF, the "Defendants"), for more

8  than twenty years. USF did so despite knowing that the Coach Defendants created and maintained

9  an intolerable sexualized environment and committed abuse at every opportunity: on the baseball

10  field, in the locker room, in their offices, during baseball practice, and at games. The resulting

11  emotional distress was so severe that several Plaintiffs contemplated suicide.

12      This Court already held that the majority of Plaintiffs' claims can proceed, at least for

13  John Does 1-3.[2] Through the present motions to dismiss, Defendants nevertheless seek again to

14  limit accountability for their conduct, by moving to dismiss several more of Plaintiffs' claims and

15  all claims by John Does 4-14. Plaintiffs respectfully submit that the Court should deny these

16  motions, in their entirety, for the following reasons.

17      *First*, John Does 4-14 bring timely claims. Plaintiffs' amended allegations demonstrate

18  that tolling of the statute of limitations governing the claims of John Does 4-14 should be decided

19  on a full factual record, not as a matter of law, particularly in light of recent guidance from the

20  Sixth Circuit on application of the discovery rule. In addition to actively (but secretly) abetting

21  the Coach Defendants' misconduct, USF received (and concealed) complaints of similar

22  misconduct against similarly-situated student-athletes, rendering the discovery rule applicable

23  here (or, at a minimum, sufficiently alleged).

24      *Second*, Plaintiffs meet the minimum threshold for pleading a "protected activity" for

25  their Title IX retaliation claims. The Court already determined that Defendants' conduct in

26  creating and perpetuating the sexualized environment to which Plaintiffs were subjected plausibly

27

---

28  [1] ECF No. 93 (SAC) ¶ 6.
[2] ECF No. 88 (Order) at 2-3.

- 1 -

constitutes "discrimination on the basis of sex in violation of Title IX."[3] In their SAC, Plaintiffs clarify that it was *this discrimination* by the Coach Defendants that Plaintiffs complained about and opposed, and for which Coach Defendants then retaliated.[4] These complaints therefore constitute the "speaking out against sex discrimination" that the Court previously held would be sufficient to state a retaliation claim.[5] In response, USF ignores the majority of Plaintiffs' amended allegations—which detail the underlying conduct, Plaintiffs' opposition to that conduct, and the various types of retaliatory conduct in which Defendants engaged in response—and dismisses other allegations of sex discrimination as not sufficiently severe to be actionable (which ignores the Court's prior Order permitting Plaintiffs' sex discrimination claim to proceed).

*Third*, Plaintiffs' ability to bring suit for violations of California Education Code § 66281.5 under § 66292.4 does not require an exhaustion of administrative remedies under § 66292.3, as that requirement is limited to civil actions brought pursuant to § 66292.3. Even if exhaustion is required, it is inapplicable here because the section provides exceptions for where plaintiffs seek injunctive relief and where a school, like USF, failed to appropriately and timely apprise Plaintiffs of their right to file formal complaints. Any exhaustion is also futile where the gravamen of Plaintiffs' claims is that USF was deliberately indifferent.

*Fourth*, Plaintiffs' express contract claims survive. Both the National Letter of Intent ("NLI")—which is recognized by courts as a contract between the student-athlete, their institution, and the NCAA—and the Student-Athlete Statement incorporate provisions of the NCAA's Manual. The Manual, in turn, makes clear that in exchange for Plaintiffs' participation on the sports team at issue, the member-institution—here, USF—agrees to "protect the health of, and provide a safe environment for, each of its participating student-athletes" and "establish and maintain an environment that fosters a positive relationship between the student-athlete and coach."[6] USF entered into these contracts with all Plaintiffs and breached them as to all Plaintiffs. USF's attack on the third written contract identified in the SAC—financial aid agreements

---

[3] Order at 28.
[4] SAC § VI.C.
[5] Order at 29.
[6] SAC ¶ 669.

between USF and certain John Does—also fails because, as written contracts, they are not subject to the statute of frauds.

*Finally*, USF's motion to strike Plaintiffs' request for injunctive relief should be denied because it is improper under the law, and even if it were proper, John Doe 1 filed his complaint while he was still subject to the sexually abusive environment he challenges, satisfying Article III standing requirements. USF's motion to strike allegations regarding the Catholic Archdioceses (SAC ¶¶ 61-66) should also be denied because those allegations are plainly relevant to USF's pattern and history of deliberate indifference to sexual misconduct despite their public promises to the contrary.

Plaintiffs therefore respectfully request that the Court deny the motions in full.

## SUMMARY OF FACTS

### I.    The Coach Defendants Subjected Plaintiffs to an Intolerable Sexualized Environment and Retaliated Against Plaintiffs for Their Opposition to that Environment.

John Does 1-3 filed suit on March 11, 2022, complaining about the pervasive sexual environment and abuse they suffered at the hands of the Coach Defendants. ECF No. 1. At the time, Does 1-3 were NCAA Division I ("DI") baseball players at USF. After the suit was filed, the San Francisco Chronicle published a story entitled, "'Intolerable sexualized environment': Ex-USF baseball players sue coaches, school, NCAA." SAC ¶ 496. Thereafter, Does 4-12—upon discovering for the first time that the sexual harassment and abuse they were subjected to was perpetuated and enabled by USF—joined the action in an Amended Complaint. SAC ¶ 521. Does 13 and 14 joined the lawsuit with the filing of the SAC.

As this Court recognized in its prior Order, and as detailed in the SAC, Plaintiffs allege the Coach Defendants created and perpetuated a culture that normalized sexual misconduct. It was not unusual for Nakamura (or "Coach Naks") to expose his genitals to Plaintiffs, such as swinging his penis like a helicopter during practice while Coach Giarratano (or "Coach G") kissed his cross and looked up to the sky or laughed. SAC ¶¶ 104-05. It was not unusual for Nakamura to mime sexual acts with his players, or for the Coach Defendants to require that players engage in sexual play—such as by gifting and then requiring them to bring sex toys to

practice. *Id.* ¶¶ 3, 89. The Coach Defendants also showered with the players, walked around

naked, talked about the players' penises, and asked the players who they were having sex with,

and what sexual acts they were engaging in with their partners. *Id.* ¶¶ 91-92, 385, 442, 463-64.

On the basis of these allegations, this Court upheld Plaintiffs' claim against USF for sex

discrimination under Title IX, as well as additional tort claims against both USF and the Coach

Defendants. Order at 27-30.

When Plaintiffs were alarmed by, complained about, and/or rejected this pervasive,

sexualized culture, the Coach Defendants used the power they wielded to run them off the team.

*E.g.*, SAC ¶¶ 125, 129. This is evidenced by USF's abnormally high transfer rates among other

NCAA DI baseball teams. *Id.* ¶¶ 132-36. The Coach Defendants also retaliated against Plaintiffs

for their opposition to the Coach Defendants' abusive behavior, including by subjecting them to

regular insults and humiliation (*e.g.*, *id.* ¶¶ 158, 179, 229-30, 281, 296, 299-300, 362, 388, 412,

427, 465), threatening harm to their baseball careers if they complained about the abuse, and at

times, threatening and causing actual physical harm (*e.g.*, *id.* ¶¶ 125, 162, 229, 296, 298, 303-04,

358, 467).

When the players themselves attempted to confront the Coach Defendants about their

experiences, the abusive conduct only worsened. For example, instead of offering mental health

resources to a suicidal player who had broken down in his office, Coach G told the player that no

one on the team liked him and that he (the player) was the problem on the team. *Id.* ¶ 430. The

effect of the Coach Defendants' actions toward Plaintiffs was profound. Almost every Plaintiff

reported near-identical symptomology that included anxiety, lack of sleep, depression, trauma,

shock, and suicidal ideation. SAC ¶¶ 193, 211-12, 235, 267, 284, 312, 330, 336, 365, 373, 403,

415, 433, 448, 469, 470.

**II.      Because the Coach Defendants' Conduct Was Normalized and Covered Up by USF, Does 4-14 Did Not Know They Were Victims of Pervasive Institutionalized Indifference to Sexual Misconduct and Abuse Until this Case Was filed.**

The Coach Defendants' conduct was normalized by USF personnel and covered up by

USF administration, which is why John Does 4-14 did not recognize the Coach Defendants'

conduct for what it was: sexual harassment and abuse. *See generally* SAC ¶¶ 484-521. Because

Plaintiffs' teammates and other coaches went along with the Coach Defendants' actions, each Plaintiff questioned their perception of what was occurring. *See, e.g.*, *id.* ¶ 257 ("What are we doing?"). For example, once John Doe 4 arrived on campus, he found the Coach Defendants' frequent nudity bizarre, but he attempted to accept it because it was portrayed as normal within the culture of the team. *Id.* ¶ 277. Similarly, John Doe 5 witnessed and was distressed by Coach Naks exposing himself in front of players, but those players seemingly accepted it as a normal part of the team culture. *Id.* ¶ 349; *see also id.* ¶ 317 (alleging "culture shock" because of the sexualized misconduct); *id.* ¶ 336 (same).

