UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8, JOHN DOE 9, JOHN DOE 10, JOHN DOE 11, JOHN DOE 12, JOHN DOE 13, and JOHN DOE 14, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNIVERSITY OF SAN FRANCISCO, ANTHONY N. (AKA NINO) GIARRATANO, and TROY NAKAMURA,<br><br>Defendants. | Case No. 22-cv-01559-LB<br><br>**ORDER GRANTING MOTIONS TO DISMISS IN PART**<br><br>Re: ECF Nos. 103, 104, 105 |

**INTRODUCTION**

The plaintiffs in this putative class action are former University of San Francisco Division I baseball players who are proceeding as John Does 1–3 (more recent players) and John Does 4–14 (earlier players). The plaintiffs allege that since 1999, USF head coach Anthony Giarratano and assistant coach Troy Nakamura created a sexualized environment — by being naked, miming and discussing sexual acts, belittling players with vulgar names, and handing out sex toys, among other conduct — and then berating and punishing players who did not participate. They sued the coaches for their behavior and USF for allowing the behavior to persist, claiming Title IX discrimination

and retaliation, negligent supervision and retention of the coaches, discrimination in violation of California Education Code § 66270, a failure by USF to identify its gender-discrimination policies in violation of California Education Code § 66281.5, other negligence claims, intentional and negligent infliction of emotional distress, and ratification.

The court previously granted in part the defendants' motions to dismiss and dismissed the claims by all Does except 1–3 as barred by the statute of limitations, dismissed the Title IX retaliation claim because the plaintiffs did not plead protected activity, and dismissed the § 66281.5 claim. The plaintiffs reasserted the dismissed claims in an amended complaint and added breach-of-contract claims. The defendants moved to dismiss the reasserted claims and the contract claims. USF also moved to strike allegations about abuse by the Catholic Archdiocese and the claim for injunctive relief for lack of standing because the plaintiffs are no longer students.

At the pleadings stage, the discrimination claims by Does 4–14 for violations of Title IX and California Education Code § 66270 (claims 1 and 5) survive. The discovery rule is better addressed at summary judgment, given the alleged coverup that was the cause of the Title IX injury. The statute of limitations bars the remaining claims for Does 4–14: the conduct was overt, and the plaintiffs experienced it as abuse when it occurred. Similarly, other claims accrued when the plaintiffs were students. The remaining plaintiffs, Does 1–3, plausibly pleaded a prima facie case of Title IX retaliation: they allege that they all pushed back on or did not condone the sexual discrimination, and they were punished for it. The § 66281.5 claim survives — even though exhaustion is required — because the plaintiffs plausibly allege that they received no notice of USF's sexual-harassment policies or procedures for challenging misconduct. The court dismisses without prejudice the contract claims based on the written and oral contracts with USF: the wrong contract was attached to the complaint, and the court cannot consider the new documents or legal theories advanced in the opposition. The court dismisses the breach-of-contract claim predicated on the alleged contract between the NCAA and USF because the plaintiffs have not plausibly alleged that they were third-party beneficiaries. The court denies the motion to strike the allegations about the Archdiocese: there are fair Rule 403 concerns that can be addressed later. Finally, on this record, the court dismisses the plaintiffs' prayer for injunctive relief without prejudice.

United States District Court
Northern District of California

**STATEMENT**

**1. The Abusive Conduct**

The court's earlier order recounted at length the allegations about the coaches' abusive conduct. These allegations remain in the amended complaint. This order does not repeat the earlier summary and instead incorporates the earlier order's summary and analysis by this reference.[1] In short, the plaintiffs played baseball on USF's Division I team: Does 1–3 more recently (2020 on) and Does 4–14 during earlier seasons (1999 through 2018).[2] The plaintiffs plausibly allege that the coaches engaged in abusive, bullying, offensive behavior for decades that was sexualized and directed against the plaintiffs because of their gender. When the plaintiffs did not participate in the behavior, the coaches insulted them and punished them, including by calling them names, belittling them, forcing them to play while injured, benching them, taking away playing time, and interfering with or denying other playing opportunities. As a result, the plaintiffs suffered anxiety, depression, and other psychological harm. Players left the team in droves. Parents complained: in 2014, Doe 6's parents sent a letter complaining about the hostile environment created by the coaches' belittling players, Doe 1's mother complained to the Athletic Director in 2021, and Doe 2's parents emailed the Director for an urgent in-person meeting without specifying why.[3]

New Doe plaintiffs 13 and 14 (2016–2018 and 2015–2016, respectively) had experiences similar to the other plaintiffs. Doe 13 adds that in 2016, an unidentified person told him to spank a nutritionist at a Christmas party at Coach Giarratano's house. He put his hand on the nutritionist's "lower back towards her buttocks." When the NCAA liaison was told of the incident, Coach Giarratano told Doe 13 to "accept full responsibility" and "not reveal that it was part of freshman

---

[1] Order – ECF No. 88 at 3–9. These allegations remain in the operative complaint, as the backline compare of the new complaint to the last complaint shows. *See* Blackline Compare – ECF No. 93-1. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Second Am. Compl. (SAC) – ECF No. 93 at 2–3 (summarizes the time frames).

[3] Order – ECF No. 88 at 3–8, 28.

hazing."[4] Doe 14 contends that he was cut from the team because he did not participate in or condone the coaches' sexual antics.[5]

There are new allegations about parents' complaints. In 2000, John Doe 9's mother called Coach Giarratano and demanded that the coaches stop their abuse. He responded by threatening that Doe 9 would never play baseball again if she elevated her complaint, and he gave Doe 9 an F in his physical-education class. Doe 9's mother also called USF's Athletic Director, who was non-responsive and said that he did not care about the behavior.[6] Doe 1 specifies that in spring 2021, his mother tried to contact the USF Athletic Director to "discuss problems with the baseball program that included sexual misconduct," but the Director did not return her calls. "In the winter of that same year," she spoke with the Director, who said that they were investigating the issues.[7]

Every plaintiff in the lawsuit "was run off the team by the Coach Defendants, while simultaneously being manipulated to believe that it was their fault and not the wrongdoing of the coaches."[8] The plaintiffs allege that they did not recognize the conduct as gender-based abuse because the coaches and other athletic staff normalized the conduct. Doe 4 (2017–2018) thought the coaches' frequent nudity was strange, but he tried to accept it because "it was portrayed as 'normal' within the team culture."[9] Doe 5 (2011–2014) was uncomfortable when Coach Nakamura exposed himself (as a joke) to other players, but it "was accepted as a normal part of the team culture."[10] Coach Giarratano required Doe 5 to meet with a school psychologist, but when Doe 5 shared his experiences, the psychologist provided no resources, including on how to report the behavior.[11] Doe 6 (2012–2014) said that sexualized events were part of the team culture, thought them

---

[4] SAC – ECF No. 98 at 67 (¶¶ 324–27), 98–99 (¶ 509); *see id.* at 106 (¶ 553) (characterizing the contact as Doe 13's "touching the buttocks of a female nutritionist").

[5] *Id.* at 69–70 (¶ 341).

[6] *Id.* at 20–21 (¶ 74), 37 (¶¶ 153, 156), 89 (¶¶ 449–50).

[7] *Id.* at 109 (¶ 564(d)).

[8] *Id.* at 34 (¶ 136).

[9] *Id.* at 59 (¶ 277).

[10] *Id.* at 71 (¶ 349).

[11] *Id.* at 72 (¶ 356), 98 (¶ 507).

