JONATHAN SELBIN (Cal. Bar No. 170222)
jselbin@lchb.com
MICHELLE LAMY (Cal. Bar No. 308174)
mlamy@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

ELIZABETH A. FEGAN (Cal. Bar No. 355906)
beth@feganscott.com
FEGAN SCOTT LLC
150 S. Wacker Drive, 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100

*Attorneys for Plaintiffs and the Proposed Class*
(Additional Counsel on Signature Page)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 8, JOHN DOE 9, JOHN DOE 10, JOHN DOE 11, and JOHN DOE 12, DOE 13, DOE 14 individually and on behalf of all others similarly situated,<br><br>   Plaintiffs,<br><br>v.<br><br>THE UNIVERSITY OF SAN FRANCISCO, ANTHONY N. (AKA NINO) GIARRATANO, and TROY NAKAMURA,<br><br>   Defendant. | Case No. 3:22-cv-01559-LB<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**<br><br>Hearing: January 30, 2025<br>Time: 9:30 a.m.<br>Courtroom: B<br><br>Judge: Hon. Laurel Beeler<br>Trial Date: None Set |

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ............................................................................................. 1

II.    SUMMARY OF FACTS ................................................................................... 2

       A.    USF Acknowledges that Student-Athletes Face a Heightened Risk of
             Sexualized Conduct and Abuse by Coaches. ........................................ 3

       B.    USF Lacks Adequate Policies to Prevent and Redress Sexualized Conduct
             by Coaches or to Educate Student-Athletes on Responding to Such Abuse.......... 4

       C.    Left Unchecked by USF, the Coach Defendants Created an Intolerable
             Sexualized Environment on and off the USF Baseball Field................................ 6

       D.    Defendants Retaliated Against Players Who Resisted the Sexualized
             Conduct, Causing a Deterrent Effect within the Team. ....................... 10

       E.    USF Was Long Aware of—and Permitted—the Coaches' Abuse...................... 11

III.   LEGAL STANDARD ..................................................................................... 14

IV.    ARGUMENT .................................................................................................. 14

       A.    The Class Satisfies All Four Requirements of Rule 23(a). .................. 15

             1.    The Class Is Sufficiently Numerous. ....................................... 15

             2.    There Is at Least One Common Question with a Common Answer......... 15

             3.    Plaintiffs' Claims Are Typical of the Class. ........................... 21

             4.    Plaintiffs and Counsel Have and Will Adequately Represent the
                   Class. ........................................................................................ 22

       B.    The Class Is Appropriate for Issue Certification under Rule 23(c)(4)................. 23

             1.    Determination of Common Issues Will Drive Resolution of this
                   Action. ....................................................................................... 23

             2.    A Class Is Manageable and Superior to Multiple Individual
                   Actions. ..................................................................................... 24

V.     CONCLUSION .............................................................................................. 25

3095525.7

# TABLE OF AUTHORITIES

Page

**Cases**

*A. B. v. Hawaii State Dep't of Educ.*,
30 F.4th 828 (9th Cir. 2022) ................................................................ 19

*Abdullah v. U.S. Sec. Assocs., Inc.*,
731 F.3d 952 (9th Cir. 2013) ................................................................ 15

*ABS Ent., Inc. v. CBS Corp.*,
908 F.3d 405 (9th Cir. 2018) ................................................................ 14

*Amador v. Baca*,
2016 WL 8904537 (C.D. Cal. Nov. 18, 2016) .................................... 23

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ........................................................ 2, 14, 15, 16

*In re Arris Cable Modem Consumer Litig.*,
327 F.R.D. 334 (N.D. Cal. 2018) ........................................................ 14

*Avilez v. Pinkerton Gov't Servs., Inc.*,
596 F. App'x 579 (9th Cir. 2015) .................................................. 14, 25

*Barnett v. Kapla*,
2020 WL 7428321 (N.D. Cal. Dec. 18, 2020) .................................... 17

*Burch v. Regents of Univ. of Cal.*,
433 F. Supp. 2d 1110 (E.D. Cal. 2006) .............................................. 19

*Butler v. Sears, Roebuck & Co. ("Butler I")*,
702 F.3d 359 (7th Cir. 2012) ................................................................ 24

*Butler v. Sears, Roebuck & Co. ("Butler II")*,
727 F.3d 796 (7th Cir. 2013) ........................................................ 15, 25

*C.A. v. William S. Hart Union High Sch. Dist.*,
53 Cal. 4th 861 (2012) ........................................................................ 21

*Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*,
678 F. Supp. 2d 1008 (E.D. Cal. 2009) .............................................. 16

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ................................................................ 15

*Delfino v. Agilent Techs., Inc.*,
145 Cal. App. 4th 790 (2006) .............................................................. 21

**TABLE OF AUTHORITIES**
(continued)

Page

*Doe 1 v. Nat'l Collegiate Athletic Ass'n*,
   2023 WL 105096 (N.D. Cal. Jan. 4, 2023) ............................................................... 16

*Doe v. Roman Catholic Diocese of Covington*,
   2006 WL 250694 (Ky. Cir. Ct. Jan. 31, 2006) ......................................................... 25

*Ellis v. Costco Wholesale Corp.*,
   285 F.R.D. 492 (N.D. Cal. 2012) ............................................................................. 25

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) .................................................................................... 21

*Emeldi v. Univ. of Or.*,
   698 F.3d 715 (9th Cir. 2012) .................................................................................... 19

*Farmers Ins. Grp. v. Cty. of Santa Clara*,
   11 Cal. 4th 992 (1995) ............................................................................................. 21

*Galvan v. KDI Distrib. Inc.*,
   2011 WL 5116585 (C.D. Cal. Oct. 25, 2011) ........................................................... 25

*Hall v. Apollo Grp., Inc.*,
   2014 WL 4354420 (N.D. Cal. Sept. 2, 2014) ........................................................... 20

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) .................................................................................. 15

*In re High-Tech Emp. Antitrust Litig.*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) .................................................................... 14

*Hilario v. Allstate Ins. Co.*,
   642 F. Supp. 3d 1048 (N.D. Cal. 2022) .............................................................. 21, 22

*Jimenez v. Allstate Ins. Co.*,
   765 F.3d 1161 (9th Cir. 2014) ............................................................................ *passim*

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
   305 F.R.D. 164 (N.D. Cal. 2015) ............................................................................. 24

*Karasek v. Regents of Univ. of Cal. ("Karasek I")*,
   500 F. Supp. 3d 967 (N.D. Cal. 2020) ..................................................................... 18

*Karasek v. Regents of Univ. of Cal. ("Karasek II")*,
   956 F.3d 1093 (9th Cir. 2020) .................................................................. 16, 17, 18, 20

*Karasek v. Regents of Univ. of Cal. ("Karasek III")*,
   534 F. Supp. 3d 1136 (N.D. Cal. 2021) .................................................................... 18

# TABLE OF AUTHORITIES
### (continued)

Page

*Levya v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) ................................................................... 24

*Lilly v. Jamba Juice Co.*,
308 F.R.D. 231 (N.D. Cal. 2014) .............................................................. 23

*Martin v. Behr Dayton Thermal Prods. LLC*,
896 F.3d 405 (6th Cir. 2018) ................................................................... 24

*McMahon v. LVNV Funding, LLC*,
807 F.3d 872 (7th Cir. 2015) ................................................................... 25

*Mejdrech v. Met-Coil Sys. Corp.*,
319 F.3d 910 (7th Cir. 2003) ................................................................... 24

*Mullen v. Treasure Chest Casino, LLC*,
186 F.3d 620 (5th Cir. 1999) ................................................................... 25

*Ollier v. Sweetwater Union High Sch. Dist.*,
768 F.3d 843 (9th Cir. 2014) ................................................................... 19

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015) ................................................................... 22

*Parra v. Bashas', Inc.*,
536 F.3d 975 (9th Cir. 2008) ................................................................... 15

*Rannis v. Recchia*,
380 F. App'x 646 (9th Cir. 2010) ............................................................. 15

*Rapuano v. Trustees of Dartmouth College*,
334 F.R.D. 637 (D.N.H. 2020) ........................................................... 17, 22

*Regents of Univ. of Cal. v. Super. Ct.*,
4 Cal. 5th 607 (2018) .............................................................................. 20

*Rosencrans v. Dover Images, Ltd.*,
192 Cal. App. 4th 1072 (2011) ................................................................ 20

*Simpson v. University of Colorado Boulder*,
500 F.3d 1170 (10th Cir. 2007) ............................................................... 18

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) ................................................................... 22

*Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*,
308 F.R.D. 630 (N.D. Cal. 2015) ....................................................... 14, 24

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016) ................................................................. 15

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) .................................................................... 23

*Vasquez v. Residential Invs., Inc.*,
    118 Cal. App. 4th 269 (2004) .................................................................. 19

*Videckis v. Pepperdine Univ.*,
    100 F. Supp. 3d 927 (C.D. Cal. 2015) ..................................................... 16

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................. 14, 15, 16

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) ................................................................... 15

*Williams v. Mohawk Indus., Inc.*,
    568 F.3d 1350 (11th Cir. 2009) ............................................................... 24

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010) ................................................................. 21

**Statutes**

Cal. Code Civ. P. § 1021.5 .................................................................... 16

Cal. Educ. Code § 66270 ...................................................................... 16

Cal. Educ. Code § 66281.5 ................................................................... 18

**Court Rules**

Fed. R. Civ. P. 23(a) ...................................................................... *passim*

Fed. R. Civ. P. 23(b)(3) ............................................................ 14, 16, 24

Fed. R. Civ. P. 23(c)(4) ................................................................... *passim*

**Other Authorities**

Celia Brackenridge & Sandra Kirby, *Playing Safe: Assessing the Risk of Sexual
    Abuse to Elite Child Athletes*, INT'L REVIEW FOR THE SOCIOLOGY OF SPORT:
    SPECIAL ISSUE ON YOUTH SPORT 13 (1997), available at https://bit.ly/3UZ8SII .................... 4

**PLEASE TAKE NOTICE** that on January 30, 2025 at 9:30 am, before the Honorable Laurel Beeler, Plaintiffs will and hereby do move for an order certifying this case as an issue class pursuant to Federal Rules of Civil Procedure 23(a) and 23(c)(4).

