# MOTION EXHIBIT 1

*John Doe 1, et al. v. University of San Francisco, et al.*

Case No. 3:22-cv-01559-LB

Expert Report of Robert Boland, J.D.

November 21, 2024

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     QUALIFICATIONS AND EXPERIENCE ......................................................... 1

III.    ASSIGNMENT ................................................................................................... 5

IV.     SUMMARY OF OPINIONS .............................................................................. 6

V.      OPINIONS .......................................................................................................... 8

        A.      Due to the Nature of NCAA Intercollegiate Athletics, College
               Coaches Exercise Significant Control Over Student-Athletes.................. 8

        B.      Due to the Significant Control College Coaches Exercise Over
               Student Athletes, All Sexualized Interactions Between Coaches
               and Student Athletes are Abusive. ......................................................... 12

        C.      USF Exercises Significant Control Over Coaches – Except with
               Regard to Sexual Conduct Directed to Student-Athletes........................ 18

        D.      USF Exercises Control Over Student-Athletes, But Fails to
               Educate, Train, or Warn Student-Athletes About the Risk of
               Sexual Conduct by Coaches.................................................................... 21

        E.      USF's Failure to Enact and Enforce Policies Regarding the
               Prohibition of Sexual Communications and Sexual Conduct by
               Coaches with Their Student-Athletes Created a Culture of Abuse.......... 26

VI.     CONCLUSION .................................................................................................. 31

## I.    INTRODUCTION

1.    I have been asked by Plaintiffs' counsel to provide an expert report in the matter of *John Doe 1, et al. v. University of San Francisco, Anthony N. (aka Nino) Giarratano, Troy Nakamura*, No. 3:22-cv-01559-LB (N.D. Cal.). I refer to University of San Francisco as USF, and Anthony N. Giarratano and Troy Nakamura as the Coach Defendants.

## II.    QUALIFICATIONS AND EXPERIENCE

2.    I am a lawyer and an expert in sports management and leadership with experience in sports administration, sports management, and intercollegiate sports. I have spent forty years in jobs directly related to or adjacent to intercollegiate sports, beginning with my own recruitment to play NCAA Division I sports in the early 1980s.

3.    After completing my undergraduate education at Columbia University, I remained at the institution to work in its athletic department. I then served as a graduate assistant at the University of Tennessee in its Women's Athletics Department from 1990 to 1992.

4.    Early in my career, I was a sports agent, representing athletes post-college in their subsequent professional careers. My recruitment of these athletes began during the college eligibility of these athletes, and was based on my experience inside college athletic departments and knowledge of the NCAA rules. During this period, I worked with care and in cooperation with college athletic department staffers, especially athletic compliance directors.

5.    From 2001 to 2015, I was a faculty member at New York University ("NYU"), where I quickly rose to be an Associate Clinical Professor and Academic Chair of the Preston Robert Tisch Center for Hospitality, Tourism, and Sports Management. While at NYU, I was also the founding professor of its graduate sports management program. A significant portion of the courses I taught and helped develop pertained to the nature of collegiate athletics.

6.    In 2015, I moved to Ohio University, as an Executive in Residence in its Business School and Director of its renowned MBA/Masters of Sports Administration ("MSA") program. Given Ohio University's history as the first graduate program devoted to the study of sports as a business and as a well-known training ground for future college athletic leaders, I tailored the courses I taught to be more focused on collegiate athletics and its evolving legal and practical

challenges. One of the courses I developed included a one-credit intensive course taught in Indianapolis, Indiana at NCAA's Headquarters and with participation from multiple NCAA staff members.

7.      The sum of all my collegiate athletic experiences combined in 2017, when I was hired by the President, Chief Ethics and Compliance Officer, and the Board of Trustees to be the Athletics Integrity Officer at Penn State University. The Athletics Integrity Officer position was created as the result of a consent decree between Penn State, the NCAA, and the Big Ten Conference in the wake of the Penn State football coach Jerry Sandusky child sex abuse scandal.

8.      During the initial Athletics Integrity Officer's three-year tenure, the role was the internal portion of an internal and external monitoring program of university processes, specified by the consent decree, to prevent the recurrence of the environment that enabled Sandusky's predations. The person occupying the Athletics Integrity Officer role met with the NCAA and the Big Ten Conference on a quarterly basis to discuss the status of the Athletics Department's compliance with the requirements set forth in the consent decree.

9.      When I joined Penn State in July of 2017, the consent decree was set to expire by its own terms in September of 2017. In this role, I helped lead Penn State out of the mandated terms of the consent decree into the largest voluntary university oversight program of athletics to date.

10.     During my five years as Penn State's Athletics Integrity Officer, I conducted more than 40 individual or joint investigations (with other university officers) relating to alleged violations of NCAA and Big Ten rules, as well as issues pertaining to athlete well-being, coaching abuse, violations of school policy, academic integrity, and other types of policy situations including matters arising out of athletics involving hazing and Title IX.

11.     As Athletics Integrity Officer, I served as a university administrator. I worked closely with the NCAA athletics compliance director on campus who was departmental director but not part of university administration and lacked an administrator title. Because of the close nexus between our two areas of focus, I worked closely with our NCAA compliance staff and supported and collaborated on investigations together with that office. I was involved at the

executive level of the university regarding most NCAA mandates and policy responses that required university wide attention. I also convened the main oversight body of athletics on campus, the Athletics Integrity Council, and reported to the University president and board of trustees.[1]

12.     In 2022, I returned principally to full-time academic work as an Assistant Professor of Law at Seton Hall University Law School, where I teach a series of sports-related courses. I also maintain a boutique outside practice as an of Counsel attorney to the Hospitality, Leisure and Sports Business practice group at Shumaker, LLC. In both capacities, my work is centered around collegiate athletics. I have on several occasions in practice represented coaches in connection with NCAA investigations. I have also advised individuals and institutional clients regarding their potential exposure in certain types of situations involving sexual assault, sexual misconduct, coaching abuse, discrimination, and hazing.

13.     In total, I have spent 22 years holding academic appointments in a variety of academic programs, including graduate, professional, and undergraduate programs. These include 15 years at NYU with an additional appointment at NYU Law School; two years at Ohio University; and three years with teaching appointments at Penn State in its Law School and in its School of Labor and Employment Relations. For the past two years, I have been and am currently faculty at Seton Hall in its School of Law. The only period since 2001 in which I have not held a full-time university teaching appointment, was my first year and a half at Penn State, 2017-18, when I was acclimating to my new role as Athletics Integrity Officer.

14.     I have taught the following courses relevant to intercollegiate athletics: (at Seton Hall) *Sports Law*, *Collegiate Sports Law Seminar*, *Name, Image, & Likeness* also at Boston College*; (at Penn State) *Representing the Professional Athlete; Collective Bargaining in Sports; The Employment Relationship: Law & Policy*; (at Ohio) *the Law of Sports* and a special topics course in *Collegiate Sports Governance* taught at the NCAA offices in Indianapolis; (at NYU) *Economics and Finance of Sports Industry, Legal Issues in Sports, Introduction to Sports*

---

[1] Nothing in this report or in the testimony that I will provide will reveal any privileged information that I learned during my tenure as Penn State's Athletics Integrity Officer.

*Management Structures and Processes of Sports Industries, Foundations of Sport and Leisure Behavior; Leadership and Management in Sport; Sports Law; Contracts and Negotiations; Antitrust and Collective Bargaining.*

15.    I am currently under contract for a book on Name, Image, and Likeness with Human Kinetics. I am author or co-author of approximately fourteen book chapters or treatise contributions, many of which are related to collegiate athletics. I am also the author or co-author of seven peer-reviewed journal articles related to sports or sports law topics. I have made approximately thirty peer-invited presentations.

16.    I am regularly sought out as an expert on intercollegiate athletics and other sports management topics, including by media outlets such as The New York Times, The Wall Street Journal, CNN, MSNBC, Bloomberg Television, CBS Sports Radio, ESPN: The Magazine, Sports Illustrated, Fortune, Sports Business Journal, and others.

17.    I received my bachelor's degree in American History from Columbia University, where I was a two-sport college varsity athlete. I received my juris doctorate degree from Samford University's Cumberland School of Law. I did additional graduate study in Communications focused on Sports Communication at the University of Tennessee, Knoxville, while working in the Women's Athletics Department at Tennessee.

18.    In terms of relevant additional training or experience, I have led a cultural review of Rugby Canada's high-performance men's and women's national teams culture in 2022 as an independent co-chair. I have been an independent member of USA Weightlifting's Ethics Committee since 2021. I have completed the US Center for SafeSport's annual training. I have also completed Title IX Coordinator Training conducted by the National Association of College Attorneys. I also work with USA Rugby on SafeSport compliance as part of my work at Shumaker.

19.    Appended to this report as Appendix 1 is a current copy of my *curriculum vitae*, which contains a more detailed description of my professional background, including a list of all publications authored.

20.     My rate for time spent working on this case (including for my report and any testimony) is $1,100 per hour, which is not contingent on my opinions or the outcome of this matter.

## III.     ASSIGNMENT

21.     I understand that Plaintiffs filed this lawsuit individually and on behalf of a class defined as: "All members of the University of San Francisco baseball team since 2000."[2]

22.     Plaintiffs allege that USF has failed to provide USF baseball players a safe environment free from sexual communications, sexual conduct, and grooming behaviors (such as hazing) by their coaches.[3] Plaintiffs allege that USF failed to fulfill its duties to student-athletes by failing to, for example, adopt, implement, and enforce appropriate policies and procedures to prevent, or properly respond to, sexual communications, sexual conduct, and grooming behaviors by coaches directed to student-athletes.[4] Plaintiffs further allege that USF knew or should have known of the Coach Defendants' sexual communications, sexual conduct, and grooming behaviors directed at the Class, and that USF participated in a cover-up of the Coach Defendants' conduct.

23.     Counsel for Plaintiffs requested that I provide my opinion, based on my experience and knowledge, on the following questions:

(a)     Nature of Coach-Student Athlete Relationship: What is the nature and structure of the relationship between coaches[5] and student-athletes within NCAA intercollegiate athletics, including at the University of San Francisco ("USF"), and how does this relationship impact the power dynamics between them?

(b)     Impact of Power Dynamics on Consent: How does the significant control that NCAA coaches exercise over NCAA student-athletes affect the ability of NCAA student-athletes to consent to sexual communications or sexual interactions with their coaches?

---

[2] ECF No. 133, Third Amended Complaint ("TAC"), ¶ 522.
[3] *See, e.g., id.* ¶¶ 1–4.
[4] *See generally* TAC.
[5] For purposes of my opinion, when I refer to coaches, I am also referring by extension to their staff and other athletics department personnel.

(c)     USF's Oversight and Control of Coaches: How does USF exercise control and oversight over its coaches, particularly concerning sexual communications, sexual conduct, and grooming behaviors directed at student-athletes?

(d)     Policies and Training Regarding Sexual Misconduct: What policies, procedures, and training does USF have in place to address the risk of sexual communications, sexual conduct, and grooming behaviors by coaches directed at student-athletes? Are there gaps in these policies that fail to address the power dynamics and the inability of student-athletes to consent?

(e)     Creation of a Culture of Abuse: In what ways do USF's actions, or lack thereof, contribute to creating a culture that heightens the risk of sexual communications, sexual conduct, and grooming behaviors by coaches? How does this culture impact the safety and well-being of student-athletes? And where did USF fail to properly oversee its coaches and respond to or fail to respond to evidence that abuse existed?

## IV.    SUMMARY OF OPINIONS

24.    My opinions are based on my extensive experience in collegiate athletics and my expertise as an attorney and academic specializing in this field. In forming these opinions, I have reviewed materials provided in this litigation as listed in Appendix 2 and supplemented them with my own knowledge and research.[6] It is important to note that some requested materials were not provided during discovery, and my opinions are subject to change should additional information become available. Having reviewed the available materials in this case within the framework of the research and literature on athletic governance and best practices and based on my experience in and scholarship about intercollegiate athletics, I offer the following opinions:

25.    **Control by Coaches Over Student-Athletes**: College coaches exercise significant and extraordinary control over student-athletes. This control is rooted in the structure of NCAA intercollegiate athletics, the hierarchical nature of collegiate sports, and the restrictive NCAA transfer rules that were in place until 2023. Coaches have influence over numerous aspects of student-athletes' lives, including their recruitment, their training, their physical and

---

[6] All internet sources cited herein were last visited on November 21, 2024.

mental well-being, financial aid and scholarship opportunities, class scheduling and access to majors and academic support, even housing opportunities, playing opportunities, and potential professional careers. Since 2021, when Name, Image, and Likeness payments to athletes became permitted, coaches have exercised control over access to these opportunities indirectly through the foregoing list of control points and more directly in suggesting opportunities for some athletes and not others. This power dynamic creates an inherently unequal relationship between coaches and student-athletes, one that is not commonly seen in other contexts, certainly not duplicated elsewhere within universities.

26.     **Sexual Interactions as Abuse**: Given the substantial power imbalance, any sexual interactions or communications between coaches and student-athletes are inherently abusive. The nature of this unequal relationship eliminates the possibility of mutual consent. Thus, regardless of the appearance of consent, which is more correctly, acquiescence, in the context in which these interactions occur, they constitute abuse.

27.     **USF's Control Over Coaches**: USF exercises significant control over its coaches, in accordance with NCAA rules and regulations. This control extends to various aspects of a coach's job, including recruitment practices, training, and daily operations. However, USF lacks explicit rules and policies that prohibit sexual conduct or communications between coaches and student-athletes. This absence is notable given the comprehensive regulations in other areas of a coach's responsibilities. Additionally, there is a lack of specific training for coaches regarding the power dynamic between coaches and student athletes and its impact on consent, or on prohibitions of any sexual communications or sexual interactions between coaches and student-athletes.

28.     **USF's Failure to Educate and Protect**: While USF maintains policies and handbooks governing student-athlete conduct, it fails to recognize, educate, train, or warn student-athletes about the risks of sexual conduct by coaches. The existing policies do not address the power dynamics between coaches and student-athletes or outline procedures for handling sexualized communications, sexualized conduct, or other abusive conduct by coaches.

Additionally, there is a lack of specific training for student-athletes on how to recognize and report inappropriate behavior by coaches.

29.     **Culture of Abuse at USF**: The absence of clear policies and adequate training, combined with USF's failure to address the inherent risks posed by the coach-student-athlete dynamic, has contributed to a culture of abuse. By characterizing inappropriate behavior as "locker room talk" or dismissing it based on the perceived consent of student-athletes, USF has failed to protect its student-athletes from sexual communications, sexual conduct, and grooming behaviors. This culture, which appears to prioritize the reputation and success of its athletics programs over the well-being of its athletes, creates an environment that heightens the risk of abuse.

30.     In summary, USF's failure to enact and enforce policies regarding sexual communications, sexual conduct, and grooming behaviors between coaches and student-athletes, as well as its lack of education and training on this issue, have resulted in a significant power imbalance and a heightened risk of abuse.

## V.     OPINIONS

### A.     Due to the Nature of NCAA Intercollegiate Athletics, College Coaches Exercise Significant Control Over Student-Athletes.

