1  [Counsel Listed on Signature Page]

2

3

4                    **UNITED STATES DISTRICT COURT**
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
5                    **SAN FRANCISCO DIVISION**

6
   JOHN DOE 1, JOHN DOE 2, JOHN DOE 3,           Case No. 3:22-cv-01559-LB
7  JOHN DOE 4, JOHN DOE 5, JOHN DOE 6,
   JOHN DOE 7, JOHN DOE 8, JOHN DOE 9,           **JOINT CASE MANAGEMENT**
8  JOHN DOE 10, JOHN DOE 11, JOHN DOE 12,        **STATEMENT**
   JOHN DOE 13, and JOHN DOE 14,
9  individually and on behalf of all others similarly
   situated,                                     Judge: Hon. Laurel Beeler
10                                                Date: June 26, 2025
11              Plaintiffs,                       Time: 9:30 AM
                                                  Crtrm: B
12         v.

13 THE UNIVERSITY OF SAN FRANCISCO,
   ANTHONY N. (AKA NINO) GIARRATANO,
14 and TROY NAKAMURA,

15              Defendants.

16

17

18

19

20

21

22

23

24

25

26

27

28
   _____
   JOINT CASE MANAGEMENT STATEMENT
   Case No.: 3:22-cv-01559-LB

The Parties, Plaintiffs John Does 1-6 and 8-14 ("Plaintiffs"), Defendant the University of San Francisco ("USF"), Defendant Anthony N. Giarratano, and Defendant Troy Nakamura submit this Joint Case Management Statement in advance of the June 26, 2025 Case Management Conference, pursuant to the Court's May 27, 2025 Order (ECF No. 341).

## I.   **Discovery Generally**

USF's Position.  The Court has already held that, in order to toll the two-year statute of limitations for the surviving claims for Does 4-14, Plaintiffs must plausibly allege that USF engaged in a "coverup" by intentionally hiding complaints of sexual harassment regarding the university's baseball coaches. (Dkt. No. 128, at 14-19.) The Court based its holding on a Sixth Circuit case, *Snyder-Hill v. Ohio State Univ.*, where "more than fifty members of the [Ohio State] staff knew about the inappropriate sexual conduct, and despite this knowledge, Ohio State did nothing to prevent the abuse and instead covered it up." (*Id.* at 16, citing 48 F.4th 686, 691 (6th Cir. 2022).)

Of course, no such "coverup" occurred here. In the hundreds of pages that make up their Third-Amended Complaint, Plaintiffs identify just a few instances over a quarter century where university officials were supposedly told about complaints concerning the baseball program, but Plaintiffs have never established that USF officials understood these complaints as being about sexual harassment, let alone that senior officials ever actively participated in a "coverup."[1] The Court has already explained Plaintiffs face an uphill battle because their "claims are ambitious and predicated on much thinner allegations of coverup than Snyder-Hill[,]" but that the statute of

---

[1] Plaintiffs cite to several documents they say show "an overt cover-up."  This status conference report is not the place to argue the merits of the case, but USF only notes that, as it has explained before when addressing the same mischaracterization by Plaintiffs, the documents Plaintiffs cite reference concern by USF about a "cover-up by the head baseball coach, Defendant Giarratano, not by the University," and a "cover-up limited to the coaches involved in the alleged wrongdoing does not toll the statute of limitations." (Dkt. No. 332, at 9-10, citing *Snyder-Hill*, 48 F.4th at 702.)  What is significant for the purpose of this hearing is that all the documents plaintiffs cite to were produced by USF.  That only reinforces USF's point — it has produced a large number of documents requested by Plaintiffs, and is willing to produce more material potentially relevant to the "coverup" claim, but Plaintiffs' requests are unreasonable and have no bearing on that issue.

1    limitations issue is "better addressed at summary judgment" because it turns on disputes of fact.

2    (Dkt. No. 128, at 19.)

3         Now, although the Court has ruled that resolving the statute of limitations issue for Does 4-

4    14 is the best way to potentially narrow the scope of this case, Plaintiffs persist in demanding

5    discovery into topics that are entirely unrelated to the whether there was a "coverup" sufficient to

6    toll the statute of limitations. For instance, Plaintiffs seek broad discovery about the history of

7    USF's policies, its student handbooks, its practices involving scholarships, the history of other

8    sports programs at the university, and other topics entirely disconnected from the narrow issue of

9    whether USF engaged in an active "coverup" sufficient to toll the statute of limitations. While

10   Plaintiffs incorrectly argue that USF seeks to "bifurcate" discovery, all USF is doing is what the

11   Court itself proposed in its May 1 order: addressing the need for the parties to prioritize "additional

12   discovery on tolling" in advance of USF's planned motion. (Dkt. No. 334.) Just as the Court did

13   with class certification, it makes sense to focus the parties on the pending issues to conserve

14   resources and efficiently manage the case.

15        Leading up to the hearing on the motion, it makes sense to permit Plaintiffs to conduct

16   discovery on the narrow issue of whether USF received complaints about sexual harassment and

17   whether university officials engaged in an active "coverup" to hide those complaints. For its part,

18   USF also intends to take discovery on the factual assertions that Plaintiffs make in their discovery

19   produced on June 9.

