# CTTACHMENT 3

JONATHAN SELBIN (Cal. Bar No. 170222)
jselbin@lchb.com
MICHELLE LAMY (Cal. Bar No. 308174)
mlamy@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

ELIZABETH A. FEGAN (Cal. Bar No. 355906)
beth@feganscott.com
FEGAN SCOTT LLC
150 S. Wacker Drive, 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100

*Attorneys for Plaintiffs*
[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JOHN DOE 15, JOHN DOE 16, JOHN DOE 17, JOHN DOE 18, and JOHN DOE 19, | **COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| THE UNIVERSITY OF SAN FRANCISCO, ANTHONY N. (AKA NINO) GIARRATANO, and TROY NAKAMURA, | |
| Defendants. | |

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 1

II.    JURISDICTION AND VENUE ......................................................................... 5

III.   INTRA-DISTRICT ASSIGNMENT ................................................................. 6

IV.   PARTIES ........................................................................................................... 6

      A.      Plaintiffs .................................................................................................. 6

      B.      Defendants ............................................................................................... 6

V.     FACTS .............................................................................................................. 7

      A.      Student-Athletes, Including Plaintiffs, Face a Heightened Risk of Sexualized Conduct and Abuse by Coaches. ....................................... 7

      B.      USF Lacks Adequate Policies to Prevent and Redress Sexualized Conduct by Coaches or to Educate Student-Athletes, Including Plaintiffs, on Responding to Such Abuse. ....................................................................... 9

      C.      Left Unchecked by USF, the Coach Defendants Created an Intolerable Sexualized Environment on and off the USF Baseball Field for Plaintiffs. ......... 10

      D.      Defendants Retaliated Against Players Who Resisted the Sexualized Conduct, Including Plaintiffs, Causing a Deterrent Effect Within the Team. ...... 13

      E.      USF Was Long Aware of—and Permitted—the Coaches' Abuse. ...................... 16

      F.      Plaintiffs' Individual Experiences ............................................................. 18

           1.      August 2020 – May 2021: John Doe 15. .............................................. 18

           2.      August 2020 – December 2020: John Doe 16. ..................................... 22

           3.      August 2020 – September 2020: John Doe 17. .................................... 26

           4.      August 2020 – May 2023: John Doe 18. .............................................. 30

           5.      August 2021-May 2022: John Doe 19. ................................................ 34

      G.      Plaintiffs Were Injured and Continue to be Injured. ................................. 38

VI.   TOLLING OF THE STATUTE OF LIMITATIONS ...................................... 38

VII.   CLAIMS FOR RELIEF ................................................................................ 39

VIII. PRAYER FOR RELIEF .................................................................................. 52

IX.   DEMAND FOR TRIAL BY JURY ............................................................... 53

Plaintiffs John Doe 15, John Doe 16, John Doe 17, John Doe 18, and John Doe 19, by and through their attorneys, bring this action, individually, against the University of San Francisco ("USF"), Nino Giarratano ("Giarratano") and Troy Nakamura ("Nakamura") (Coaches Giarratano and Nakamura collectively referred to as the "Coach Defendants" and all defendants collectively referred to as "Defendants").[1]

## I.   **INTRODUCTION**

1.     For over two decades, USF's head baseball coach, Giarratano, and assistant baseball coach, Nakamura, created and coercively maintained an abusive and sexualized environment on USF's Division I baseball program. Despite being aware of the risks of abuse faced by student-athletes, like Plaintiffs, and the need to implement policies to protect them, USF failed to adopt and enforce policies prohibiting such abuse, even after the Coach Defendants' misconduct prompted complaints to the University. In addition, the USF Athletic Department was significantly understaffed and without oversight from administrators which contributed to the failure to detect, address, and prevent the Coach Defendants' misconduct.

2.     USF had—and has—an ongoing duty to protect the health and safety of student-athletes in its care, like Plaintiffs. This duty includes prohibiting discrimination and sexual and psychological abuse of student-athletes by adopting, implementing, and enforcing appropriate policies and procedures to prevent, or properly respond to, discrimination and sexual misconduct and abuse of student-athletes by USF personnel. However, as alleged herein, USF did not have any sexual misconduct prevention policies to address the power dynamics between coaches and student-athletes while Giarratano and Nakamura were coaches at USF and while Plaintiffs attended USF. Nor did USF adequately enforce the limited, inadequate policies it did have in place.

3.     The lack of such policies affected Plaintiffs during an incredibly vulnerable period

---

[1] A motion or stipulation to proceed anonymously is forthcoming. In the related case, *John Does 1-14 v. University of San Francisco, et al.*, Case No. 3:22-cv-1559-LB (N.D. Cal), the Court granted the Plaintiffs' motion to proceed anonymously, finding that publicly revealing Doe 1-14's "identities could cause mental or emotional harm and possible retaliation in the community." ECF No. 63, Order Granting Admin. Mot. to Proceed Anonymously at 1, *John Does 1-14 v. University of San Francisco, et al.*, Case No. 3:22-cv-1559-LB (N.D. Cal).

in their lives. Often living away from home for the first time, Plaintiffs arrived at USF expecting to develop as athletes under the supervision of USF's athletic department personnel and, in particular, Giarratano and Nakamura. Plaintiffs understood these individuals to be educated, skilled, fully vetted, and committed to Plaintiffs' best interests, and therefore accorded them deference, respect, loyalty, and trust.

4.     In dereliction of its duty to protect student-athletes, including Plaintiffs, USF employed Giarratano and Nakamura for over 22 years despite knowing that the Coach Defendants created an intolerable sexualized and psychologically abusive environment on USF's baseball team. In fact, USF President Fr. Fitzgerald recognized deep-seated cultural problems with the baseball program. Specifically, the Coach Defendants engaged in a concerted pattern of sexualized and psychological misconduct towards Plaintiffs, among others, that included Nakamura repeatedly exposing his genitalia to players on and off the baseball field, engaging in sexualized skits (involving miming sexual acts with players and/or forcing players to mime sexual acts with one another), showering with players, and describing his sexual desires to them. Rather than stop him, Giarratano encouraged and participated in Nakamura's behavior.

5.     When Plaintiffs refused to participate or expressed any disagreement with this sexualized culture, the Coach Defendants would retaliate against them. This retaliation included psychologically abusing Plaintiffs (including with sexualized taunts), taking away playing time, coercing Plaintiffs—who otherwise met all National Collegiate Athletic Association ("NCAA") and academic requirements—into leaving USF (and giving up their guaranteed scholarships) through threats and misrepresentations, and then blackballing Plaintiffs to make it difficult for them to transfer and play at other schools. The conduct was so abhorrent that some Plaintiffs experienced suicidal thoughts, and all have been left with severe trauma.

6.     The sexualized and abusive environment and calculated retaliation by the Coach Defendants effectively drove Plaintiffs to leave (or want to leave) the team. Such attrition had become characteristic of Giarratano's tenure as USF's head baseball coach. Following the 1999-2000 academic year, when Giarratano became head coach at USF, only one of 15 players returned

for their sophomore year. Of the 12 or 13 players who entered USF's baseball program in 2013, only five played baseball at USF for all four years of college, and one of those players was Giarratano's son. Every other player transferred. Of the 16 freshman recruits in the 2020 USF baseball class, 11 (or nearly 70%) left. Three of those 11 were Plaintiffs. These transfer rates—which stand in stark contrast to the reported 2.3% of four-year college transfers among Division I baseball players—are a testament to the Coach Defendants' sexual misconduct, ruthlessness, retaliation, and callous treatment of players, including Plaintiffs.

7.     The Coach Defendants' conduct was so outside the realm of what was "normal" in elite, competitive baseball that they took steps to cover it up, including by manipulating Plaintiffs into believing that the conduct was normal and that if the Plaintiffs could not handle the conduct, it was the fault of Plaintiffs. Likewise, when USF was confronted with allegations that sexual misconduct was rampant in its athletic programs—beyond allegations about the Coach Defendants' wrongdoing—through complaints made to the very highest levels of the Athletic Department, USF buried those complaints. Instead of stepping in to protect Plaintiffs (and other student-athletes), USF chose to protect its own reputation, back the Coach Defendants, and co-sign their efforts to mask their sexual misconduct by retaliating against any non-compliant student-athletes, including by running them off the baseball team.

8.     It was only after two decades of this abuse that USF was finally forced to act after the filing of numerous reports and Title IX complaints about the Coach Defendants' misconduct in 2021. The subsequent Title IX investigation confirmed the complaints, and, on January 13, 2022, USF announced that Nakamura was no longer a coach for USF's baseball team following "a human resources investigation into incidents in which 'the coaches' language, behavior and/or actions were inappropriate.'"[2] On January 24, 2022, Giarratano was officially reprimanded, but allowed to keep his job in continuance of USF's pattern of turning a blind eye.[3]

---

[2] Ron Kroichick, *Intolerable Sexualized Environment': Ex-USF Baseball Players Sue Coaches, School, NCAA*, SAN FRANCISCO CHRONICLE (Mar. 11, 2022, updated Mar. 13, 2022), https://www.sfchronicle.com/sports/college/article/Intolerable-sexualized-environment-Ex-USF-16994972.php.
[3] *Id.*

9.      As a result of this misconduct by Defendants, a class action lawsuit was filed in the Northern District of California by former Division I baseball players, spanning over 22 years. ECF No. 133, Third Amended Complaint, *John Does 1-14 v. University of San Francisco, et al.*, Case No. 3:22-cv-1559-LB (N.D. Cal). The Doe Plaintiffs in that case, thirteen former baseball players at USF, brought claims on behalf of all USF baseball players from 1999-2022 for, *inter alia*, Title IX discrimination, Title IX retaliation, violations of the California Education Code, negligence, and negligent supervision and retention of Giarratano and Nakamura. Only after the filing of the original complaint by John Does 1-13, on March 11, 2022, did USF further address the situation by firing Giarratano, two days later, "effective immediately."[4] Then, on June 10, 2022, USF's Athletic Director ("AD"), Joan McDermott, announced her retirement "in the wake of lawsuits alleging coaching misconduct in the baseball and women's basketball programs."[5]

10.      On May 5, 2025, Magistrate Judge Laurel Beeler denied John Does 1-14's motion to certify an issue class. ECF No. 312, Order Denying Mot. To Certify Issue Class, *John Does 1-14 v. University of San Francisco*, et al., Case No. 3:22-cv-1559-LB (N.D. Cal). But John Does 1-14 are not alone. John Does 15-19 experienced the same intolerable sexualized environment, psychological abuse, and retaliation inflicted by the Coach Defendants against John Does 1-14. No longer putative class members, John Does 15-19 now bring this lawsuit, individually, for violations of Title IX of the Education Amendments of 1972 ("Title IX"), as amended, 20 U.S.C. § 1681 *et seq.*, as well as various state statutory and common laws.

11.      Through this lawsuit, John Does 15-19 seek compensation from USF and the Coach Defendants for Plaintiffs' injuries from the intolerable sexualized environment, psychological abuse, and retaliation to which the Coach Defendants subjected Plaintiffs.

12.      Specifically, Plaintiffs seek money damages from USF and the Coach Defendants

---

[4] Jessica Flores, *USF Baseball Coach Fired After Ex-players' Lawsuit Alleges 'Intolerable Sexualized Environment,'* SAN FRANCISCO CHRONICLE (Mar. 13, 2022), https://www.sfchronicle.com/sports/college/article/USF-baseball-coach-fired-after-ex-players-16998516.php.
[5] Ron Kroichick, *USF's Joan McDermott Announces Her Retirement, Ending Turbulent Run as Athletic Director,* SAN FRANCISCO CHRONICLE (June 10, 2022, updated June 11, 2022), https://www.sfchronicle.com/sports/college/article/USF-s-Joan-McDermott-to-announce-her-17233293.php.

for the psychological abuse and repeated inappropriate sexual conduct they suffered, and

compensation for lost guaranteed scholarship money, other out-of-pocket costs, and impairment

of their baseball careers, including playing Major League Baseball. Among other damages, as a

result of the Coach Defendants' misconduct, Plaintiffs suffered and continue to suffer severe

emotional and physical pain, including shock, emotional distress, physical manifestations of

emotional distress including embarrassment, loss of self-esteem, disgrace, humiliation, and loss of

enjoyment of life and baseball; were prevented and will continue to be prevented from

performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings

and earning capacity; and/or have incurred and will continue to incur expenses for medical and

psychological treatment, therapy, and counseling.

## II.    JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises

under the laws of the United States.

14.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs'

state law claims, because they arise from a common nucleus of operative facts with their federal

claims and are so related to the federal claims as to form part of the same case or controversy

under Article III of the United States Constitution.