Even team professionals and other coaches normalized the Coach Defendants' sexual misconduct. As an example, John Doe 5 was mandated by Coach G to meet with a USF sports psychologist. While John Doe 5 confided in the mental health professional what he was experiencing on the baseball team, the psychologist never offered him any resources or guidance. SAC ¶¶ 356, 507. John Doe 6 also alleges that many sexualized events were part of the team's culture, but he could not speak up because it appeared normal to the team's other coaches and USF staff. *Id.* ¶¶ 384, 387. The other team coaches knew first-hand about the Coach Defendants' actions but never reported them to USF administration and, in fact, would report back to the Coach Defendants if a player confided in them. *Id.* ¶ 263.

USF and the Coach Defendants knew the Coach Defendants' conduct was not normal, appropriate, or legal, so, for over two decades, they took steps to cover it up. The Coach Defendants manipulated Plaintiffs into believing that there was something wrong *with them* since they could not handle the culture of the team and they found it abhorrent. *E.g.*, SAC ¶¶ 4, 76, 136, 369, 484-539. They also encouraged players to sweep instances of sexual misconduct and sex discrimination "under the rug." *Id.* ¶¶ 352, 506. When Plaintiffs or their parents nevertheless complain about the sexual misconduct, their complaints were ignored. For example, in or around 2000, John Doe 9's mother called Coach G to demand that he stop his abuse, only to be told by USF's then-Athletic Director ("AD") that he did not care about the Coach Defendants' behavior. *Id.* ¶¶ 74, 153, 449-50. In 2014, John Doe 6's mother sent a letter to the Associate AD and the NCAA Faculty Athletics Representative complaining about the "hostile environment." *Id.* ¶ 395.

In violation of USF's reporting and investigation policies (*id.* ¶ 520), this complaint was also swept under the rug. *Id.* ¶ 400. To cover up the Coach Defendants' misconduct, USF allowed John Doe 6 to keep his scholarship for all four years even though he was no longer on the team. *Id.* And between the spring and fall of 2021, John Doe 1's mother phoned the AD twice to complain, while John Doe 2's parents sent the AD a written "URGENT MEETING REQUEST" to complain. *Id.* ¶¶ 505-13; *see also id.* ¶¶ 324-26 (sexual misconduct at a 2016 holiday party at Coach G's house prompted a Title IX investigation). The persistent normalization of the Coach Defendants' actions and the attendant cover ups rendered it impossible for Does 4-14 to know they were victims of serial abuse and institutional indifference until the *San Francisco Chronicle* story was published in March 2022. *Id.* ¶ 496.

USF also ignored the alarmingly high transfer rate in its baseball program that evidenced a problem warranting investigation. SAC ¶¶ 7, 132-35. It was only in January of 2022—after decades of misconduct by the Coach Defendants—that USF fired Nakamura. Even then, however, USF stood behind Giarratano and terminated him only after Does 1-3 filed suit. *Id.* ¶¶ 9, 46-47.

In addition to the above, it is well-studied and long-understood that power disparities in the coach-athlete relationship increase the risk for abuse. SAC § VI.A. Despite its promises to protect its student-athletes, USF—who is not a stranger to a history of abuse in its athletics department (SAC ¶¶ 67-77)—failed to act on those warnings and prevent the abuse of Plaintiffs. Despite the pervasiveness and seriousness of Coach Defendants' abuse and USF's knowledge of that abuse, USF was deliberately indifferent to the heightened risk of sexual abuse to Plaintiffs. *Id.* ¶¶ 9, 73, 361, 450, 500, 545, 550-56.

## **LEGAL STANDARDS**

### I.    **Motion to Dismiss.**

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows for dismissal only if the complaint "fail[s] to state a claim upon which relief can be granted." A complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

1  *Iqbal*, 556 U.S. 662, 678 (2009). The court must accept all of the allegations in the complaint as

2  true and construe them in the light most favorable to the plaintiff. *Moore v. Mars Petcare US,*

3  *Inc.*, 966 F.3d 1007, 1016 (9th Cir. 2020).

4  **II.     Motion to Strike.**

5       Under Rule 12(f), a court "may strike from a pleading an insufficient defense or any

6  redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The function of

7  such a motion is to dispense of "spurious issues" prior to trial. *Whittlestone, Inc. v. Handi-Craft*

8  *Co.*, 618 F.3d 970, 973 (9th Cir. 2010). Where the issue is a disputed factual or legal matter,

9  however, a motion to strike is improper. *Id.* Indeed, a Rule 12(f) motion to strike is generally

10  "disfavored," *Griffin v. Gomez*, No. C 98-21038 JW (NJV), 2010 WL 4704448, at *4 (N.D. Cal.,

11  2010), and "should not be granted unless the matter to be stricken clearly could have no possible

12  bearing on the subject of the litigation," *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d

13  1048, 1057 (N.D. Cal. 2004). "If there is any doubt . . . , the court should deny the motion." *Id.;*

14  *see also Fernandez v. CoreLogic Credco, LLC*, 593 F. Supp. 3d 974, 994 (S.D. Cal. 2022)

15  ("[S]triking the pleadings is considered an extreme measure, and Rule 12(f) motions are,

16  therefore, generally viewed with disfavor and infrequently granted.") (cleaned up).

17                                    **ARGUMENT**

18  **I.     Plaintiffs John Does 4-14 Bring Timely Claims.**

19       Statute of limitations is an affirmative defense that "may be upheld on a motion to dismiss

20  only when [it is] established on the face of the complaint." *Lopes v. Vieira*, 488 F. Supp. 2d 1000,

21  1008 (E.D. Cal. 2007). In other words, dismissal is appropriate only if it can "be determined from

22  the face of the Complaint that [plaintiff's] claims are time-barred as a matter of law." *Id.* at 1030.

23  A motion to dismiss can therefore "be granted only if the assertions of the complaint, read with

24  the required liberality, would not permit the plaintiff to prove that the statute was tolled."

25  *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).

26       On the basis of the allegations in the First Amended Complaint ("FAC"), this Court

27  previously held that claims by John Does 4-12 are time-barred because they all "knew about the

28  misconduct when it occurred" and because "defendants did not conceal critical facts that

1    prevented the plaintiffs from learning the facts underlying their claims." Order at 21, 24.

2    However, two things have changed since the parties briefed Defendants' motions to dismiss the

3    FAC: (1) Plaintiffs filed the SAC, which includes seven pages of new allegations supporting

4    tolling, SAC § VII; and (2) the Sixth Circuit affirmed guidance regarding application of the

5    discovery rule in cases, like this one, where plaintiffs had no way of knowing that defendants had

6    received (and concealed) complaints of similar misconduct against similarly situated individuals,

7    revealing a previously unknown pattern of institutional indifference, *Snyder-Hill v. Ohio State*

8    *University*, Nos. 21-3981/3991 (ECF No. 98-2) (6th Cir. Dec. 14, 2022).[7]

9           Consistent with California's "policy favoring disposition of cases on the merits rather than

10   on procedural grounds," and in light of *Snyder-Hill* and Plaintiffs' new allegations, Plaintiffs

11   respectfully submit that the question of tolling should be decided on a full factual record, not as a

12   matter of law. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005). Indeed, the

13   California Supreme Court has cautioned that "[r]esolution of the statute of limitations issue is

14   normally a question of fact." *Id.* at 810. As detailed below, Plaintiffs believe full discovery will

15   provide even further justification for tolling the statute of limitations here.

16          **A.      As a result of Defendants' conduct, Plaintiffs did not know—and could not**

17          **have known, until this case was filed—that others had complained to USF.**

18          The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or

19   has reason to discover, the cause of action." *Fox*, 35 Cal. 4th at 807.[8] Courts do not take a

20   "hypertechnical approach" to the rule: "Rather than examining whether the plaintiffs suspect facts

21   supporting each specific legal element of a particular cause of action, [courts] look to whether the

22   plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." *Id.* "[T]he

23   _____

24   [7] In December 2022, the Sixth Circuit denied a petition for rehearing *en banc* of its decision in
     *Snyder-Hill v. Ohio State University*, 48 F.4th 686 (6th Cir. Sept. 14, 2022). Because this decision

25   came down following briefing and argument on Defendants' motions to dismiss the FAC,
     Plaintiffs submitted this case in a Statement of Recent Decision. ECF No. 87.

26   [8] Plaintiffs maintain that through both the allegations in the FAC and the more detailed
     allegations of the SAC, they also sufficiently allege three additional, independent bases to toll all

27   statutes of limitation: (1) equitable tolling; (2) equitable estoppel/fraudulent concealment; and (3)
     principles of equity. *See* SAC § VII (alleging facts supporting tolling on all three bases); ECF No.

28   79 (Opp'n to MTD FAC) at 14-24 (detailing case law on all three theories, which continues to
     support their application here). At a minimum, however, *Snyder-Hill* and Plaintiffs' new
     allegations make clear that the discovery rule should be decided on a full factual record.

statute only begins to run once a plaintiff has knowledge of the 'critical facts' of his injury, which are 'that he has been hurt *and who has inflicted the injury*.'" *Bibeau v. Pac. Nw. Rsch. Found. Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999) (quoting *United States v. Kubrick*, 444 U.S. 111, 122 (1979)) (emphasis supplied). "If a plaintiff has no reason to know who injured them, their claim has not accrued." *Snyder-Hill*, 48 F.4th at 701.