United States District Court
Northern District of California

inappropriate, and felt he couldn't speak up formally about misconduct that "appeared 'normal' to other non-defendant coaches and USF staff."[12] "Coach G[iarranto]'s open and public participation in and encouragement of Coach Nak[amura]'s sexual behavior in front of non-defendant coaches, other USF personnel (such as the team athletic trainers and photographer), and students led Plaintiffs to believe that Coach G[iarranto]'s (and Coach Nak[amura]'s) behavior was generally accepted and that their own discomfort with the behavior was the player's personal and individual defect."[13] Similarly, the coaches' open encouragement of sexual behavior (including sexualized hazing and skits) and their physical and emotional abuse of plaintiffs who did not participate normalized the behavior and caused the plaintiffs to think that it was not abuse.[14] Does 4–14 thus did not know that they had claims until they read a San Francisco Chronicle article (published in March 11, 2022) about the lawsuit.[15]

USF participated in the coverup by not following up on parents' complaints, which violated its reporting and investigative policies.[16] USF allowed Doe 6 (2012–2014) to keep his scholarship "because his parents complained to the school and the NCAA faculty representative," and "in order to perpetuate the cover up of the Coach Defendants' actions, including the sexualized misconduct and [the fact] that Coach G[iarratano] had been falsifying baseball players' statistics."[17] USF ignored the high transfer rate in its baseball program that "put [it] on notice of serious problems within the program that should have resulted in a documented Title IX investigation."[18] After the plaintiffs filed this lawsuit, a USF employee contacted the plaintiffs' counsel in writing, "on a confidential basis." The employee claimed that "USF engaged in 'the gaslighting of these students'" and "explained that the 'longstanding relationships' between Coach

---

[12] *Id.* at 77 (¶¶ 384, 387).

[13] *Id.* at 95 (¶ 486).

[14] *Id.* at 95–96 (¶¶ 487–495).

[15] *Id.* at 96–97 (¶ 496).

[16] *Id.* at 80 (¶ 399), 100 (¶ 520).

[17] *Id.* at 79 (¶ 394), 80 (¶ 400).

[18] *Id.* at 34 (¶ 135).

G[iarratono] and Coach Nak[amura], and between the Coach Defendants and the [Athletic Director], as well as 'their location within the USF culture were a core reason that these severe violations and behaviors were tolerated, dismissed, and/or covered up at the expense of the physical and mental health of these student-athletes.'"[19] This active concealment meant that Does 4–14 did not know that others had complained and that their abuse was part of a broader policy of deliberate indifference by USF to the coaches' decades-long abuse.[20]

When they started at USF (for all plaintiffs) or at any time thereafter (for Does 2–14), the plaintiffs do not recall (1) being advised that USF had policies governing or prohibiting sexual harassment, or the reporting of it, (2) seeing the policies displayed on campus, (3) being told about them at orientation, or (4) receiving a publication that had the policies.[21]

## 2. The Claims

The fourteen Doe plaintiffs were USF baseball players (Does 1–3 in recent seasons (2020 through 2022) and Does 4–14 in earlier seasons (1999 through 2018)) and sue individually and on behalf of a putative class of all members of the USF baseball team since 2000.[22] The defendants are USF and the two coaches: Nino Giarratano and Troy Nakamura.[23] The complaint has seventeen claims, all both class and individual (numbered here as in the complaint): (1) discrimination by an intolerable sexualized environment and emotional abuse, in violation of Title IX, 20 U.S.C §§ 1681–89 (against USF); (2) retaliation for players' complaining of sex discrimination (shown by the complaints by Doe 6's parents in May 2014 about a hostile environment, the December 2016 spanking incident at a Christmas party at Coach Giarratano's house that resulted in a Title IX investigation, the March 2021 complaint by Doe 2's parents, and

---

[19] *Id.* at 96 (¶ 494).

[20] *Id.* at 97 (¶ 499).

[21] *Id.* at 40 (¶¶ 167–68), 46 (¶¶ 198–99), 50 (¶¶ 223–24), 55 (¶¶ 252–53), 59 (¶¶ 275–76), 61 (¶¶ 291–92), 65–66 (¶¶ 315–16), 68–69 (¶¶ 334–35), 77 (¶¶ 382–83), 81 (¶¶ 405–06), 84 (¶¶ 422–23), 87 (¶¶ 440–41), 90 (¶¶ 459–60).

[22] *Id.* at 2–3 (summarizes the time frames), 101–02 (¶¶ 530–32).

[23] *Id.* at 4.

United States District Court
Northern District of California

the winter and spring 2021 complaints by Doe 1's parents (all described above)), in violation of Title IX (against USF); (3) negligent supervision and retention of Coach Nakamura (against USF and Nino Giarratano); (4) negligent supervision and retention of Coach Giarratano (against USF); (5) discrimination in the form of an intolerable sexualized environment and emotional abuse, in violation of Cal. Educ. Code § 66270 (against USF); (6) inadequate notice of USF's sexual harassment policy, in violation of Cal. Educ. Code § 66281.5 (against USF); (7) gross negligence by breaching the duty of care to ensure players' safety and freedom from sexual harassment and abuse (against all defendants); (8) negligence on the same theory (against all defendants); (9) negligent failure to warn, train, and educate about the risks of sexual harassment and abuse (against USF); (10) intentional infliction of emotional distress (against all defendants); (11) negligent infliction of emotional distress (against all defendants); (12) ratification of the coaches' behavior (against USF); (13) breach of contractual obligations in the players' signed National Letters of Intent, including the obligation to provide a safe and healthy environment (against USF); (14) breach of obligations in the parties' oral contract, including the obligation to provide scholarships and other benefits (against USF); (15) breach of obligations in the contract between USF and the NCAA (predicated on the plaintiffs' being third-party beneficiaries), including the obligation to provide a safe and healthy environment (against USF as an alternative theory if claims 13 and 14 are dismissed); (16) tortious interference with the written and oral contracts in claims 13 and 14 (against the coach defendants); and (17) tortious interference with prospective economic advantage for the financial benefits promised to the players in the contracts (against the coach defendants).[24] The plaintiffs seek individual and class damages and injunctive relief in the form of appropriate policies.[25]

---

[24] *Id.* at 105–27 (¶¶ 540–703).

[25] *Id.* at 127–28.

### 3. Jurisdiction and Procedural History

The court has federal-question jurisdiction under 28 U.S.C. § 1331, CAFA diversity jurisdiction under 28 U.S.C. § 1332(d)(2), and supplemental jurisdiction over the state claims under 28 U.S.C. § 1367. All parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636.[26] The defendants moved to dismiss the substantive claims for failure to state a claim under Rule 12(b)(6), and USF moved to strike allegations about the Catholic Archdiocese under Rule 12(f) and the injunctive-relief claim for lack of standing.[27] The plaintiffs conceded dismissal of claims 16 and 17 (both against the coach defendants).[28] The court held a hearing on May 25, 2023.

### STANDARDS OF REVIEW

### 1. Rule 12(b)(6) Motion to Dismiss

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of (1) what the claims are and (2) the grounds upon which they rest. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, "[a] complaint may fail to show a right to relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory." *Woods v. U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016).

A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (cleaned up). A complaint must contain factual allegations that, when accepted as true, are sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 838 F. App'x 231, 234 (9th

---

[26] Consents – ECF Nos. 15, 30, 35, 42, 48.

[27] Mots. – ECF Nos. 103, 104, and 105.

[28] Opp'n – ECF No. 114 at 30.

United States District Court
Northern District of California

Cir. 2020). "[O]nly the *claim* needs to be plausible, and not the facts themselves . . . ." *NorthBay*,

838 F. App'x at 234 (citing *Iqbal*, 556 U.S. at 696); *see Interpipe Contracting, Inc. v. Becerra*,

898 F.3d 879, 886–87 (9th Cir. 2018) (the court must accept the factual allegations in the

complaint "as true and construe them in the light most favorable to the plaintiff") (cleaned up).

Put another way, "[a] claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops

short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (cleaned up).

If a court dismisses a complaint because of insufficient factual allegations, it should give leave

to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook,*

*Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). If a court

dismisses a complaint because its legal theory is not cognizable, the court should not give leave to

amend. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016); *see*

*Steele-Klein v. Int'l Bhd. of Teamsters, Loc. 117*, 696 F. App'x 200, 202 (9th Cir. 2017) (leave to

amend may be appropriate if the plaintiff "identifie[s] how she would articulate a cognizable legal

theory if given the opportunity").