## I.    INTRODUCTION

For over two decades, the University of San Francisco ("USF") knew its head baseball coach, Anthony "Nino" Giarratano, and assistant baseball coach, Troy Nakamura ("the Coaches"), created and coercively maintained a sexualized environment on USF's Division I baseball team. Discovery demonstrates that USF has long known the risks of abuse faced by student-athletes and the need to implement policies to protect them. Yet, year after year, USF failed to adopt and enforce policies prohibiting such abuse, even after the Coaches' misconduct prompted several complaints to the university. USF's deliberate indifference had tragic consequences.

Plaintiffs are thirteen former members of the USF baseball team who suffered abuse by the Coaches, with USF's (at times explicit) approval. All thirteen arrived at USF as elite athletes at the start of promising baseball careers. All played—before and after USF—on other elite baseball teams, including at the professional level. None experienced—before or since—another environment where such profoundly disturbing sexualized abuse was normalized. Indeed, the Coaches' sexual conduct was so abhorrent and abusive that several highly-regarded recruits contemplated suicide, while many others fled the team.

Plaintiffs' expert Robert Boland, who served as Athletic Integrity Officer at Penn State in the wake of the Jerry Sandusky scandal, explains the Coaches' behavior was "egregiously inappropriate and harmful to the student-athletes," and that USF's "rationalization [of it] not only trivialized the harm caused to the athletes but also perpetuated a culture in which abusive behavior by coaches could continue unchecked." Boland opines that the Coaches' reign of abuse was the predictable result of USF's deficient sexual misconduct policies and USF's choice to ignore, by its own admission, the "best practices" long ago adopted by other schools. Boland concludes: "USF has failed to protect its student-athletes from sexual communications, sexual conduct, and grooming behaviors," and instead "create[d] an environment that heighten[ed] the risk of abuse."[1]

---

[1] Selbin Decl., Ex. 1 ("Boland Rep.") at 14, 27, 8. All references to "Ex." herein are to Selbin Decl.

In this litigation, as in the past two decades, USF and the Coaches continue to minimize the severity of their misconduct and the resulting harms.[2] Plaintiffs seek to finally hold them accountable. They seek certification of an issue class pursuant to Rules 23(a) and 23(c)(4) defined as: "All members of the University of San Francisco baseball team since 2000." Issue certification is warranted because the common answers to the common questions detailed herein will "drive resolution of the class' claims." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1166 n.5 (9th Cir. 2014). With respect to their discrimination claims, liability will turn on the severity of the Coaches' misconduct, whether USF acted with deliberate indifference, and whether USF's indifference created a heightened risk of abuse. With respect to their negligence claims, liability will turn on whether USF and the Coaches owed a duty to protect class members from sexual misconduct, whether they breached that duty, and whether vicarious and/or direct liability attaches. These are binary, "yes/no" questions, the answers to which are identical for *all* class members—positive or negative. Because they share this "fatal similarity," they are common questions that support issue certification. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 470 (2013). With respect to all other issues—including damages—Plaintiffs propose they be deferred to a second phase of litigation, after common questions are answered for the class, consistent with the Ninth Circuit's guidance on bifurcation of liability and damages issues. *Jimenez*, 765 F.3d at 1166-67.

## II.    SUMMARY OF FACTS

Plaintiffs await much of the discovery they sought in this case.[3] Key facts continue to be discovered by the day: several of the documents cited herein, for example, were produced less than one week ago.[4] But discovery to date reflects a decades-long pattern of uniform abuse by the

---

[2] As just one example: after Doe 8 testified that his shame about the Coaches' sexualized abuse became so acute that he contemplated suicide, prompting his parents to "fly out to San Francisco to make sure that [he] was alive the next morning," USF asked him: "But did you at any point take steps – attempt to take steps to carry out suicide?" Ex. 20 ("Doe 8 Tr.") at 37:25-38:11, 156:20-22. He responded that he had, and described them. *Id.* at 156:23-157:2.

[3] USF has yet to produce key policy, complaint, and investigation files, and has yet to complete (or even provide an estimated date for completing) production for a single document custodian (including the narrow subset identified by Plaintiffs as key to class certification), while Giarratano has yet even to *begin* electronic discovery (i.e., yet to produce a single text message or email). *See* von Klemperer Decl. ("MvK Decl."), ¶¶ 2-9 (detailing this and other outstanding discovery).

[4] USF's November 15, 2024 production (alone) included 2,505 documents, many of which Plaintiffs were not able to complete reviewing while simultaneously preparing this motion. MvK Decl., ¶ 9. Such delays have prevented Plaintiffs from deposing a single witness. To wit: the most

Coaches, which was long known to—and long permitted by—USF's uniform failure to act.

**A.** **USF Acknowledges that Student-Athletes Face a Heightened Risk of Sexualized Conduct and Abuse by Coaches.**

College coaches control almost every aspect of student-athletes' lives. Absent adequate policies, college administrators are incentivized to look the other way. Under these circumstances, student-athletes are at a heightened risk of sexual abuse by coaches.

Plaintiffs' expert Robert Boland explains that athletics, and in particular college athletics, are notoriously hierarchical, with power flowing downward from the coach. Boland Rep. ¶¶ 24-25, 35-36.[5] Coaches directly control student-athletes' recruitment, training, well-being, financial aid, scholarships, playing time, and prospects of going pro. *Id.* ¶ 35. Thus, coaches hold student-athletes' future careers, and even their ability to continue attending college, in their hands. For many student-athletes, "the magnitude of the coach's control will likely exceed . . . the extent of control any individual has ever had over them at any point in their lives, with the exception of their parents." *Id.* ¶ 38 (quoting NCAA publication). In addition, by condoning, or even participating in hazing (such as kangaroo courts, dare challenges, threats of physical violence, and actual physical violence), coaches exert even more control and cement their influence over student-athletes. *Id.* ¶¶ 43-45. Hazing reinforces a culture of fear and compliance, ensuring that student-athletes feel powerless to resist or report a coaches' abusive conduct. *Id.* The NCAA's transfer rules traditionally were also very restrictive, requiring student-athletes to document extraordinary circumstances and coach approval. *Id.* ¶ 39. Before 2023, coaches could exploit these rules to prevent student-athletes from transferring, making student-athletes even more susceptible to coaches' control. *Id.*

Coaches exert this control with minimal to no oversight. *Id.* ¶¶ 32-38. As Boland explains, coaches command substantial prestige on campus. *Id.* ¶ 33. Given the pressure to succeed (and the resulting financial and intangible benefits), colleges compete fiercely for the best coaches, and coaches are among the highest paid individuals on campus. *Id.* This can cloud college administrators' judgment and lead them to excuse or willfully ignore misconduct. *Id.* ¶ 34.

---

recent production included key documents regarding witnesses Plaintiffs identified as key to class certification, including the Coaches. *Id.* ¶¶ 9-10 & n2. Even assuming these were the last documents produced for these witnesses—and they are not—it would have been impossible for Plaintiffs to notice and take their depositions all within the last four business days. *Id.* ¶ 10.

[5] This power imbalance is well-documented. *See* Boland Rep. ¶ 24 (summarizing literature).

Given this power imbalance, interactions between coaches and student-athletes are inherently unequal and student-athletes are particularly at risk of sexual abuse by their coaches. *Id.* ¶ 40. As athletes advance to the upper echelons of their sport, the power balance grows:

> [A]thletes may be more susceptible to the grooming process . . . when they have reached a high standard of performance but are just below the elite level. We call this the 'stage of imminent achievement' (SIA). . . . *In these circumstances it is not difficult for a coach with sexual motives to groom and gain compliance from the athlete*.[6]

Given this reality, student-athletes are not capable of consenting to sexual communications or interactions with coaches. *See* Boland Rep. ¶¶ 40, 43, 49 (citing literature). "In other words, the dynamics of the coach-athlete relationship in intercollegiate sport make *any* sexual contact between a coach and an athlete abusive, regardless of whether it was wanted by the athlete and regardless of whether the athlete is over the age of consent." *Id.* ¶ 49 (quoting research).