31.     Coaches, and by extension athletics department personnel, exercise significant control over student athletes due to: (1) the nature and customs of intercollegiate athletics; (2) the hierarchical organization of collegiate athletics, and in particular, the near total control that coaches exert in this sphere; and (3) until 2023, NCAA restrictions on the ability of student athletes to transfer and when and how a year of eligibility is expended.

32.     First, the nature and customs of intercollegiate athletics provides coaches with significant power on their campuses and lack of oversight of their day-to-day activities.

33.     NCAA member-institutions and the individuals who support them, such as trustees, donors, and boosters, compete directly for coaching talent and resources, making collegiate coaches among the highest paid individuals on a campus. This is often true of even

coaches in non-revenue positive sports who enjoy a heightened prestige on many campuses, such as the prestige that Coach Giarratano enjoyed at USF.[7]

34.     In the quest for a successful team, revenue, and under the pressure of the athletic calendar—or out of fear of criticizing or undermining a beloved program—institutional leaders can be either willfully blind to the failings of successful coaches in terms of student-athlete safety and team culture or exercise what Dr. David Ridpath has described as a kind of "situational ethics."[8] That is, these factors take precedence and cloud the judgment of otherwise clear-headed leaders and individuals charged with making appropriate decisions regarding potential misconduct.[9] The result is a failure to pursue aggressive oversight of athletics or hold coaches responsible for their misconduct, similar to USF's Athletic Director expressing her desire to protect her friendship with Coach Giarratano over protection of the student-athletes on the baseball team and the Administration's flip-flopping on the decision to suspend Coach Giarratano during the 2021 Title IX investigation.[10]

35.     Second, athletics—and collegiate athletics in particular—is notoriously hierarchical: power flows from coaches downward through a team. As the NCAA acknowledged

---

[7] *E.g.* Deposition of John Doe 2 (June 21, 2024) at 116:7–11 ("Doe 2 Tr."); Deposition of John Doe 3 (June 24, 2024) at 155:15–18 ("Doe 3 Tr. (June 24, 2024)").

[8] Bradley David Ridpath, *Tainted Glory: How an Institution Sells Its Soul for Athletic Success and its Unintended Consequences*, Fifth Annual College Sports Research Institute Conference (Apr. 16–18, 2012).

[9] *See, e.g.,* Freeh Sporkin & Sullivan, LLP, *Report of the Special Investigative Counsel Regarding the Actions of The Pennsylvania State University Related to the Child Sexual Abuse Committed by Gerald A. Sandusky* (hereinafter "The Freeh Report") at 14–15 (July 12, 2012), available at https://media.pennlive.com/midstate_impact/other/REPORT_FINAL_071212.pdf (describing "[t]he most saddening finding by the Special Investigative Counsel" as "the total and consistent disregard by the most senior leaders at Penn State for the safety and welfare of Sandusky's child victims").

[10] *E.g.* Declaration of John Doe 2 In Support of Plaintiffs' Motion for Class Certification at ¶¶ 13–14 (explaining how, in addressing the coaches' conduct, USF's Athletic Director told the baseball team that Giarratano was a "great guy," that she and Giarratano had been friends for years, and that they all would get through this together) ("Doe 2 Decl."); Claimant Anthony N. Giarratano's Pre-Hearing Brief, *Anthony Nino Giarratano vs. University of San Francisco, Paul J. Fitzgerald, and Does 1–10, Inclusive*, Case No. A29499B, at 8 (█████████████████████ █████████████), 9 (██████████████████████████████████████), 21 (████████ ██████████████████).

in its 2012 seminal publication, *Staying in Bounds: An NCAA Model Policy to Prevent Inappropriate Relationships Between Student-Athletes and Athletics Department Personnel*, this means that coaches wield tremendous emotional control and power over student-athletes.[11] College coaches exercise control over athletes' recruitment, admission to schools, and their opportunities to play.[12] Coaches can control an athlete's financial aid and, thus, their ability to pay for and attend—and continue to attend—college.[13] Coaches can also affect an athlete's ability to pursue professional or Olympic sport opportunities, which have significant economic rewards attached.[14] And despite NCAA guidance prohibiting or limiting their involvement,

---

[11] Deborah L. Brake, J.D. and Mariah Burton Nelson, MPH, CAE, *Staying in Bounds, An NCAA Model to Prevent Inappropriate Relationships Between Student-Athletes and Athletics Department Personnel* ("Staying in Bounds"), at 15, available at https://www.ncaapublications.com/p-4308-staying-in-bounds.aspx.

[12] *Id.*; *see also* Deposition of John Doe 8 (April 2, 2024) at 91:17–93:24 (demanding Doe 8 relinquish scholarship); 121:10–122:9 (Giarratano reaching out to Doe 8's new coach, saying he was not Division I material) ("Doe 8 Tr."); Deposition of John Doe 1 (June 17, 2024) at 126:3–13 (preventing Doe 1 from playing sophomore year because he complaint of coaches conduct) ("Doe 1 Tr."); Doe 2 Dep. at 209:17–210:21 (coaches talking poorly of Doe 2's character to ensure no interest from other Division I programs); Doe 3 Tr. (June 24, 2024) at 147:9–20 (notifying Doe 3 if he stays at USF, he will never play baseball again); Declaration of John Doe 5 In Support of Plaintiffs' Motion for Class Certification at ¶ 13 (regularly benching Doe 5, despite excellent performance) ("Doe 5 Decl."); Declaration of John Doe 6 In Support of Plaintiffs' Motion for Class Certification ¶¶ 7–8 (telling Doe 6 unless he gives up summer internship and plays summer ball in the Bay Area, he will be cut) ("Doe 6 Decl."); Declaration of John Doe 9 In Support of Plaintiffs' Motion for Class Certification ¶ 9 (threatening Doe 9's mother that son will be cut if she complains to administration about coaches' behavior) ("Doe 9 Decl."); Declaration of John Doe 10 In Support of Plaintiffs' Motion for Class Certification ¶ 13 ("blackballing" Doe 10 as a transfer prospect) ("Doe 10 Decl."); Declaration of John Doe 12 In Support of Plaintiffs' Motion for Class Certification ¶¶ 10–11 ("Doe 12 Decl.") (benching Doe 12 despite excelling in play).

[13] *Staying in Bounds* at 15; *see also* Doe 8 Tr. at 93:17–95:10 (refusing to release Doe 8 but demanding he relinquish scholarship); Doe 1 Tr. at 140:16-23; 145:11–146:5; 153:10–16 (encouraging Doe 1 and other players to transfer or, in the alternative, allowing Doe 1 to keep scholarship but never play baseball at USF again); Doe 2 Tr. at 214:8–20 (coaches' conduct intended to force Doe 2 to forfeit scholarship); Doe 3 Tr. (June 24, 2024) at 145:23–146:16 (telling Doe 3 he is not worthy of a scholarship and must relinquish it); Doe 5 Decl. ¶ 11 (Giarratano telling Doe 5 there was only room for one of the two gay players on the team); Doe 6 Decl. ¶ 8 (telling Doe 6 unless he gives up summer internship and plays summer ball in the Bay Area, he will be cut); Doe 9 Decl. ¶ 9 (threatening Doe 9's mother that son will be cut if she complains to administration about coaches' behavior); Doe 12 Decl. ¶ 12 (telling Doe 12 he was not worthy of a scholarship and needed to leave USF).

[14] *Staying in Bounds* at 15; *see also* Doe 8 Tr. at 163:11–164:7 (coaches' behavior requiring transfer to NAIA school with less MLB exposure/opportunities); Doe 3 Tr. (June 24, 2024) at

coaches have the power to affect athletes' ability to access their Name, Image, & Likeness ("NIL") rights, which courts have recognized as valuable intrinsic rights.[15]

36.    Coach control extends to student-athletes' medical care: team medical staffs, which include physicians, athletic trainers, performance coaches, and nutritionists serve the interests of the team and, as a result, do not always observe an athlete-focused level of patient care.[16] These providers are often departmental employees who routinely share medical information with coaches, thus intertwining the medical staff with the coaching staff.[17] As such, these providers often operate with minimal independent oversight and unquestioned authority from institutions.

37.    College coaches exercise much of this control without direct oversight by the athletic departments at the member-institutions that employ them.[18] Departmental committees, including in the context of student-athlete financial aid, often defer to the wishes of team coaches, both as a matter of policy and practice,[19] unless an athlete can allege some significant misconduct.

---

272:19–273:21 (inability to transfer in the Spring impacted professional opportunities); Doe 10 Decl. ¶¶ 10–11 (pulling Doe 10 out of summer baseball league known for association with top prospects and MLB draftees).

[15] *See Tennessee v. NCAA*, No. 3:24-CV-00033-DCLC-DCP, 2024 U.S. Dist. LEXIS 32050, at *13, 2024 WL 755528, at *3 (E.D. Tenn. Feb. 23, 2024); *O'Bannon v. NCAA*, 802 F.3d 1049, 1065 (9th Cir. 2015); *see also Ohio v. NCAA*, 706 F. Supp. 3d 583, 597 (N.D.W. Va. Dec. 13, 2023) (recognizing that college students missing even a single contest constitutes "irreparable harm").

[16] *E.g.* Doe 8 Tr. at 39:6–17 (providing USF sports psychologist as only mental health resource); Doe 5 Decl. ¶ 12 (same); Doe 1 Tr. at 98:12–99:2 (forcing Doe 1 to go against trainer's instructions, leading to injury); Deposition of John Doe 3 (June 25, 2024) at 326:3–10 (forcing Doe 3 to throw after injury, leading to re-injury) ("Doe 3 Tr. (June 25, 2024)"); Doe 6 Decl. ¶ 6 (forcing Doe 6 to do strength-building exercises incompatible with injury, leading to re-injury).

[17] *E.g.* Doe 5 Decl. ¶ 12 (instructing Doe 5 to see sports psychologist provided by USF as only mental health resource); Doe 8 Tr. at 39:6–17 (same).

[18] Doe 1 Tr. at 150:14–17 (requiring surrender of scholarship, despite 4-year guarantee) Doe 8 Dep, 91:17–92:24 (same); Doe 3 Tr. (June 24, 2024) at 146:23–147:4 (same); Doe 9 Decl. ¶ 9 (threatening cutting of scholarship if complained to administration); Doe 5 Decl. ¶ 6 (telling USF baseball team to sweep abuse of gay student "under the rug"); Declaration of John Doe 13 In Support of Plaintiffs' Motion for Class Certification ¶¶ 11-12 ("Doe 13 Decl.") (instructing Doe 13 to accept full responsibility for coach condoned hazing).

[19] *E.g.* Declaration of John Doe 1 In Support of Plaintiffs' Motion for Class Certification ¶ 9-10 (Athletic Director standing behind Giarratano's decision that Doe 1 must leave team and encouraging Doe 1 to enter transfer portal. ("Doe 1 Decl.").

38.     At bottom, "the magnitude of the coach's control will likely exceed . . . the extent of control any individual has ever had over them at any point in their lives, with the exception of their parents."[20]

39.     Third, the NCAA's transfer rules have traditionally been very restrictive. Before 2023, coaches and administrators exercised significant control over whether and when a student-athlete could leave their program and find immediate eligibility at another school. Along with having to document "extraordinary" circumstances leading to a transfer, often athletes had to get the approval of their current athletic director or coach to approve the request or support their claims.[21] In many cases, coaches used the transfer rules to keep athletes from transferring to competitive programs or even keep them from transferring at all.[22]

## B.     Due to the Significant Control College Coaches Exercise Over Student Athletes, All Sexualized Interactions Between Coaches and Student Athletes are Abusive.

40.     In the context of college athletics, regardless of the age or maturity of the student-athlete, the power imbalance between a coach and an athlete is profound and pervasive. Coaches exert authority over nearly every aspect of a student-athlete's life, from their academic and athletic success to their social interactions and even their future career prospects. This significant power differential makes any interactions between coaches and student-athletes inherently unequal. In such a relationship, the concept of "mutual consent" is fundamentally flawed, as the

---

[20] *Staying in Bounds* at 15.

[21] *See, e.g.*, NCAA-USF-00017080 at 176 (2020-2021 NCAA Division I Manual Art. 12 § 12.8.1.7.1.3); Doe 8 Tr. at 93:17–95:10 (refusing to release Doe 8); Doe 1 Tr. at 153:7–12 (requiring Doe 1 to release scholarship in order to contact other schools). *See also* Brett Dawson, *What is the NCAA transfer portal? Explaining the process for athletes switching schools*, COURIER JOURNAL (Jan. 12, 2023), available at https://www.courier-journal.com/story/sports/college/2023/01/12/everything-you-need-to-know-about-the-ncaa-transfer-portal/69670749007/  ("Under the transfer portal system, athletes only have to submit their name into the portal to be transfer eligible, a change from the previous process that required permission from a coach, athletics administrator or other party to transfer.")

[22] *See, e.g.,* Doe 2 Tr. at 12:2–16 (transfer rules ensured Doe 2 was unable to play games when arrived at UNR; Doe 3 Tr. (June 24, 2024) at 274:13–19 (inability to transfer in the Spring ensured Doe 3 had to go to junior college or NAIA school). *See also* Dan Wolken, *NCAA tightens transfer guidelines, limits players gaining immediate eligibility*, USA TODAY (June 26, 2019), available at https://www.usatoday.com/story/sports/college/columnist/dan-wolken/2019/06/26/ncaas-changes-transfer-guidelines-limit-immediateeligibility/1569260001/.

student-athlete is under constant pressure to comply with the coach's expectations, often feeling unable to refuse or object to the coach's advances or inappropriate behavior without fear of reprisal.[23] The inherent imbalance of power negates the possibility of true, voluntary consent to any sexual communications or interactions.[24] It makes the coach-athlete relationship—and the sports team environment—vulnerable to abuse.[25]

41.     The extreme behavior of Assistant Coach Troy Nakamura and Head Coach Nino Giarratano, including instances where Coach Nakamura appeared naked on the field, mimicked explicit sexual acts, and engaged in humiliating strip games during practices, was not hidden or confined to private settings. These acts occurred openly on university grounds, in full view of the entire baseball team and other athletic staff. Such blatant and recurring misconduct, witnessed by multiple players and other individuals present at practices, created a highly visible culture of

---

[23] *See Staying in Bounds* at 15–16. According to Nancy Hogshead-Makar, CEO of Champion Women and Olympic gold medalist, being a successful elite athlete requires obedience and subservience to coaches. Gabriel Baumgaertner, *The Olympic champion who channeled trauma into protecting her fellow athletes*, THE GUARDIAN (Dec. 2019), available at https://www.theguardian.com/sport/2019/dec/18/nancy-hogshead-makar-lawyersafe-sport-swimming#:~:text=%E2%80%9CThere%20is%20no%20way%20to,%2C%20subservient%20 athletes%20like%20soldiers.%E2%80%9D. She claims that, contrary to the notion that elite athletes are powerful, in fact they have no power within the athletic system, and rampant sexual abuse of athletes by coaches is a symptom of their powerlessness. *Id.* The "system," Hogshead-Makar asserts, wants athletes to fall in line "like soldiers." *Id.* The result, according to Hogshead-Makar, is a system designed to attract predators: "Not every coach is a pedophile but every pedophile wants to be a coach." *Id.*

[24] One study showed that more than 25% of college athletes experience inappropriate sexual misconduct from a coach or professor, and athletes were 2.5 times more likely than other students to claim having experienced sexual misconduct from an authority figure. N'dea Yancey-Bragg, 1 in 4 college athletes say they experienced sexual abuse from an authority figure, survey finds, USA TODAY (Aug. 26, 2021), available at https://www.usatoday.com/story/news/nation/2021/08/26/collegeathlete-report-sexual-assault-common-survey/8253766002/. In that same study, 83% percent of student athletes knew of another student athlete who had experienced inappropriate sexual behaviors from an authority figure on campus. Lauren Book*, College athletes report high incidence of sexual abuse by campus authority figures, survey finds*, LAUREN'S KIDS (Aug. 31, 2021), available at https://laurenskids.org/college-athletes-report-high-incidence-of-sexual-abuse-by-campus-authority-figures-survey-finds/.