20        <u>Plaintiffs' Position</u>: USF's proposal to bifurcate discovery three years after this case was

21   filed and two years after discovery started is untimely, unfair, and unworkable. Under Rule 42—

22   under which USF has *not* made a formal motion—USF bears the "heavy burden" to prove

23   bifurcation is warranted. *Facebook, Inc. v. Onlinenic Inc*., No. 19-cv-07071-SI, 2022 U.S. Dist.

24   LEXIS 63561, at *7, *9 (N.D. Cal. Apr. 5, 2022). Factors courts consider include "whether the

25   issues are clearly separable, and whether bifurcation would increase convenience and judicial

26   economy, reduce the risk of jury confusion, and avoid prejudice to the parties." *Id.* at *7, *10

27

28

1    (rejecting effort to bifurcate discovery and focus on single issue prior to summary judgment). None

2    supports bifurcation here.

3    Two years ago, the Court held that discovery would be necessary before addressing USF's

4    statute of limitations defense. ECF 128 at 18-19. USF could have requested narrow, statute-of-

5    limitations-focused discovery at that time, but it failed to do so. In the intervening years, Does 4-14

6    have been subject to the *full scope of discovery* and completed their document productions last

7    July—almost a *full year ago*. Doe 8 was deposed. It would be fundamentally unfair for USF to

8    move now for summary judgment without likewise completing discovery.

9    This is particularly important because USF's exceptionally narrow conception of what is

10   relevant to its statute of limitations defense conflicts sharply with *Snyder-Hill* and this Court's

11   motion to dismiss order adopting it. *See* ECF 128 at 18 ("the court follows *Snyder-Hill*").

12   Remarkably, USF interprets *Snyder-Hill*, without a shred of factual or legal support, as being

13   limited strictly to the following scenario: knowledge by "more than fifty members of . . . staff . . .

14   and despite this knowledge," doing "nothing to prevent the abuse and instead cover[ing] it up."[2]

15   But as this Court has already explained, *Snyder-Hill* found three independent bases for tolling: (1)

16

17   [2] Plaintiffs note that the time-limited discovery Plaintiffs fortuitously *do* have demonstrate
18   an overt cover-up—the extent of which Plaintiffs can only know if they are allowed the discovery
     they seek. For example, two key witnesses independently described the university's handling of the
19   Coach Defendants' sexual misconduct as a "cover up." ECF No. 328 at 7. In 2017, a former USF
     employee emailed USF's Board of Trustees (among others) a 21-page narrative detailing the
20   "unethical behavior within the Athletic Department . . . and our unwillingness to deal with these
     very important issues," which describes "the behavior of both coaches and leadership" as "rogue,
21   unethical, and illegal." (USF_0073737). Another document shows Coach Giarratano trying to "keep
     . . . under raps [sic]" a 2011 complaint "about a girl accusing [a baseball player] of drugging and
22   raping her." (USF_0163579). A year later, the Board of Trustees received a complaint about the
     baseball team, stating that "[t]he ecosystem, processes and leadership to insure a safe environment
23   for students at USF is non-existent," and that "the related lack of action on the part of the university
     is evidence of that failure." (USF_0174305). Plaintiffs have these documents only because they are
24   from the arbitration materials USF was compelled to produce, from USF's (arbitrary) 2012 cut-off
     of its complaint database, or from Giarratano's ESI. That is, they are from a sliver of available
25   documents that USF was either forced to hand over or could not avoid producing. Plaintiffs are
     entitled to know what else exists.
26   Below, Coach Giarratano disputes the meaning of USF_0163579. Plaintiffs believe the
27   document speaks for itself and are happy to file it under seal if the Court so desires.

28

1  the plaintiffs lacked a reason to know the school causes their injury, (2) even if plaintiffs had

2  investigated, they would not have learned of the school's conduct, and (3) the plaintiffs did not

3  know they were abused. *Id.* at 16-17. Facts this court has found relevant to tolling include the

4  Does' allegations of "overt conduct that spanned decades, USF's failure to address it, an attrition

5  rate that shows the problem, unaddressed complaints," a "culture of tolerance of the abuse, a

6  coverup of it," "a gaslighting of athletes," and "USF's pattern of indifference." *Id.* at 17-18. In

7  short, the evidence relevant to tolling *far exceeds* USF's "cover-up" only position.

8       USF's proposal is also impossible to implement as a practical matter. Rather than promote

9  judicial economy, given the parties' grossly divergent views on relevance, every RFP, every search

10  term, every interrogatory, every deposition question, is likely to spur a dispute between the parties.

11  Indeed, most of the disputes addressed throughout this report are a result of USF's unilateral (and

12  erroneous) view that certain evidence is not relevant to the statute of limitations issue.

13       Finally, USF's proposal would greatly extend this already three-year-old case and result in

14  substantial prejudice to all Plaintiffs. Does 1-3 filed this lawsuit in March 2022. USF now proposes

15  putting their cases on hold for many additional months. Does 4-14 would of course be prejudiced if

16  denied evidence necessary to oppose USF's motion. And if the Court ultimately denies that

17  motion, Does 4-14 would likewise need to complete the outstanding discovery they need. Either

18  way, USF's proposal ensures this case continues, likely for another year if not longer before it

19  could conceivably proceed to trial.