15.     This Court has personal jurisdiction over Defendant USF because it is located in

this District and the wrongdoing occurred in this District.

16.     This Court has personal jurisdiction over Defendant Anthony "Nino" Giarratano

because Giarratano coached in this District for over 22 years. Giarratano committed the

wrongdoing alleged herein largely, if not entirely, within this District.

17.     This Court has personal jurisdiction over Defendant Troy Nakamura because

Nakamura coached in this District for over 22 years. Nakamura committed the wrongdoing

alleged herein largely, if not entirely, within this District.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2)

because Defendant USF is a resident of the State in which the District is located; and a substantial

part of the events and omissions giving rise to the claims occurred in this District.

**III.    INTRA-DISTRICT ASSIGNMENT**

19.    Assignment in the San Francisco Division is appropriate because USF resides in this Division.

**IV.    PARTIES**

    **A.    Plaintiffs**

20.    **John Doe 15** is a citizen and resident of Utah and a citizen of the United States. John Doe 15 was a freshman at USF in the fall of 2020 and attended USF through the 2020-2021 academic year. He transferred from USF because of the actions of the Defendants.

21.    **John Doe 16** is a citizen and resident of California and a citizen of the United States. John Doe 16 was a freshman at USF in the fall of 2020. John Doe 2 transferred out of USF in December 2020 due to the actions of the Defendants.

22.    **John Doe 17** is a citizen and resident of California and a citizen of the United States. John Doe 17 was a freshman at USF for the fall of 2020 and left USF a few weeks into the fall 2020 semester because of Defendants' actions.

23.    **John Doe 18** is a citizen and resident of Arizona and a citizen of the United States. John Doe 18 attended USF from 2020 to 2023.

24.    **John Doe 19** is a citizen and resident of California and a citizen of the United States. John Doe 19 attended USF from 2021 to 2022. At the end of the 2022 spring season, John Doe 19 transferred from USF due to the actions of Defendants.

    **B.    Defendants**

25.    **Defendant University of San Francisco (USF)** is a California corporation located at 2130 Fulton Street, San Francisco, California 94117. USF's agent for service of process, Donna J. Davis, is located at the same address. USF is a Division I member institution of the NCAA and the only Division I university in San Francisco.

26.    **Defendant Nino Giarratano** is a resident of Arizona. Giarratano was the head coach of the USF baseball team from 1999 until March 13, 2022, when USF announced

Giarratano had been fired.

27.     **Defendant Troy Nakamura** is a resident of North Carolina. Nakamura was an assistant to Giarratano for 15 years at USF until he was promoted to Associate Head Coach in the summer of 2013. USF announced on January 13, 2022, that Nakamura had been fired.

## V.     FACTS

### A.     Student-Athletes, Including Plaintiffs, Face a Heightened Risk of Sexualized Conduct and Abuse by Coaches.

28.     College coaches control almost every aspect of student-athletes' lives. Absent adequate policies, college administrators are incentivized to look the other way. Under these circumstances, student-athletes are at a heightened risk of sexual abuse by coaches. It is also harder for student-athletes to recognize abuse in the context of college athletics due to the insular nature of such teams, the extreme trust and authority placed in coaches, and the role of coaches in setting team cultural norms.

29.     College athletics are notoriously hierarchical, with power flowing downward from the coach: "[C]oaches have power over athletes' lives far exceeding the mechanics of practicing and competing in a sport. A coach's power over athletes can extend to virtually all aspects of the athlete's life in such ways that clear boundaries are hard to delineate. This near-total control is rarely questioned."[6] For example, coaches directly control student-athletes' recruitment, training, well-being, financial aid, scholarships, playing time, and prospects of playing professionally. Thus, coaches hold student-athletes' future careers, and even their ability to continue attending college, in their hands. "The athlete's dependence on the coach makes it enormously difficult for the athlete to control the boundaries of the relationship or speak up to a coach who oversteps."[7]

30.     As recognized by the NCAA as early as 2012, for student-athletes, "the magnitude of the coach's control will likely exceed … the extent of control any individual has ever had over

---

[6] Deborah L. Brake, *Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds*, 22 MARQUETTE SPORTS L. REV. 395, 405 (Jan. 1, 2012) (footnotes omitted).
[7] *Id.* at 406.

them at any point in their lives, with the exception of their parents." [8] Coaches exert even more control and cement their influence over student-athletes by condoning or even participating in hazing. ECF No. 266-002 ¶¶ 43-45, Expert Report of Robert Boland, J.D., *John Does 1-14 v. University of San Francisco, et al.*, Case No. 3:22-cv-1559-LB (N.D. Cal) (hereinafter "Boland Report"). Hazing reinforces a culture of fear and compliance, ensuring that student-athletes feel even more powerless to resist or report a coaches' abusive conduct. *Id.*

31.     Coaches exert this control with minimal to no oversight, and many coaches command substantial prestige on campus. *Id.* ¶ 33. Given the pressure to succeed (and the resulting financial and intangible benefits), colleges compete fiercely for the best coaches, and coaches are among the highest paid individuals on campus. *Id.* This can cloud college administrators' judgment and lead them to excuse or willfully ignore misconduct. *Id.* ¶ 34.

32.     Given this power imbalance, interactions between coaches and student-athletes are inherently unequal and student-athletes are particularly at risk of sexual abuse and harassment by their coaches. As researchers suggest, "the culture of sport, specifically the power invested in the coach, facilitates an environment conducive to, and tolerant of, sexual exploitation."[9] Moreover, as athletes advance to the upper echelons of their sport, the power balance grows:

> [A]thletes may be more susceptible to the grooming process . . . when they have reached a high standard of performance but are just below the elite level. We call this the 'stage of imminent achievement' (SIA). . . . [T]he young athlete often needs the attention of the coach in order to maintain form and the chance to succeed. In these circumstances it is not difficult for a coach with sexual motives to groom and gain compliance from the athlete.[10]

33.     This dependence and power differential created by the coach-athlete relationship ensures that student-athletes are not capable of consenting to sexual communications or interactions with coaches. Boland Report ¶¶ 40, 43, 49 (citing literature). "In other words, the

---

[8] Deborah L. Brake & Mariah Burton Nelson, *Staying in Bounds* 15 (citations omitted), http://ncaa.org.s3.amazonaws.com/documents/2021/1/18/Staying_2Bin_2BBounds_2BFinal.pdf (last visited June 25, 2025).
[9] Joy D. Bringer, Celia H. Brackenridge, & Lynn H. Johnston, *Defining Appropriateness in Coach-Athlete Sexual Relationships: The Voice of Coaches*, 8 J. SEXUAL AGGRESSION, at 3 (2002), (unpublished manuscript), https://www.tandfonline.com/doi/abs/10.1080/13552600208413341.
[10] Celia Brackenridge & Sandra Kirby, *Playing Safe: Assessing the Risk of Sexual Abuse to Elite Child Athletes*, INT'L REVIEW FOR THE SOCIOLOGY OF SPORT: SPECIAL ISSUE ON YOUTH SPORT 13 (1997), https://bit.ly/3MBMlvJ.

dynamics of the coach-athlete relationship in intercollegiate sport make any sexual contact between a coach and an athlete abusive, regardless of whether it was wanted by the athlete and regardless of whether the athlete is over the age of consent." *Id.* ¶ 49 (quoting research). This power imbalance is what enables predators who work with student-athletes (like Jerry Sandusky, Larry Nassar, Robert Anderson, and Nakamura) to thrive.

**B.** **USF Lacks Adequate Policies to Prevent and Redress Sexualized Conduct by Coaches or to Educate Student-Athletes, Including Plaintiffs, on Responding to Such Abuse.**

34.     USF did not have *any* sexual misconduct prevention policy that addressed the power dynamics between coaches and student-athletes while Giarratano and Nakamura were coaches at USF and while Plaintiffs attended USF.

35.     USF has the responsibility to—and does—exercise institutional control over its coaches. USF dictates almost every aspect of a coach's job, including qualifications to work, trainings to compete, when to work, when to interact with athletes, how to disseminate information from the NCAA to their staff, and when and how to recruit new athletes. USF also enforces detailed NCAA rules that further define what coaches can and cannot do.

36.     Yet, USF has no policies (1) prohibiting sexual communication or sexual conduct between coaches and student-athletes; (2) mandating training related to the power dynamic between coaches and student-athletes and to the inability of student-athletes to consent to any form of sexual communication or sexual conduct with their coaches; or (3) requiring appropriate team environments free from any form of sexual communication or sexual conduct between coaches and student-athletes. The limited training provided focuses on student-on-student complaints, not misconduct by coaches.

37.     USF likewise exercises substantial control over student-athletes, including Plaintiffs, as reflected in a number of handbooks and policies. Yet none address the power dynamic between coaches and student-athletes, the effect of the power-dynamic on consent with respect to sexual communications or sexual conduct by coaches directed at student-athletes, or how to handle sexual communications or sexual conduct by coaches directed at student-athletes.

Rather, existing policies address only student-on-student harassment, including imposing sanctions when a student is found to have violated this policy. There is no mention of coaches facing sanctions for their sexual misconduct.

38.     Despite the need for a policy prohibiting relationships and other sexual conduct between faculty and students—and despite the existence of such a policy at many similar institutions—USF has no policy addressing such relationships or conduct.

39.     USF also does not—and did not while Plaintiffs attended USF—provide training to student-athletes to address sexual interactions or sexual communications between coaches and student-athletes, or on how the power dynamic between them implicates consent. While USF provides training on topics like dating violence, sexual assault, and stalking, no training addresses sexual misconduct in the context of athletic power dynamics. These narrowly focused trainings reflect USF's emphasis on complying only with USF's reporting requirements under the Clery Act and suggests that USF's focus is not on protecting its students, but rather on limiting the number of reportable incidents and keeping its official numbers low.

**C.     Left Unchecked by USF, the Coach Defendants Created an Intolerable Sexualized Environment on and off the USF Baseball Field for Plaintiffs.**

40.     In the absence of appropriate policies, the heightened risk of abuse materialized for Plaintiffs while playing under the Coach Defendants.

41.     Plaintiffs arrived at USF ready to work and succeed. All had successful careers in high school and on baseball travel teams, and USF publicly touted them when they committed. The Coach Defendants assured Plaintiffs that they would be major additions to the USF baseball team, were integral to the team's future success, and had the skills to make it to the next level. All Plaintiffs had aspiration of playing Major League Baseball.

42.     However, once they arrived at USF, Plaintiffs were subjected to a toxic environment created and perpetuated by the Coach Defendants that was characterized by inappropriate sexual conduct and psychological and physical abuse.

43.     Inappropriate sexual conduct was rampant at baseball practice. For example, at the beginning of base running, players were split into small groups, assigned a base, and asked to

perform a skit as an "icebreaker." Giarratano would stand on the pitching mound, judge each base's skit, and declare a winner. Nakamura would typically join the players on 3rd base and engage in sexualized skits. On one occasion, several Plaintiffs witnessed Nakamura go into the dugout and come out completely naked as part of his skit. On another occasion, Nakamura motorboated a players' genitalia as part of the skit.

44.     Immediately following base running, the hitters would be divided into two groups—one would go to the batting cages with volunteer assistant coach, Allen Smoot, and the other would stay and hit with Giarratano and Nakamura. The players who stayed with Giarratano and Nakamura would be required to engage in "café" exercises. The café exercises involved Nakamura or Giarratano identifying a theme for a hypothetical dinner, such as barbecue or fast food, and then each person (including both coaches and players) would identify what they would bring to dinner (such as a type of food or drink). Plaintiffs regularly witnessed Giarratano and Nakamura choose inappropriate answers. Not only did Giarratano witness these café exercises, but he engaged in the same behavior as Nakamura and encouraged inappropriate responses.

45.     All Plaintiffs were affected. For example, John Doe 18 went out of his way to hit with Allen Smoot instead of joining Giarratano. Giarratano called John Doe 18 out for avoiding him and asked why John Doe 18 was scared of him and hiding in the batting cages. Giarratano then strongly advised John Doe 18 to regularly hit with Giarratano and engage in the café exercises. Because this behavior was so normalized within the baseball team's culture, Plaintiffs felt obliged to participate for fear of being singled out or retaliated against.

46.     Giarratano and Nakamura's inappropriate behavior was not limited to the skits and café exercises. Nakamura would regularly make inappropriate and sexualized comments about women on campus, players' girlfriends, and even players' sisters. Giarratano not only heard Nakamura's inappropriate comments, but he often participated in these conversations. Plaintiffs regularly spoke among themselves and to other players on the team at the time about how uncomfortable the Coach Defendants' conduct made them, even though it was normalized on the baseball team.