With respect to application of the discovery rule here, Defendants cite the same cases and make the same arguments they raised against the FAC.[9] Notably, though Plaintiffs filed a Statement of Recent Decision when *Snyder-Hill* was first issued, not one of the Defendants addresses *Snyder-Hill* in moving to dismiss the SAC. ECF No. 87-1.[10] And though *Snyder-Hill* applies the federal discovery rule, the case is nevertheless instructive because "[u]nder both federal and California law, the discovery rule provides that a limitations period does not commence until a plaintiff discovers, or reasonably could have discovered, his claim." *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1147 (9th Cir. 2002).[11]

In *Snyder-Hill*, the Sixth Circuit applied the discovery rule to delay accrual of plaintiffs' claims relating to a university doctor's sexual abuse under the guise of medical examinations. The court concluded that until public reporting about the doctor's abuses in 2018, plaintiffs had no "reason to know that others had previously complained to Ohio State about [the doctor's] conduct, let alone how Ohio State had responded to any previous complaints." 48 F.4th at 694. "In short, although plaintiffs allege that Ohio State administrators knew of the abuse at the time, the plaintiffs allege that they did not know until 2018 that Ohio State administrators knew or that

---

[9] *Compare* ECF No. 104 (Giarratano Mot.) at 5-7 (citing *Norgart v. Upjohn Co.*, 21 Cal. 4th 383 (1999), *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103 (1988), *Gutierrez v. Mofid*, 39 Cal. 3d 892 (1985), *Geertz v. Ausonio*, 4 Cal. App. 4th 1363 (1992); *Mills v. Forestex Co.*, 108 Cal. App. 4th 625 (2003)); *with* ECF No. 64 (Giarratano MTD FAC) at 5-7 (citing same); *with* Opp'n to MTD FAC at 16-17 (distinguishing same). *Compare* ECF No. 105 (Nakamura Mot.) at 5-8 (citing *Jolly, Lukovsky, Doe v. Univ. S. Cal.*, No. 2:18-cv-09530-SVW-GJS, 2019 WL 4228371, at *5 (C.D. Cal. Apr. 18, 2019)) *with* ECF No. 65 (Nakamura MTD FAC) at 17-20 (citing same); *with* Opp'n to MTD FAC at 16-17 (distinguishing same).

[10] The Court likewise did not discuss *Snyder-Hill* in its prior order on this issue.

[11] In fact, the Ninth Circuit has held that in certain cases were the "federal standard is more generous than California law in tolling," federal law "preempts California's discovery rule." *O'Connor*, 311 F.3d at 1144, 1146-47.

2734277.8

they enabled and perpetuated the abuse." *Id*. at 695.[12] Other courts have reached similar

conclusions, applying the discovery rule where plaintiffs lacked knowledge that an institutional

defendant knew of and perpetuated their abuse. *See, e.g.*, *Ouellette v. Beaupre*, 977 F.3d 127,

132-40 (1st Cir. 2020) (applying discovery rule where plaintiff alleged a police officer sexually

abused him decades earlier, but where plaintiff did not know at the time that the police

department had received prior complaints about the officer); *Doe 1 v. Baylor Univ.*, 240 F. Supp.

3d 646, 663 (W.D. Tex. 2017) (finding that the plaintiffs' claims—brought in 2016, despite the

underlying conduct occurring in 2004—were not time-barred even though "Plaintiffs were aware

of their injuries from the time the assaults occurred" because "they had no reason to know of

Baylor's alleged causal connection to their assaults until the spring of 2016, when media reports

regarding the rampant nature of sexual assault on Baylor's campus first came to light").

Here, John Does 4-14 all allege that they did not discover their causes of action until

March 11, 2022, when the San Francisco Chronicle published a story entitled "'Intolerable

sexualized environment': Ex-USF baseball players sue coaches, school, NCAA." SAC ¶ 521. As

in *Snyder-Hill*, until this public reporting, "Plaintiffs did not have reason to know nor could have

known that others had previously complained to USF about the Coach Defendants' conduct, let

alone how USF had responded to any previous complaints." *Id*. ¶ 498. This is because both "USF

and the Coach Defendants knowingly concealed complaints about the misconduct . . . in an effort

to prevent Plaintiffs and other victims of Defendants' misconduct from discovering their harms

and seeking legal recourse." *Id*. ¶ 499. Accordingly, as in *Snyder-Hill*, "until this case was filed,

John Does 4-14 had no reason to know that their abuse was part of a broader policy of deliberate

indifference by USF towards the Coach Defendants' decades-long pattern of abuse." *Id*. ¶ 500.

Each John Doe's experience at USF also confirms that, as in *Snyder-Hill*, "even if he had

investigated, further inquiry would have been futile because [the university] controlled their

access to information." 48 F.4th at 695. *See also* SAC ¶ 501 (same). Indeed, even without access

to any discovery, Plaintiffs have already identified at least seven instances when Defendants were

---

[12] In denying the petition for rehearing *en banc*, Judge Moore wrote a concurring opinion to emphasize that "[t]he panel's application of the discovery rule fully comports with our precedent and Supreme Court precedent." ECF No. 87-1 at 5 (citing 48 F.4th at 690).

put on notice of the misconduct, but suppressed the complaint: (1) during the 2000-2001 academic year, when John Doe 9's mother complained; (2) in or about 2013, when the Coach Defendants called a player meeting to discuss players' mimicking of their homophobic and violent behavior, from which they explicitly excluded John Doe 5 (who is gay) and at which they told players to "sweep it under the rug"; (3) in May 2014, when John Doe 6's parents sent the USF Associate AD and the USF NCAA Faculty Athletic Representative a letter describing the Coach Defendants' misconduct; (4) at the end of 2016, when the USF NCAA Faculty Athletic Representative became aware of a sexualized incident that occurred at Coach G's house during a Christmas party; (5) in the spring of 2021, when John Doe 1's mother phoned USF's AD to complain; (6) in May 2021, when John Doe 2's parents sent the AD a written "URGENT MEETING REQUEST"; and (7) in the fall of 2021, when John Doe 1's mother complained of the Coach Defendants' misconduct to the AD. *Id.* ¶¶ 505-13. In none of these cases did the incident result in an investigation that was published contemporaneously, subsequently, or until after this lawsuit was filed in 2022. *Id.*; *cf. Snyder-Hill*, 48 F.4th at 695 (noting that despite numerous complaints, "[the doctor's] personnel file had no record of Snyder-Hill's or any other complaint").

Defendants either ignore these new allegations or selectively cite them in an attempt to avoid their impact. USF argues, for example, that the allegations "are particularized to Doe 9 and Doe 5" (they are not), and that Plaintiffs therefore fail to "allege how the concealing of these particular complaints delayed other Plaintiffs in bringing suit." ECF No. 103 (USF Mot.) at 10. In addition to ignoring allegations regarding Does 1, 2, 6, and the entire 2013 and 2016 teams, SAC ¶¶ 505-13, USF misunderstands the nature of these allegations. The school's cover-up extends far beyond the conduct aimed at John Does 5 and 9 (or any other student-athlete), to include a decades-long effort to minimize the Coach Defendants' misconduct and discourage complaints. To wit: Plaintiffs allege that after they filed this lawsuit, their counsel "was contacted in writing by a USF employee, on a confidential basis," who "claimed that USF engaged in 'the gaslighting of these students'" due to the "'longstanding relationships' between Coach G and Coach Naks, and between the Coach Defendants and the AD." *Id.* ¶ 494. The employee also said the Coach

Defendants' "'location within the USF culture'" was "'a core reason that these severe violations and behaviors were tolerated, dismissed, and/or covered up at the expense of the physical and mental health of these student-athletes.'" *Id*. This employee also noted "the 'inexcusable' and 'blatant lack of response to parents,'" but wished to remain anonymous because "they had 'reason to fear retaliation.'" *Id*. ¶ 128. And again, "discovery is likely to uncover additional evidence of USF's history of covering up the Coach Defendants' sexual misconduct, misinforming USF baseball players of their rights, and using force, threats and intimidation to stop those who would otherwise seek relief." *Id*. ¶ 76.

Finally, Defendants contend that "[i]t is of no moment that Plaintiffs now allege that they 'were led to believe that such conduct was normal or acceptable.'" USF Mot. at 7. In fact, the *Snyder-Hill* court noted allegations that abuse was widely discussed and "normalized" in *support* of applying the discovery rule. *See* 48 F.4th at 696 ("The plaintiffs who observed Ohio State's coaches' and staff's widespread acceptance of Strauss's conduct allege that their coaches' normalization of Strauss's conduct led them to reasonably believe that it was not abuse."). As here, "widespread acceptance of the abuse meant that they had no reason to know that other athletes had complained to Ohio State about the abuse or that Ohio State had covered up any abuse or student complaints." *Id*. at 697. Indeed, allegations that (as here) the improper "conduct was common knowledge among student athletes, who joked about it and discussed it amongst themselves," did not preclude but instead supported application of the discovery rule. *Id*. at 695. *See also* SAC § VII.A (alleging similar).