## 2.   Rule 12(f) Motion to Strike

Motions to strike are governed by Rule 12(f) of the Federal Rules of Civil Procedure. That rule

provides: "The court may strike from a pleading . . . any redundant, immaterial, impertinent, or

scandalous matter." Fed. R. Civ. P. 12(f). "The function of a [Rule 12(f)] motion to strike is to avoid

the unnecessary expenditures that arise throughout litigation by dispensing of any spurious issues

prior to trial." *Rosales v. FitFlop USA, LLC*, 882 F. Supp. 2d 1168, 1178 (S.D. Cal. 2012) (citing

*Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983)). Striking is appropriate if it

"will make trial less complicated or eliminate serious risks of prejudice to the moving party, delay,

or confusion of the issues." *Sliger v. Prospect Mortg.*, 789 F. Supp. 2d 1212, 1216 (E.D. Cal. 2011).

United States District Court
Northern District of California

"Immateriality" and "impertinence" under Rule 12(f) both speak to the relevance of challenged allegations. "'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds,* 510 U.S. 517 (1994) (cleaned up). "'Impertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Id.* Where a movant challenges allegations as immaterial or impertinent, "[a] court must deny the motion to strike if there is any doubt whether the allegations in the pleadings might be relevant in the action." *Oracle Am., Inc. v. Micron Tech., Inc.*, 817 F. Supp. 2d 1128, 1132 (N.D. Cal. 2011). "[G]enerally," then, courts grant such a motion "only where 'it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.'" *Rosales*, 882 F. Supp. 2d at 1179 (quoting *Walters v. Fid. Mortg. of Cal.*, 730 F. Supp. 2d 1185, 1196 (E.D. Cal. 2010) (citing in turn *Lilley v. Charren*, 936 F. Supp. 708, 713 (N.D. Cal. 1996)).

"Even where matter in a pleading is relevant to the controversy, it nonetheless may be stricken if it is scandalous or set out in 'needless detail.'" *Tucker v. Am. Int'l Grp., Inc.*, 936 F. Supp. 2d 1, 16 (D. Conn. 2013) (quoting *Cabble v. Rollieson*, No. 04CIV9413LTSFM, 2006 WL 464078, at *11 (S.D.N.Y. Feb. 27, 2006) and citing authorities). "Scandalous" under Rule 12(f) "generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." *Anderson v. Davis Polk & Wardwell LLP*, 850 F. Supp. 2d 392, 416 (S.D.N.Y. 2012) (quoting 2 J. Moore *et al.*, *Moore's Federal Practice* ¶ 12.37[3] (3d ed. 2010)). "Scandalous" has also been said to encompass allegations that "improperly cast a derogatory light on someone." *Asher & Simons, P.A. v. j2 Global Canada, Inc.*, 965 F. Supp. 2d 701, 704 (D. Md. 2013) (quoting 5C C. Wright *et al.*, *Federal Practice and Procedure* § 1382 (3d ed. 2011)).

"As a rule, motions to strike are regarded with disfavor because striking is such a drastic remedy; as a result, such motions are infrequently granted." *Amini Innovations Corp. v. McFerran Home Furnishings, Inc.*, 301 F.R.D. 487, 489–90 (C.D. Cal. 2014) (citing *Freeman v. ABC Legal Servs., Inc.*, 877 F. Supp. 2d 919, 923 (N.D. Cal. 2012) (citing in turn *Stanbury Law Firm v. IRS*, 221 F.3d 1059, 1063 (8th Cir. 2000)). "[W]hen ruling on a motion to strike," the court accepts the

challenged allegations as true and "must liberally construe" those allegations "in the light most favorable" to the non-moving pleader. *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1140 (N.D. Cal. 2010); *see, e.g., Multimedia Patent Trust v. Microsoft Corp.*, 525 F. Supp. 2d 1200, 1211 (S.D. Cal. 2007) ("In determining a motion to strike, a district court must view the pleadings in the light most favorable to the pleader.").

## ANALYSIS

### 1. Statute of Limitations

The statute of limitations for claims for breach of a written contract is four years. Cal. Civ. Proc. Code § 337. The tort and breach-of-oral-contract claims have two-year statutes of limitations. Cal. Civ. Proc. Code § 335.1; Cal. Civ. Proc. Code § 339; *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006) (Title IX claims borrow the state statute of limitations; federal law determines when the claim accrues). Thus, all claims by Does 4–12, who all left USF more than four years before the complaint was filed, are barred unless the statutes of limitations are tolled.

In the complaint, the plaintiffs identify four bases for tolling: the discovery rule, equitable tolling, equitable estoppel, and principles of equity.[29] The defendants addressed all bases.[30] In their opposition to the motions to dismiss, the plaintiffs address only the discovery rule (albeit with a perfunctory reference in a footnote to their other theories), contending that the discovery-rule issue should be decided on a full factual record at summary judgment.[31] By not responding to the defendants' motions to dismiss, the plaintiffs effectively concede the other issues: as the court held previously, equitable tolling, equitable estoppel, and principles of equity do not suspend the statutes of limitations.[32] The remaining issue is whether the discovery rule suspends the statute of limitations. At least at the pleadings stage, it does.

---

[29] SAC – ECF No. 93 at 95–101 (¶¶ 484–529); Opp'n – ECF No. 114 at 14 n.8 (the plaintiffs assert that they sufficiently alleged all four theories).

[30] *See, e.g.*, Mot. – ECF No. 103 at 12–19.

[31] Opp'n – ECF No. 114 at 13–19; *id.* at 14 & n.8 (in a footnote, said — without further analysis — that the plaintiffs alleged all theories sufficiently).

[32] Order – ECF No. 88 at 23–27.

"Where the federal courts borrow the state statute of limitations, courts also borrow the forum state's tolling rules." *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999) (cleaned up). But "[a]lthough Title IX borrows a state statute of limitations period, federal law governs the determination of the point at which the limitations period begins to run." *Stanley*, 433 F.3d at 1136. State and federal tolling rules lead to the same result here, though.

Under state law, "[g]enerally speaking, a cause of action accrues at the time when the cause of action is complete with all of its elements." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005) (cleaned up). The discovery rule is an exception to the accrual rule and postpones "accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Fox*, 35 Cal. 4th at 807.

> A plaintiff has reason to discover a cause of action when he or she "has reason at least to suspect a factual basis for its elements." Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period. *Norgart* explained that by discussing the discovery rule in terms of a plaintiff's suspicion of "elements" of a cause of action, it was referring to the "generic" elements of wrongdoing, causation, and harm. In so using the term "elements," we do not take a hypertechnical approach to the application of the discovery rule. Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them.

*Id.* (cleaned up). The plaintiffs must establish that the discovery rule postpones the accrual of their claim: "to rely on the discovery rule for delayed accrual of a cause of action, a plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Id* at 808 (cleaned up). "[I]gnorance of the legal significance of known facts" does not delay accrual. *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 (1988).

Similarly, "[u]nder federal law, a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *TwoRivers*, 174 F.3d at 991. "The proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." *Stanley*, 433 F.3d at 1136 (cleaned up).