USF internally acknowledges this power imbalance and the risk it poses. A policy memo authored by an assistant to an Associate Dean recognized that relationships between faculty or staff and students are "problematic based on power differentials" and present risks of harassment, discrimination, and retaliation. *Id.* ¶ 50 (citing USF_0040035). Further, a 2024 USF policy analysis concluded that it "made particular sense" to align USF's policies with the "best practices" adopted by similar schools that had prohibited relationships between faculty and students they teach, coach, or "over whom they otherwise hold authority." *Id.* (citing USF_0041335 at -337-338). USF's Title IX office later recommended adopting a Consensual Relationship Policy aimed at addressing the power differentials within relationships between employees and students, to protect community members from abuse and exploitation. *Id.* ¶ 51 (citing USF_0055085). Yet, inexplicably, to Plaintiffs' knowledge, this policy has yet to be adopted.

## B.    USF Lacks Adequate Policies to Prevent and Redress Sexualized Conduct by Coaches or to Educate Student-Athletes on Responding to Such Abuse.

As USF acknowledges internally, where left unchecked by appropriate policies, coaches can wield their power with tragic consequences. Despite the clear need and their own admissions, USF did not have *any* sexual misconduct prevention policy that addressed the power dynamics

---

[6] Celia Brackenridge & Sandra Kirby, *Playing Safe: Assessing the Risk of Sexual Abuse to Elite Child Athletes*, INT'L REVIEW FOR THE SOCIOLOGY OF SPORT: SPECIAL ISSUE ON YOUTH SPORT 13 (1997), available at https://bit.ly/3UZ8SII (emphasis supplied).

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 3:22-CV-01559-LB

between coaches and student-athletes during the class period. Boland Rep. ¶ 53

There is no question USF has the responsibility to—and does—exercise institutional control over coaches. USF dictates almost every aspect of a coach's job, including qualifications to work, trainings to complete, when to work, when to interact with athletes, how to disseminate information from the NCAA to their staff, and when and how they can recruit new athletes. *Id*. ¶ 55. USF also enforces detailed NCAA rules that further define what coaches can and cannot do. *Id*. ¶ 56.

Yet, remarkably, USF has <u>no</u> policies (1) prohibiting sexual communication or sexual conduct between coaches and student-athletes, (2) mandating training related to the power dynamic between coaches and student-athletes and to the inability of student-athletes to consent to any form of sexual communication or sexual conduct with their coaches, or (3) requiring appropriate team environments free from any form of sexual communication or sexual conduct between coaches and student-athletes. *Id*. ¶ 58.[7] And the limited training provided to coaches focuses on student-on-student complaints, not misconduct by coaches. *Id*. ¶ 59. These policy failures place USF far below minimal acceptable standards for college sexual misconduct policies. *Id*. ¶ 50.

USF likewise exercises substantial control over student-athletes. *Id*. ¶ 63. That control is reflected in a number of handbooks and policies. Yet *none* addresses the power dynamic between coaches and student-athletes, the effect of the power dynamic on consent with respect to sexual communications or sexual conduct by coaches directed at student-athletes, or how to handle sexual communications or sexual conduct by coaches directed at student-athletes. *Id*. ¶¶ 63-75.

For instance, USF's 2018 "Sexual Misconduct Policy" addresses only student-on-student sexual misconduct, noting that USF may "impose different sanctions when a *student* is found to have violated this policy." *Id*. ¶ 74 (citing USF_0001695 at 697) (emphasis supplied). It makes no mention of coaches facing sanctions for their sexual misconduct. *Id*. Similarly, USF's 2021 "Interim Policy and Procedures, Nondiscrimination Based on Sex and Gender, Sexual Harassment, and Sexual Misconduct for All Students, Employees, and Third-Parties" contains no mention of sexual interactions or sexual communications between coaches and student-athletes, nor how the

---

[7] Boland reviewed every policy and training document produced by USF through November 15, 2024. MvK Decl. ¶ 12. However, USF's production remains incomplete, including its production of discovery Plaintiffs identified as key for class certification. *Id*. ¶ 10.

- 5 -

power dynamic between them affects the concept of consent. *Id*. ¶ 75 (citing USF_0004838).

Indeed, despite acknowledging the need for a policy prohibiting relationships and other sexual conduct between faculty and students—and despite the existence of such a policy at many "ideologically and/or geographically similar institutions to USF"—USF *still has no policy* that addresses allegedly "consensual relationships between employees, staff, faculty, and students." Ex. 2 at -372. This is so, despite USF's acknowledgment of the power dynamics at play in sexual harassment. *See* Ex. 37 at -56 (training describing sexual harassment as occurring in the context of one who "abuses existing power dynamic").

Nor does USF provide training to student-athletes to address sexual interactions or sexual communications between coaches and student-athletes, or on how the power dynamic between them implicates consent. Boland Rep. ¶ 76. While USF does provide training on topics like dating violence, sexual assault, and stalking, no training addresses sexual misconduct in the context of athletic power dynamics. *Id*. ¶¶ 78-79. This is consistent with Plaintiffs' own experience—the Title IX training they received focused on student-on-student misconduct, not on protecting them from their coaches. *See, e.g.*, Doe 3 Tr. at 17:7-20; 19:25-20:10; Doe 1 Decl. at ¶ 6; Doe 3 Decl. at ¶ 6.

USF's approach to trainings reflects a strategic emphasis on complying with USF's reporting requirements under the Clery Act, focusing narrowly on issues like domestic violence, dating violence, sexual assault, and stalking. Boland Rep. ¶ 78. This suggests that USF's focus is not on protecting its students, but rather on limiting the number of reportable incidents and keeping its official numbers low. *Id*. ¶¶ 81-82. Sadly, this attitude allowed the Coaches' misconduct to continue unchecked *for decades*, despite that misconduct occurring in plain sight and prompting multiple complaints to the administration over the years.

### C.      Left Unchecked by USF, the Coach Defendants Created an Intolerable Sexualized Environment on and off the USF Baseball Field.

In the complete absence of appropriate policies, the heightened risk of abuse materialized for members of USF's baseball team who played under the Coaches. Copious evidence from not only the Plaintiffs but also internal USF documents, correspondence, and the Defendants' own admissions indicate that, throughout the class period, the Coaches created an intolerable sexualized environment in which they subjected players to sexual degradation and psychological abuse.

Plaintiffs' experiences span more than two decades.[8] Yet *every Plaintiff* either directly experienced or witnessed the Coaches engage in sexualized conduct, which by definition is sexual misconduct. Boland Rep. at ¶¶ 42-43, 49. For example, Nakamura regularly exposed himself to players, both on and off the field, and both Coaches showered with the players. *See, e.g.*, Doe 4 Decl. ¶ 3 ("Naks so often exposed himself to us that players also had the expression: 'If Coach Naks whips his dick out, you know he's in a good mood.'").[9] Both Coaches engaged in sexualized bullying, regularly analyzed and commented on players' genitals, demanded players partake in sexualized skits or discuss sexual topics, and made sexual comments about female students on campus (including Plaintiffs' romantic partners). *See, e.g.*, Doe 12 Decl. ¶¶ 4-5 ("I was shocked at how often Giarratano would talk about peoples' penises."); Doe 4 Decl. ¶ 3 (noting the Coaches "constantly commented on the shape and size of players' penises").[10]

Every Plaintiff also directly experienced or witnessed one or both Coaches engaged in psychological abuse or threats of violence, which is a form of grooming to ensure the players submit to other sexualized conduct. Boland Rep. ¶ 48. For example, both Coaches often belittled players (Doe 4 Decl. ¶ 4), calling them a "disgrace" (Doe 9 Decl. ¶ 6), "worthless" (Doe 3 Tr. at 251:25-252:2), and a "fucking embarrassment," "a piece of shit," "a fuck-wit-freshman," and "a nobody" (Doe 10 Decl. ¶¶ 8, 9), and "a fucking pussy" (Doe 11 Decl. ¶ 5; Doe 12 Decl. ¶ 8 [also calling Doe 12 a pussy]; Doe 14 Decl. ¶ 5 [same]).[11] At one point, Giarratano, holding a bat, told Doe 3, "I wish

[8] The examples cited herein are far from exhaustive, but reflect the consistency of the Coaches' disgusting and unlawful behavior over time.

[9] *See also, e.g.*, Doe 5 Decl. ¶ 3 ("On multiple occasions, Naks exposed himself in front of myself and other players, which was accepted as a normal part of team culture."); Ex. 3 (Doe 1 Tr.) at 95:10-12 ("I remember [Nakamura] crawling out onto the field like a bear, completely naked."), 303:22-304:5 (both Coaches showering with the players); Ex. 4 (Doe 2 Tr.) at 39:13-40:1 (Nakamura getting naked in front of players in the locker room and, later, removing his clothing and jumping on the table in the press box); Ex. 5 (Doe 3 Tr.) at 167:19-170:2 (Nakamura swinging his penis in a circle like a helicopter); Doe 6 Decl. ¶ 2 ("Naks crawling on the field naked in front of the team"); Doe 14 Decl. ¶ 4 (Nakamura's weekly showers with players); Doe 12 Decl. ¶ 6 (both Coaches waited to shower with the players with their genitals exposed).