[25] Research literature over the past two decades supports this conclusion. *See generally Staying in Bounds*; *see also, e.g.*, *Sexual Violence and the Coach–Athlete Relationship—a Scoping Review From Sport Sociological and Sport Psychological Perspectives*, NATIONAL LIBRARY OF MEDICINE (May 13, 2021), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8155665.

abuse and harassment. The public and pervasive nature of the coaches' sexualized conduct should have unquestionably put the University of San Francisco on notice. The university's failure to recognize and address this behavior suggests a deliberate indifference or gross negligence, as any reasonable observer would recognize that the conduct was egregiously inappropriate and harmful to the student-athletes.

42.     In defending their actions, USF and the Coach Defendants have attempted to downplay the seriousness of their sexualized conduct and communications, dismissing them as harmless "locker room talk" or framing pre-practice exercises as intended to build team camaraderie or "loosen" the players up. [26] However, these defenses are "self-justifying and, frankly, self-delusional," [27] as they fail to recognize the inherent harm and violation of trust that occurred. At the time they engaged in this conduct, the Coach Defendants were aware that their actions crossed professional boundaries and were inappropriate. The casual normalization of such behavior by invoking sports culture rhetoric only serves to further highlight the disregard for the well-being and safety of the student-athletes.

43.     The significant control that coaches have over every aspect of their players' lives exacerbates the impossibility of genuine consent. Coaches dictate not only playing time and athletic opportunities but also influence academic standing, financial aid, living arrangements, and future prospects in professional sports. This all-encompassing authority means that student-athletes are often left with no viable option to refuse or resist inappropriate behavior, even if they are uncomfortable. In my experience, the reaction of laughing along or appearing compliant does not signify consent but rather reflects the athletes' sense of obligation to appease their coaches to

---

[26] *Anthony Nino Giarratano vs. University of San Francisco, Paul J. Fitzgerald, and Does 1–10, Inclusive*, Case No. A29499B, Volume II, Arbitration Proceedings (June 11, 2024) at 391:10–24 (███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████); A GIARRATANO 000001 (Confidential) (███████████████████████████████████ █████████████████████); Doe 8 Tr. at 56:5–57:7 (describing sexualized conduct as team building and bonding); Doe 2 Tr. at 50:16–19 (coaches told players the skits were intended to "relax you"); Doe 3 Tr. (June 25, 2024) at 274:16-21 (coaches claiming sexualized conduct to be "a sense of building team").
[27] *See Staying in Bounds* at 6.

avoid negative consequences. It is more correctly a power-influenced acquiescence or capitulation.

44.    In addition to their pervasive influence over academic and athletic aspects of student-athletes' lives, the USF coaches further exercised control through the use of hazing. Hazing is another tool that reinforced the power dynamics between coaches and student-athletes, creating an environment of compliance and fear.[28] This environment not only solidified the coaches' authority but also had significant implications for student-athletes' ability to report misconduct.

45.    In addition to the sexualized conduct and communications already discussed, the USF coaches engaged in and permitted extensive hazing of student-athletes. This hazing culture included dangerous practices such as excessive drinking, kangaroo courts, dare challenges, threats of physical violence, and, in some instances, actual physical violence.[29] These activities go beyond mere team-building rituals and enter the realm of abusive and coercive behavior, further exacerbating the power imbalance between coaches and student-athletes.[30]

46.    Recognizing the inherent dangers of such hazing practices, the majority of states, including California, have enacted anti-hazing laws to protect student. These laws underscore the seriousness of hazing as a form of abuse and emphasize the responsibility of institutions like USF to ensure that their programs are safe and free from such harmful behaviors.

---

[28] As national hazing expert psychologist Susan Lipkin writes, "Hazing continues to incorporate sexualized events. From a psychological perspective, using sexualized hazing is the quickest method of humiliating a student. It immediately demonstrates the hierarchy and makes the victim feel completely helpless." Dr. Susan Lipkins, *What's New in Hazing?*, INSIDE HAZING (2024), https://www.insidehazing.com/whats-new-inhazing.

[29] Doe 9 Decl. ¶ 4; Doe 13 Decl. ¶¶ 7-8; Doe 5 Decl. ¶ 5; Doe 3 Tr. (June 25, 2024) at 37:2-39:15.

[30] It is clear that some hazing rites and rituals are sexual assaults, and when they involve male on male misconduct they are aimed at the "sexual humiliation of presumed heterosexual males." Michael Kimmel, *Guyland: The Perilous World Where Boys Become Men*, Harper Perennial (2008), p. 120. Northwestern University made national news over a scandal rooted in sexualized hazing last year. The university's football coach was fired after an expose of a hazing culture that, according to the president of Northwestern, routinely "included forced participation, nudity and sexualized acts of a degrading nature." *Northwestern Fires Coach Pat Fitzgerald after Hazing Allegations Surface with Football Team*, AP News (Jul. 10, 2023), available at https://apnews.com/article/northwestern-hazing-fitzgerald-6aed9ee03d6efae9b6d55702952f594d.

47.     Hazing and permitting other related and coercive behaviors not only poses immediate physical and psychological risks but, in my experience, also serves as a tool of control and manipulation by coaches and teams.[31] It can be used as a form of grooming, creating an environment where student-athletes are conditioned to accept mistreatment and discouraged from speaking out or reporting more severe abuses, such as sexual misconduct by coaches.

48.     By allowing and, at times, participating in these hazing practices, the USF coaches reinforced a culture of fear and compliance. This culture ensured that student-athletes felt powerless to resist or report the coaches' abusive behaviors, further entrenching the cycle of abuse. The overlap between hazing and grooming behaviors highlights how coaches can use their authority to create an environment where student-athletes are less likely to recognize, resist, or report inappropriate conduct. As a result, the absence of stringent anti-hazing enforcement at USF contributed to the overall climate of abuse, leaving student-athletes vulnerable to both physical and sexual misconduct. This is particularly stark after multiple noteworthy incidents took place in the years preceding the death of Penn State student Timothy Piazza in February 2017.

49.     Given this power differential, any sexual communications or sexual conduct initiated by coaches toward student-athletes must be considered sexual misconduct. The dynamics of the coach-athlete relationship in intercollegiate sports create an environment where any form of sexual contact is inherently coercive and abusive. The substantial influence and authority that coaches wield make it impossible for student-athletes to provide authentic and voluntary consent. "In other words, the dynamics of the coach-athlete relationship in intercollegiate sport make any sexual contact between a coach and an athlete abusive, regardless of whether it was wanted by the athlete and regardless of whether the athlete is over the age of consent."[32]

50.     USF lags well behind in the acknowledgment of these. For instance, a policy memo authored by a young assistant to the Associate Dean of Sciences at USF from February

---

[31] *See* Lipkin*, supra.*
[32] *See Staying in Bounds* at 6.

2020 to May 2024 recognized that relationships between faculty or staff and students are "problematic based on power differentials" and present risks of harassment, discrimination, preferential treatment, and retaliation.[33] This memo highlighted the university's awareness of the dangers inherent in relationships marked by power imbalances. Further, another internal document noted that 21 out of 28 colleges and universities associated with the Association of Jesuit Colleges and Universities had policies that, at a minimum, prohibited sexual contact between employees and students over whom they had supervisory or evaluative authority. Some of these institutions went further, prohibiting such relationships altogether, regardless of direct authority.[34]

51.     Recognizing the potential for harm, USF's Title IX office later recommended adopting a Consensual Relationship Policy. This policy aimed to address the power differentials within relationships between employees and students and to protect community members from abuse and exploitation. The Title IX office's own admissions reveal significant gaps in USF's policies: the university did not have rules or guidelines that specifically addressed "consensual" relationships between coaches and student-athletes or considered the profound implications of power on the concept of consent.[35] The absence of such policies left student-athletes vulnerable to misconduct.

52.     USF even went as far as drafting a Sample Consensual Relationship Policy, which would have explicitly prohibited sexual contact between any university employee and individuals over whom they held instructional, supervisory, or administrative authority. This draft policy recognized the risks associated with power imbalances but does not appear to have been implemented during the Class Period.[36] Instead, the University continued without clear guidelines that took into account the unique vulnerabilities of student-athletes and the significant authority coaches hold over them.

---

[33] USF_0040035 (Confidential). *See also* https://www.linkedin.com/in/gillian-rude/ (last accessed Nov. 17, 2024).
[34] USF_0041335 (Confidential).
[35] USF_0055085 (Confidential).
[36] USF_0040710 (Confidential).

53.     Despite the clear need for such policies, and consistent with the admissions made by USF's Title IX office, the University did not have a sexual misconduct prevention policy that addressed the power dynamics between coaches and student-athletes during the class period. This inaction left student-athletes without adequate protection and allowed a culture to persist where abusive behavior by coaches could go unchallenged.

### C.     USF Exercises Significant Control Over Coaches – Except with Regard to Sexual Conduct Directed to Student-Athletes.

54.     Due at least in part to the profoundly important role that coaches play in the lives of student-athletes and to the success of their teams, the NCAA has implemented rules, requiring institutions to exercise institutional control over athletics programs and coaches.

55.     In accordance with NCAA rules, USF exercises institutional control almost every aspect of a coach's job, including what qualifications coaches must have to be able to work, what trainings they must complete, when coaches are allowed to work, when coaches can interact with the athletes in their charge, how coaches disseminate information from the NCAA to their staff, and when and how they can recruit new athletes.[37]

56.     USF follows detailed NCAA rules such as:

(a)     Coaches are subject to NCAA ethical rules, which forbid coaches from engaging in sports wagering, providing banned substances to student-athletes, providing a prospective or current student-athletes improper inducements or extra benefits, and facilitating a meeting between a student-athlete and an agent;[38]

(b)     Coaches are subject to NCAA rules on recruiting, including when a coach can contact a prospective athlete and what is permitted when a prospective athlete visits

---

[37] *E.g.* USF_0013877 (Confidential). I found the Dons Compliance Manual ("Compliance Manual") publicly available online at https://s3.us-east-2.amazonaws.com/sidearm.nextgen.sites/usfca.sidearmsports.com/documents/2023/10/16/Compliance_Manual_2023-24.pdf. While I reviewed both the Confidential and publicly-available version, I relied upon the publicly available version for purposes of my report because there were no differences material to my opinion.

[38] *See* Compliance Manual, at 79, 96–98, 105–06, 112–13.

campus—down to the time of the visit, where and with whom the athlete can speak, how long the athlete can physically be on campus, and the costs that can be expended on him or her;[39]

(c)    Coaches are subject to NCAA rules regarding how they run their practices, including the length of time that practices and team meetings can last, specific to different times of year—including whether or not pre-practice stretching or weight training counts towards that time;[40] and

(d)    Coaches are subject to NCAA rules on who from coaching staff can participate in workouts with different rules depending on the sport.[41]

57.    Second, the NCAA and USF exercise control over coaches through training requirements. For example, a coach cannot engage in off-campus recruiting events until the coach has received "rules education covering NCAA legislation, including Bylaw 13 and other bylaws."[42] And coaches must engage in any training their school requires, per NCAA rules.

58.    Given the myriad of ways USF regulates coaches, it is therefore remarkable that USF has no rules expressly prohibiting any form of sexual communication or sexual conduct between coaches and student-athletes, mandating training related to the power dynamic between coaches and student-athletes and to the inability of student-athletes to consent to any form of sexual communication or sexual conduct with their coaches, and appropriate team environments free from any form of sexual communication or sexual conduct between coaches and student-athletes.

---

[39] *See, e.g.*, *id.* 21–36.
[40] NCAA Division I Manual 2022-23, Art. 17 §§ 17.1.7.1, 17.1.7.2; NCAA Division I Manual 2021-22, Art. 17 §§ 17.1.7.1, 17.1.7.2; NCAA Division I Manual 2020-21, Art. 17 §§ 17.1.7.1, 17.1.7.2; NCAA Division I Manual 2018-19, Art. 17 §§ 17.1.7.1, 17.1.7.2; NCAA Division I Manual 2012-2013, Art. 17 §§ 17.1.6.1, 17.1.6.2(a); NCAA Division I Manual 2011-2012, Art. 17 §§ 17.1.6.1, 17.1.6.2(a); NCAA Division I Manual 2002-03, Art. 17 §§ 17.1.5.1, 17.1.5.2.
[41] *See, e.g.*, NCAA Division I Manual 2022-23, Art. 11 § 11.7.4.1.1 ("A weight (strength and conditioning) coach may conduct flexibility, warm-up and physical conditioning activities prior to any game and prior to or during any practice or other organized activities without being included in the limitations on number of coaches. (Revised: 1/15/11 effective 8/1/16)"). *See also* NCAA Division I Manual 2021-22, Art. 11 § 11.7.4.1.1; NCAA Division I Manual 2020-21, Art. 11 § 11.7.4.1.1; NCAA Division I Manual 2018-19, Art. 11 § 11.7.5.1.1; NCAA Division I Manual 2012-2013, Art. 11 § 11.7.2.1.1; NCAA Division I Manual 2011-2012, Art. 11 § 11.7.2.1; NCAA Division I Manual 2002-03, Art. 11 § 11.7.3.1.1.
[42] NCAA Division I Manual 2022-23, Art. 11 § 11.5.1.

59.    *Training.*  USF does not train coaches related to the power dynamic between coaches and student-athletes, the inability of student-athletes to consent to any form of sexual communication or sexual conduct with their coaches, or how to maintain appropriate team environments free from any form of sexual communication or sexual conduct between coaches and student-athletes. USF also fails to train student-athletes in how to report such violations when they occur, which is particularly important given that student-athletes are extensively indoctrinated on their teams never to complain to anyone beyond their head coach.

60.    Based on the documents I reviewed, it appears that the training USF provides to coaches includes "REPS Advocate Training," which has apparently been provided to coaches and administration from 2018 to the present,[43] as well as "Mandatory Reporter Training" in a course entitled "Building Supportive Communities: Clery Act and Title IX."[44]

61.    None of the training materials that I reviewed contained any references to the power dynamic between coaches and student-athletes, the inability of student-athletes to consent to any form of sexual communication or sexual conduct with their coaches, or how to maintain appropriate team environments free from any form of sexual communication or sexual conduct between coaches and student-athletes.[45] Moreover, while certain training materials contained hypothetical scenarios to role play when a student-athlete complains about harassment or abuse by another student, none contained a situation involving a coach's sexual interactions or communications with a student-athlete.