20       <u>Giarratano's Position.</u> Footnote 1 misrepresents the email from Coach Giarratano, USF

21  0163579.  First, the email from Associate Coach Greg Moore to Coach G states that a third party

22  had sent an email to a member of the USF staff, reporting that a girl accused a USF player of

23  drugging and raping her.  However, the same third-party email "said that the police investigated

24  and dropped the case because of a lack of evidence."  Coach G suggested the matter be kept

25  confidential until a few days later, when he could talk to the accused player. As the Coach noted,

26  the player was "innocent until proven guilty."   It was completely appropriate for the Coach to

27  protect the USF player from allegations made by a third party, especially when the police

28

1    concluded there was no proof of a crime. The email does not suggest covering up a rape

2    accusation.  Nothing about this email chain demonstrates a "cover up" from USF players any

3    issues relating to the conduct of the coaches or the baseball team.

4    **II.    Specific Disputes**

5    **A.    Discovery Timeline**

6    Plaintiffs' Position. For nearly three months, Plaintiffs have been requesting that USF

7    provide a timeline for production of its outstanding discovery. USF has flatly refused. Instead, it

8    insists that no timeline be developed until the Court "narrows the scope of the case from a 25-year

9    period to a 2-year period." USF's position assumes the Court will (a) sharply limit the scope of

10   discovery, and then (b) grant a motion for partial summary judgment that USF has not yet made,

11   and that the Court has already "defer[red] based on the need for additional discovery on tolling."

12   ECF No. 334 at 1. Because USF cannot develop a reasonable timeline on its own, Plaintiffs

13   respectfully request that the Court order USF to complete production of all outstanding document

14   discovery no later than August 26, 2025.

15   On April 2, 2025, Plaintiffs issued targeted discovery to USF—including as relevant to

16   USF's statute of limitations defense—for the years Does 4-14 were students at USF (1998-2000

17   and 2011-2017). ECF No. 328 at 3. On the same day, Plaintiffs requested that USF review that

18   discovery and develop a timeline for its production, so that the parties could then discuss a briefing

19   schedule for USF's motion for partial summary judgment against Does 4-14. *Id*. USF ignored

20   Plaintiffs' invitation to cooperate. Instead, and without meeting and conferring, USF sought leave

21   to file its motion for summary judgment on a timeline that would deny Plaintiffs the discovery they

22   need to oppose that motion. *Id*. On May 1, 2025, the Court rightly rejected that maneuver, holding

23   that discovery must come first. ECF No. 334 at 1.

24   It has been nearly two months since the Court's order, and USF has neither produced a

25   single document responsive to Plaintiffs' requests nor provided any sense of its timeline for

26   beginning (to say nothing of completing) production of the requested discovery. Rather than

27   engage, USF effectively stayed discovery when its lead counsel, Jonathan Baum, changed law

28

1   firms on April 16, 2025. Plaintiffs remain willing to accommodate that transition. But months have

2   passed and USF still refuses to answer even basic questions about the outstanding discovery. For

3   instance, Plaintiffs sent USF a proposed list of custodians for the periods Does 4-14 were enrolled

4   at USF, and asked USF to confirm by June 4, 2025 whether it would agree to run the parties'

5   agreed-upon search terms for these custodians. USF failed to respond by the deadline, and in their

6   draft of the status report, appear to be considering Plaintiffs' request without committing to it (let

7   alone providing a timeline for effectuating it).

8       While Plaintiffs understand that Mr. Baum's new firm only received access to USF's

9   discovery database on June 9, 2025, that does not justify months of silence or refusal to engage.

10  Plaintiffs have shown consistent willingness to cooperate; USF, by contrast, has done everything

11  possible to delay. The pattern is clear: without Court intervention, discovery will remain

12  indefinitely stalled.

13      USF's Position. While the Court has agreed with USF that it makes sense for the parties to

14  focus on the threshold question of whether this case involves a 2-year period or a 25-year period,

15  Plaintiffs continue to embark on an unrestrained fishing expedition, unwilling to narrow their

16  discovery requests to issues that plausibly relate to whether there was a "coverup" as required to

17  toll the statute of limitations. Plaintiffs' insistence on expansive discovery at this time defeats the

18  entire purpose of the Court prioritizing the statute of limitations question, resulting in a needless

19  waste of time and money.

20      Discovery is proceeding apace. Contrary to Plaintiffs' dire descriptions, USF has expended

21  tremendous efforts to review and produce documents in response to Plaintiffs' ongoing requests. At

22  a time when universities across the country are under financial strain, USF has spent in excess of

23  $1 million in this case reviewing hundreds of thousands of documents—including documents

24  responsive to the search terms negotiated between the parties for 28 USF custodians over the five-

25  year lookback period the Court imposed. To date, USF has produced more than 24,000 documents,

26  spanning nearly 178,000 pages. And, though USF lost access to its Relativity database housing all

27  documents relevant to this litigation from April 16 to June 9 because of its change of law firms,

28

JOINT CASE MANAGEMENT STATEMENT          6
Case No.: 3:22-cv-01559-LB

1   USF continued to produce discovery during this period. Just since April 16, USF has responded to

2   eleven requests for production from Plaintiffs, eleven sets of interrogatories from Plaintiffs, made

3   accompanying document productions, and has met and conferred with Plaintiffs regarding

4   discovery on at least eight occasions—nearly once per week.