- 11 -

47.     Both Coach Defendants also showered with the players in the locker room. This made Plaintiffs uncomfortable and many avoided showering after practices and games to avoid being naked around the Coach Defendants. During away games, those Plaintiffs who travelled were assigned hotel rooms to shower with approximately five other players, and often coaches. On one occasion, Nakamura showered with the door open and then entered the hotel room without a towel covering his genitals. Nakamura remained standing (with his towel around his neck) and spoke with players in the room, including John Doe 18, about Nakamura's sexual fantasies.

48.     Nakamura also engaged in calculated displays of nudity outside of the sexualized skits. On one occasion, several Plaintiffs witnessed Nakamura come out of the dugout naked and swing his genitalia around like a helicopter. Rather than condemn Nakamura's actions, Giarratano often made a joke of them. For example, after one of the sexualized skits involving nudity, Plaintiffs recall that Giarratano kissed the cross on his necklace and jokingly mimed looking up at the sky to ask God for forgiveness.

49.     Against this sexualized backdrop, Plaintiffs were also regularly verbally abused by the Coach Defendants who would say things such as, "I wouldn't bet on you," "you motherfucker!," "you fucking cunts," "you will never play baseball at USF," "pathetic," "worthless piece of shit," "kill yourself," and "we don't want you here." These taunts were often sexualized, with the Coach Defendants calling Plaintiffs a "pussy," telling John Doe 17 that he has "pussy skin … [and is] not a real man," and telling John Doe 15 that "I will eat your ass." One time, Nakamura even bear crawled across the baseball field and said, "Oh, look at [John Doe 17]'s ass. Look at that. I want a piece of that."

50.     Despite such verbal abuse, Plaintiffs wanted to succeed and stay at USF, but, when they expressed this to Coach Defendants, they were regularly told that they should give up their guaranteed scholarships, leave USF, and never play baseball again.

51.     This verbal abuse was often accompanied by physical abuse by the Coach Defendants. On one occasion, Giarratano punched John Doe 15 in the chest in front of the entire

team before yelling "I will eat your ass if you ever disrespect me like that again." Likewise, Giarratano aggressively shoved John Doe 17 for his performance during a conditioning run while saying "you fucking suck." On another occasion, while telling John Doe 17 that he was "the biggest mistake he made," Giarratano grabbed John Doe 17 by the neck, squeezed tightly, and threw him violently to the ground.

52.     As a result of his sexualized and abusive environment, Plaintiffs did not feel comfortable being around the Coach Defendants or at practice. At the same time, Defendants' conduct was so normalized on the baseball team that Plaintiffs began questioning if something was wrong with them for feeling uncomfortable with the Coach Defendants' conduct.

**D.     Defendants Retaliated Against Players Who Resisted the Sexualized Conduct, Including Plaintiffs, Causing a Deterrent Effect Within the Team.**

53.     The Coach Defendants' abuse did not stop at their underlying misconduct. Instead, they enforced their team motto, "loose lips sink ships," and engaged in a pattern and practice of retaliation against players, like Plaintiffs, who resisted their toxic, sexualized environment. USF supported this retaliation by allowing the Coach Defendants to run Plaintiffs and other players off the team in record numbers and by permitting the Coach Defendants to withdraw Plaintiffs' and other players' guaranteed scholarships in violation of USF and NCAA policies.

54.     All Plaintiffs experienced some form of retaliation by the Coach Defendants—agents of USF—for refusing to accede to the Coach Defendants' sexualized culture. This retaliation took the form of, among other things, revoking or threatening to revoke scholarships, providing no or less playing time, ostracizing Plaintiffs, forcing Plaintiffs to do extra physical tasks when injured, and blackballing Plaintiffs' baseball prospects at other schools or professionally. Physical abuse, as discussed above, also often followed Plaintiffs' rejection of the sexualized environment, including Giarratano purposefully throwing pitches to hit Plaintiffs in the genitalia or violently throwing Plaintiffs to the ground.

55.     Another common form of retaliation was being run off the baseball team by the

Coach Defendants.[11] Beginning in January 2015, the NCAA permitted conferences to start providing four-year guaranteed scholarships, which prevented coaches from deciding not to renew players' scholarships to free up scholarship money for someone else.

56.     To avoid this limitation, the Coach Defendants implemented a system of retaliation, intended to get rid of players who did not play along or fit within the sexually charged culture they created. Of the 11 or 12 recruits in the 2001 freshman class, only one or two stayed for all four years. Of the 12 or 13 recruits in the 2013 USF baseball class, 75%, or all but five, transferred in the following four years. Of the 13 recruits in the 2017 class, only five stayed for four years. Of the 16 recruits in the 2020 USF baseball class, eleven transferred. This transfer rate stands in stark contrast with the 2018-19 percentage of four-year college transfers among Division I student-athletes on baseball teams, which was just 2.3%, or the fourth lowest rate out of all 38 NCAA Division men's and women's sports. These abnormally high transfer rates put USF on notice of a serious problem within the baseball program that should have resulted in a Title IX investigation long before Plaintiffs attended USF.

57.     Because of this conduct, the threat of retaliation was also ubiquitous, leaving Plaintiffs scared to bring their concerns up directly to the Coach Defendants.

58.     All Plaintiffs experienced retaliation from the Coach Defendants.

59.     John Doe 15 left USF after his freshman year, despite his guaranteed four-year scholarship and the Coach Defendants wishes that he stay at USF. Initially, wanting to fulfil his dream of playing professional baseball and given his guaranteed four-year scholarship, John Doe 15 chose to return for the Spring semester of his freshman year despite the sexualized and toxic environment on the baseball team. Following his return, Giarratano physically assaulted John Doe 15 and sexually humiliated him by punching John Doe 15 before yelling "I will eat your ass if you ever disrespect me like that again." Giarratano then proceeded to limit John Doe 15's playing time. The Coach Defendants also used threats against John Doe 15 to prevent him from reporting

---

[11] Being "run off" a team occurs when a coach kicks or otherwise forces the player off the team for reasons other than those that are academic or disciplinary, i.e., reasons not within the student-athlete's control.

the abuse, explaining that they had "killed" other players who had complained about the Coach Defendants' misconduct to USF and were no longer on the baseball team. Such retaliation, combined with the intolerable environment on the baseball team, made it impossible for John Doe 15 to remain at USF without further negatively impacting his mental health.

60.     John Doe 16 left USF after only one semester due to the Coach Defendants' misconduct, including retaliation that minimized his playing time and worked to run John Doe 16 off the team despite his guaranteed four-year scholarship. The Coach Defendants told John Doe 16 that he would never play at USF and should just give up his guaranteed scholarship and not come back. When John Doe 16 communicated his intent to return to USF, the Coach Defendants told him that, if he ever returned, they would make sure he never played baseball again. The Coach Defendants then forced John Doe 16 to renounce his guaranteed scholarship.

61.     John Doe 17 left USF after only three weeks due to the Coach Defendants' misconduct and retaliation despite his guaranteed and full four-year scholarship. The Coach Defendants physically assaulted John Doe 17 on several occasions, including squeezing John Doe 17's neck, throwing him to the ground, and hurling balls at his genitalia. John Doe 17 was also ostracized and regularly told by the Coach Defendants to "kill yourself" and that he was "the biggest mistake [Giarratano] made."

62.     John Doe 18 was regularly subjected to retaliation for not participating in the Coach Defendants' sexualized environment. Not only did Giarratano have John Doe 18 engage in sexualized exercises when he made a conscious effort to avoid it, but he forced him to play through a meniscus tear and worked to actively blackball John Doe 18 by telling every MLB scout interested in John Doe 18 that they shouldn't touch him.

63.     John Doe 19 left USF after his freshman year due to the Coach Defendants' misconduct and retaliation. Clearly uncomfortable with the sexualized environment on the team, the Coach Defendants forced him to play through a back injury and told him to "fucking leave this program; we don't want you here – I don't care if you never play baseball again."

**E.     USF Was Long Aware of—and Permitted—the Coaches' Abuse.**

64.     USF knew of the abusive culture throughout its Athletic Department, affecting sports from men's soccer to women's basketball. The baseball team was not immune, but USF persistently ignored and/or actively concealed evidence to the contrary.

65.     As early as the fall of 2000, baseball players began elevating concerns about the Coach Defendants to USF. Formal complaints were made to USF's Administration in at least 2000, 2013, 2014, and 2021, in addition to players in 2000, 2014, and 2020 who noted on their exit paperwork that they were leaving USF because of the Coach Defendants and the environment on the baseball team. Nothing came of these reports and USF took no meaningful action to address the complaints or investigate the environment on the baseball team further. This was true despite USF also being put on notice of sexualized incidents regarding the baseball team in 2013, 2016, 2017, 2019, and 2021, and despite complaints to numerous members of Athletic Department staff about the Coach Defendants in 2013, 2014, 2017, 2018, and 2021.

66.     These reports represent the players brave enough to come forward and report the misconduct despite fear of the Coach Defendants' retaliation, as detailed herein. The Coach Defendants exploited their power imbalance to normalize a culture of silence, coercion, and abuse on USF's baseball team. A coach's authority and the associated power-dynamic and pressures are significant factors in determining whether athletes report a coach's misconduct. *See* ECF No. 300-021 ¶¶ 21-38, Supplemental Expert Report of Robert Boland, J.D., *John Does 1-14 v. University of San Francisco, et al*., Case No. 3:22-cv-1559-LB (N.D. Cal) (hereinafter "Supplemental Boland Report"). It is for that reason that "team dynamics commonly minimize or deny misconduct … [a phenomenon that] is amplified when the conduct involves hazing or sexual, taboo, or embarrassing matters." *Id.* ¶ 35. Here, the Coach Defendants used "hazing" and [other coercive behaviors] as a form of grooming, reinforcing a culture of fear and compliance, and conditioning student-athletes to accept mistreatment and not report (or even recognize) abuse." *Id.* ¶ 22. As such, players, including Plaintiffs, were led to believe that the Coach Defendants' misconduct was normal.

67.     "For its part, USF failed to implement adequate anti-hazing measures, contributing

to the overall climate of abuse, and leaving student-athletes vulnerable to both physical and sexual misconduct." *Id.* "[N]ot only were USF's policies and trainings inadequate, but the entire structure of its Athletic Department and administration all but ensured that misconduct was not identified, reported, or prevented. This further compounded the culture of abuse." *Id.* ¶ 9.

68.     Others had notified USF of issues within the Athletic Department. In July of 2020, sexual assault and abuse allegations spanning ten years were revealed against members of the USF Men's Soccer Team. *See* ECF No. 133 ¶ 64. A Change.org petition described a homophobic and misogynistic "toxic" sexual environment on the men's soccer team, which led to the suspension of a professional soccer player based on his conduct while at USF as a student-athlete. *Id.* The petition—signed by over 5,000 individuals—stated that USF's reporting system is ineffective and that USF dismisses allegations of sexual misconduct and demanded that USF investigate the sexual misconduct claims involving the men's soccer team. *Id.*

69.     In response to this petition, USF investigated the misconduct, including USF's handling of the misconduct, and released a 53-page report on January 11, 2021. *Id.* ¶ 65. Despite the graphic nature of the incidents reported, as well as the fact that 11 soccer players were accused of engaging in sexual misconduct over the past decade, the investigative report determined that it is more likely than not that sexual misconduct and/or disrespectful behavior towards women and/or LGBTQIA individuals was not pervasive among members of the USF men's soccer team over the past decade, and that USF had acted diligently in response to reported allegations of sexual misconduct involving soccer players over the past 10 years. *Id.*

70.     Then, following the filing of *John Does 1-14 v. University of San Francisco, et al.*, Case No. 3:22-cv-1559-LB (N.D. Cal), in a USF-commissioned report dated August 28-29, 2023, Mitchell Malachowski (Faculty Athletic Representative, University of San Diego), Ellen Ferris (Senior Associate Commissioner, American Athletic Conference), and Bruce Rasmussen (Former Athletic Director, Creighton University) concluded that USF's Athletic Department was understaffed and lacked sufficient checks and balances in the department structure and staffing to ensure issues could be identified and addressed before becoming a systemic problem. ECF No.

300 at 1, 5, Plaintiffs' Reply In Support of Class Certification, *John Does 1-14 v. University of San Francisco, et al.*, Case No. 3:22-cv-1559-LB (N.D. Cal).

71.     The numerous reports of the Coach Defendants' abuse ensured that USF, including President Fr. Fitzgerald, were well-aware of the "deep seated problems" on the baseball team. However, USF covered up the problems until the complaints grew too loud (and too public). This cover up was so blatant that members of USF's Administration and Athletic Department even recognized that the university's handling of the Coach Defendants' sexual misconduct involved a cover up.