To be clear, Plaintiffs do not allege that they experienced the Coach Defendants' behavior as anything other than abuse, at the time they were abused—they did. Rather, Plaintiffs allege that they had no reason to know until March 11, 2022 that the Coach Defendants had engaged in a decades-long pattern of *abusing others in the same way*, that USF knew about the Coach Defendants' rampant abuse, and that USF enabled and perpetuated the abuse. Consistent with *Snyder-Hill*, these are sufficient allegations to support tolling of Plaintiffs' claims.

1
2

**B.** **Plaintiffs' allegations are sufficient to support tolling against all Defendants and on behalf of the entire Class.**

3

Because Coach Defendants aided in—and were central to—manipulating Plaintiffs and

4

covering up decades of their abuse, SAC ¶¶ 4, 136, 369, 484-529, tolling applies with equal

5

weight to Plaintiffs' claims against them. *See, e.g.*, *Aldrich v. Nat'l Collegiate Athletic Ass'n*, 484

6

F. Supp. 3d 779, 800 (N.D. Cal. 2020) (tolling claims against abusive coach, in addition to

7

school, because he "knew about and maybe even participated in the manipulation" of the

8

plaintiffs). And because John Does 4-14 (or even any one of them) adequately alleges tolling,

9

claims are tolled for the entire Class. *See, e.g., Jarrett v. Kassel*, 972 F.2d 1415, 1427 (6th Cir.

10

1992) (concluding that because a named plaintiffs' actions are attributable to the class for the

11

purposes of tolling, if "plaintiffs prove the remaining elements" of tolling, the statute is tolled for

12

the class).

13
14

**II.** **Plaintiffs Plausibly Allege Claims for Retaliation Under Title IX Because Plaintiffs Engaged in a "Protected Activity."**

15

A Title IX retaliation claim requires Plaintiffs to allege that (1) they engaged in a

16

protected activity, (2) they suffered an adverse action by the defendant, (3) and a causal link

17

exists between the two. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir.

18

2014). A prima facie case requires a "*minimal* threshold showing of retaliation." *Emeldi v. Univ.*

19

*of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012) (emphasis supplied); *see also MacIntyre v. Carroll*

20

*College*, 48 F.4th 950, 954 (9th Cir. 2022) (noting that even at summary judgment, "[t]he

21

requisite degree of proof 'does not even need to rise to the level of a preponderance of the

22

evidence'" (quoting *Emeldi*, 698 F.3d at 724)).

23

At issue is whether Plaintiffs have met the threshold prima facie showing that they

24

engaged in "protected activity" under Title IX which, as the Court acknowledged, includes

25

various opposition activities such as "speaking out against sex discrimination." *See* Order at 29

26

(citing *Emeldi*, 698 F.3d at 725). While this Court recognized that "[t]he coaches' behavior here

27

plausibly was discrimination based on sex in violation of Title IX" because it was "abusive,

28

bullying, and offensive behavior . . . [and] directed against the plaintiffs because of their gender"

(Order at 28), the Court nevertheless dismissed Plaintiffs' Title IX retaliation claims on the basis that Plaintiffs' "complaints here were about pervasive abuse and bullying, not a sexualized environment that was sex discrimination" (*id.* at 29). In the SAC, however, Plaintiffs clarify through additional allegations that they did, in fact, complain *about* Coach Defendants' sexual misconduct and sex discrimination, and that they were retaliated against for this protected activity. SAC ¶ 18.

Specifically, it was the *very* behavior that perpetuated a sexualized environment—that the Court already deemed plausible discrimination based on sex—that Plaintiffs opposed and complained about, and that led to continued and further abuse, bullying, and offensive behavior. *E.g.*, *id.* ¶¶ 5, 7, 18, 74, 86, 117, 119, 123-62, 514-15. Even USF's inaccurate summary of three of the many examples of Plaintiffs' complaints plead "protected activity." USF Mot. at 12-13.[13] For example, John Doe 13 was subject to sexualized hazing, including being dared to spank a female at a team Christmas party in 2016. *Id.* ¶¶ 116, 157, 324-27. He, like other Plaintiffs, was ostracized for not fully participating in the sexualized atmosphere—his opposition is a protected activity that led Coach G to retaliate by subjecting him to further verbal abuse, harassment, and ridicule. *Id.* ¶ 321.

Likewise, John Doe 9's mother complained to Coach G about his abuse of her son. *Id.* ¶¶ 153, 155-56; *see also Ollier*, 768 F.3d at 866 (acknowledging that students themselves need not make Title IX complaints themselves to bring retaliation claims). When Coach G responded with threats, John Doe 9's mother elevated her complaint to then-AD Bill Hogan who conveyed to her that he did not care about Coach Defendants' sexual misconduct. SAC ¶¶ 74, 155-56, 450. This led Coach G to retaliate against John Doe 9 by giving him a failing grade in physical education. *Id.* ¶¶ 153, 453. USF's argument that John Doe 9's allegations provide no description regarding the nature of the complained-of "abuse" ignores the entirety of John Doe 9's allegations

---

[13] USF claims the Court previously found allegations regarding John Doe 6's parents' May 2014 letter and John Doe 2's parents' email insufficient to support retaliation claims. USF Mot., n.8. However, the Court did not discuss these specific complaints in the context of Plaintiffs' retaliation claim. Moreover, in their SAC, Plaintiffs include additional allegations with respect to their retaliation claim, including additional engagement in protected activities. SAC ¶¶ 201-202 (Doe 2); 387-388, 399 (Doe 6).

- 14 -

1   (*e.g.*, *id.* ¶¶ 155-56; 443, 450), and underscores the purpose of discovery, which will reveal the

2   full extent of the events, including any and all conversations.

3         USF also highlights another of Doe 1's protected activities—that Doe 1 spoke with the

4   AD about problems with USF's baseball program including sexual misconduct. USF Mot. at 13.

5   This is a protected activity much like his previous protected activities that resulted in retaliation

6   and further abuse, such as John Doe 1's reluctance and refusal to participate in bizarre, sexualized

7   exercises (*e.g.*, SAC ¶¶ 93-95, 169), and his participation (along with Does 2 and 3) in a skit to

8   express their discomfort with the Coach Defendants' behavior. SAC ¶¶ 171, 182, 201, 225, 514,

9   564(d). That Coach Nakamura was eventually fired (USF Mot. at 13) does not absolve

10  Defendants' previous retaliation efforts for John Doe 1's complaints and opposition to participate

11  in the sexualized environment.

12        All the above are precisely the types of protected activity that federal laws like Title IX

13  are designed to protect from retaliation. *See Emeldi*, 698. F.3d at 725 ("It is a protected activity to

14  protest or otherwise oppose unlawful . . . discrimination") (cleaned up); *see also Thomas v. City*

15  *of Beaverton*, 379 F.3d 802, 809 (9th Cir. 2004) (recognizing that plaintiff's conveyance of "an

16  implicit message of disapproval of the illegality of the activity through her conduct by refusing to

17  facilitate or participate in it" was "protected activity" for a First Amendment retaliation claim);

18  *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994) (holding that "[o]pposition can, of course,

19  consist of a refusal to carry out an order or policy" for Title VII retaliation claims). Plaintiffs'

20  separate complaints about non-sexualized general abuse and bullying are included in the SAC to

21  provide context for the broader environment in which the students suffered, but should not detract

22  from the fact that Plaintiffs *also* engaged in protected activity by opposing discriminatory

23  behavior.

24        Finally, USF argues that retaliation claims would not extend to all Plaintiffs, particularly

25  those who left USF years earlier, because not all Plaintiffs are within the "zone of interests"

26  protected by Title IX's retaliation provision. USF Mot. at 14 (citing *Ollier*, 768 F.3d at 866).

27  USF's reading of *Ollier* is incorrect. There, the Ninth Circuit explicitly rejected the defendant's

28  reading of the "zones of interests" jurisprudence to limit standing to only those who both engaged

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS AND USF'S MOTION TO STRIKE
CASE NO. 3:22-CV-01559-LB

1   in the protected activity and were the subject of unlawful retaliation as "artificially narrow" with

2   "no basis in text or prior practice." *Ollier*, 768 F.3d at 866. "Rather, any plaintiff with an interest

3   arguably sought to be protected" by Title IX's retaliation provision has standing, including all

4   students. *Id.* (cleaned up); *see also id.* at 868 (holding that it is not "a viable argument

5   for [defendant] to complain that only some members of the plaintiff's class who attended [the

6   school] when complaints were made can urge they engaged in protected activity").

7      Nevertheless, each Plaintiff here alleges (1) engagement in a protected activity by

8   opposition to the sexualized environment, including both their refusal to join in the sexualized

9   conduct and their direct complaints about the conduct, and (2) the Coach Defendants' retaliatory

10  conduct thereafter. *E.g.*, SAC ¶¶ 125-161, 567. Each Plaintiff also alleges that their experiences

11  were typical of those on the team during that time period. *Id.* § VI.D (1-14), ¶ 530. Plaintiffs'

12  allegations of engaging in protected activity meet the low bar to state a *prima facie* claim for

13  retaliation under Title IX.