The court previously dismissed the claims of all Does except Does 1–3:

> The plaintiffs contend that they did not learn about their claims until March 11, 2022, when the San Francisco Chronicle published an article about the case. This, they contend, is a triggering event, likening their reaction to survivors of sexual abuse[,] who take years to acknowledge and understand their harms, especially when there is a power imbalance between the assailant and the victim. But the plaintiffs knew about the wrongful conduct when it occurred: they allege that they were humiliated, isolated, threatened, destroyed, and uncomfortable. The coaches' misconduct caused them to leave the team or transfer to another school. The abuse they experienced, while significant, is not like the trauma and the suppression of memories that victims of physical sexual abuse can experience, resulting in the victim's denial and lack of understanding of legal rights (and thus the tolling of the statute of limitations). *Aldrich* [*v. NCAA*], 484 F. Supp. 3d [779], 788–89 [(N.D. Cal. 2020)] (sexual-assault victim's repression of memories, and her later recovery of them by the triggering event of watching a Michael Jackson documentary, meant that it was not apparent from the face of the complaint that the statute of limitations barred the suit); *Doe v. Pasadena Hosp. Ass'n*, No. 2:18-cv-08710-ODW (MAAx), 2020 WL 1244357, at *5 (C.D. Cal. Mar. 16, 2020) (court tolled the statute for sexual-assault claims when a university gynecologist misrepresented that his misconduct conformed to accepted medical practice and the university knew of misconduct and allowed the doctor to continue practicing after his probationary period). Instead, what the plaintiffs describe is a lack of understanding of their legal rights [based on known facts]. That does not toll the statute [of limitations]. *Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d 1044, 1049–50 (9th Cir. 2008); *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 (1988).[33]

In the SAC, the plaintiffs add more allegations to establish tolling.

---

[33] *Id.* at 22–23. To support the conclusion that the players knew about the conduct and were humiliated, isolated, threatened, destroyed, and uncomfortable, the order cited the complaints' allegations about the players' experiences. *Id.* n.70 (citing First Am. Compl. (FAC) – ECF No. 38 at 68–69 (¶¶ 303, 305–07) (Doe 4) (humiliated, crushed, called his mother daily in tears), 74–78 (¶¶ 339, 340, 343, 349, 352, 360, 363) (Doe 5) (felt unsafe, very upset, isolated and threatened, and suffered nightmares about USF since 2012), 81 (¶ 379) (Doe 6) (parents wrote letter in May 2014 describing conduct as completely unacceptable behavior that created a hostile environment), 83–84 (¶¶ 391, 395–96) (Doe 7) (describing worst night of his life in 2014 and resulting development that year of anxiety, sleep deprivation, and fear for his safety), 86–87 (¶¶ 406–07, 410–11, 415) (Doe 8) (confidence and mental state were destroyed during his tenure in 2013, sought counseling, hated going to the field each day), 88–89 (¶¶ 420, 424–25) (Doe 9) (experienced dread and severe depression, and his mother called a coach to demand stopping the abuse), 65–67 (¶¶ 284–87, 293) (Doe 10) (disgusted by conduct, confided in pitching coach while crying hysterically, left team at the end of the year to protect his mental health), 91–93 (¶¶ 438, 440, 443–44, 447) (Doe 11) (uncomfortable during practices, panic attacks, felt unsafe, severe emotional injuries), 73 (¶ 329) (Doe 12) (father flew to USF sixteen times during freshman year 2017–18 to provide emotional support for how isolating the abuse was and out of fear that Doe 12 would harm himself)). These allegations also are in the SAC. Blackline Compare – ECF No. 93-1.

First, they reiterate in a stand-alone section the individual plaintiffs' allegations (set forth earlier in the complaint in the sections about each player's experiences) that they did not recognize the conduct as gender-based abuse because the coaches and other athletic staff normalized the conduct. (The allegations that the coaches and staff normalized the conduct were in the first amended complaint too, just not in a standalone section on tolling.[34])

Second, they allege that Does 4–14 had no reason to know that others had complained to USF, USF and the coaches concealed the abuse, and (until the lawsuit was filed in 2022), Does 4–14 "had no reason to know that their abuse was part of a broader policy of deliberate indifference by USF towards the Coach Defendants' decades-long pattern of abuse."[35] The plaintiffs give seven examples where USF knew about misconduct and allegedly concealed it:

(1) Doe 9's mother's complaint in 2000 to Coach Giarratano about the abuse, his threats, and the Athletic Director's non-responsiveness;

(2) a 2013 incident where a USF baseball player punched a gay student and threw him out of a baseball party because no "faggots were allowed," which mimicked the coaches' regular use of the word and other gender/sexual-orientation epithets aimed at Doe 5 (who is gay) and another player; the coaches held a meeting (excluding Doe 5) and told the players to "sweep it under the rug;" after the incident, Coach Giarratano told Doe 5 that he had mental issues and sent him to see a sports psychologist; Doe 5 discussed the incident but the psychologist never offered him any resources, including a means to report the behavior;

(3) a May 2014 letter by Doe 6's parents to an Associate Athletic Director and the USF NCAA Faculty Athletic Representative describing the Coach Defendants' misconduct and pointing out the attrition rate for players;

---

[34] SAC – ECF No. 93 at 95–97 (¶¶ 484–96); *see supra* Statement (describing the individual player's accounts set forth earlier in the SAC); *cf.* Blackline Compare – ECF No. 93-1 ("normalization allegations" in Statement are in the SAC and the earlier FAC).

[35] SAC – ECF No. 93 at 97 (¶¶ 497–500).

1     (4) the 2016 incident involving Doe 13 at Coach Giarratano's Christmas party, resulting in a

2     Title IX investigation and Coach Giarratano's telling the player to take responsibility and not

3     reveal that it was part of freshman hazing;

4      (5) Doe 1's mother's unreturned calls to the Athletic Director in the spring of 2021 "about

5     several of the undescribed incidents;"

6     (6) Doe 2's parents' May 2021 written request for an urgent meeting, which the Athletic

7     Director ignored; and

8     (7) Doe 1's mother's complaint in the winter of 2021 to the Athletic Director about the

9     coaches' misconduct.

10     The complaint characterizes these actions as concealment because the complaints weren't

11     published, and USF therefore actively concealed them.[36]

12     The plaintiffs contend that the March 2022 San Francisco Chronicle article's revealing a

13     previously unknown pattern of institutional indifference means that the question of tolling should

14     be decided on a full fact record, not as a matter of law at the pleadings stage.[37] They rely on

15     *Snyder-Hill v. Ohio State Univ.*, where the Sixth Circuit held, at the motion-to-dismiss phase, that

16     the plaintiffs' Title IX claims against Ohio State University were not barred by the statute of

17     limitations because the plaintiffs alleged that they did not know, and reasonably could not have

18     known, that they were injured by Ohio State until public reporting on the issue in 2018. 48 F.4th

19     686, 690 (6th Cir. 2022), *cert. denied*, No. 22-896, 2023 WL 4163223 (U.S. June 26, 2023).

20     The *Snyder-Hill* plaintiffs based their Title IX claim on allegations that a university physician

21     and team doctor abused hundreds of young men by groping their genitals, performing unnecessary

22     rectal exams, drugging and raping them, and engaging in other sexually abusive behavior. *Id.* at

23     690–91. The allegations became public in 2018, after Ohio State commissioned an independent

24     investigation by the law firm Perkins Coie that substantiated the plaintiffs' allegations of abuse,

---

[36] *Id.* at 97 (¶ 504) (describing USF's behavior in the examples as "concealment," a word reiterated for the specific examples), 97–99 (¶¶ 505–13) (seven examples), 71 (¶ 349) (Doe 5 was gay but not out); *see* Opp'n – ECF No. 114 at 17 (describing these seven incidents as examples of the defendants' being put on notice of misconduct but "suppress[ing] the complaint").

[37] Opp'n – ECF No. 114 at 14–17.