[10] *See also, e.g.*, Doe 11 Decl. ¶¶ 3-5 ("Giarratano persistently asked me about my sex life in front of the other players."); Doe 13 Decl. ¶ 3 (describing the sexualized skits); Doe 3 Tr. at 175:22-176:19 (Nakamura asking him about his sex life and encouraging him to sleep with drunk girls); Doe 1 Tr. at 94:7-96:2 (Nakamura making sexual comments about women on campus and discussing sexualized skits); Doe 2 Tr. at 58:24-59:4 (Nakamura "look[ing] for the best looking and youngest college female to walk his dog"); Doe 5 Decl. ¶ 6 (Giarratano saying he played "like a . . . faggot[]");Doe 9 Decl. ¶ 6 (Nakamura calling players "faggots").

[11] *See also* Doe 13 Decl. ¶ 5 ("Giarratano would tell me things such as, 'You can take your fat ass

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 3:22-CV-01559-LB

more than anything I could hit you . . . with this bat and maybe knock some fucking sense into your brain." Doe 3 Tr. at 259:1-4. On another occasion, Giarratano, in front of parents and coaches, yelled at Doe 2, calling him a "fucking cunt." Doe 2 Tr. at 46:18-47:5.

Plaintiffs were not alone: the limited discovery produced to date reveals numerous other class members experienced this misconduct.[12] For example, one parent of a former player wrote to Athletic Director ("AD") Joan McDermott in March 2022 that he "was not surprised" to hear about this lawsuit because his son, too, had been subjected to the "toxic" culture on USF's baseball team. Ex. 6. Another filed a Title IX complaint after his son was "bullied, intimidated and abused by the coaching staff during the fall of 2020," after which he "was essentially forced to quit" the team. Ex. 7 at -655. Like Plaintiffs, that individual ████████████████████████████████████ ████████████████████████████ *Id.*; *see also* Ex. 8 (email from another parent describing the "demeaning and degrading" way in which the Coaches treated her son and the "horrific experience" that led him to give up baseball).

Complaints from other members of the USF community reveal the Coaches' toxic culture was widely known on campus. In 2019, for example, Title IX Coordinator Jess Varga received a ████████████████████████████████████████████ Ex. 9. In response to the student's demand that Ms. Varga note the USF baseball team ████████████████ Ms. Varga said she would speak to the AD and "imagine[s] we will be involving the baseball team head coach at some point." *Id.* USF has not produced any evidence that such a meeting occurred. In August 2021— *before* Does 1-3 and others made Title IX complaints—three members of USF women's soccer team spoke with another member of the Title IX office about sexual misconduct on the baseball team. Ex. 11. They told her it was "common[ly]" known that the baseball team had "for a long time" a system of fining players, including for their sexual relationships; that "[a] council meets once a week to decide who gets fined"; that people felt "[g]ross about interacting with the team"; and that "[o]ff-campus[,] they tell people to stay away from the baseball team." *Id.* They noted that

in a canoe and paddle back [home].'"); Doe 1 Tr. at 99:17-21 ("Naks once told me I was tearing up the fabric of the culture of the team for deciding to return . . . for my sophomore year."); Doe 5 Decl. ¶ 9 (telling Doe 5 he had "mental issues"); Doe 8 Tr. at 112:11-21 (explaining how Giarratano said Doe 8 was "not part of the brotherhood" and "nobody likes you here.").

[12] Even players who were reticent to criticize the Coaches described Nakamura as "weird." Ex. 10 at -615.

"[a]ssistant [c]oaches were apart (sic) of the team, so . . . [they] kn[ew] about this." *Id.* And on December 13, 2021, Ms. Varga emailed Athletic Department personnel and others in USF's Title IX office "to discuss increasing concerns . . . regarding the baseball team": after acknowledging that there had been prior conversations, Ms. Varga wrote "just this past week I have received more information alleging behaviors and a culture that are said to be known, particularly among women student-athletes, that are furthering my concern." Ex. 12 at -2834.

There is no real debate about whether the misconduct Plaintiffs allege occurred. After originally lying about his behavior during USF's investigation, Nakamura admitted he was often naked in front of players, including by exposing his genitals on the baseball field and by participating in sexual skits with players where his pants were down. Ex. 13 at -893. Giarratano, too, ultimately admitted ███████████████████████████████████████████ Arb. Tr. at 1248:13-14, witnessed Nakamura expose himself on the baseball field, did not report it, and knew he should have, Ex. 14 at -707. These admissions did not stop the Coaches from later accusing Plaintiffs of fabricating these events under oath.[13]

USF's belated internal investigation concluded the same. Assistant Vice President of Human Resources Diane Nelson "determined that Troy [Nakamura] demonstrated poor judgment inconsistent with athletic department and university policy" by exposing his genitals, engaging in sexualized "baseball skits," and using inappropriate language and sexual innuendo with students. Ex. 15 at -761. Nelson's findings regarding Giarratano were even more damning. ███████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████ Ex. 16 (USF Suppl. Rog. Resps.) at 3. Upon reviewing Plaintiffs' initial complaint in this lawsuit in March 2022, even AD McDermott agreed: "The behavior of both baseball coaches is

---

[13] *See, e.g.*, Doe 3 Tr. at 168:18-21 ("Q.  I've spoken to a number of players, and nobody knows anything about this. Are you making this up? A.  No.").

- 9 -

disgusting." Ex. 17 at -216. Indeed, when it has suited USF—i.e., in its arbitration against Giarratano—it has acknowledged both the existence and the severity of the Coaches' misconduct. *See, e.g.*, Ex. 18 (Giarratano Pre-Hearing Br.) at n.6 (█████████████████████████ ██████████████████████████); Ex. 16 (USF Suppl. Rog. Resps.) at 9-10 (███████████████████████████.

### D.    Defendants Retaliated Against Players Who Resisted the Sexualized Conduct, Causing a Deterrent Effect within the Team.

As established by USF's internal investigation, the Coaches' abuse did not stop at their underlying misconduct. Instead, they enforced their team motto: "███████████." Ex. 16 (USF Suppl. Rog. Resps.) at 3. It is well-documented that the Coaches engaged in a pattern and practice of retaliation against players who resisted their sexualized environment, in an express and successful effort to breed an omnipresent fear of retaliation. USF supported this retaliation by allowing the Coaches to run players off the team in record numbers and by permitting the Coaches to withdraw scholarships in violation of USF and NCAA policies.

Once again, *every* Plaintiff experienced some form of retaliation for refusing to accede to the Coaches' sexualized demands. This retaliation took the form of, among other things, revoking or threatening to revoke scholarships (*e.g.*, Doe 1 Decl. ¶ 11; Doe 2 Decl. ¶ 8; Doe 3 Tr. at 70:13-20; Doe 8 Tr. at 92:7-24; Doe 6 Decl. ¶ 8), providing no or less playing time (*e.g.*, Doe 9 Decl. ¶ 9; Doe 12 Decl. ¶ 10; Doe 5 Decl. ¶ 10; Doe 1 Depo. at 126:3-13), causing academic problems (*e.g.*, Doe 5 Decl. ¶ 12; Doe 6 Decl. ¶ 11), ostracizing players (Doe 4 Decl. ¶¶ 4, 7; Doe 9 Decl. ¶¶ 5-6), forcing them to do extra physical tasks when injured (*e.g.*, DoeDoe Doe 12 Decl. ¶ 7; Doe 1 Tr. at 98:12-99:2; Doe 3 Tr. at 326:3-10), forcing unusual drug testing (*e.g.*, Doe 14 Decl. ¶ 5; Doe 3 Tr. at 68:14-65:17), and blackballing their baseball prospects at other schools or professionally (*e.g.*, Doe 10 Decl. ¶ 11; Doe 8 Tr. at 121:10-17; Doe 2 Tr. at 209:17-210:21).

Moreover, the *threat* of retaliation was ubiquitous. As John Doe 8 testified: "[The Coaches] created this scared and power dynamic environment, . . . people were so scared to bring [their concerns] up directly to the coaches due to repercussions of scholarships being pulled, less playing time, and not, you know, buying into this 'brotherhood.'" Doe 8 Tr. at 46:22-47:3. Discovery

confirms other players expressed similar fear about participating in USF's investigation, with one noting AD McDermott "told the team 'everything can be used and acts [sic] as if everything is recorded' and it can come back to get you." Ex. 10 at -615; *see also id.* at -616 (another stating: "These are very hard lines to cross [and] this is our career- it is tough and we do not want to mess up our career, and if someone finds out if someone said something, not the best for what we have going on."). The players' fears were justified: as set forth below, USF was long aware players were cut from or otherwise driven off the baseball team in startling numbers.

### E.    <u>USF Was Long Aware of—and Permitted—the Coaches' Abuse.</u>

USF knew its failure to enact appropriate policies resulted in an abusive culture throughout its Athletic Department, from men's soccer to women's basketball.[14] The baseball team was not immune, but USF persistently ignored—or worse, actively concealed—evidence to the contrary.

The limited evidence to date demonstrates that, repeatedly throughout the class period, people elevated concerns about the Coaches to authority figures at USF—all to no avail. As early as 2000, John Doe 9's mother complained to then-AD Bill Hogan about the Coaches' abuse. Doe 9 Decl. ¶¶ 9-10. Hogan said he did not care and had no intention of stepping in to address the misconduct. *Id.* ¶ 10. Similarly, in 2013, John Doe 8's father spoke with members of USF's administration about the abuse and retaliation his son endured, including the Coaches' sexualized hazing and threats of revoking Doe 8's scholarship. Ex. 19 at -350-51; Doe 8 Tr. at 37:4-39:2. John Doe 8's father even divulged that the Coaches' abuse had led his son to contemplate suicide. Doe 8 Tr. at 37:12-38:3. Nothing came of these conversations.