62.    Moreover, it appears from USF's documents that USF's Athletic Director did not require coaches to make up training for which they were late (including Coach Giarratano).[46]

---

[43] USF_0001732 (Confidential). *See also* USF, *Workshops & Trainings*, MYUSF.USFCA.EDU, available at https://myusf.usfca.edu/title-ix/workshops.
[44] USF, *Workshops & Trainings*, MYUSF.USFCA.EDU, available at https://myusf.usfca.edu/title-ix/workshops. *See also* USF_0059943 (Confidential)
[45] USF_0002249 (Confidential), USF_0002329 (Confidential), USF_0002648 (Confidential), USF_0002715 (Confidential)
[46] USF_0005049 (Confidential).

Moreover, according to the class representatives, in the rare instance that a training session with Title IX officers was held, the coaches did not attend.[47]

    **D.**    <u>**USF Exercises Control Over Student-Athletes, But Fails to Educate, Train, or Warn Student-Athletes About the Risk of Sexual Conduct by Coaches.**</u>

63.    USF maintains a number of policies exercising control over student-athlete conduct. None address the power dynamic between coaches and student-athletes, the effect of the power dynamic on consent with respect to sexual communications or sexual conduct by coaches directed at student-athletes, or how to handle sexual communications or sexual conduct by coaches directed at student-athletes.

    *1)*  *Fogcutter Student Handbook.*

64.    I understand that, throughout the Class Period, USF maintained different versions of the Fogcutter Student Handbook.[48] For purposes of my report, I viewed the Fogcutter Student Handbook available on USF's website, which states that it was last updated during the 2021-22 school year.[49] The Fogcutter Student Handbook applies to all students at USF, regardless of participation in sport.

65.    The Fogcutter Student Handbook is comprised of a list of university deans, a list of student resources, a "Student Code of Conduct," "Residential Policies," and "Student Org Regulations," in addition to "Campus Emergency Procedures," and "Other Resources and Information."[50]

66.    USF's Student Code of Conduct is comprised of both a Non-Academic Student Conduct Code and an Academic Honor Code.[51] The Student Conduct Code "provides guidelines

---

[47] Decl. of Doe 1 ¶ 6; Decl. of Doe 2 ¶ 7; Declaration of John Doe 3 In Support of Plaintiffs' Motion for Class Certification ¶ 6 ("Doe 3 Decl.").

[48] USF_0001732 (Confidential). *See also* USF, *Fogcutter Student Handbook – Important Updates*, MYUSF.USFCA.EDU, available at https://myusf.usfca.edu/fogcutter/important-updates. I have asked for all versions of the handbook, but I understand that only one version of the handbook been produced. USF_0072518 (date created 7/25/2007).

[49] USF, *Fogcutter Student Handbook*, MYUSF.USFCA.EDU, available at https://myusf.usfca.edu/fogcutter.

[50] USF, *Fogcutter Student Handbook*, MYUSF.USFCA.EDU, available at https://myusf.usfca.edu/fogcutter.

[51] USF, *Student Conduct,* myusf.usfca.edu, MYUSF.USFCA.EDU, available at https://myusf.usfca.edu/fogcutter/student-conduct.

and expectations for appropriate student behavior,"[52] including with respect to physical self-harm, alcohol and drug misuse, conduct that harms or endangers others, fraud or other illegal acts, computer misuse, and other prohibited student conduct,[53] as well as cheating, plagiarism, false citations, and other prohibited academic student conduct.[54] USF's Residential Policies govern the university's behavioral expectations for all students residing in university housing.[55] And USF's Student Org Regulations govern the rules for maintaining student organizations.[56] None of the rules or regulations govern sexual communications or sexual conduct directed at student-athletes by coaches.

67.    The Fogcutter Student Handbook also provides students a list of 30 resource types, ranging from campus vending machines, to food services, to university ministry.[57]

### 2) *Student-Athlete Handbooks.*

68.    USF also maintains Student-Athlete Handbooks,[58] which contain nearly 40 pages of information governing student-athlete conduct.  In fact, USF highlights penalties to the

---

[52] USF, *Student Conduct Code – Section 1. Purpose,* MYUSF.USFCA.EDU, available at https://myusf.usfca.edu/fogcutter/student-conduct/section-1-purpose.

[53] USF, *Student Conduct Code – Section 5. Prohibited Conduct,* MYUSF.USFCA.EDU, available at https://myusf.usfca.edu/fogcutter/student-conduct/section-5-prohibited-conduct.

[54] USF, *Honor Code,* MYUSF.USFCA.EDU, available at https://myusf.usfca.edu/academic-integrity/honor-code.

[55] USF, *Student Residential Policies,* MYUSF.USFCA.EDU, available at https://myusf.usfca.edu/fogcutter/student-residential-policies.

[56] USF, *Student Organization Regulations,* MYUSF.USFCA.EDU, available at https://myusf.usfca.edu/fogcutter/organization-regulations.

[57] USF, *Student Resources,* MYUSF.USFCA.EDU, available athttps://myusf.usfca.edu/fogcutter/student-resources. *See also*, USF, *Other Resources and Information,* MYUSF.USFCA.EDU, available athttps://myusf.usfca.edu/student-conduct/other-info (provides resources to parents/guardians and information for faculty/staff).

[58] I have asked for all versions of the Student-Athlete handbook, but I have only been provided versions for the years 2014-2015 (USF_0019468, USF_0019204), 2015-2016 (USF_0098244, USF_0023302, USF_0020865), 2017-2018 (USF_0003477), 2018-2019 (USF_0003512), 2019-2020 (USF_0003549), 2020-2021 (USF_0001537, USF_0001751, USF_0002564), 2021-2022 (USF_0022217, USF_0003584, USF_0017336), and 2022-23 (USF_0002601, USF_0003621), 2023-2024 (USF_0002211). While I reviewed these versions produced in discovery, all designated Confidential, I also found a publicly available version of the USF 2021-22 Student-Athlete Handbook online at https://usfdons.com/documents/2021/8/6/USF_Handbook_2021_22.pdf. I relied on the publicly available version for purposes of my report because there were no differences material to my report.

student-athlete for engaging in hazing or sexual misconduct, and notes such penalties can be imposed separately by the University or the Athletics Department or both.

69.     Yet the Handbook contains no reference to the expectations that a student-athlete should have of their coaches. Buried on the last page of the Handbook is a general statement about USF's commitment to Title IX, but it does not reference coaches or address sexual communications or sexual conducted by coaches directed at student-athletes.

### 3) *Sexual Misconduct Policies.*

70.     On October 1, 2016, USF published its Annual Security & Fire Safety Report.[59] In the Introduction to the report, USF states that the report is published annually, and an email is sent to all employees and students advising them that the report is available to be viewed. The report includes a section titled "Response to Sexual Misconduct."[60]

71.     While the report provides that USF will discipline any employee or student who engages in sexual misconduct, the report defines sexual misconduct as including sexual assault, domestic violence, dating violence, and stalking.[61] The Report's description of sexual misconduct does not address sexual interactions or sexual communications between coaches and student-athletes, nor how the power dynamic between them affects the concept of consent.

72.     In or about 2018, USF appears to have published the USF Sexual Misconduct Policy (01/11/18).[62]

73.     The Sexual Misconduct Policy encourages all students who believe they have been subjected to "sexual misconduct" to report the incidents. The policy provides: "When an allegation of misconduct is brought to an appropriate University official, the University will

---

[59] USF_0028633 (Not Confidential). I also reviewed the 2020-21 Annual Fire Safety and Security Report, which was not materially different for the purposes of this report. USF_0040789 (Confidential).

[60] USF_0028633 (Not Confidential), at 45. *See also* USF_0040789 (Confidential).

[61] USF_0028633 (Not Confidential), at 45-68.

[62] USF_0004838. I asked for all versions of any sexual misconduct policy, but I understand that only Confidential versions from 2018 (USF_0004838), 2019 (USF_0036276), and an unknown date (USF_0062083), in addition to Confidential interim policies from 2020 (USF_0042148, USF_0002351, USF_0027083, USF_0028507, USF_0037338, USF_0042148), 2021 (USF_0002417), and 2022 (USF_0002491, USF_0026871, USF_0036883, USF_0037640, USF_0037780), and an unknown date (USF_0085500) have been produced.

respond promptly, equitably and thoroughly to stop the discriminatory behavior, remedy its effects, and prevent its recurrence."[63]/[64]

74.    The Sexual Misconduct Policy, however, appears to only address student-on-student sexual misconduct, providing "Not all forms of sexual misconduct will be deemed to be equally serious offenses, and the University reserves the right to impose different sanctions when a student is found to have violated this policy, ranging from verbal warning to expulsion, depending on the severity of the offense."[65] The policy does not address sanctions on coaches when sexual communications or sexual conduct is directed at student-athletes.

75.    In or after 2021, USF appears to have published "Interim Policy and Procedures, Nondiscrimination Based on Sex and Gender, Sexual Harassment, and Sexual Misconduct for All Students, Employees, and Third-Parties" ("Interim Policy").[66] The Interim Policy describes the process for addressing allegations of discrimination, harassment, or retaliation. These interim policies and procedures also include a "Policy on Discriminatory Harassment," describing "the specific forms of legally prohibited harassment that are also prohibited under university policy."[67] However, neither the Interim Policy generally nor Section 15 describing sexual harassment and consent are specific to the athletic department, and do not address sexual interactions or sexual communications between coaches and student-athletes, nor how the power dynamic between them affects the concept of consent.

### 4)  Training

76.    The evidence I reviewed reflected that USF did not provide the necessary training to its student-athletes to address sexual interactions or sexual communications between coaches and student-athletes, nor inform its student-athletes about how the power dynamic between them

---

[63] USF_0004838 (Confidential), at p.1
[64] Importantly, for purposes here, USF advised its employees that "all employees" are mandated reporters or responsible parties (for reporting) under Title IX.  E.g. USF_0004909 (Confidential).
[65] USF_0004838 (Confidential), at 2.
[66] The Interim Policy is publicly available at https://myusf.usfca.edu/sites/default/files/users/jvarga/Interim%20Policy%20and%20Procedures%2008.14.2020.pdf. Versions were produced as Confidential at USF_0002417, USF_0002491. I have reviewed the confidential versions but relied upon the public version for my report because there were no differences material to my report.
[67] Interim Policy § 15.

affects the concept of consent. This failure to educate student-athletes on the unique vulnerabilities they face within the coach-athlete relationship is a critical oversight.

77.    Effective training would have focused on the inherent power imbalance that exists in these relationships, emphasizing how this dynamic complicates the ability to give genuine consent. By neglecting to provide targeted education, USF left student-athletes ill-equipped to recognize, report, or respond to inappropriate behavior by coaches. The absence of such training perpetuated a culture in which student-athletes might not fully understand their rights or feel empowered to speak out against abuse, further exacerbating the risk of misconduct.

78.    For example, USF provided specific trainings on topics such as "Intimate Partner Violence," [68] "Active Bystander for Responsible Drinking and Prevention of Sexual Assault," [69] and "Sexual Harassment Prevention" (which covered only dating violence, sexual assault, and stalking), [70] and a variety of other trainings which covered domestic violence, dating violence, sexual assault, and/or stalking.[71]

79.    These trainings, while important, did not address the distinct and critical issue of sexual misconduct within the context of athletic power dynamics. They focused broadly on scenarios involving peer-to-peer interactions or romantic relationships but failed to account for the unique environment of collegiate athletics, where coaches hold significant authority over student-athletes.

80.    This gap in training reflects a fundamental misunderstanding or disregard for the risks associated with the coach-student-athlete relationship, where power imbalances can make it difficult for athletes to resist or report inappropriate behavior. As a result, student-athletes were left without the necessary tools or knowledge to navigate or confront misconduct originating from those in positions of power over them.

---

[68] USF_0040012 (Not Confidential).
[69] USF_0028633 at 682 (Not Confidential).
[70] *Id.* at 683 (Not Confidential).
[71] *Id.* at 681-83 (Not Confidential) *See also* USF_0040789 at 846-48 (2020-21 training focuses on domestic violence, dating violence, sexual assault, and/or stalking.).

81.    The Class Representatives attest that they do not recall themselves or the baseball team being advised that USF had policies prohibiting sexual harassment or other sexualized misconduct by the coaches, setting boundaries for appropriate behavior by coaches, or identifying the risks of sexual misconduct by coaches because of the coach-athlete power imbalance. The Class Representatives also do not recall seeing any such policies displayed on campus, being told about such policies at any orientation conducted for new students, or receiving a publication that contained such policies.

82.    The Class Representatives further attest that they do not recall themselves or the baseball team being advised or learning of any procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus. The Class Representatives also do not recall seeing any such rules or procedures displayed on campus, being told about such rules or procedures at any orientation conducted for new students, or receiving a publication that contained such rules or procedures.

E.    **USF's Failure to Enact and Enforce Policies Regarding the Prohibition of Sexual Communications and Sexual Conduct by Coaches with Their Student-Athletes Created a Culture of Abuse.**

83.    Despite its unique position to view and understand the vast scope of the problem of sexual misconduct by coaches across NCAA member institutions and within USF, the University failed to take appropriate action to protect the well-being of the athletes in its care. USF had the knowledge, resources, and authority to implement comprehensive policies and practices to prevent and address such misconduct, yet it consistently denied or deflected responsibility. Instead of acknowledging the seriousness of the allegations against the Coach Defendants, USF minimized or dismissed their actions, characterizing sexualized behavior and comments as mere "locker room talk."[72] Even when confronted with evidence of inappropriate conduct, the University claimed that the student-athletes' reactions—such as playing along or laughing—implied consent or acceptance, ignoring the inherent power imbalance that

---

[72] Doe 3 Tr. (June 25, 2024) at 30:25–36:1 (USF taking the position in questioning Doe 3 that other baseball team members played along with/laughed at the sexual conduct); USF_0001573 (Confidential) (explaining "boys will be boys" as to Plaintiffs' allegations).

undermines any notion of genuine consent. This rationalization not only trivialized the harm caused to the athletes but also perpetuated a culture in which abusive behavior by coaches could continue unchecked.

84.    By downplaying and normalizing such conduct, USF has created a heightened risk of sexual misconduct and inappropriate communications by coaches toward their student-athletes. The University's failure to enforce robust safeguards makes it complicit in fostering an unsafe environment. USF bears direct responsibility for this risk because, as the institution overseeing and employing the coaches, it is uniquely positioned to establish and enforce protective measures. Through its control over hiring practices, training requirements, and oversight mechanisms, USF had the power to stop or prevent misconduct but chose not to exercise that power effectively, thereby prioritizing its reputation and athletic success over the safety and welfare of its student-athletes.

85.    The culture of abuse at USF was not limited to neglecting to address sexual misconduct but also extended to the tacit acceptance and participation in harmful hazing practices. Hazing further compounded the environment of fear and compliance, making it even more difficult for student-athletes to report any form of abuse. By failing to address or curtail these practices, USF perpetuated a climate where athletes were conditioned to endure mistreatment and remain silent. Having served as the Athletics Integrity Officer in the wake of the Sandusky scandal, and also the wake of the Piazza hazing death (even though it did not directly affect my role, it focused great attention on any form of coercive activity that might be deemed hazing), I am in a position to know that a university's culture of acceptance of sexual conduct and sexual communications by coaches starts at the top.  In my experience, institutional leaders set the tone for accountability and prioritization of athlete safety. When leadership fails to implement and enforce robust policies, it sends a clear message that misconduct may be tolerated or ignored. The fact that USF's culture of abuse is not limited to the baseball team[73] reflects an organizational acceptance of systemic failures that permeate the athletics department,

---

[73] Investigation Report Regarding Allegations of Sexual Misconduct Involving the University of San Francisco Men's Soccer Team, USF_0039959 (Not Confidential).

highlighting a widespread disregard for student-athlete welfare and an emphasis on protecting the institution's reputation and athletic success over ensuring a safe environment.