5           Now, the Court has instructed Plaintiffs to focus on discovery relevant to the tolling issue.

6   But rather than focusing their discovery on issues that plausibly relate to the alleged "coverup,"

7   Plaintiffs are rehashing the same script they used to try to delay the class certification motion,

8   insisting that USF produce every single document in the case, even if totally unconnected to the

9   intentional "coverup" they need to establish to toll the statute of limitations. For example, one

10  request seeks back to 1999 "all Documents and Communications regarding or tracking rates of

11  transfer, graduation rates, or attrition within any Athletic Program." And Plaintiffs seek to depose a

12  USF designee on similarly broad topics. Plaintiffs, through Doe 1, even recently served

13  interrogatories regarding Doe 7's communications with USF's counsel, which has nothing to do

14  with the issues at hand and instead merely relitigates their frustration that Doe 7 contradicted their

15  claims of commonality and accused Plaintiffs' counsel of misleading him when he was their client.

16  None of these requests would reveal whether a complaint of sexual misconduct was made to USF

17  or whether USF "covered up" such a complaint.

18          The path here is clear. USF recognizes that both sides will need to take discovery related to

19  the narrow issue of whether there was a "coverup" sufficient to toll the statute of limitations. USF

20  also recognizes this will take time. For that reason, USF is willing to delay filing its partial

21  summary judgment motion until the fall, so both sides can take the discovery they need.

22          Plaintiffs themselves have provided information that should guide the scope of discovery

23  here. On May 9, 2025, Plaintiffs served responses to detailed interrogatories from USF asking

24  them to identify specific facts supporting their claim that USF was put on notice of sexual

25  harassment or that it engaged in a "coverup."  USF is happy to share these responses with the

26  Court at the conference.  Those alleged notifications are the key events for evaluating the question

27  of whether an alleged coverup occurred. As a result, leading up to the hearing on the motion, it

28

1    makes sense for both sides to focus discovery on the narrow issue of whether USF received

2    complaints about sexual harassment involving the baseball team and coach defendants and whether

3    university officials engaged in an active "coverup" to hide those complaints.

4          USF also recognizes that Plaintiffs may have other factual theories that relate to the

5    "coverup" allegation. Therefore, USF is willing to provide such information so long as Plaintiffs

6    can articulate some reasonable theory for how it may connect to the question of whether there was

7    a "coverup" sufficient to toll the statute of limitations.

8                    **B.**    **Relevant Time Period for Discovery**

9          Plaintiffs' Position.  For months, USF refused to produce documents from or a Rule

10   30(b)(6) witness to testify about the years Does 4-6 and 8-14 were enrolled at USF despite seeking

11   summary judgment against these Does on the statute of limitations. To address this issue, Plaintiffs

12   sent USF a discovery letter brief on June 6 in hopes of filing it at least ten days before the status

13   conference. But USF refused to send Plaintiffs their section of the letter brief, weaponizing the

14   Court's joint filing requirement. Now, in this status report, USF finally agrees to "review[] and

15   produce[] documents beyond the five-year lookback period so long as the relevant request is likely

16   to yield information regarding whether the statute of limitations should be tolled in this case." As

17   discussed above, USF's attempt to bifurcate discovery is improper and impossible to implement in

18   practice. Indeed, despite being served with the parties' Rule 30(b)(6) notice in March and its RFPs

19   in April, USF still cannot identify the RFPs and 30(b)(6) topics for which it will or will not

20   produce responsive documents or a witness for the entire relevant time period. Instead, USF puts

21   forth the superficially appealing but practically-impossible-to-implement position that it will

22   produce discovery but only if USF thinks it's relevant to tolling. What that is, no one knows.

23         Plaintiffs have served RFPs and a 30(b)(6) notice geared towards discovering information

24   such as complaints related to the USF baseball team for the years each Doe was a student and the

25   school's policies, procedures, and practices for reviewing and investigating complaints of sexual

26   misconduct. Such complaints—and if or how they were addressed—are clearly relevant to the

27   *Snyder-Hill* analysis. *See* ECF No. 128 at 18. Moreover, as Plaintiffs previously explained,

28

1    historical evidence regarding USF's knowledge and practices is relevant to all Does' Title IX and

2    California claims—courts routinely consider evidence predating the abuse at issue in evaluating

3    Title IX claims. *See* ECF No. 245 at 1 (collecting cases). But USF won't say one way or another

4    whether they intend to produce such information.

5         Relevance aside, USF now—again for the first time in this draft status report—says

6    running the parties' agreed-upon search terms on existing custodians for the entire relevant time

7    period would result in 60,000 documents, which USF considers "unduly burdensome" to review.

8    As a preliminary matter, there are 13 plaintiffs, seven of whom went to USF before the five-year

9    lookback and all of whom have claims for which historical evidence is relevant. That is 4,600 to

10   8,500 documents per case. That is hardly unduly burdensome, particularly when compared to the

11   100,000 documents Plaintiffs produced—a number that still exceeds all of the documents USF

12   would produce if they ended up producing every single one of the 60,000 documents that hit upon

13   the parties' search terms (in addition to the 24,095 documents USF produced to date). Moreover,

14   the fact that USF has already spent hundreds of thousands of dollars reviewing and producing

15   documents is neither surprising nor notable for a litigation this size. USF cannot keep refusing to

16   engage in standard discovery practice and deprive Does 4-6 and 8-14 (in particular) of the

17   evidence to which they are entitled because USF would rather not spend the money. These

18   Plaintiffs have waited long enough.

19        <u>USF's Position</u>.  Plaintiffs' position here confuses relevance to the **<u>merits</u>** of Doe 4-14's

20   claims with relevance to the question of whether they can show the **<u>"coverup"</u>** they need to toll the

21   statute of limitations. While USF has already produced an incredible amount of discovery,

22   including searches going back to 1999 that relate directly to Does 4-14, Plaintiffs are now asking

23   USF to apply the same 280 search terms used during the 2017-2022 look-back period to tens of

24   thousands of documents going back to 1998. To be clear, this exhaustive and expensive search

25   may be necessary if Plaintiffs eventually prevail on the statute of limitations issue, but it is not

26   relevant to the alleged "coverup" issue, and it does not make sense to do it now before this motion.