72.     In 2021, a player's parents demanded an "URGENT MEETING REQUEST" with Joan McDermott and were ignored. Likewise, despite numerous complaints at this time explaining the Coach Defendants' misconduct, USF did not fire Giarratano. These complaints detailed, for example, Nakamura displaying and waving his genitalia in front of the whole team and in the presence of Giarratano and Nakamura placing his face in a player's crotch while Giarratano laughed. Other complaints called USF out for not addressing the Coach Defendants abuse and misconduct. Instead of addressing these complaints—or the numerous complaints that had begun two decades earlier—USF issued Giarratano a letter of reprimand and allowed him to remain at USF, thereby continuing to cover-up his involvement in the misconduct and allowing it to continue until at least March 2022.

73.     Plaintiffs expect that discovery will reveal just how deep USF's cover up efforts went.

**F.     Plaintiffs' Individual Experiences**

**1.     August 2020 – May 2021: John Doe 15.**

74.     John Doe 15 was a standout player on his high school baseball team. Major League Baseball scouts attended John Doe 15's games to watch him play, the San Francisco Giants, Mets, and Twins expressed interest in him, and he was projected to go in the 4th-8th round of the Major Baseball League draft out of high school. Due to COVID, the number of draft rounds decreased, and John Doe 15 elected to pursue collegiate baseball instead to increase his

draft prospects. He was recruited by numerous Division I Universities.

75. In late summer of 2019, John Doe 15 attended an invite-only showcase baseball camp at USF after being nominated by Dom Robinson. Impressed by John Doe 15's play, Nakamura invited him on an official recruiting visit to USF where John Doe 15 met the entire coaching staff.

76. USF heavily recruited John Doe 15 based on his baseball skills and experience. John Doe 15 had not considered USF, but the Coach Defendants sold him on representations that he would excel under Giarratano's guidance, and that the Coach Defendants were invested in his development. Giarratano told John Doe 15: "We recruited you because you're a great player. If you suck, it's our fault and we've got to be better coaches… I don't cut kids … You're either going to get drafted or graduate from USF … I will see you at your wedding." John Doe 15 was also attracted to USF due to the caliber of the incoming players, the standard of education, and that USF was part of the West Coast Conference.

77. USF offered John Doe 15 guaranteed athletic grants-in-aid (scholarships) for four years, worth approximately $50,000 per year. This guarantee was dispositive of John Doe 15's decision to commit to USF.

78. When John Doe 15 started at USF, he was not advised of and did not learn that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, did not see any policies displayed on campus, was not told about such policies at any orientation conducted for new students, and did not receive a publication that contained such policies.

79. When John Doe 15 started at USF, he was not advised of and did not learn of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing availability remedies and resources, on or off campus, did not see any such rules or procedures displayed on campus, was not told about such rules or procedures at any orientation conducted for new students, and did not receive a publication that contained such rules or procedures.

80.     Immediately upon joining the team, John Doe 15 was subject to an intolerable, and often sexualized, environment that the Coach Defendants created and perpetuated. From the outset of John Doe 15's freshman year, he was verbally berated by the Coach Defendants, including being yelled at by Nakamura for things as simple as asking to switch jersey numbers to his childhood number, even though other coaches, such as Allen Smoot, had approved the switch.

81.     John Doe 15 also regularly witnessed Nakamura's sexualized behavior on the baseball field, including inappropriate sexual remarks.

82.     In addition to the sexualized behavior that John Doe 15 witnessed, he was informed by his teammates about the sexualized conduct and nudity by Nakamura that occurred during the outfielders' practice and in front of Giarratano, including sexualized skits such as Nakamura pretending he was at a buffet by having a player do a handstand, grabbing that player's legs and splitting them open, then pretending to eat spaghetti from that player's genital region.

83.     John Doe 15 was shocked that such behavior was portrayed as a normal part of the team culture, even though John Doe 15 and some of his teammates would talk about how disgusting and strange this behavior was. As a result, John Doe 15 quickly became uncomfortable around the Coach Defendants.

84.     On another occasion, John Doe 15 was in the bullpen when Nakamura helicoptered his penis around on the baseball field in front of several players. This led John Doe 15 to do his best to avoid Nakamura out of fear that he would either verbally berate him or say something sexually inappropriate.

85.     Giarratano also regularly denigrated and taunted John Doe 15, saying things such as "You might be the best pitcher on the team, but I wouldn't bet on you." He also told John Doe 15 that "you need to change who you are and conform to this culture." Giarratano was also aware that John Doe 15 was roommates with John Does 1 and 2, and would threaten John Doe 15 in strange ways, such as saying "You don't have roommates, I killed them."

86.     John Doe 15 was shocked to find that the Coach Defendants' behavior was normalized and that players were coerced into participation or tolerance to avoid retaliation. In

fact, John Doe 15 noticed that the Coach Defendants also retaliated against his parents (in addition to the parents of John Does 1 and 2) by providing them with inferior seating at baseball games compared to other parents.

87. Despite the verbally and sexually hostile environment, John Doe 15 did not want to leave USF. If John Doe 15 chose to leave, he understood that he would lose his guaranteed scholarship and valuable playing time under the NCAA's transfer rules. Staying and succeeding at USF was important to John Doe 15, who wanted to become the best possible player and aspired to play professional baseball following college. After playing professionally, he had goals of becoming a lawyer and knew that USF's education was a stepping-stone towards that goal.

88. John Doe 15 returned for the Spring semester, where he earned the coveted spot of pitching as a true freshman in the season opener against UCLA, the number two team in the country at the time.

89. Despite this positive start to the Spring semester, a few weeks later in the game against UCSB, Giarratano physically assaulted John Doe 15 and sexually humiliated him. During a tied game, John Doe 15 walked two players in a row and was taken out of the game. John Doe 15, disappointed in himself, handed Giarratano the ball on the mound and walked back to the dugout. In response, and in the dugout, Giarratano yelled, "You motherfucker!" and punched John Doe 15 in the chest with enough force to move him before proceeding to yell, "You disrespected me out there. I will eat your ass if you ever disrespect me like that again." The majority of players and coaching staff at the time witnessed the incident.

90. On the bus home from USCB, Giarratano came back and sat with John Doe 15 and, in an attempt to justify his behavior, said "Don't worry about it, this was no big deal … I just want you to know, one time I tried to head butt this kid's helmet off his fucking head." This comment only further upset John Doe 15, who viewed this as a veiled threat not to tell anyone about what had happened. Again, the players and coaching staff on the bus likely witnessed this incident.

91. Following the UCSB game, John Doe 15 was ridiculed by his teammates and

coaches that Giarratano wanted to eat John Doe 15's ass. Giarratano then purposely excluded John Doe 15 from attending the next several away games.

92.     John Doe 15 was finally invited to attend an away game when USF travelled to Sacramento to play against Sacramento State. Due to COVID, and restrictions about how many players could be in the dugout, John Doe 15 and three other players were sitting and chatting outside of the dugout during the game. Nakamura came over and, in earshot of USF and Sacramento State players, parents, and spectators, yelled, "Fuck you all! You motherfuckers! You fucking cunts." Parents from both teams were shocked by Nakamura's behavior, and John Doe 15 understood that Sacramento State parents reported the incident to USF.

93.     John Doe 15 did not want to go to practice due to being uncomfortable and scared of Nakamura and Giarratano. He became nervous and anxious, which led to decreased performance on the baseball field. John Doe 15 also began to struggle with eating and lost 20 pounds in the span of a few months, being so worried that Giarratano would physically assault him again. He lost motivation, became depressed, and his grades dropped.

94.     John Doe 15's parents were extremely worried about him, as he would regularly call his father telling him that he was depressed and anxious and hated being at USF. On one occasion, John Doe 15 broke down to his father on the phone, saying "they [the Coach Defendants] won't help me."

95.     By the end of his freshman year, John Doe 15 decided that he needed to leave USF in order to protect his mental health and get the coaching support he deserved.

96.     After leaving USF, John Doe 15 transferred to another Division I University. He was excited to have a second chance to make it to the Major Leagues but discovered that the emotional and physical consequences of the Coach Defendants' behavior followed him. John Doe 15 found his anxiety persisted, he was less trusting and more suspicious of coaches, and he had lost his love and passion for baseball.

**2.      August 2020 – December 2020: John Doe 16.**

97.     John Doe 16 was a talented baseball player. By 10th grade, he was part of an elite

travel team that was managed by a Major League Baseball scout. Heading into his junior year of high school, he attended numerous college baseball camps and received significant recruiting interest from Division I, II, and III schools. As a high school junior, he was MVP of his high school varsity baseball team, earned First Team All-Conference, All-Area , and Third Team All-State honors, and was the 10th ranked catcher in the State of California by Prep Baseball Report.

98.     In November of 2018, he was invited on a recruiting visit to USF. USF heavily recruited John Doe 16 based on his baseball skills and experience. During the recruiting visit, USF offered John Doe 16 guaranteed athletic and academic grants-in-aid (scholarship) for four years, worth approximately $50,000 per year. This guarantee was dispositive of John Doe 16's decision to commit to USF, in addition to USF's representations during the recruiting process that he would start as a freshman and that they expected him to be a high-level draft prospect.

99.     In August 2020, just before John Doe 16 was set to arrive at USF, he suffered a hamate bone fracture playing summer baseball and had surgical repair. The Coach Defendants were aware of this injury, approved his surgery, and were supportive of his recovery process—he was told that he was the first recruit in his class, and that the Coach Defendants were basing the recruiting team around him.

100.     When John Doe 16 started at USF, he was not advised of and did not learn that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, did not see any policies displayed on campus, was not told about such policies at any orientation conducted for new students, and did not receive a publication that contained such policies.

101.     When John Doe 16 started at USF, he was not advised of and did not learn of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing availability remedies and resources, on or off campus, did not see any such rules or procedures displayed on campus, was not told about such rules or procedures at any orientation conducted for new students, and did not receive a publication that contained such rules or procedures.

102.     When John Doe 16 arrived on campus, he was subject to strict quarantine rules due to the COVID policies on USF's campus. Not only did this isolation affect John Doe 16's morale but, once he was cleared to practice, John Doe 16 was subject to an intolerable environment created and perpetuated by the Coach Defendants.

103.     The Coach Defendants immediately began berating, mentally abusing, and ostracizing John Doe 16 in front of the other players. He was repeatedly told by the Coach Defendants that they had made a mistake in recruiting John Doe 16. Such verbal beratement and humiliation was common, and normalized, including towards those players unable to run a six minute mile who were then subject to "fat camp." During "fat camp," a term coined by the Coach Defendants, players were required to do additional conditioning at 5:00 a.m. on Tuesdays and Thursdays, in addition to beach workouts at 7:00 a.m. on Saturdays. Because John Doe 16 did not run a six minute mile, he was forced to participate in "fat camp" while rehabilitating from a significant injury during the COVID-19 pandemic.

104.     John Doe 16 also experienced the Coach Defendants making sexual comments in front of players on the baseball field, including one sexual innuendo about a player's sister.

105.     John Doe 16 was shocked to find that the Coach Defendants' behavior was normalized and began to dread going to practice and seeing the Coach Defendants. He was terrified of being yelled at and of how unpredictable Giarratano was. John Doe 16 quickly became depressed, distressed, and unmotivated.

106.     The Coach Defendants also began retaliating against John Doe 16 by minimizing his playing time in scrimmages. They also actively worked to run John Doe 16 off the team. In December of 2020, John Doe 16 had an exit interview with the coaching staff. During this meeting, the Coach Defendants continued to verbally berate John Doe 16, telling him that he hadn't done anything well this semester, was never going to play at USF, and that John Doe 16 should just give up his guaranteed scholarship money and not come back.

107.     John Doe 16 did not want to leave USF. If John Doe 16 chose to leave, he understood that he would lose his guaranteed scholarship and valuable playing time under the

NCAA's transfer rules. As such, John Doe 16 communicated his intent to return to USF, but the Coach Defendants told him that, if he returned, he would never play baseball again and would be wasting his time.

108. The Coach Defendants then forced John Doe 16 to renounce his guaranteed scholarship. On his exit paperwork, John Doe 16 noted that he was leaving USF against his will and that he was being forced to sign away his scholarship. No one from USF followed up with John Doe 16 about these comments.

109. After leaving USF, John Doe 16 transferred to a city college. Although he was relieved to be out of the abusive environment at USF, the emotional consequences of Coach Defendants' behavior followed him. While Major League Baseball scouts approached John Doe 16 during his time at his new school, he continued to feel depressed, was drinking heavily, had lost his love for baseball, and had suicidal thoughts. This led John Doe 16 to seek psychiatric treatment, where he was diagnosed with Chronic Depression, Generalized Anxiety Disorder, and Hyperactive/Inattentive ADHD.