14  **III.   Plaintiffs Plausibly Allege Violations of California Education Code § 66281.5**
     **Because the Exhaustion Requirement Does Not Apply Here.**

15

16     Plaintiffs adequately allege violations of California Education Code ("Code") § 66281.5

17  because, contrary to USF's argument (USF Mot. at 14-15), the statutory exhaustion requirement

18  does not apply if a party is seeking civil remedies pursuant to § 66292.4 of the Code.

19     Code § 66292.3(d) states that "a victim of discrimination may not seek civil remedies . . .

20  until at least 90 days have elapsed from the filing of a discrimination complaint with the local

21  educational agency." However, the provision applies only to those seeking civil remedies

22  "pursuant to this section," i.e., § 66292.3. *Id.* The preceding subdivision, Code § 66292.3(c),

23  clearly states that "[n]othing in this chapter shall be construed to require an exhaustion of the

24  appeal to the Board of Governors . . . or to the Chancellor of the California State university

25  pursuant to subdivision (a), before civil law remedies may be purchased." *Id.*; *see also* Code

26  § 66281.8(d) (recognizing that a civil action may be brought under both § 66292.3 and § 66292.4

27  for violations of that particular section). Here, Plaintiffs allege violations of § 66281.5 and bring

28  this action pursuant to § 66292.4. SAC ¶¶ 598-600. Accordingly, they do not have to exhaust

administrative remedies.

If the Court is persuaded that Code § 66292.3(d) applies outside of § 66292.3, the same provision further states that the "90-day moratorium" is "applicable *only* if the local educational agency has appropriately, and in a timely manner, apprised the complainant of his . . . right to file a complaint." *Id.* (emphasis supplied). Indeed, the very basis of Plaintiffs' claim here is that USF failed to do this, i.e., to properly notify Plaintiffs of the prohibition against sexual harassment and discrimination on the basis of sex, available remedies, and relevant procedures. *E.g.*, SAC ¶¶ 598-602. Because USF failed to appropriately and timely apprise Plaintiffs of their right to file formal complaints here, the 90-day moratorium does not apply.

Nevertheless, even if this provision applies and exhaustion were required for Plaintiffs (which it is not), any complaints would have been futile. Plaintiffs allege that USF knowingly allowed the sexual exploitation of Plaintiffs to occur, and this abuse was part of USF's broader policy of deliberate indifference. *E.g.*, SAC ¶¶ 500-01. Moreover, as USF points out, the statute expressly carves out an exception for injunctive relief. USF Mot. at 14-15; Code § 66292.3(d). Plaintiffs allege injunctive relief claims here (*e.g.*, *id.* ¶ 538, 590), and contrary to USF's assertions, Plaintiffs have standing to assert such claims (*see infra* Section VI, opposition to motion to strike). Thus, any such requirement for exhaustion is excused due to futility and the exception for injunctive relief.

## IV. Plaintiffs Plausibly Allege Contract Claims Against USF.

### A. Plaintiffs adequately allege claims against USF for breach of express and oral contracts.

Plaintiffs adequately allege breach of express contract and oral contract claims against USF. "Under California law, the elements of a breach of contract claim are: (1) the existence of a contract, (2) performance or excuse of nonperformance, (3) defendant's breach, and (4) damages." *Saroya v. Univ. of the Pac.*, 503 F. Supp. 3d 986, 996 (N.D. Cal. 2020). "[T]he basic relationship between a student and a university is contractual in nature." *Id.*

Plaintiffs allege they entered into contracts with USF by signing the National Letter of Intent ("NLI") (SAC ¶¶ 659, 673), the NCAA Division I Student-Athlete Statement ("Student-

Athlete Statement") (SAC, Ex. B), and, for certain Plaintiffs, separate financial aid agreements

(SAC ¶¶ 5, 13, 166, 197, 219, 657, 675(a), 676, 679; *see also* Decl. of Jonathan D. Selbin ISO

Pls. Opp. to Defs' Mots. to Dismiss and USF's Motion to Strike ("Selbin Decl."), Ex. C).[14]

Plaintiffs allege that the NLI "is a binding agreement between a prospective student-athlete and

an NLI member institution." SAC, n.63. Courts agree. *See O'Brien v. Ohio State Univ.*, 2007-

Ohio-4833, ¶ 22 n.6 (Ohio Ct. App. 2007) ("The NLI acts as a contract between a school and a

prospective student-athlete . . . ."); *Williams v. Univ. of Cincinnati*, 752 N.E.2d 367, 374 (Ohio

Ct. Cl. 2001) ("The NLI, by its express terms, both commits a student-athlete to attend a

particular college or university and commits that college or university to provide the student-

athlete with a scholarship for at least one year."); *see also id.* (finding that financial aid

agreements between the institution and plaintiff constitute valid contracts); *Knapp v. Nw. Univ.,*

No. 95 C 6454, 1996 WL 495559, at *1 (N.D. Ill. Aug. 28, 1996) ("The NLI is a contract which

imposes obligations upon a prospective student-athlete and the university who executes it.").

Further, the Student-Athlete Statement is "required by" the NCAA Constitution and Bylaws.

SAC, Ex. B, p.1. And through the grant-in-aid agreements, USF agreed to provide Plaintiffs

specific scholarships and financial aid in exchange for those Plaintiffs attending USF and

participating in the USF baseball program. Selbin Decl., Ex. B.

       Both the NLI and the Student-Athlete Statement incorporate various provisions of the

NCAA Division I Constitution and Bylaws, called the Manual. SAC ¶¶ 660-667. The Manual

promises student-athletes that in exchange for their participation in sport, member institutions,

such as USF, would "protect the health of, and provide a safe environment for, each of its

participating student-athletes" and "establish and maintain an environment that fosters a positive

---

[14] Together with this Opposition, Plaintiffs submit a declaration attaching samples of all three contracts at issue, to clarify confusion USF raised in its motion about the contracts identified in the SAC. Although Plaintiffs need not attach a contract to state a breach of contract claim, *see Eberz v. CitiMortgage, Inc.*, No. 2:12-CV-4746-SVW-MRW, 2012 WL 12897373, at *3 (C.D. Cal. Sept. 12, 2012), Plaintiffs nevertheless attach the 2020-2021 versions of the NLI and Student-Athlete Statement, as well as an example financial aid agreement as Exhibits A, B, and C to the Selbin Declaration, respectively. While Plaintiffs allege breaches of all three contracts in the SAC, Plaintiffs attached only a sample Student-Athlete Statement to the SAC (as Exhibit B, at ECF No. 93-2). For the avoidance of doubt, and though not required, Plaintiffs now attach samples of all three contracts.

1    relationship between the student-athlete and coach." *Id.* ¶ 669.a-b; *see generally id.* ¶ 669. In

2    fact, USF *admits* that the Manual is "intended to regulate the conduct of member universities

3    and their athletics programs." USF Mot. at 19. Further, pursuant to the NLI (SAC ¶ 670) and the

4    financial aid agreements (SAC ¶¶ 657, 675-676, 679; Selbin Decl., Ex. C.), USF agreed to

5    provide athletics financial aid.

6        Plaintiffs allege they complied with their obligations under the contracts by playing

7    baseball, but USF breached these contracts by failing to provide a safe environment, failing to

8    establish and maintain an environment that fosters a positive relationship between student-

9    athlete and coach, and failing to provide promised financial aid. SAC ¶¶ 657, 674-675. As a

10   result of those breaches, Plaintiffs were injured. *Id.* ¶ 676. Plaintiffs thus allege the nature of the

11   contracts, the consideration exchanged by the parties, the manner of the USF's breach, and

12   Plaintiffs' injuries. This is sufficient to state a claim.

13       USF contends that there is no manifestation of mutual assent between USF and Plaintiffs

14   to enter into *any* contract.[15] USF Mot. at 16. But the SAC is replete with allegations that USF

15   promised Plaintiffs academic and athletic scholarships in exchange for Plaintiffs' participation

16   in the USF baseball program. *See, e.g.,* SAC ¶¶ 166, 197, 219, 251, 290, 314, 345, 381, 421,

17   438, 458, 675-676; *see also* Selbin Decl., Ex. C. For those Plaintiffs who did not receive

18   scholarship monies, they nevertheless signed the NLI, making a commitment to play on the

19   USF baseball team. SAC ¶¶ 274, 333, 404. Certainly, USF did not provide Plaintiffs with

20   scholarship monies for altruistic purposes, and it is likely that many of the Plaintiffs would not

21   have agreed to play on the USF baseball team without the scholarships and financial aid

22   incentives. USF's argument that there was no manifestation of mutual assent to enter into any

23   _____

24   [15] USF also argues that Plaintiffs' "attempt to incorporate 'terms' from the NCAA Bylaws into
     the [Student-Athlete Statement] is a red herring." USF Mot. at 16. But, again, Plaintiffs allege

25   that the Manual is incorporated into the NLI as well as the Student-Athlete Statement. SAC
     ¶¶ 660-667. Furthermore, "where the meaning of the words used in a contract is disputed, the trial

26   court must provisionally receive any proffered extrinsic evidence which is relevant to show
     whether the contract is reasonably susceptible of a particular meaning." *Nomadix, Inc. v. Guest-

27   Tek Interactive Ent. Ltd.*, No. CV1608033ABFFMX, 2017 WL 11049752, at *3 (C.D. Cal. Sept.
     6, 2017) (quoting *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1350 (2004)). As such,

28   whether the terms say what Plaintiffs allege or what Defendants assert cannot be resolved on a
     motion to dismiss.