United States District Court
Northern District of California

finding that the physician sexually abused at least 177 students (mostly athletes). *Id.* at 691. The plaintiffs alleged that many students had complained about the abuse, more than fifty members of the staff knew about the inappropriate sexual conduct, and despite this knowledge, Ohio State did nothing to prevent the abuse and instead covered it up. The Perkins Coie report corroborated the coverup: it said that despite regular complaints, Ohio State did nothing until January 1996, when it suspended the physician. *Id.* It then hid why it investigated the physician, concealed the abuse by not investigating it or identifying victims, and destroyed files relevant to the abuse. *Id.*

After the 2018 report, victims sued Ohio State under Title IX, claiming it was deliberately indifferent to their heightened risk of abuse. The district court dismissed the claims as barred by the statute of limitations. The Sixth Circuit reversed. *Id.* at 689–90. In a Title IX case, a plaintiff's claim is against the school based on the school's actions or inactions, not the actions of the person who abused the plaintiff. *Id.* at 702; *see id.* at 705 ("A plaintiff's knowledge that he was abused is not enough to start the clock."). Because the plaintiffs' claims were predicated on a theory of deliberate indifference, Ohio State's coverup and enabling of the physician's ongoing abuse put the plaintiffs at heightened risk of abuse, which was the cause of the Title IX injury. *Id.* at 704–05. Until the Perkins Coie report became public in 2018, the plaintiffs had no way of knowing that Ohio State's mishandling of their complaints was part of a broader policy of deliberate indifference about the physician's abuse. *Id.* at 707.

The Sixth Circuit held that the plaintiffs plausibly alleged that they did not know that Ohio State knew about and did not address the abuse. Even if they investigated the abuse, they would not have discovered earlier that Ohio State injured them, given the decades-long coverup. *Id.* at 705. Also, the plaintiffs plausibly alleged that they did not know that they were abused: the plaintiffs were young and inexperienced, the physician gave medical explanations for his abuse, and the culture of college athletics includes the role of coaches and trainers in setting norms. *Id.* The court concluded that "the plaintiffs' claims survive Ohio State's motion to dismiss for three independent reasons. First, the plaintiffs plausibly allege that they did not know and lacked reason to know that Ohio State caused their injury. Second, they plausibly allege that even if they had investigated further, they could not have learned of Ohio State's conduct. Third, most plaintiffs

United States District Court
Northern District of California

plausibly allege that they did not know that they were abused. Alone, each of these grounds is sufficient to delay accrual." *Id.* at 706–07.

Like the *Snyder-Hill* plaintiffs, the plaintiffs here allege that they did not know that USF did not address a decades-long problem until March 11, 2022, the date of the lawsuit and the resulting article in the San Francisco Chronicle.[38] The allegations are that the abuse was persistent and apparent, some players or their parents complained, USF did nothing despite overt misconduct and high transfer rates, and this put the players at higher risk of abuse (a Title IX injury), something that was not apparent until the issues were made public.[39] Like the *Snyder-Hill* plaintiffs, the plaintiffs allege that even if they had investigated, USF had the sole access to relevant information, and the plaintiffs have done what they can with the seven instances they have identified.[40] And like the *Snyder-Hill* plaintiffs, the plaintiffs allege a culture of normalizing the abuse (amplified by the coach-player relationship dynamics) that made young, inexperienced athletes doubt (or accept) their experiences.[41]

USF distinguishes *Snyder-Hill* as factually different: it involved physical sexual abuse that can result in a victim's denial or suppression of it (as the court's earlier order, excerpted above, discussed).[42] It also involved a documented coverup by Ohio State.[43]

The fortuity of an internal investigation gave the *Snyder-Hill* plaintiffs data at the pleadings stage that is not replicated in most cases. And it is an unremarkable fact of coverups that the concealer has the knowledge of it. The plaintiffs allege overt conduct that spanned decades, USF's

---

[38] *See, e.g.*, SAC – ECF No. 93 at 100 (¶ 521).

[39] *See, e.g.*, *id.* at 97–99 (¶¶ 498, 503–13) (setting forth the examples summarized earlier in this section); *see supra* Statement (discussing USF's failure to investigate and a culture of tolerance of the coaches' conduct).

[40] *See, e.g.*, *id.* at 97–100 (¶¶ 501–13).

[41] *See supra* Statement (describing the coaching staff's normalizing the abuse); *cf.* Opp'n – ECF No. 114 at 18 (the plaintiffs "do not allege that they experienced the Coach Defendants' behavior as anything other than abuse, at the time they were abused — they did. Rather, Plaintiffs allege that they had no reason to know until March 11, 2022 that the Coach Defendants had engaged in a decades-long pattern of abusing others in the same way, that USF knew about the Coach Defendants' rampant abuse, and that USF enabled and perpetuated the abuse.") (emphasis omitted).

[42] Reply – ECF No. 118 at 12–13; Order – ECF No. 88 at 22–23.

[43] Reply – ECF No. 118 at 13–15.

failure to address it, an attrition rate that shows the problem, unaddressed complaints, and an insider's view that there was a culture of tolerance of the abuse, a coverup of it, and a gaslighting of the athletes.[44] *Barnett v. Kapla*, No. 20-CV-03748-JCS, 2020 WL 6737381, at *7–8 (N.D. Cal. Sept. 28, 2020) (for Title IX claims, "the 'injury' . . . is the educational institution's deliberate indifference to the plaintiff's experience of sexual misconduct that then causes him or her to experience further sexual misconduct or makes him or her vulnerable to it") (collecting cases). Also, the plaintiffs acknowledge that they experienced the coaches' behavior as abuse (albeit normalized abuse), but — like the *Snyder-Hill* plaintiffs — they did not know about USF's pattern of indifference.

Courts apply the discovery rule in situations where the injury is difficult to detect, and the defendant has superior knowledge of the injury and reason to think that the plaintiff is unaware of it. *Id.* at *8 ("Plaintiff did not know or have reason to know of the injury which is the basis of his post-harassment/assault Title IX claims . . . before October 16, 2018. Therefore, based at least on the pleadings filed to date, the limitations period did not commence before that date[.]") (cleaned up); *April Enters. v. KTTV*, 147 Cal. App. 3d 805, 831 (1983) (admittedly a contract case, which is different for purposes of the discovery rule). Also, statute-of-limitations issues that turn on disputes of fact generally are better addressed at summary judgment, not through a motion to dismiss. *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206–07 (9th Cir. 1995) (a motion for summary judgment is the proper procedure to evaluate the expiration of the statute of limitations when the inquiry turns on disputed facts; the equitable-tolling doctrine generally is not amenable to resolution in a motion to dismiss under Rule 12(b)(6); "[i]n fact, a complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim"); *Barnett*, 2020 WL 6737381, at *8.

At the pleadings stage, the court follows *Snyder-Hill* and holds that the statute of limitations does not bar Does 4–14's Title IX or California Education Code § 66270 claims (claims 1 and 5).

---

[44] *See supra* Statement.

48 F.4th at 705–07. The issue is better addressed at summary judgment. *Supermail*, 68 F.3d at 1206–07.

The statute of limitations does bar the remaining claims by Does 4–14, though. The claims against the coach defendants and the derivative tort claims against USF (claims 3–4, 7–12) involve conduct that was overt, and the plaintiffs experienced it as abuse when it occurred, which means the claims accrued at the time of the abuse.[45] What distinguishes the discrimination claims (claims 1 and 5) is the coverup that was the cause of the Title IX injury. *Snyder-Hill*, 48 F.4th at 704–05. Similarly, claim 2 for Title IX retaliation and claim 6 for inadequate notice of the sexual harassment policy in violation of California Education Code § 66281.5 accrued when the plaintiffs were students. Finally, although the parties did not address this point, courts rarely apply the discovery rule for claims involving breach of contract. *See Wakefield v. Wells Fargo & Co.*, No. C 13-05053 LB, 2014 WL 5077134, at *10–11 (N.D. Cal. Oct. 9, 2014). There are no discernable grounds for tolling the contract claims.

The scope of the case remains concerning: USF is not wrong that the claims are ambitious and predicated on much thinner allegations of coverup than in *Snyder-Hill*. *Snyder-Hill* also was not a class action. At the hearing, the plaintiffs' counsel said that she was amenable to beginning discovery with a five-year lookback. That approach might reveal the scope of USF's knowledge sufficiently to at least evaluate the case before plowing into issues surrounding class certification.