In May of 2014, John Doe 6's parents sent the USF Athletic Program, Associate AD,[15] and NCAA Faculty Athletic Representative ("FAR")[16] a letter describing the Coaches' conduct and the "hostile environment" they cultivated. Doe 6 Decl. ¶ 10; Ex. 21. Noting that they wrote "to make the University aware," they described the abuse to which their son and other players were subjected—including being called "a cancer to the team," "pathetic," and "weak-minded"—and

---

[14] Ex. 38 (USF_0039959); Ex. 39 (USF_0028037).

[15] The Associate AD forwarded the communication to then-AD Sidwell. Ex. 22.

[16] USF's FAR, Jeremy Howell, described the FAR as an "institutional role . . . [that] provide[s] independent reporting on athletics related matters to the University Athletic Oversight Board and the University President directly." Ex. 23.

highlighted that he was "bull[ied] to quit [the team], because an outright termination would be something that would probably be questioned." *Id*. They also made clear that their son was not alone: "Although we may be bringing these issues forward, we assure you there are other players and parents on the team in the same situation . . . Think about how many young men are leaving the team this year with a complete and utter distaste for the USF baseball program." *Id*. at -615.

In the wake of this letter, AD Scott Sidwell expressed profound concern about "the high rate of attrition on baseball roster" and Giarratano's "lack of rationale" for pulling players' scholarships, Ex. 24, particularly in the context of players like John Doe 6 who, had only one year left before completing their degrees, Ex. 25. AD Sidwell recognized that revoking players' scholarships would "put the students, staff, department and him in a situation that would be severely criticized internally and externally in the media." *Id*. As such, AD Sidwell offered to reinstate the scholarships for John Doe 6 and another player, but, notably, did *nothing* to address the underlying complaints of abuse—his internal email regarding John Doe 6's parents' complaint does not even mention the abuse allegations. *Id*.[17] John Doe 6 explains that "[o]nly after this case was filed did [he] understand that this offer was actually an attempt to silence [him] and cover-up Giarratano and Naks' abusive behavior." Doe 6 Decl. ¶ 13.

The 2014 incident with John Doe 6 was not the first or only time USF was alerted to the baseball team's disturbingly low retention rate—USF has known since *at least* 2009, and noted it multiple times since then. *See* Ex. 26 (noting the goal for athletic team graduation rates is 70% or above, but was 41% for the 2008-2009 baseball team). In 2011, another baseball player appealed his revocation of athletic aid and asked the school to provide statistical information about non-renewals or reductions of scholarship on the baseball team as compared to other sports. Ex. 27. The school refused. *Id*. at -092. In 2014, FAR Howell expressed concern about Giarratano's decision not to renew another player's scholarship (in addition to John Doe 6), writing to AD Sidwell: "Was he failing? It cannot simply be because he was not playing well. I am always concerned when we

---

[17] Perhaps more disturbing, two weeks after the complaint was made, internal emails between AD Sidwell, FAR Howell, and Deputy AD Julie Ross reveal that they were still trying to justify terminating Doe 6 and another player by finding grounds to claim both were medically disqualified from playing. Ex. 31. Despite medical staff's "hoping we could get this done," they could not: a finding of medical disqualification would require "creat[ing] new medical issues for both of them. Which is not appropriate." *Id*.

- 12 -

ask a kid to come here, and then after 1 year, tell him we are cutting his funding to be here." Ex. 28; *see also* Ex. 29 (email from Sidwell to Giarratano asking to discuss "a big spike in non renewals"). USF then conducted an analysis of the baseball team from 2011-2016; they found that in those six years, 50 student-athletes either graduated or exhausted their NCAA eligibility while 38 either transferred to another school or left USF. Ex. 30 at -899.[18] That is, USF was aware that almost as many players *left* USF's baseball team as stayed. Similarly, a 2021 Title IX complaint by another class member revealed that nearly 60 percent of his recruiting class either transferred or intended to transfer, a fact his father noted as "a testament to the coaching staff's ruthlessness and callous player treatment." Ex. 7 (USF_0004448) at 658. The same year, Howell, the same FAR who expressed concerns *in 2014*, again noted the problem. When alerted to the fact that Giarratano intended to cut John Does 1-3 when they "have done anything that could result in having their scholarships cut," Howell responded: "Forced to leave [] play or kicked off roster if you stay . . . is the EXACT false choice that Father Paul brought up with me. . . . They were recruited, so coach them." Ex. 32. When told another freshman baseball student was transferring and AD McDermott attributed the departure to COVID, Howell said: "COVID has done a number for sure. Having said that, we need to keep an eye on graduation rates" because "precovid baseball [was] only 43%." Ex. 33; *see also* Ex. 7 at -658 (Title IX complaint noting that such "an abnormally high transfer rate . . . can't simply be explained away by the Covid-19 pandemic").

Despite knowledge of both the abuse and the troubling transfer statistics, USF did nothing to put an end to Giarratano's and Nakamura's reign or the untold harms it caused.[19] Instead, USF covered up the problem until the complaints grew too loud (and too public). In the spring of 2021, John Doe 2's parents emailed AD McDermott, demanding "an urgent in person meeting." Ex. 34. This email launched the series of events that culminated in the firing of both Coaches, an admission by USF (but only internally) that their sexual misconduct likely violated Title IX, Ex. 16 (USF's

---

[18] This document was produced on the evening of Friday, November 15, 2024, less than one week before Plaintiffs' class certification brief was due. MvK Decl. ¶ 13.

[19] This was not for lack of ability to or interest in regulating coaches. Indeed, USF placed Giarratano on probation in 2015 related to "extensive . . . [but] not exhaustive" "administrative issues," such as mismanagement of team funds and numerous NCAA bylaw violations. Ex. 24. At the time, USF was conspicuously silent on the by then well-documented accusations of abuse. *Id.* The reason is clear: USF only punished coaches when necessary to protect the bottom line.

1    Suppl. Rog. Resps.) at 3-4, and, ultimately, the filing of this lawsuit.

2    **III.    LEGAL STANDARD**

3    A class must satisfy Rule 23(a) and one of the three sections of Rule 23(b). *In re Arris Cable*

4    *Modem Consumer Litig.*, 327 F.R.D. 334, 348 (N.D. Cal. 2018). "When appropriate, an action may

5    be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4).

6    An issue class must still satisfy Rules 23(a) and (b), with the exception of Rule (b)(3)'s

7    predominance requirement. *Avilez v. Pinkerton Gov't Servs., Inc.*, 596 F. App'x 579 (9th Cir. 2015);

8    *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 633 (N.D. Cal. 2015).

9    A plaintiff need not "prove elements of their substantive case" to satisfy Rule 23. *In re*

10   *High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1187 (N.D. Cal. 2013). "Merits questions

11   may be considered to the extent—but only to the extent—that they are relevant to determining

12   whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466. This

13   "determination can only be decided after the district court undertakes a 'rigorous analysis' of the

14   prerequisites for certification." *ABS Ent., Inc. v. CBS Corp.*, 908 F.3d 405, 427 (9th Cir. 2018)

15   (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011)).

16   **IV.    ARGUMENT**

17   Significant key discovery remains outstanding.[20] Yet it is already clear this case meets the

18   requirements for Rule 23(c)(4) certification: all Rule 23(a) requirements are satisfied, and classwide

19   determination of the common issues will promote the fair, cost-effective, and consistent

20   adjudication of them for the class. Plaintiffs' trial plan eliminates the need for multiple factfinders

21   to make repeat determinations on these issues, while preserving Defendants' ability to defend the

22   claims as they see fit, including (in the event of a liability finding on any issue) by contesting class

23   members' damages. This is consistent with the Ninth Circuit's guidance on phased proceedings.

24   *See Jimenez*, 765 F.3d at 1167-68 (adopting the prevailing view that "determination of damages

---

25   [20] On September 16, 2024, the Court ordered Plaintiffs to identify the discovery "key to class

26   certification," and Defendants to "provide their timeline for production." ECF No. 235. Plaintiffs
     identified this key discovery, but none of the Defendants have come close to completing production

27   of it (or even providing the timeline ordered by the Court). MvK Decl. ¶¶ 6-9. Moreover, there are
     numerous discovery disputes briefed but still pending, including over critical evidence such as the

28   testimony and evidence developed in the Giarratano-USF arbitration. *Id*. *See ABS Ent.*, 908 F.3d at
     427 (noting need to permit appropriate discovery before "undertak[ing] that [Rule 23] analysis").

may be reserved for individual treatment with the question of liability tried as a class action").[21]

### A.    The Class Satisfies All Four Requirements of Rule 23(a).

Rule 23(a) is satisfied if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Plaintiffs easily clear the low threshold requirements of Rule 23(a).

### 1.    The Class Is Sufficiently Numerous.

Although no strict numerical test applies, courts in this Circuit generally find the numerosity requirement met with at least 40 class members. *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010). Here, the proposed class includes hundreds of student-athletes,[22] making joinder of all class members impracticable and satisfying the numerosity requirement.