86.     Moreover, in my role as Athletics Integrity Officer, I helped coordinate annual training at Penn State for every athlete, administrator, and coach regarding sexual abuse and misconduct.  This training emphasized the critical importance of understanding the inherent power imbalance between coaches and student-athletes, and it provided comprehensive education on recognizing, preventing, and responding to and reporting misconduct anonymously or confidentially. By contrast, USF's training programs lack this essential focus. The training materials I reviewed from USF do not address the unique vulnerabilities of student-athletes or the significant control coaches exert over them. USF's failure to prioritize student-athlete safety or educate on the power dynamic between coaches and athletes leaves a critical gap in awareness and prevention, ultimately contributing to a culture where abuse can flourish unchecked.

87.     The lack of specific training is exacerbated by other failures at USF. The executive summary from Northwestern University's Football Hazing Investigation, conducted by Arent Fox Schiff, LLP and published in 2022, includes reference to three specific and relevant recommendations all notably absent at USF: (1) an online tool for reporting potential incidents of hazing or abuse; (2) additional antihazing trainings; and (3) review of the student-athlete survey process to identify concerns.[74]  In my role at Penn State in 2017, I had experience with each of these and their purposes. From what I reviewed, USF does not appropriately message the existence of (1) to its students and is entirely lacking as to (2) and (3).

88.     USF is far stricter and more draconian regarding recruiting inducements or amateurism violations than it is regarding the physical and psychological well-being of its athletes. It has enacted comprehensive and detailed 114-page Compliance Manuals to address every nuance of NCAA rules, covering issues such as recruitment timelines, permissible benefits, and amateurism standards. [75] Despite this meticulous approach to NCAA compliance,

---

[74] Northwestern, *Executive Summary: Northwestern Football Hazing Investigation*, https://news.northwestern.edu/assets/Docs/Executive-Summary-FINAL.pdf.
[75] E.g. USF_0013877 (Confidential). I found the Dons Compliance Manual publicly available online at https://s3.us-east-

USF has not enacted or enforced any rules explicitly addressing the serious harms of sexual misconduct or abuse by coaches toward student-athletes.

89.     This glaring discrepancy illustrates a misplaced set of priorities, where administrative and regulatory compliance is treated as paramount, while the safeguarding of student-athlete welfare is woefully neglected. This oversight is particularly egregious given the well-documented risks and power imbalances inherent in coach-athlete relationships. Furthermore, the lack of robust policies and protections remains indefensible in the face of evolving societal and legislative efforts to address sexual misconduct in sports, such as those seen in the Olympic Movement.[76]

90.     USF has ignored Congress' action to mitigate and adjudicate cases of sexual assault, misconduct, and abuse through the creation of SafeSport. This federally mandated initiative, based on generally accepted standards designed to protect athletes from abuse, underscores the importance of institutional accountability and proactive measures to ensure and report athlete safety. By disregarding these advancements, USF has failed to align its practices with national and generally accepted standards aimed at athlete protection.

91.     SafeSport's code, which applies to all coaches, athletes and other participants in sports offered under the auspices of the Olympic Movement and United States Olympic and Paralympic Committee, including baseball, contains specific language that creates a presumption of a power imbalance in a coach-athlete relationship. Specifically, it states:

> "M. Power Imbalance A Power Imbalance refers to an actual or perceived unequal
> distribution of power and authority between individuals.  A Power Imbalance is
> presumed to exist, but may be rebutted, in (a) any coach-Athlete relationship or (b) any
> other relationship where a Participant has authority or control over another person, is in a

---

2.amazonaws.com/sidearm.nextgen.sites/usfca.sidearmsports.com/documents/2023/10/16/Compliance_Manual_2023-24.pdf. While I reviewed both the Confidential and publicly-available version, I relied upon the publicly available version for purposes of my report because there were no differences material to my opinion.

[76] Protecting Young Victims of Sexual Abuse and Safe Sport Authorization Act of 2017, Pub. L. No. 115-126, 132 Stat. 318 (Feb. 14, 2018), available at https://www.congress.gov/bill/115th-congress/senate-bill/534/text.

position to confer, grant, or deny a benefit or advancement to the person, or is responsible for the physical or psychological well-being of the person. Once a coach-Athlete relationship is established, there is a rebuttable presumption that a Power Imbalance exists throughout the coach-Athlete relationship (regardless of age) and is presumed to continue for Minor Athletes after the coach-Athlete relationship terminates until the Athlete reaches 25 years of age."[77]

It is likely the Defendant Coaches would have been aware of SafeSport's authority and, very possibly, been trained in these policies in connection with their coaching in USA Baseball activities outside of USF.

92.     Additionally, USF has overlooked significant research and data that highlight the frequency and impact of sexual abuse in sports environments. This includes studies emphasizing the heightened risks faced by student-athletes due to the power dynamics in their relationships with coaches.[78]

93.     United Educators, a risk management company, published a study in 2024 of 73 claims arising from coach-on-athlete abuse in independent secondary schools and made the following findings. First that "[p]hysical and emotional abuse by coaches of athletes at independent K-12 schools is a relatively common occurrence that often goes undisciplined."[79] "Insurance claims and news reports make clear this is a widespread concern."[80]  Finally emerging concerns found in these claims indicate "a lack of oversight of the athletics department, and lack of training to prevent misconduct. Student-athletes' reported abuse doesn't always result in action. That is, reports weren't always investigated unless they reached school administrators outside the athletics department."[81]

---

[77] U.S. Center for Safe Sport, *SafeSport Code for the U.S. Olympic and Paralympic Movement*, at 9, USCENTERFORSAFESPORT.ORG, available at https://uscentersafesport.org/wp-content/uploads/2023/03/2024_SafeSportCode-_073124_v3-A-.pdf (last updated July 31, 2024).
[78] *See id.*
[79] Melanie Bennett, *Preventing Abuse in Coaching*, NBOA.ORG, (May 6, 2024), available at https://www.nboa.org/net-assets/article/preventing-abuse-in-athletic-coaching
[80] *Id.*
[81] *Id.*

94.    While the setting of a university athletic department may be different, the results are just as applicable to USF. The United Educators' study makes multiple relevant recommendations that were absent at USF through the entire class period including: (1) limitations on profanity and insults as motivation; (2) eliminating inappropriate touching without a clear developmental purpose; (3) an annual statement of behavioral standards for coaches and athletes; (4) encouraging reporting; (5) strengthening anti-retaliation mechanisms; (6) investigation with administrative oversight; and (7) enforcement of standards.[82]

95.    Moreover, USF has ignored the NCAA's own teachings, which stress the inability of student-athletes to provide genuine consent in sexual relationships with coaches and offer model policies to mitigate these risks. This disregard for best practices and expert guidance demonstrates a pattern of willful neglect and self-serving inconsistency.

## VI.    CONCLUSION

96.    Based on the documents I have reviewed to date, it is clear that USF has breached its responsibility to protect student-athletes, prioritizing institutional interests over the well-being and safety of those under its care.

I declare that the foregoing is true and correct to the best of my knowledge.

Dated: November 21, 2024

Robert A. Boland, J.D.

---

[82] *Id.*

# Appendix 1

# Robert A. Boland, J.D.
### 917-716-8637 (mobile)
### Bob74game@gmail.com (email)

### Education:

**Cumberland School of Law, Samford University,** Birmingham, AL
August 1992-May 1995
- J.D. (Juris Doctor) degree, Scholar of Merit, Dean's List
- Finalist, Justice Shores Moot Court Competition argued before Alabama Supreme Court
- ABA Negotiation National Team, Negotiation Competition Finalist
- Scholar of Merit, Top Student Award in Business Drafting course

**University of Tennessee, Graduate School of Communications,** Knoxville, TN
August 1990-August 1992
Major: Broadcast Management
- Completed additional course work toward Doctor of Philosophy degree
- Significant work in media research and federal communications law and regulation

**Columbia University, Columbia College,** New York, NY
September 1982-May 1987
- A.B. degree, Concentration in American History
- Varsity Football and Wrestling Letter winner

### Current Academic Appointment:

**Assistant Professor of Law, Seton Hall University School of Law**
Newark, NJ, July 2022- present
- Awarded Provost Academy Grant for Interdisciplinary Study of Sports

### Current Legal Activity:

**Of Counsel, Shumaker, Loop & Kendrick, LLC- 2022- present**
- Of Counsel to AmLaw 200 firm's Leisure, Hospitality & Sports Sector Practice Group
- Contract, Investigative & Industry Advisory work to clients in the Education, Entertainment and Sports spaces
- Cases include *Clayton v. NCAA*, leading to an injunction permitting college athlete to play after being declared ineligible- among first cases to interpret NY NIL Law
- Representing coaches and athletic directors at more than a dozen institutions achieve favorable outcomes in employment or investigatory matters
- NIL Organizational Structure Advising

### Prior Academic & Teaching Appointments:

**Athletics Integrity Officer & Acting University Ethics Officer, AVP-level appointment, Pennsylvania State University**
University Park, PA
*Athletics Integrity Officer, July 2017- March 2022*
*Acting University Ethics Officer July 2021- March 2022*

- Reporting to University Board of Trustees and charged with oversight of integrity and ethical compliance for 31 varsity sports in one of the nation's largest intercollegiate athletic departments with 850 student-athletes, nearly 400 employees and $150- $180 million dollars in annual revenue during tenure
- Oversight of NCAA, Big Ten, and institutional and legal compliance by athletic department
- Chair of the University's Athletics Integrity Council, providing oversight of intercollegiate athletics at Penn State and comprised of senior faculty and administrators, specific accomplishment: expansion of Athletics Integrity Council membership from 9 to 14 to include greater diversity and representation from senior leadership and faculty; revisions to the University's Athletics Code of Conduct related to interference with admissions, financial aid, student conduct, or sports medicine, reporting inquiries from the US Center for SafeSport and reporting inquiries related to sports betting information
- Led significant investigations either alone or in tandem with Affirmative Action Office, Title IX, Athletics Compliance, Office of Student Conduct, and Labor & Employee Relations into serious issues of misconduct or failures of compliance
- Charged with implementing oversight and training program to manage impact of legalized sports betting- program includes more than 30 specific initiatives to train and educate potential stakeholders in risks posed by game fixing or conflicts of interest, including monitoring betting lines nationally
- Leading role in analysis implementation of University's Name, Image and Likeness (NIL) response, including assisting the mark-up of the Pennsylvania NIL bill before passage
- Revised, implemented, and approved training for over 1600 signing parties to University's Athletics Code of Conduct
- Coordinate and assist in campus response to Title IX Sexual Violence and Clery Act compliance, including serving on University-wide Title IX Regulation re-drafting committee in response to new Department of Education Guidance, 2021 became Certified Title IX Coordinator by National Association of University Attorneys (NACUA)
- Collaborative and shared responsibility with Office of General Counsel, Law Enforcement & Police, Office of Student Conduct, Affirmative Action and Title IX, Registrar, Provost, Audit and Risk Management, and Provost for issues arising out of athletics
- Specific Oversight of Big Ten Standards of Institution Governance Standards including assuring the independence of sports medical services, admission integrity- internal "Operation Varsity Blues review and ongoing implementation of Name, Image & Likeness for student-athletes

- Implemented education and training regarding compliance with U.S. Center for SafeSport jurisdiction
- Role also includes oversight of serious issues and management of intercollegiate athletics on 19 Penn State Commonwealth Campuses and dotted-line leadership of Commonwealth Campus Athletics
- Co-author of Intercollegiate Athletics Drug and Alcohol Education Policy and Chair of Drug Testing Appeals Committee

**Lecturer, Penn State University, School of Labor & Employment Relations**
University Park, PA 2018- 2022

**Penn State University Law School**
University Park, PA 2019- 2022

**Faculty & Graduate Director, Ohio University**
Athens, OH 2015-2017
**College of Business, Department of Sports Administration**
**Director of the Master of Business Administration (MBA) /Master of Sports Administration (MSA) Dual Degree Program**
Executive in Residence Sports Law, August 2015-2017
Director MBA/MSA & MSA Programs, January 2016-2017
Joined the faculty of the oldest and globally top-ranked sports administration program in the world, Ohio University maintained ranking as top graduate sports administration course in the world in each of two years of program leadership

- Courses taught included: *Law of Sports (graduate & undergraduate), Sport Finance, Sport History*
- As Director of the MSA and MBA/MSA Dual Degree Programs, charged with curriculum, faculty staffing, budget, recruitment, and admissions process responsibility for highly selective pool of candidates graduate candidates
- Recruited and admitted 43 students to yield 40 students, with GMAT Median of 600 and GPA Median of 3.7, from 7 countries, in two admitted classes
- Led increased commitment to diversity in recruitment and admissions; the first admitted class under my leadership was 40% female- the highest percentage in the program's 50-year history and overall admitted group was 60% diverse, overall
- Traveled to Bayreuth, Germany as assistant director of Global Consulting Project, in conjunction with Adidas and Universitat Bayreuth, assisted in the completion of a global partnership with Universitat Bayreuth that allows undergraduate students from Bayreuth and Ohio to receive a degree from both universities after residencies in both countries and meet European Union work requirements on completion

**New York University**
New York, NY  2001-2015
**Academic Chair & Clinical Associate Professor of Sports Management & Business**
**Preston Robert Tisch Center for Hospitality, Tourism, & Sports Management**
Academic Chair 2011- 2014
Full-time Clinical Associate Professor 2010- 2015
Full-time Clinical Assistant Professor 2003- 2009
Adjunct Lecturer September 2001-2003

- Courses: undergraduate- *Introduction to Sports Management, Leadership and Management in Sports Industries, Structures and Processes of Sports Organizations, Sports Finance, Foundations of Sports and Leisure Behavior, Sports Law, Antitrust and Collective Bargaining, Professional Franchises, Leagues and Governing Organizations* and graduate- *Legal Issues, Economics and Finance of Sports, Planning and Development of Major Events, Revenue Management, Sports Tourism and Professional Franchise Operations, Labor Relations in Sports*
- As a faculty member, among the very highest and most consistently reviewed faculty at the Tisch Center and at NYU, as a whole
- Winner of the Schoolwide Teaching Excellence Award in 2006 and Schoolwide Service Award in 2014 (faculty may only win each award one time)
- Founding faculty member of Master of Science degree program in Sports Business that launched in the Fall 2003, more 200 students enrolled within the first two years of program, exceeding University and departmental expectations for success by twenty-fold and produced gross annual revenue of $5 - $6 million dollars
- Appointed Academic Chair of the Preston Robert Tisch Center, senior academic administrator, supervising as many as 120 adjunct faculty from Hospitality, Tourism, and Sports in courses from the Undergraduate, Masters to Continuing Education levels; leadership of 15 full-time faculty and curricular development; during time as Academic Chair adjunct faculty grew from 65 to 140 based on growth of Center
- Adjunct faculty in the 2012-2013 and 2013-2014 academic years were rated equal in quality and satisfaction in student evaluations (5.9 on 7.0) to full-time faculty on Likert scale for effectiveness and quality of teaching, an improvement of 33%
- Oversaw enrollment growth of master's degree programs from 150 to 300 students, from 2011-2013 with no corresponding increase in students on academic probation or being dismissed for academic reasons or attrition
- During term as Academic Chair oversaw growth of traditional-aged undergraduate programs, with highly competitive admissions standards, increasing from approximately 300 students to nearly 400 students with tuition and fees in excess of $72,000 annually- the nation's highest for two of those four years
- Attrition among undergraduate students were at lowest level in history of Center during period as Academic Chair
- Student satisfaction as measured by University survey showed the Tisch Center among the highest of all divisions of NYU during period as Academic Chair