27   Indeed, contrary to Plaintiffs' misleading assertions, they have not identified any evidence of a

28

1    coverup by USF leadership that would toll the statute of limitations. The documents that Plaintiffs

2    maintain show that "two key witnesses independently describ[ed] the university's handling of the

3    Coach Defendants' sexual misconduct as a 'coverup,'" are actually documents from the arbitration

4    stating that the alleged sexual harassers, Coaches Giarratano and Nakamura, themselves "covered

5    up" complaints by players—this is a far cry from the type of institutional coverup that is necessary

6    to toll the statute of limitations in this type of case. *Snyder-Hill.*, 48 F.4th at 702.

7         USF is willing to produce discovery beyond the lookback period if that discovery is plausibly

8    related to the "coverup" allegation. However, it makes no sense to require full-scale discovery going

9    back 25 years, when the whole purpose of USF's partial motion for summary judgment is to save

10   the parties' money, and the Court's time and resources, by potentially narrowing the scope of the

11   case from 25 years to 2 years.

12        This issue is not hypothetical. USF recently ran Plaintiffs' 280 search terms against archives

13   dating back to 1998 and found that those searches yield over 60,000 documents. Based on USF's

14   experience in this case, USF estimates it would take several hundred hours of attorney time to review

15   these documents, costing the university well in excess of $500,000. And, to be clear, Plaintiffs' new

16   requests are not limited to the 280 search terms used in their prior requests. Plaintiffs seek documents

17   from 28 **new** USF custodians, most of whom had zero connection to the university's baseball

18   program and who have little connection to any possible "coverup" sufficient to toll the statute of

19   limitations. Plaintiffs' overbroad discovery demands are not limited to documents. Plaintiffs seek to

20   depose a USF 30(b)(6) designee on 137 topics, including subparts, for three distinct time periods

21   spanning 25 years. While USF agrees to designate a representative to testify on matters that are

22   relevant to the claims of Does 1-3 and relevant to the alleged "coverup" that would revive the claims

23   of Does 4-14, it makes little sense **now** to spend dozens of hours preparing a USF designee to testify

24   about matters before 2017 that have no bearing on any alleged "coverup."

25                        C.    **Technology Assisted Review (TAR)**

26        <u>Plaintiffs' Position.</u> On April 2, USF notified Plaintiffs that it had finished ESI

27   productions—excluding text messages—for the remaining 17 custodians USF agreed to in the

28

1  summer of 2024. Plaintiffs immediately followed up to ask why USF produced 7,517 documents

2  for 17 custodians, whereas it produced 13,218 documents for the initial 11 custodians prioritized

3  for class certification. That is, Plaintiffs wanted to know why USF produced about half the number

4  of documents for a custodian list that was 155% larger. USF did not respond. On April 15, USF

5  sent Plaintiffs' a "TAR disclosure letter," wherein USF disclosed for the first time that it had used

6  TAR to review and produce documents despite the stipulated ESI Order's mandate that the parties

7  "meet and confer in good faith" *prior* to its use. ECF No. 168 § V.2. This "disclosure" came

8  approximately a year after Plaintiffs agreed to narrow (or entirely eliminate) many search terms

9  based on USF's assertion of burden associated with human review. After Plaintiffs demanded

10  more information, USF—despite insisting that it used TAR only to prioritize the review of

11  allegedly more relevant documents, rather than remove documents from review—revealed that it

12  did not have a human review and did not produce **61,500** documents that hit on the parties' agreed-

13  upon search terms. This is a staggering number of documents where USF produced only 23,745

14  documents and Plaintiffs have produced over 100,000 documents, reviewed many thousands more,

15  and never used TAR.

16      In light of the delay caused by USF's after-the-fact TAR disclosure and its blatant

17  disregard of the stipulated ESI order in this case, USF must either review those 61,500 documents

18  for production or immediately produce all of them subject to clawback for privilege. *See*

19  *Progressive Cas. Ins. Co. v. Delaney*, No. 2:11-cv-00678-LRH-PAS, 2014 WL 3563467, at *11

20  (D. Nev. Jul. 18, 2014) (requiring production without review subject to privilege filters where

21  party that used TAR did so after agreeing to use search terms and then abandoning that process

22  mid-stream without disclosing its intent to do so). USF refuses to do either and asks Plaintiffs (and

23  the Court) to trust that their process was sound, despite (1) applying TAR after search terms, in

24  violation of electronic discovery best practices and (2) allowing Plaintiffs no role in training or

25  even knowing how their algorithm was trained. At the very least, USF must provide the "concepts"

26  it used to train its TAR algorithm and the set of documents it used to validate its system so that

27  Plaintiffs can determine whether court intervention is necessary. USF refuses to do so.

28

1    USF's Position.  Plaintiffs appear to misunderstand the review process that USF used.

2    From the beginning, USF has employed the search terms the parties agreed to.[3] While reviewing

3    documents that hit upon those agreed search terms, USF also used an AI tool to help prioritize

4    attorney review batches by placing documents most likely to have relevant information at the top

5    of the queue. This AI tool did not remove any documents—it simply prioritized the batches that

6    the attorneys reviewed, putting the most relevant batches first.