110. In December 2021, John Doe 16's father filed a Title IX Complaint with USF. This complaint outlined the Coach Defendants' inappropriate treatment, including retaliation against John Doe 16 and forcing John Doe 16 to give up his scholarship and leave USF. John Doe 16's father specifically noted that this was a cultural issue: "It is very telling that [John Doe 16's] 2020 USF baseball recruiting class had a total of 17 recruits, of which seven have transferred and two more are planning to transfer …[i]t is a testament to the coaching staff's ruthlessness and callous player treatment."

111. That same day, John Doe 16's father emailed Diane Nelson about his Title IX complaint, explaining that John Doe 16 "was bullied, intimidated, and abused by the coaching staff during the fall of 2020 … Because of the traumatic baseball experience at USF, [John Doe 16] suffers from anxiety and depression. In the Spring of 2021, [John Doe 16] experienced suicidal thoughts." John Doe 16's suicidal thoughts continued until early Summer of 2022.

2841900.2

### 3. August 2020 – September 2020: John Doe 17.

112.    John Doe 17 has a long history of success in baseball. He was on his high school's varsity team in 10th, 11th, and 12th grade, and John Doe 17's travel baseball team was one of the top ranked teams in the nation. By his junior year of high school, John Doe 17 was heavily recruited by numerous Division I Universities, and received letters of interest from various Major League Baseball teams, including the White Sox, the Phillies, and the Diamondbacks. John Doe 17's goal was to be drafted and play in the Major Leagues, and he believed that playing Division I baseball would only increase his draft prospects.

113.    In July 2019, Nakamura watched John Doe 17 play in Arizona. USF heavily recruited John Doe 17 based on his baseball skills and experience and, shortly after watching John Doe 7 play, Nakamura invited John Doe 17 on an official recruiting visit to USF.

114.    While on his recruiting visit to USF, John Doe 17 was offered guaranteed and full four-year athletic and academic grants-in-aid (scholarships). Nakamura explained to John Doe 17 that "USF is one of the few schools that exclusively offer 4 year scholarship contracts … It is our commitment toward your degree from world class University where you will be surrounded by people who are passionately committed to help you become the best version of yourself everyday." This guarantee of a full scholarship for four years was dispositive of John Doe 17's decision to commit to USF. John Doe 17 also felt that USF was his best path to play professional baseball.

115.    When John Doe 17 started at USF, he was not advised of and did not learn that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, did not see any policies displayed on campus, was not told about such policies at any orientation conducted for new students, and did not receive a publication that contained such policies.

116.    When John Doe 17 started at USF, he was not advised of and did not learn of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing availability remedies and resources, on or off campus, did not see any such rules or procedures displayed on campus, was not told about such rules or procedures at any orientation

conducted for new students, and did not receive a publication that contained such rules or procedures.

117.    When John Doe 17 arrived on campus, he was subject to strict quarantine rules due to the COVID policies on USF's campus, including being quarantined alone in his dorm room for 14 days. Because the isolation was affecting John Doe 17's morale, his parents reached out to Giarratano. In response, Giarratano berated John Doe 17, telling him that he was pathetic and that his "mommy" needed to stop calling.

118.    Immediately upon starting practices, John Doe 17 was subject to an intolerable environment that the Coach Defendants created, perpetuated, and normalized. Sexualized comments by the Coach Defendants were common, including about females on campus and other players' genitalia. Such comments led John Doe 17 to avoid using the baseball locker room as he was anxious the Coach Defendants would comment on his own genitals.

119.    The Coach Defendants also immediately began to verbally abuse John Doe 17, with Giarratano saying things like "What the fuck are you doing here? I forgot we even recruited you." Despite having promised John Doe 17 new jerseys and baseball gloves during the recruiting process, the Coach Defendants refused to give John Doe 17 proper gear and, instead, provided pants that were far too big for him. The Coach Defendants then proceeded to make fun of John Doe 17's ill-fitted clothes, calling him a "little leaguer," "pathetic," and a piece of shit."

120.    Such verbal beratement was common, including towards those players unable to run a six minute mile who were subject to "fat camp." During "fat camp," a term coined by the Coach Defendants, players were required to do additional conditioning on the weekends. During one of the runs as part of the additional conditioning, John Doe 17 finished last. When he finished, Giarratano pushed John Doe 17 off to the side to isolate him and said, "Wow you fucking suck. Really? A seven minute mile. We expected you to be the top athlete." Giarratano then shoved John Doe 17 and walked away.

121.    During "fat camp," Nakamura would bear crawl and say things such as, "Oh, look at [John Doe 17]'s ass. Look at that. I want a piece of that." Taunts by the Coach Defendants at

fat camp were also common and often sexually humiliating, such as "Oh, imagine having to go to fat camp, those fucking losers, they probably get no pussy."

122.     Giarratano also physically assaulted John Doe 17 on numerous occasions. After one practice, Giarratano told John Doe 17 to meet him in center field. There, Giarratano yelled at John Doe 17 calling him a "worthless piece of shit." Giarratano also told John Doe 17 that he was "the biggest mistake he made," that he "never should have brought you here" to USF, and that he wished the NCAA would change the rules and "let me put my hands on you." Giarratano then grabbed John Doe 17 by the neck, squeezing him tightly, and threw him violently to the ground. John Doe 17 started throwing up from the abuse. Later that day, Nakamura called John Doe 17 and told him he was "such a lazy fuck" and needed to "do better in life."

123.     Giarratano would also physically intimidate and threaten John Doe 17 during batting practice by hurling balls at his genitalia. Whenever John Doe 17 missed the ball during practice, Giarratano would also push or shove him. This physical contact was often combined with humiliating verbal insults such as "dipshit," "dumbass," "asshole," and "retard." Oftentimes, the insults were sexualized. One time John Doe 17 dove for the ball and was bleeding and Giarratano said, "Oh yeah, that's that pussy skin. You're not a real man." This verbal denigration was constant, and typically in front of his teammates. It included "You're not a man, you lift weights like a bitch" and, separately, "Your parents raised you like a bitch. Why were you ever conceived? Your dad should have left a condom on." Other times, it was aggressive "You fucking suck, kill yourself" or "you're worthless" "I wish you were never born."

124.     The physical and mental abuse that Giarratano and Nakamura inflicted on John Doe 17 in the three weeks he was on campus had a profound impact on him. He became anxious and depressed, found himself unable to leave his dorm room, and was throwing up uncontrollably, including at practice.

125.     John Doe 17 eventually withdrew from USF and quit baseball. When he got home, he took down his baseball hats and sold all his gear. After arriving home, John Doe 17 also went to the emergency room several times due to his persistent anxiety and suicidal thoughts. As a

result, John Doe 17 was unable to engage in the numerous Division I collegiate baseball teams that reached out to recruit him after leaving USF, thereby impacting John Doe 17's collegiate and professional baseball prospects.

126. John Doe 17 continues to suffer with anxiety, struggling to leave the house, return to college, or keep a full-time job. He has since been diagnosed with severe PTSD, anxiety, and depression as a result of the Coach Defendants' conduct. While John Doe 17 takes medication to address his anxiety, he still struggles and experiences anxiety when leaving the house and interacting with others.

127. While at USF, John Doe 17's mother called USF numerous times to complain during the onslaught of abuse by the Coach Defendants. Nothing was done by USF in response. Instead, Giarratano and Nakamura told John Doe 17 to "stop lying" and stop "making excuses like a little bitch."

128. On March 4, 2022, John Doe 17's mother emailed Nakamura and another USF coach, Mathew Keplinger, and asked that the email be forwarded to Giarratano also. In that email, she detailed the abuse, including the Coach Defendants referring to John Doe 17 as a "mistake", the $7,000 bill that John Doe 17 received after leaving USF, and explained that "You have ruined everything for him. Toughlove is one thing' psychological abuse, demeaning and degrading these kids is something else."

129. On March 16, 2022, John Doe 17's mother forwarded the March 4, 2022 email to Joan McDermott, and added that John Doe 17 "came over on a full scholarship to play baseball in August 2020 and left recently after because of the mistreatment and misconduct from your coaches. Now all of this has come to light in the news and my son finally has some validation. This is unacceptable and inexcusable. These coaches have ruined everything for my son and so many players."

130. On March 16, 2022, Joan McDermott thanked John Doe 17's mother for the email and asked if she could share it with "upper administration." John Doe 17's mother said "Please do! … He was forced out by Nino and Naks!"

131. By May 8, 2022, the $7000 bill still had not been resolved. John Doe 17's mother emailed USF about the bill explaining that John Doe 17 "came over on a FULL SCHOLARSHIP in Aug 2020/Baseball. He moved in Aug 15, 2020 and moved out/left that school Sept 9, 2020! He was forced out by the misconduct and abusive behavior of your baseball coaches. We received this $7000+ bill weeks after he got home. It has now all surfaced a couple of years later, the school admitting guilt by firing Coach Nakamura and Nino, BUT THE SCHOOL STILL IS TRYING TO COLLECT THIS MONEY! This is absolutely ridiculous!! He was forced out!"

**4.    August 2020 – May 2023: John Doe 18.**

132. John Doe 18 was a standout high school baseball player. He lettered and earned multiple All-Conference and All-State Awards. During his senior year of high school, John Doe 18 earned Second Team All-American Honors, and was named County Player of the Year and First Team All-County. Thereafter, John Doe 18 attended Junior College and excelled as a freshman and sophomore having multi-home run games and guiding the team to Conference Championship.

133. In the summer of 2020, Nakamura invited John Doe 18 to visit USF. John Doe 18 was subsequently offered a guaranteed 5% athletic scholarship. This scholarship, accompanied by the academic scholarship that John Doe 18 was awarded (covering half of his tuition), was dispositive of John Doe 18's decision to continue his baseball career at USF.

134. When John Doe 18 started at USF, he was not advised of and did not learn that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, did not see any policies displayed on campus, was not told about such policies at any orientation conducted for new students, and did not receive a publication that contained such policies.

135. When John Doe 18 started at USF, he was not advised of and did not learn of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing availability remedies and resources, on or off campus, did not see any such rules or procedures displayed on campus, was not told about such rules or procedures at any orientation

conducted for new students, and did not receive a publication that contained such rules or procedures.

136. Immediately upon joining the team, John Doe 18 was subject to an intolerable, sexualized environment that the Coach Defendants created and perpetuated. Each day, John Doe 17 was subject to sexualized skits and then café exercises. At the beginning of base running, players were split into groups of four, assigned a base, and asked to perform a skit as an "icebreaker." Giarratano would stand on the pitching mound, judge each base's skit, and declare a winner. Nakamura would always join the players on 3rd base and engage in sexualized skits. On one occasion, John Doe 18 witnessed Nakamura going into the dugout and coming out completely naked as part of his skit. John Doe 18 immediately turned to another player and said: "I can't do this anymore." Following the skit, Allen Smoot told the players in the 1st base group that "if anyone finds that out, we're all fired." Other inappropriate sexual conduct during the skits was common and was portrayed as 'normal' within the team culture, which shocked John Doe 18.

137. Immediately following the base running, hitters (including John Doe 18) would be divided into two groups—one would go to the batting cages with Allen Smoot and the other would stay and hit with Giarratano and Nakamura. Those players who stayed with Giarratano and Nakamura would be asked to stand in a circle around the batter's box before hitting with the Coaches in the front and engage in "café" exercises. During these exercises, Giarratano or Nakamura would identify a dinner theme (such as barbecue or fast food) and set the tone by saying what they would bring to the dinner/order (such as a type of drink or food). Giarratano and Nakamura would regularly choose inappropriate answers, such as bodily fluids or alcohol, and identify a woman's body part that they would drink it off of. The players would then be asked to participate one by one. When shy or new players on the team ordered a normal drink or specified a normal body part, they would be booed. These exercises happened regularly, if not daily, and the Defendant Coaches' answers progressively got more inappropriate and disgusting. John Doe 18 recalls being disgusted by this behavior and found it very difficult to refocus and carry on with hitting practice. Such behavior also made him increasingly uncomfortable with being in the

locker rooms, and showering, with the Coach Defendants in the room.

138.    To avoid engaging in these café exercises, John Doe 18 always tried to go to the batting cages with Allen Smoot instead. Giarratano called John Doe 18 out for avoiding him and asked why John Doe 18 was scared of him and hiding in the batting cages. Giarratano then strongly advised John Doe 18 to regularly hit with Giarratano and engage in the café exercises.