1    contract is inconsistent with the allegations of the SAC, the business of collegiate athletics, and

2    the legal import of the NLI. *Knapp*, 1996 WL 495559, at *1.

3        USF next argues that Plaintiffs' contract claims cannot proceed because Plaintiffs

4    previously asserted these same contract claims against the NCAA. USF Mot. at 16. But

5    Plaintiffs allege that the NLI and the Student-Athlete Statement are contracts between Plaintiffs

6    and *both* USF and the NCAA. SAC ¶ 659. *See also Oliver v. NCAA*, 920 N.E.2d 190, 195 (Ohio

7    Ct. Com. Pl. 2008) (noting "it is clear that the plaintiff alleges that he has a contractual

8    relationship with OSU and the NCAA through his national letter of intent that obligated the

9    parties to act in good faith and to deal fairly with the plaintiff"). Plaintiffs' allegations against

10   the NCAA do not obviate their allegations against USF based on both being parties to the same

11   contracts. Further, just because Plaintiffs chose not to bring contract claims against USF in the

12   original complaint does not foreclose Plaintiffs' ability to do so now.

13       Finally, USF argues that the Student-Athlete Statement (Ex. B to the SAC) is not a

14   contract between Plaintiffs and USF for those who left USF before 2019, especially because

15   USF is not mentioned anywhere in the document. USF Mot. at 15-16. In making this argument,

16   USF overlooks the various obligations imposed on member institutions such as USF pursuant to

17   the Manual (which is incorporated, in part, in the Student-Athlete Statement). Further, while the

18   Student-Athlete Statement is on NCAA letterhead as noted by USF, it does indeed impose

19   obligations on the member institution, including that the institution be the point of contact with

20   the student-athlete: "Any questions regarding this form should be referred to your director of

21   athletics . . . ." SAC, Ex. B, pp. 1, 7. Finally, while the Student-Athlete Statement may have had

22   different numerical titles corresponding to the academic year it was in place, every year's form

23   was substantially the same and therefore the same for all Plaintiffs, including those who left

24   USF before 2019. SAC ¶¶ 663-664. Thus, the Student-Athlete Statement does indeed impose

25   obligations on USF, especially when considered along with the obligations that the Manual

26   imposes on member institutions. Accordingly, Plaintiffs plausibly plead express contract claims.

27       Plaintiffs' oral contract claims at Count XIV are predicated on the same allegations of

28   the express contract claim: that Plaintiffs agreed to participate in the USF baseball program in

1  exchange for USF's promise of athletic and academic scholarships and financial aid, in addition

2  to providing a safe environment and one that fosters a positive relationship between the student-

3  athlete and coach. SAC ¶¶ 679-681.

4      USF responds, like it did above, that there is no manifestation of assent for USF to be

5  bound. USF Mot. at 17. For the same reasons set out above—that there was indeed a

6  manifestation of mutual assent where USF promised Plaintiffs certain benefits in exchange for

7  participating in its baseball program—this argument fails.

8      USF next argues that there can be no oral contract where Plaintiffs allege that the

9  promises of academic and athletic scholarships are contained in the NLI. USF Mot. at 17. Yet

10 Plaintiffs' oral contract claim is made in the alternative, in the event this Court does not find the

11 existence of any of the alleged written contracts. SAC ¶ 679.

12     Finally, USF argues that Plaintiffs do not allege that USF entered into written financial

13 aid agreements with John Does 4, 7, and 14. USF Mot. at 18.  As set out above, however,

14 Plaintiffs *do allege* that they *all* signed the NLI and the Student-Athlete Statement for their

15 respective years. These contracts incorporated commitments on behalf of both parties, including

16 abiding by the NCAA Manual. The existence of these written contracts undercuts any argument

17 that John Does 4, 7, and 14 (or any other Does) fail to allege a written contract claim. As to the

18 remaining Does, USF's statute of frauds argument (USF Mot. at 18) fails because the grant-in-

19 aid agreements at issue are written contracts—not oral contracts. SAC ¶¶ 5, 13, 166, 197, 219,

20 657, 675(a), 676, 679; Selbin Decl., Ex. C. USF does not (and cannot) argue that the statute of

21 frauds applies to these written instruments. Again, Plaintiffs' oral contract claims are made *in*

22 *the alternative*, in the event this Court should find that no written contracts exist.

23     **B.**     **Plaintiffs adequately allege that they are third-party beneficiaries of a**
            **contract between USF and the NCAA.**

24

25     Plaintiffs also plausibly allege they are third-party beneficiaries of a contract between

26 USF and the NCAA at Count XV. That contract is the NCAA Constitution, Operating Bylaws,

27 and Administrative Bylaws, collectively called the "Manual" and discussed above. SAC ¶ 684.

28 The Manual requires the NCAA to conduct intercollegiate athletics programs in a manner

designed to protect the physical and educational well-being of student-athletes (*id.* ¶ 686.c) and

requires member institutions like USF to provide a safe environment for student-athletes and to

maintain a positive relationship between student-athletes and coaches. *Id.* ¶ 686.d-e; *see generally*

*id.* ¶ 686. The beneficiaries of the Manual are the student-athletes. *Id.* ¶ 690.

Courts consistently recognize that student-athletes are the intended third-party

beneficiaries of the contract between a member institution and the NCAA. For example, in

*Oliver v. National Collegiate Athletic Association*, the court found it "unquestionable" that the

contractual agreement between the member university and the NCAA is created to confer a

benefit on student-athletes:

> The purpose of the NCAA (see Bylaws 1.2 and 1.3.1), and the
> obligation of member institutions (see Obligations of Member
> Institutions, Article 1.3.2) form a contract in which the defendant
> promises, among many things, to initiate, stimulate and improve
> intercollegiate athletic programs for student athletes, see Article 1.2
> (a). OSU promises to enforce the defendant's legislation as it relates
> to its members and "protect and enhance the physical and educational
> well-being of student athletes." *See* Article 1.3.2 and 2.2. The
> constitution of the NCAA, the operating and the administrative
> bylaws (the NCAA Divisional Manual) represents the contract
> between the association and its member institutions whereby student-
> athletes remain amateurs in an intercollegiate sport, where they are
> "motivated primarily by education and by the physical, mental and
> social benefits to be derived." *See* Article 2.9. According to the
> principles of the agreement, "student participation in intercollegiate
> athletics is an avocation, and student-athletes should be protected
> from exploitation by professional and commercial enterprises." *Id.*
> Each entity binds itself to follow the directives of the contractual
> manual in order to promote an intercollegiate amateur athletic
> program for student-athletes.

920 N.E.2d 203, 211 (Ohio Com. Pleas 2008); *see also Bloom v. Nat'l Collegiate Athletic Ass'n*,

93 P.3d 621, 623-24 (Colo. App. 2004) (finding third-party beneficiary standing because "the

NCAA's constitution, bylaws, and regulations evidence a clear intent to benefit student-

athletes"); *Weston v. Big Sky Conference*, 466 F. Supp. 3d 896, 910 (N.D. Ill. 2020) (same).

USF contends that any benefits the student-athletes derive from such agreements are

incidental. USF Mot. at 19. To support this argument, USF points to three cases, all of which

are distinguishable. First, *Knelman v. Middlebury College*, 898 F. Supp. 2d 697, 715 (D. Vt.

2012), *aff'd,* 570 F. App'x 66 (2d Cir. 2014) was decided on summary judgment after discovery

was completed, and the court expressly did "not decide the issue" of whether the student filing

suit constituted a third-party beneficiary. Second, in *Hall v. National Collegiate Athletic*

*Association*, 985 F. Supp. 782, 797 (N.D. Ill. 1997), the court assumed that "the Halls have

some likelihood of success in proving that student athletes are third-party beneficiaries to the

contract among the NCAA and all its members." The failing there was that the Halls did not

establish any breach. *Id.* Finally, in *Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1320

(9th Cir. 1996), the university was not a party to the case and the NCAA Manual was not at

issue. Instead, the student-athletes lodged contract claims against the conference in which they

played while at their university. The court stated, "[t]he key here is that appellants have not

demonstrated that the parties intended to create direct legal obligations between themselves and

the students." *Id.* Here, on the other hand, USF made specific commitments to its student-

athletes through the NCAA Manual.

     In a last-ditch effort to avoid conferring third-party beneficiary status on Plaintiffs, USF

argues that the obligations Plaintiffs identify in the Manual are imposed on the NCAA, not USF.