## 2. Title IX Retaliation

The elements of a Title IX retaliation claim are that (1) the claimant engaged in protected activity, (2) the claimant suffered an adverse action by the defendant, and (3) there is a causal connection between the two. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014). "Protected activity" is "protest[ing] or otherwise oppos[ing] unlawful . . . discrimination," including (relevantly here) "speaking out against sex discrimination." *Emeldi v. Univ. of Or.*, 698 F.3d 715, 725 (9th Cir. 2012) (cleaned up) (complaints about gender-based

---

[45] Opp'n – ECF No. 114 at 18.

institutional bias and unequal treatment of female students were Title IX protected activity); *accord Grabowski v. Ariz. Bd. of Regents*, --- F. 4th ---, 2023 WL 3961123, at *6 (2023) (complaints by player and parents of sexual and homophobic bullying).

The court previously held that the allegations about the coaches' behavior plausibly pleaded sex discrimination under Title IX.[46] The protected activity is complaining about or at least pushing back on sex discrimination.[47] The plaintiffs describe the adverse acts: the coaches retaliated against plaintiffs "who tried to stop the sexual misconduct or did not condone it . . . [by] running players off the team, blacklisting players through disparaging remarks to prospective or new coaches (thus ending or severely limiting the players' continued baseball careers), interfering directly with their education (e.g., by giving failing physical education grades or making it impossible to graduate on time) or indirectly (e.g., through Coach G[iarratano]'s wife, who was an academic advisor to some of the athletes), expressly or implicitly threatening them with harm, and physically abusing them."[48] The plaintiffs identify the following complaints: (1) the sexualized hazing of Doe 13 (like the spanking at the 2016 Christmas party) who — like the other plaintiffs — was ostracized for not fully participating in the sexualized behavior;[49] (2) Doe 9's mother's complaint in 2000 to Coach Giarratano about the abuse, his threats, the resulting failing grade in phys ed, and the Athletic Director's non-responsiveness;[50] (3) the 2013 incident involving Doe 5, the homophobic epithets, the referral to a therapist, and the therapist's failure to offer resources;[51] and (5) Doe 1's mother's complaints in 2021 (summarized above) about the problems with the baseball program, including sexual misconduct.[52]

---

[46] Order – ECF No. 88 at 28.

[47] Opp'n – ECF No. 114 at 19–20.

[48] SAC – ECF No. 93 at 9 (¶ 18); *see also id.* at 5–6 (¶ 5) (same), 6–7 (¶ 7) (summarizing the attrition rate from the team during the coaches' tenure).

[49] *Id.* at 29 (¶ 116), 38–39 (¶ 161), 67 (¶¶ 324–27).

[50] *Id.* at 37 (¶ 153)

[51] *Id.* at 38 (¶ 158).

[52] *Id.* at 41 (¶ 175), 43 (¶ 185).

As the court's earlier order recounts, the plaintiffs describe the horrific sexualized atmosphere that they encountered, the verbal and physical abuse that they suffered, and the substantial interference with their playing opportunities.[53] That order is a summary: the fact allegations in the complaint run hundreds of paragraphs. Now the complaint adds the gloss that because they all tried to stop, or did not condone, the sexualized atmosphere, they were subjected to the abuse, run off the team, and denied playing time and other playing opportunities.[54] The court's problem with the complaint — last time and now — is that the claim is against USF. Aside from a handful of complaints to the administration, the players pushed back at the coaches. But the current complaint — as recounted in the last section — now alleges enough to show that USF allegedly knew: the conduct was overt, the players pushed back, some players or parents complained to USF, the attrition rate showed the problem too, and USF did nothing.

This is not the most robust tie of protected activity to adverse action, but it is enough at the pleadings stage. To plead a prima facie case of retaliation, the plaintiff need only make a minimal threshold showing of retaliation. *Emeldi*, 698 F.3d at 724. A plaintiff "need not expressly accuse [a defendant] of illegal activity. Rather, she may convey an implicit message of disapproval of the illegality of the conduct through her conduct by refusing to facilitate or participate in it." *Thomas v. City of Beaverton*, 379 F.3d 802, 810 (9th Cir. 2004) (addressing the standard for retaliation in violation of the First Amendment). The plaintiffs allege that they all refused to participate in or condone the sexualized environment on the team. The claim stands.

As discussed in the first section of the Analysis, the claims of Does 4–14 are barred by the statute of limitations. This addresses USF's concern about the scope of the claim.[55]

### 3. California Education Code § 66281.5

Section 66281.5 requires postsecondary schools to have a written policy on sexual harassment

---

[53] Order – ECF No. 88 at 3–9.

[54] SAC – ECF No. 93 at 9 (¶ 18), 34–36 (¶¶ 137–45),

[55] Reply – ECF No. 118 at 20–21.

United States District Court
Northern District of California

— including information about how to report charges and available remedies and resources (on and off campus) — and to provide notice of it by posting it on the institution's website, displaying it prominently, and including it in any orientation program. Despite saying that it takes sexual abuse seriously, USF allegedly failed to adopt appropriate policies to prevent or respond to the abuse here.[56] USF moved to dismiss the claim on the ground that the plaintiffs did not file an administrative complaint with USF regarding any discrimination or harassment based on sex.[57] The plaintiffs counter that the exhaustion requirement does not apply because they seek civil remedies under a different code section, USF in any event did not notify them of the prohibition against sexual harassment and sex discrimination and their right to file a formal complaint, USF allowed their exploitation to occur as part of its broader policy of deliberate indifference, and the plaintiffs assert claims for injunctive relief that are exempt from the exhaustion requirement.[58]

California Education Code §§ 66290 through 66293 govern the enforcement of the Equity in Education Act (including the § 66281.5 claim). It requires exhaustion:

> [A] person who alleges that he or she is a victim of discrimination may not seek civil remedies pursuant to this section until at least 90 days have elapsed from the filing of a discrimination complaint with the local educational agency. The 90-day moratorium imposed by this subdivision does not apply to injunctive relief and is applicable only if the local educational agency has appropriately, and in a timely manner, apprised the complainant of his or her right to file a complaint.

Cal. Educ. Code § 66292.3(d); *Wren v. RGIS Inventory Specialists*, No. C-06-5778 JCS, 2007 WL 484793, at *2 (N.D. Cal. Feb. 9, 2007) ("[I]n general, state law exhaustion requirements have been found under the *Erie* doctrine to apply in cases where federal courts exercise diversity jurisdiction over state law claims.") (citing *White v. Lavigne*, 741 F.2d 229, 230 (8th Cir. 1984)). The plaintiffs contend that they bring the claim under § 66292.4: it says "[t]his chapter may be enforced through a civil action." The plaintiffs' reading of the statute is unpersuasive: the "chapter" allows a civil action, *id.*, but it also requires exhaustion of administrative remedies, *id.* § 66202.3(d). The

---

[56] SAC – ECF No. 93 at 113 (¶¶ 600–02).

[57] Mot. – ECF No. 103 at 21.

[58] Opp'n – ECF No. 114 at 22–23.

plaintiffs' interpretation does not comport with the statutory scheme's plain language. *See People v. Glasper*, 113 Cal. App. 4th 1104, 1114–15 (2003) (discussing principles of statutory instruction, including avoiding an "interpretation that renders related provisions nugatory," reading sentences in light of the statutory scheme, and avoiding reading a statute to achieve absurd results or results inconsistent with apparent legislative intent).

But the plaintiffs claim that USF never told them about the policies governing sexual harassment, including how to report it.[59] USF counters that this is "demonstrably false" because in 2021, the plaintiffs had to "attend a multi-hour session with the [USF] Title XI officers at the baseball field" (a session that the coaches did not attend).[60] To the extent that this turns on facts, the court accepts the allegations in the complaint as true: the plaintiffs allege that USF did not tell them about the policies or how to report harassment. Any issues are better addressed at summary judgment.