### 2.    There Is at Least One Common Question with a Common Answer.

Certification is appropriate where "a classwide proceeding [can] generate common *answers* apt to drive the resolution of the litigation." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) (emphasis in original) (quoting *Wal-Mart*, 564 U.S. at 350). Commonality is a "flexible standard," *Parra v. Bashas', Inc.*, 536 F.3d 975, 978 (9th Cir. 2008), that is "construed permissively," *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Not "*every* question of law or fact must be common to the class; all that Rule 23(a)(2) requires is 'a single *significant* question of law or fact.'" *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (emphasis in original) (cleaned up). That common question need not be one that "will be answered on the merits, in favor of the class." *Amgen*, 568 U.S. at 459. It must only "be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims." *Wal-Mart*, 564 U.S. at 350.

Here, the proposed class' claims involve numerous questions of law and fact that arise from

---

[21] Citing *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 853-55 (6th Cir. 2013), *Butler v. Sears, Roebuck & Co. ("Butler II")*, 727 F.3d 796, 801-02 (7th Cir. 2013), *In re Deepwater Horizon*, 739 F.3d 790, 810-17 (5th Cir. 2014).

[22] *See* MvK Decl., ¶ 13 (citing USF_0101896).

- 15 -

conduct common to the class. Indeed, all of the questions posed below are common because, should

the Court answer them in the negative, that answer would end this litigation for *all class members*.

*See Amgen*, 568 U.S. at 470 (noting that the requirements of Rule 23(b)(3), more than is required

here, will be satisfied where the common questions possess "a fatal similarity") (citation omitted).

<u>Discrimination Claims.</u>  Plaintiffs and the class bring sex discrimination claims under

Title IX and California law, asserting post-assault and pre-assault theories of liability as well as

retaliation. All theories raise common questions that will be answered with common evidence.[23]

*First*, to prove a post-assault claim, a plaintiff must show: (1) the school had "substantial

control" over the accused; (2) the harassment was "so severe, pervasive, and objectively offensive

that it can be said to deprive the [plaintiff] of access to the educational opportunities or benefits";

(3) an official with "authority to address the alleged discrimination and to institute corrective

measures" had knowledge of the harassment; (4) the school acted with "deliberate indifference,"

"such that the school's 'response to the harassment or lack thereof [was] clearly unreasonable in

light of the known circumstances'"; and (5) this deliberate indifference either caused the

harassment or made the plaintiff "vulnerable to it." *Karasek v. Regents of Univ. of Cal. ("Karasek

II")*, 956 F.3d 1093, 1105 (9th Cir. 2020) (citations omitted). The school's knowledge need not

be of current abuse; this element "is met when an appropriate official has actual knowledge of a

substantial risk of abuse . . . based on prior complaints of other students." *Roe ex rel. Callahan v.

Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1030 (E.D. Cal. 2009) (citation omitted).

Here, resolution of Plaintiffs' post-assault theory raises numerous common questions that

will be answered with common evidence:

    1. Whether USF had substantial control over the Coaches;

    2. Whether the Coaches' harassment was severe, pervasive, and objectively offensive;

---

[23] These are Counts I (Title IX) and V (California Education Code), respectively. The Court already held that the "Title IX analysis governs the [California Education Code] § 66270 claim." *Doe 1 v. Nat'l Collegiate Athletic Ass'n*, 2023 WL 105096, at *15 (N.D. Cal. Jan. 4, 2023) (citing *Videckis v. Pepperdine Univ.*, 100 F. Supp. 3d 927, 935 (C.D. Cal. 2015)).

There is, however, one notable distinction between Plaintiffs' federal and state discrimination claims: damages and fees not available under Title IX may still be recoverable under California law. *See Videckis*, 2017 WL 11633265, at *2 (punitive damages); Cal. Code Civ. P. § 1021.5 (catalyst fees). This distinction is not relevant to the present motion, as Plaintiffs do not seek to certify damages and fee issues under Rule 23(c)(4).

- 16 -

3.  Whether a USF official (of which Giarratano is one) knew of the harassment;

4.  Whether USF acted with "deliberate indifference" to the harassment; and

5.  Whether this indifference made Plaintiffs and the class "vulnerable" to harassment.

Courts find that common questions of this nature satisfy Rule 23(a). In *Rapuano v. Trustees of Dartmouth College*, for example, plaintiffs brought a class Title IX claim alleging Dartmouth was aware that three professors created a sexually hostile environment for female students in a particular department. 334 F.R.D. 637, 642 (D.N.H. 2020). The court found that whether the professors' harassment was severe, pervasive, and objectively offensive was a common question that could be answered with common evidence because "the professors' misconduct created a baseline of equally egregious sexual harassment to which all class members were subjected." *Id.* at 647-48.[24]

*Second*, to prove a pre-assault claim, a plaintiff must show: "(1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was 'so severe, pervasive, and objectively offensive that it can be said to have deprived the plaintiff of access to the educational opportunities or benefits.'" *Karasek II*, 956 F.3d at 1112 (cleaned up). "[A] plaintiff is not required to allege that the school had actual knowledge that the *plaintiff* experienced sexual harassment or assault or that the school responded with deliberate indifference to the *plaintiff*'s experience of sexual harassment or assault." *Barnett v. Kapla*, 2020 WL 7428321, at *6 (N.D. Cal. Dec. 18, 2020) (emphasis supplied). The focus is on the school's indifference to reports of sexual misconduct, generally. *Id.*

Here, resolution of Plaintiffs' pre-assault claim raises numerous common questions that will be answered with common evidence:

1.  Whether USF had a policy of deliberate indifference to reports of sexual misconduct;

2.  Whether this indifference created a heightened risk of sexual harassment in a context (its baseball program) subject to USF's control; and

3.  Whether the class suffered severe, pervasive, and objectively offensive harassment.

Such questions are well-suited for class disposition. In *Karasek v. Regents of Univ. of Cal. ("Karasek I")*, plaintiffs alleged the university inadequately educated students about sexual

---

[24] Though *Rapuano* was certified in the settlement context, the court made clear that its analysis was no less rigorous than if it had been analyzing the class for litigation. 334 F.R.D. at 643-44.

misconduct, inadequately trained faculty on same, and ignored prior complaints. 500 F. Supp. 3d 967, 985-86 (N.D. Cal. 2020). None of these facts were specific to plaintiffs; all provided common support for finding the university had "a policy of deliberate indifference to reports generally," which "would naturally create an 'obvious' risk" as to sexual assault in a similar context. *Id.* at 987-89.[25] Similarly, in *Simpson v. University of Colorado Boulder*, where plaintiffs alleged they were sexually assaulted by football recruits, the court found evidence sufficient to establish that the university had an official policy of deliberate indifference. 500 F.3d 1170, 1173 (10th Cir. 2007). Again, the court cited common evidence: reporting about sexual misconduct within college programs, an article on misconduct by players at Boulder, a prior complaint (not by plaintiffs), that the handbook "does not . . . address the risk of sexual assault or harassment in the recruiting program," and the coach's "hostility to those alleging sexual harassment." *Id.* at 1183-84.

As in *Karasek, Rapuano*, and *Simpson*, Plaintiffs will offer common evidence to prove their post- and pre-assault theories, some of which is detailed above: USF lacks (and has throughout the class period) policies addressing coach-athlete misconduct, lacks appropriate reporting mechanisms, fails to educate students or train staff regarding sexual misconduct, ignored complaints about the Coaches' misconduct dating back to at least 2000, and the Coaches maintained a culture of secrecy and outward hostility to reporters of misconduct. *See supra* § II.B; Boland Rep. § V.E. Whether (or not) this evidence is sufficient to prove USF's liability on these claims is therefore a question that will be answered in the same way for all class members.[26]

*Finally*, to prove retaliation, a plaintiff must show: protected activity, adverse action, and a causal link. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014). Protected activity includes "speak[ing] out against sex discrimination." *Emeldi v. Univ. of Or.*, 698 F.3d 715, 725 (9th Cir. 2012); *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1126 (E.D.

---

[25] *See also Karasek v. Regents of Univ. of Cal. ("Karasek III")*, 534 F. Supp. 3d 1136, 1150 (N.D. Cal. 2021) ("If a school intentionally (or with deliberate indifference) adopts a policy of systemically failing to adequately educate students about sexual misconduct, that would seem to be just as much an 'intentional' act as a policy of ignoring reports of sexual misconduct.").

[26] With respect to Plaintiffs' claim regarding USF's harassment policy under California Education Code § 66281.5 (Count VI), this too will turn on common evidence regarding the common content of USF's policy over time and USF's universal failure to properly distribute it. *See supra* § II.B (detailing deficiencies in USF's policies and Does' testimony regarding failure to distribute them).

Cal. 2006) ("[C]omplaining informally . . . is a protected activity, as is complaining about the discriminatory treatment of others."). Class retaliation claims are appropriate even where "many of the class members had not even been 'members of the [] team at the time of retaliation,'" provided they "had been affected by the retaliation and were within the zone of interests protected by Title IX." *A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 841 (9th Cir. 2022) (citation omitted).