- Growth of Tisch Center programs countered an overall decrease in enrollment of similar programs nationally and globally, and an overall decrease in all enrollment at NYU of 2%
- Led curriculum revision in 2010 that resulted in the creation of innovative concentrations for undergraduate and graduate programs in sports and hospitality; concentrations aligned with employment opportunities included in Sports- Law, Media, Professional and Collegiate Operations, Events, Sales and Marketing; in Hospitality- Operations, Hotel Development, Brand Strategy, Revenue Management and Marketing
- Helped integrate broad based foreign study program into Tisch Center curricula, initiating intensive courses taught at NYU Centers in Berlin and Prague and also fieldwork experiences in London, Barcelona, Lausanne, Munich and Vienna

**Affiliated Faculty Member, New York University Law School**
Co-teaching with Arthur R. Miller, Spring 2011- 2014
    Sports Law
- Affiliated appointment to co-teach with cross disciplinary course in sports law with legendary University Professor Arthur R. Miller
- Developed a series of multiple dialogues and symposia on Sports Law for Law School in collaboration with existing sports business programs taking place in the Tisch Center

**Courses Taught:**

**Seton Hall University Law School:**
- Sports Law (IND 7308) Fall 2022-23
- Hospitality Law (IND 7323) Spring 2023-24
- Collegiate Sports Law Seminar (IND 9555) Spring 2023-24
- Name, Image & Likeness Special Topics Course Winter 2024

**Penn State University Law School:**
- Representing the Professional Athlete (EXP 954) Spring 2020, 2021, 2022

- **Penn State School of Labor & Employment Relations**
- Collective Bargaining in Professional Sports (LER 459) Spring 2019, 2020, 2021, 2022
- The Employment Relationship: Law & Policy (LER 201) Fall 2020, 2021

- **MBA/MSA Courses- Ohio University:**
  - Law of Sports (BUSL 5650) Fall 2015, 2016

**Undergraduate Sports Management Courses- Ohio University**
- Law of Sports (BUSL 4650) Fall 2015, Spring 2016, Fall 2016, Spring 2017
- Financial Issues in Sports (SASM 4250) Fall 2015, Spring 2017

- Associate Director Global Consulting Program- Bayreuth, Germany, Summer 2016

**Graduate Courses- NYU Tisch Center Master of Sports Business Program:**
- Economics and Finance of Sports Industry (Y70.1050)
  - Legal Issues in Sports (Y70.1040)
  - Revenue Management (Y70.2130)
  - Planning and Development of Major Sporting Events (Y70.2140)
  - Sports Tourism Development (Y70.3360)-
    - Summers 2007- 2013- two-week intensive course taught at NYU Center in Prague Czech Republic with field work travel to Munich, Germany; Innsbruck, Austria; Zurich, Switzerland and Lausanne, Switzerland, Course taught in Berlin in 2011 and 2013.
  - Advanced Research Seminar (Y70.3000)-
    - Professor, Research Capstone Course for Master's Students 2013- 2015
  - Professional Sports Franchise Operations (Y70.2015)
  - Labor Relations in Professional Sports (Y70.2055)

**Undergraduate Courses- NYU Tisch Center Bachelor's in Sports Management:**
- Introduction to Sports Management (Y68.1001)
- Structures and Processes of Sports Industries (Y68.1010)
- Foundations of Sport and Leisure Behavior (Y68.1020)-
  Developed canon of 15 significant texts to run through these three classes to use liberal arts technique to create common base of knowledge among entering majors
- Leadership and Management in Sport (Y68.1350)
- Sports Law (Y68.2320)
- Sports Finance (Y68.2310)
- Contracts and Negotiations (Y68.2450)
- Business Development I (Y66.1600& Y68.1600)
- Professional Seminar I-IV (Y.68.1071, 1072, 1073, 1074)
- Antitrust and Collective Bargaining (TCSM1-2046)

**University, School, and Divisional Service:**

**University Level Service**

**Penn State:**
Board of Trustees Committee on Law & Compliance, ex officio- 2017- 2022
Name, Image, and Likeness Implementation Committee (START), 2021-2022
Title IX Policy Revision Task Force Member- 2020
Faculty Senate Committee on Intercollegiate Athletics, resource member, 2017-2022
University Ethics & Compliance Council, 2017- 2022
Athletics Integrity Council, Chair, 2017-2022

**New York University:**
Faculty Fellow in Residence-
*Appointed in 2007 to three-year term as Faculty Fellow in Residence,*
renewed to new three-year term in 2010, extended to 2-year special term in 2013
NYU Residence Education selected 24 faculty members to serve as faculty fellows in residence (FFiR) in university residence halls.  Other Faculty Fellows in Residence in cohort including the dean of the College of Arts and Science, the dean of Wagner School of Public Administration and the vice president for student affairs, the position involves the creation and implementation of special academic enrichment programming for 400 students in Coral Towers residence hall.  Faculty Fellows also meet in committee to serve as a link between the residential experience and academic experience at NYU. As a Faculty Fellow, created and launched model program called "visiting faculty in residence" which enabled outstanding scholars and professionals to visit NYU and connect with students in both the classroom and residence halls

Academic Advisement & Mentorship-
Served as primary academic advisor to as many as 50 undergraduate and graduate students majoring in sports management or sports business in each semester. Have advised students at all academic levels from freshman to graduate levels.  Member along with University President John Sexton of colloquium committees of two selected Gallatin School Seniors doing projects related to sports.  Currently serve as mentor to about 35 undergraduate and graduate students.  Worked with Divisional Dean and administrative staff to devise current advisement/mentorship structure. As Academic Chair oversaw staff of 8 professional advisors and career services & industry relations staff of three.

Socratic Dialogue Creation-
Coordinated the first Socratic Dialogue led by University Professor Arthur Miller on Sports in America; featuring a panel of distinguished industry leaders and faculty as activity for Graduate Sports Business Society; produced a second panel as part of 2008-09 Cal Ramsey Distinguished Lecture Series.  Subsequently have created eight Socratic Dialogues and facilitated the creation of New York University's Sports and Society Program

Undergraduate Academic Affairs Committee- 2014-2015
Distinguished Teaching Award University Wide Committee- 2012- 2014
Middle States Assessment Task Force- 2011-2014

**School-wide Service**

**Seton Hall Law School**
Sports Speakers Series, Organizer & Moderator 2022- present
Sports Law Symposium, Organizer 2023

Gaming, Hospitality, Entertainment & Sports (GHamES) Initiative, Faculty 2022-present
Provost Academy Grant for Interdisciplinary Study of Sports, 2023- present
Founders Day Committee Member, 2023- present
Curriculum Committee Member, 2023- present

**Ohio University College of Business:**
College Task Force on Shared Governance, co-chair - 2016-2017
Continuous Improvement Team- Graduate Studies- 2016-2017
Continuous Improvement Team- New Faculty- 2015-2016
Search Committee Member for Senior Director of Events- 2017

**New York University School of Professional Studies:**
Faculty, Rank, Title, and Privilege Committee- 2011-2013
Academic Policy Committee- 2007-2013
Middle States Assessment Task Force- 2011-2014

**<u>Divisional Service</u>**

**Department of Sports Administration, Ohio University, College of Business:**
Department of Sports Administration Faculty Search, Search Committee Member- 2017
Department of Sports Administration Annual Faculty Review Committee- 2016-2017
Department of Sports Administration International Opportunities Committee- 2016-2017
MSA Student Association Advisor- 2016-2017

**Preston Robert Tisch Center for Hospitality, Tourism, & Sports Management, New York University:**

Divisional Study Abroad-
Led students for study abroad experience at NYU Center in Prague, Czech Republic 2007-2009
NYU Center in Berlin, Summer 2011-2014
Each year the reach of the course was expanded to include former Olympic sites in Germany and Austria, European and World Championship sites in the Czech Republic, Switzerland, Austria, and the headquarters of the International Olympic Committee in Switzerland. Planned and developed courses and field work for students, including travel arrangements and enrichment activities

Tisch Center Scholars-
Led honors scholars for research trip to London in 2012 examining preparation for the 2012 Olympic Games. Barcelona in 2013 looking at legacy of 1992 Olympics on city. London in 2014 to examine post-Olympic effect on Gross Domestic Product, cultural development, economic and life of the city

Club Advisement-
Previously advisor to Undergraduate Student Sports Business Society 2003-2005, then advisor to Graduate Sports Business Society from 2005-2014, coordinating 8-10 events per academic year including the implementation of a program called Factually Speaking which allows students to interact with faculty in an informal manner on crucial business issues

Committee Service-
Member of the School's Academic Policy committee.
Member of three search committees for full-time faculty, two-time participant in President's faculty roundtable.  Faculty Fellow in Residence committee.
Member Tisch Center grade appeal committee.
Member of Tisch Center committee on the creation of minors.
Co-chair of Tisch Center scholarship committee

Curriculum Revision and Development-
Co-Chair of faculty committee updating of undergraduate and graduate course offerings including developing first of its kind legal issues in sports minor for undergraduate students, process also includes development of curriculum from idea stage to course description to model syllabus stage, concluding with New York State Department of Education Approval in 2008 and rollout in 2009-2010 academic year

Student Recruitment-
Led initiatives for Tisch Center that involved monthly graduate student recruitment events, 10 annual undergraduate student recruitment events focused fall and spring, coordinating, and overseeing follow up on interested students and applicants; measure of success of these initiatives include significant enrollment increases in all programs and nearly 30% across the Tisch Center as a whole since 2011

Partnership with the U.S. Conference of Mayors- Mayors Professional Sports Alliance-
Creation of a partnership between the U.S. Conference of Mayors, the Mayors Professional Sports Alliance- a special interest group of the membership of the U.S. Conference of Mayors aimed at developing best practices in relations and facility development with professional sports teams, since 2012, the U.S. Conference of Mayors and NYU's Tisch Center have collaborated on research projects on more than a dozen cities and have developed a database of arena and stadia leases

Industry Relations Development-
Played significant role in identifying industry leaders for Tisch Center Advisory Board, and in building industry partnerships.  Significant Industry leaders who became involved with the Tisch Center as a result of these activities included:
- **Marvin Miller,** Former Executive Director of the Major League Baseball Players Association;
- **Allie Sherman,** Former Head Coach, New York Giants and Executive Director New York City Off-Track Betting- recruited to Tisch Center Advisory Board;
- **Fay Vincent,** former Commissioner of Major League Baseball;

9

- **Pat Kirwan,** former Vice President New York Jets - recruited to serve as adjunct faculty;
- **Mike Tannenbaum,** General Manager New York Jets;
- **Ernie Accorsi**, General Manager, New York Giants; participated in career panel;
- **Earl Monroe**, NBA Hall of Famer and business leader;
- **Kevin Wynne,** former Senior Vice President, Madison Square Garden, now COO of Don King Enterprises- recruited to serve as adjunct faculty;
- **Seth Abraham,** former President HBO Sports and Madison Square Garden- recruited to serve as adjunct faculty;
- **Gregory Carey**, Managing Director Infrastructure Finance, Goldman Sachs- recruited to serve as adjunct faculty; member of advisory board;
- **Craig Esherick,** VP of University Relations, College Sports Television; recruited to adjunct faculty
- **Phil Simms,** CBS Television, former New York Giants great;
- **Frank Gifford**, NFL Hall of Famer and ABC Broadcasting legend;
- **David Gardi,** NFL Vice President of Operations;
- **Joan Cronan,** Athletic Director, University of Tennessee;
- **Bob Lamonte**, President, Professional Sports Representation, Inc- recruited to Tisch Center Advisory Board;
- **Michael Cramer,** venture capitalist and former president of Texas Rangers and Dallas Stars; recruited to full-time faculty in 2007
- **George Pyne,** President, International Management Group (IMG) former COO of NASCAR, distinguished lecturer;
- **Michael Lombardi,** former Director of Player Administration and Football Operations for Oakland Raiders; recruited as first participant in Visiting Faculty in Residence program, General Manager of the Cleveland Browns of the NFL; Assistant New England Patriots- Adjunct Faculty and Tisch Center Advisory Board;
- **Partho Dutta,** Head of Sports Practice HKS Architecture New York Office, designer of Yankee Stadium, adjunct faculty;
- **Doug Logan,** former Executive Director USA Track and Field, founding Commissioner MLS, adjunct faculty;
- **Doug Fillis,** EVP IMG College, formerly Vice President for Corporate Partnerships, FCNYC- MLS Franchise, former Senior Associate Athletic Director Rutgers University, adjunct faculty;
- **Len DeLuca,** former Vice President for Programming CBS and ESPN, President of Leonard DeLuca and Associates, adjunct faculty
- **Dana Jacobson,** CBS Radio and Television Host, ESPN Anchor, adjunct faculty;
- **Don McPherson,** ESPN Broadcaster, College Football Hall of Fame;
- **Tiki Barber,** New York Giants star, CBS Radio Host;
- **Charles Grantham,** former Executive Director National Basketball Players Association, adjunct faculty;
- **John Maguire,** Vice President for Corporate Partnership, New York Giants, adjunct faculty;
- **Doug Smoyer,** Vice President for Business Development, National Football League, adjunct faculty;

- **Frank Supovitz,** Senior Vice President for Events National Football League, distinguished lecturer 2014;
- **Evan Dabby,** Executive Director New Jersey Soccer Federation, former Senior Director Security and Supporter Relations, Major League Soccer adjunct faculty;
- **Ray Katz,** President of SourceOne Sports, adjunct faculty;
- **Joe Banner,** former Chief Executive Officer, Cleveland Browns;
- **Ari Nissim,** Director of Player Administration- New York Jets, adjunct faculty;
- **David Fuller,** Principal, The GlideSlope, adjunct faculty, research partnership;
- **Alan Ostfield,** President LiveNation, New York/Atlantic, former President of Detroit Pistons and Palace Sports and Entertainment, adjunct faculty;
- **David Kahn,** former President Minnesota Timberwolves, adjunct faculty;
- **Tom McClimon,** Deputy Executive Director of U.S. Conference of Mayors, research partnership

**Media and Public Relations Activities:**

Actively appearing on, speaking, and giving editorial assistance to a large number of media outlets on relevant sports topics. Giving an estimated 1500 interviews since 2006. A sample of media outlets include:

Television:
- NBC Today Show; NBC Nightly News; BBC; ABC World News Tonight; Good Morning America; CNN; CNN Headline News; MSNBC; Bloomberg Television, Canadian Broadcasting Company; Canadian Television; TV Ontario; Reuters Television; Al Jazeera English and Canada's Business News Network (BNN) television

Radio:
- WCBS-AM Radio in New York; CBS Sports Radio nationally; the nationally syndicated Paul Finebaum Radio Network and XM Satellite Radio's Baseball Channel; WTMY-AM; WASI-AM

Print:
- Associated Press; Reuters; The Wall Street Journal; Newsweek; The New York Times; New York Daily News; New York Post; Los Angeles Times; Newsday; Brandweek Magazine; Advertising Age Magazine; ESPN: The Magazine; Crain's New York Business; The Orange County Register and the Fort Wayne News Sentinel; Sports Illustrated; Fortune; Sports Business Journal

**<u>Books:</u>**

Boland, R., Okoli, C. and Fillis, D. (due August 2023), Name, Image & Likeness: An Introduction (Textbook). Human Kinetics, Champaign, IL. (*in progress*).