7    A few months ago, when this AI tool indicated that the remaining batches had either no or

8    virtually no responsive material, USF acted in accordance with the ESI protocol in this case and

9    sent a letter to Plaintiffs' counsel indicating that we planned to cease review of batches that were

10    analytically predicted to have an exact responsiveness rate of 0%. USF is not relying on the AI tool

11    alone. USF attorneys reviewed hundreds of these documents by hand and concluded that zero were

12    responsive. (USF has offered to conduct additional confirmatory reviews, but Plaintiffs have

13    refused this compromise offer.)

14    Contrary to Plaintiffs' claims, USF fully complied with the ESI protocol regarding use of

15    technology-assisted review. The ESI protocol does not impose any requirements with regard to the

16    order in which counsel must review documents. Once USF decided to use technology assisted

17    review to make the determination that some documents need not be reviewed, because of their

18    extremely low chance of responsiveness, it notified Plaintiffs. That is what the ESI protocol

19    requires. The protocol does not require the other party's agreement on use of AI technology, but

20    merely gives the other side notice so the parties can confer and raise any objections with the court.

21    The parties have conferred, and Plaintiffs are raising their arguments right now, as the ESI protocol

22    contemplates.

23    Showing little regard for the university's financial restraints, Plaintiffs seek to force USF to

24    manually review more than 61,000 documents that are highly likely to be unresponsive. After

25

26    _____

    [3] Contrary to Plaintiffs' assertion, the fact the USF's production from the second set of 17 custodians
27    contained fewer documents than its initial 11 custodians had nothing to do with technology-assisted
    review. That set contained fewer documents because USF did not produce duplicates that had already
28    been produced from the initial custodians.

1  talking with its document vendor, USF estimates this review would require thousands of hours of

2  attorney time at a cost of more than $648,210.

3      Even less reasonable is Plaintiffs' suggestion that USF produce these documents without

4  prior review, subject to a claw back for privilege. Doing so would expose protected information to

5  Plaintiffs, and USF would still have to review the entire document set post-production. USF has

6  expressed its willingness to consider performing additional sampling tests to re-confirm that that

7  few if any responsive documents remain in the set that have not undergone manual review.

8  However, Plaintiffs have rejected this proposal and have failed to offer an alternative solution that

9  more reasonably weighs the burden of review with the predicted lack of responsiveness in the

10  document set.

11          **D.    Text Messages**

12      Plaintiffs' Position. On May 14, 2025—more than a month ago—the Court held that

13  "[w]ork-related messages on the personal devices of USF's current employees are under USF's

14  possession, custody, or control," and ordered their production. ECF No. 337. The Court also

15  ordered USF to produce any messages of its former employees "that it previously collected and

16  preserved." *Id.* Until June 13, 2025, USF had refused to engage with Plaintiffs on its intent to

17  comply with the Court's order and, to date, USF has not produced a single text message. By

18  contrast, Plaintiffs completed production of their own text messages in September 2024.

19      Less than a week before this status report was due, USF finally said it would produce

20  responsive text messages, and on Saturday, June 14, USF belatedly sent Plaintiffs a list of

21  proposed search terms. The list is too narrow and, devised without consulting the source data,

22  includes terms that did not mirror how people actually speak over text message. Although

23  Plaintiffs do not believe a second round of drawn-out search term negotiations is necessary where

24  the parties already spent months negotiating—and ultimately agreeing to—search terms for email

25  review, Plaintiffs agree to consider USF's proposal if USF assures Plaintiffs that production will

26  follow in short order.

27

28

JOINT CASE MANAGEMENT STATEMENT          13
Case No.: 3:22-cv-01559-LB

1    <u>USF's Position.</u>  Because of the transition to a new law firm, USF did not have access to

2  the data on its employees' cell phones until June 9, and when it did, it promptly evaluated potential

3  search terms and sent a proposed list of search terms to Plaintiffs.

4    Consistent with the Court's order that USF use targeted search terms for the searching of

5  text messages, USF has proposed to Plaintiffs search terms to be run on the devices of the current

6  and former employees whose cell phone data were collected for the arbitration, and will ask for the

7  cell phone data from other custodians who are current employees.

8    USF's proposed search terms are designed to be robust, while also balancing the

9  employees' interest in not having irrelevant, private communications reviewed. Because of the

10  nature of the case, a number of the terms USF proposes to use are sexual or describe intimate body

11  parts, and USF wants to be careful that those terms are only used in tandem with terms closely

12  related to this particular case. Otherwise, a search for "naked," for example, is likely to intrude into

13  the private lives of USF employees. USF proposes to search for any text mentioning the Plaintiffs

14  or their parents, texts with Mr. Giarratano or Mr. Nakamura that mention the Plaintiffs or other

15  relevant search terms, and texts mentioning "baseball," Mr. Giarratano, Mr. Nakamura, or "coach"

16  within 15 words of a long list of terms related to the case. If the Plaintiffs have their own proposal

17  for searching that complies with the Court's requirement that the terms used be "targeted," USF is

18  willing to consider it.

19    **E.    Privilege Log Challenges**

20    <u>Plaintiffs' Position.</u> On April 23, 2025, Plaintiffs sent USF approximately 400 challenges to

21  their privilege log. USF has not yet responded and, during a June 16 meet and confer, was still

22  unable to provide an estimate on when it will do so.