139.    Giarratano and Nakamura also sometimes showered with the players in the players' locker room.

140.    During one away game during John Doe 18's first year at USF, players were split into groups of approximately five and assigned hotel rooms to shower. Following one game, John Doe 18 recalls walking into his assigned hotel room to find Nakamura already showering. Nakamura proceeded to exit the shower and, with no towel on, enter the main room before standing, unclothed, in the hotel room for approximately 15 minutes. While standing in the hotel room, Nakamura said various inappropriate things to John Doe 18 and the other players in the room, including discussing his sexual fantasies. Shortly thereafter, John Doe 18 went to take a shower. While doing so, Nakamura pulled the shower curtain open, said hello to John Doe 18, and briefly stood there while John Doe 18 was taking a shower before leaving the curtain open, washing his hands, and leaving the bathroom. This made John Doe 18 incredibly uncomfortable.

141.    As soon as it became apparent to Giarratano and Nakamura that John Doe 18 would not play along with the sexually charged behavior and was suffering from a meniscus injury (which was affecting John Doe 18's on field performance), the Coaches began to retaliate and emotionally abuse John Doe 18. Weekly, Giarratano would text John Doe 18 to come to the press box where, for hours, the Coaches would insult him, his family, and his girlfriend.

142.    Further, when John Doe 18 first injured his knee and informed the Coaches that he had a meniscus tear, they refused to believe him and forced him to continue playing. John Doe 18 went to two different respected doctors to get an MRI—both confirming the tear. When John Doe 18 shared this with the Coach Defendants, Giarratano told him that he injured his knee because he was fat, not because he had an issue with his meniscus. When John Doe 18 then told the Coach

Defendants that he wanted to get surgery to protect his knee instead of playing, the Coach Defendants told him that he was "soft," didn't want it enough, and threatened to cut him from the team if he chose to get surgery. John Doe 18 felt like the Coach Defendants questioned and attacked his integrity rather than addressing a serious surgical issue.

143.    While at USF, John Doe 18 was also getting multiple calls from Major League Baseball teams who were expressing interest in him. John Doe 18 recalls that, one day, Giarratano called him into his office and told him not to worry about the MLB teams because Giarratano had called the scouts that were interested and told them not to touch John Doe 18. Being told this by Giarratano broke John Doe 18 mentally, having already been struggling to succeed as a player due to the sexualized culture on the baseball team and the retaliation by the Coach Defendants. John Doe 18 found himself in the lowest point of his life, becoming severely depressed, declining to go out with friends or leave his room, and finding himself fixated on mistakes he made while at USF.

144.    John Doe 18 witnessed Giarratano and Nakamura retaliate against other players on the team. For those players that Giarratano wanted to cut, he would set up batting practice for only those individuals before practice for everyone else. During such practices, Giarratano would throw the ball at players as hard as possible to make it impossible to hit. This tactic happened every day and John Doe 18 understood it as a way to torment players into leaving USF.

145.    When the initial lawsuit was filed, John Doe 18 recalls team meetings in the locker room where players would be taught how to lie and defend the Coach Defendants. Older players on the team also advised the team to text the Coach Defendants in support, which John Doe 18 did to avoid any further retaliation.

146.    As part of the Title IX investigation, the players were sat down on the field as Title IX Officers attempted to have a conversation about the Coach Defendants' behavior. Out of fear of retaliation both from the Coach Defendants and other players, John Doe 18 remained silent. Other players pretended to have no clue what the Title IX Officers were talking about.

147.    On December 19, 2021, John Doe 18 emailed Katrina Garry saying "I would like

to be heard in this investigation. I was wondering if everything was confidential or not because it doesn't really seem like it."

### 5. August 2021-May 2022: John Doe 19.

148. John Doe 19 was a highly skilled baseball player in high school, ranked by Perfect Game as between a "Potential draft pick and/or excellent college prospect" and "Potential top 10 round pick and/or highest level college prospect."

149. USF, at the encouragement of Giarratano, heavily recruited John Doe 19 based on his baseball skills and experience. By March 2021, Nakamura was regularly in contact with John Doe 19 about scholarship money and invited John Doe 19 to visit: "The [John Doe 19] DNA is special. You're built to grind and thrive. Looking forward to seeing you on the Hilltop in April."

150. During John Doe 19's visit to USF in April 2021, he had the opportunity to meet the team and the Coaches. John Doe 19 was told that he would start in right field immediately and that USF didn't currently have anyone to fill that position. John Doe 19 was also told that the Coach Defendants had got one of their star players a tryout with Team USA and, if John Doe 19 played well enough, that would be an opportunity for him too. At the conclusion of the trip, Nakamura informed John Doe 19 that the Coach Defendants were working to free up money for him in Year 1 but promised him 50% of the cost of school at USF (approximately $35,000 in addition to $10,000-14,000 in academic scholarship) for the following years: "Can't tell you how impressed we were to meet you … and even more excited to welcome to you the Hilltop Family."

151. Due to increased interest in John Doe 19 by other Division I baseball teams, including UCLA, the Coach Defendants ultimately offered John Doe 19 a 25% athletic grant-in-aid (scholarship) for his first year at USF which, as promised, would increase to 50% the following year. In addition to the academic scholarship that John Doe 19 was eligible for, and the additional financial aid secured by the Coach Defendants, John Doe 19's freshman year (including room and board) cost him only $300 out-of-pocket. The guarantee of a four-year scholarship (which, with the academic scholarship and additional financial aid, was essentially a full scholarship) and the Coaches' representations that John Doe 19 would have an immediate

impact on the team and start, as a freshman, were dispositive of John Doe 19's decision to commit to USF.

152. When John Doe 19 started at USF, he was not advised of and did not learn that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, did not see any policies displayed on campus, was not told about such policies at any orientation conducted for new students, and did not receive a publication that contained such policies.

153. When John Doe 19 started at USF, he was not advised of and did not learn of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing availability remedies and resources, on or off campus, did not see any such rules or procedures displayed on campus, was not told about such rules or procedures at any orientation conducted for new students, and did not receive a publication that contained such rules or procedures.

154. Immediately upon joining the team, John Doe 19 was subject to an intolerable, sexualized environment that the Coach Defendants created and perpetuated. Each day, John Doe 19 was subject to sexualized skits. Players were split into small groups, assigned a base, and told to perform a skit as an "icebreaker." Giarratano would stand on the pitcher's mound, judge each base's skit, and declare a winner. On one occasion, John Doe 18 witnessed Nakamura, as part of his skit, go into the dugout and come out naked. On another occasion, John Doe 8 witnessed Nakamura touch his face to another player's genitalia and "motorboat" him. Other inappropriate sexual conduct during the skits was common.

155. Giarratano and Nakamura also regularly showered with the players in the players' locker room.

156. John Doe 19 was appalled by and uncomfortable with the Coach Defendants' behavior and the sexualized culture on the baseball team. He was also shocked to find that the Coach Defendants' behavior was normalized and that players were coerced into participation or tolerance to avoid retaliation. As a result, he attempted to avoid the Coach Defendants. When

Nakamura asked John Doe 19 to do private hitting lessons with him, John Doe 19 did everything he could do avoid the lessons, nervous that Nakamura may inappropriately touch him during these one-on-one sessions or talk about uncomfortable sexual topics. John Doe 19 had also heard stories from other players on the team about the Coach Defendants showering with players and was nervous about traveling for this reason.

157.    In addition, it became clear to John Doe 19 that the Coach Defendants had made false representations about his status on the team. When John Doe 19 arrived at USF, he learned that there were 8 outfielders—all returners, and four fifth years—competing for the position that Giarratano had told John Doe 19 was his as a freshman.

158.    When it became apparent to the Coach Defendants that John Doe 19 would not play along with the sexually charged behavior on and off the field, they began to retaliate and emotionally abuse John Doe 19. Verbal abuse was common, with the Coach Defendants regularly calling John Doe 19 a "pussy" or other derogatory phrases, and Nakamura telling John Doe 19: "I hope you fucking leave this program; we don't want you here – I don't care if you never play baseball again, I don't want to see your face."

159.    The Coach Defendants were well aware of John Doe 19's history of lumbar stress fractures, evident from the beginning of the season when John Doe 19 was unable to participate in the mile run test because of his back pain. When John Doe 19 continued to have back issues, requiring regular rehabilitation with athletic training staff, the Coach Defendants would call him a "pussy" and tell him "you can't make the club in the tub," meaning that he would not make the team if he was always doing rehabilitation exercises. As a result, John Doe 19 was pressured to avoid the training room, which ensured that he did not get the treatment for his back that he needed. He was also forced to engage in the Coach Defendants' beach workouts, which were the worst on his lower back. Despite being informed by his physical therapist at home not to do these beach workouts, John Doe 19 was so afraid of retaliation by the Coach Defendants that he forced himself to participate in excruciating pain. This led Doe 19's back to get so bad that a surgeon suggested that he get a fusion in his back, meaning that he would never play baseball again. To

continue his baseball career, John Doe 19 was, instead, forced to have spine surgery (with another required surgery anticipated in the future).

160.    The Coach Defendants also tried to force John Doe 19 into a position that he had never played and was not recruited for. When John Doe 19 resisted, the Coach Defendants retaliated against him again by refusing to travel him and telling him that he was selfish, not a team player, and would never play for USF again.

161.    Despite the verbally and sexually hostile environment, John Doe understood that, if he left USF, he would lose his scholarship and valuable playing time under the NCAA's transfer rules. Staying and succeeding at USF was important to John Doe 19, who wanted to become the best possible player and aspired to play professional baseball following college. John Doe 19 also feared that the Coach Defendants would blackball him if he attempted to transfer to another Division I University.

162.    When John Doe 19 returned for the Spring semester, the Coach Defendants' continued behavior led him to become anxious, nervous, and depressed.

163.    In the middle of the baseball season, while still playing for USF, John Doe 19 decided to leave USF and enter the transfer portal in order to protect his mental health and get the coaching support he deserved.

164.    After leaving USF, John Doe 19 transferred to another Division I University and had to accept a significantly lower scholarship. He was excited to have a second chance to make it to the Major Leagues but discovered that the emotional and physical consequences of the Coach Defendants' behavior followed him, his lower back continued to deteriorate due to the lack of adequate treatment and support at USF, and he had lost his love and passion for baseball.

165.    Despite leaving USF, Giarratano continued to text John Doe 19 in late 2022, including with reference to the lawsuit filed by John Does 1-14, which made John Doe 19 very uncomfortable and fearful that Giarratano would attempt to blackball John Doe 19 at his new school.

G.      **Plaintiffs Were Injured and Continue to be Injured.**

166.    Plaintiffs' harms stem from the fact that USF created a system that places a higher value on institutional reputations, at the expense of the student-athletes' well-being.

167.    The sexual, physical, and mental harassment and abuse many student-athletes—including the Plaintiffs in this case—have suffered have been accompanied by self-doubt, shame, blame, and guilt, and oftentimes requires years of reflection, meditation, counseling, medication, and psychotherapy. All the while, many continue to be plagued with depression, anxiety, and suicidal thoughts.[12]

168.    Sexual and mental harassment and abuse of athletes results in long-term posttraumatic symptomology, with core symptoms including re-experiencing, avoidance, and hyperarousal symptoms.[13] Furthermore, recounting sexual abuse can lead to "double-trauma," which can cause intense ruptures in day-to-day life.[14]

169.    Psychological damage from sexual abuse is especially harmful when the perpetrator is known and trusted by the victim.[15]

170.    In addition to psychological injury, Plaintiffs suffered out-of-pocket losses from the loss of scholarships, payments of costs-of-attendance, payments for medical and psychiatric treatment, damage to their careers as college baseball players directly affecting their prospects of becoming professional baseball players, and other compensatory and consequential damages.

VI.    **TOLLING OF THE STATUTE OF LIMITATIONS**

171.    John Does 15-19's claims are timely. All Plaintiffs were members of the proposed

---

[12] Ingunn Bjørnseth & Attila Szabo, *Sexual Violence Against Children in Sports and Exercise: A Systematic Literature Review*, JOURNAL OF CHILD SEXUAL ABUSE, 27:4, 365-385, 365 (2018).
[13] Helen Owton & Andrew C. Sparkes, *Sexual Abuse and the Grooming Process in Sport: Learning from Bella's Story*, SPORT EDUC. AND SOCIETY, at 5 (July 2015) (unpublished manuscript), https://www.researchgate.net/publication/281771790_Sexual_abuse_and_the_grooming_process_in_sport_Learning_from_Bella's_story.
[14] *See id.*
[15] *See* Gloria Dura-Vila & Roland Littlewood, *Integration of Sexual Trauma in a Religious Narrative: Transformation, Resolution and Growth among Contemplative Nuns* 50 TRANSCULT PSYCHIATRY 21–46 (2013); Kimberly A. Lonsway & Sgt. Joann Archambault (Ret.), *Victim Impact: How Victims are Affected by Sexual Assault and How Law Enforcement Can Respond* 33-37 (Apr. 2006, updated Nov. 2020) https://evawintl.org/wp-content/uploads/Module-2_Victim-Impact.pdf (last visited July 14, 2022).