USF Mot. at 20-21. Not so. The SAC makes clear that the Manual's obligations are imposed on

both the NCAA and USF. SAC ¶ 686. Pursuant to the Manual, USF has obligations to provide for

the health of, and provide a safe environment for, each of its participating student-athletes, and to

establish and maintain an environment that fosters a positive relationship between the student-

athlete and coach. SAC ¶ 686.d-e; *see also id.* ¶ 686.f. These provisions are not, as USF contends,

too indefinite to be enforced. USF Mot. at 21. The case that USF cites, *Holmes v. Lerner*, 74 Cal.

App. 4th 442, 457-59 (1999), actually supports Plaintiffs' argument. There, the Court affirmed

the trial court's entry of judgment on an oral partnership agreement where the agreement was

sufficiently definite. Contrary to USF's argument, Plaintiffs do not attempt to impute such

promises on USF; instead, USF made various commitments to student-athletes by being a

member of the NCAA and garnering the benefits of the student-athletes' participation in sport as

a result of that membership.

- 23 -

1

**V.      Plaintiffs Concede Dismissal of Tortious Interference with Contract and Tortious Interference with Prospective Economic Advantage Against the Coach Defendants.**

2

3       Plaintiffs allege tortious interference with contract and tortious interference with

4    prospective economic advantage claims against the Coach Defendants at Counts XVI and XVII.

5    Plaintiffs allege they entered into valid written contracts and agreements with USF, or

6    alternatively, oral ones, that afforded them athletic and academic grants-in-aid (scholarships),

7    financial aid, and a safe environment free from sexual abuse and/or sexual harassment in

8    exchange for participating in USF's baseball program. SAC ¶¶ 692, 699. Plaintiffs allege that the

9    Coach Defendants interfered with those contracts and expectancies. SAC ¶¶ 699, 701.

10      The Coach Defendants do not argue that Plaintiffs' claim is not sufficiently pled.

11   Instead, they contend that they cannot tortiously interfere with a contract between Plaintiffs and

12   USF because they were agents of USF. Giarratano Mot. at 10-11; Nakamura Mot. at 12-13.

13   Plaintiffs concede dismissal of these claims pursuant to the "agent's immunity rule," where

14   agents and employees of a corporation cannot conspire with their corporate principal or

15   employer to interfere with the employer's contracts. *See Applied Equip. Corp. v. Litton Saudi*

16   *Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994) (citing cases). Plaintiffs therefore agree that Counts XVI

17   and XVII should be dismissed.

18   **VI.     USF's Motion to Strike Must Be Denied.**

19      USF also moves to strike Plaintiffs' request for injunctive relief and certain allegations

20   regarding the Catholic Archdiocese of San Francisco. The motion is both procedurally improper

21   and substantively without merit, and should be denied.

22      As a threshold matter, motions to strike injunctive relief are not permitted in the Ninth

23   Circuit. Even if they were, USF's sole argument for striking Plaintiffs' request for injunctive

24   relief—that as (now all) former USF students, Plaintiffs lack standing to seek such relief—fails

25   because John Doe 1 was a current student at USF when he filed the complaint.[16] USF Mot. at 22-

26   24; ECF No. 1 (Compl.) ¶ 34; FAC ¶ 38.

27

28   _____
[16] To the extent USF raises other arguments in its reply, Plaintiffs request the ability to respond in a sur-reply or at the May 18, 2023 hearing on this motion.

### A.       Motions to strike injunctive relief are not permitted.

A motion to strike is not the appropriate procedural vehicle to challenge a request for injunctive relief. In *Whittlestone*, the Ninth Circuit held that Rule 12(f) does not authorize district courts to strike claims for damages on the ground that such relief is precluded as a matter of law. 618 F.3d at 973. Numerous courts in this Circuit have since held that this ruling applies to other remedies, including injunctive relief. *See Guerrero v. Halliburton Energy Servs., Inc.*, 231 F. Supp. 3d 797, 809 (E.D. Cal. 2017) (refusing to strike claim for injunctive relief based on *Whittlestone*); *Walker v. McCoud Cmty. Servs. Dist.*, No. 2:16–61 WBS CMK, 2016 WL 951635, at *2 (E.D. Cal. Mar. 14, 2016) ("In light of *Whittlestone*, courts . . . have held that Rule 12(f) cannot be used to strike any portion of a plaintiff's prayer for relief[.]"); *Byrd v. Masonite Corp.*, 215 F. Supp. 3d 859, 869 (C.D. Cal. 2016) ("A claim for relief, regardless of form, is not immaterial to a plaintiff's complaint . . . ."); *Varsam v. Lab. Corp. of Am.*, 120 F.Supp.3d 1173, 1183 (S.D. Cal. 2015) ("Rule 12(f) states that a district court 'may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.' Plaintiff's claim for injunctive relief is none of these.") (cleaned up).

The only case on which USF relies, *Susilo v. Wells Fargo Bank, N.A.*, 796 F. Supp. 2d 1177, 1196 (C.D. Cal. 2011), cites out-of-circuit precedent and contravenes *Whittlestone*. *See Powell v. Wells Fargo Home Mortg.*, No. 14-CV-04248-MEJ, 2017 WL 2720182, at *6 (N.D. Cal. June 23, 2017), *aff'd*, 855 F. App'x 382 (9th Cir. 2021) (explaining that *Susilo* relied on out-of-circuit precedent "and did not address *Whittlestone*'s holding"); *Power Probe, Inc. v. Sullivan*, No. SACV 15–1404–JLS, 2016 WL 7496865, at *4 (C.D. Cal. 2016) (describing *Susilo* as being in "conflict" with *Whittlestone*). For this reason alone, the Court should deny USF's motion to strike.[17]

### B.       John Doe 1 has standing to seek injunctive relief because he was a current student when he filed the complaint.

Even if USF's motion were procedurally proper, it is factually flawed. Standing is

---

[17] This is not simply an academic distinction. Whereas motions to dismiss pursuant to Rule 12(b) are subject to de novo review, motions to strike under Rule 12(f) are reviewed for abuse of discretion. *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 963 (9th Cir. 2018).

determined at the outset of litigation and only one named plaintiff must have standing to represent the class. Because John Doe 1 had standing to seek injunctive relief when he filed this case, Plaintiffs maintain standing to seek injunctive relief.

To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61(1992)). Standing is determined based "on the facts as they exist when the complaint is filed." *Lujan*, 504 U.S. at 570 n.4 (quoting *Newman-Green, Inc. v. Alfonzo- Larrain*, 490 U.S. 826, 830 (1989)) (emphasis omitted); *see also Am. Civil Liberties Union of Nev. v. Lomax*, 471 F.3d 1010, 1016 (9th Cir. 2006) ("[S]tanding is evaluated by the facts that existed when the complaint was filed . . . ."). In a class action, standing is satisfied "if at least one named plaintiff meets the requirements." *Bates v. United Parcel Serv.*, 511 F.3d 974, 985 (9th Cir. 2007); *see also Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014) (same).

John Doe 1 satisfies these requirements. At the time he filed the complaint, John Doe 1 was a student-athlete on the USF baseball team and was subject to the sexually abusive environment that injured him and the Class. Compl. ¶ 34. USF does not contend that John Doe 1 lacked standing to seek injunctive relief when he was a current student—nor could it: John Doe 1 alleges that (1) he suffered sexual, physical, and mental harassment and abuse, (2) fairly traceable to USF's inadequate policies and procedures to prevent or properly respond to such abuse, and (3) his injury could be redressed by an injunction requiring USF to adopt, implement, and enforce appropriate policies and procedures.[18] SAC ¶¶ 169-73, 178-79, 478, 481-82; *see also R.G. v. Koller*, 415 F. Supp. 2d 1129, 1135 (D. Haw. 2006) (holding that plaintiffs had standing to seek injunctive relief where they alleged that they suffered harassment and abuse due to the lack of adequate policies and procedures at the youth facility entrusted with their care).

For purposes of standing, it is irrelevant that John Doe 1 transferred from USF (because of

---

[18] Notably, former Defendant NCAA previously conceded that current students have standing to seek injunctive relief. *See* ECF No. 65 (NCAA's Mot.) at 14 (arguing only that John Does 4-12, as former students, lacked standing to seek injunctive relief).

Defendants' actions) after the complaint was filed. *Doe v. Wolf*, 424 F. Supp. 3d 1028 (S.D. Cal. 2020), is illustrative. There, petitioners were asylum seekers who alleged that respondents had a policy of prohibiting asylum seekers access to retained counsel for interviews used to determine whether they would face persecution if returned to the country from which they arrived. *Id.* at 1034. While petitioners' action was pending, the court granted the petitioners' motion for a TRO and, with counsel present, they passed their interview. *Id.* They therefore were no longer at risk of being sent to Mexico while they awaited their immigration proceedings. *Id.* at 1035. Because they were no longer at risk, respondents argued that petitioners lacked standing to enjoin the policy. *Id.* at 1036-37. The court disagreed, holding that petitioners had standing because, when they filed their complaint, they suffered the injury of being deprived access to retained counsel for their interview, the injury was caused by the respondents' policy, and an injunction prohibiting the policy would redress the injury. *Id.* at 1037. "The fact that Petitioners are no longer at risk of [being sent to Mexico] does not change this analysis." *Id.*; *see also Slayman*, 765 F.3d at 1048 ("[A]ny named plaintiff who was a FedEx driver at the time the complaint was filed did have standing to seek injunctive and declaratory relief."). The same is true here.