### 4.  Breach-of-Contract Claims (Claims 13 and 14)

The wrong contract is attached to the complaint: the plaintiffs allege that their "National Letters of Intent" (Form 19-2a) sets forth USF's contractual obligations to them, including the obligation to provide a safe environment and educational and financial benefits, but they attach Form 19-1a, the Student Athlete Statement.[61] USF thus analyzed the breach-of-contract claim under Form 19-1a.[62] The plaintiffs then submitted three different forms with their opposition (the 2020–2021 National Letter of Intent, the 2020–2021 Form 20-1a Student-Athlete Statement, and a sample USF Multi-Year Athletic Grant-in-Aid Agreement) and argued that they were the contracts.[63] USF objected to the lack of foundation to establish the documents' authenticity.[64] Fed.

---

[59] SAC – ECF No. 93 at 40 (¶¶ 167–68), 46 (¶¶ 198–99), 49–50 (¶¶ 222–23), 55 (¶¶ 252–53), 59 (¶¶ 275–76), 61 (¶¶ 291–92).

[60] Reply – ECF No. 118 at 22 (citing SAC – ECF No. 93 at 40 n.48, 46 n.51, & 50 n.52).

[61] SAC – ECF No. 93 at 119–123 (¶¶ 651–81); Form 19-1a, Ex. B to *id.* – ECF No. 93-2.

[62] Mot. – ECF No. 103 at 22–24.

[63] Opp'n – ECF No. 114 at 23–27; Selbin Decl. – ECF No. 115 & Exs. A–C – ECF Nos. 115-1–115-3.

[64] Reply – ECF No. 118 at 24.

United States District Court
Northern District of California

R. Evid. 901. Also, they are matters outside the pleadings that cannot be considered on a motion to dismiss. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989). USF's counsel also said at the hearing that the forms vary by year.

The court dismisses claims 13 and 14 with leave to amend. The plaintiffs have a new theory that varies from the complaint.

### 5.  Breach-of-Contract Claim (Claim 15)

As an alternative to their claims of breach of the alleged contracts between the players and USF, the plaintiffs claim that they are third-party beneficiaries to a contract between the NCAA and USF that USF breached. The contract is USF's agreement to abide by the NCAA Division Manual: "[a]s an express condition of their membership in the NCAA, USF agreed to abide by the respective NCAA Division Manual, each of which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. The Manual thus constitutes a contract between the NCAA and USF."[65] The complaint cites parts of the Manual (the NCAA Constitution, Art. 1, §§ 1.2(a)–(b) and Art. 2, §§ 2.2, 2.2.3, 2.2.4, and 2.8.2) describing standards for athletic programs, protecting the student-athletes' health and safety, and fostering a positive environment between students and coaches.[66] The plaintiffs allege that the sexual harassment and abuse of athletes violated that contract.[67] The excerpts of the standards in the complaint are as follows:

> 686. In the Manual, the NCAA promises the following for the student-athlete's benefit:
>
> a. "to initiate, stimulate and improve intercollegiate athletics programs for student athletes . . . ," NCAA Const., Art.1, § 1.2(a);
>
> b. "to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," NCAA Const., Art.1, § 1.2(b);

---

[65] SAC – ECF No. 93 at 123 (¶ 684).

[66] *Id.* at 123–24 (¶ 686).

[67] *Id.* at 124–25 (¶ 687).

United States District Court
Northern District of California

c.  to conduct intercollegiate athletics programs "in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes," NCAA Const., Art. 2, § 2.2 (Revised: 11/21/05);

d.  to require "each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3 (Adopted: 1/10/95);

e.  to require "each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach," NCAA Const., Art. 2, § 2.2.4 (Adopted: 1/10/95);

f.  to require that "each member institution to establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," NCAA Const., Art. 2, § 2.2 (Adopted: 1/10/95);

g.  to "assist the institution in its efforts to achieve full compliance with all rules and regulations and shall afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance," NCAA Const., Art. 2, § 2.8.2.[68]

Under California law, a "contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Cal. Civ. Code § 1559. The issue here is whether the plaintiffs are intended beneficiaries. Read as a whole in light of the circumstances under which it was made, the contract must "clearly manifest" the intent to benefit the third party. *Martin v. Bridgeport Cmty. Ass'n, Inc.*, 173 Cal. App. 4th 1024, 1034 (2009); *Souza v. Westlands Water Dist.*, 135 Cal. App. 4th 879, 891 (2006); *Markowitz v. Fidelity Nat'l Title Co.*, 142 Cal. App. 4th 508, 527 (2006). "Ascertaining this intent is a question of ordinary contract interpretation." *Markowitz*, 142 Cal. App. 4th at 527. The basic test is "whether an intent to benefit a third person appears from the terms of the contract." *Cargill, Inc. v. Souza*, 201 Cal. App. 4th 962, 967 (2011). The determination of intent is generally a question of fact. *Hotel Emps. & Rest. Emps. Local 2 v. Vista Inn Mgmt. Co.*, 393 F. Supp. 2d 972, 987 (N.D. Cal. 2005). But at the pleadings stage, if it is clear from the contract and the allegations in the complaint that the plaintiffs are not third-party beneficiaries, dismissal is appropriate. *Ngo v. BMW of N. Am.*,

---

[68] *Id.* at 123–24 (¶ 686) (citing NCAA Division Manual, Ex. 1 to ECF No. 65-1). The court can consider the manual under the incorporation-by-reference doctrine. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

United States District Court
Northern District of California

23 F.4th 942, 946 (9th Cir. 2022) (citing *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 930 (2019)).

The terms identified by the plaintiffs in the NCAA constitution are principles about NCAA members' athletic programs. Student-athletes presumably benefit from them. But in a similar context, the Ninth Circuit held that student-athletes at the University of Washington were not third-party beneficiaries of a contract among the Pac-10 member institutions. *Hairston v. Pac. 10 Conf.*, 101 F.3d 1315, 1320 (9th Cir. 1996). The Pac-10 sanctioned the UW for recruiting violations. The plaintiffs were football players who sued in part on the ground that the sanctions violated contractual provisions about conducting athletic programs with high standards and integrity. *Id.* at 1317, 1320. Applying Washington state law, the district court dismissed the claim on the ground that the players were not third-party beneficiaries. *Id.* at 1317–18.

The Ninth Circuit affirmed, holding that contractual provisions — academic and athletic achievements of student athletes, increased educational opportunities for young people, quality competitive opportunities for student-athletes, and amateurism in intercollegiate athletics — were (as the district court held) "vague, hortatory pronouncements in the contract" that "by themselves . . . are not sufficient to support the players' claims that the Pac-10 intended to assume a direct contractual obligation to every football player on a Pac-10 team." *Id.* at 1320 (cleaned up). "The key," the Ninth Circuit said, was that plaintiffs did not demonstrate that "the parties intended to create direct legal obligations between themselves and the students." Other than the statements from the Pac-10's bylaws, constitution, and other legislation, the plaintiffs "failed to provide any evidence that the parties intended to create a contractual obligation; accordingly, we find their claim without merit." *Id.*

*Hairston* is persuasive. The court applies it here. Nothing shows an intent to create a contractual obligation to the plaintiffs.

The plaintiffs' cases are distinguishable, largely for the reasons that USF advances. More practically, this is a tort case, not a breach-of-contract case. The NCAA principles may describe some of the rules of the road. That is how one tries a tort case: by reference to the duty of care. But

United States District Court
Northern District of California

that does not make a hortatory pronouncement (however important) a contractual obligation that benefits the plaintiffs as third-party beneficiaries.

### 6. Motion to Strike: Allegations Against the Archdiocese

USF moved to strike paragraphs 61 to 66 from the complaint:

> 61. The University of San Francisco is a Catholic, Jesuit institution. One of its core religious values is *cura personalis*, or "care of the whole person."

> 62. USF is part of the Catholic Archdiocese of San Francisco. Saint Ignatius Church is located on the University of San Francisco campus. The church serves a parish of the Catholic Archdiocese of San Francisco and is the university's chapel.