Here, resolution of Plaintiffs' retaliation claim raises numerous common questions:

1. Whether members of the USF baseball team engaged in protected activity; and

2. Whether that activity was met with retaliation that resulted in a broader deterrent effect within the USF baseball team.

Courts find that questions of this nature satisfy Rule 23(a). The Ninth Circuit recently reversed an order denying certification of a Title IX retaliation claim, rejecting the argument that the underlying retaliation was "'unique to the named Plaintiffs' and [] therefore 'not typical of the proposed class.'" *A. B.*, 30 F.4th at 834. The Court held that where, as here, the "retaliation had a deterrent effect on female students more generally . . . that many of the class members were not the direct targets of the alleged retaliation would not necessarily be a bar to classwide relief." *Id.* at 841.

As in *A.B.*, common evidence will show the Coaches' retaliation—including a years-long, documented practice of running players who refused their sexual conduct off the team—had the "effect of broadly dissuading [players] from 'raising the issue of sex discrimination' out of fear that the [Coaches] would likewise retaliate against them." *Id.* at 840; *see also supra* § II.D.

Negligence Claims. To prove negligence,[27] Plaintiffs and the class must show that the "defendant[s] had a duty to use due care, that [they] breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Vasquez v. Residential Invs., Inc.*, 118 Cal. App. 4th 269, 278 (2004). The elements of duty and breach present common questions. Whether USF (as an employer) is vicariously liable for the Coaches' misconduct, or directly liable for its own negligent hiring, supervision, and retention of them, likewise raises common questions.[28]

---

[27] Plaintiffs' negligence claims are: Counts III (negligent supervision and retention of Nakamura), IV (negligent supervision and retention of Giarratano), VII (gross negligence), VIII (negligence), IX (negligence failure to warn), and XI (negligent infliction of emotional distress). TAC at 106-15.

[28] Plaintiffs will use common evidence to demonstrate gross negligence: breaches were "an extreme departure from the ordinary standard of conduct." *Rosencrans v. Dover Images, Ltd.*, 192 Cal. App. 4th 1072, 1082 (2011). Plaintiffs' negligent infliction of emotional distress claim mirrors their negligence claim. *Hall v. Apollo Grp., Inc.*, 2014 WL 4354420, at *6 (N.D. Cal. Sept. 2, 2014).

A duty may arise in the context of a "special relationship." *Regents of Univ. of Cal. v. Super. Ct.*, 4 Cal. 5th 607, 619 (2018). The California Supreme Court has already held "that universities have a special relationship with their students and a duty to protect them from foreseeable violence during curricular activities." *Id*. at 613. Courts may also weigh the *Rowland* factors of foreseeability and public policy to determine whether a duty exists. *Id.* at 629. "[T]he court's task is not to decide whether a particular plaintiff's injury was reasonably foreseeable," but rather "to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced." *Id.* (cleaned up). However, case-specific evidence, such as notice to the defendant that a particular individual posed a foreseeable risk, will weigh in favor of foreseeability. *Id.* at 630. In examining public policy, courts weigh "moral blame," the "overall policy of preventing future harm," the "burden that recognizing a tort duty would impose on the defendant and the community," and "availability of insurance for the risk involved." *Id*. at 631-33 (emphasis omitted). In *Regents*, for example, the Court concluded that "colleges will typically have access to more information about potential threats and a superior ability to control the environment and prevent harm," *id*. at 631-32, and "recognizing a legal duty to protect students from foreseeable threats would [not] pose an unmanageable burden," *id*. at 633. The Court therefore reversed the lower courts' duty rulings, finding instead "that universities owe a duty to protect students from foreseeable violence during curricular activities." *Id*. at 634.

Once a duty is established, breach may be shown by demonstrating that the defendant's actions were not reasonable in light of those risks. *Id.* at 633. Evidence that a school or supervisor was on notice of a risk may be evidence of breach because it goes to reasonableness. *Id.* at 630.

Finally, an employer may be found vicariously liable for the acts of its employees "arising out of the employment," including "willful and malicious torts of an employee as well as negligence." *Farmers Ins. Grp. v. Cty. of Santa Clara*, 11 Cal. 4th 992, 1003-04 (1995). Alternatively, an employer and supervisors may be found directly liable for the negligent hiring, supervision, and retention of employees. *See Delfino v. Agilent Techs., Inc*., 145 Cal. App. 4th 790, 815 (2006) ("Liability for negligent supervision and/or retention of an employee is one of direct liability for negligence, not vicarious liability."). Liability for negligent hiring, supervision,

or retention requires a showing that "the employer knew or should have known the employee was or became unfit or incompetent." CACI No. 426 (cleaned up, citing authorities). And the employees themselves may of course be held individually liable for their own tortious conduct. *C.A. v. William S. Hart Union High Sch. Dist.*, 53 Cal. 4th 861, 875 (2012).

Resolution of the proposed class's negligence claims will therefore present the following common issues that should be resolved on a class-wide basis:

1. Whether a special relationship exists between USF and the USF baseball players, or between the USF baseball coaches and USF baseball players;

2. Whether abuse by the Coaches was foreseeable to USF, or abuse by Nakamura foreseeable to Giarratano;

3. Whether recognizing a duty as to USF or the Coaches is consistent with public policy;

4. Whether USF was on notice of the risks posed by the Coaches, or Giarratano on notice of the risks posed by the Nakamura;

5. Whether USF failed to take reasonable steps with respect to the Coaches, or Giarratano with respect to Nakamura, including by not terminating or adequately supervising;

6. Whether the Coaches' conduct arose out of their employment; and

7. Whether, as head coach, Giarratano was responsible for the conduct of his subordinates.

Questions of this nature satisfy Rule 23(a). *See Hilario v. Allstate Ins. Co*., 642 F. Supp. 3d 1048, 1060 (N.D. Cal. 2022) (certifying class negligence claim; finding that "[w]hether Allstate breached a duty to insureds by [taking certain action] are common questions of law and fact 'capable of class-wide resolution'") (citation omitted), *aff'd*, 2024 WL 615567 (9th Cir. Feb. 14, 2024).

### 3.    <u>Plaintiffs' Claims Are Typical of the Class.</u>

The typicality requirement is met when the class representative's claims rest on the same legal theory as those of absent class members. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). The claims of named plaintiffs and class members need not be identical, and "different factual circumstances" do not defeat typicality. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).

The Plaintiffs' claims are typical of the class because they arise from the same course of conduct by Defendants and are rooted in identical legal theories. As set forth above, Plaintiffs' discrimination claims turn on the severity of the Coaches' misconduct, whether USF acted with deliberate indifference to that misconduct, and whether USF's indifference created a heightened

risk of abuse—questions that do not vary between Plaintiffs and the class. *See, e.g., Rapuano*, 334 F.R.D. at 648 (finding named plaintiffs typical in similar class Title IX case). Plaintiffs' negligence claims likewise advance the same duty owed to all class members (to protect from sexual misconduct) and the same breach of that duty (failure to take reasonable steps to do so). *See, e.g., Hilario*, 642 F. Supp. 3d at 1061-62 (finding named plaintiff typical in negligence case).

### 4.  Plaintiffs and Counsel Have and Will Adequately Represent the Class.

Adequacy is satisfied when (1) the plaintiff and counsel have no conflicts with the class; and (2) the plaintiff will "prosecute the action vigorously." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Only conflicts that are "fundamental to the suit and that go to the heart of the litigation" inform adequacy. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (citation omitted). Plaintiffs and their counsel satisfy this "adequacy" prong.

First, the Does do not have any interests antagonistic to or in conflict with the interests of the class. They and the class share a common interest in establishing Defendants' legal obligations under federal and state law, and in proving that Defendants failed to discharge those obligations here. At base: Plaintiffs and the class share the common goal of holding USF and the Coaches to account for their past misconduct, and in guaranteeing that USF take reasonable steps to protect student-athletes from similar misconduct in the future. *See, e.g., Rapuano*, 334 F.R.D. at 648 (finding named plaintiffs adequate in similar class Title IX case).

Second, Plaintiffs have already shown their ability to handle and willingness to participate in significant and complex litigation on behalf of all the class. They reviewed countless pleadings and responded to significant discovery, including enduring forensic scans of their electronic devices, granting unfettered access to their medical records and social media feeds, supplementing their discovery responses to address questions from Defendants, and (for some) sitting for depositions.[29] They also submitted to psychiatric assessments to diagnose the past, current, and long-term impact of the Coaches' sexual misconduct and the USF's failure to prohibit such

---

[29] Doe 1 Decl. ¶¶16-18; Doe 2 Decl. ¶¶17-19; Doe 3 Decl. ¶¶12-14; Doe 4 Decl. ¶¶13-15; Doe 5 Decl. ¶¶21-23; Doe 6 Decl. ¶¶27-29; Doe 8 Decl. ¶¶11-13, 16; Doe 9 Decl. ¶¶16-18; Doe 10 Decl. ¶¶18-20; Doe 11 Decl. ¶14; Doe 12 Decl. ¶¶20-22; Doe 13 Decl. ¶¶17-19; Doe 14 Decl. ¶¶14-16.

misconduct.[30] Moreover, they have not been deterred by Defendants' at times outwardly antagonist conduct in this litigation, including during depositions.[31]

Finally, proposed class counsel have demonstrated their commitment to representing the class in this litigation. Counsel began investigating Plaintiffs' case in December 2021 and have since devoted substantial time and resources necessary to prosecute this action.[32] Counsel have extensive experience in prosecuting complex litigation, including class actions and cases related to sexual misconduct. [33] They will continue to commit substantial resources to vigorously pursue this litigation on behalf of the class. [34] Adequacy is satisfied.