**<u>Book Chapters:</u>**

Boland, R., McNeely, M. (2023). Name, Image, & Likeness. In G. Uberstine, Law of Professional and Amateur Sports Treatise (in press): Clark, Boardman, Callaghan Publishing.

Boland, R. (2023). Deflategate. In J. Sanderson, Corruption & Scandal in American Sports. ABC-Clio Publishing.

Boland, R. (2021). Stadium Finance. In K. Weaver, Sports Finance (Textbook). Dubuque, IA: Kendall Hunt Publishing.

Boland, R. (2011). Blackouts. In L. Swayne, M. Dodds & G. Golson, Encyclopedia of Sports Management and Marketing.  Thousand Oaks, CA: Sage Publications.

Boland, R. (2011) Cartel. In L. Swayne, M. Dodds & G. Golson, Encyclopedia of Sports Management and Marketing.  Thousand Oaks, CA: Sage Publications.

Boland, R. (2011) Change and Sports Management. In L. Swayne, M. Dodds & G. Golson, Encyclopedia of Sports Management and Marketing.  Thousand Oaks, CA: Sage Publications.

Boland, R. (2011) Contracts, Television and Radio. In L. Swayne, M. Dodds & G. Golson, Encyclopedia of Sports Management and Marketing.  Thousand Oaks, CA: Sage Publications.

Boland, R. (2011) League Structure. In L. Swayne, M. Dodds & G. Golson, Encyclopedia of Sports Management and Marketing.  Thousand Oaks, CA: Sage Publications.

Boland, R. (2011) Local Market: Major League. In L. Swayne, M. Dodds & G. Golson, Encyclopedia of Sports Management and Marketing.  Thousand Oaks, CA: Sage Publications.

Boland, R. (2011) Local Market: Minor League. In L. Swayne, M. Dodds & G. Golson, Encyclopedia of Sports Management and Marketing.  Thousand Oaks, CA: Sage Publications.

Boland, R. (2011) Rights Fees. In L. Swayne, M. Dodds & G. Golson, Encyclopedia of Sports Management and Marketing.  Thousand Oaks, CA: Sage Publications.

Boland, R. (2011) Sports Networks. In L. Swayne, M. Dodds & G. Golson, Encyclopedia of Sports Management and Marketing.  Thousand Oaks, CA: Sage Publications.

Igel, L.H. & Boland, R. (2010). National Collegiate Athletic Association. In C.J. Russo (Ed.), Encyclopedia of Law and Higher Education. Thousand Oaks, CA: Sage Publications.

Igel, L. & Boland R. (2009). Earnings of professional athletes, "21st century economics: A reference handbook" Sage Publications.

## Peer Reviewed Publications:

Boland, R., Stop Digging: Pitfalls of the NFL's Investigatory Procedures (Spring 2016) American Journal of Trial Advocacy, Vol. 39, No.3, 595-607.

Boland, R., Hard Talk: Do Sports Mega Events Contribute, (Spring 2014) Americas Quarterly: Policy Journal of the Western Hemisphere, Spring 2014, 22-23.

Boland, R. & Lattinville, R. & Speyer, B. Labor Pains: The effect of a work stoppage on the NFL and its coaches. (2010, June) Marquette University Sports Law Review, Vol. 20, No. 2, 335-375.

Boland, R. & Lattinville, R. (2007, January), Coaching in the National Football League, a market analysis and legal review. Marquette University Sports Law Journal, vol. 17, number 1.

Boland, R. & Strutin, K.  (1993, July).  Media relations for the criminal defense attorney.  Practical Litigator.

Boland, R. (1991, March) Origin of the property right in sports broadcasting law, the Annals of University of Tennessee Communications Research Symposium.

## Peer Reviewed and Juried Conference Presentations:

Balsam, J.; Boland, R., Greenspan, D.; Levine, B., London, R., Rapoport, I., Wickersham, S. (2016: March). The Confines of the Commissioner's Disciplinary Power: Tom Brady & Deflategate. Fifth Annual Sports Law Colloquium, New York University School of Law. New York, New York.

Belser, J., Berger, K., Boland, R. (*panelist & moderator*), Miele, K. (2016 March). Sports Agency, Negotiating the Superstar Contract. Fourth Annual Sports Law Symposia, Cardozo School of Law, New York, New York.

Boland, R. (*presenter*) (2016 February) Stop Digging: Lessons from the NFL's Season of Investigations. "Probing": Attorneys Exploring, Investigating, and Uncovering

Misconduct Outside the Courtroom. Annual Symposium of the American Journal of Trial Advocacy, Cumberland School of Law, Samford University, Birmingham, Alabama.

Boland, R. *(moderator)*, DeLuca, R., Maguire, J., Nahra, J., Verille, M. (2014 April). Anatomy of Sports Endorsement Deal. New York University Law School Third Annual Sports Law Colloquium, New York University, New York.

Barber, T., Boland, R., DeLuca, L., R., Edelman, M., Esherick, C., Grantham, C., Jacobson, D., McPherson, D. (2014 April). Unionization of College Athletes and the Future of the NCAA.  New York University Law School Third Annual Sports Law Colloquium, New York University, New York.

Boland, R., McDonnell, W., Marks, A., O'Keeffe, M., Orza, E., (2014 April). The Ethics of the A-Rod Case. New York University Law School Third Annual Sports Law Colloquium, New York University, New York.

Belser, J., Boland, R., Grantham, C., Litvin, J. (2014 March) Unionization of College Athletes. Cardozo Law School Sports Law Symposium, New York, New York.

Balsam, J., Boland, R., Heitner, J., Schwartz, A. (2013 April).  Head Injuries in the National Football League.  New York Law School Sports Law Symposium, New York, New York.

Boland, R., Higgins, M., Wertheim, J. (2013, March). Freedom to Tweet, New Dimensions in Social Media, Sports and the Law.  Fordham University School of Law, Sports Law Symposium, New York, New York.

Aldrich, E., Boland, R., Cramer, M., Luchs, J., Stapleton. W. (2011 March). Agents across entertainment.  University of Texas Review of Entertainment and Sports Law Annual Symposium, University of Texas School of Law. Austin, Texas.

Boland. R., Caudill, D., Cramer, M., Jones, B., Luchs. J. Weston, M. (2011 March). The future of agents.  University of Texas Review of Entertainment and Sports Law Annual Symposium, University of Texas School of Law. Austin, Texas.

Boland. R., Feher, Ford, J., D., Goldfein, S., Granik, R., Wertheim, J. (2011 April) From Bird to Brady: collective bargaining in American Sports.  Intellectual Property Entertainment Law Society. New York University School of Law.  New York, New York.

Boland, R. *(moderator)*, Grantham, C., Hawkins, F., Lombardi, M., McDonnell, W., Wertheim, J. (2011 April) Week of April 18: Tisch Center special roundtable on collective bargaining agreements in professional sports. Preston Robert Tisch Center for Hospitality Tourism and Sports Management. New York, New York.

Boland R. (2010, April).  Made to be broken: an analysis of collegiate coach movement due to contractual terms. College Sport Research Institute 2010 Scholarly Conference on College Sport, Chapel Hill, North Carolina.

Esherick, C., Baker, R., Boland, R. & McDonnell, W. (2010, April). Which professional sport has the best college eligibility rules? College Sport Research Institute 2010 Scholarly Conference on College Sport, Chapel Hill, North Carolina.

Boland, R. (2010, March), The Rooney Rule, Seton Hall School of Law Sports & Entertainment Law Symposium, Seton Hall University, Newark, New Jersey.

Boland, R., Feldman, G, McCann, M., Pace, M. Wertheim, J.  (2010, March). Hot topics in sports law.  New York Law School Media Entertainment and Sports Law Society, Sports Law Symposium, New York Law School, New York, New York.

Barragan, L., Boland, R., Feldman, G., Haberman, P., Soskin, D. (2010 March). Breaking into the sports industry.  New York Law School Media Entertainment and Sports Law Society, Sports Law Symposium, New York Law School, New York, New York.

Boland, R., Denhart, M., Esherick, C., Otto, K. & Ridpath, D. (2009, April).  Is the intercollegiate athletics ship sinking? If so, is there anything we can do to right the ship?  Panelist on keynote panel presented for the College Sport
Research Institute's 2009 Scholarly Conference on College Sport at the University of North Carolina.  Chapel Hill, North Carolina.

Boland, R. (2008, October).  Pressing issues in professional sports.  Panelist on panel presented for National Sports Law Institute Fall Conference at Marquette University. Milwaukee, Wisconsin.

Boland, R. (2008, February).   Sports tourism: a continental approach to African tourism development. Panelist on panel presented for Africa Travel Association. New York, New York.

Boland, R. (2008, January).  Winning through diversity: what sports can teach us.  New York University Residence Education Training Seminar. New York, New York.

Boland, R. (2006, October).  Recent trends in coaching contracts. Panelist for final panel of annual International Conference on Sports and Entertainment Businesses, Craig Kelly Law Forum. Columbia, South Carolina.

Boland, R., Lattinville, R. & Whiffen, T. (2006, June), Negotiating coaching contracts in professional sports. Panel presented at the annual meeting of the Sports Lawyers Association, Toronto, Ontario, Canada.

Boland R., Bolster, J., Hollander, D. & Sullivan, C. (2006, February).  Sports and film. Panel discussion at SoHo House sponsored by Angelika Films, New York, New York.

15

Boland, R., Bolster, J., Hollander, D. & Sullivan, C. (2006, February).  Sports and film. Panel discussion at Film Archives, New York, New York.

Boland, R. (2005, October). Playing Moneyball to win.  Paper presented at the annual International Conference on Sports and Entertainment Businesses. Columbia, South Carolina

Boland, R. (2004, April) AHCA-NYU collegiate hockey coaches salary study.  Paper presented and keynote presentation at annual meeting of the American Hockey Coaches Association. Naples, Florida.

Boland, R. (1991, March) Origin of the property right in sports broadcasting law, University of Tennessee Communications Research Symposium.

**Selected Industry Articles & Publications:**

Boland, R. & Grantham, C. (2022, 4 October). The Robert Sarver Situation Must Prompt Action Across All Sports. Sportico.

Boland, R. (2016, June) Did They Think Better or Did They Blink? Antitrust Implications of the Now Abandoned Satellite Camp Rule. Legal Issues in Collegiate Athletics.

Boland, R. & Bonina, E. (2014, 23 October). Clearer player disciplinary process can help restore NFL's luster. New York Law Journal.

Boland R. (2011, 14 February). Wilpon's financial morass offers lessons for franchise owners. Sports Business Journal.

Boland R. & Igel, L. (2009, 7 September). Kennedy's legacy lives on in Title IX. Sports Business Journal.

Boland, R. (2008-2009 Winter) Golf marketing: all those greenside logos add up to greenbacks. Sun Country Golf Magazine.

Boland, R. (2008, 17 September). The stadium naming rights problem.  National Football Post, online publication www.nationalfootballpost.com.

Boland, R. (2008, September-October). Advice to parent: how to play the college golf scholarship game.  Sun Country Golf Magazine.

Boland, R. (2008, 16 June). Jim McKay: Farewell to sports favorite teacher.  Sports Business Journal.

Boland, R. & Igel, L. (2007, 21 May). Don't sell your values for naming rights.  Sports Business Journal.

Boland, R. & Wagner, J. (2007, 7 May). Few understood sports' cultural impact as Halberstam did. Sports Business Journal.

Boland, R. & Rosenberg, J. (2006, 24 March). NHL's DH will thrive under the salary cap.  Sports Business Journal.

Boland, R. (2006, 16 January).  Baseball's recent hires test the age of reason.  Sports Business Journal.

**Industry Speeches, Presentation & Keynotes:**

Boland, R. (moderator) Kenah, R., Moore, Z. and Beard Stanley, T. (2022, March) How events of all sizes can work with and benefit diverse communities. Travel Unity Southeastern DEI Summit, Brookhaven, Georgia.

Boland, R. (2022, March). NIL: an introduction. NCAA Frozen Four Women's Leadership Forum, State College, Pennsylvania.

Panelist (2021, December). The Future of College Sports Integrity and Beyond. SBC North America, Sports Betting Summit, East Rutherford, New Jersey.

Boland, R. (2015, December). Sports economics & sports agency. New York Times Pre-College Program, New York, New York.

Boland, R. (2014, November). Tourism educators' forum, moderator. Africa Travel Association 39th Annual Congress, Kampala, Uganda.

Boland, R. (2014, November). Sports tourism development in Africa. Africa Travel Association 39th Annual Congress, Kampala Uganda.

Supovitz, F., Boland, R. (2014, March). On the biggest stage: an analysis of New York and New Jersey's hosting of the Super Bowl. Cal Ramsey Distinguished Lecture, New York University, New York, New York.

Panelist (November 2012). Arthur Miller sports in America Socratic dialogue: Head Injuries in Sports. Presented by
New York University's Medical School, Langone Medical Center, Hospital for Joint Diseases, Preston Robert Tisch Center, New York, New York.

Boland, R. (2009, April). The art of negotiation.  Asian American Hotel Owners Association (AAHOA) Annual Conference, National Harbor Resort, Maryland.

17

Panelist (2008, March). Arthur Miller sports in America Socratic dialogue: Performance enhancing drugs illegal, immoral, unfair? Presented by New York University Graduate Sports Business Society. New York, New York.

Boland, R. (2008, March). The art of the deal: practical negotiation solutions. Asian American Hotel Owners Association (AAHOA) Annual Conference. San Antonio, Texas.

Boland, R. (2007, September). The art of the practical negotiation solutions.  Asian American Hotel Owners Association (AAHOA) Executive Leadership Conference. Gwinnett, Georgia.

Boland, R. (2007, October).  Can sports be saved. Invited lecture at Samford University's Cumberland School of Law, as part of Cordell Hull Distinguished Speakers Series. Birmingham, Alabama.

Boland, R. (2004, April) AHCA-NYU collegiate hockey coaches salary study.  Paper presented and keynote presentation at annual meeting of the American Hockey Coaches Association. Naples, Florida.

**Honors & Awards:**

"Law 360 Award for Distinguished Legal Writing- Law Firm," Presented by The Burton Awards- which honors the highest standards of legal excellence nationally, May 2023.

"Award for Service," New York University, School of Continuing and Professional Studies, April 2014.

"Award for Teaching Excellence," New York University, School of Continuing and Professional Studies, April 2006. Also nominated for University Teaching Medal.

"Best in the Nation" Award Winner; Basketball Media Guide and Poster. College Sports Information Directors of America, National Publications Award in 1992.