23    Despite having these challenges for months while Plaintiffs patiently waited for a response,

24  USF now agrees to review them but insinuates that they were made in bad faith because plaintiffs

25  challenge "numerous documents where lawyers were participants, where the subject line indicates

26  the document is privileged, and where the description makes clear the basis for privilege." That is

27  simply wrong: numerous challenges pertain to communications in which no attorney is involved or

28

1    the privilege has clearly been broken because the communication was forwarded to a third party.

2    And Plaintiffs have concerns about USF's privilege logging process because, last time Plaintiffs

3    made challenges, USF agreed to withdraw or produce redacted versions of ninety-two (92)

4    documents that had been inappropriately redacted or withheld in full and updated its descriptions

5    on its privilege log for thirty-five others. Plaintiffs thus have ample reason to demand USF take a

6    second look and should not have to wait indefinitely for USF to rectify their mistakes.

7        USF's Position. USF provided Plaintiffs with a privilege log on April 11, 2025, which

8    includes detailed descriptions of the reason each document was withheld or (for documents that are

9    only partially privileged or work product) redacted. In response, Plaintiffs have made a tremendous

10   number of challenges to log entries without any valid basis for disbelieving USF's assertions of

11   privilege or work product. For example, Plaintiffs challenge numerous documents where lawyers

12   were participants, where the subject line indicates the document is privileged, and where the

13   description makes clear the basis for privilege.

14       USF's counsel will review the challenged documents to re-confirm that its privilege

15   determinations are correct. But the sheer number of Plaintiffs' privileged challenges makes review

16   more time-consuming and laborious. USF's existing log already provides detailed information

17   about the documents, and USF is concerned that it will complete this process only to have

18   Plaintiffs say they are not satisfied and continue groundless challenges to documents.

19                        **F.    Depositions**

20       Plaintiffs' Position. On May 7, 2025, Plaintiffs and USF discussed the deposition limit and

21   both agreed that the default cap of 10 per side would be inadequate in this case. Plaintiffs then

22   emailed USF a proposal of 25 depositions per side, noting that Plaintiffs would be open to limiting

23   the number of in-person depositions to minimize burden for all involved. USF has not responded,

24   noting that it would wait until after the June 26 conference before engaging on the topic further.

25       USF's Position. Contrary to Plaintiffs' suggestion that USF has not responded, the parties

26   discussed Plaintiffs' proposal on June 16, 2025 by phone. The number of depositions needed in the

27   case overall is likely to depend significantly on how the Court addresses the present dispute over

28

the scope of discovery in advance of USF's motion for partial summary judgment related to the statute of limitations for Does 4–14. While USF remains willing to discuss the issue, it believes the subject can more constructively be resolved later, hopefully without the need for resolution by the Court.

### G.    30(b)(6) Deposition Notice

Plaintiffs' Position. Plaintiffs served USF with a Rule 30(b)(6) deposition notice on March 28, 2025. After meeting and conferring, Plaintiffs sent USF a letter on May 28, making a number of concessions, where appropriate, and seeking clarification from USF on numerous other issues. USF still has not responded to that letter. With respect to the relevant time period, Plaintiff responds to USF's arguments above. USF's characterization of the notice below is completely inaccurate.

USF's Position. Plaintiffs seek to depose a USF designee on 137 topics, including subparts, for three distinct time periods spanning 25 years. While USF agrees to designate a representative to testify on matters that are relevant and proportional to the needs of this case, USF cannot agree—without guidance from the Court—to prepare a designee to testify on all matters in Plaintiffs' over-broad requests dating back to 1999.  For example, just one of Plaintiffs many requests asks for USF to prepare a designee to testify for periods spanning 1999-2022 on:

> USF's efforts to review, analyze, and/or audit the academic success of student-athletes (e.g., graduate rates, rates of transfer, academic progress rates, and/or grade point averages), including (a) the identity, responsibilities, and reporting structure for the departments and personnel involved, (b) the systems and methods for documenting and housing information related to such analyses, (c) where such documentation (whether hard copy or electronic) has been stored and by whom, and (d) USF's policy for retaining such documentation. This topic includes but is not limited to the analyses reflected at ECF No. 300-14.

These topics would not reveal whether a complaint of sexual misconduct was made to USF or whether USF "covered-up" such a complaint. Even if Plaintiffs were able to articulate a remote theory regarding why these topics may tangentially relate to such an inquiry, the burden of preparing a designee to testify on such broad topics dating back to 1999 is not outweighed by the minimal probative value of the evidence sought.

1    USF is amenable to preparing a designee to testify on requests beyond the five-year look

2    back period permitted by the Court where such topics are likely to yield discoverable information

3    regarding whether the statute of limitations should be tolled in this case. However, many of

4    Plaintiffs' topics are not relevant to that narrow inquiry. USF hopes to understand the Court's

5    position on what discovery should be allowed beyond the five-year look back period related to

6    tolling the statute of limitations before undertaking the substantial burden of preparing a deponent

7    on so many topics dating back to 1999.

8                              **H.    Discovery Master**

9    _Plaintiffs' Position_. Discovery in this case began _over two years ago_. As set forth above

10   and below, discovery is not close to concluding and disputes are piling up.[4] These include

11   technical matters, such as USF's undisclosed utilization of TAR. It also includes mundane topics,

12   like the negotiation of search terms that USF has reopened despite agreeing to terms last summer.