1  class in *John Does 1-14 v. University of San Francisco, et al*., Case No. 3:22-cv-1559-LB (N.D.

2  Cal). That case involved the same Defendants, the same subject matter, and the same claims as

3  the present case. Plaintiffs' statues of limitations were tolled until class certification was denied in

4  that case on March 5, 2025. ECF No. 312, Order Denying Mot. To Certify Issue Class, *John Does*

5  *1-14 v. University of San Francisco*, et al., Case No. 3:22-cv-1559-LB (N.D. Cal); *see American*

6  *Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) (tolling statute of limitations for class

7  members' individual claims while class certification is pending); *Crown, Cork & Seal Co. v.*

8  *Parker*, 462 U.S. 345, 353 (1983) (same, even if class is ultimately not certified).

9  **VII.    CLAIMS FOR RELIEF**

10  

**COUNT I**
**VIOLATION OF TITLE IX [20 U.S.C. § 1681 *et seq.*] FOR DISCRIMINATION**
**(ALL PLAINTIFFS AGAINST USF)**

12      172.    Plaintiffs incorporate by reference paragraphs 1 through 171 as if set forth in full

13  herein.

14      173.    Title IX of the Education Amendments of 1972 ("Title IX"), as amended, 20

15  U.S.C. § 1681 *et seq.*, provides that "[n]o person in the United States shall, on the basis of sex, be

16  excluded from participation in, be denied the benefits of, or be subjected to discrimination under

17  any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

18      174.    Title IX bars gender-based discrimination and discrimination based on sexual

19  orientation by federally funded educational institutions. Such discrimination includes sexual

20  harassment.

21      175.    USF receives federal funding, including, but not limited to, financial aid and

22  grants, and grants from the Higher Education Emergency Relief Fund (authorized by the

23  American Rescue Plan (ARP), Public Law 117-2, signed into law on March 11, 2021).

24      176.    At the time of the events alleged herein, each Plaintiff was enrolled as an

25  undergraduate student at USF.

26      177.    USF exercised substantial control over its baseball program, as well as over its

27  coaching staff, including the Coach Defendants.

28

178. Plaintiffs suffered sexual harassment by Nakamura, facilitated and condoned by Giarratano, and/or by Giarratano that was so severe, pervasive, and objectively offensive it deprived Plaintiffs access to the educational opportunities and benefits USF provides.

179. Specifically, the intolerable sexualized environment and psychological abuse that Plaintiffs were forced to endure since the beginning of their time at USF was continuous and unrelenting, thereby violating Title IX.

180. Giarratano oversaw, participated in, and approved of this culture of harassment and abuse in the baseball program, which was so extreme and outrageous that John Does 15-17 and 19 had to leave USF at great personal and financial losses, including damage to each of their elite baseball careers.

181. Giarratano, as the head coach of the baseball program, had actual knowledge of the harassment and physical and mental abuse of Plaintiffs that was occurring by Nakamura, and indeed, condoned and participated in the conduct.

182. Numerous Athletic Directors and other administrators, in a position of oversight and control of USF's baseball program, including its coaching staff, had actual knowledge of the harassment that was occurring and the history of complaints of harassment on the baseball team and in the Athletic Department. *See* Section V.E, *supra.* This included when, in December 2020, John Doe 16 was forced to renounce his guaranteed scholarship by the Coach Defendants and, on that paperwork, noted that he was leaving USF against his will and was being forced to sign away his guaranteed four-year scholarship. Despite submitting this to USF's Athletic Department, no one from USF investigated this further or followed up with John Doe 16.

183. While USF fired Nakamura after an influx of complaints in 2021, Giarratano retained his position, allowing the pervasive sexual environment to continue. This was despite the fact that USF's Athletic Department had received complaints detailing Giarratano's involvement in the misconduct, including how, *inter alia*, Nakamura displayed and waved his genitalia in front of the entire team and in the presence of Giarratano, who said nothing, and also how Nakamura placed his face in another player's crotch, and Giarratano laughed and did not address the

inappropriate behavior with the team. Another player reported that Giarratano took no action when the player was forced to get naked and use only a sock to cover his genitals. Another complaint even called USF out for turning a "blind eye" to the Coach Defendants' abuse and misconduct. Yet still no action was taken to address Giarratano's behavior.

184.    USF's failures allowed the severe and pervasive harassment to continue and ensured that Giarratano remained head coach until March 2022 despite his involvement in the misconduct.

185.    USF's actions constitute deliberate indifference to the harassment, and USF's failure to respond to the complaints was clearly unreasonable in light of the circumstances.

186.    USF's actions constitute a policy of deliberate indifference that created an obvious risk of sexual harassment in a context (the baseball program) subject to USF's control.

187.    USF's actions allowed the bullying, harassment, intimidation, and sexual misconduct to continue.

188.    As a direct and proximate result of USF's actions and inactions, Plaintiffs were damaged and continue to be damaged. Plaintiffs seek all available forms of damages and other monetary relief.

## COUNT II
### VIOLATION OF TITLE IX [20 U.S.C. § 1681 *et seq.*] FOR RETALIATION
### (ALL PLAINTIFFS AGAINST USF)

189.    Plaintiffs incorporate by reference paragraphs 1 through 171 as if set forth in full herein.

190.    Retaliation against an individual for complaining of sex discrimination, including sexual harassment, constitutes prohibited sex discrimination under Title IX.

191.    USF receives federal funding, including, but not limited to financial aid and grants, and grants from the Higher Education Emergency Relief Fund (authorized by the American Rescue Plan (ARP), Public Law 117-2, signed into law on March 11, 2021).

192.    At the time of the events alleged herein, each Plaintiff was enrolled as an undergraduate student at USF.

193.    USF's administration, including numerous Athletic Directors, had actual knowledge of the sexual misconduct occurring in the USF baseball program over a two-decade period. *See* Section V.E, *supra.*

194.    Giarratano, as the head coach of the baseball program, also had actual knowledge of the sexual misconduct that was occurring, and indeed, condoned and participated in the harassment. Giarratano participated in and was a witness to the abuse, including Nakamura's nudity.

195.    As set out in Section V.D, *supra*, the Coach Defendants engaged in multiple types of retaliatory conduct against Plaintiffs for their refusal to participate in the sexualized environment, including running Plaintiffs off the team, blacklisting Plaintiffs through disparaging remarks to prospective or new coaches (thus ending or severely limiting the Plaintiffs' continued baseball careers), physically abusing them, and expressly or implicitly threatening them with harm.

196.    The Coach Defendants engaged in such retaliation against Plaintiffs, who refused to condone or participate in their intolerable sexualized environment, including a relentless campaign to bully and demean each Plaintiff into leaving USF, resulting in severe depression and anxiety among all Plaintiffs, as well as damage to their baseball careers.

197.    The examples in this Complaint are part of a concerted practice by USF administration—including the Coach Defendants—to isolate and bully Plaintiffs into relinquishing their scholarships and leaving USF, and to ruin their baseball careers.

198.    Such retaliation caused all Plaintiffs to leave, want to leave, and/or feel they were forced to leave USF, at considerable personal and financial expense to each, including damage to their baseball careers.

199.    As a direct and proximate result of USF's actions and inactions, Plaintiffs were damaged and continue to be damaged. Plaintiffs seek all available forms of damages and other monetary relief.

**COUNT III**
**NEGLIGENT SUPERVISION AND RETENTION OF TROY NAKAMURA**
**(PLAINTIFFS AGAINST USF AND GIARRATANO)**

200.    Plaintiffs incorporate by reference paragraphs 1 through 171 as if set forth in full herein.

201.    Since 2000, and until USF removed Nakamura in 2022, USF employed Nakamura and had the right to control him and the manner and methods in which he fulfilled his duties as a baseball coach.

202.    During this same period, Giarratano had the right to control Nakamura and the manner and methods in which he fulfilled his duties as a baseball coach.

203.    Nakamura was unfit or incompetent to work directly with student-athletes and posed a particular risk of sexually harassing and mentally abusing them.

204.    USF and Giarratano knew or should have known that Nakamura was unfit or incompetent to work directly with student-athletes and posed a particular risk of sexually harassing or mentally abusing them, and that this unfitness created a particular risk to Plaintiffs.

205.    Nakamura's unfitness and particular risk to student-athletes on USF's baseball team harmed Plaintiffs.

206.    USF and Giarratano's negligence in supervising and/or retaining Nakamura were substantial factors in causing harm to Plaintiffs.

207.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs were damaged. Plaintiffs seek all available forms of damages and other monetary relief.

**COUNT IV**
**NEGLIGENT SUPERVISION AND RETENTION OF NINO GIARRATANO**
**(ALL PLAINTIFFS AGAINST USF)**

208.    Plaintiffs incorporate by reference paragraphs 1 through 171 as if set forth in full herein.

209.    Since 1999, and until USF fired Giarratano in 2022, USF employed Giarratano and had the right to control him and the manner and methods in which he fulfilled his duties as a baseball coach.

210.    Giarratano was unfit or incompetent to work directly with student-athletes because

- 43 -

2841900.2                                                                COMPLAINT

he sexually harassed and mentally abused them and/or allowed Nakamura to sexually harass and mentally abuse the student-athletes.

211.    USF knew or should have known that Giarratano was unfit or incompetent to work directly with student-athletes because he was sexually harassing and mentally abusing them and/or allowing Nakamura to sexually harass and mentally abuse them, and that this unfitness created a particular risk to Plaintiffs.

212.    USF knew or should have known that Giarratano was protecting Nakamura and facilitating Nakamura's sexual harassment and mental abuse of student-athletes, and that Nakamura's unfitness created a particular risk to Plaintiffs.

213.    Giarratano's unfitness and particular risk to student-athletes on USF's baseball team harmed Plaintiffs.

214.    USF's negligence in supervising and/or retaining Giarratano were substantial factors in causing harm to Plaintiffs.

215.    As a direct and proximate result of Defendants' actions and/or inactions, Plaintiffs were damaged and continue to be damaged. Plaintiffs seek all available forms of damages and other monetary relief.

**COUNT V**
**DISCRIMINATION IN THE EDUCATIONAL SETTING**
**[CAL. EDUC. CODE § 66270]**
**(ALL PLAINTIFFS AGAINST USF AND THE COACH DEFENDANTS)**

216.    Plaintiffs incorporate by reference paragraphs 1 through 171 as if set forth in full herein.

217.    Section 66270 of the California Education Code provides in pertinent part: "No person shall be subjected to discrimination on the basis of disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, [or] sexual orientation . . . in any program or activity conducted by any postsecondary educational institution that receives, or benefits from, state financial assistance or enrolls students who receive state student financial aid."

218.    Upon information and belief, USF receives state financial assistance and enrolls

- 44 -

students who receive state student financial aid.

219.    Plaintiffs were harmed by the psychological and physical abuse, as well as intolerable sexualized environment, that the Coach Defendants subjected them to while at USF because of Plaintiffs' gender, and Defendant USF and the Coach Defendants are responsible for that harm.

220.    Plaintiffs suffered harassment that was so severe, pervasive, and offensive it effectively deprived Plaintiffs the right of equal access to educational benefits and opportunities.

221.    Because of USF's and the Coach Defendants' conduct, Plaintiffs have been damaged and continue to be damaged in an amount to be proven at trial. Plaintiffs seek all available forms of damages and other monetary relief.

222.    Further, USF and the Coach Defendants acted willfully and maliciously with the intent to harm Plaintiffs, and in conscious disregard of the rights of Plaintiffs, so as to constitute malice and oppression under California Civil Code Section 3294. Plaintiffs are therefore entitled to the recovery of punitive damages, in an amount to be determined at trial.

<u>COUNT VI</u>
**VIOLATION OF THE CALIFORNIA EQUITY IN HIGHER EDUCATION ACT
[CAL. EDUC. CODE § 66250]
(ALL PLAINTIFFS AGAINST USF)**

223.    Plaintiffs incorporate by reference paragraph 1 through 171 as if set forth in full herein.

224.    Section 66281.5 of the California Equity in Higher Education Act provides in pertinent part: "(a) It is the policy of the State of California, pursuant to Section 66251, that all persons, regardless of their sex, should enjoy freedom from discrimination of any kind in the postsecondary educational institution of the state. The purpose of this section is to provide notification of the prohibition against sexual harassment as a form of sexual discrimination and to provide notification of available remedies."

225.    Section 66281.5 goes on to detail the affirmative steps that schools must take to provide notification of the prohibition against sexual harassment and the available remedies.

- 45 -

226.     USF's conduct as alleged herein constitutes sexual harassment as a form of sexual discrimination against Plaintiffs and violated the Equity in Higher Education Act. Plaintiffs are entitled to enforce the Act through a civil action pursuant to Education Code Section 66292.4.