USF's authorities are not to the contrary. In all of them, the plaintiffs were not currently subject to the processes they sought to enjoin *when they filed their complaints. See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (plaintiff not detained at the time of filing); *Updike v. Multnomah Cnty.*, 870 F.3d 939, 948 (9th Cir. 2017) (plaintiff no longer a pretrial detainee at the time of filing)[19]; *Walsh v. Nev. Dep't of Hum. Res.*, 471 F.3d 1033, 1035-37 (9th Cir. 2006) (plaintiff's employment ceased a month before filing); *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999) (plaintiff a former student at the time of filing); *Grant House v. Nat'l Collegiate Athletic Ass'n*, 545 F. Supp. 3d 804, 818 (N.D. Cal. 2021) (plaintiff a former

---

[19] USF cites *Updike* for the proposition that Plaintiffs must show a "real and immediate threat of repeated injury" to seek injunctive relief. USF Mot. at 22 (quoting *Updike*, 870 F.3d at 947). As the court explained in *Doe v. Wolf* when rejecting this same argument, such a requirement applies only where plaintiffs are not subject to the challenged policies (or lack thereof) *at the time they filed their complaint. See* 424 F. Supp. 3d at 1037-38 (distinguishing *Lyons*, 461 U.S. 95 and *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260 (9th Cir. 1999), cases on which USF also relies, on this basis).

1    student-athlete at the time of filing)[20]; *Baas v. Dollar Tree Stores, Inc.*, No. C 07-03108 JSW,

2    2009 WL 1765759, at *3 (N.D. Cal. June 18, 2009) (plaintiffs former employees at the time of

3    filing). As such, these cases are factually distinguishable from the present case.[21]

4           Because John Doe 1 filed his complaint while he was subject to the sexually abusive

5    environment he challenges, he has standing to seek injunctive relief for himself and the Class.[22]

6           **C.      Allegations regarding the Catholic Archdioceses are relevant to USF's official
              policy of deliberate indifference to sexual abuse.**

7

8           USF also argues that the Court should strike Paragraphs 61-66 of the SAC because they

9    are "immaterial," "impertinent," or "scandalous." USF Mot. at 24. The six paragraphs at issue

10   provide brief background information on USF's history of sexual abuse and USF's president's

11   commentary about that history. SAC ¶¶ 61-66. Though USF may wish it were not so, this

12   relevant history includes USF's relationship with the Catholic Archdiocese of San Francisco, of

13   which USF is a part. *Id.* ¶ 62. Particularly as it relates to Plaintiffs' allegation that USF had an

14   official policy of deliberate indifference to sexual abuse, SAC ¶¶ 555-57, USF's history of sexual

15

16   [20] Moreover, the *Grant* plaintiffs conceded that the individual at issue lacked standing to seek
     injunctive relief and the court granted the defendants' motion to dismiss the claims for injunctive
17   relief "[i]n light of this concession." 545 F. Supp. 3d at 818.

18   [21] USF's remaining authorities—*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) and
     *Aldrich v. Nat'l Collegiate Athletic Ass'n*, 565 F. Supp. 3d 1094 (S.D. Ind. 2021)—relate to the
19   sufficiency of the injury in fact—an element of standing USF does not contest here.

     [22] USF does not argue that Plaintiffs' request for injunctive relief is moot. If it makes any such
20   argument in reply, Plaintiffs request the ability to fully brief this issue in a sur-reply. *See Bayer v.
     Neiman Marcus Grp., Inc.*, 861 F.3d 853, 862 (9th Cir. 2017) ("The party asserting mootness
21   bears the heavy burden of establishing that there remains no effective relief a court can
     provide."). Nevertheless, John Doe 1 may continue to seek injunctive relief even after transferring
22   from USF because his claims are subject to the "inherently transitory" exception to mootness.
     This exception applies in cases where "the duration of the challenged action is 'too short' to allow
23   full litigation before [the named plaintiff's interest] ceases and . . . it is certain that other persons
     similarly situated will have the same complaint." *Belgau v. Inslee*, 975 F.3d 940, 949 (9th Cir.
24   2020) (cleaned up). Such is the case here: Plaintiffs were on the USF baseball team for a limited
     time and allege that all members of the team since 2000 suffer from the same abusive conduct.
25   SAC ¶ 530. *See also In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust
     Litig.*, 311 F.R.D. 532, 538 (N.D. Cal. 2015) (applying the exception in the context of student-
26   athletes); *Wolf*, 424 F. Supp. 3d at 1039-40 (holding that petitioners' claims were inherently
     transitory because they were placed in short-term detention). Plaintiffs' claims thus relate back to
27   the filing of the complaint. *See Wade v. Kirkland*, 118 F.3d 667, 670 (9th Cir. 1997) (in the class
     action context, inherently transitory claims "relate to [the plaintiff's] standing at the outset of the
28   case in order 'to preserve the merits of the case for judicial resolution'") (quoting *Cnty. of
     Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991)).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS AND USF'S MOTION TO STRIKE
CASE NO. 3:22-CV-01559-LB

abuse—and its response thereto—is not "immaterial" or "impertinent." *See Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1105 (9th Cir. 2020) (describing the University of California, Berkeley's history of responding to reports of sexual misconduct in evaluating plaintiffs' official policy claim under Title IX). Indeed, USF may attempt to cite broader university policies and public statements, such as USF's president's comment that "any abuse is promptly reported to the authorities," SAC ¶ 64, in its defense to this case.

Courts routinely deny motions to strike similar allegations, because they "provide the Court with a fuller understanding" of the case. *Kaiser Found. Hosps. v. California Nurses Ass'n*, No. 11-5588 SC, 2012 WL 440634, at *4 (N.D. Cal. Feb. 10, 2012) (declining to strike allegations "merely because they provide background information or because they portray [the defendant] in an unfavorable light"); *S.L. ex rel. Mary L. v. Downey Unified Sch. Dist.*, No. CV 13-06050 DDP PJWX, 2014 WL 934942, at *10 (C.D. Cal. Mar. 10, 2014) (denying motion to strike because "[t]he Court is convinced that the background facts . . . are useful for a fuller understanding of the dispute"); *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000) (denying a motion to strike because "past activities" and "a brief history" of the defendant could be relevant to understanding whether they committed fraud). Given the high standard set by Rule 12(f), the Court should do the same here. *See Polaris PowerLED Techs., LLC v. Nintendo Co.*, No. C22-0386JLR, 2022 WL 3646575, at *3 (W.D. Wash. Aug. 24, 2022) (refusing to strike background facts because "[a]t this stage, the court cannot say that the allegations are immaterial, impertinent, or otherwise have no bearing on this litigation").

## **CONCLUSION**

Plaintiffs respectfully request that this Court deny Defendants' motions to dismiss and USF's motion to strike in their entirety. Should the Court grant the motions in any respect, Plaintiffs request leave to amend pursuant to Fed. R. Civ. P. 15(a)(2).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND USF'S MOTION TO STRIKE CASE NO. 3:22-CV-01559-LB

1    Dated:  April 5, 2023                    Respectfully submitted,

2
                                             */s/ Jonathan D. Selbin*
3                                            JONATHAN D. SELBIN (Cal. Bar No. 17022)
                                             jdselbin@lchb.com
4                                            MICHELLE LAMY (Cal. Bar No. 308174)
                                             mlamy@lchb.com
5                                            LIEFF CABRASER HEIMANN & BERNSTEIN
                                             275 Battery Street, 29th Floor
6                                            San Francisco, CA  94111-3339
                                             Telephone: (415) 956-1000
7                                            Facsimile: (415) 956-1008

8                                            JESSICA A. MOLDOVAN (*admitted pro hac vice*)
                                             jmoldovan@lchb.com
9                                            LIEFF CABRASER HEIMANN & BERNSTEIN
                                             250 Hudson Street, 8th Floor
10                                           New York, NY 10013
                                             Telephone: (212) 355-9500
11                                           Facsimile: (212) 355-9592

12                                           ELIZABETH A. FEGAN (*admitted pro hac vice*)
                                             beth@feganscott.com
13                                           FEGAN SCOTT LLC
                                             150 S. Wacker Dr., 24th Floor
14                                           Chicago, IL 60606
                                             Telephone: (312) 741-1019
15                                           Facsimile: (312) 264-0100

16                                           LYNN A. ELLENBERGER (*admitted pro hac vice*)
                                             lynn@feganscott.com
17                                           FEGAN SCOTT LLC
                                             500 Grant St., Suite 2900
18                                           Pittsburgh, PA 15219
                                             Telephone: (412) 346-4104
19                                           Facsimile: (312) 264-0100

20                                           LING S. WANG (*admitted pro hac vice*)
                                             ling@feganscott.com
21                                           FEGAN SCOTT LLC
                                             121 N. Washington Ave, 4th Floor
22                                           Minneapolis, MN 55401
                                             Telephone: (651) 432-4468
23                                           Facsimile: (312) 264-0100

24                                           *Attorneys for Plaintiffs and the Proposed Class*

25

26

27

28