> 63. A 2018 report of alleged sexual assaults and misconduct among three Bay Area dioceses, including the San Francisco Archdiocese, found that five alleged offenders were priests affiliated with USF at one point in their careers. Those priests were assigned to USF over a span of 32 years, from 1949 to 1981, though the report did not say whether the abuse occurred on the USF campus. Three of the priests faced legal proceedings that included criminal convictions.

> 64. Referring to the history of sexual abuse in the church, USF's president, Fr. Paul Fitzgerald, vowed to take sexual abuse matters seriously:

> > But the cover-up by civil and religious authority figures allowed abusers to become repeat offenders; in my view, this is the heart of the scandal. Today, any abuse is promptly reported to the authorities, who take these matters extremely seriously.

> 65. After the report's revelations, Fr. Fitzgerald also promised to promote a better culture at USF that supports survivors and includes transparency:

> > Abuse of power is at once infuriating and disillusioning. We cannot become inured to these published reports and revelations, whether they occur within the Catholic Church, another organization or even our own community. We must all work to promote a culture that prevents abuse, hears and supports survivors, seeks transparency and advances reform. I write to assure you that I am committed to acting against all forms of abuse of power by any member of our community, including the Jesuits.

> 66. Despite Fr. Fitzgerald's public statements and the administration's knowledge of the issue, sexual abuse continues on USF's campus.[69]

Paragraphs 61, 62, 65 and 66 have allegations — the nature of the institution, its views on abuse of power, and abuse on campus — that at least possibly have a bearing on the claims here.

---

[69] Mot. – ECF No. 103 at 31; SAC – ECF No. 93 at 17–18 (¶¶ 61–66) (footnotes omitted).

*Oracle Am.*, 817 F. Supp. 2d at 1132; *Rosales*, 882 F. Supp. 2d at 1179. They also are not salacious or scandalous within the meaning of Rule 12(f).

It is a closer question whether paragraphs 63 and 64 can survive a challenge under Rule 12(f) to their materiality or pertinence. The allegations involve different allegations by different plaintiffs during a different time period about different alleged abusers that seemingly have no connection to USF faculty. They seem gratuitous. The plaintiffs assert that they are relevant to USF's policy of deliberate indifference to sexual abuse.[70] The case they cite is *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093 (9th Cir. 2020). But that case involved U.C. Berkeley's history of responding to reports of sexual misconduct, an issue relevant to the plaintiff's official-policy claim under Title IX. *Id.* at 1104. The allegations here are not so connected to the lawsuit.

USF's main concern is that the allegations complicate the claims and issues and would confuse the jury. These are fair Rule 403 concerns. (USF also talks about unwarranted media attention, but a public filing can't be unfiled.)[71] At the pleadings stage, though, the court cannot say that the allegations have "no possible bearing" on the litigation. *Rosales*, 882 F. Supp. 2d at 1179. That said, it is highly doubtful that facts like these would be admissible at trial. Fed. R. Evid. 403.

### 7. Motion to Strike: Prayer for Injunctive Relief

In their prayer for relief, the plaintiffs ask the court to award

> injunctive relief requiring USF to adopt, implement, and enforce appropriate policies and procedures to prevent, or properly respond to, sexual misconduct and psychological abuse of students and student-athletes, because: (1) there is a substantial likelihood that Plaintiffs and the Class will prevail on the merits; (2) there is a real and substantial threat that the Class will suffer irreparable injury if the injunction is not granted; (3) the Class's threatened injury outweighs any threatened harm to USF; and (4) granting the injunction will serve the public interest.[72]

Doe 1 was still enrolled at USF when the complaint was filed, but he has since transferred away.[73]

---

[70] Opp'n – ECF No. 114 at 34–35.

[71] Reply – ECF No. 118 at 32.

[72] SAC – ECF No. 93 at 127–28.

[73] *Id.* at 45 (¶ 195); Opp'n – ECF No. 114 at 32.

United States District Court
Northern District of California

The parties first dispute whether a motion to strike is the proper mechanism here. Usually, a motion to strike is not the mechanism to address the legal sufficiency of a claim: it is about getting rid of spurious issues by dispensing them. *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010). The issue is standing: it pertains to the court's subject-matter jurisdiction and is more conventionally raised in a motion to dismiss under Rule 12(b)(1). *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121–22 (9th Cir. 2010). That said, the form of the motion seems trivial: the parties both analyze the issue under the conventional standing analysis.[74]

Federal-court jurisdiction extends only to "cases" and "controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 338 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Ordinarily, "standing is evaluated by the facts that existed when the complaint was filed." *ACLU of Nev. v. Lomax*, 471 F.3d 1010, 1016 (9th Cir. 2006). "[M]ootness inquiries," on the other hand, "require courts to look to changing circumstances that arise after the complaint is filed." *Id.*

"[S]tanding for injunctive relief requires that a plaintiff show a 'real and immediate threat of repeated injury[.]'" *Updike v. Multnomah Cnty.*, 870 F.3d 939, 947 (9th Cir. 2017) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). The plaintiff must show that the defendant's "wrongful behavior is likely to recur against him." *Id.* at 948. And where circumstances change after commencement of a suit such that the wrongful behavior is no longer likely to recur against the plaintiff (for example, because the plaintiff left his job with the defendant), "his claims for prospective relief [become] moot because he [can] no longer benefit from such relief." *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1048 (9th Cir. 2014) (a named plaintiff worked at FedEx at the outset of suit but later left the job; his claim for prospective relief became moot such that the class action also became moot).

---

[74] Mot. – ECF No. 103 at 29–30; Opp'n – ECF No. 114 at 32–34.

United States District Court
Northern District of California

1    In *Bd. of Sch. Comm'rs of City of Indianapolis v. Jacobs*, for instance, the plaintiffs "were or

2  had been involved in the publication and distribution of a student newspaper" at the outset of the

3  case, but as the case was ongoing, they "graduated from the Indianapolis school system." 420 U.S.

4  128, 129 (1975) (per curiam). "The case is therefore moot unless it was duly certified as a class

5  action pursuant to [Rule] 23, a controversy still exists between [the defendants] and the present

6  members of the class, and the issue in controversy is such that it is capable of repetition yet

7  evading review." *Id.*; *see also Caselman v. Pier 1 Imports (U.S.), Inc.*, No. 14-CV-02383-LHK,

8  2015 WL 106063, at *3 (N.D. Cal. Jan. 7, 2015) ("[E]ven if Plaintiff had standing to bring suit

9  initially, Plaintiff's claim for injunctive relief is now moot because she no longer works at Pier 1

10  and thus will not benefit personally from any injunction that may be imposed.") (collecting cases).

11    On this record and briefing, Doe 1's claim for injunctive relief is moot and the court thus

12  dismisses the plaintiffs' claim for injunctive relief. But that dismissal is without prejudice to any

13  amended complaint and briefing that addresses the factual context of changed circumstances after

14  the case's commencement and the resulting mootness issue.

15                          **CONCLUSION**

16    The court grants the motion to dismiss the claims of John Does 4–14 as barred by the statute of

17  limitations, except for claims 1 and 5 for discrimination under Title IX and Cal. Educ. Code

18  § 66270. For Does 1–3, the court dismisses the contract claims and the prayer for injunctive relief

19  with leave to amend. The court denies the motion to dismiss Does 1–3's claims for retaliation and

20  a violation of Cal. Educ. Code § 66281.5. The court denies the motions to strike allegations related

21  to abuse in the Catholic Church.

22    Any amended complaint must be filed within 28 days and must attach a blackline compare of

23  the amended complaint against the current complaint. This resolves ECF Nos. 103, 104, and 105.

24    **IT IS SO ORDERED.**

25    Dated: August 2, 2023

26                                          _____

27                                          LAUREL BEELER
                                            United States Magistrate Judge
28