## B.    The Class Is Appropriate for Issue Certification under Rule 23(c)(4).

Plaintiffs seek certification only "with respect to particular issues" that will drive resolution for the entire class. Fed. R. Civ. P. 23(c)(4). The Ninth Circuit has long recognized the propriety of such issue classes: "Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues . . . and proceed with class treatment of these particular issues." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *see also Jimenez*, 765 F.3d at 1164 (affirming a district court order that took this approach); *Amador v. Baca*, 2016 WL 8904537, at *3 (C.D. Cal. Nov. 18, 2016) ("[T]he Ninth Circuit endorses 23(c)(4) liability classes."); *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 244 (N.D. Cal. 2014) (certifying an issue class under Rule 23(c)(4) "solely for purposes of determining liability").

### 1.    Determination of Common Issues Will Drive Resolution of this Action.

An issue class may be certified when it will "materially advance the litigation." *Tasion Commc'ns*, 308 F.R.D. at 633. Courts recognize that issue certification offers efficiencies by "carving at the joints of the parties' dispute." *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003); *see also Butler v. Sears, Roebuck & Co.* ("*Butler I*"), 702 F.3d 359, 362 (7th Cir.

---

[30] Doe 1 Decl. ¶¶20-21; Doe 2 Decl. ¶¶21-22; Doe 3 Decl. ¶16; Doe 4 Decl. ¶¶9, 17; Doe 5 Decl. ¶¶17, 25; Doe 6 Decl. ¶¶15, 31; Doe 8 Decl. ¶¶7, 15; Doe 9 Decl. ¶¶12, 20; Doe 10 Decl. ¶¶14, 21; Doe 11 Decl. ¶¶10, 18; Doe 12 Decl. ¶¶16, 24; Doe 13 Decl. ¶¶13, 20; Doe 14 Decl. ¶¶10, 18.

[31] *E.g.*, Doe 3 Tr. at 168:18-21.

[32] *See* Selbin Decl., ¶ 17; Fegan Decl., ¶. 14.

[33] *See* Selbin Decl., ¶¶ 2-14, Ex. 35 (resume); Fegan Decl., ¶¶ 3-12, Ex. A(resume).

[34] *See* Selbin Decl., ¶ 16; Fegan Decl., ¶ 14.

1  2012) ("Is it more efficient, in terms both of economy and judicial resources and of the expense of

2  litigation to the parties, to decide some issues on a class basis or all issues in separate trials?").

3       Plaintiffs detail above multiple common questions on their discrimination and negligence

4  claims. Rule 23(c)(4) certification of each question is appropriate, as resolution of each will

5  "accurately and efficiently resolve the question of liability, while leaving the potentially difficult

6  issue of individualized damage assessments for a later day." *Kamakahi v. Am. Soc'y for Reprod.*

7  *Med.*, 305 F.R.D. 164, 176 (N.D. Cal. 2015) (citing *Jimenez*, 765 F.3d at 1164). Indeed, the answers

8  will depend on facts concerning USF's uniform policies (or lack thereof) and the Coaches' decades-

9  long pattern of sexual misconduct, not the conduct of any one Doe or class member.

10       **2.     A Class Is Manageable and Superior to Multiple Individual Actions.**

11       Rule 23(b)(3) also asks whether "a class action is superior to other available methods for

12  fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Certification is

13  appropriate where resolving common issues "in one fell swoop would conserve the resources of

14  both the court and the parties." *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 416

15  (6th Cir. 2018). The inquiry is comparative, asking courts to weigh the relative benefits of

16  proceeding with and without a class. *See, e.g.*, *Levya v. Medline Indus. Inc.*, 716 F.3d 510, 515

17  (9th Cir. 2013) (reversing where the "district court concluded that class certification is not the

18  superior method of adjudication but did not suggest any other means for putative class members

19  to adjudicate their claims"); *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir.

20  2009) ("[W]e are not assessing whether this class action will create significant management

21  problems, but instead determining whether it will create relatively more management problems

22  than any of the alternatives.") (citation omitted).

23       Consistent with Ninth Circuit precedent, Plaintiffs propose first proceeding with a class

24  trial on the common issues, followed by proceedings to adjudicate any issues (including damages)

25  specific to each class member. *Jimenez*, 765 F.3d at 1168 (citing *Butler II*); *see also Butler II*, 727

26  F.3d at 800 (a trial "limited to determining liability on a class-wide basis, with separate hearings

27  to determine [] the damages of individual class members . . . is permitted by Rule 23(c)(4) and

28

- 24 -

will often be the sensible way to proceed").[35] The bifurcation of common and individual issues (including damages) will create substantial efficiencies. *See McMahon v. LVNV Funding, LLC*, 807 F.3d 872, 876 (7th Cir. 2015) ("It is well established that, if a case requires determinations of individual issues of causation and damages, a court may bifurcate the case into a liability phase and a damages phase.") (cleaned up). Indeed, a class trial on the common issues is plainly superior to hundreds of individual trials on these same issues, using the same evidence. *See Avilez*, 596 F. App'x 579-80 (reversing and ordering district court on remand to "certify a class under Federal Rule of Civil Procedure 23(c)(4) on the issue whether there exists a prima facie case for liability," and if so, "proceed to entertain [defendant's] affirmative defenses and cull the class accordingly").

The privacy interests at stake—the same interests that continue to necessitate Doe pleading for the Plaintiffs—also strongly favor a class action over individualized trials on all issues. *See, e.g.*, *Doe v. Roman Catholic Diocese of Covington*, 2006 WL 250694, at *5 (Ky. Cir. Ct. Jan. 31, 2006) (noting that use of a class action "encouraged a large number of people to come forward who would otherwise never have done so had they been left to their individual devices").

Finally, the relatively small size of the class will make determination of individual issues manageable. *See, e.g.*, *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 627 (5th Cir. 1999) (upholding superiority finding where "the class would consist of only hundreds, instead of millions, of members"). Conversely, Defendants' conduct in this matter demonstrates that individual trials on common issues would be unmanageable and unfair. As the Court has seen firsthand, getting even basic discovery from Defendants has required significant time and expense from Plaintiffs. Selbin Decl. ¶¶ 17-18. Forcing Plaintiffs—and all other class members—to complete discovery (and try these common issues) alone would quickly overwhelm and make financially unviable any one of their individual cases—effectively rewarding Defendants for their discovery misconduct.

## V.    <u>CONCLUSION</u>

Plaintiffs respectfully request that the issues above be certified pursuant to Rule 23(c)(4).

---

[35] *See also, e.g.*, *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 540 (N.D. Cal. 2012) (bifurcated trial plan, in which liability is determined in phase one while entitlement to relief is adjudicated individually in phase two, "presents a manageable way to adjudicate" class members' claims); *Galvan v. KDI Distrib. Inc.*, 2011 WL 5116585, at *12 (C.D. Cal. Oct. 25, 2011) (a "workable trial plan" supported superiority finding).

1    Dated:  November 21, 2024      Respectfully submitted,

2

3                           By:/s/ Jonathan D. Selbin

                               JONATHAN D. SELBIN (Cal. Bar No. 170222)

                               jdselbin@lchb.com

4                           MICHELLE LAMY (Cal. Bar No. 308174)

                               mlamy@lchb.com

5                           LIEFF CABRASER HEIMANN & BERNSTEIN

6                           275 Battery Street, 29th Floor

                               San Francisco, CA  94111-3339

7                           Telephone: (415) 956-1000

                               Facsimile: (415) 956-1008

8

9                           JESSICA A. MOLDOVAN

                               (admitted pro hac vice)

                               jmoldovan@lchb.com

10                          LIEFF CABRASER HEIMANN & BERNSTEIN

11                          250 Hudson Street, 8th Floor

                               New York, NY 10013

12                          Telephone: (212) 355-9500

                               Facsimile: (212) 355-9592

13

                          ELIZABETH A. FEGAN (Cal. Bar No. 355906)

14                          beth@feganscott.com

                               FEGAN SCOTT LLC

15                          150 S. Wacker Dr., 24th Floor

                               Chicago, IL 60606

16                          Telephone: (312) 741-1019

                               Facsimile: (312) 264-0100

17

18                          LYNN A. ELLENBERGER

                               (admitted pro hac vice)

19                          lynn@feganscott.com

                               FEGAN SCOTT LLC

20                          500 Grant St., Suite 2900

                               Pittsburgh, PA 15219

21                          Telephone: (412) 346-4104

                               Facsimile: (312) 264-0100

22                          MICHAEL VON KLEMPERER

                               (admitted pro hac vice)

23                          mike@feganscott.com

                               FEGAN SCOTT LLC

24                          1763 Columbia Road NW, Suite 100

                               Washington, DC 20009

25                          Telephone: (202) 921-0002

                               Facsimile: (312) 264-0100

26

                          *Attorneys for Plaintiffs and the Proposed Class*

27

28