**Professional Affiliations:**

- International Institute for Sports Business and Leadership, Gordon Lang School of Business, University of Guelph (Canada) Advisory Board Member 2018- present
- Penn State University Sports Management Program Advisory Board 2013- present
- Sports Lawyers Association 1998- present
- National Sports Law Institute 2006- present
- College Sports Research Institute 2006- present
- American Bar Association- member 1992- present

**Areas of Expertise and Interest:**

- Sports Contracts, Salary Caps and Collective Bargaining Issues
- Coaching Contracts and Compensation
- Leadership in Collegiate and Professional Athletics
- Higher Education Law: especially related to intercollegiate athletics
- Title IX
- SafeSport
- Antitrust and Labor issues in Sports
- Collegiate Athletic Conference Realignment
- Name, Image, and Likeness
- Agent and Player relations
- Amateur Athletes Rights
- Stadium Economics
- Sports Franchises and Cities
- Mega Events and Sports Legacy
- History of Sports

**Recent Sports Sector Consulting & Extramural Work:**

**Of Counsel, Shumaker, Loop & Kendrick, LLC- 2022- present**
- Of Counsel to AmLaw 200 firm's Leisure, Hospitality & Sports Sector Practice Group
- Contract, Investigative & Industry Advisory work to clients in the Education, Entertainment and Sports spaces
- Cases include *Clayton v. NCAA*, leading to an injunction permitting college athlete to play after being declared ineligible- among first cases to interpret NY NIL Law
- Matters of interest include representing coaches and athletic directors at more than a dozen institutions achieve favorable outcomes in employment or investigatory matters
- NIL Organizational Advising

**Boland Sports Practice, LLC- 2014- to 2022**
- Sports consultancy focused on valuation, strategy and operations for collegiate and professional teams on a global scale
- Due diligence for prospective purchasing group of Buffalo Bills franchise 2014
- Representing NFL Players Association Executive Vice President Russell Okung in grievance action and other legal actions against NFLPA for failure to follow its Constitution and internal rules 2019-2020

  Examples of Consulting Engagements:
  Sport Cultural Review, Rugby Canada- 2021-2022, Langford, British Columbia
- One of two independent study review chairs, selected by Canadian National Sports Organization
- Chaired six-month detailed review of Canada's national men's and women's high-performance cultures (Olympic & World Cup teams)

Feasibility Consultant 2014-2015 GMR/HKS/Goldman Sachs, New Delhi, India
- Providing stadium feasibility consulting services for first privately funded cricket stadium project in India;
- Examination of 80 stadia and facility on a global level

Head Coaching Search Consultant- 2013-2014 Cleveland Browns, National Football League
- Providing insight and evaluation of candidates for head coaching position
- Reviewed candidates
- Conducted background analysis
- Close contact with Chief Operating Officer and General Manager


## Sports & Legal Industry Affiliations:

**USA Weightlifting, Ethics Committee Independent Member,**
May 2021- present

**Culture in Sports, President,** 501(c)(3) organization dedicated to improving culture in sports.
March 2021- present

**Special Labor Counsel to Russell Okung,** current NFL player, former NFLPA Executive VP, advocate
July 2019- June 2020
- Represented Mr. Okung in internal National Football League Players Association action 2019
- Represented Mr. Okung in grievance against the NFL Los Angeles Chargers which was settled amicably, 2019
- Co-Counsel to Mr. Okung in National Labor Relations Board Unfair Labor Practice Charge, 2020
- Strategic Communications and Public Relations support for Mr. Okung in generating feature coverage in the New York Times
  https://www.nytimes.com/2020/01/26/sports/football/nfl-okung.html

**Partner, Global Athletic Management Enterprises,** (GAME), New York, NY
January 1998-June 2009
- Co-founder of professional sports management, consulting and marketing firm representing and managing the careers of professional and Olympic sports athletes
- Recruited and signed athlete-clients from colleges in full compliance with NCAA and state rules
- Negotiated recent player contracts with Oakland Raiders, Cleveland Browns, Arizona Cardinals, Cincinnati Bengals and New York Jets (NFL); New York

Dragons (AFL); Philadelphia Charge (WUSA); New York Power (WUSA); Indiana Firebirds (AFL) and NFL Europe
- Conducted successful grievance hearings for clients in NFL
- Developed and obtained endorsements for athletes
- Certified NFL Players Association contract advisor 1999-2009
- Member National Association of Sports Lawyers

**Assistant Director of Sports Media; Athletic Administrator**
University of Tennessee Women's Athletics Department, Knoxville, TN
August 1990- August 1992
Columbia University Athletics Department, New York, NY
May 1987- May 1990
- Administered all facets of media relations for nationally ranked Tennessee program
- Designed communications strategy for swimming and diving program
- Assisted in the home event and media management and operations for all sports
- Functioned as primary women's sports media representative for all varsity sports at Columbia
- Coordinated with NFL Films to produce first-ever highlight and recruiting film for Columbia football program
- Assisted all varsity programs including serving as Assistant Coach of Women's Swimming

<u>**Past Legal Experience:**</u>

**Deputy Chief Administrative Law Judge, City of New York, Taxi & Limousine Commission,** New York, NY
September 2000-2006
Promoted to Appeals Unit 2001, Assistant Chief Judge in 2003, Elevated to Deputy Chief Judge 2004
- Conducting hearings as a judge into driving and rules violations by 20,000 city-licensed drivers
- Received superior evaluations and series of promotions from general tribunal to licensing standards and finally to hearing and deciding sensitive consumer complaint hearings
- Named Assistant Chief Judge in 2003, supervising roster of 72 judges reporting directly to the Chief Judge, supervising Consumer Affairs Tribunal and Appeals Division, Promoted to Deputy Chief Judge in 2004

**Litigation & Antitrust Contract Attorney Skadden, Arps, Slate, Meagher & Flom**, New York, NY
March 1999-August 2000
- Defending against Department of Justice and Securities and Exchange Commission Civil Information Demand and Second Request in major securities industry/financial markets antitrust matter
- Defended class action antitrust lawsuits arising from dual 18-month investigations

21

- Initiated privilege log and attorney review of massive corporate discovery materials
- Helped implement firm-wide use of Documatrix, on-line document imaging program

**Litigation & Antitrust Contract Attorney, McCarter & English**, Newark, NJ
January 1998-February 1999
• Discovery and production in Multi-District Federal lawsuit and Securities and Exchange Commission Second Request-insurance and securities fraud

**Of Counsel, Law Offices of Joel S. Walter,** New York, NY
January 1998-September 2003
- Of counsel to firm of prominent criminal defense and general litigation attorney and firm
- Functioned as lead trial counsel in successful defense of clients charged with serious crimes and representation of clients in civil trials and appeals,
- Conducted Trials, Pre-Trial Hearings in more than 200 matters in New York State Supreme and Criminal Courts, authored successful appeal *In re: Georgia Ameen v. Robert Ameen* before the Appellate Division Second Department
- Certified member of Kings County Assigned Counsel Criminal Defense Panel

**Court Attorney, Judge Michael Brennan, Criminal Court of the City of New York/Acting Supreme Court Justice,** New York, NY
November 1996- September 1997
- Chief legal advisor to trial judge, writing and researching opinions and judicial orders
- Key decision published in New York Law Journal and State Reporter, on the right to counsel

**Assistant District Attorney, City of New York,** County of Richmond, NY
July 1995- September 1996
- Personal assistant to District Attorney William L. Murphy
- Overseeing re-election issues
- Supervised criminal prosecutions, trials and hearings
- Fundraising and political assistant to D.A. Murphy- raised over $500,000 dollars for successful District Attorney candidate in most expensive local prosecutors' race in U.S. history at time

**Clerkship Experience:**

**Cooper, Mitch, Crawford, Kuykendall & Whatley,** Birmingham, AL
- Major Southeastern litigation firm, focus in federal labor, employment and civil rights law
- Significant work included preparation of three Presidential pardon applications
**Clerk-May 1994- May 1995; Attorney-May - June 1995**

**Law Clerk to Governor Mario M. Cuomo,** Albany, NY
Assisted the Governor's Director of Legislative and Intergovernmental Affairs; Summer 1993

**Licensure:**

- Bars of Georgia, 1995; New York 1996 and New Jersey 1996 (now inactive)
- United States Federal District Court for the Eastern District of New York, 2001

**Additional Sports Activities and Consultancies:**

Premier Stinson Sports
Consultant on contractual and professional issues for nation's largest firm
representing over 100 coaches in collegiate and professional sports. 2009-2011

National Football League Franchise Bidding Group/ Stinson
Morrison Heckler LLP
Advised capital and equity partners, business brokerage and law firm on the
formation, acquisition and approval process for the purchase of a National Football
League franchise. 2008

Carr Sports Associates, Radford University Study
and Report
Co-Consultant, co-author 2005
Evaluated and recommend athletic conference realignment
options for a Division I institution seeking to explore new
affiliations.

Strategic Planning Consultant, Hockey East Athletic Conference
Conducted original proprietary research as consultant to American Hockey Coaches
Association and Hockey East athletic conference focusing on strategic planning
issues regarding conference expansion, television broadcast rights, coaching salaries
and Title IX compliance, 2003-2004

Media Relations or Championship Event Coordinator -
- 1998 Goodwill Games, International Wrestling Venue, Team Liaison, New York, New York
- 1992 United States Olympic Trials, Photographic Liaison, Swimming Trials, Indianapolis, Indiana
- 1992 Southeastern Conference Swimming & Diving Championships, Lexington, Kentucky
- 1992 Southeastern Conference Tennis Championships, Knoxville, Tennessee
- 1991 Southeastern Conference Women's Basketball Championships, Albany, Georgia
- 1991 Southeastern Conference Swimming & Diving Championships, Tuscaloosa, Alabama
- 1991 NCAA Regionals Women's Basketball, Knoxville, Tennessee
- 1990 NCAA Cross Country Championships, Knoxville, Tennessee

- 1989 United States Swimming National Championships, Los Angeles, California
- 1988 United States Olympic Trials, Swimming Trials, Austin, Texas

# Appendix 2

**Materials Considered**

| Starting Bates Number |
|:---:|
| USF_0001537 |
| USF_0001732 |
| USF_0001744 |
| USF_0001787 |
| USF_0001805 |
| USF_0002249 |
| USF_0002285 |
| USF_0002297 |
| USF_0002329 |
| USF_0002351 |
| USF_0002417 |
| USF_0002491 |
| USF_0002564 |
| USF_0002601 |
| USF_0002639 |
| USF_0002642 |
| USF_0002646 |
| USF_0002648 |
| USF_0002688 |
| USF_0002695 |
| USF_0002715 |
| USF_0004836 |
| USF_0004838 |
| USF_0004909 |
| USF_0004915 |
| USF_0004924 |
| USF_0004946 |
| USF_0005010 |
| USF_0005044 |
| USF_0005049 |
| USF_0005101 |
| USF_0005114 |
| USF_0005169 |
| USF_0005676 |
| USF_0005677 |
| USF_0013877 |
| USF_0015213 |
| USF_0015215 |
| USF_0015216 |
| USF_0015221 |
| USF_0015228 |
| USF_0015233 |

| |
|---|
| USF_0015235 |
| USF_0020157 |
| USF Third Amended Complaint |
| Giarratano Responses to Doe 3 Rogs |
| Nakamura Responses to RPD3 |
| USF Responses to Doe 2 Rogs |
| USF Responses to Doe 1 Rogs |
| John Doe 1 Rough Transcript |
| John Doe 8 Rough Transcript |
| John Doe 3 Transcripts (both days) |
| USF_0001732 |
| USF_0002211 |
| USF_0002642 |
| USF_0003477 |
| USF_0003512 |
| USF_0003549 |
| USF_0003584 |
| USF_0005037 |
| USF_0005114 |
| USF_0007983 |
| USF_0008638 |
| USF_0018892 |
| USF_0019641 |
| USF_0032586 |
| USF_0037959 |
| USF_0047235 |
| USF_0047979 |
| USF_0028633 |
| USF_0039959 |
| USF_0040012 |
| USF_0040034 |
| USF_0040709 |
| USF_0040711 |
| USF_0040741 |
| USF_0040789 |
| USF_0040877 |
| USF_0040907 |
| USF_0041054 |
| USF_0041138 |
| USF_0041146 |
| USF_0041156 |
| USF_0041247 |
| USF_0041262 |
| USF_0041318 |
| USF_0041335 |

| |
|---|
| USF_0041348 |
| USF_0041369 |
| USF_0041385 |
| USF_0041416 |
| USF_0041457 |
| USF_0041484 |
| USF_0041515 |
| USF_0041711 |
| USF_0041714 |
| USF_0041868 |
| USF_0041929 |
| USF_0042148 |
| USF_0042302 |
| USF_0042407 |
| USF_0044786 |
| USF_0047192 |
| USF_0055085 |
| USF_0055469 |
| USF_0055550 |
| USF_0055954 |
| USF_0059943 |
| USF_0060066 |
| USF_0061964 |
| USF_0061966 |
| USF_0062042 |
| USF_0062083 |
| USF_0062302 |
| USF_0062453 |
| USF_0062464 |
| USF_0062490 |
| USF_0062523 |
| USF_0068590 |
| John Doe 2 Transcript |
| Declaration of John Doe 1 ISO Plaintiffs' Motion for Class Certification |
| Declaration of John Doe 2 ISO Plaintiffs' Motion for Class Certification |
| Declaration of John Doe 3 ISO Plaintiffs' Motion for Class Certification |
| Declaration of John Doe 5 ISO Plaintiffs' Motion for Class Certification |
| Declaration of John Doe 6 ISO Plaintiffs' Motion for Class Certification |
| Declaration of John Doe 9 ISO Plaintiffs' Motion for Class Certification |

| |
|---|
| Declaration of John Doe 10 ISO Plaintiffs' Motion for Class Certification |
| Declaration of John Doe 12 ISO Plaintiffs' Motion for Class Certification |
| Declaration of John Doe 13 ISO Plaintiffs' Motion for Class Certification |
| Claimant Anthony N. Giarratano's Pre-Hearing Brief, *Anthony Nino Giarratano vs. University of San Francisco, Paul J. Fitzgerald, and Does 1-10, Inclusive*, Case No. A29499B |
| *Anthony Nino Giarratano vs. University of San Francisco, Paul J. Fitzgerald, and Does 1-10, Inclusive*, Case No. A29499B, Volume II, Arbitration Proceedings (June 11, 2024) |
| A GIARRATANO 000001 |
| NCAA-USF-00017080 |
| NCAA-USF-00017544 |
| NCAA-USF-00018010 |
| NCAA-USF-00024171 |
| NCAA-USF-00031267 |
| NCAA-USF-00044120 |
| NCAA-USF-00083540 |
| USF_0001751 |
| USF_0003621 |
| USF_0017336 |
| USF_0019204 |
| USF_0019468 |
| USF_0020865 |
| USF_0022217 |
| USF_0022254 |
| USF_0023302 |
| USF_0026871 |
| USF_0027083 |
| USF_0028507 |
| USF_0028633 |
| USF_0036276 |
| USF_0036883 |
| USF_0037338 |
| USF_0037640 |
| USF_0037780 |
| USF_0040035 |
| USF_0040710 |
| USF_0040789 |
| USF_0072518 |
| USF_0085500 |

USF_0098244

Additional research cited in report.