13   And much more, including dozens of disputed RFPs and Rule 30(b)(6) topics. Finally, if USF is

14   successful in having the scope of discovery narrowed sharply to what it describes as tolling-related

15   evidence, there will likely be many further disputes, as the parties argue about what falls within

16   that narrowed scope.

17   Plaintiffs have proposed a commonsense solution to keep this case moving forward: the

18   appointment of a discovery master under Rule 53. Access to a master to call balls and strikes in an

19   informal setting and keep the parties on track will substantially improve the efficiency of discovery

20   dispute resolution. It will have the added benefit of avoiding burdening the Court with what will

21   likely be many forthcoming disputes. USF rejected Plaintiffs' proposal.

22   _USF's Position._ USF does not believe that engaging a Discovery Master at this stage of the

23   case is worthwhile. Precisely because the case has been going on for a long time, this Court is

24   familiar with the case, the relevant issues, and the different discovery disputes that have previously

25   arisen. Engaging a Special Master would mean starting fresh with someone who does not have that

26

27   ───────────────────
     [4] Time and again, USF has weaponized the Court's joint filing requirements to prevent Plaintiffs
     from timely raising discovery disputes until the time is convenient for USF.

28

1  same familiarity, and who did not issue the previous discovery orders that he or she would be

2  interpreting and applying. Additionally, as the disputes above suggest, many of the discovery

3  issues in the case are interwoven with substantive issues in the case. Using a Special Master to

4  resolve discovery disputes would run the risk that the Special Master resolves issues in ways that

5  are at odds with the Court's view of what is needed for summary judgment on limitations issues,

6  for example. In practice, this is likely to result in increasing the number discovery disputes, rather

7  than narrowing them.[5]

8

9  Dated:   June 18, 2025                      LIEFF CABRASER HEIMANN & BERNSTEIN

10                                             By:   /s/ Jonathan D. Selbin

11                                             JONATHAN D. SELBIN (Cal. Bar No. 17022)
                                               jdselbin@lchb.com
12                                             MICHELLE LAMY (Cal. Bar No. 308174)
                                               mlamy@lchb.com
13                                             LIEFF CABRASER HEIMANN & BERNSTEIN
14                                             275 Battery Street, 29th Floor
                                               San Francisco, CA  94111-3339
15                                             Telephone: (415) 956-1000
                                               Facsimile: (415) 956-1008
16
17                                             JESSICA MOLDOVAN (admitted *pro hac vice*)
                                               jmoldovan@lchb.com
18                                             LIEFF CABRASER HEIMANN & BERNSTEIN
19                                             250 Hudson Street
                                               New York, NY 10013
20                                             Telephone: (212) 355-9500
                                               Facsimile: (212) 355-9592
21
22                                             ELIZABETH A. FEGAN *(admitted pro hac vice)*
                                               beth@feganscott.com
23                                             FEGAN SCOTT LLC
                                               150 S. Wacker Dr., 24th Floor
24                                             Chicago, IL 60606
25
   _____
26  [5] Plaintiffs' suggestion that the USF has "weaponized" the joint filing requirements is baseless.  USF
    has not (and cannot) prevent Plaintiffs from raising any discovery issue it wishes with the Court.
27  However, Plaintiffs have repeatedly pushed to file discovery letters while the parties are still
    conferring the disputes, and while USF believes that a resolution without the Court's intervention is
    possible and preferable.
28

1    Telephone: (312) 741-1019
     Facsimile: (312) 264-0100
2
3    MICHAEL VON KLEMPERER
     (*admitted pro hac vice*)
4    mike@feganscott.com
     FEGAN SCOTT LLC
5    1763 Columbia Road NW, Suite 100
     Washington, DC 20009
6    Telephone: (202) 921-0002
     Facsimile: (312) 264-0100
7
8    *Attorneys for Plaintiffs*
9
     HWG LLP
10
     By:  /s/ *Jonathan M. Baum*
11   Jonathan M. Baum (SBN 303469)
     jbaum@hwglaw.com
12   1919 M Street N.W.
     Washington, D.C. 20036
13   Telephone: (202) 796-0587
14   *Attorneys for Defendant the University of San*
     *Francisco*
15
16   FUTTERMAN DUPREE DODD CROLEY
     MAIER LLP
17
     By:  /s/ *Daniel A. Croley*
18   Daniel A. Croley
     dcroley@fddcm.com
19   FUTTERMAN DUPREE DODD CROLEY
     MAIER LLP
20   601 Montgomery St., Suite 333
     San Francisco, CA 94111
21   Telephone: (415) 399-3840
     Facsimile: (415) 399-3838
22
23   *Attorneys for Defendant Anthony N. Giarratano*
24
25   RAPKIN & ASSOCIATES, LLP
26   By:  /s/ *Scott Rapkin*
27   SCOTT RAPKIN
     scottrapkin@rapkinesq.com
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RAPKIN & ASSOCIATES, LLP
475 Washington Blvd.
Marina del Rey, CA 90292
Telephone: (310) 319-5465
Facsimile: (310) 306-1339

*Attorneys for Defendant Troy Nakamura*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### ATTESTATION OF FILING

I, Jessica A. Moldovan, hereby attest, pursuant to Northern District of California, Local Rule 5-1(h)(3) that concurrence to the filing of this document has been obtained from each signatory hereto.

DATED:    June 18, 2025                      By: _/s/  Jessica A. Moldovan_____