227.     Plaintiffs were never advised of any USF policy governing or prohibiting sexual harassment or other sexualized misconduct by coaches; never saw any such policies displayed on campus; never received or were told about such policies at any orientation conducted for new students; and never received a publication that contained such policies.

228.     Plaintiffs were never advised of any USF rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus; never saw any such rules or procedures displayed on campus; never received or were told about such rules or procedures at any orientation conducted for new students; and never received a publication that contained such rules or procedures.

229.     Because of Defendants' conduct, Plaintiffs have been damaged and continue to be damaged in an amount to be proven at trial. Plaintiffs seek all available forms of damages and other monetary relief.

### COUNT VII
### GROSS NEGLIGENCE
### (ALL PLAINTIFFS AGAINST USF AND COACH DEFENDANTS)

230.     Plaintiffs incorporate by reference paragraphs 1 through 171 as if set forth in full herein.

231.     USF and the Coach Defendants owed Plaintiffs a duty to use due care to ensure their safety and freedom from sexual harassment and abuse while interacting with their respective employees, representatives, and/or agents, including the Coach Defendants.

232.     The Coach Defendants owed Plaintiffs a duty of due care in carrying out their coaching responsibilities as employees, agents, and/or representatives of USF.

233.     The Plaintiffs' acceptance of USF's offers to join the baseball team and seek out coaching from the Coach Defendants in the course of their employment, agency, and/or representation of USF created a special, confidential, and fiduciary relationship between Plaintiffs

and the Coach Defendants, resulting in Coach Defendants owing Plaintiffs a duty to use due care.

234.    USF's failure to adequately supervise the Coach Defendants, especially after USF knew or should have known of complaints regarding their sexual harassment and abuse while coaching was so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs would be injured as a result.

235.    The Coach Defendants' conduct in sexually harassing Plaintiffs in the course of their employment, agency, and/or representation of USF as baseball coaches was so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs would be injured as a result.

236.    USF's conduct as described above demonstrated a willful disregard for precautions to ensure Plaintiffs' safety, as well as a willful disregard for substantial risks to Plaintiffs.

237.    USF breached duties owed to Plaintiffs and were grossly negligent when they conducted themselves as described above, said acts having been committed with reckless disregard for Plaintiffs' health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether Plaintiffs would be injured as a result.

238.    USF is liable and vicariously liable for the Coach Defendants' conduct.

239.    As a direct and/or proximate result of Defendants' actions and inactions, Plaintiffs were damaged and continue to be damaged. Plaintiffs seek all available forms of damages and other monetary relief.

**COUNT VIII**
**NEGLIGENCE**
**(ALL PLAINTIFFS AGAINST USF AND COACH DEFENDANTS)**

240.    Plaintiffs incorporate by reference paragraphs 1 through 171 as if set forth in full herein.

241.    USF and the Coach Defendants owed Plaintiffs a duty to use due care to ensure their safety and freedom from sexual harassment and abuse while interacting with their respective employees, representatives, and/or agents, including the Coach Defendants.

242.    The Coach Defendants owed Plaintiffs a duty of due care in carrying out their coaching responsibilities as employees, agents, and/or representatives of USF.

243.    The Plaintiffs' acceptance of USF's offers to join the baseball team and seek out

2841900.2

COMPLAINT

coaching from the Coach Defendants in the course of their employment, agency, and/or representation of USF created a special, confidential, and fiduciary relationship between Plaintiffs and the Coach Defendants, resulting in Coach Defendants owing Plaintiffs a duty to use due care.

244.    USF's negligence in supervising the Coach Defendants, especially after USF knew or should have known of complaints regarding their sexual harassment and abuse while coaching were substantial factors in causing harm to Plaintiffs.

245.    The Coach Defendants' negligent conduct in sexually harassing Plaintiffs in the course of their employment, agency, and/or representation of USF as baseball coaches was so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs would be injured as a result.

246.    USF's conduct as described above demonstrated a negligent disregard for precautions to ensure Plaintiffs' safety, as well as a negligent disregard for substantial risks to Plaintiffs.

247.    USF breached duties owed to Plaintiffs and were negligent when they conducted themselves as described above, said acts having been committed with disregard for Plaintiffs' health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether Plaintiffs would be injured as a result.

248.    USF is liable and vicariously liable for the Coach Defendants' conduct.

249.    As a direct and/or proximate result of Defendants' actions and inactions, Plaintiffs were damaged and continue to be damaged. Plaintiffs seek all available forms of damages and other monetary relief.

## COUNT IX
### NEGLIGENT FAILURE TO WARN, TRAIN, OR EDUCATE
### (ALL PLAINTIFFS AGAINST USF AND GIARRATANO)

250.    Plaintiffs incorporate by reference paragraphs 1 through 171 as if set forth in full herein.

251.    USF owed Plaintiffs a duty to take reasonable protective measures to protect them and other student-athletes from the risk of sexual harassment and abuse by the Coach Defendants

1   by properly warning, training, and educating Plaintiffs and others about how to avoid such a risk.

2        252.   Giarratano owed Plaintiffs a duty to take reasonable protective measures to protect

3   them and other student-athletes from the risk of sexual harassment and abuse by Nakamura by

4   properly warning, training, and educating Plaintiffs and others about how to avoid such risk.

5        253.   USF breached its duty to take reasonable protective measures to protect Plaintiffs

6   and other student-athletes from the risk of sexual harassment and abuse by the Coach Defendants,

7   such as the failure to properly warn, train, or educate Plaintiffs and other student-athletes about

8   how to avoid the particular risk the Coach Defendants posed of sexual misconduct.

9        254.   Giarratano breached his duty to take reasonable protective measures to protect

10   Plaintiffs and other student-athletes from the risk of sexual harassment and abuse by Nakamura,

11   such as the failure to properly warn, train, or educate Plaintiffs and other student athletes about

12   how to avoid the particular risk Nakamura posed of sexual misconduct.

13        255.   USF breached its duty to take reasonable protective measures to protect Plaintiffs

14   and other student-athletes from the risk of sexual harassment and abuse by the Coach Defendants

15   by failing to supervise and stop their employees, agents, and representatives, including the Coach

16   Defendants, from committing wrongful harassment and abuse of student-athletes, including

17   Plaintiffs.

18        256.   Giarratano breached his duty to take reasonable protective measures to protect

19   Plaintiffs and other student-athletes from the risk of sexual harassment and abuse by Nakamura

20   by failing to supervise and stop Nakamura from committing wrongful harassment and abuse of

21   student-athletes, including Plaintiffs.

22        257.   As a direct and/or proximate result of USF's and Giarratano's actions and/or

23   inactions, Plaintiffs were damaged and continue to be damaged. Plaintiffs seek all available forms

24   of damages and other monetary relief.

25                    **COUNT X**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

26   **(ALL PLAINTIFFS AGAINST USF AND COACH DEFENDANTS)**

27        258.   Plaintiffs incorporate by reference paragraphs 1 through 171 as if set forth in full

28

herein.

259.    USF and the Coach Defendants' extreme and outrageous conduct intentionally or recklessly caused Plaintiffs to suffer severe emotional distress. This conduct was not the type of ordinary rude or obnoxious behavior student-athletes should be expected to weather—it exceeded all possible bounds of decency.

260.    USF and the Coach Defendants acted with the intention of causing, or with reckless disregard for the probability of causing, Plaintiffs to endure extreme emotional distress.

261.    Indeed, USF and the Coach Defendants used student-athletes' severe distress to subdue and threaten them; force them to leave USF, give up their scholarships, and enter the NCAA transfer portal; and to prevent them from complaining or suing over the Coach Defendants' misconduct. They did so with deliberate disregard as to the high possibility such actions would result in Plaintiffs experiencing additional severe emotional distress.

262.    USF and the Coach Defendants' conduct intended to cause and caused Plaintiffs suffering exceeding all bound that are usually tolerated in a civilized community.

263.    A causal nexus existed between (i) the Coach Defendants' recruitment and grooming of student-athletes, including Plaintiffs, to join USF and (ii) their abuse of power to coerce and harass those student-athletes.

264.    Each act of harassment and abuse was foreseeable given, *inter alia*, the use of USF materials to lure victims and the commission of the acts on USF property.

265.    The Coach Defendants' conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of USF's business. Assaults in the context of USF athletics by coaches and other athletics department personnel are exactly why student-athletes would expect USF to take extra precautions.

266.    The Coach Defendants' conduct was committed within the scope of their positions as USF coaches. Holding USF liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs do not have separate remedies under Title VII because they are not (currently)

considered employees of USF.

267.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs were damaged and continue to be damaged. Plaintiffs seek all available forms of damages and other monetary relief.

**COUNT XI**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(ALL PLAINTIFFS AGAINST USF AND COACH DEFENDANTS)**

268.    Plaintiffs incorporate by reference paragraphs 1 through 171 as if set forth in full herein.

269.    USF and the Coach Defendants' conduct negligently caused emotional distress to Plaintiffs, and USF and the Coach Defendants could reasonably foresee that their actions would cause Plaintiffs to suffer emotional distress.

270.    Plaintiffs were in a specific zone of danger by training with the Coach Defendants and at risk of physical harm, causing their fear.

271.    Plaintiffs, immediately or shortly after training with the Coach Defendants, suffered distress and emotional harm.

272.    A causal nexus existed between (i) the Coach Defendants' recruitment and grooming of student-athletes, including Plaintiffs, to join USF and (ii) their abuse of power to coerce and harass those student-athletes.

273.    Each act of harassment and abuse was foreseeable given, *inter alia*, the use of USF materials to lure victims and the commission of the acts on USF property.

274.    The Coach Defendants' conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of USF's business. Assaults in the context of USF athletics by coaches and other athletics department personnel are exactly why student-athletes would expect USF to take extra precautions.

275.    The Coach Defendants' conduct was committed within the scope of their positions as USF coaches. Holding USF liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that

Plaintiffs do not have separate remedies under Title VII because they are not (currently) considered employees of USF.

276.     As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs were damaged and continue to be damaged. Plaintiffs seek all available forms of damages and other monetary relief.

**COUNT XII**
**RATIFICATION**
**(ALL PLAINTIFFS AGAINST USF)**

277.     Plaintiffs incorporate by reference paragraphs 1 through 171 as if set forth in full herein.

278.     The Coach Defendants were USF coaches for several decades.

279.     At the time of the acts alleged herein, there was an actual or assumed agency relationship between the Coach Defendants and USF.

280.     All acts or omissions alleged herein were ratified by USF. USF had knowledge that the Coach Defendants were sexually abusing or harassing student-athletes but refused to take any action to the Coach Defendants or other predators like them. Moreover, USF hid this information from the public so that the Coach Defendants could continue to work for USF until at least 2022.

281.     Despite USF, and/or its agents' knowledge of the Coach Defendants' sexual misconduct, the Coach Defendants were allowed to be alone with student-athletes while on USF business during the relevant time period.

**VIII.   PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter a judgment on their behalf and against the University of San Francisco, Nino Giarratano, and Troy Nakamura, and further grant the following relief:

A.     Award Plaintiffs compensatory damages, punitive damages, damages for pain and suffering and emotional distress, and any other relief to which they are entitled under the law;

B.     Award Plaintiffs pre-judgment interest, post-judgment interest, costs, attorneys'

fees, expert fees; and

      C.     Award Plaintiffs such other and further relief as the Court deems just and proper.

## IX.    <u>DEMAND FOR TRIAL BY JURY</u>

     Plaintiffs respectfully request a trial by jury as to all matters so triable.

Dated: June 25, 2025

Respectfully submitted,

By: */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan (Cal. Bar No. 355906)
beth@feganscott.com
FEGAN SCOTT LLC
150 S. Wacker Drive, 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100

Michael von Klemperer (*pro hac vice* forthcoming)
mike@feganscott.com
FEGAN SCOTT LLC
1763 Columbia Road NW, Suite 100
Washington, DC 20009
Telephone: (202) 921-0002
Facsimile: (312) 264-0100

Georgia Jaye Zacest (*pro hac vice* forthcoming)
georgia@feganscott.com
FEGAN SCOTT LLC
708 Main, 10th Floor
Houston, TX 77002
Telephone: (830) 212-4042
Facsimile: (312) 624-0100

JONATHAN SELBIN (Cal. Bar No. 170222)
jselbin@lchb.com
MICHELLE LAMY (Cal. Bar No. 308174)
mlamy@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

JESSICA MOLDOVAN (*pro hac vice* forthcoming)
jmoldovan@lchb.com
LIEFF CABRASER HEIMANN
& BERNSTEIN
250 Hudson Street
New York, NY 10013

1

Telephone: (212) 355-9500
Facsimile: (212) 355-9592

2

*Attorneys for Plaintiffs*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 54 -