# CTTACHMENT 4

JONATHAN SELBIN (Cal. Bar No. 170222)
jselbin@lchb.com
MICHELLE LAMY (Cal. Bar No. 308174)
mlamy@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

ELIZABETH A. FEGAN (*pro hac vice*)
beth@feganscott.com
FEGAN SCOTT LLC
150 S. Wacker Drive, 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100

LYNN A. ELLENBERGER (*pro hac vice*)
lynn@feganscott.com
FEGAN SCOTT LLC
500 Grant Street, Suite 2900
Pittsburgh, PA 15219
Telephone: (412) 346-4104
Facsimile: (312) 264-0100

*Attorneys for Plaintiffs and the Proposed Class*
[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8, JOHN DOE 9, JOHN DOE 10, JOHN DOE 11, JOHN DOE 12, JOHN DOE 13, and JOHN DOE 14, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNIVERSITY OF SAN FRANCISCO, ANTHONY N. (AKA NINO) GIARRATANO, and TROY NAKAMURA,<br><br>Defendants. | CASE NO. 3:22-CV-01559-LB<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................. 1

II.     ROADMAP TO AMENDMENTS ....................................................................... 6

III.    JURISDICTION AND VENUE .......................................................................... 6

IV.     INTRA-DISTRICT ASSIGNMENT .................................................................. 7

V.      PARTIES ............................................................................................................. 7

        A.      Plaintiffs ................................................................................................... 7

        B.      Defendants ................................................................................................ 9

VI.     FACTS ................................................................................................................. 9

        A.      Student-Athletes Are at Risk for Sexual Harassment, Exploitation, and
                Mental Abuse by Coaches ........................................................................ 9

        B.      The University of San Francisco Permitted Sexual Exploitation of Student-
                Athletes on and off the Field .................................................................. 13

                1.      Neither the Archdiocese of San Francisco nor USF are strangers to
                        sexual abuse and abuse of power. .............................................. 13

                2.      Coach Naks created an intolerable sexualized environment at every
                        practice and Coach G not only tolerated it, he participated in it. ....... 18

        C.      USF retaliated against the players who tried to stop the sexual misconduct
                or who did not condone it. ...................................................................... 27

                1.      USF retaliated against *every single* Plaintiff for rejecting the
                        sexualized environment and abuse by running them off the team. ........ 28

                2.      USF engaged in a pattern of retaliation against those who rejected
                        the sexualized environment by refusing to release them and/or by
                        blacklisting them from alternative baseball opportunities. .................... 31

                3.      USF engaged in a pattern of retaliation by interfering directly with
                        players' education or educational opportunities. ................................ 32

                4.      USF used threats to retaliate to keep the players from reporting the
                        abuse. 34

                5.      USF, through the Coach Defendants, used physical abuse to
                        retaliate against players for rejecting the sexualized environment
                        and abuse. ..................................................................................... 35

        D.      Plaintiffs were subjected to Coach Defendants' sexual misconduct and
                retaliated against for refusing to condone and participate in their own
                abuse ....................................................................................................... 35

                1.      2020-22: John Doe 1's experience was typical. ...................... 35

                2.      2020-22: John Doe 2's experience was typical. ...................... 42

                3.      2021-22: John Doe 3's experience was typical. ...................... 46

                4.      2017-18: John Doe 10's experience was typical. .................... 51

                5.      2017-18: John Doe 4's experience was typical. ...................... 55

                6.      2017-18: John Doe 12's experience was typical. .................... 57

**TABLE OF CONTENTS**
**(continued)**

|  | Page |
|---|---|
| 7. 2016-18: John Doe 13's experience was typical. | 62 |
| 8. 2015-16: John Doe 14's experience was typical. | 65 |
| 9. 2011-14: John Doe 5's experience was typical. | 67 |
| 10. 2012-14: John Doe 6's experience was typical. | 73 |
| 11. 2014: John Doe 7's experience was typical. | 77 |
| 12. 2013: John Doe 8's experience was typical. | 80 |
| 13. 2000: John Doe 9's experience was typical. | 83 |
| 14. 1999-2000: John Doe 11's experience was typical. | 87 |
| E. Plaintiffs and the Class Were Injured and Continue to be Injured. | 90 |
| VII. TOLLING OF THE STATUTE OF LIMITATIONS | 91 |
| A. The statutes of limitations are tolled by the discovery rule, because John Does 4-14 did not know they were illegally sexually abused until this lawsuit was filed. | 91 |
| B. The statutes of limitations are tolled by the discovery rule, because John Does 4-14 could not have known about USF's responsibility for the abuse given its active concealment. | 94 |
| VIII. CLASS ALLEGATIONS | 97 |
| IX. CLAIMS FOR RELIEF | 101 |
| X. PRAYER FOR RELIEF | 124 |
| XI. DEMAND FOR TRIAL BY JURY | 125 |

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

1    Plaintiffs John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John

2    Doe 7, John Doe 8, John Doe 9, John Doe 10, John Doe 11, John Doe 12, John Doe 13, and John

3    Doe 14, on behalf of themselves and all others similarly situated, by and through their attorneys,

4    bring this action against the University of San Francisco ("USF"), Nino Giarratano ("Giarratano"

5    or "Coach G"), and Troy Nakamura ("Nakamura" or "Coach Naks") (Coaches G and Naks

6    collectively referred to as the "Coach Defendants" and all defendants collectively referred to as

7    "Defendants").

8    **I.    <u>INTRODUCTION</u>**

9        1.    USF had and has an ongoing duty to protect the health and safety of the student-

10   athletes in its care. This includes a duty to prohibit discrimination and sexual abuse of student-

11   athletes by adopting, implementing, and enforcing appropriate policies and procedures to prevent,

12   or properly respond to, discrimination and sexual misconduct and abuse of student-athletes by

13   USF personnel. USF's duty (and failure) affects these athletes during an incredibly vulnerable

14   period in their lives. Student-athletes—who are typically living away from home for the first

15   time—arrive at college expecting to develop into the best athletes they can under the supervision

16   of educated, skilled, and fully vetted athletics department personnel committed to their best

17   interests. Many student-athletes dream of playing their sports professionally after college and are

18   taught from a young age to trust their coaches to help them realize those dreams. These student-

19   athletes, therefore, accord their coaches, trainers, and team doctors deference, respect, loyalty,

20   and trust.

21       2.    In dereliction of its duty to protect these student-athletes, USF employed two

22   baseball coaches for over 22 years despite knowing that these coaches created an intolerable

23   sexualized environment within USF's Division I ("DI") baseball team. From 1999 to 2022, Head

24   Coach Nino Giarratano and Assistant Coach Troy Nakamura wielded their power to subject their

25   players to an intolerable sexualized environment, retaliation, and psychological abuse resulting in

26   emotional distress so severe that multiple players contemplated suicide.

27       3.    The Coach Defendants created and perpetuated a culture that normalized sexual

28   misconduct directed at the players, including: Coach Naks appearing naked on the field at

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

practice, swinging his penis in a circular motion imitating a helicopter rotor and/or crawling across the field completely naked, while the entire team—including Coach G—watched; Coach Naks miming sexual acts with the players, or forcing players to mime sexual acts with one another; Coach Naks showering with players; the Coach Defendants criticizing the size or shape of individual players' penises; the Coach Defendants forcing players to remove an article of clothing every time they made an error during practice; the Coach Defendants handing out sex dolls or sex toys to the players as "awards"; the Coach Defendants discussing their sexual preferences, sexual fantasies, and the bodily fluids they would like to drink with Plaintiffs and other members of the USF baseball team; and the Coach Defendants directing sexualized taunts at the players on a regular basis.

4.     Make no mistake: this case is not about the behavior of an overbearing "hard-ass" coach or "locker room talk." Plaintiffs spent most of their lives playing baseball, and the conduct at issue is profoundly more disturbing than anything they experienced on any other baseball team. The conduct was not "normal"—even in the realm of elite, competitive baseball—and USF and the Coach Defendants knew it was not normal. So, they took steps to cover it up, including by manipulating the young student-athletes into believing that the Coach Defendants' conduct *was* normal and that if the players could not handle the conduct, it was the fault of Plaintiffs, not USF or the Coach Defendants.

5.     The Coach Defendants created a divide within the USF baseball team between the players who condoned and participated in their sexual misconduct—to stay in the Coach Defendants' good graces—and the players who did not—including Plaintiffs and countless others. The Coach Defendants engaged in retaliation and psychological abuse of any student-athlete, including Plaintiffs, who did not outwardly condone or participate in the sexualized atmosphere. The Coach Defendants berated, belittled, and disparaged these student-athletes; took away their playing time and scholarships; and coerced these student-athletes—who otherwise met all National Collegiate Athletic Association (NCAA) and academic requirements—into leaving USF through threats and misrepresentations. For example, the Coach Defendants tricked these student-athletes into signing forms indicating that their relinquishment of their scholarships was

voluntary when it was not. After forcing them off the USF team, the Coach Defendants continued their retaliation by "blackballing" Plaintiffs, including by making disparaging remarks about Plaintiffs to prospective or subsequent coaches, teams, and schools where Plaintiffs hoped to continue their baseball careers.

6.      USF—a Jesuit university with a mission to create a more humane and just world, including by holding staff accountable to promote the common good and address inequities— participated in the cover up. When USF was confronted with allegations generally that sexual misconduct was rampant in its athletic programs (including its soccer program) and allegations specifically about the Coach Defendants' wrongdoing through complaints made to the very highest levels of the Athletic Department, USF buried those complaints. Instead of stepping in to protect the student-athletes, USF chose to protect its own reputation at the expense of the student-athletes, back the Coach Defendants, and co-sign their effort to mask their sexual misconduct by retaliating against any non-compliant student-athletes, including by running them off the baseball team.

7.      The intolerable sexualized environment and calculated retaliation against Plaintiffs and other student-athletes was incredibly effective in driving players to leave the team:

        a.      In the 1999 academic year, when Coach G first became head coach of the USF baseball program, only one of 15 players returned for their sophomore year.

        b.      Of the 12 or 13 players who entered USF baseball program in 2013, only five played baseball at USF for all four years of college, and one of those players is Coach G's son. Every other player transferred.

        c.      Of the three Plaintiffs who played in 2020-21, none remain at USF. Of the 16 freshman recruits in the 2020 USF baseball class, eleven left.  The fact that nearly 70% of the 2020 recruiting class left is a testament to the Coach Defendants' sexual misconduct, ruthlessness, retaliation, and callous treatment of the USF players. This transfer rate stands in stark contrast to the reported percentage of four-year college transfers among DI baseball

1  players—just 2.3% (and the fourth lowest rate out of 38 NCAA DI sports).[1]

2      8.      It was only after two decades of this abuse that USF was finally forced to take

3  action. In December 2021, certain Plaintiffs learned that USF had opened a Title IX investigation

4  into the Coach Defendants' misconduct. On January 13, 2022, USF announced that Coach Naks

5  was no longer on the baseball team following "a human resources investigation into incidents in

6  which 'the coaches' language, behavior and/or actions were inappropriate.'"[2] On January 24,

7  2022, Coach G was officially reprimanded, but allowed to keep his job in continuance of USF's

8  pattern of turning a blind eye.[3]

9      9.      John Does 1, 2, and 3 filed their original complaint on March 11, 2022, and only

10 because of that filing did USF take any further action to address the situation and mitigate

11 Plaintiffs' harms, because it realized that it could not bury the problem with a meaningless

12 "reprimand." Two days later, USF announced that it had fired Coach G "effective immediately."[4]

13 And on June 10, 2022, USF's Athletic Director ("AD"), Joan McDermott, announced her

14 retirement "in the wake of lawsuits alleging coaching misconduct in the baseball and women's

15 basketball programs."[5]

16     10.     On July 15, 2022, Plaintiffs filed an Amended Complaint adding nine more USF

17 baseball players who were coached by the Coach Defendants from 1999 to 2018, and in the

18 Second Amended Complaint added two more USF baseball players who played from 2015 to

19 2018. These additional players experienced the same intolerable sexualized environment,

20

21 [1] NCAA, *Transfer Composition of Division I Teams*, 10 (July 2020),
   https://ncaaorg.s3.amazonaws.com/research/transfers/RES_TransCompD1TeamsSlides.pdf (last
22 visited Aug. 30, 2023).
   [2] Ron Kroichick, *Intolerable Sexualized Environment': Ex-USF Baseball Players Sue Coaches,*
23 *School, NCAA,* SAN FRANCISCO CHRONICLE (Mar. 11, 2022, updated Mar. 13, 2022),
   https://www.sfchronicle.com/sports/college/article/Intolerable-sexualized-environment-Ex-USF-
24 16994972.php.
   [3] *Id.*
25 [4] Jessica Flores, *USF Baseball Coach Fired After Ex-players' Lawsuit Alleges 'Intolerable*
   *Sexualized Environment,'* SAN FRANCISCO CHRONICLE (Mar. 13, 2022),
26 https://www.sfchronicle.com/sports/college/article/USF-baseball-coach-fired-after-ex-players-
   16998516.php.
27 [5] Ron Kroichick, *USF's Joan McDermott Announces Her Retirement, Ending Turbulent Run as*
   *Athletic Director,* SAN FRANCISCO CHRONICLE (June 10, 2022, updated June 11, 2022),
28 https://www.sfchronicle.com/sports/college/article/USF-s-Joan-McDermott-to-announce-her-
   17233293.php.

psychological abuse, and retaliation the Coach Defendants inflicted on John Does 1, 2, and 3. Their stories substantiate the claims of John Does 1, 2, and 3, reflect the fact that the Coach Defendants engaged in their misconduct at USF throughout their 22-year tenures, and demonstrate USF's and the Coach Defendants' concerted efforts to cover up their wrongdoing by normalizing otherwise unlawful conduct.

11.     Through this lawsuit, Plaintiffs seek for themselves and all others similarly-situated: (i) to hold USF accountable by requiring it to adopt, implement, and enforce appropriate policies and procedures to prevent, or properly respond to, sexual misconduct and psychological abuse of students and student-athletes by USF personnel; and (ii) compensation from USF and the Coach Defendants for Plaintiffs' injuries from the intolerable sexualized environment, psychological abuse, and retaliation to which the Coach Defendants subjected Plaintiffs and other members of the USF baseball to during the relevant time period.

12.     First, Plaintiffs seek injunctive and equitable relief requiring USF to adopt, implement, and enforce appropriate policies and procedures to prevent, or properly respond to, sexual misconduct and psychological abuse perpetrated by USF personnel against students and student-athletes, who continue to be harmed by the absence or lack of enforcement of such policies. Based on information and belief, USF has not implemented any such policies since the filing of this lawsuit, much less comprehensive best practices designed by independent experts and/or approved by a court.

13.     Second, Plaintiffs seek money damages from USF and the Coach Defendants for the psychological abuse and repeated inappropriate sexual conduct they suffered, and compensation for lost guaranteed scholarship money, other out-of-pocket costs, and impairment of their baseball careers, including playing Major League Baseball. Among other damages, as a result of the Coach Defendants' misconduct, Plaintiffs and Class members suffered and continue to suffer severe emotional and physical pain, including shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life and baseball; were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain

loss of earnings and earning capacity; and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

14. Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and/or (c)(4), Plaintiffs bring this class action for violations of Title IX of the Education Amendments of 1972 ("Title IX"), as amended, 20 U.S.C. § 1681 *et seq.*, as well as various state statutory and common laws.

## II.   ROADMAP TO AMENDMENTS

15. Plaintiffs provide the following roadmap to the amendments reflected in this Third Amended Class Action Complaint following the Court's Order on Defendants' motions to dismiss. Dkt. 128 ("Order").

16. First, Plaintiffs amended their claims to conform to the Order with respect to statute of limitations issues for John Does 4-14.

17. Second, Plaintiffs clarified their contract claims against USF relating to the NCAA's National Letter of Intent, the Student-Athlete Statement, and USF's promises of athletics grants-in-aid (scholarships) and other benefits to Plaintiffs by (1) attaching examples of the contracts at issue and (2) adding facts to show that USF and the NCAA intended to create direct legal obligations between themselves and the students.

18. Finally, Plaintiffs added facts demonstrating that they have standing to seek injunctive relief and their claims for such relief are not moot.

19. A blacklined comparison indicating the changes from the Second Amended Complaint is attached as **Exhibit A**.

## III.   JURISDICTION AND VENUE

20. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

21. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because: (a) there are at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; (c) at least one Plaintiff is a citizen of a different state than at least one Defendant; and (d) at least one member of

the Class, including Plaintiffs, is a citizen of a different state than at least one Defendant.

22.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims, because they arise from a common nucleus of operative facts with their federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

23.     This Court has personal jurisdiction over Defendant USF because it is located in this District and the wrongdoing occurred in this District.

24.     This Court has personal jurisdiction over Defendant Nino Giarratano because, based on information and belief, he resides in this District. Moreover, Giarratano coached in this District for over 22 years.

25.     This Court has personal jurisdiction over Defendant Troy Nakamura because, based on information and belief, he resides in this District. Moreover, Nakamura coached in this District for over 22 years.

26.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because all Defendants are residents of the State in which the District is located; and a substantial part of the events and omissions giving rise to the claims occurred in this District.

## IV.  <u>INTRA-DISTRICT ASSIGNMENT</u>

27.     Assignment in the San Francisco Division is appropriate because USF and the Coach Defendants reside in this Division.

## V.  <u>PARTIES</u>

### A.  <u>Plaintiffs</u>

28.     **John Doe 1** is a citizen and resident of California and a citizen of the United States. John Doe 1 was a freshman at USF in the fall of 2020 and attended USF remotely through the 2022 academic year. He transferred from USF because of the actions of the Defendants.

29.     **John Doe 2** is a citizen and resident of California and a citizen of the United States. John Doe 2 was a freshman at USF in the fall of 2020. John Doe 2 transferred out of USF in January 2022 due to the actions of the Defendants.

30.     **John Doe 3** is a citizen and resident of California and a citizen of the United

States. John Doe 3 was a freshman at USF for the fall of 2021 and attended USF remotely through the 2021 academic year. He transferred after his freshman year because of Defendants' actions.

31.     **John Doe 4** is a citizen and resident of Washington and a citizen of the United States. John Doe 4 was a freshman at USF in the fall of 2017, but transferred out of USF after his first year in 2018 due to the actions of Defendants.

32.     **John Doe 5** is a citizen and resident of Washington and a citizen of the United States. John Doe 5 attended USF from 2012 to 2014. At the end of the 2014 spring season, John Doe 5 quit USF's baseball team due to the actions of Defendants.

33.     **John Doe 6** is a citizen and resident of California and a citizen of the United States. Though John Doe 6 attended USF from 2012 to 2015, he quit the baseball team after two years due to the actions of Defendants.

34.     **John Doe 7** is a citizen and resident of California and a citizen of the United States. John Doe 7 committed to play baseball at USF where he started in 2014, but stayed only one semester due to the actions of Defendants.

35.     **John Doe 8** is a citizen and resident of Colorado and a citizen of the United States. John Doe 8 left USF in 2013 after only one semester due to the actions of Defendants.

36.     **John Doe 9** is a citizen and resident of California and a citizen of the United States. John Doe 9 left USF after the 2000-01 academic year due to the actions of Defendants.

37.     **John Doe 10** is a citizen and resident of California and a citizen of the United States. John Doe 10 attended USF and was a member of the baseball team from 2017 to 2018. Upon completion of his 2018 spring semester, John Doe 10 transferred from USF due to the actions of Defendants.

38.     **John Doe 11** is a citizen and resident of Missouri and a citizen of the United States. John Doe 11 attended USF from 1999 to 2000, then transferred after completing just his freshman year due to the actions of Defendants.

39.     **John Doe 12** is a citizen and resident of Texas and a citizen of the United States. John Doe 12 attended USF and was a member of the baseball team from 2017 to 2018; he

transferred after his freshman year due to the actions of Defendants.

40. **John Doe 13** is a citizen and resident of Hawaii and a citizen of the United States. John Doe 13 attended USF his freshman and sophomore years and was a member of the baseball team from 2016 to 2018; he then transferred due to the actions of Defendants.

41. **John Doe 14** is a citizen and resident of Arizona and a citizen of the United States. John Doe 14 was a select walk-on at USF in the fall of 2015 through part of spring 2016; he transferred due to the actions of Defendants.

**B.     Defendants**

42. **Defendant University of San Francisco (USF)** is a California corporation located at 2130 Fulton Street, San Francisco, California 94117. Its agent for service of process, Donna J. Davis, is located at the same address. USF is a DI member institution of the NCAA and the only DI university in San Francisco.

43. **Defendant Nino Giarratano (Coach G)** is a resident of San Francisco, California. Coach G was the head coach of the USF baseball team from 1999 until March 13, 2022, when USF announced Coach G had been fired.

44. **Defendant Troy Nakamura (Coach Naks)** is a resident of Pacifica, California. Coach Naks was an assistant to Coach G for 15 years at USF until he was promoted to Associate Head Coach in the summer of 2013. USF announced on January 13, 2022 that Coach Naks was no longer associated with the USF baseball program.

**VI.     FACTS**

**A.     Student-Athletes Are at Risk for Sexual Harassment, Exploitation, and Mental Abuse by Coaches.**

45. Nancy Hogshead-Makar, a 1984 Olympic gold medalist in swimming and the CEO of Champion Women, a non-profit providing legal advocacy for athletes, explains the tremendous power differential present in relationships between coaches and athletes: "There's no balance of power, there's power one way, which is the coach has all the power and the athlete

1    does not . . . . [The coach] has her scholarship, her ability to continue her education."[6]

2           46.     This power imbalance extends beyond the sport and to the athlete's personal life:

3    "[C]oaches have power over athletes' lives far exceeding the mechanics of practicing and

4    competing in a sport. A coach's power over athletes can extend to virtually all aspects of the

5    athlete's life in such ways that clear boundaries are hard to delineate. This near-total control is

6    rarely questioned."[7]

7           47.     "The athlete's dependence on the coach makes it enormously difficult for the

8    athlete to control the boundaries of the relationship or speak up to a coach who oversteps."[8] This

9    dependency is often even more acute in student-athletes entering college for the first time.

10          48.     All college students are encouraged to develop a clear sense of self, commitment,

11   and direction. Emerging adults engage in a variety of developmental tasks such as identity

12   formation, becoming personally competent, developing interpersonal relationships, and planning

13   for the future.[9]

14          49.     While engaged in this period of self-exploration, student-athletes must also

15   balance a unique set of often-competing circumstances including, but not limited, to their athletic

16   and academic endeavors. They must balance social activities against the isolation of athletic

17   pursuits; maintain mental equilibrium in the face of athletic success or shortcomings; play

18   notwithstanding physical infirmities and injuries; and, often, reconcile the termination of an

19   athletic career to set goals for the future.[10]

20          50.     Research conducted by the NCAA acknowledges the uniquely important process

21

22   [6] John Barr & Nicole Noren, *Outside the Lines: Track & Fear*, ESPN,
     http://www.espn.com/espn/feature/story/_/id/18900659/university-arizona-coach-threatened-one-
     athletes-blackmail-violence-death-school-stopped-him (quoting Nancy Hogshead-Makar).
23   [7] Deborah L. Brake, *Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds*, 22
     MARQUETTE SPORTS L. REV. 395, 405 (Jan. 1, 2012) (footnotes omitted).
24   [8] *Id.* at 406.
     [9] Emily Benton Heird & Jesse A. Steinfeldt, An Interpersonal Psychotherapy Approach to
25   Counseling Student-Athletes: Clinical Implications of Athletic Identity, 16 J. C. COUNSELING
     143-57 (2013).
26   [10] Joy Gaston Gayles, *Engaging Student Athletes*, STUDENT ENGAGEMENT IN HIGHER EDUCATION:
     THEORETICAL PERSPECTIVES AND APPROACHES FOR DIVERSE POPULATIONS 209-21 (Stephen John
27   Quaye et al. eds., 2nd ed. 2015).

28

of identity formation for student-athletes, because "academic outcomes (grades, graduation and eventual graduate degree attainment) are strongly related to identity as a student while in college, even after taking prior academic performance into account."[11]

51. For student-athletes, this crucial developmental period necessarily includes significant time spent with teammates and coaches. While other college students have the opportunity to test their emerging identities through school-based and friendship networks, the college athlete typically spends significant time separated from these networks while they train and compete. Student-athletes often spend hours a day with their coaches on the practice field, in the training room, and in meetings.

52. This dynamic with their coaches renders student-athletes uniquely vulnerable to sexual harassment and abuse. As researchers suggest, "the culture of sport, specifically the power invested in the coach, facilitates an environment conducive to, and tolerant of, sexual exploitation."[12]

53. This power imbalance is especially dangerous for athletes close to the upper echelon of their sport. As one author explains:

> [A]thletes may be more susceptible to the grooming process which precedes actual sexual abuse when they have most at stake in terms of their sporting careers, that is when they have reached a high standard of performance but are just below the elite level. We call this the 'stage of imminent achievement' (SIA). . . . For these athletes, the personal costs of dropping out of their sport might be deemed to be higher than for others. The novice athlete can drop out without loss of face, can leave to find another coach or another sport without loss of reputation and has invested least, in terms of time, effort, money and family sacrifices. The top athlete, on the other hand, has a proven record, has already attained some of the rewards of success, and may be less dependent upon his or her coach for continued achievement at that level. . . . The increased self esteem and personal confidence which accrues to the successful elite performer (after SIA) may provide them with the necessary personal resources to stand on their own[.]

---

[11] NCAA, *Do NCAA Student-Athletes View Themselves As Students Or Athletes?* (Aug. 2013), http://www.ncaa.org/about/resources/research/do-ncaa-student-athletes-view-themselves-students-or-athletes (last visited Aug. 30, 2023).

[12] Joy D. Bringer, Celia H. Brackenridge, & Lynn H. Johnston, *Defining Appropriateness in Coach-Athlete Sexual Relationships: The Voice of Coaches*, 8 J. SEXUAL AGGRESSION, at 3 (2002), (unpublished manuscript), https://www.tandfonline.com/doi/abs/10.1080/13552600208413341.

       &ast;  &ast;  &ast;

> The elite young athlete treads a fine line between success and failure. Physical injuries or illness can occur at any time, destroying years of training. Psychological damage can be caused by the withdrawal of the coach's attention of interest. In short, the young athlete often needs the attention of the coach in order to maintain form and the chance to succeed. In these circumstances it is not difficult for a coach with sexual motives to groom and gain compliance from the athlete.[13]

54. Furthermore, "[t]he style of coaching that is most conducive to forming coach-athlete sexual relationships is more closely associated with male coaches: authoritarian, requiring unquestioning submission to the coach's authority, and exercising near total control over athletes' lives."[14] Thus, "having a male coach with an authoritarian coaching style is a high risk factor for coach-athlete sexual abuse."[15]

55. The fact that most college athletes are over the age of 18, however, does not make any sexual relationship or sexual activity with a coach consensual. According to many experts, the implicit power coaches have over athletes negates consent.[16] From a very young age, athletes are taught to look up to and respect their coaches, to view them as upstanding adults who serve as mentor, trainer, counselor, and sometimes even surrogate parent, and to accord them unquestioning authority. Thus, a coach with sexual motives is able to groom and gain his athlete's compliance.

56. In 2012, the NCAA acknowledged a coach's ability to wield tremendous emotional control and power over his student-athletes:

> In the most tangible terms, the student-athlete depends on the coach for: a place on the roster; playing time; training and skills-building opportunities; visibility and references that can lead to professional opportunities; and, in Division I and II programs, scholarships that can mean the difference between being able to afford a college

---

[13] Celia Brackenridge & Sandra Kirby, *Playing Safe: Assessing the Risk of Sexual Abuse to Elite Child Athletes*, INT'L REVIEW FOR THE SOCIOLOGY OF SPORT: SPECIAL ISSUE ON YOUTH SPORT 13 (1997), https://bit.ly/3MBMlvJ.
[14] Brake, *supra* note 7, at 403.
[15] *Id.* & n.35 (citations omitted).
[16] Brake, *supra* note 7, at 399.

education or not. In exercising this power, the coach commonly exerts broad control over a student-athlete's life, including in such areas as physical fitness, diet, weight, sleep patterns, academic habits, and social life. For intercollegiate athletes, the magnitude of the coach's control will likely exceed that of any other single individual at that student-athlete's institution. For many, it will exceed the extent of control any individual has ever had over them at any point in their lives, with the exception of their parents.[17]

57.     This dependence and power differential created by the coach-athlete relationship enables predators who work with student-athletes (like Jerry Sandusky, Larry Nassar, Robert Anderson, and Coach Naks) to thrive.

**B.     The University of San Francisco Permitted Sexual Exploitation of Student-Athletes on and off the Field.**

**1.     Neither the Archdiocese of San Francisco nor USF are strangers to sexual abuse and abuse of power.**

58.     The University of San Francisco is a Catholic, Jesuit institution.[18] One of its core religious values is *cura personalis,* or "care of the whole person."[19]

59.     USF is part of the Catholic Archdiocese of San Francisco. Saint Ignatius Church is located on the University of San Francisco campus. The church serves a parish of the Catholic Archdiocese of San Francisco and is the university's chapel.[20]

60.     A 2018 report of alleged sexual assaults and misconduct among three Bay Area dioceses, including the San Francisco Archdiocese, found that five alleged offenders were priests affiliated with USF at one point in their careers. Those priests were assigned to USF over a span of 32 years, from 1949 to 1981, although the report did not say whether the abuse occurred on the

---

[17] Deborah L. Brake & Mariah Burton Nelson, *Staying in Bounds* 15 (citations omitted), http://ncaa.org.s3.amazonaws.com/documents/2021/1/18/Staying_2Bin_2BBounds_2BFinal.pdf (last visited Aug. 30, 2023).
[18] USF, *Facts & Statistics*, https://www.usfca.edu/about-usf/what-you-need-to-know/facts-statistics (last visited Aug. 30, 2023).
[19] USF, *Our Values*, https://www.usfca.edu/about-usf/who-we-are/our-values (last visited Mar. 8, 2022).
[20] USF, *Facts & Statistics*, https://www.usfca.edu/about-usf/what-you-need-to-know/facts-statistics (last visited Aug. 30, 2023).

USF campus. Three of the priests faced legal proceedings that included criminal convictions.[21]

61.     Referring to the history of sexual abuse in the church, USF's president, Fr. Paul Fitzgerald, vowed to take sexual abuse matters seriously:

> But the cover-up by civil and religious authority figures allowed abusers to become repeat offenders; in my view, this is the heart of the scandal. Today, any abuse is promptly reported to the authorities, who take these matters extremely seriously.[22]

62.     After the report's revelations, Fr. Fitzgerald also promised to promote a better culture at USF that supports survivors and includes transparency:

> Abuse of power is at once infuriating and disillusioning.  We cannot become inured to these published reports and revelations, whether they occur within the Catholic Church, another organization or even our own community. We must all work to promote a culture that prevents abuse, hears and supports survivors, seeks transparency and advances reform. I write to assure you that I am committed to acting against all forms of abuse of power by any member of our community, including the Jesuits.[23]

63.     Despite Fr. Fitzgerald's public statements and the administration's knowledge of the issue, sexual abuse continues on USF's campus.

64.     In July of 2020, sexual assault and abuse allegations spanning ten years were revealed against members of the USF Men's Soccer Team.[24] A Change.org petition described a homophobic and misogynistic "toxic" sexual environment on the men's soccer team, which led to the suspension of a professional soccer player based on his conduct while at USF as a student-athlete.[25] The petition—signed by over 5,000 individuals—stated that USF's reporting system is

---

[21] Izzie Hallock, *Alleged Sex Abusers Include USF Jesuits*, SAN FRANCISCO FOGHORN (Nov. 8, 2018), http://sffoghorn.com/alleged-sex-abusers-include-usf-jesuits/.
[22] *Id.*
[23] *Id.*
[24] Gabriel Greschler, *Sexual Assault Allegations Against Soccer Team Members Prompt a Reckoning For USF*, SF EXAMINER (July 19,2020), https://www.sfexaminer.com/sports/sexual-assault-allegations-against-soccer-team-force-a-reckoning-for-usf/.
[25] Petition, *USFCA TAKE ACTION NOW! Alleged Sexual Allegations on the USFCA Men's Soccer Team* (July 13, 2020), https://www.change.org/p/university-of-san-francisco-usfca-take-action-now-alleged-sexual-allegations-on-the-usfca-men-s-soccer-team?original_footer_petition_id=&grid_position=&pt=.

ineffective and that USF diminishes and dismisses allegations of sexual misconduct against

soccer players, and demanded that USF investigate sexual misconduct claims involving the men's

soccer team.[26]

65.     In response to the petition, USF investigated the alleged misconduct on the men's

soccer team, as well as USF's handling of such misconduct, and released a 53-page report on

January 11, 2021.[27] Despite the graphic nature of the incidents reported, as well as the fact that 11

soccer players were accused of engaging in sexual misconduct over the past decade, the

investigative report determined that it is more likely than not that sexual misconduct and/or

disrespectful behavior towards women and/or LGBTQIA individuals was ***not*** pervasive among

members of the USF men's soccer team over the past decade, and that USF had acted diligently

in response to reported allegations of sexual misconduct involving soccer players over the past 10

years.[28]

66.     In response to the release of the report, Fr. Fitzgerald took a facially strong stance

against sexual misconduct:

> Sexual misconduct and sex and gender discrimination are not tolerated at USF and we take all allegations of sexual assault seriously. Whether occurring days or decades ago, on or off-campus, all reports of sexual misconduct received by the university are investigated thoroughly.

                    *          *          *

> Our goal is to equip students with the understanding that sexual misconduct is not tolerated at USF and with the tools to intervene if they see something that may cause harm to another person. USF offers employee educational programs with the goal of fostering a safe and supportive working and learning environment. Our policies are continually reviewed and refined to ensure that sexual assault, harassment, and discrimination have no place at USF.

                    *          *          *

[26] *Id.*
[27] Hulst & Handler, LLP, "Investigation Report Regarding Allegations of Sexual Misconduct Involving the University of San Francisco's Men's Soccer Team," found at https://myusf.usfca.edu/sites/default/files/general/011121%20USF%20Men's%20Soccer%20Team%20Investigation%20Report.unencrypted.pdf  (last visited Aug. 30, 2023).
[28] *Id.* at 3 (emphasis added).

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

1
2
3
4
5

Together with our staff in Title IX, we affirm our commitment to students, and all members of the USF community, to continue working toward a more positive, safe, and healthy campus. We affirm our commitment to responding to all incidents of sex and gender discrimination, providing pathways of opportunities for victims and survivors to learn about resources, supportive measures, and accountability options. We invite students, faculty, and staff to join us in these efforts and reaffirm their commitments to the betterment of our community.[29]

6
7
8
9
10
11
12
13

67.     *Sports Illustrated* ("SI") found that the USF-commissioned investigative report's conclusions could not be squared with the facts. SI spoke to a former USF student who said that in 2003, she went to the administration with soccer players' concerns regarding the filming of women in intimate settings without their consent, and that there were other instances when the administration was aware of team members' behavior. SI's investigative reporting found that there was a "distinct culture of misconduct on the team that spanned three coaches, four athletic directors—though one, Scott Sidwell, was present for the majority of the time—and two school presidents." Thus, USF still fails to adequately address misconduct on its sports teams.[30]

14
15
16
17
18
19
20

68.     Notwithstanding USF's confounding finding that sexual misconduct was not pervasive, in 2021, a new deputy Title IX Coordinator position was filled to work directly with the Athletics department; a new Policy on Nondiscrimination Based on Sex and Gender, Sexual Harassment, and Sexual Misconduct for Students, Employees, and Third Parties was approved; and every then-current coach and team purportedly participated in a review of the Athletics Student Handbook as it pertains to sex and gender discrimination, harassing behavior, and sexual misconduct.[31] Yet, these responses appear to be just window dressing.

21
22
23

69.     As but one example of USF's continued failings in this area and relevant to the allegations of this Complaint, at the outset of the fall 2021 baseball season, members of the USF

24
25
26
27

[29] myUSF, *Men's Soccer Investigation: Update from President Fitzgerald Regarding the Sports Illustrated Story*, https://myusf.usfca.edu/title-ix/mens-soccer-investigation (last visited Aug. 30, 2023).
[30] Priya Desai & Jenny Vrentas, *A Predatory Culture, a Viral Reckoning—and Now What?*, SPORTS ILLUSTRATED (Sep. 30, 2021), https://www.si.com/college/2021/09/30/usf-mens-soccer-sexual-assault-and-harassment-reckoning-daily-cover.
[31] *Id.*

28

baseball team were required to attend a multi-hour session with the Title IX officers at the baseball field. However, neither Coach G nor Coach Naks attended.[32]

70.    Moreover, USF knew about the baseball coaches' harassment and abuse long before the soccer scandal broke yet turned a blind eye. Upon information and belief, several of Plaintiffs' parents complained to USF about misconduct in the USF baseball program before the allegations against USF Men's Soccer Team were revealed in 2020. Moreover, the harassment and abuse was open and public on the baseball field and USF property.

71.    For example, in or about 2000, John Doe 9's mother called Coach G to demand that Coach Defendants stop their abuse. Coach G responded by threatening that John Doe 9 would never play baseball again if either John Doe 9 or his mother elevated their complaints. John Doe 9's mother also complained to the then-Athletic Director Bill Hogan, who was non-responsive. In direct retaliation for elevating the complaints, Coach G gave John Doe 9 an "F" in his physical education class.

72.    Similarly, in May of 2014, John Doe 6's parents sent the USF Associate Athletic Director and the NCAA Faculty Athletic Representative a letter describing the Coach Defendants' conduct. The Athletic Director Scott Sidwell was also informed of the complaints at that time. Again, USF did nothing.

73.    While additional complaints are detailed in Section VI.D., *infra*, discovery is likely to uncover additional evidence of USF's history of covering up the Coach Defendants' sexual misconduct, misinforming USF baseball players of their rights, and using force, threats and intimidation to stop those who would otherwise seek relief.

74.    Because USF did nothing about these reports, the Coach Defendants' abuse continued for years thereafter, affecting countless other young men.

---

[32] Additionally, in June 2021, twin sisters and former USF basketball players Marta and Marija Galic brought suit in San Francisco Superior Court against Molly Goodenbour, the head coach of the USF women's basketball team, and USF, challenging Coach Goodenbour's "archaic and abusive conduct" towards the twins from 2019 to 2021 and USF's awareness of the coach's verbal and psychological abuse.

1

**2.      Coach Naks created an intolerable sexualized environment at every
practice and Coach G not only tolerated it, he participated in it.**

2

3      75.      During the time Coach Naks was at USF, USF described his duties as follows: "In

4    addition to guiding the Dons[33] on the base paths, Nakamura's other on-field duties include

5    coaching third base, overseeing the team's SPARQ (Speed, Power, Agility, Reaction, and

6    Quickness) training and leading the team's visualization and imagery training program."[34]

7      76.      Coach Naks was also an integral part of recruiting high school players. In fact, in

8    2013, Coach G promoted Coach Naks to Associate Head Coach for "play[ing] a critical role in

9    the recruitment and development of student-athletes."[35]

10      77.      In July 2020, USF's Executive Senior Associate Athletic Director described Coach

11   Naks as "an amazing man who truly defines what it means to be a Diamond Don."[36]

12      78.      Further, in a November 2020 interview, Coach G described Coach Naks as

13   follows:

> Oh boy, Troy and I have you know we've been together for 22 years
> here at USF. So um what a great relationship and just Troy's loyalty
> to me is why he's here. Troy's had plenty of opportunities right and
> he's always wanted to stay and it's it's it's [sic] wonderful that he's
> wanted to be here in the Bay Area and be my right-hand man. I could
> never express how appreciative I am of Troy as a, as a person, as a
> friend, as a coach, uh as a mentor, as someone to [sic] spend this
> time with. I mean he's just wonderful. He he leads in a lot of ways.
> He does a lot of things for me and I never have to question it . . .  Me
> and Troy spend more time together than than [sic] me and my wife
> most of the time and more emotional wins and losses there too. A
> lot of times where we've been up at the top and we've been down
> and we've . . . . Oh it's it's [sic] I can't thank him enough. He's he's
> he's [sic] the best.[37]

14

15

16

17

18

19

20

21

22      79.      Coach Naks had therefore established himself as a trusted coach and advisor

23

---

24   [33] Members of USF baseball team are referred to as the Diamond Dons. *See, e.g.,* Diamond Dons
     Take Two (Feb. 18, 2017), https://usfdons.com/news/2017/2/18/baseball-diamond-dons-take-
     two.aspx.

25   [34] Profile: Troy Nakamura, https://usfdons.com/sports/baseball/roster/coaches/troy-nakamura/66
     (last visited Jan. 26, 2022).

26   [35] Profile: Troy Nakamura, *supra*.
     [36] Tuesday Testimonial: Troy Nakamura (July 28, 2020),

27   https://www.youtube.com/watch?v=Rtd_HrkWW9w (last visited Jan. 28, 2022).
     [37] Tuesday Testimonial: Baseball Head Coach Nino Giarratano (Nov. 3, 2020),

28   https://www.youtube.com/watch?v=tvdyIFXEYq0&list=PLQJ7Y9Sjcc_ivhkGCZkiQKJlfrE7Qll5
     D (last visited Aug. 30, 2023).

1  before members of the Class even began college.

2      80.    Plaintiffs came to campus their freshman years ready to work and succeed. All had

3  successful careers in high school and on baseball travel teams, and USF publicly touted them

4  when they committed. Further, Coach G or Coach Naks assured all of them that they would be

5  major additions to the USF baseball team, were integral to the team's future success, and had the

6  skills to make it to the next level. All had aspirations of playing Major League Baseball.

7      81.    However, within the first couple of months of each Plaintiff's arrival to USF—and

8  sometimes within mere days—the Coach Defendants' mental (and sometimes physical) abuse

9  towards each Plaintiff would escalate. Coach Defendants isolated Plaintiffs and told them they

10 were worthless or that they "fucking suck so much." They stated that Plaintiffs could not and

11 would not succeed, routinely called them "pussies" and "faggots," and berated them for throwing

12 or hitting like a "pussy" or "bunch of pussies." One Coach Defendant even called a player a

13 "fucking cunt" within earshot of the opposing team's fans at a game. Players were repeatedly

14 berated, beaten down, and forced to practice, even when physically impaired.

15     82.    Each Plaintiff desired to make it to the next athletic level, so most independently

16 asked the Coach Defendants for guidance. But Coach G and Coach Naks regularly responded by

17 telling Plaintiffs that their requests were a waste of time; that they were not good enough or that

18 their personalities did not fit with the team; that they were "toxic," "a cancer," or "worthless;"

19 that they would never make it in DI baseball; that they might as well leave USF; that they should

20 give up their scholarships; and that they would never make it as professional baseball players.

21 Coach G even said to one player that he "might as well kill [him]self."

22     83.    Against this backdrop of mental abuse, the Coach Defendants also engaged in

23 inappropriate sexual conduct, created an intolerable sexualized environment, and retaliated

24 against the players.

25     84.    For example, at one of John Doe 8's first practices as a freshman in 2013, Coach

26 Naks gestured to the undergraduate dormitories overlooking the baseball field and said:

27 "Sometimes girls will stand at their windows, pull up their shirts, and show their boobs. We're

28 here to play baseball, so just look at them and jerk off about it later. Trust me, I want to fuck them

too." John Doe 9 also recalls, in the fall of 2000, Coach Naks persistently encouraging female students at these same open dorm windows to flash their breasts by whistling and lifting his shirt to suggest the females do the same. Coach G would laugh.

85.     The Coach Defendants also subjected the team's pitchers to strip games during practice. John Does 6, 7, and 8 recall that during the 2012 to 2014 seasons, any pitcher who made an error at practice would have to take off an item of clothing. There were times the players had to strip down to their underwear while the Coach Defendants and other players laughed. John Does 10 and 12 were also forced to participate in these strip games during the 2017-2018 season.

86.     Another example involved a player who was on the USF baseball team from in or about 2011-13. During a gift exchange, a coach gave the player a life-sized, blow-up female sex doll. The coach told the player that if he did not bring the doll to practice the next day, he would make him run. The player was forced to walk home from practice with the doll, and on his way home, he was stopped by a police officer who yelled at him for possessing the doll and popped it.

87.     Yet another example is that, from the outset of John Does 1, 2, and 3's freshman years in 2020 and 2021, Coach Naks started practices or particular drills with a "café" exercise. The point of the exercise was to loosen the players up before they started practice. The café exercise involved Coach Naks identifying a theme for a hypothetical dinner, such as "barbecue" or "fast food." Then, each member of the team—including the Coach Defendants and players— was supposed to name the food or drink item they would bring to that themed dinner.

88.     However, players would quickly learn that Coach Naks always sexualized the exercise. Coach Naks would refer to women's body parts he wanted to eat, bodily fluids and secretions he wanted to drink, or engage in other sexual innuendo. For example, Coach Naks stated that he wanted to eat "Jennifer Aniston's boobs" and "slurp whipped cream from Pamela Anderson's crotch."

89.     Coach G was a part of these café exercises, witnessed the way Coach Naks spoke and encouraged sexual banter, and did nothing to stop it. In fact, Coach G engaged in and encouraged the same behavior, naming women's body parts or fluids he wanted to eat or drink and cajoling other coaches and the players to answer similarly.

90.     All of the players were affected. For example, John Doe 1 was extremely bothered—and tried to stick to appropriate answers, such as milk or soda. However, when John Doe 1—or any other player—did not play along, he was laughed at by the coaches and others who were forced to join in the conduct and pressured to play along. Plaintiffs felt pressured to stay when these exercises were happening, given that the coaches demanded the players' participation.

91.     Coach Naks sexualized other exercises prior to John Does 1, 2, and 3's tenure on the team, as well. For example, during the 2017-18 season, while players would do their daily butterfly stretches, the coaches on at least a weekly basis would ask John Does 4 and 12, "Where are your butterflies flying to?" Coach Naks would respond with sexual comments like, "They're going to get some strippers," or, "They're going to strippers' asses." The players felt extreme pressure from Coach Naks to respond to the coaches' question in a sexual manner because he would get angry with players who did not.

92.     Plaintiffs' discomfort and reluctance to participate in such bizarre behavior was apparent to the Coach Defendants, whose abuse and taunting escalated as a result.

93.     Coach Naks' inappropriate sexual banter was not limited to the exercises. He would also regularly talk about the fact that he was bisexual, how little clothing female students on campus would wear during warm weather, and what sexual acts he would like to perform on young women he saw on campus. At one point in time, Coach Naks moved to live on campus, and his comments about the women on campus became increasingly sexual and distressing to the players. Their discomfort with such conversation was apparent.

94.     Coach G heard and participated in these conversations.

95.     The inappropriate things Coach Naks did or said that day—and what seemed like every day—was a regular topic of conversation among the players.

96.     Coach Naks' sexually charged behavior was not limited to the way he spoke. He also engaged in calculated displays of nudity on and off the field, exposing himself to the players and other coaches.

97.     For example, another exercise the coaches required before most practices was the

1 performance of skits. Players were split up into four groups at first, second, third, and home

2 bases, and had to improvise skits for the team judged by Coach G.

3       98.    As with the café exercises, Coach Naks would regularly sexualize the skits. He did

4 so at least twice a week by instructing players to perform sexualized skits and/or by participating

5 in the skits in a sexual manner himself.

6       99.    For example, on multiple occasions in 2017, 2018, and 2021, Coach Naks would

7 pretend he was at a buffet by having a player do a handstand, grabbing that player's legs and

8 splitting them open, then pretending to eat spaghetti from that player's genital region. Many

9 players would be visibly disgusted and upset and would turn their heads away when Coach Naks

10 performed this skit.

11       100.    On another occasion, John Doe 12 recalls Coach Naks performed his own skit in

12 which he instructed a player to get on his hands and knees and then proceeded to ride that player

13 as though the player was a bull and Coach Naks was having sex with it.

14       101.    During another practice, Coach Naks told his group that he would take care of the

15 group's skit for the day. When it was Coach Naks' group's turn to perform, Coach Naks crawled

16 out of the dugout naked, moved to a kneeling position in front of the players, and swung his penis

17 around. Plaintiffs and some other players looked away in disbelief, embarrassment, and disgust.

18       102.    Rather than condemn Coach Naks' actions, Coach G kissed the cross on his

19 necklace and jokingly mimed looking up at the sky to ask God for forgiveness.

20       103.    Coach G knew that Coach Naks' actions were wrong. Coach G would say to older

21 players, "We could get fired for this." He also told the players that his wife was mad at him

22 because his job was in jeopardy due to Coach Naks' nudity and behavior on the field and around

23 the players. Yet Coach G condoned and even facilitated Coach Naks' behavior by playing along

24 with and normalizing it.

25       104.    This was not the first time Coach Naks crawled on to the field naked. All Plaintiffs

26 report often seeing Coach Naks naked or holding a bat between his legs and pretending it was his

27 erect penis. On another occasion, a player fielding ground balls after practice heard Coach Naks

28 call his name and looked to see Coach Naks standing on a table completely naked and swinging

his penis in a helicopter motion while yelling: "Hey, [Player X]!"[38]

105.   Coach Naks took these grooming actions on the field and extended them to more intimate settings. For example, the coaches would often shower with the players in the players' locker room. They would also walk around the player's locker room, either naked or barely dressed.

106.   In the fall of 2000, Coach Naks often asked John Doe 9 if he could shower in his dormitory, which was comprised of all first-year students.

107.   Players who attended an away game in the spring of 2021 reported that Coach Naks entered a group of players' hotel room and asked to use their shower. After Coach Naks got out of the shower, he walked around naked in the room, exposing himself to the players while talking about his bisexuality.

108.   No one was immune from the sexualized environment, which was used as a weapon to psychologically harass those who would not conform in order to force them off the team. In addition to the examples above, the sexualized environment became the centerpiece of so-called "team bonding" exercises and presentations the coaches endorsed. The coaches were present and participated in them at the expense of players who would not conform.

109.   For example, John Does 4 and 12 recall military training-type exercises at 6:00 a.m. on Saturday mornings where, at the beach, players would strip down to their underwear and float in the water with linked arms. Upon the players emerging from the water, the Coach Defendants would comment on how shriveled up all the players' penises were.

110.   The Coach Defendants were also present for and condoned sexualized and degrading skits and presentations roasting freshmen teammates every year at the team's annual Rookie Show, including the following incidents:

   a.   During the 2013 Rookie Show, two players did a skit that depicted John Doe 5 and another teammate (who are both gay but were not out at that time) biking to Whole Foods and having anal sex.

   b.   During John Doe 8's freshman year in 2013, one of his teammates did not

---

[38] To protect their privacy, Plaintiffs do not use any USF baseball players' real names.

1   trim his pubic hair. A picture of that teammate was broadcast on a

2   presentation screen with a graphic of a large bush over his genital area. The

3   room erupted with laughter. That player was so mortified, and John Doe 8

4   never saw him take a shower with the other players again.

5   d.   During John Doe 7's freshman year in 2014, team bonding included

6   comments about another player who wore "tighty whities" and had a small

7   penis.

8   e.   During the 2017 Rookie Show, a slide show contained a naked picture of

9   the then-current Director of Operations for the team, who had been cat-

10   fished by several of the players.

11   111.   In addition to the team building events, there were annual hazing parties thrown at

12   the expense of the incoming freshman. For example:

13   a.   During 2000, John Doe 9 recalls discussion of 25 tasks that the freshmen

14   had to accomplish. Some of the items on the list included: "have sex with a

15   fat woman, get a hickey from a girl, do a 30-second beer bong or keg stand,

16   and get your girlfriend to blow you and swallow your load." This hazing

17   was tied to drinking, where the players would go to a bar called "Steps of

18   Rome," with fake identification. The coaches were aware of and

19   encouraged this behavior.

20   b.   During 2013, John Doe 8 recalls that freshman were given a checklist of 25

21   items worth certain points. For example, one item was to go to a strip club

22   and take a picture with a stripper and another one was to get a hickey from

23   a girl and take a picture of it. While all freshmen had to drink, the freshman

24   with the most points had to drink the least, while the freshman with the

25   least points had to drink the most. Upon information and belief, the Coach

26   Defendants were aware of these parties, their sexual content, and the fact

27   that drinking was mandatory, as they would cancel practice the morning

28   after the party.

c.  During 2014, John Doe 7 was given the list of 25 items during his freshman year, which included many of the above items. The drinking was also a part of it, and the freshman were forced into a contest to see who could drink the most before blacking out. The coaches knew about the hazing party, as they would cancel the next morning's practice.

112.  The hazing condoned by the Coach Defendants extended to physical abuse of others. One semester in or around 2013, a USF baseball player threw a young man out of a party hosted by the baseball team because he was gay. The USF player slammed the young man, injuring him. At a team meeting following the incident, Coach G told all the players not to discuss what happened because "this needs to stay in house," suggesting that there would be an internal cover-up of the incident. However, John Doe 5 (who witnessed the incident and is gay) was not invited to this meeting. Later, the incident became a source of locker room humor for the coaches and the upperclassmen.

113.  Similarly, during a team Christmas party in 2016 at Coach G's house, John Doe 13, a freshman, was challenged to spank the female school nutritionist in front of her husband and the team in exchange for the ability to forego further participation in drinking games and the sexualized hazing. John Doe 13 was so sick of the sexualized hazing that he decided to take the dare and he placed his hand on the nutritionist's lower back towards her buttocks. The nutritionist demanded to know in front of those assembled who put him up to it. The next day Coach G called John Doe 13 into his office, knowing that John Doe 13 did it on a "dare" and conveyed to him in words or substance that John Doe 13 should accept responsibility for the entire event and not convey that it was done as a part of hazing in which the Coach Defendants participated. USF's NCAA liaison also interviewed John Doe 13 in connection with this incident, and thus had knowledge of the surrounding events.

114.  These are just a few examples of the completely inappropriate sexual misconduct that created an intolerable sexualized environment the players had to endure—and participate in to survive—on a near-daily basis. Rather than create fun, relax the players, or build rapport among teammates, this environment made the players stressed, upset, and unable to concentrate.

This behavior occurred year after year, and any player who did not endorse this atmosphere or participate in the customs was singled out by the coaches for further abuse and retaliation (including being forced off the team).

115.   That players saw Coach Naks as a sexual predator encouraged by Coach G is evinced by an incident at a 2021 fall World Series game. While players were in the dugout, they saw Coach Naks interacting with a little girl next to the dugout, and one player remarked that if he saw Coach Naks interacting with his little sister, he would strangle him.

116.   Many players discussed not wanting to go to practice because of this intolerable sexualized environment or leaving practice as soon as it ended to avoid Coach Naks. The players also regularly discussed ways to get the Coach Defendants' behavior to stop. However, as set forth below, the Coach Defendants retaliated against those who refused to play along or spoke up.

117.   For example, in his freshman year, John Doe 1 discussed reporting the Coach Defendants' behavior to the school's Title IX office with several older players. All agreed that none of their prior coaches acted like Coach Naks or Coach G, and that the sexual conduct and psychological abuse was not normal. One of the older players also told John Doe 1 that he had offered a player $100 to turn the Coach Defendants in. John Doe 1 offered to contribute another $100 to get the same player to make a complaint.

118.   Another one of these older players told John Doe 1 and several other players not to be surprised if they were called in for interviews after that player graduated because he planned to file a Title IX complaint as soon as he could no longer be subject to retaliation.

119.   John Doe 3 also spoke with an older transfer player who assured John Doe 3 that Coach Naks' behavior was not normal, that the sexualized environment "not the way college athletics was supposed to be," and that the Coach Defendants were not "doing it right" at USF.

120.   In late November 2021, after the "skit" incidents, eight players—including John Does 1, 2, and 3—decided to express their discomfort with the Coach Defendants' inappropriate behavior. Wary of retaliation, however, they determined it would be wisest to do so in a way the Coach Defendants would find comical. Thus, during one pre-workout skit, the players pretended to make a complaint about Coach Naks to the Title IX Office. They feigned putting Coach Naks

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

in handcuffs and carrying him off to jail (the "Title IX Skit").

121. During and after the Title IX Skit, both the Coach Defendants looked extremely uncomfortable. Yet neither followed up with the players after practice to determine whether the skit was performed seriously or in jest, nor did either take any action to change their behavior. Moreover, none of the other non-defendant coaches present at the practice followed up with the players regarding their concerns.

**C.  USF retaliated against the players who tried to stop the sexual misconduct or who did not condone it.**

122. The Coach Defendants engaged in multiple types of retaliatory conduct, including running players off the team, blacklisting players through disparaging remarks to prospective or new coaches (thus ending or severely limiting the players' continued baseball careers), interfering directly with their education (giving failing physical education grades or making it impossible to graduate on time) or indirectly (through Coach G's wife who was an academic advisor to some of the athletes), physically abusing them, and expressly or implicitly threatening them with harm. Some of the non-exhaustive examples are contained in this section; others are detailed in the individual player experiences in Section VI.D., *infra*.

123. As described below, this experience with retaliation was not unique to any single Plaintiff. In fact, by 2020, several players discussed how to complain without being retaliated against. This engrained fear of retaliation is the result of USF's policy of, expressly or implicitly, retaliating against student-athletes, their parents, and non-defendant USF employees if they did not engage in the sexualized conduct or perpetuate the cover-up.

124. As set out above, in his freshman year, John Doe 1 discussed reporting the Coach Defendants' behavior to the school's Title IX office with several older players. One of the older players told John Doe 1 that he had offered a player $100 to turn the Coach Defendants in. John Doe 1 offered to contribute another $100 to get the same player to make a complaint. Another one of these older players told John Doe 1 and several other players not to be surprised if they were called in for interviews *after* that player graduated because he planned to file a Title IX complaint as soon as he could no longer be subject to retaliation.

125.    In another example, after the filing of this lawsuit, counsel was contacted by a USF employee, on a confidential basis, concerning the "outright abuse and gaslighting of these students" and the "inexcusable" and "blatant lack of response to parents." However, the confidential witness asked that their name not be disclosed as they had "reason to fear retaliation" from USF.  The witness noted that amongst USF employees, the acronym USF is colloquially referred to as "U Stay Forever," implying that so long as an employee does not voice any complaints about USF and otherwise tows the line, they have a near-lifetime position at the university.

<strong>1.    <u>USF retaliated against <em>every single</em> Plaintiff for rejecting the sexualized environment and abuse by running them off the team.</u></strong>

126.    A common recurring form of retaliation involved being run off the USF baseball team by the Coach Defendants, who are agents of USF. Being "run off" a team occurs when a coach kicks or otherwise forces the player off the team for reasons other than those that are academic or disciplinary, i.e., reasons not within the student-athlete's control.

127.    Prior to January 2015, NCAA schools were required to give scholarships that were renewable each year rather than guaranteed four-year scholarships. Thus, it was much easier for a coach to "run off" a disfavored athlete by pulling a scholarship from the student-athlete to force them to transfer. Nevertheless, even that involved paperwork and red tape, so it was easiest for the coaches to force players to resign their scholarship themselves.

128.    In January 2015, the NCAA permitted conferences to start providing four-year guaranteed scholarships, which took away the coaches' ability to not renew scholarships (thus making it harder to run a student-athlete off a team to free up the scholarship money for someone else).

129.    Coach G and Coach Naks avoided this limitation by implementing a system of retaliation intended to get rid of players who did not play along or fit within the sexually charged culture they created. The Coach Defendants' retaliation worked. Of the 11 or 12 recruits in the 2001 freshman class, only one or two stayed for all four years.  Of the 12 or 13 recruits in the 2013 USF baseball class, 75%, or all but five, transferred in the following four years. Of the 13

1  recruits in the 2017 class, only five stayed for four years. Of the 16 recruits in the 2020 USF

2  baseball class, eleven transferred.

3      130.   These statistics are a testament to the ruthlessness of the Coach Defendants' illegal

4  sexualized abuse and retaliation against players who did not willingly submit to this abuse, as

5  USF's baseball numbers fall far outside the norm for DI athletics programs:

6      a.   According to the NCAA, based on a 2018 study from the National Student

7      Clearinghouse, just 13% of then-current DI student-athletes in all sports

8      transferred from another school.[39]

9      b.   The 2018-19 percentage of four-year college transfers among DI student-

10      athletes on baseball teams was even lower—just 2.3%, or the fourth lowest

11      rate out of all 38 NCAA DI men and women's sports:[40]

**2018-19 Percentage of Four-Year College Transfers among Division I Student-Athletes**

| Men's Sport | 4-year | Women's Sport | 4-year |
|---|---|---|---|
| Soccer | 18.6% | Beach Volleyball | 18.4% |
| Basketball | 15.3% | Tennis | 14.1% |
| Tennis | 13.8% | Basketball | 11.9% |
| Golf | 8.3% | Volleyball | 9.7% |
| Track and Field | 8.1% | Golf | 9.0% |
| Cross Country | 7.2% | Softball | 8.5% |
| Football (FCS) | 7.2% | Track and Field | 7.1% |
| Wrestling | 6.8% | Soccer | 7.0% |
| Ice Hockey | 6.7% | Cross Country | 6.3% |
| Skiing | 6.1% | Bowling | 5.5% |
| Swimming | 5.7% | Skiing | 4.8% |
| Volleyball | 5.4% | Water Polo | 4.6% |
| Football (FBS) | 4.6% | Fencing | 4.4% |
| Lacrosse | 3.6% | Ice Hockey | 4.4% |
| Fencing | 2.8% | Swimming | 4.4% |
| Rifle (co-ed) | 2.4% | Field Hockey | 4.0% |
| Baseball | 2.3% | Lacrosse | 3.1% |
| Gymnastics | 2.0% | Rowing | 3.0% |
| Water Polo | 1.8% | Gymnastics | 1.6% |

---

[39] NCAA, *Research on Student-Athlete Transfers*, https://www.ncaa.org/sports/2019/8/5/research-on-student-athlete-transfers.aspx (last visited Aug. 30, 2023).
[40] NCAA, *Transfer Composition of Division I Teams*, *supra* note 1, at 10.

c.   In fact, the overall trend from 2004 to 2019 was a significant decrease in
the transfer rate among NCAA DI baseball teams:[41]



Trends in the Proportion of Four-Year College Transfers in APR Cohorts

Notes: Percentages based on the 2019 APR data (released in May 2020).

131.   One of the largest amateur baseball scouting organizations ranked USF's 2020 recruiting class #80 in the nation among DI baseball programs.[42] USF was one of only two West Coast Conference baseball programs ranked in the top 100 and USF was ranked higher than programs such as Michigan State, Rice, and UCSB.[43]

132.   The data show that these well-regarded recruits transferred out of USF at an abnormally high transfer rate as a direct result of USF and the Coach Defendants' wrongdoing. These rates put USF on notice of serious problems within the program that should have resulted in a documented Title IX investigation.

133.   Every single Plaintiff in this lawsuit was run off the team by the Coach Defendants, while simultaneously being manipulated to believe that it was their fault and not the wrongdoing of the Coach Defendants and USF.

---

[41] *Id.* at 13.
[42] Perfect Game, *College Recruiting Rankings: Class of 2020*,
https://www.perfectgame.org/rankings/Recruiting/Rankings.aspx?g=2020 (last visited Aug. 30, 2023).
[43] *Id.*

**2.      USF engaged in a pattern of retaliation against those who rejected the sexualized environment by refusing to release them and/or by blacklisting them from alternative baseball opportunities.**

134.     The Coach Defendants, individually and as agents of USF, also retaliated against players who did not wholeheartedly participate in the sexualized environment by refusing to release them (when coach releases were required by the NCAA) and/or by blacklisting players to prospective coaches of summer league teams, other NCAA teams, and non-NCAA leagues, effectively ending or severely limiting their baseball careers and earning power. The following are non-exhaustive examples:

135.     In the spring of 2016, John Doe 14 decided to leave USF but was not able to transfer to another DI school, as that was prohibited. He knew he could not transfer to another NCAA Division II ("DII") school or NAIA because both needed a coach's release, and he knew that Coach G would never release him. John Doe 14 had never had the opportunity to play baseball at another school.

136.     In the summer of 2018, John Doe 10 was accepted to play with a collegiate summer baseball league known for its association with top prospects and draftees to the MLB. At the end of the USF season, in retaliation for John Doe 10's rejection of the sexualized environment and abuse, Coach G told John Doe 10 that he had notified the summer baseball league that he was withdrawing his referral, causing John Doe 10 to miss a once-in-a-lifetime opportunity that would have advanced his professional baseball career.

137.     After John Doe 10 was run off the team by the Coach Defendants' conduct, John Doe 10 sent text messages and emails, and made phone calls to dozens of colleges in an attempt to transfer. After only receiving a few walk-on offers, he discovered that Coach G was "blackballing" him. One DI coach told John Doe 10: "I like you, but I am friends with Nino [Giarratano], so I am not interested."

138.     John Doe 10 decided to attend a DI school where he would have to pay his own tuition and sit out for one year due to the NCAA's transfer rules. Based on his new coach's statements, it was clear that Coach G had also tried to blackball John Doe 10 from this school.

139.     In another example, John Doe 5 had aspirations of playing MLB, and his

performance during his college career certainly pointed in the direction of him being selected in the MLB draft. However, in retaliation for John Doe 5's rejection of the sexualized environment and abuse, Coach G told John Doe 5 that he had informed scouts that John Doe 5 "had no interest in playing professionally, and that he didn't really care about baseball in general."

140.    After John Doe 7 was run off the team, he attended a local community college. Yet even there, Coach G's retaliation for John Doe 7's rejection of the sexualized environment and abuse continued, and John Doe 7's new teammates (who were friends with Coach G's son) were told, "[John Doe 7]'s a pussy who sucked at baseball and couldn't hang at USF."

141.    After John Doe 8 was run off the team and during the transition to his new school, John Doe 8 learned that Coach G, in retaliation for John Doe 8's rejection of the sexualized environment and abuse, made an unsolicited call to John Doe 8's new coach to declare that John Doe 8 was "at the bottom of USF's depth chart" and "not a fit for their program." John Doe 8 also learned that during a college baseball showcase, another USF coach made comments to one of John Doe 8's new coaches, claiming that John Doe 8 "lacked energy and competitiveness" and "was not DI material."

142.    None of these comments about John Doe 8's ability and skills were true. John Doe 8 set a record at his new school for most wins as a pitcher and was named an All-American and an All-Conference player for three years. After college, John Doe 8 was signed by an MLB team as an undrafted free agent and played professional baseball for four years.

143.    Given that blacklisting of this nature is inherently difficult to uncover absent discovery, the above pattern of conduct demonstrates that it is plausible these blacklisting attempts were not limited to the above examples.

**3.      USF engaged in a pattern of retaliation by interfering directly with players' education or educational opportunities.**

144.    The Coach Defendants, individually, and as agents of USF, also retaliated against players who did not wholeheartedly participate in the sexualized environment by interfering, or causing interference with, their education and educational opportunities. The following are non-exhaustive examples:

145.    John Doe 5's academic advisor was Coach G's wife, Brenda Giarratano. She used her advisory time with John Doe 5 to question what was going on with his relationship with Coach G and why it was bad. After she learned that John Doe 5 was refusing to condone Coach G's sexually abusive environment—including by deciding to leave the team—she implemented the pattern of retaliation perpetuated by Coach G.

146.    Specifically, after John Doe 5 quit the team, he applied to graduate early using college credits he accumulated during high school through the "Running Start" program, which allowed him to take college courses at Washington community and technical colleges. Though these records were provided to USF when John Doe 5 was admitted and used to place him in certain USF classes, when John Doe 5 applied to graduate early, Coach G's wife claimed that she could not locate John Doe 5's transcripts.

147.    Upon information and belief, Coach G's wife used her power as a USF staff member with access to John Doe 5's academic records to try and prevent him from applying for and receiving early graduation as a punishment for perceived wrongs against her husband and the USF baseball program.

148.    Coach G's wife was also John Doe 6's academic advisor. When registering for Spring 2014 classes, John Doe 6 was assured by Coach G's wife that he was on track for graduating in May 2015.

149.    John Doe 6's parents subsequently complained of an "abusive situation" and questioned the "ethical and moral conduct" of the coaches and the effect of the coaches' misconduct on their son. In retaliation, Coach G's wife told John Doe 6 that he was now short one class and so had to "overload" his schedule to graduate on time.

150.    And, after John Doe 9's mother complained to Coach G and the Athletic Director about the abuse, Coach G retaliated by giving John Doe 9 a failing grade in his baseball physical education class.

151.    Given that interference with education of this nature is inherently difficult to uncover absent discovery, the above pattern of conduct demonstrates that it is plausible these retaliation attempts were not limited to the above examples.

**4.    USF used threats to retaliate to keep the players from reporting the abuse.**

152.    The Coach Defendants, individually and as agents of USF, also retaliated against players who did not wholeheartedly participate in the sexualized environment by threatening to retaliate against them if they complained about the abuse. The following are non-exhaustive examples:

153.    For example, when John Doe 9 told his mother about Coach G's behavior, John Doe 9's mother called Coach G to tell Coach G that her son was struggling and to demand that the Coach Defendants' abuse stop. Coach G claimed that he had no idea what John Doe 9's mother was talking about and told her she was wasting his time. When John Doe 9's mother responded that she intended to complain to Coach G's supervisors, Coach G said, "If you say anything to the people above me, I will make sure your son never puts a uniform on again." The next day, Coach G told John Doe 9 that he would be kicked off the team if he or his mother called the athletic department.

154.    In another example, at a sanctioned team Christmas party, freshman John Doe 13 was told he had to spank the team's female nutritionist. Humiliated, John Doe 13 did so out of fear of repercussion from his team and the Coaches. Afterward, during an investigation conducted by USF, Coach G told John Doe 13 in words or substance that he should accept sole responsibility for spanking the nutritionist and not reveal that it was part of the sexualized hazing of the freshmen on the baseball team or he would be subject to repercussions.

155.    After one game where John Doe 5 and the only other gay player on the team played poorly, Coach G told the team that "they played like a bunch of faggots" and challenged them to tell the AD if they had a problem with how Coach G was speaking to the players, while looking directly at John Doe 5. After this game, Coach G had a meeting with both John Doe 5 and the other gay player and told them he only had room for one of them on the team—even though they played different positions and were both starters. John Doe 5 thinks Coach G said this because both players were gay, making John Doe 5 feel even more isolated and threatened if he chose to speak out. Coach G retaliated against the players by intimidating them so that they would

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

1    not file a complaint.

2    156.    Another example of this administrative cover-up was reported by Sports

3    Illustrated: a USF student journalist was threatened when she began investigating the sex scandal

4    on the USF soccer team, causing her to drop her story.[44]

5    157.    Similar threats and disparagement have been lodged against the Plaintiff John

6    Does since the filing of this lawsuit. For example, an online group apparently connected to USF

7    has vilified Plaintiff John Does for coming forward on its website[45] and social media,[46] stating

8    they "are not John Does for a reason."[47] Plaintiff John Does have also been the target of hate

9    posts claiming that they are "cowards" and "benchwarmers" "using their parents to spread lies."

10   The source and nature of all direct and indirect threats will be the subject of discovery.

11   158.    USF and the Coach Defendants' engagement in threats and duress, as well as

12   policy of implicitly or expressly condoning such threats, constitutes retaliation.

13            **5.    USF, through the Coach Defendants, used physical abuse to retaliate**
                 **against players for rejecting the sexualized environment and abuse.**

14

15   159.    As described in the individual Plaintiffs' experiences that follow, physical abuse

16   followed the Plaintiffs' rejection of the sexualized environment, including examples where Coach

17   G purposefully threw pitches that hit players in the neck and head, violently threw players against

18   walls and to the ground, made players engage in extreme physical exercises intended to cause

19   distress and humiliation, and made players engage in unwarranted drug testing.

20            **D.    Plaintiffs were subjected to Coach Defendants' sexual misconduct and**
                 **retaliated against for refusing to condone and participate in their own abuse.**

21

22            **1.    2020-22: John Doe 1's experience was typical.**

23   160.    John Doe 1 was a standout on his high school baseball team, was recruited by

24   many schools, and given offers by multiple schools, including Ivy League schools.

25

26   _____
     [44] https://www.si.com/college/2021/09/30/usf-mens-soccer-sexual-assault-and-harassment-
     reckoning-daily-cover (last accessed Aug. 30, 2023).

27   [45] *See, e.g.,* https://wesupportcoachg.com/ (last accessed Jan. 31, 2023).
     [46] *See, e.g.,* https://twitter.com/WeSupportCoachG;

28   https://www.facebook.com/WeSupportCoachG/ (last accessed Aug. 30, 2023).
     [47] https://www.youtube.com/watch?v=pamkxJfVzO4 (last accessed Aug. 30, 2023).

161.    Coach Naks scouted and met John Doe 1 at a 2019 tournament in Arizona while John Doe 1 was in his junior year of high school. Impressed by John Doe 1's play, Coach Naks invited him to an official visit at USF two weeks later, where John Doe 1 met the entire coaching staff.

162.    USF heavily recruited John Doe 1 based on his baseball skills and experience. The coaches sold John Doe 1 on representations that USF's Jesuit culture set the team apart from all others, all the teammates loved each other, and the coaches treated the players as "family." Coach Naks emphasized four core values, including trust and accountability. He said that John Doe 1 would be a "cornerstone" of the USF baseball team.

163.    USF offered John Doe 1 guaranteed four-year athletic and academic grants-in-aid (scholarships) of approximately $60,000 per year. On October 7, 2019, Coach Naks sent a letter to John Doe 1 along with his official offer. In the letter Coach Naks wrote, "I do not believe I mentioned to you that we are one of the few schools out there that offer 4-year guaranteed contracts. If you sign a National Letter of Intent with the [USF] Dons, your scholarship is guaranteed to you for the entire time you are on the Hilltop. It cannot be reduced for any reason, only increased. Like I mentioned, we have a tradition of reinvesting in our family for guys that take care of business on the field, in the classroom and protect the culture." This guarantee was dispositive in John Doe 1's decision to sign with USF.

164.    When John Doe 1 started at USF, he does not recall being advised or learning that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, seeing any such policies displayed on campus, being told about such policies at any orientation conducted for new students, or receiving a publication that contained such policies.

165.    When John Doe 1 started at USF, he does not recall being advised or learning of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus, seeing any such rules or procedures displayed on campus, being told about such rules or procedures at any orientation

1   conducted for new students, or receiving a publication that contained such rules or procedures.[48]

2   166.   Immediately upon joining the team, John Doe 1 was subjected to the intolerable

3   sexualized environment the Coach Defendants created and perpetuated. From the outset of John

4   Doe 1's freshman year, Coach Naks started practices or particular drills with a "café" exercise, in

5   which Coach Naks would identify a dinner theme (such as barbecue or fast food), then each

6   person (including both coaches and players) would identify what they would bring to the dinner

7   (such as a type of drink or food). When John Doe 1 tried to stick to appropriate answers (such as

8   milk or soda), he was laughed at by the Coach Defendants and others who were forced to join in

9   "game" by providing sexual responses.

10   167.   The Coach Defendants also put on "skits," during which John Doe 1 observed

11   other inappropriate sexual conduct. For example, Coach Naks would pretend he was at a buffet by

12   having a player do a handstand, grabbing that player's legs and splitting them open, then

13   pretending to eat spaghetti from that player's genital region. Many players would be visibly

14   disgusted and upset and would turn their heads away when Coach Naks performed this skit.

15   168.   John Doe 1 was appalled by this behavior.  During his freshman year, John Doe 1

16   discussed reporting the Coach Defendants' behavior to the school's Title IX office with several

17   older players. In late November 2021, eight players—including John Does 1, 2, and 3—decided

18   to express their discomfort with the Coach Defendants' inappropriate behavior. Wary of

19   retaliation, however, they attempted to do so in a way the Coach Defendants would find comical.

20   Thus, during one pre-workout skit, the players pretended to make a complaint about Coach Naks

21   to the Title IX office—the "Title IX Skit." Despite John Doe 1's attempt to avoid retaliation,

22   retaliation and emotional abuse against John Doe 1 began as soon as it became apparent to the

23   coaches that he would not play along with the sexually charged behavior on the field and/or that

24   John Doe 1 was discussing ways to get the behavior to stop.

25   169.   Though John Doe 1 injured his hand the fall of his freshman year, he was told to

26   _____

27   [48] It was not until his sophomore year, at the outset of the fall 2021 baseball season that members
of the USF baseball team were required to attend a multi-hour session with the Title IX officers at

28   the baseball field. However, neither Coach G nor Coach Naks attended.

continue playing. Eight days later, he injured his ACL and meniscus and underwent surgery to repair both injuries.

170.    When John Doe 1 returned following surgery, the coaches, including Coach G, would interfere with his doctor's orders and yell at him for either doing too much physical therapy or not the right kind of therapy. Despite his injury, John Doe 1 would show up to practice early and before anyone else—yet he was yelled at for being tardy. Coach G demanded that John Doe 1 practice 100% with the team even though John Doe 1's doctor prohibited that.

171.    The Coach Defendants regularly told John Doe 1 that he was not working hard enough and that would never be good enough. Coach Naks regularly berated John Doe 1 at practice and in his office.

172.    At the end of his freshman year, and after John Doe 1's parents learned of several of the above-described incidents, John Doe 1's mom left several voicemails for USF's AD at the time, Joan McDermott, which were not returned.

173.    Under the USF Nondiscrimination Based on Sex and Gender, Sexual Harassment, and Sexual Misconduct Policy ("Title IX Policy"), the AD is considered a "Mandatory Reporter" and should have immediately followed up with John Doe 1's mother and reported the substance of John Doe 1's complaints to USF's Title IX office.[49] The AD's failure to do so was, itself, a violation of USF's Title IX Policy.[50]

174.    Not only did the AD not report John Doe's mother's complaint, John Doe 1 believes the AD shared the complaint with Coach G and Coach Naks because the abuse then escalated throughout the summer of 2021.

175.    Specifically, during the summer between his freshman and sophomore year, Coach Naks called John Doe 1 multiple times and told him not to come back. Every time, John Doe 1 told Coach Naks he intended to return to school as he had a four-year scholarship and wanted to

---

[49] USF, Nondiscrimination Based on Sex and Gender, Sexual Harassment, and Sexual Misconduct for All Students, Employees, and Third-Parties, Title IX Policy 2 (effective Aug. 14, 2020), https://myusf.usfca.edu/sites/default/files/users/jvarga/Interim%20Policy%20and%20Procedures%2008.14.2020.pdf (last visited Aug. 30, 2023).
[50] *Id.* at 21.

honor his commitment to the team. In response, Coach Naks told him he was "the most irrational person he had ever met." Coach Naks also said, "The people here don't believe in you." Coach Naks told him he was "tearing up the fabric of the program and not protecting the culture." Coach Naks threatened, "I am going to make sure it is not an enjoyable experience for you." He would keep John Doe 1 on the phone for 30 minutes at a time, relentlessly threatening and berating him if he would not agree to transfer from USF. He also refused to allow John Doe 1 to discuss the matter with his parents, demanding an immediate answer.

176.   Coach G also called John Doe 1 several times that summer. He told John Doe 1 that he would never play at USF again, that he was "toxic" to the program, and that he might as well leave. Coach G called him a "fucking pussy," told him he was being "fucking selfish for keeping his scholarship," and that he was hurting the rest of the team by not agreeing "to give his scholarship to someone who would buy into the culture of the program."

177.   John Doe 1 did not want to leave USF. He liked his teammates, and if John Doe 1 chose to leave, he would lose his scholarship and valuable playing time under the NCAA's transfer rules. Staying and succeeding at USF both academically and on the baseball team was also important to John Doe 1 because he wanted to become the best possible player and aspired to play professional baseball.

178.   John Doe 1 returned for the fall season his sophomore year. Both Coach G and Coach Naks largely ignored John Doe 1 from a coaching perspective, refusing to help him. At the end of the fall season (and after the Title IX Skit described above), all the coaches held exit interviews with every player to discuss their futures.

179.   During John Doe 1's sophomore year, a teammate and friend reported to USF about the Coach Defendants' misconduct. Upon information and belief, it was to USF's Title IX office.

180.   At John Doe 1's exit interview, each coach told him that he should leave. Coach G told him that the relationship between the coaches and John Doe 1 had become "toxic." Coach G told him that he was being "very selfish" for staying at USF and not agreeing to enter the transfer portal and relinquish his scholarship. John Doe 1 insisted he was not going to leave.

181.   Shortly after the exit interview, the AD reached out to John Doe 1 and told him she understood he was going to enter the transfer portal to leave USF. John Doe 1 was surprised by the AD's call, given that he had not agreed to go into the portal nor to give up his scholarship.

182.   John Doe 1's mom spoke with the AD and reminded the AD that she had tried to contact her in the spring of 2021 about the problems her son was experiencing on the baseball team, but the AD had never responded.

183.   During one of the calls between John Doe 1's mom and the AD in December of 2021, the AD disclosed that the Title IX office had already been alerted to issues on the baseball team and that John Doe 1 would be contacted and interviewed as part of the investigation.

184.   After that call, John Doe 1 learned he was excluded from an upcoming team meeting where the AD shared the status of the investigation and suspension of the coaches with the other players.

185.   Three weeks later (in January 2022), neither John Doe 1 (nor many of the other players) had been contacted regarding the Title IX investigation. John Doe 1 contacted the AD to express concern that he had not yet been interviewed. He was only called for a cursory interview after his mom inquired with the AD herself.

186.   On January 11, 2022, USF issued the following statement to student-athletes via email:

> Dear Members of the USF Baseball Team,
>
> On Dec. 17, 2021, after receiving complaints from members of the USF community, USF baseball head coach Nino Giarratano and associate coach Troy Nakamura were suspended with pay, pending results of an internal investigation. Conducted by USFs Office of Human Resources, the investigation was focused on reports of incidents within the baseball program when the coaches [*sic*] language, behavior, and/or actions were inappropriate and did not reflect USFs mission and values.
>
> As a result of that investigation, Coach Nakamura is no longer associated with the USF baseball program, effective immediately. Coach Giarratano was officially reprimanded for inappropriate behavior related to the reported incidents.
>
> While the investigation did not find evidence of a widespread harmful culture within the baseball program, the reported incidents indicated that coaches showed poor judgment and lack of supervision. The university has taken immediate action to address

1    this. Procedures are being put in place to ensure baseball team
2    members are ensured a respectful, safe environment with proper
     oversight, direction, and mentoring by their coaches. The wellbeing
3    of all students at USF is our highest priority.

4    The Athletic Department and the university is grateful to members
     of the community who came forward with concerns, and provided
5    information. We are also grateful to the staff in Human Resources
     who conducted a thorough, swift and comprehensive investigation.

6    187.    In light of USF's attempt to close out these issues without acknowledging that

7    sexually abusive behavior was indeed widespread on the baseball team and that its investigation

8    was not thorough, it is unsurprising that USF's administration has continued to engage in

9    retaliation.

10    188.    For example, right after the above announcement, the AD contacted John Doe 1 to

11    inform him that while Coach Naks had been terminated, Coach G would stay on. She stated that

12    Coach G would be on a year-to-year contract and would not be allowed to travel or hold meetings

13    without an administrator present. John Doe 1 asked the AD how Coach G felt about John Doe 1

14    remaining on the team, and the AD said she would speak to Coach G and follow up with John

15    Doe 1 "in a couple of days."

16    189.    In the interim, USF posted a message on Instagram, congratulating John Doe 1 and

17    three other players for maintaining a 4.0 GPA in the fall semester. Just an hour later, the post was

18    taken down. On information and belief, it was taken down because Coach G continued his

19    campaign of retaliation and wanted to force John Doe 1 to leave USF by discrediting his

20    accomplishments and deflating his confidence.

21    190.    Given his anxiety about returning to USF's campus, John Doe 1 tried to register

22    for online classes for the spring 2021 semester but was unable to register for a full course load.

23    He signed up for class waitlists, emailed professors, and had multiple calls with his advisor, but

24    was still unable to register for enough classes. After additional complaints, USF finally helped

25    John Doe 1 by assigning him an academic success coach.

26    191.    After almost two weeks, John Doe 1 still had not heard back from the AD, so John

27    Doe 1 called her. The AD told John Doe 1 that Coach G did not want him to return to the team,

28    and that she was going to stand behind Coach G's decision that John Doe 1 should leave the team.

The AD thus adopted and furthered the abusive coach's retaliation against a student-athlete brave enough to call out the coaches for their illegal behavior.

192.    USF encouraged John Doe 1 to transfer by entering the transfer portal. However, in order to enter John Doe 1 into the transfer portal, USF gave John Doe 1 a document to sign that stated that by entering the transfer portal, USF would be entitled to revoke his scholarship. John Doe 1 refused to sign the document. Nevertheless, USF entered John Doe 1 into the transfer portal in January 2022. John Doe 1 finished the school year at USF remotely, and transferred to another school in the fall of 2022.

193.    Although John Doe 1 was and continues to be traumatized by his experience at USF, there is a reasonable likelihood that John Doe 1 would return to USF if USF implemented and enforced appropriate policies to ensure the abuse he endured would not occur again.

### 2.    2020-22: John Doe 2's experience was typical.

194.    USF heavily recruited John Doe 2 based on his baseball skills and experience. The coaches at USF portrayed the USF baseball team as a cohesive, caring culture where everyone cared about each other's successes and had each other's backs.

195.    John Doe 2 committed to play baseball at USF in his senior year of high school and signed a National Letter of Intent to attend USF. John Doe 2 was offered (and accepted) guaranteed four-year athletic and academic grants-in-aid (scholarships) in an amount of $75,000 per year to attend USF. John Doe 2 received the largest scholarship ever awarded by USF for an outfielder.

196.    When John Doe 2 started at USF, he does not recall being advised or learning that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, seeing any such policies displayed on campus, being told about such policies at any orientation conducted for new students, or receiving a publication that contained such policies.

197.    When John Doe 2 started at USF, he does not recall being advised or learning of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus, seeing any such rules or procedures displayed on campus, being told about such rules or procedures at any orientation

conducted for new students, or receiving a publication that contained such rules or procedures.[51]

198.     Immediately upon joining the team, John Doe 2 was subjected to the intolerable sexualized environment the Coach Defendants created and perpetuated. From the outset of John Doe 2's freshman year, Coach Naks started practices or particular drills with a "café" exercise, in which Coach Naks would identify a dinner theme (such as barbecue or fast food), then each person (including both coaches and players) would identify what they would bring to the dinner (such as a type of drink or food). The Coach Defendants also put on "skits," during which John Doe 2 observed other inappropriate sexual conduct. For example, Coach Naks would pretend he was at a buffet by having a player do a handstand, grabbing that player's legs and splitting them open, then pretending to eat spaghetti from that player's genital region.

199.     John Doe 2 was disgusted by this behavior.  In late November 2021, eight players—including John Does 1, 2, and 3—decided to express their discomfort with the Coach Defendants' inappropriate behavior. Wary of retaliation, however, they attempted to do so in a way the Coach Defendants would find comical. Thus, during one pre-workout skit, the players pretended to make a complaint about Coach Naks to the Title IX Office—the "Title IX Skit."

200.     Nevertheless, the retaliation and emotional abuse against John Doe 2 began as soon as it became apparent to the coaches that he would not play along with the sexually charged behavior on the field and/or that he and his teammates were discussing ways to stop the behavior.

201.     Throughout the fall of 2020, Coach G and Coach Naks did not provide John Doe 2 with opportunities to play, nor did they provide coaching direction. While Coach G texted John Doe 2 that he was doing great, those accolades did not transfer to opportunities to practice or playing time on the field.

202.     At the time, in the fall of 2020, John Doe 2 did not understand why he was not afforded playing time and practice opportunities. John Doe 2 had dreams of playing baseball professionally, and he wanted to do all that he could to better himself as a ball player and athlete

---

[51] It was not until his sophomore year, at the outset of the fall 2021 baseball season that members of the USF baseball team were required to attend a multi-hour session with the Title IX officers at the baseball field. However, neither Coach G nor Coach Naks attended.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

while at USF.

203.    During the spring of 2021, Coach Naks began verbally abusing John Doe 2. By way of example only, at an away game, Coach Naks screamed at John Doe 2, calling him a "fucking cunt" while they were in the dugout. Parents from the opposing team reported the event to several USF parents, and John Doe 2's parents learned about the shocking conduct. John Doe 2 was humiliated.

204.    In the spring of 2021, Coach G brought John Doe 2 in for an early exit interview. Coach G told John Doe 2 that he wanted him gone from the team because John Doe 2 was "too nice and too respectful," presumably for the intolerable sexualized environment the Coach Defendants had created. Coach G told John Doe 2 that he did not like him and that John Doe 2 did not have the type of personality Coach G wanted. Coach G tried to force John Doe 2 to verbally agree to leave the team and to give up his scholarship. John Doe 2 was stunned and upset. He was not prepared to leave the team or give up his scholarship, particularly without speaking with his parents.

205.    On May 30, 2021, John Doe 2's parents requested "an urgent in person meeting" with USF's AD. The subject line of the email stated, "URGENT MEETING REQUEST." The AD never responded to this email.

206.    Shortly after his early exit interview, John Doe 2 showed up to take the bus to an away game, but the team did not have him on the player list or assigned seating chart. John Doe 2 understood this was because Coach G was retaliating against him by trying to run him off the team.

207.    In the summer of 2021, Coach G repeatedly called John Doe 2, asking him if he was returning to the team. John Doe 2 told him he was. Coach G became very upset, telling John Doe 2 that he was making a terrible decision, that he did not belong at USF, and that he was going to be cut from the team as soon as he got back to campus.

208.    In the fall of 2021, Coach G largely ignored John Doe 2 when it came to providing coaching direction. John Doe 2 would ask Coach G what he could do to get more playing time and how he could improve. Coach G would respond that John Doe 2's playing ability was fine,

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

but that he just did not have room for him.

209.   Coach G and Coach Naks clearly communicated that they hated John Doe 2, that they wanted him to leave, and that they would not give him any coaching direction. John Doe 2 became extremely stressed. He was upset that no matter how hard he worked—and even though his playing ability was not in question—the coaches wanted him to leave. His grades suffered, and he began isolating himself. He felt degraded given that he had to suffer through the sexualized conduct and harassment at practice, with little to no coaching, and then be told his personality was the problem because he would not play along.

210.   John Doe 2 became physically ill from the stress, resulting in five emergency room visits during the fall of 2021; by the end of fall 2021, Coach G's campaign to force John Doe 2 of the team succeeded. John Doe 2 determined that his physical and mental health was suffering too much and advised USF that he intended to transfer and lose his scholarship.

211.   John Doe 2 spoke with both the AD and assistant AD regarding his reasons for leaving USF. During his call with the AD, the AD told John Doe 2 that she knew things were going on with the coaches on the team and implied that both Coach G and Coach Naks were going to be terminated.

212.   In December 2021, John Doe 2 learned of a Zoom meeting the AD was holding with the team that he had not been invited to. Like John Doe 1, he reached out to the AD seeking to be included.

213.   During this Zoom meeting, which was attended by over 40 people, the AD acknowledged how angry and distraught the team must be, and that she felt the same, alluding to Coach Naks' behavior and the complaints about him. She told the team that Coach G was a "great guy," that she and Coach G had been friends for years, and that they all would get through this together. She told the team that the events that had transpired were hard on her, too. She said she had hardly slept and she loves "those guys."

214.   John Doe 2 understood from the team meeting that the AD intended to protect Coach G, despite the fact that Coach G had normalized and participated in Coach Naks' sexual harassment. John Doe 2 was upset that the AD minimized the players' experiences, including the

1    inappropriate sexual conduct that created an intolerable sexualized environment and

2    psychological abuse in which Coach G had engaged.

3        215.    In 2022, John Doe 2 transferred from USF.

4        **3.    2021-22: John Doe 3's experience was typical.**

5        216.    John Doe 3 received approximately 10 offers, including from Ivy League schools

6    as well as USF, which heavily recruited John Doe 3 based on his baseball skills and experience.

7        217.    The coaches sold John Doe 3 on the USF baseball team through representations

8    that the baseball players were very close to each other, there was a family culture on the team,

9    John Doe 3 could leave a legacy on the program, and he would be the "foundation of the

10    program" for years to come.

11        218.    John Doe 3 committed to play baseball at USF in his junior year of high school

12    and signed a National Letter of Intent to attend USF. John Doe 3 was offered (and accepted)

13    guaranteed four-year athletic and academic grants-in-aid (scholarships) of more than $280,000.

14        219.    Afterwards, John Doe 3 was injured during his senior year of high school and

15    worked extensively with a physical therapist to be ready to play baseball for USF.

16        220.    The summer before John Doe 3 was to begin his fall semester at USF, John Doe 3

17    was invited to work out with Coach G on campus numerous times. During this time, several

18    coaches praised John Doe 3 and said they were excited to get him on campus.

19        221.    When John Doe 3 started at USF in the fall of 2021, he does not recall being

20    advised or learning that USF had policies governing or prohibiting sexual harassment or other

21    sexualized misconduct by coaches, seeing any such policies displayed on campus, being told

22    about such policies at any orientation conducted for new students, or receiving a publication that

23    contained such policies.

24        222.    When John Doe 3 started at USF, he does not recall being advised or learning of

25    any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or

26    for pursuing available remedies and resources, on or off campus, seeing any such rules or

27    procedures displayed on campus, being told about such rules or procedures at any orientation

28

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

1    conducted for new students, or receiving a publication that contained such rules or procedures.[52]

2         223.    When John Doe 3 started at USF, he was immediately subjected to the intolerable

3 sexualized environment the Coach Defendants created and perpetuated. From the outset of John

4 Doe 3's freshman year, Coach Naks started practices or particular drills with a "café" exercise, in

5 which Coach Naks would identify a dinner theme (such as barbecue or fast food), then each

6 person (including both coaches and players) would identify what they would bring to the dinner

7 (such as a type of drink or food). The Coach Defendants also put on "skits," during which John

8 Doe 1 observed other inappropriate sexual conduct. For example, Coach Naks would pretend he

9 was at a buffet by having a player do a handstand, grabbing that player's legs and splitting them

10 open, then pretending to eat spaghetti from that player's genital region.

11         224.    John Doe 3 was appalled by this conduct.  In late November 2021, eight players—

12 including John Does 1, 2, and 3—decided to express their discomfort with the Coach Defendants'

13 inappropriate behavior. Wary of retaliation, however, they attempted to do so in a way the Coach

14 Defendants would find comical. Thus, during one pre-workout skit, the players pretended to make

15 a complaint about Coach Naks to the Title IX Office—the "Title IX Skit."

16         225.    In fact, during the first week of school, a USF Title IX representative came to the

17 baseball field and spoke about the Title IX office and its role. The USF representative made it

18 clear it was because of the soccer team scandal. The Coach Defendants and other coaches were

19 not present at that meeting.

20         226.    Nevertheless, the retaliation and emotional abuse against John Doe 3 continued as

21 soon as it became apparent to the coaches that he would not play along with the sexually charged

22 behavior on the field and/or that he and his teammates were discussing ways to stop the behavior.

23 The Coach Defendants began constantly verbally abusing him for being injured and for having to

24 rehabilitate his arm. Coach G would yell "you pussy" at John Doe 3, and demand he throw the

25 ball harder or differently, causing John Doe 3's arm injury to worsen. John Doe's worsening

26

27 ───────────────
[52] During his freshman year, at the outset of the fall 2021 baseball season, members of the USF
baseball team were required to attend a multi-hour session with the Title IX officers at the
28 baseball field. However, neither Coach G nor Coach Naks attended.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

injury made him unable to throw at all for more than a month, spurring additional criticism from Coach G.

227.     Just three weeks into school, John Doe 3 asked Coach G for help. John Doe 3 wanted to become a standout player on the USF team, as he had aspirations of one day playing professional baseball. Coach G responded that it would be a waste of his time, pointless for him to help John Doe 3 out with coaching, that John Doe 3 was not and never would be one of his top five players, and so he refused to work with him.

228.     During practice, Coach G would verbally abuse John Doe 3 in front of the other players, threatening to hit him on the head with a baseball bat, and telling him he was the problem with the team. Despite the Coach Defendants' treatment, John Doe 3 strived to be successful. Every day from 7 a.m. to 6 p.m., John Doe 3 was either in class, on the baseball field, or in physical therapy. He showed up at practice, even when he could not participate in certain drills due to his injury.

229.     In a subsequent meeting in Coach G's office, Coach G called John Doe 3 a liar, when John Doe 3 told him that he had not been late for physical therapy. When John Doe 3 tried to defend himself, Coach G told him that none of his teammates or coaches liked him, that he was a waste of space, and that he was a problem for "everyone." Coach G told John Doe 3 to "get the fuck out" of the school because he did not belong there. Coach G also said that he wished he could take John Doe 3's scholarship away more than anything, and that he was the biggest mistake he had made in 22 years of coaching. Coach G called John Doe 3 a "pussy" repeatedly during this meeting.

230.     When John Doe 3 reinjured his arm soon thereafter, Coach G became angry and told John Doe 3 that there was "something seriously wrong" with John Doe 3's head.

231.     Because of his injury, Coach G told John Doe 3 not to do anything during practices, and sarcastically said that John Doe 3 could have fun and watch his teammates improve. At an away game, while John Doe 3 was observing his teammates practice, Coach G called John Doe 3 over and began yelling at him for not joining practice. When he responded that he (Coach G) told him not to do anything, Coach G responded, "Can't you even

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

think? I've never in my life had someone make me so angry every day. You can't go a day without pissing me off."

232.    No matter what John Doe 3 did, the coaches berated him. For example, for one game, the players were supposed to arrive at 8 a.m. John Doe 3 showed up at 7:53 a.m. and was the first to take batting practice. A little while later, Coach G made him leave the game because he "had arrived 10 minutes late" (which was obviously not true). Later in the game, Coach G badmouthed John Doe 3 to his teammates, asking, "Where's [John Doe 3]? He must be home taking a long nap since he's not here."

233.    The following Monday, the coaches sent John Doe 3 for a blood draw to test for drugs. John Doe 3 had not been taking drugs and understood that no other baseball player had been sent for drug testing, ever. John Doe 3 believed the Coach Defendants were singling him out for abuse to get him to leave the team, and of course, John Doe 3 tested negative for drugs.[53]

234.    John Doe 3 became increasingly anxious and depressed as the semester progressed. When not in class or at practice, he stayed in his room distressed. He could not sleep or eat and felt very anxious at practices, waiting to be singled out and abused, and hoping for the practices to end.

235.    John Doe 3 was retaliated against for not participating in the sexually charged behavior in which the coaches were engaged. Most times, when a sexual conversation was occurring, John Doe 3 would distance himself by walking or turning away.

236.    During the semester, John Doe 3 complained to the Director of Player Development, who is responsible for safeguarding players' mental health. He spoke with the director for a week about the abuse before he was sent to a USF sports therapist. That USF sports therapist told John Doe 3 that his experience and those events occurring with the team were normal, and that is how most coaches act.

237.    In advance of his exit interview after the season, the coaches told the players that they needed to fill out their personal evaluation forms in advance, but that they needed to be filled

---

[53] Notably, the NCAA Drug-Testing Program for 2020-2021 specifies urine collection, not blood draws.  *See* https://ncaaorg.s3.amazonaws.com/ssi/substance/2020-21SSI_DrugTestingProgramBooklet.pdf (last visited Aug. 30, 2023).

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

out in the way that the coaches wanted them to. If they did not, the players were told that their subsequent "conversation would not be pleasant and would involve a lot of yelling." Fearing further verbal abuse, John Doe 3 complied with Coach G's order to fill out the form as directed.

238. At John Doe 3's Fall 2021 season exit interview, the coaches told John Doe 3 that his scholarship was revoked and that he would not be at USF next semester. They demanded that John Doe 3 enter the transfer portal immediately and forced him to fill out another form stating that he (John Doe 3) was being cut from the team.

239. John Doe 3 left the meeting upset and confused. He had chosen USF because of the guaranteed four-year scholarship. He did not understand how the coaches could revoke it. So, he undertook his own research online and learned that the coaches had lied about their ability to revoke the scholarship and had tricked him into writing that he was leaving on the form.

240. John Doe 3 contacted the Associate AD. The Associate AD confirmed that the coaches could not take away his scholarship.

241. John Doe 3 then contacted Coach Naks and asked how his guaranteed scholarship could be taken away. Coach Naks told him to come by the office. Coach G told John Doe 3 at that meeting that he understood John Doe 3 wanted to leave. He asked: "Are you leaving?" When John Doe 3 said he did not know, Coach G looked surprised and told him there was no point in staying as he would never be part of the baseball team. Coach G demanded an immediate answer and would not allow John Doe 3 to discuss the matter with his parents.

242. John Doe 3 was then contacted by USF's NCAA representative, Jeremy Howell by phone, to discuss why he was leaving the team. At that meeting, John Doe 3 received confirmation that USF does not drug test its players and spoke about his plans if he left USF.

243. Following the meeting and phone calls, the Coach Defendants sent John Doe 3 text messages about other schools interested in him and with requests to return his equipment.

244. During winter break, John Doe 3 spoke with the AD, who told John Doe 3 that he could stay and finish the school year and that USF does not have pre-exit interview forms. The guaranteed scholarship was important to John Doe 3, and he did not want to relinquish it.

245. Nevertheless, in March of 2022, John Doe 3 entered the transfer portal because of

the abuse inflicted upon him by the Defendants. And even though the Coach Defendants did not

want him on the USF team, the Coach Defendants also did everything they could to blackball

John Doe 3 and ruin his efforts to play baseball at another school in retaliation. For example, John

Doe 3 had several positive conversations with the coach at Pepperdine, but after those first,

positive contacts, John Doe 3's calls to the coach went unreturned.

246.    John Doe 3 has transferred to another school.

### 4.    2017-18: John Doe 10's experience was typical.

247.    John Doe 10 was a talented baseball player in high school. In 2016, after his junior

year, he was named to the all-state baseball team by Cal-Hi Sports, a prestigious honor for a high

school baseball player. John Doe 10 graduated in 2017 and was drafted by a Major League

Baseball team, but decided to attend college before going to the major leagues.

248.    John Doe 10 knew it was important to pick the right college on his path to the

major leagues. His grandfather had been inducted into the Professional Baseball Scouts Hall of

Fame, and his father worked as a scout for over a decade for several Major League Baseball

organizations.

249.    John Doe 10 was heavily recruited but decided to attend USF based on Coach G's

representations that the team was a "family," that it was built on certain pillars of faith and

morals, and that Coach G cared about the players as people.

250.    John Doe 10 also established an excellent rapport with the pitching coach. Coach

G and the pitching coach convinced John Doe 10 that he was the future of the USF program.

251.    John Doe 10 received an athletic and academic grants-in-aid (scholarships) valued

at $200,000 guaranteed for four years to play baseball at USF and earned one of three coveted

starting weekend pitching spots as a freshman in 2018. He signed a National Letter of Intent.

252.    Neither when John Doe 10 started at USF nor at any time thereafter does he recall

being advised or learning that USF had policies governing or prohibiting sexual harassment or

other sexualized misconduct by coaches, seeing any such policies displayed on campus, being

told about such policies at any orientation conducted for new students, or receiving a publication

that contained such policies.

253.     Neither when John Doe 10 started at USF nor at any time thereafter does he recall being advised or learning of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus, seeing any such rules or procedures displayed on campus, being told about such rules or procedures at any orientation conducted for new students, or receiving a publication that contained such rules or procedures.

254.     Upon joining the USF baseball team, John Doe 10 was subjected to the intolerable sexualized environment the Coach Defendants created and perpetuated. For example, during practice for the pitchers, the coaches made them play a strip game they called "flinch or balk." Each pitcher would have to take off a layer of clothing during practice when they made an error. There were times when the players stripped down to their compression shorts, and the coaches and other players would laugh.

255.     The coaches would also make the players perform skits on the field during practice that were judged by Coach G. The coaches encouraged these skits to be sexual in nature. In one example, a group of players "dry hump[ed]" each other; Coach G pointed at them and yelled, "Winner!"

256.     Coach Naks would also talk about female athletes in a sexualized and offensive manner in front of the team. Coach G would talk with the players about the size or shape of individual players' penises.

257.     John Doe 10 was disgusted by the coaches' conduct, and recalls thinking, "What are we doing?" John Doe 10 therefore refused to condone this behavior, but was scared that the coaches would penalize him if he formally complained. So he remained on the team, but the Coach Defendants' ongoing sexual misconduct was so distracting that he struggled to consistently perform on the mound.

258.     John Doe 10 had also been diagnosed with ADHD, executive functioning disorder, and verbal dyslexia. During his first semester of his freshman year at USF, John Doe 10 struggled with the academic workload on top of the training schedule, and his learning disabilities contributed to his difficulties.

259.     During this time, his learning disabilities became known to the team, and John Doe 10's stress was exacerbated because Coach G and Coach Naks called him a loser, made fun of his learning disabilities, and told him that ADHD is not "real".

260.     The Coach Defendants retaliated against John Doe 10 for his refusal to condone and participate in the sexualized environment they had created. For example, during a February 20, 2018 meeting, John Doe 10 shared with Coach G that he was struggling and felt like he was blacking out on the mound. Rather than help John Doe 10, Coach G berated him, telling him he was "a piece of shit," "a fuck-wit-freshman," and "a nobody."

261.     Coach G told John Doe' 10, "your family isn't shit and you aren't shit," referring to John Doe 10's grandfather and father. Coach G said: "Suck my cock," adding, "You aren't a winner, you know nothing about winning, I know everything about winning, I'm a winner, you aren't close. You're lucky I even let you be a part of this program."

262.     During Coach G's tirade, John Doe 10 asked how Coach G could say these harsh things about him when had hadn't taken the time to get to know John Doe 10 or what he was dealing with on a day-to-day basis (including with respect to his ADHD, executive functioning disorder, and verbal dyslexia) over the last seven months. In response, Coach G told John Doe 10 to "shut the fuck up," and said: "ADHD is a hoax, and you just use it as an excuse when you fail."

263.     In another example, after a Saturday doubleheader, Coach G told John Doe 10 that he was a "fucking embarrassment" and a "fucking loser" in front of the team. John Doe 10 was so visibly upset that the pitching coach told him to come to his room after the game. There, while crying hysterically, John Doe 10 confided in the pitching coach about Coach G's abuse. The following Tuesday, Coach G yelled at John Doe 10 to stop talking to the pitching coach and said, "If you can't throw strikes, you might as well fucking kill yourself." The pitching coach was not the only staff member with whom John Doe 10 shared the abuse that Coach G inflicted.

264.     During one game, Coach G became so incensed at John Doe 10 that he physically abused John Doe 10, throwing him against the wall in the dugout.

265.     Coach G's abuse and retaliation of John Doe 10 extended beyond USF. In the summer of 2018, John Doe 10 was accepted to play with a collegiate summer baseball league

known for its association with top prospects and draftees to the MLB.

266.    At the end of the USF season, Coach G told John Doe 10 that he had notified the summer baseball league that he was withdrawing his referral. Coach G told John Doe 10 that there was "no way" John Doe 10 would be good enough to play in that league and that he wasn't "going to ruin [his] relationship with" the team.  This caused John Doe 10 to miss a once-in-a-lifetime opportunity that would have advanced his professional baseball career.

267.    John Doe 10 was devastated by the combination of psychological and physical abuse. He began to believe what the coaches said about him—that he was a loser, worthless, and a bad baseball player—and to hate himself. Because John Doe 10 was depressed, he began struggling to perform and as punishment, he was not allowed to travel and received minimal play time. When he did play, and Coach G began forcing John Doe 10 to throw only fastballs, preventing him from throwing other pitches. One time John Doe 10 attempted to "shake a pitch," which means to ignore the catcher's call for the next pitch and throw a different pitch; Coach G yelled at him, saying words to the effect that if John Doe 10 did that again, Coach G would throw him off the team.

268.    John Doe 10's parents were extremely worried about him. He would call them crying, and they were concerned he would harm himself. On one occasion, he was so upset that they stayed on the phone with him until he fell asleep. On numerous occasions, John Doe 10's father would make the nearly two-hour drive to San Francisco to check on him. He would sometimes stay into the early morning hours to console John Doe 10 and ensure he would not harm himself.

269.    By the end of the year, John Doe 10 and his parents agreed that John Doe 10 needed to leave in order to protect his mental health and get the coaching support he deserved. At the exit meeting at the end of the season, John Doe 10 asked for a release from the team because of the abuse.

270.    After leaving USF, John Doe 10 focused on his mental and physical health and was able to find his passion for baseball again. He played summer ball, while he sent text messages and emails, and made phone calls to dozens of colleges in an attempt to transfer. He

wrongly assumed that there would be the same interest in him as there was when he was recruited from high school, but that was not so. He only received a few walk-on offers. He discovered that Coach G was "blackballing" him when one DI coach told John Doe 10: "I like you, but I am friends with Nino [Giarratano], so I am not interested."

271. John Doe 10 decided to attend a DI school where he would have to pay his own tuition and sit out for one year due to the NCAA's transfer rules. Based on his new coach's statements, it was clear that Coach G had also tried to blackball John Doe 10 from this school.

272. John Doe 10 worked hard to recover from the abuse and setbacks USF inflicted and had a successful year at his new school and a promising summer in 2019 with his summer league team. However, because of the NCAA's transfer rule at that time, John Doe 10 had no body of work to show after his initial season at his new school. This changed his career trajectory for the MLB draft, as he was relegated to sign as an undrafted free agent by an MLB team and currently fights to be seen in the minor leagues.

### 5. 2017-18: John Doe 4's experience was typical.

273. Being offered a spot on the USF baseball team was a dream come true for John Doe 4. He was recruited his senior year of high school and had offers to play at many DI schools but was persuaded to attend USF because the Coach Defendants sold him on the school's Jesuit values and Coach G "rolled out the red carpet" during John Doe 4's visit to USF.

274. During this visit, Coach G showed John Doe 4 and his parents his house and spoke to them about the team being a "big family" in which everyone gets along. Coach G told them that if a player cannot "go home for a holiday, there's always a seat at the [Giarratano] dinner table." John Doe 4 signed a National Letter of Intent committing to play baseball as a freshman at USF in the fall of 2017.

275. Neither when John Doe 4 started at USF nor at any time thereafter does he recall being advised or learning that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, seeing any such policies displayed on campus, being told about such policies at any orientation conducted for new students, or receiving a publication that contained such policies.

276.     Neither when John Doe 4 started at USF nor at any time thereafter does he recall being advised or learning of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus, seeing any such rules or procedures displayed on campus, being told about such rules or procedures at any orientation conducted for new students, or receiving a publication that contained such rules or procedures.

277.     John Doe 4's dream quickly became a nightmare once John Doe 4 arrived on campus. The Coach Defendants were often nude around players and would shower with them. Though John Doe 4 thought this was very strange, he attempted to accept the behavior as it was portrayed as "normal" within the team culture. This also applied to Coach Naks' more frequent nudity, for which the players even had the expression: "If Coach Naks whips his dick out, you know he's in a good mood."

278.     John Doe 4 also recalls the Coach Defendants constantly talking with the players about the shape and size of the players' penises.

279.     John Doe 4 did not participate in the sexualized behaviors, and the Coach Defendants noticed. So, they constantly belittled him throughout the school year in an effort to force John Doe 4 off the team.

280.     For example, when John Doe 4 would make a mistake, Coach G would immediately berate him, saying, for example: "Hey, [John Doe 4], why don't you just try to do one thing right instead of everything wrong. You're such a stupid fucking idiot."

281.     While at bat during a scrimmage, John Doe 4 moved out of the way of a pitch. Coach G stopped the game and said, "You can't hit anyway so [getting hit by a pitch] might be your only shot to get on base. Toughen up and don't be a pussy." Later that day, with the entire team in the dugout, Coach G said, "[John Doe 4], you played like a scared bitch today. What happened? [Another teammate], too, you guys both looked like scared girls running the bases." While the team laughed, John Doe 4, mortified, was nearly brought to tears.

282.     One day Coach G said to the entire team, "Last night I laid in bed and thought to myself: Tomorrow I'm going to try and not be mean to [John Doe 4]. Then I thought, no, it's just

too easy to be mean to him, I don't know what it is about that guy but it's so easy to be mean to him."

283. During a rain delay affecting one game, a senior captain picked up and threw John Doe 4 on the field, then forced him to dance on the field in front of the entire USF team, the coaches, and the opposing team. Everyone, including the Coach Defendants, laughed. John Doe 4 was humiliated.

284. The incessant, degrading treatment and comments worked: after his freshman year, John Doe 4 was crushed. He lost all confidence, dreaded going to practice, and wanted off the team. He was severely depressed, could not complete his homework, and would call his mother every day in tears. His parents worried that he might harm himself.

285. John Doe 4 left USF after his freshman year, played baseball near his home for two years, then transferred to another DII university to continue playing baseball.

286. In 2019, John Doe 4 sought counseling to help overcome the trauma caused by Defendants' conduct.

### 6. 2017-18: John Doe 12's experience was typical.

287. Baseball meant everything to John Doe 12 as a child and young adult: he was the youngest of three brothers—all of whom played baseball—and began playing baseball at the age of three on a select team coached by his father. John Doe 12's childhood dream before starting at USF was to join a DI school and then play baseball professionally.

288. John Doe 12 was a gifted baseball player. In high school, he started varsity at shortstop all four years; played on three prestigious traveling teams; and led the state's batting statistics when he was a member of his home state's all-state team his junior and senior years.

289. Because of his baseball skills and experience, John Doe 12 was heavily recruited by over 40 college baseball programs, including 22 NCAA DI baseball programs and five Top 20 NCAA DI baseball programs.

290. John Doe 12 signed a National Letter of Intent after his junior year of high school committing to USF because USF offered him a 4-year guaranteed scholarship $256,000 after he was told that many other schools do not offer this kind of guarantee, which could not be taken

away from him. He was told this was an investment in him and his family. John Doe 12 also chose USF because he had been told that USF was recruiting him to be a starting player.

291.    Neither when John Doe 12 started at USF nor at any time thereafter does he recall being advised or learning that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, seeing any such policies displayed on campus, being told about such policies at any orientation conducted for new students, or receiving a publication that contained such policies.

292.    Neither when John Doe 12 started at USF nor at any time thereafter does he recall being advised or learning of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus, seeing any such rules or procedures displayed on campus, being told about such rules or procedures at any orientation conducted for new students, or receiving a publication that contained such rules or procedures.

293.    Once John Doe 12 joined the USF baseball team, he was immediately subjected to the intolerable sexualized environment the Coach Defendants had created. The Coach Defendants would often make comments about each other's penises, as well as those of the other players. For example, two minutes into John Doe 12's first practice with the USF team, Coach G asked John Doe 12 if he had "seen [Player Y's] piece yet." When John Doe 12 expressed confusion over what Coach G was referring to, Coach G said: "Ohhh, you'll see it soon, you better watch out." Upon information and John Doe 12's belief, Coach G had been referring to teammate Player Y's penis size.

294.    During John Doe 12's first month at USF, Coach G began talking about how small Coach Naks' penis is on the baseball mound at practice, noting that he could "barely see it." Coach G then imitated Coach Naks urinating by holding his penis with only his thumb and one finger to indicate how small it was. Coach Naks laughed and repeated the same imitation vis-à-vis Naks.

295.    After an away game at Oregon in 2018, the USF players showered in the Oregon visitors' locker room. The coaches showered with them. Coach G and Naks also waited in line to

shower, with towels on their shoulders and genitals uncovered. They both, without refrain, looked and commented on the players' private parts. Coach G would say things such as: "How's it hanging today?" "Is it a cold one today for you? "Oh come on, you don't even use that thing." "You need a lawn mower down there." Coach Naks also laughed and swung his penis around during that time.

296.    John Doe 12 was disgusted by this behavior and declined to participate. In response, the Coach Defendants immediately began abusing John Doe 12. Coach G constantly cursed at John Doe 12 and forced him to play even when he was injured or physically unwell. For example, within John Doe 12's first two weeks of practice as a freshman, John Doe 12 recalls Coach G telling John Doe 12 how much he sucked at fielding the baseball and that he was "the biggest pussy" he'd seen. Coach G told John Doe 12 that John Doe 12 "had no dick, so even if the ball did hit" him, "it wouldn't hurt" in response to John Doe 12 not fielding the ball the way Coach G wanted him to. At a practice later that fall, when John Doe 12 missed a ground ball considered unfieldable because it was hit so hard, Coach G stalked over to John Doe 12 at third base, and said, "You have no fucking balls. I have more balls than you and I have one fucking testicle, you pussy."

297.    Another incident took place in the spring of 2018 at a pre-game practice at Saint Mary's College of California ("St. Mary's"). In response to John Doe 12 missing a ground ball at third base, Coach G stopped the entire batting practice. In front of the USF baseball team, St. Mary's baseball team, and staff from both schools watching the practice, Coach G walked slowly over to John Doe 12 while cursing at him and stating: "How embarrassing is it that I have to come over here just to teach you how to field a fucking ground ball."

298.    Coach G came up behind John Doe 12, and grabbed him by the waist, which made John Doe 12 extremely uncomfortable, especially in light of the abusive environment he and other teammates had been subjected to all year. Coach G then patronizingly "taught" John Doe 12 how to field a ground ball as though John Doe 12 was a small child. This incident lasted for about 5-7 minutes, during which the St. Mary's team and staff, as well as USF's team and staff, watched and laughed at John Doe 12. After Coach G was done humiliating John Doe 12, he said,

"See now, you've ruined our whole entire batting practice, look what you did" and walked off.

299.    It was an exception for John Doe 12 to be able to leave a practice or game without getting railed against by the coaches. Statements such as "you fucking suck so much today," "you're a fucking terrible baseball player," and "you're a pussy" were common. The coaches made these statements to John Doe 12 regardless of whether John Doe 12 was performing well that day.

300.    Coach G would also pull John Doe 12 out of games or no apparent reason. For example, in the spring of 2018 at a game against Reno, Nevada, despite John Doe 12 executing two plays perfectly, Coach G called John Doe 12 over, questioned how he could have put John Doe 12 in a game if John Doe 12 was "such an incompetent pussy," and pulled him out of the game.

301.    Additionally, despite the fact that in the spring of 2018, John Doe was batting .400 after the first five games, the second best average on the team at the time, Coach G benched him for the next 15 games with no explanation.

302.    Instead, Coach G put a fifth-year senior second baseman in who had never batted over .250. Upon information and John Doe 12's belief, Coach G played that second baseman because he had a better relationship with that second baseman than he did with John Doe 12. That second baseman batted below .200 during those 15 games John Doe 12 was benched.

303.    The night before another practice John Doe 12's freshman year, John Doe 12 came down with food poisoning. Despite the fact that he told Coach Naks that he had vomited many times the night before and could not practice, Coach Naks called John Doe 12 a "completely ball-less pussy" and said that if John Doe 12 did not practice, he would be "looked at like a pussy by everyone, especially Coach G." Because of Coach Naks' statements to John Doe 12, John Doe 12 felt the need to try to practice; John Doe 12 threw up for hours after practice and ultimately lost eight pounds in 48 hours.

304.    At a practice game towards the end of John Doe 12's freshman year, after John Doe 12 broke this throwing hand thumb, Coach G called John Doe 12 a "big pussy" and forced him to continue throwing because John Doe 12 "needed to get better" according to Coach G.

305.    The incident with his throwing hand thumb catalyzed John Doe 12's decision to quit the USF baseball team. John Doe 12 attended his exit interview at the end of his freshman year and told Coach G that he felt Coach G had treated him poorly and did not like how Coach G stripped John Doe 12 of his "confidence and dignity all-year long."

306.    In response, Coach G aggressively came at John Doe 12 and began yelling at him in a manner that made John Doe 12 fear harm from Coach G. Coach G told John Doe 12 that he had never been "worthy" of his USF scholarship and had to give it back, and that he needed to leave because there was no place left for John Doe 12 at USF; John Doe 12, did not fit into USF's baseball program. Coach G also told John Doe 12 that he did not deserve to play at USF and called John Doe 12 "stupid" and "incapable."

307.    That meeting made John Doe 12 feel unwanted, and as though he had no choice but to relinquish his scholarship and leave USF. At the time of his exit interview, John Doe 12 was not comfortable openly discussing the sexual abuse he had been subjected to given the extreme retaliation to which he was subjected. The retaliation occurred in front of other non-defendant coaches and USF officials and no one protected him. Thus, he understood that USF condoned this behavior as the norm.

308.    Because of the Coach Defendants' abuse, John Doe 12's father flew across state lines to USF 16 times over the course of John Doe 12's freshman year to provide his son emotional support out of concern for how isolating the Coach Defendants' abuse was for John Doe 12 and fear that his son would harm himself.

309.    Because of the NCAA's rules, once John Doe 12 quit the USF baseball team, he had to go back to a junior college for a year. After that year, he then went back to a DI school—this time without any financial assistance—and continued to play baseball.

310.    It was only in 2019, after John Doe 12 experienced the abuse-free environments at his junior college and new DI school, that he understood that the Coach Defendants' behavior was egregious and abusive.

311.    John Doe 12 stopped playing baseball in June 2021, and then finished his last semester at his new DI school.

312.    Because of the Coach Defendants' abuse, John Doe 12 ultimately gave up his lifelong dream to play professional baseball and now plans to attend law school. John Doe 12 felt the Coach Defendants' emotional and sexual abuse wore him down to the point where he "could no longer become what [he] wanted to be." John Doe 12 has not yet recovered from the trauma to which the Coach Defendants subjected him and still experiences the anxiety and depression he began feeling his freshman year at USF.

### 7.    2016-18: John Doe 13's experience was typical.

313.    In high school, John Doe 13 was heavily recruited by other DI universities, including USF, because of his baseball skills and experience. Coach Naks, who was an alumnus of John Doe 13's high school, sought out John Doe 13, boasted of USF's Jesuit core-family values, and indicated that the USF baseball team was a close-knit community. John Doe 13 was told that he would be invited to family, holiday dinners and treated as a part of one, big family.

314.    John Doe 13 was offered (and accepted) a renewable annual athletic and academic grants-in-aid (scholarships) of 60%, and he signed a National Letter of Intent committing to USF.

315.    Neither when John Doe 13 started at USF nor at any time thereafter does he recall being advised or learning that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, seeing any such policies displayed on campus, being told about such policies at any orientation conducted for new students, or receiving a publication that contained such policies.

316.    Neither when John Doe 13 started at USF nor at any time thereafter does he recall being advised or learning of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus, seeing any such rules or procedures displayed on campus, being told about such rules or procedures at any orientation conducted for new students, or receiving a publication that contained such rules or procedures.

317.    Once he arrived on campus, John Doe 13 was subject to "culture shock" because Coach Naks was the ringleader of non-stop sexualized misconduct and Coach G the cheerleader who egged him on. Practices included sexualized skits several times per week, and everyone vied

for Coach G to pick them as a winner to be part of the "in" crowd (i.e., in the Coaches' favor). If a player did not participate, he became part of the "out crowd" (i.e., subject to hazing and retaliation by Coach Defendants). Skits were held at the beginning of practice for the position players (non-pitchers), who Coach G and Coach Naks were in charge of, and participation was mandatory.

318.    The sexualized environment was not only limited to skits, but also included vile commentary. For example, during practices Coach Naks would talk about the co-eds on campus, saying things such as, "Did you see that girl, she has big breasts and a big butt, and if I lived in the dorms, I'd hit that." Coach G would hear such comments and egg Coach Naks on.

319.    During this time, the Coach Defendants exceeded the NCAA's practice limits every week. There were rumors that the team's coaches had been disciplined for exceeding practice hours, and it was understood by the players that if anyone claimed the team practiced more time than allowed, that player would be cut from the team.

320.    During practices, the freshmen players were required to "cross-dress" in sexualized manners, rolling up their pants to look like panties and twisting their shirts to look like bras. There were games where they were required to take off items of clothing. Anyone who did not wholeheartedly participate in these sexualized activities was ostracized.

321.    Those who were ostracized for not participating in the sexualized atmosphere like John Doe 13 were subject to verbal abuse, harassment, and ridicule. At least once a week, Coach G would tell John Doe 13 things such as, "You can take your fat ass in a canoe and paddle back to Hawaii."

322.    During John Doe 13's Rookie Show, one skit involved a player being naked on a table and another player "playing" him like air drums. John Doe 13 was revolted.

323.    Throughout the team's hazing week—which was the same week as winter final exams—the upper-class players hosted hazing events at each of their apartments for five consecutive nights. At those hazing events, freshmen were forced to drink until they almost passed out. One night all the freshmen players had to strip down naked in a dark living room. Another night involved one shot of red wine every minute for one hour straight. On another night,

1  freshmen players were required to take a shot every couple steps until they finished climbing a

2  flight of stairs at an upper-class player's apartment.

3      324.    An incident that haunts John Doe 13 to this day involved hazing at Coach G's

4  home at a Christmas Party in 2016. As a freshman, John Doe 13 knew that, as part of the Coach-

5  sanctioned hazing of freshman, he could be called out by the upperclassmen at any time during

6  finals to drink alcohol or perform 25 inappropriate (and typically sexual) tasks on a scavenger

7  hunt. At Coach G's party, John Doe 13 was told to spank the female school nutritionist to avoid

8  doing the scavenger hunt tasks, and so he placed his hand on the nutritionist's lower back towards

9  her buttocks. The nutritionist was mortified and demanded to know in front of those assembled

10  who put him up to it.

11      325.    The next day, Coach G called John Doe 13 into his office. Coach G told John Doe

12  13 in words or substance that John Doe 13 should accept full responsibility for the incident and

13  not reveal that it was a part of freshmen hazing. He made it clear that John Doe 13 should not

14  implicate the team in any way.

15      326.    The incident became known to USF's administration and Athletics Department at

16  least as early as when USF's NCAA liaison interviewed John Doe 13 in connection with this

17  incident and, based upon information and belief, a Title IX investigation was initiated.

18      327.    To this day, John Doe 13 is highly ashamed of his role in the incident, and is

19  mortified that he was living in an environment that led him to believe that that slapping a woman

20  at a party was a required part of team building in a coach's home.

21      328.    Coach G's son was a member of the team during John Doe 13's time at USF. He

22  witnessed errors recorded for Coach G's son during games removed from the box score online

23  that night.

24      329.    John Doe 13's freshman year was so intolerable that he began looking into

25  transferring out of USF; however, John Doe 13 knew that if any prospective new school coach

26  called Coach G or Coach Naks to inquire about John Doe 13's baseball abilities, the Coach

27  Defendants would blackball him.  So, John Doe 13 stayed at USF for an additional year and

28  continued to be subjected to the same sexualized misconduct by the Coach Defendants during that

time.

330.    The Coach Defendants' conduct destroyed John Doe 13's love of the game and effectively caused him to leave the team and USF after his sophomore year.

**8.      2015-16: John Doe 14's experience was typical.**

331.    John Doe 14 was recruited by a number of DI schools, including USF. John Doe 14 was swayed by Coach Naks' messaging that the baseball team was a family and team members come back for alumni events. Coach Naks said that he would always be there for John Doe 14 if he needed anything.

332.    Even though USF was interested in John Doe 14, the school did not immediately have scholarship money available for him. He was invited to be a select walk-on transfer to USF during his junior year, and was told he would be able to earn a scholarship at USF with his 4.0 GPA.

333.    Based on these promises, John Doe 14 forewent other offers, attended a junior college for two years and signed a National Letter of Intent. He transferred to USF in the fall of 2015. Because of the Coach Defendants' conduct, however, John Doe 14 did not even complete one academic year at USF.

334.    Neither when John Doe 14 started at USF nor at any time thereafter does he recall being advised or learning that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, seeing any such policies displayed on campus, being told about such policies at any orientation conducted for new students, or receiving a publication that contained such policies.

335.    Neither when John Doe 14 started at USF nor at any time thereafter does he recall being advised or learning of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus, seeing any such rules or procedures displayed on campus, being told about such rules or procedures at any orientation conducted for new students, or receiving a publication that contained such rules or procedures.

336.    Upon arriving at USF, John Doe 14 experienced "immediate culture shock."

Players who did not buy in to the sexualized environment were name-called and singled out as lazy. John Doe 14 was constantly called "a pussy" and told that he was not working hard enough, all because he did not engage in the sexual antics.

337.    It was not unusual for Coach Naks to shower with the players–it was a weekly occurrence. And in the locker room, a host of demeaning sexual words, including "pussy" and "faggot," were always coming out of Coach Naks' mouth.

338.    At the time, the USF baseball field was under construction and John Doe 14 would have to ride in Coach Naks' van to the practice field. When they would pass a co-ed, Coach Naks would make sexual comments about the girl and what he would like to do with her. Such commentary by Coach Naks was non-stop. Coach Naks even made sexualized comments about John Doe 14's girlfriend, making John Doe 14 extremely uncomfortable.

339.    During his time at USF, John Doe 14 would hear players on the team discuss that Coach G's son was always starting in games despite what everyone noted was mediocre performance on the field. And while John Doe 14 never saw the stats, the rumor was that Coach G was altering his son's stats to inflate his abilities.

340.    John Doe 14 was also randomly drug tested twice and was told he was being tested at the NCAA's request. Both tests occurred at 5:00 a.m. on a Sunday. There were only two or three other players who were also drug tested with him, and none of them starting players. John Doe 14 believes that he was drug tested so that if the tests were positive (they were not), the Coach Defendants could have a pretext to kick him off the team mid-season.

341.    In the spring, and despite promises of a spot on the team and scholarship money, John Doe 14 was run off the team. At the time, he did not understand why he was run off the team, because his batting average was better than two of his fellow outfielders who were not cut. It was not until learning of this lawsuit that John Doe 14 realized that he was cut in retaliation for not partaking in, or condoning, the sexual antics of the Coach Defendants.

342.    John Doe 14 decided to leave USF but was unable to transfer to another DI school, as that was prohibited. He knew he could not transfer to another DII school or to the National Association of Intercollegiate Athletics (NAIA) because both needed the coach's release, and he

knew that Coach G would never release him, destroying any prospect that John Doe 14 had to play baseball at another school.

343.    John Doe 14 never received any promised scholarship money from USF, and after transferring, had to take out loans to finish his college education. He never had an opportunity to further pursue his career in baseball.

### 9.    2011-14: John Doe 5's experience was typical.

344.    John Doe 5 received numerous offers, including from USF, which heavily recruited John Doe 5 based on his baseball skills and experience. The Coach Defendants sold John Doe 5 on the USF baseball team through representations that the baseball players were very close to each other, there was a family culture on the team, and John Doe 5 would be an important member of the team.

345.    John Doe 5 was offered renewable annual athletic and academic grants-in-aid (scholarships), starting at 25% his freshman year which increased over time to nearly 100% based on his performance. He accepted the offer and signed a National Letter of Intent. In 2013, he received the Con Dempsey Jr. Award,[54] named for a former USF baseball player who played in the MLB in the 1950s. The award is given every year to the USF baseball player "who comes on late in the season to make a significant impact."[55] Although John Doe 5's scholarship amount increased over the years, the Coach Defendants treated him worse each year.

346.    Neither when John Doe 5 started at USF nor at any time thereafter does he recall being advised or learning that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, seeing any such policies displayed on campus, being told about such policies at any orientation conducted for new students, or receiving a publication that contained such policies.

347.    Neither when John Doe 5 started at USF nor at any time thereafter does he recall being advised or learning of any rules or procedures for reporting charges of sexual harassment or

---

[54] The award is named after a former USF baseball player who played in the MLB in the 1950s.
[55] SF Baseball, *BASE: Dons Hand Out Annual End-of-Year Awards* (May 20, 2019), https://usfdons.com/news/2019/5/20/baseball-base-dons-hand-out-annual-end-of-year-awards (last visited Aug. 30, 2023).

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

1  misconduct by coaches or for pursuing available remedies and resources, on or off campus,

2  seeing any such rules or procedures displayed on campus, being told about such rules or

3  procedures at any orientation conducted for new students, or receiving a publication that

4  contained such rules or procedures.

5        348.  Upon joining the USF baseball team, John Doe 5 soon learned that there was no

6  family culture and that a player's staying power on the team was dependent on participating in the

7  coaches' sexualized environment. For example, in November 2011, Coach Naks emailed John

8  Doe 5 a visualization technique that was supposed to "free you up to attack like a rabid, horny

9  Rottweiler."

10        349.  On multiple occasions, John Doe 5 witnessed Coach Naks exposing himself as a

11  joke in front of players, which was accepted as a normal part of team culture. Coach Naks also

12  frequently asked John Doe 5 and other teammates sexual questions about women. This made John

13  Doe 5, a gay man not yet out, incredibly uncomfortable. Further, John Doe 5's lack of responses

14  often resulted in his teammates ridiculing him and invasively questioning his sexuality.

15        350.  On another occasion, a pitching coach (now head coach at another university)

16  exposed himself in front of the team to pee on a scouting report of USF players to demonstrate

17  that the opinions of other teams in those scouting reports did not matter to him.

18        351.  The Coach Defendants and several teammates who knew John Doe 5 is gay would

19  also single him out because of his sexuality and make him feel unsafe. For instance, each year,

20  the Coach Defendants organized a "Rookie Show" and encouraged players to provide sexualized

21  entertainment. During John Doe 5's freshman year, two players performed a skit depicting John

22  Doe 5 and the only other gay teammate (also not out at the time) biking to Whole Foods and

23  having anal sex. The coaches laughed at this skit.

24        352.  The Coach Defendants were aware that one of the baseball players who acted in

25  the above skit punched a gay student and physically threw him out of a USF baseball party

26  because there were no "faggots" allowed at the party. Following that incident, the Coach

27  Defendants called a player meeting—from which John Doe 5 was excluded—during which they

28  told the players to "sweep it under the rug."

353.     John Doe 5 heard about the assault from other players and was very upset that Coach G condoned the incident by covering it up. In fact, Coach G went out of his way to cater to this player, who became a first-round MLB draft pick.

354.     Coach G and John Doe 5's teammates also often made jokes about John Doe 5 and his straight roommate dating.

355.     Because John Doe 5 saw that no one was punished after these events, John Doe 5 no longer felt safe. As a result, he began volunteering less for optional team activities, which Coach G seized on to vocalize John Doe 5's lack of commitment to the entire team on multiple occasions. For example, Coach G selected John Doe 5 to host the sexualized Rookie Show his sophomore year, but John Doe 5 declined. Coach G became irate, belittling John Doe 5 for not being a good teammate.

356.     Coach G also isolated John Doe 5 during multiple one-on-one meetings in which he told John Doe 5 that he had mental issues and needed to see a sports psychologist provided to him by USF. Despite revealing what had occurred to the USF psychologist, the psychologist never offered John Doe 5 any resources.

357.     Indeed, John Doe 5 does not remember being informed of any sexual harassment, sexual orientation, or discrimination policies implemented at USF or receiving any training about them.

358.     During batting practice freshman year, John Doe 5 was joking around with a few of his teammates while another player took batting practice from one of the other coaches in the team's batting cage. When it was John Doe 5's turn, a coach threw a hard and fast pitch at John Doe 5's face, striking him in the neck. He then called John Doe 5 a "pussy" and said that he deserved the hit for joking around.

359.     The NCAA sanctioned Coach G and USF for using too much off-season practice time during John Doe 5's tenure at USF.[56] In response to the sanctions, USF staff replaced

---

[56] Though not the subject of this litigation, John Does 4 and 12 recall that during one of their first practices in 2017, the coaches made all players pre-sign their weekly NCAA practice hour logs

practices with additional workouts and "non-team practices" that were ostensibly optional. However, players including John Doe 5, felt forced to go to them to avoid Coach G's retaliation for not attending. These additional unconventional practices, which included long marches and hikes, caused John Doe 5 to develop a wear and tear injury in his hip.

360.    Following his injury, USF coaching staff intimidated John Doe 5 into having hip surgery so that he could get back onto the field as soon as possible. The coaches then forced John Doe 5 to play summer baseball before recovering from the surgery. This injury, which included torn cartilage, a torn hip flexor, and hip damage, has caused life-long problems for John Doe 5.

361.    John Doe 5 did not feel comfortable talking with the AD because the AD, as it is now widely known, was already covering up a major sexual abuse scandal relating to the men's soccer team. Coach G knew this and used this information against the team to make them feel unsafe and unsupported.

362.    After one game where John Doe 5 and the only other gay player on the team played poorly, Coach G told the team that "they played like a bunch of faggots" and challenged them to tell the AD if they had a problem with how Coach G was speaking to the players, while looking directly at John Doe 5. After this game, Coach G had a meeting with both John Doe 5 and the other gay player and told them he only had room for one of them on the team—even though they played different positions and were both starters. John Doe 5 thinks Coach G said this because both players were gay, making John Doe 5 feel even more isolated and threatened. Moreover, Coach G was retaliating against the players by intimidating them so that they would not file a complaint.

363.    During the spring of his junior year, John Doe 5 was batting over .300 in conference play during his first season back since his hip surgery. Despite performing well, he started to notice that (along with the consistent verbal abuse from Coach G) Coach G was now starting to regularly bench John Doe 5 in front of the team during the 7th or 8th inning of games

for the entire semester. Though the coaches explained they did this to avoid forgetting to turn any logs in, John Does 4 and 10 later learned that the coaches did this because they made the players practice more hours each week than allowed by the NCAA. USF's conduct demonstrates its knowing flouting of its duties and the rules.

whose outcomes were already determined to demoralize John Doe 5 and single him out because of his sexuality. However, because Coach G was not willing to risk losing a game by replacing John Doe 5, he did not do this during close or important games.

364.   John Doe 5 continued to try to ignore these events and Coach G used John Doe 5's lack of reaction to point out to the team how little John Doe 5 cared, furthering his argument that John Doe 5 was "toxic" and a "cancer" to the team as a whole.

365.   The Coach Defendants' jokes about John Doe 5's sexuality, sexually inappropriate actions, mentally and physically abusive behavior towards the team, and verbal and physical assaults of gay players in particular made John Doe 5 feel so extremely unsafe, he felt forced to quietly quit the program at the end of the spring 2014 season. During his time on the team, John Doe 5 became depressed and suicidal and witnessed other players become depressed and suicidal.

366.   Many teammates did not understand why John Doe 5 had left the team, and Coach G used this as further proof that John Doe 5 was not committed to the team and that Coach G had effectively excised a "cancer" from the team.

367.   John Doe 5's academic advisor was Coach G's wife, Brenda Giarratano. She used her advisory time with John Doe 5 to question what was going on with his relationship with Coach G and why it was bad. After she learned that John Doe 5 was refusing to condone Coach G's sexually abusive environment—including by deciding to leave the team—she, too, began retaliating against John Doe 5.

368.   After John Doe 5 quit the team, he applied to graduate early using college credits he accumulated during high school through the "Running Start" program, which allowed him to take college courses at Washington community and technical colleges. Though these records were provided to USF when John Doe 5 was admitted and used to place him in certain USF classes, when John Doe 5 applied to graduate early, Coach G's wife claimed that she could not locate John Doe 5's transcripts.

369.   Upon information and belief, Coach G's wife used her power as a USF staff member with access to John Doe 5's academic records to try and prevent him from applying for and receiving early graduation as a punishment for perceived wrongs against her husband and the

1  USF baseball program. Coach G and his family used their power to manipulate and punish USF

2  players who they did not like and were willing to go to great lengths to assert their authority.

3  370.   Prior to USF, John Doe 5 had aspirations of playing MLB, and his performance

4  during his college career certainly pointed in the direction of him being selected in the MLB draft,

5  but Coach G told John Doe 5 that he had informed scouts that John Doe 5 had no interest in

6  playing professionally, and that he didn't really care about baseball in general.

7  371.   Coach G systematically destroyed John Doe 5's love for the game and destroyed

8  any professional prospects John Doe 5 had, thus ensuring that John Doe 5 would never play

9  baseball again.

10  372.   John Doe 5 had planned to get his MBA from USF while on scholarship but lost

11  his scholarship when he was forced to quit the program because of concerns for his personal

12  safety. As a result, he had to pay out of pocket to continue his education.

13  373.   Since 2012, John Doe 5 has suffered from recurring nightmares about USF

14  baseball, frequent anxiety attacks, and bouts of depression affecting his personal and professional

15  relationships, as well as his ability to stay employed. He feels unable to rekindle previously

16  significant friendships with many of his teammates who continued to play after John Doe 5 left

17  USF. He was made to feel as though he was a pariah and would not be welcomed back because

18  he was told that the way he left the program was disgraceful and harmful to the team.

19  374.   In early December of 2021, John Doe 5 finally felt he had the capacity to begin to

20  address his mental health and began discussing his experience at USF with some of his former

21  teammates.

22  375.   In December of 2021, John Doe 5 also reached out to Coach G on LinkedIn and

23  asked him to catch up. That same day, over the phone, John Doe 5 explained to Coach G how the

24  incidents of abuse and the intolerable sexualized environment he experienced on the baseball

25  team made him feel at the time, and how they continue to affect him to this day. John Doe 5

26  mentioned Coach G saying the team "played like faggots," and his teammate's assault of the gay

27  student at the USF baseball party as examples.

28  376.   When John Doe 5 expressed to Coach G that Coach G's failure to punish the

player who had assaulted the gay student was upsetting and contributed to his feeling that he was not safe on the team, Coach G said he could not apologize for other people's actions. Coach G's lack of remorse shocked John Doe 5.

377.    After this conversation, John Doe 5 learned of Coach G's suspension and Coach Naks' termination and realized that there were other instances of the Coach Defendants' abuse he had not known about.

378.    Learning that Coach G would not be fired because USF took the positions that only Coach Naks was a problem and that there was no proof of a problematic culture on the baseball team was incredibly upsetting for John Doe 5, because he knew both Coach Naks and Coach G created and fostered the pervasive abuse Plaintiffs suffered.

379.    On Friday, March 11, 2022, when John Doe 5 read the filed Complaint brought against Defendants, he suffered a panic attack because of the trauma he endured at the hands of the Coach Defendants.

### 10.    2012-14: John Doe 6's experience was typical.

380.    John Doe 6 was recruited by USF as a sophomore during high school based on his baseball skills and experience. John Doe 6 backed out of an offer he had from another DIII school, and instead went to a community college for his freshman year pursuant to an agreement with USF to accept him afterwards. John Doe 6 picked USF because he was told that the "culture" on the baseball team was such that the team is very close and supportive of each other so that each member becomes the best player that he can.

381.    After that one year, during which he was awarded Junior College All American, he transferred to USF for his sophomore year in the fall of 2012 and accepted USF's offer of annual renewable athletic and academic grants-in-aid (scholarships) of 35%. John Doe 6 signed a National Letter of Intent.

382.    Neither when John Doe 6 started at USF nor at any time thereafter does he recall being advised or learning that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, seeing any such policies displayed on campus, being told about such policies at any orientation conducted for new students, or receiving a publication

1  that contained such policies.

2      383.  Neither when John Doe 6 started at USF nor at any time thereafter does he recall

3  being advised or learning of any rules or procedures for reporting charges of sexual harassment or

4  misconduct by coaches or for pursuing available remedies and resources, on or off campus,

5  seeing any such rules or procedures displayed on campus, being told about such rules or

6  procedures at any orientation conducted for new students, or receiving a publication that

7  contained such rules or procedures.

8      384.  When John Doe 6 arrived on USF's campus, there were many sexualized events

9  constituting part of the team's culture. For example, Coach Naks sometimes showered at the same

10  time the players did. One time, John Doe 6 recalls seeing Coach Naks crawling on the field

11  naked, which he found extremely bizarre.

12      385.  Coach Naks also spoke about trying to get the female students in the overlooking

13  dorm rooms to flash their breasts.

14      386.  And although, as a pitcher, he was not required to participate in the skits, John Doe

15  6 would often see Coach Naks performing skits and Coach G grinning. Coach Naks was often

16  grunting and making animal sounds. Coach Naks would sometimes hold a bat between his legs

17  like it was a penis.

18      387.  John Doe 6 thought it was highly inappropriate and declined to participate in this

19  misconduct. But he felt he could not formally speak up about this misconduct, because this

20  behavior appeared "normal" to other non-defendant coaches and USF staff.

21      388.  John Doe 6 played baseball at USF for two years. His first year, he spent under the

22  supervision and protection of the pitching coach, who never endorsed the Coach Defendants'

23  sexual abuse. However, after the pitching coach left following John Doe 6's first year, John Doe 6

24  had a drastically different experience in his second (junior) year because he was now subject to

25  abuse, harassment, and retaliation for refusing to condone the Coach Defendants' sexualized

26  misconduct. For example, Coach G often called John Doe 6 a "pussy." Coach G would also say

27  that the pitchers were throwing "like a bunch of pussies."

28      389.  The fall of 2013 saw a large incoming freshman class on the baseball team, and

one of the freshmen was Coach G's son. John Doe 6 and other players believe the Coach Defendants began to take steps to force the current players off the team to make space for the freshmen.

390.    For example, although John Doe 6 had a stress fracture in his back from his youth that the coaches and trainers knew about, the coaches and trainers demanded he do strength-building exercises incompatible with his injury. Not wanting to contradict the authority figures he trusted, John Doe 6 followed USF staff's exercise protocol. One day while doing the exercises, he heard a pop in his back, felt a tingling sensation in his legs, and fell over. An MRI revealed a slipped disk and a herniated disk. Even though his injury was documented by an MRI, John Doe 6 had to convince the Coach Defendants that he was indeed injured.

391.    John Doe 6 worked hard at rehabilitating his injury in the off-season and was cleared to start the 2014 season in the spring. Even though he had not pitched much, he was brought in to pitch in the second game of the season and, unsurprisingly, did not perform well. Coach G walked out on the mound and said, "Get off my fucking mound; you're a piece of shit and an embarrassment to the program."

392.    The next time John Doe 6 pitched, he performed very well, evidenced by a scoreless inning. Despite this, Coach G later called him into his office and said, "Unless anything drastic changes, we're going to go in another direction next year. We don't think your heart is in it. You don't have the ability to play on this team. We found our pitchers that we're going to use, and you're not one of them. You're still on the team and can come to practices, but you can't go on road trips." Though he was not permitted to travel, John Doe 6 continued to attend practices and to rehabilitate his back because he wanted to succeed on the team.

393.    At John Doe 6's exit interview with Coach G at the end of that season, Coach G said that he found John Doe 6 a summer league in the Bay Area. John Doe 6 was astounded, as he had previously understood that he was going to be cut from the team. John Doe 6 told Coach G that he got an internship in Los Angeles and found a summer league there in which to play. Coach G responded, "If you're going to do this internship and not play ball in the Bay Area, you're not going to be on the team next year," even though he had told him previously he was not on the

team. Coach G added: "Since you have a career-ending injury, you should approach the NCAA to give your scholarship to them next year."

394.     John Doe 6 quit the team due to Coach G's constant abuse and belittlement throughout that year. However, he was allowed to keep his scholarship and graduate from USF because his parents complained to the school and the NCAA faculty representative of the "hostile environment" and the fact that he was "bull[ied] to quit [the team], because an outright termination would be something that would probably be questioned."

395.     Specifically, in May of 2014, John Doe 6's parents sent the Associate AD and the NCAA Faculty Athletic Representative a letter. The NCAA Faculty Athletic Representative brought the AD, Scott Sidwell, into the conversation. Among other things, John Doe 6's parents wrote:

> **Hostile Environment**
>
> With the change in the coaching personnel this year there has been a significant change in the way the program has been managed, and this has created a 'hostile environment' for the athletes, especially the Pitching Squad. Players are being called out and they are told they are 'pathetic', 'weak-minded', 'a cancer to the team', and that they 'need to understand that their baseball career is over'. This is completely unacceptable behavior from any coach, especially a college coach at an institution such as USF, which subscribed to fair play, high values and ethics.

396.     John Doe 6's parents complained of an "abusive situation" and stated: "To tell a player you have no value to the team, and then to take a player's scholarship when you gave him no real opportunity to prove his value, is an obvious indicator of an extremely poor coach/program…."  John Doe 6's parents highlighted the questionable "ethical and moral conduct" of the coaches and the fact that other players were likely in the same plight as their son.

397.     John Doe 6's parents also highlighted Coach G's wife's failings as John Doe 6's academic advisor that was seemingly influenced by his status on the team. When registering for Spring 2014 classes, John Doe 6 was assured by Coach G's wife that he was on track for graduating in May 2015. However, prior to his meeting with the baseball program he was told by Coach G's wife that he was now short one class and so had to "overload" his schedule to graduate on time.

398.    John Doe 6's parents also directed USF to look at the attrition rates of players leaving the baseball program: "Think about how many young men are leaving the team this year with a complete and utter distaste for the USF baseball program."

399.    Had USF followed up on each or any of these complaints, including the "abusive situation" and conducted an open investigation, it would not have been able to continue to ignore and cover up the problems in the baseball program, and the sexualized misconduct in which the Coach Defendants engaged would have been brought to light.

400.    However, in the face of these complaints, Scott Sidwell, USF's AD at the time, offered to continue John Doe 6's partial scholarship, but only if he did an "internship" for the baseball team. Though John Doe 6 declined the offer because he no longer wanted to be around Coach Defendants, USF continued to provide John Doe 6 his scholarship. Upon information and belief, USF continued to provide John Doe 6 a scholarship in order to perpetuate the cover up of the Coach Defendants' actions, including the sexualized misconduct and that Coach G had been falsifying baseball players' statistics.

401.    Specifically, during one of the several conversations with USF, John Doe 6's parents mentioned their awareness that Coach G had been falsifying his son's baseball performance statistics. These falsified statistics had been used to the detriment of John Doe 6 and other players.

402.    Though John Doe 6 was no longer an active player on the baseball team, during his last year at USF, Coach Naks called John Doe 6 into his office and told him that he had been randomly selected for a drug screening test to be administered by the NCAA. Curiously, none of the players selected for the "random drug test" were starting players.

403.    Because of Defendants' actions, John Doe 6 suffered an avoidable physical injury; lost all will, ambition, and love for the game of baseball; and gave up on his dream to one day play professional baseball.

**11.     2014: John Doe 7's experience was typical.**

404.    John Doe 7 was a legacy USF baseball player and student: his grandfather played baseball at USF; and his father, uncle, and cousin attended USF. While John Doe 7 had

opportunities to play baseball elsewhere, he only wanted to play at USF because of this legacy. While recruiting him, Coach G told John Doe 7 that he would be treated "like family" and that "we take care of each other" and "we build people up." He signed a National Letter of Intent to attend USF.

405.    Neither when John Doe 7 started at USF nor at any time thereafter does he recall being advised or learning that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, seeing any such policies displayed on campus, being told about such policies at any orientation conducted for new students, or receiving a publication that contained such policies.

406.    Neither when John Doe 7 started at USF nor at any time thereafter does he recall being advised or learning of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus, seeing any such rules or procedures displayed on campus, being told about such rules or procedures at any orientation conducted for new students, or receiving a publication that contained such rules or procedures.

407.    When John Doe 7 arrived on campus, it was apparent that the team was not like a family. Instead, there was a great divide between the players who parroted Coach G and Coach Naks' conduct—including the sexualized activities and the unrelenting cruelty—to stay in the coaches' good graces, and everyone else.

408.    Among other sexual misconduct, John Doe 7 endured Coach Naks' sexual displays and efforts to persuade females to expose themselves in front of dorm windows. At the time, John Doe 7 minimized these incidents because Coach G did not seem bothered by them. John Doe 7 was also mandated to participate in stripping drills where players would have to remove articles of clothing during practice when they made errors.

409.    Those players who were not a part of the "in group" because they refused to condone such misconduct were not even allowed to sit at the same table with the others (who did) and would sometimes be forced to pay for those other players' meals. John Doe 7 and his roommate would eat dinner at different times to avoid paying for other players' meals. There

were also rumors that, in prior years, players had to serve meals in French maids' costumes.

410.     Another activity to keep the divide between the players was called "Kangaroo Court." Senior players would call out younger players' mistakes and impose "fines" that had to be paid on the spot. For example, they would announce, "[John Doe 7] owes $15 for missing a ground ball." The senior players would take the money for themselves. Coach G and Coach Naks participated and laughed.

411.     During his freshman year, John Doe 7 was assigned the same jersey number of a former USF player who went on to play Major League Baseball. A senior later told John Doe 7 that Coach Naks made another teammate take John Doe 7's jersey out of his locker because John Doe 7 "didn't deserve to wear that number." John Doe 7 was fined in Kangaroo Court for "losing" the jersey.

412.     If John Doe 7 did well, it was not good enough for Coach G. If he performed poorly, Coach G would say words to the effect of, "You suck and that's what I expected." Coach G often told him, "You're a pussy. You're letting your family down. You're not capable of playing baseball at this level."

413.     Coach G also used "team building" events as a tool to degrade players. In a skit teammates performed about John Doe 7 when he was a freshman in 2014, another player portrayed John Doe 7 as the intellectually disabled character Lenny from *Of Mice and Men*. At the end of the skit, Lenny/John Doe 7 was killed with a baseball bat. Following the skit, upperclassmen showed John Doe 7 a series of video clips from all his teammates about why they hated John Doe 7, why he sucked at baseball, and why he is a bad person. This was the worst night of John Doe 7's life.

414.     Despite this unrelenting abuse, John Doe 7 continued to work hard. Taking Coach G upon his professed open door policy, John Doe 7 attempted to meet with him on several occasions to discuss how to improve his performance. Each time, Coach G brushed him off by telling him that he was too busy and would catch up with him later. He never did.

415.     John Doe 7 began experiencing anxiety and sleep deprivation. He dreaded attending practice because he feared being targeted. Older players on multiple occasions

threatened him with violence in front of the whole team, yet the Coach Defendants did nothing. He was afraid for his safety given the violent culture the Coach Defendants created and perpetuated on the team.

416. John Doe 7 was so depressed he transferred out of USF after only one semester, as did his roommate, also a freshman on the baseball team. When John Doe 7 told Coach G about his plans to transfer, Coach G responded, "I knew you weren't capable of playing here. Thank you for wasting our time."

417. John Doe 7 then attended a local community college; yet even there, Coach G's reach extended, and John Doe 7's new teammates (who were friends with Coach G's son) were told, "[John Doe 7]'s a pussy who sucked at baseball and couldn't hang at USF."

418. Based upon these events, John Doe 7 became severely depressed and had to work hard to overcome the emotional injuries that Defendants inflicted. To this day, he regrets his decision to attend USF.

### 12. 2013: John Doe 8's experience was typical.

419. John Doe 8 was recruited by USF during his junior year of high school based on his baseball skills and other experience. He was also actively recruited by several other schools and received an offer his junior year from Pepperdine University, another school in the same conference as USF. However, the summer after his junior year, John Doe 8 bonded with the USF pitching coach and verbally committed to USF based on the representations the pitching coach made about the USF baseball team.

420. The pitching coach called John Doe 8 weekly as part of the recruiting process, consistently spoke about how much John Doe 8 was wanted at USF, and how USF would help him make it to the major leagues. He told John Doe 8 that the USF baseball team is a "brotherhood" in which teammates are very close, build each other up, and spend time together off the field.

421. John Doe 8 was offered and accepted USF's renewable annual athletic and academic grants-in-aid (scholarships) of 25%, and he signed a National Letter of Intent. However, right before John Doe 8 arrived on campus, the pitching coach left USF to serve as a DI head

coach in Southern California and John Doe 8 soon learned that everything he was told about the baseball program's culture was untrue.

422.    Neither when John Doe 8 started at USF nor at any time thereafter does he recall being advised or learning that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, seeing any such policies displayed on campus, being told about such policies at any orientation conducted for new students, or receiving a publication that contained such policies.

423.    Neither when John Doe 8 started at USF nor at any time thereafter does he recall being advised or learning of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus, seeing any such rules or procedures displayed on campus, being told about such rules or procedures at any orientation conducted for new students, or receiving a publication that contained such rules or procedures.

424.    Once he joined the team, John Doe 8 was immediately subjected to the intolerable sexualized environment the Coach Defendants had created. At one of John Doe 8's first practices as a freshman in 2013, Coach Naks referenced the undergraduate dormitories overlooking the baseball field and said: "Sometimes girls will stand at their windows, pull up their shirts, and show their boobs. We're here to play baseball, so just look at them and jerk off about it later. Trust me, I want to fuck them too."

425.    John Doe 8 was also subjected to strip games where each pitcher had to take an item of clothing off when they made an error during practice.

426.    During John Doe 8's freshman year in 2013, a picture of John Doe 8's girlfriend, an elite athlete, was posted on the same screen alongside a picture of a famous athlete and word to the effect of "Your girlfriend is now fucking him. Not sure why she was ever with you." John Doe 8 was appalled that he and his girlfriend were the brunt of cruel and sexualized humor condoned by the coaches.

427.    John Doe 8 was disgusted by, and refused to participate in, this sexual misconduct. The Coach Defendants retaliated against him for this refusal. For example, Coach G constantly

berated John Doe 8 on the field, no matter how hard he tried. Coach G used insulting phrases including, "something is wrong with you;" "you will never go anywhere in baseball;" "we don't want you here, you need to leave;" "you are selfish;" "you are a pussy;" and "no one wants you on the team."

428.    Almost immediately, Coach G suggested John Doe 8 should give up his USF scholarship. This constant barrage of insults, no matter what John Doe 8 did, soon destroyed his confidence and his mental state. Nevertheless, John Doe 8 was determined to succeed. Coach G professed an open door policy, and several times, John Doe 8 would ask Coach G how to take his game to the next level. Coach G's response was always the same: "I don't have time for you." Coach G called John Doe 8 "useless" and told him that he regretted awarding him a partial scholarship.

429.    John Doe 8 began hating going to the field each day because he was anxious about the abuse Coach G would inflict on him. Coach G would say things such as: "Don't do it like [John Doe 8]," in front of the entire team. John Doe 8 walked on eggshells at each practice, not wanting to make any mistakes, knowing that if he did, the Coach Defendants would call him out in front of everybody and they would all laugh at him.

430.    John Doe 8 became severely depressed and suicidal because he was constantly berated and told that he was a failure. One day, John Doe 8 went to Coach G in tears and told him that while he was trying his hardest on the field, he was struggling with the baseball program's culture and "not in a good head space." Instead of offering even a modicum of support, Coach G responded by telling John Doe 8 that he was the problem, that his teammates did not like him, and that Coach G wished he had never offered John Doe 8 a scholarship.

431.    Coach G demanded that John Doe 8 sign papers to relinquish his scholarship. When John Doe 8 told Coach G that he wanted to talk to his parents first, Coach G responded: "You're 18 years old. Be a man and make a decision. You don't need to talk to your parents."

432.    After only one semester, John Doe 8 decided to transfer. And even though Coach G told John Doe 8 that he did not have a place on the team, Coach G refused to release him, preventing John Doe 8 from being able to talk to other DI schools and explore other options.

433.     Prior to USF, John Doe 8 never required counseling or medication. He was an upbeat positive young man when he arrived at USF. However, during his one semester at USF, John Doe 8 sought counseling, was diagnosed with severe depression and anxiety, and started taking anti-depressant medication that he continues to take. On his darkest day, John Doe 8 called a suicide hotline.

434.     Because John Doe 8 was so depressed and desperate to leave USF, John Doe 8 considered transferring to a school without a baseball program because Coach G refused to release him. However, John Doe 8's high school baseball coach was able to convince John Doe 8 to continue playing college baseball at a lower division outside USF's conference.

435.     Not only did USF force John Doe 8 to give up his scholarship, the Coach Defendants made efforts to sabotage his new opportunity. In the transition to his new school, John Doe 8 learned that Coach G made an unsolicited call to John Doe 8's new coach to express his opinions to the effect of John Doe 8 being "at the bottom of USF's depth chart" and "not a fit for their program." John Doe 8 also learned that during a college baseball showcase, another USF coach made comments to one of John Doe 8's new coaches, claiming that John Doe 8 "lacked energy and competitiveness" and "was not DI material."

436.     None of these comments about John Doe 8's ability and skills were true. John Doe 8 set a record at his new school for most wins as a pitcher and was named an All-American and an All-Conference player for three years. After college, John Doe 8 was signed by an MLB team as an undrafted free agent and played professional baseball for four years.

437.     Upon information and belief, had John Doe 8 been able to continue his college career at a DI university, he would have had a greater chance of being drafted by an MLB team, and thus would have had greater earning potential.

### 13.     2000: John Doe 9's experience was typical.

438.     USF heavily recruited John Doe 9 based on his baseball skills and experience. During his junior year of high school, USF offered John Doe 9 an annual renewable scholarship of over 60% to play on the baseball team. On information and belief, John Doe 9 signed a National Letter of Intent in connection with his receipt of his USF athletic scholarship.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

439. Though St. Mary's, Cal Poly, and other DI and DII universities also offered John Doe 9 scholarships, John Doe 9 chose to attend USF because Coach G told him the baseball team was a unified brotherhood in which players supported each other to bring forth the best each could be and because of USF's Jesuit mission statement communicating Christian beliefs and a moral culture welcoming all.

440. Neither when John Doe 9 started at USF nor at any time thereafter does he recall being advised or learning that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, seeing any such policies displayed on campus, being told about such policies at any orientation conducted for new students, or receiving a publication that contained such policies.

441. Neither when John Doe 9 started at USF nor at any time thereafter does he recall being advised or learning of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus, seeing any such rules or procedures displayed on campus, being told about such rules or procedures at any orientation conducted for new students, or receiving a publication that contained such rules or procedures.

442. Upon arriving on campus, John Doe 9 soon learned this was not true. In addition to observing Coach Naks regularly encourage females in nearby dorms to flash their breasts while Coach G laughed, John Doe 9 recalls Coach Naks constantly talking about sexual topics, including his sexual escapades with his girlfriend, sexual positions, oral sex, and sexual fantasies. Coach Naks also attempted to engage John Doe 9 in discussions about John Doe 9's sexuality and his sexual experiences, asking questions like: "Tell me what your tongue did" and "What positions did you do?" Coach G also once said, "There's a lot of pussy on campus."

443. John Doe 9 was very uncomfortable with these types of conversations, and it soon became evident to the Coach Defendants that John Doe 9 would not participate in their intolerable sexualized environment. As a result, they began ostracizing John Doe 9 and tried to run him off the team. For example, once when John Doe 9 was sick and presented Coach G a doctor's note excusing him from practice, Coach G became enraged and told him that he was going to "rip his

1  ass."

2      444.    John Doe 9 came to dread the nearly weekly meetings he had with Coach G in

3  Coach G's office because he was afraid of Coach G's volatility. During these meetings, Coach G

4  would typically threaten John Doe 9 with what he could to do John Doe 9 and his baseball career.

5      445.    At one of their last meetings, Coach G called John Doe 9 into his office and told

6  him that he needed to work harder and that he (Coach G) "didn't believe his commitment to the

7  team." John Doe 9 responded that he had been working very hard, which incensed Coach G, who

8  jumped up, lunged across the desk, grabbed a report card from John Doe 9's hand, and ripped it

9  up. He told John Doe 9, "You're the most condescending piece of shit I've ever met."

10     446.    No matter how hard John Doe 9 tried on the field, he was bullied and harassed. For

11  example, one of John Doe 9's roles on the team was to put the baseballs away at the end of

12  practice. Coach G's son, a young child at the time, asked John Doe 9 to leave a few balls out so

13  that he could play with them. John Doe 9 did, and the next day, Coach G verbally attacked him

14  for not completing his job. To this day, John Doe 9 has never been yelled at as Coach G did that

15  day. When John Doe 9 explained that he left the balls out for Coach G's son, Coach G said,

16  "Leave my son alone."

17     447.    Coach G also unrelentingly abused John Doe 9's teammates. At their first team

18  meeting of the season, Coach G yelled at all the players, including John Doe 9, calling them a

19  "disgrace" and stating that he should strip them of their scholarships. He often called players

20  "faggots," both in meetings and on the field.

21     448.    John Doe 9 no longer wanted to be around Coach G because he was afraid of him.

22  By October of his freshman year, John Doe 9 was severely depressed. He stopped going to class,

23  rarely left his dormitory, and gained weight.

24     449.    When John Doe 9 told his mother about Coach G's abusive behavior, John Doe 9's

25  mother called Coach G to tell Coach G that her son was struggling and to demand the abuse stop.

26  Coach G claimed he had no idea what John Doe 9's mother was talking about and told her she

27  was wasting his time. When John Doe 9's mother threatened to complain to Coach G's

28  supervisors, Coach G said, "If you say anything to the people above me, I will make sure your

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB

son never puts a uniform on again." The next day, Coach G told John Doe 9 that he would be kicked off the team if he or his mother called the athletic department.

450.    John Doe 9's mother, however, was not deterred. She contacted the AD at the time who conveyed to her that he did not care about the Coach Defendants' behavior. Thus, USF had knowledge of but did nothing about the Coach Defendants' sexual misconduct.

451.    At no time did USF advise John Doe 9 of any anti-harassment or discrimination policies, or otherwise offer resources.

452.    John Doe 9 decided to give up his scholarship and leave USF to maintain his mental health. When John Doe 9 told Coach G that he wanted to retrieve his personal equipment, Coach G told him to come back later that evening, which John Doe 9 thought strange.  When John Doe 9 did come back, he noticed several of his baseball gloves had been stolen from his locker.

453.    Additionally, Coach G promised John Doe 9 an "A" for his physical education class (baseball), but retaliated and gave him a failing grade, which lowered John Doe 9's GPA and it more difficult for John Doe 9 to transfer.

454.    Because Coach G would not release John Doe 9 to a four-year university, John Doe 9 could only transfer to a junior college and he became a "4-2-4 Transfer."[57] The NCAA's policies concerning such transfers made it impossible for John Doe 9 to finish his college education. To return to a 4-year school, he would have to take and pay for extra classes, as he no longer had a scholarship. So, he played baseball at a junior college for one year, where he became an All-American player. However, without the ability to finish his college education, he was forced to sign a low value contract with an MLB team.

455.    In his second year of spring training for MLB, John Doe 9 suffered a serious injury to his right arm, which left him unable to continue playing baseball. As such, he became a 22-year-old unable to complete his college education and unable to earn a living playing baseball.

---

[57] Planning to go Division I – 4-2-4 Transfer, http://fs.ncaa.org/Docs/eligibility_center/Transfer/DI_4-2-4_Transfer.pdf (last visited Aug. 30, 2023).

**14.      1999-2000: John Doe 11's experience was typical.**

456.      In 1998 during his senior year of high school and based on his baseball skills and experience, John Doe 11 was recruited heavily by Coach G, who at the time was an assistant coach at Arizona State. In 1999, Coach G became the head coach at USF and continued recruiting John Doe 11.

457.      Coach G scheduled a USF visit for John Doe 11. John Doe 11 enjoyed the atmosphere of the university and its location, and chose to play baseball there, as opposed to any of the other schools where he could have played.

458.      John Doe 11 was offered a scholarship to play on the USF baseball team. On information and belief, John Doe 11 signed a National Letter of Intent in connection with his receipt of his USF athletic scholarship.

459.      Neither when John Doe 11 started at USF nor at any time thereafter does he recall being advised or learning that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, seeing any such policies displayed on campus, being told about such policies at any orientation conducted for new students, or receiving a publication that contained such policies.

460.      Neither when John Doe 11 started at USF nor at any time thereafter does he recall being advised or learning of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus, seeing any such rules or procedures displayed on campus, being told about such rules or procedures at any orientation conducted for new students, or receiving a publication that contained such rules or procedures.

461.      When John Doe 11 arrived on campus, "it all began." John Doe 11 was immediately subjected to the intolerable sexualized environment the Coach Defendants had created.

462.      Nothing was off-limits and John Doe 11's personal life outside of baseball became the subject of Coach G's intense and inappropriate interest. For example, John Doe 11 began dating another student during the fall of 1999. Supposedly, another player asked this student why

she was dating John Doe 11, and she responded, "Because he has a big dick."

463.    Whether she said this or not, word spread throughout the team. After one away game when John Doe 11 was in the shower and Coach G was taking a shower with the players, Coach G said, "Turn around. Let me see it. Let me see what you're working with," referring to John Doe 11's penis. The rest of the players in the shower erupted in laughter, but John Doe 11 was mortified. John Doe 11 refused to turn around and faced the wall until Coach G left the shower.

464.    After that, Coach G persistently asked John Doe 11 about his sex life in front of the other players. John Doe 11 became highly uncomfortable during practices, as Coach G would ask about the women John Doe 11 was seeing and say things like, "I heard you got some pussy last night, she's hot," or, "Tell me what you did last night." Everything always related back to sex.

465.    John Doe 11 was disgusted by, and refused to participate in, this sexual misconduct. The Coach Defendants retaliated against him for this refusal. For example, Coach G would go on vicious tirades, constant yelling and screaming. Name-calling was a daily thing. If Coach G did not like how a player was performing, he would say things such as, "You're a piece of shit" or "You're a fucking pussy."

466.    During one game, in which John Doe 11 was delayed in putting his shin guards on, Coach G screamed the following at him the entire time it took John Doe 11 to put the shin guards on: "You son-of-a-bitch. You lazy motherfucker. I don't know why you're on this team." Everyone in the dugout at the time stared at John Doe 11 during Coach G's tirade.

467.    Coach G required all players use a certain type of baseball bat because, upon information and belief, USF had a contract with that bat manufacturer. During one practice while John Doe 11 was in the batting cage and Coach G was pitching balls, Coach G noticed John Doe 11 using his own bat (which John Doe 11 preferred and was manufactured by a different company). Coach G then threw a pitch to hit John Doe 11, which struck John Doe 11 in the back as he turned away to avoid the ball. After commenting that John Doe 11 was not a "team player," Coach G threw another pitch hitting John Doe 11 again while making a similar comment. Coach

G's third pitch hit John Doe 11 in the head, stunning him. Coach G called him a "fucking pussy" and kicked him out of the batting cage. John Doe 11 was in shock that his coach was trying to injure him with his pitches.

468.    Coach G's angry outbursts continued. A rumor had spread about an extra-marital affair in which Coach G was involved with an assistant coach's girlfriend. Coach G gathered the whole team to an indoor meeting and started screaming and threatening them, saying that what he did in his private life was none of their business and that if anyone said anything more, he would ruin their career. He said, "If you're man enough to come talk to me one-on-one, you know where my office is," which John Doe 11 took as a challenge not to talk, but to fight.

469.    John Doe 11's mental, emotional, and physical condition declined because of the Coach Defendants' constant belittling. He did not want to go to practices to get screamed at, or to hear other players get screamed at. He was not excited to play baseball anymore. He lost the love of the sport. Coach G would criticize him, no matter how hard he worked, and would hurl insults all the time. He was anxious and depressed and began to suffer from panic attacks, which continue to this day. John Doe 11 began seeing a therapist early in his freshman year.

470.    For example, one day John Doe 11 missed a weightlifting practice because of his anxiety. Furious, Coach G punished John Doe 11 by making him run "pole to pole"—more than 100 yards—80 times. Coach G threatened: "If you stop, you'll be off the team." John Doe 11 knew that Coach's G's home was within eyesight of the field, so John Doe 11 ran for what seemed to be hours. Even though John Doe 11 was suffering from Coach G's constant abuse, John Doe 11 wanted to succeed with the hopes of one day playing MLB.  As he ran into the evening, his roommate brought him a hamburger, which he ate while he was running.

471.    In his second semester, John Doe 11 injured his back and was immediately ostracized. Coach G told him he was not worth playing and subsequently ignored him; the rest of his team followed Coach G's lead.

472.    John Doe 11's panic attacks became more prevalent during his second semester at USF. John Doe 11 recalls his heart racing while he hid in his dorm room to avoid practice. Coach G would then call his dorm room, sometimes around 10:00 or 11:00 p.m., yelling, "Where were

you? What were you doing?" At times John Doe 11 would see Coach G walking on campus and turn the other way to avoid him.

473.    After the pitching incident, John Doe 11 began feeling unsafe around Coach G. During weightlifting workouts, Coach G would periodically say he wanted to fight John Doe 11 one day. Although Coach G would make the statement in a joking manner, John Doe 11 felt that Coach G was attempting to assert his dominance by challenging John Doe 11 to a fight.

474.    Depression and anxiety spread through the team. The incoming freshmen began discussing dropping out, and after the winter break, many did not return. Out of the 18 incoming freshmen in 1999, 17 did not return for their sophomore year. Upon information and belief, the one player who stayed on the team had a full academic scholarship and tolerated the abuse because he did not want to forfeit that scholarship.

475.    John Doe 11 chose to drop out of the program after his freshman year. He transferred to a junior college and played one more year of baseball before sustaining a career-ending arm injury.

476.    John Doe 11 worked hard to overcome the severe emotional injuries Defendants inflicted and to come to terms with the fact that he would never be able to realize his dream of playing professional baseball.

**E.    Plaintiffs and the Class Were Injured and Continue to be Injured.**

477.    Plaintiffs' harms stem from the fact that USF created a system that places a higher value on institutional reputations, at the expense of the student-athletes' well-being.

478.    The sexual, physical, and mental harassment and abuse many student-athletes— including the Plaintiffs in this case—have suffered have been accompanied by self-doubt, shame, blame, and guilt, and oftentimes requires years of reflection, meditation, counseling, medication, and psychotherapy. All the while, many continue to be plagued with depression, anxiety, and suicidal thoughts.[58]

---

[58] Ingunn Bjørnseth & Attila Szabo, *Sexual Violence Against Children in Sports and Exercise: A Systematic Literature Review*, JOURNAL OF CHILD SEXUAL ABUSE, 27:4, 365-385, 365 (2018).

479.    Sexual and mental harassment and abuse of athletes results in long-term posttraumatic symptomology, with core symptoms including re-experiencing, avoidance, and hyperarousal symptoms.[59] Furthermore, recounting sexual abuse can lead to "double-trauma," which can cause intense ruptures in day-to-day life.[60]

480.    Psychological damage from sexual abuse is especially harmful when the perpetrator is known and trusted by the victim.[61]

481.    In addition to psychological injury, Plaintiffs and the Class suffered out-of- pocket losses from the loss of scholarships, payments of costs-of-attendance, payments for medical and psychiatric treatment, damage to their careers as college baseball players directly affecting their prospects of becoming professional baseball players, and other compensatory and consequential damages.

482.    Unless USF is required to adopt, implement, and enforce appropriate policies and procedures to prevent, or properly respond to, sexual misconduct and psychological abuse of students and student-athletes by institution personnel, current and future students and student-athletes will continue to suffer these injuries.

## VII.    TOLLING OF THE STATUTE OF LIMITATIONS

483.    All statutes of limitations are tolled based on the discovery rule, the doctrines of equitable estoppel and/or equitable tolling, and principles of equity.

### A.    The statutes of limitations are tolled by the discovery rule, because John Does 4-14 did not know they were illegally sexually abused until this lawsuit was filed.

484.    At the time of the abuse, each of the Plaintiffs was a teenager or young adult who

---

[59] Helen Owton & Andrew C. Sparkes, *Sexual Abuse and the Grooming Process in Sport: Learning from Bella's Story*, SPORT EDUC. AND SOCIETY, at 5 (July 2015) (unpublished manuscript), https://www.researchgate.net/publication/281771790_Sexual_abuse_and_the_grooming_process_in_sport_Learning_from_Bella's_story.

[60] See id.

[61] *See* Gloria Dura-Vila & Roland Littlewood, *Integration of Sexual Trauma in a Religious Narrative:  Transformation, Resolution and Growth among Contemplative Nuns* 50 TRANSCULT PSYCHIATRY 21–46 (2013); Kimberly A. Lonsway & Sgt. Joann Archambault (Ret.), *Victim Impact: How Victims are Affected by Sexual Assault and How Law Enforcement Can Respond* 33-37 (Apr. 2006, updated Nov. 2020) https://evawintl.org/wp-content/uploads/Module-2_Victim-Impact.pdf  (last visited Aug. 30, 2023).

was playing DI baseball for the first time.

485.    Coach Naks' open and public sexual behavior in front of Coach G, non-defendant coaches, other USF personnel (such as the team athletic trainers and photographer), and students led Plaintiffs to believe that Coach Naks behavior was generally accepted and that their own discomfort with the behavior was the player's personal and individual defect.

486.    Coach G's open and public participation in and encouragement of Coach Naks' sexual behavior in front of non-defendant coaches, other USF personnel (such as the team athletic trainers and photographer), and students led Plaintiffs to believe that Coach G's (and Coach Nak's) behavior was generally accepted and that their own discomfort with the behavior was the player's personal and individual defect.

487.    Coach G's and Coach Naks' open and public encouragement of sexual behavior by and between the players, including but not limited to sexualized hazing (including at Coach G's house and USF facilities) and sexualized skits (including on the USF baseball field), led Plaintiffs to believe that such conduct was normal and acceptable in a DI baseball program and that their own discomfort with the behavior was the player's personal and individual defect.

488.    Coach G's and Coach Naks' open and public displays of emotional and physical abuse of Plaintiffs and other players who did not participate in the sexual conduct, including emotional and physical abuse in front of non-defendant coaches, other USF personnel (such as the team athletic trainers and photographer), baseball fans, and students led Plaintiffs to believe that that their own discomfort with the sexual conduct was the player's personal and individual defect and deserving of punishment.

489.    Coach G and Coach Naks gave pretextual and false explanations defending the sexual abuse, including (but not limited to) by telling the Plaintiffs they were engaged in team-building exercises like the Rookie show, the on-the-field pre-drill skits, the pitching exercises with associated removal of clothing, the hazing rituals, and the Saturday-morning "swims".

490.    Coach G and Coach Naks perpetuated these pretextual and false explanations defending the sexual abuse by calling Plaintiffs "pussies" and other derogatory terms if they did not participate and otherwise communicating that Plaintiffs could not handle the "normal" way in

which DI baseball teams were run.

491.    Coach G and Coach Naks also perpetuated these pretextual and false explanations defending the sexual abuse by using physical abuse, after the Plaintiffs rejected participating in the sexual misconduct, to gaslight Plaintiffs into believing that they could not handle the "normal" way in which DI baseball teams were run.

492.    Moreover, because the Coach Defendants' conduct was so widely known and talked about, they were led to believe that it could not have been abuse.

493.    Plaintiffs believed that USF would not have retained the Coach Defendants over such a long tenure or so widely touted their coaching styles unless the Coach Defendants' coaching style and sexual conduct were legitimate, and thus that the sexual conduct was appropriate even if it was uncomfortable.

494.    After the filing of this lawsuit, counsel was contacted in writing by a USF employee, on a confidential basis. This employee claimed that USF engaged in "the gaslighting of these students." They explained that the "longstanding relationships" between Coach G and Coach Naks, and between the Coach Defendants and the AD, as well as "their location within the USF culture were a core reason that these severe violations and behaviors were tolerated, dismissed, and/or covered up at the expense of the physical and mental health of these student-athletes."

495.    Thus, even though Plaintiffs felt uncomfortable during the Coach Defendants' actions, they did not understand or believe that the Coach Defendants had sexually abused them but instead were led to understand and believe that they (the Plaintiffs) were at fault for not being able to live up to DI and USF standards.

496.    Plaintiffs John Does 4-14 did not discover their claims until March 11, 2022, when the *San Francisco Chronicle* published a story entitled "'Intolerable sexualized environment': Ex-USF baseball players sue coaches, school, NCAA." Once John Does 4-14 found out the truth, they exercised diligence in joining this lawsuit.

**B.**  **The statutes of limitations are tolled by the discovery rule, because John Does 4-14 could not have known about USF's responsibility for the abuse given its active concealment.**

497.   Due to USF's and the Coach Defendants' cover-up efforts, none of the John Does 4-14 could have known of USF's responsibility for the abuse before the filing of this lawsuit.

498.   Plaintiffs did not have reason to know nor could have known that others had previously complained to USF about the Coach Defendants' conduct, let alone how USF had responded to any previous complaints.

499.   USF and the Coach Defendants knowingly concealed complaints about the misconduct alleged herein, in an effort to prevent Plaintiffs and other victims of Defendants' misconduct from discovering their harms and seeking legal recourse.

500.   Plaintiffs had no reason to know that others had previously complained to USF about the Coach Defendants' conduct, and had no reason to know whether or how USF had responded to previous complaints. Specifically, until this case was filed, John Does 4-14 had no reason to know that their abuse was part of a broader policy of deliberate indifference by USF towards the Coach Defendants' decades-long pattern of abuse.

501.   Further, even if any one of the Plaintiffs had investigated further, further inquiry would have been futile because USF controlled their access to information.

502.   Thus, although USF administrators knew of abuse at the time, Plaintiffs did not know until this lawsuit was filed that USF administrators knew or that they enabled and perpetuated the abuse.

503.   On information and belief, discovery of information held and currently only available to Defendants will reveal what USF knew, the actions taken to hide what it knew, the falsification of investigations or evaluations, and the potential destruction (or loss) of records.

504.   However, by way of example only, Plaintiffs have alleged specific allegations of concealment, including as follows:

505.   During the 2000-2001 academic year, John Doe 9's mother complained directly to Coach G about the Coach Defendants' misconduct. After Coach G threatened her and her son to refrain from complaining to USF, John Doe 9's mother also complained to the then- AD. Neither

these complaints nor the results of any investigation were published at the time or subsequently, and thus, were actively concealed.

506.    In or about 2013, the Coach Defendants were aware that one of the baseball players punched a gay student and physically threw him out of a USF baseball party because there were no "faggots" allowed at the party. This conduct mimicked the Coach Defendants' regular use of the word "faggot" and other gender- and sexual orientation-based epithets aimed at John Doe 5 and another player. Following that incident, the Coach Defendants called a player meeting—from which John Doe 5 was excluded—during which they told the players to "sweep it under the rug." Neither this incident nor the results of any investigation were published at the time or subsequently, and thus were actively concealed.

507.    Moreover, after that incident, Coach G told John Doe 5 that he had mental issues and needed to see a sports psychologist provided to him by USF. Despite revealing what had occurred to the USF psychologist, the USF psychologist never offered John Doe 5 any resources, such as disclosing any reporting mechanism for the Coach Defendants' sexual harassment, sexual orientation, and discrimination.

508.    In May of 2014, John Doe 6's parents sent the USF Associate AD and the USF NCAA Faculty Athletic Representative a letter describing the Coach Defendants' misconduct and pointing out the resulting attrition rates of players on the baseball team. The AD, Scott Sidwell was also informed of the complaints (and would have been aware of the transfer and team withdrawal rates). Neither these complaints nor the results of any investigation were published at the time or subsequently, and thus were actively concealed. Moreover, USF touted Coach Gs' record and incoming recruits, making it appear that there were no problems with the Coaches or effects on players.

509.    At the end of 2016, the USF NCAA Faculty Athletic Representative became aware of a sexualized incident that occurred at Coach G's house during a Christmas party. Based upon information and belief, a Title IX investigation also occurred. Coach G instructed John Doe 13 in words or substance to accept full responsibility and not reveal that it had anything do with the team's freshmen hazing rituals. Neither this incident nor the results of any investigation were

published at the time or subsequently, and thus were actively concealed.

510.     In the spring of 2021, at the end of his freshman year, and after John Doe 1's parents learned of several of the above-described incidents, John Doe 1's mom left several voicemails for USF's AD at the time, Joan McDermott, which were not returned.

511.     The AD also ignored a written "URGENT MEETING REQUEST" from John Doe 2's parents on May 20, 2021.

512.     None of these attempts to reach the AD (who knew that John Does 1 and 2 were baseball players) nor the results of any investigations were published at the time or subsequently, and thus, were actively concealed.

513.     In the fall of 2021, John Doe 1's mom complained of the Coach Defendants' misconduct to the AD. Neither this complaint nor the results of any investigation were published at the time or subsequently (until after this lawsuit was filed in 2022), and thus were actively concealed.

514.     The players also tried to bring the misconduct to the attention of other non-defendant coaches. For example, in late November 2021, eight players—including John Does 1, 2, and 3—decided to express their discomfort with the Coach Defendants' inappropriate behavior. During one pre-workout skit, the players pretended to make a complaint about Coach Naks to the Title IX Office. They feigned putting Coach Naks in handcuffs and carrying him off to jail (the "Title IX Skit").

515.     Yet not a single coach, even the non-defendant coaches who were present, followed up with the players after practice to determine whether the skit was performed seriously or in jest, nor did USF take any action to change the sexualized behavior. Nor were the results of any Title IX or other administrative reports or investigations published at the time, and thus were actively concealed.

516.     Moreover, the widespread acceptance of the Coach Defendants' sexualized conduct in full and plain view of other non-defendant USF personnel demonstrates that Plaintiffs had no reason to know that other student-athletes (and their parents) had complained to USF about the misconduct or that USF had covered up any abuse or student-athletes' complaints.

517.    Given the length of time that USF allowed this misconduct to occur, discovery is likely to reveal additional complaints by student-athletes and their parents that USF covered up.

518.    Moreover, given the public displays of nudity, it is likely that USF officials, other non-defendant coaches, and non-athlete students knew of, discussed, and complained of the misconduct. Thus, discovery is likely to reveal knowledge and cover-up by USF beyond that alleged here.

519.    USF's failure to act was intended to deceive and silence those Plaintiffs and their parents to make them believe that their complaints were isolated, not actionable, and not a systemic problem, so they would not make their experiences public by complaining in other fora or otherwise filing suit. USF's actions were also intended to ensure that other USF baseball players would not make their experiences public or file suit.

520.    USF's failure to investigate these complaints or notify students and the public of the persistent abuse was also contrary to USF's mandatory reporting and investigation policies. Plaintiffs' complaints should have been investigated yet were not (or were covered up) so that USF could continue to ignore Defendants' misconduct, which it effectively did until 2022, when John Does 1, 2, and 3 brought suit.

521.    Plaintiffs John Does 4-14 did not discover their claims until March 11, 2022, when the *San Francisco Chronicle* published a story entitled "'Intolerable sexualized environment': Ex-USF baseball players sue coaches, school, NCAA." Once John Does 4-14 found out the truth, they exercised diligence in joining this lawsuit.

## VIII.    CLASS ALLEGATIONS

522.    Plaintiffs bring this action against USF and the Coach Defendants on behalf of the following Class pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4): "All members of the University of San Francisco baseball team since 2000."

523.    Plaintiffs reserve the right to modify or amend the class definitions, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

524.    Excluded from the Class is Defendants and any of their affiliates, parents, subsidiaries, officers, and directors; any entity in which Defendants have a controlling interest; all

1    persons who make a timely election to be excluded from the class; governmental entities; and all

2    judges assigned to hear any aspect of this litigation, including their immediate family members.

3        525.    Numerosity: There are an average of 35 players per year on a DI baseball roster.[62]

4    As such, the members of the Class are so numerous joinder is impractical.

5        526.    Typicality: Plaintiffs' claims are typical of the claims of each class member in that

6    Plaintiffs, like all Class members, are or were members of the USF baseball team. Plaintiffs and

7    the Class members were injured through USF's failure to protect them, and Plaintiffs are

8    advancing the same legal theories on behalf of themselves and the Class.

9        527.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class.

10   Plaintiffs' interests and the interests of all other members of the Class are identical, and Plaintiffs

11   are cognizant of their duty and responsibility to the Class. Accordingly, Plaintiffs can fairly and

12   adequately represent the interests of the Class. Moreover, Plaintiffs' counsel are competent and

13   experienced in litigating class actions, including litigation of this kind. Plaintiffs and counsel

14   intend to vigorously prosecute this case and will fairly and adequately protect the Class's

15   interests.

16       528.    Commonality and Predominance: There are numerous questions of law and fact

17   common to the Class, and these common questions predominate over any issues affecting only

18   individual Class members.  Questions common to the Class include:

19           a.    Whether USF had a duty to implement and enforce policies to, *inter alia*:

20               •  prohibit sexual harassment and/or sexual abuse of student-athletes

21                  by athletics department personnel;

22               •  prohibit romantic and sexual relationships between coaches and

23                  student-athletes;

24               •  prohibit grooming and other sexually-exploitative behavior by

25                  athletics department personnel of student-athletes;

26

27   _____
     [62] Aria Gerson, *NCAA Provides Relief on Division I Baseball Roster Limits in Wake of Shorter MLB Draft*, USA TODAY (June 10, 2020),
28   https://www.usatoday.com/story/sports/2020/06/10/ncaa-division-i-baseball-roster-limits-relief/5335956002/ (last visited Aug. 30, 2023).

- require mandatory reporting to higher levels of the institution of any allegations of sexual harassment or abuse of a student-athlete by athletics department personnel;

- maintain all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

- require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently investigated;

- implement public sanctions on athletics department personnel where allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel are substantiated;

- mandate training of athletics department personnel regarding grooming, sexual relationships with student-athletes, sexual abuse and harassment, the prohibition thereof, and reporting obligations;

- mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

- provide an independent ombudsman when student-athletes seek to leave their teams, enter the NCAA transfer portal, and/or forego their scholarships;

- protect Plaintiffs and members of the Class from such abuse and other known and/or foreseeable risks, including the loss of scholarships; and

- provide a safe environment for USF student-athletes free from sexual abuse and/or sexual harassment;

    b.    Whether USF breached the foregoing duties;

    c.    Whether the Coach Defendants sexually harassed and retaliated against

Plaintiffs and the Class;

d.    Whether the USF and the Coach Defendants intentionally or negligently inflicted emotional distress on Plaintiffs and the Class;

e.    Whether USF breached its contract with the Plaintiffs and the Class;

f.    Whether USF should be held vicariously liable for the Coach Defendants' tortious conduct;

g.    Whether USF ratified the Coach Defendants' tortious conduct; and

h.    The scope of declaratory and/or injunctive relief and the nature and amount of damages to which Plaintiffs and the Class are entitled.

529.    Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individual litigation by each class member would also strain the court system, create the potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. Moreover, the highly sensitive and traumatic nature of the facts involved here makes a class action superior, because in circumstances like these, there will be some survivors who are emotionally ready and able to come forward and bring suit on behalf of the many others who are not able or ready to come forward to bring suit on their own. In sum, the class action presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

530.    Declaratory/Equitable Relief: Class certification is also appropriate under Rule 23(b)(2) because Defendants acted and refused to act on grounds generally applicable to the Class as a whole, such that final injunctive relief is appropriate with respect to the Class as a whole. Such injunctive relief includes, but is not limited to, requiring USF to adopt, implement, and enforce appropriate policies and procedures to prevent, or properly respond to, sexual misconduct and psychological abuse of students and student-athletes.

531.    In the alternative, this action is also properly maintainable under Rule 23(c)(4) in that particular issues common to the class, as set out above, are most appropriately and efficiently

resolved through a class action and would advance the disposition of this matter and the parties' interests.

**IX.    CLAIMS FOR RELIEF**

**COUNT I**

**VIOLATION OF TITLE IX [20 U.S.C. § 1681 *et seq.*] FOR DISCRIMINATION
(ALL PLAINTIFFS AND THE CLASS AGAINST USF)**

532.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

533.    Title IX of the Education Amendments of 1972 ("Title IX"), as amended, 20 U.S.C. § 1681 *et seq.*, provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

534.    Title IX bars gender-based discrimination and discrimination based on sexual orientation by federally funded educational institutions.

535.    USF receives federal funding, including but not limited to financial aid and grants, and grants from the Higher Education Emergency Relief Fund (authorized by the American Rescue Plan (ARP), Public Law 117-2, signed into law on March 11, 2021).

536.    At the time of the events in question, Plaintiffs were enrolled as undergraduate students at USF.

537.    USF exercised substantial control over its baseball program, as well as over its coaching staff, including the Coach Defendants.

538.    Plaintiffs suffered sexual harassment by Coach Naks, facilitated and condoned by Coach G, and/or by Coach G that was so severe, pervasive, and objectively offensive it deprived Plaintiffs access to educational opportunities and benefits USF provides.

539.    Specifically, the intolerable sexualized environment and emotional abuse Plaintiffs were forced to endure since the beginning of their time at USF was continuous and unrelenting, thereby violating Title IX.

540.    Coach G oversaw, participated in, and approved of this culture of harassment and abuse in the baseball program, which was so extreme and outrageous that several Plaintiffs had to

1   leave USF at great personal and financial losses, including damage to each of their elite baseball

2   careers.

3       541.    Coach G, as the head coach of the baseball program, had actual knowledge of the

4   harassment and physical and mental abuse that was occurring, and indeed, condoned and

5   participated in the conduct.

6       542.    The AD, who is in a position of oversight and control of USF's baseball program

7   including its coaching staff, had actual knowledge of the harassment that was occurring.

8       543.    In May of 2014, John Doe 6's parents advised the USF AD, the assistant AD, and

9   the NCAA Faculty Athletic Representative that the baseball program contained a "hostile

10  environment" that included mental abuse, favoritism, and nepotism. USF's response was that

11  John Doe 6 was allowed to retain his partial scholarship for his last year in college and not play

12  baseball. USF did nothing, and the abuse continued.

13      544.    The AD is a Mandatory Reporter under the USF Title IX Policy and had a duty to

14  report the complaint to the USF Title IX Officer. Thus, the AD's failure to report the complaint

15  was, itself, a violation of the USF Title IX Policy.

16      545.    Further, in 2016, USF was on notice of an incident that occurred at Coach G's

17  house at a Christmas Party involving John Doe 13 touching the buttocks of a female nutritionist.

18  USF's NCAA liaison was made ware of the incident and, based upon information and belief, a

19  Title IX investigation was conducted by USF. Coach G instructed John Doe 13 in words or

20  substance that he should accept full responsibility for the incident and not reveal that it was part

21  of sexualized hazing to which all players were subject to. USF and its employees had an

22  opportunity to fully investigate, but nothing was ever done.

23      546.    Finally, USF's AD ignored an "URGENT MEETING REQUEST" from John Doe

24  2's parents on May 20, 2021.

25      547.    The AD's failures allowed the severe and pervasive harassment to continue

26  through the end of 2021.

27      548.    The AD's actions constituted deliberate indifference on the part of USF to the

28  harassment, and USF's failure to respond to the complaint was clearly unreasonable in light of the

circumstances.

549.   USF's actions allowed the bullying, harassment, intimidation, and sexual misconduct to continue.

550.   As a direct and proximate result of USF's actions and inactions, Plaintiffs and the Class were damaged and continue to be damaged.

551.   Because Plaintiffs and the Class are at continuing risk of harm, Plaintiffs seek injunctive or equitable relief requiring USF to adopt, implement, and enforce appropriate policies and procedures to prevent, or properly respond to, sexual misconduct and psychological abuse of students and student-athletes, including ones that:

      a.    prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

      b.    prohibit romantic or sexual relationships between athletics department personnel and student-athletes;

      c.    prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

      d.    require mandatory reporting of any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

      e.    maintain all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

      f.    require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently investigated;

      g.    implement public sanctions on athletics department personnel where allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel are substantiated;

      h.    mandate training of athletics department personnel regarding grooming, sexual relationships with student-athletes, sexual abuse and harassment, the prohibition thereof, and reporting obligations;

i. mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

j. provide an independent ombudsman when student-athletes seek to leave their teams, enter the NCAA transfer portal, and/or forego their scholarships;

k. protect Plaintiffs and members of the Class from such abuse and other foreseeable risks, including the loss of scholarships; and

l. provide a safe environment for USF student-athletes free from sexual abuse and/or sexual harassment.

## COUNT II

**VIOLATION OF TITLE IX [20 U.S.C. § 1681 *et seq.*] FOR RETALIATION
(PLAINTIFFS JOHN DOES 1-3 AND THE CLASS AGAINST USF)**

552. Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein, and in particular Section VI.C, *supra*.

553. Retaliation against an individual for complaining of sex discrimination, including sexual harassment, constitutes prohibited sex discrimination under Title IX.

554. USF receives federal funding, including but not limited to financial aid and grants, and grants from the Higher Education Emergency Relief Fund (authorized by the American Rescue Plan (ARP), Public Law 117-2, signed into law on March 11, 2021).

555. At the time of the events in question, Plaintiffs were enrolled as undergraduate students at USF.

556. The AD had actual knowledge of the sexual misconduct occurring in the USF baseball program:

a. John Doe 6's parents complained in May of 2014 about the "hostile environment" the Coach Defendants created and the attrition of the team's players.

b.    In December 2016, USF's NCAA's liaison was informed of a spanking incident that occurred at a Christmas party at Coach G's house, and, based upon information and belief, a Title IX investigation was conducted.

c.    On March 30, 2021, John Doe 2's parents requested for an urgent in-person meeting to discuss the Coach Defendants' misconduct, but the AD never responded.

d.    In the spring of 2021 John Doe 1's mother attempted to contact the AD to discuss problems with the baseball program that included sexual misconduct, but the AD never returned her calls. In the winter of that same year, John Doe 1's mom spoke with the AD and told her about her attempts to contact her. The AD advised John Doe 1's mother that USF was aware of the issues and an investigation was being conducted. While Coach Naks was fired, Coach G retained his position, allowing the pervasive sexual environment to continue.

557.    Coach G, as the head coach of the baseball program, also had actual knowledge of the sexual misconduct that was occurring, and indeed, condoned and participated in the harassment. Coach G participated in and was a witness to the abuse, including the Title IX Skit that occurred in October or November of 2021. Yet Coach G never questioned Plaintiffs about the reasons underlying the skit.

558.    Further, when USF's NCAA liaison was told of a sexual battery that occurred at Coach G's house during a Christmas party, Coach G told John Doe 13 that he had to be the fall guy and take all responsibility for the incident, even though the incident was a part of mandatory, freshmen sexualized hazing of which Coach G was aware.

559.    As set out in Section VI.C. above, the Coach Defendants engaged in multiple types of retaliatory conduct against John Does and the Class for their refusal to participate in the sexualized environment, including running players off the team, refusing to sign transfers, blacklisting players through disparaging remarks to prospective or new coaches (thus ending or severely limiting the players' continued baseball careers), interfering directly with their education

(giving failing physical education grades for baseball) or indirectly (through Coach G's wife who was an academic advisor to some of the athletes), physically abusing them, and expressly or implicitly threatening them with harm.

560.     The Coach Defendants engaged in such retaliation against any player who refused to condone or participate in their intolerable sexualized environment, including a relentless campaign to bully and demean each Plaintiff into leaving USF, resulting in severe depression and anxiety among all Plaintiffs, as well as damage to their baseball careers.

561.     The examples in this Complaint are part of a concerted practice by USF administration—including the Coach Defendants—to isolate and bully Plaintiffs into relinquishing their scholarships and leaving USF, and to ruin their baseball careers.

562.     Such retaliation caused all Plaintiffs to leave, want to leave, and/or feel they were forced to leave USF, at considerable personal and financial expense to each, including damage to their baseball careers.

563.     As a direct and proximate result of USF's actions and inactions, Plaintiffs and the Class were damaged and continue to be damaged.

## COUNT III

### NEGLIGENT SUPERVISION AND RETENTION OF TROY NAKAMURA
### (PLAINTIFFS JOHN DOES 1-3 AND THE CLASS AGAINST USF AND NINO GIARRATANO)

564.     Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

565.     The Class brings this claim pursuant to California law.

566.     Since 2000 and until USF removed Coach Naks in 2022, USF employed Coach Naks and had the right to control him and the manner and methods in which he fulfilled his duties as a baseball coach.

567.     During this same period, Coach G had the right to control Coach Naks and the manner and methods in which he fulfilled his duties as a baseball coach.

568.     Coach Naks was unfit or incompetent to work directly with student-athletes and posed a particular risk of sexually harassing and mentally abusing them.

569.     USF and Coach G knew or should have known that Coach Naks was unfit or

incompetent to work directly with student-athletes and posed a particular risk of sexually

harassing or mentally abusing them, and that this unfitness created a particular risk to Plaintiffs

and the Class.

570.    Coach Naks' unfitness and particular risk to student-athletes on USF's baseball

team harmed Plaintiffs and the Class.

571.    USF and Coach G's negligence in supervising and/or retaining Coach Naks were

substantial factors in causing harm to Plaintiffs and the Class.

572.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs

and the Class were damaged.

**COUNT IV**

**NEGLIGENT SUPERVISION AND RETENTION OF NINO GIARRATANO**
**(PLAINTIFFS JOHN DOES 1-3 AND THE CLASS AGAINST USF)**

573.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

574.    The Class brings this claim pursuant to California law.

575.    Since 1999 and until USF fired Coach G in 2022, USF employed Coach G and had

the right to control him and the manner and methods in which he fulfilled his duties as a baseball

coach.

576.    Coach G was unfit or incompetent to work directly with student-athletes because

he sexually harassed and mentally abused them and/or allowed Coach Naks to sexually harass

and mentally abuse the student-athletes.

577.    USF knew or should have known that Coach G was unfit or incompetent to work

directly with student-athletes because he was sexually harassing and mentally abusing them, and

that this unfitness created a particular risk to Plaintiffs and the Class.

578.    USF knew or should have known that Coach G was protecting Coach Naks and

facilitating Coach Naks' sexual harassment and mental abuse of student-athletes, and that Coach

Naks' unfitness created a particular risk to Plaintiffs and the Class.

579.    Coach G's unfitness and particular risk to student-athletes on USF's baseball team

harmed Plaintiffs and the Class.

580.   USF's negligence in supervising and/or retaining Coach G were substantial factors in causing harm to Plaintiffs and the Class.

581.   As a direct and proximate result of Defendants' actions and/or inactions, Plaintiffs and the Class were damaged and continue to be damaged.

## COUNT V

### DISCRIMINATION IN THE EDUCATIONAL SETTING
### [CAL. EDUC. CODE § 66270]
### (ALL PLAINTIFFS AND THE CLASS AGAINST USF)

582.   Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

583.   Section 66270 of the California Education Code provides in pertinent part: "No person shall be subjected to discrimination on the basis of disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, [or] sexual orientation . . . in any program or activity conducted by any postsecondary educational institution that receives, or benefits from, state financial assistance or enrolls students who receive state student financial aid."

584.   Upon information and belief, USF receives state financial assistance and enrolls students who receive state student financial aid.

585.   Plaintiffs and the Class members were harmed by the psychological and physical abuse, as well as intolerable sexualized environment, the Coach Defendants subjected them to at USF because of Plaintiffs and the Class members' gender, sexual orientation, and disability status; and Defendant USF is responsible for that harm.

586.   Plaintiffs and the Class members suffered harassment that was so severe, pervasive, and offensive it effectively deprived Plaintiffs and the Class members the right of equal access to educational benefits and opportunities.

587.   Because of Defendant USF's conduct, Plaintiffs and the Class have been damaged and continue to be damaged in an amount to be proven at trial.

588.   Further, USF acted willfully and maliciously with the intent to harm Plaintiffs and the Class members, and in conscious disregard of the rights of Plaintiffs and the Class members, so as to constitute malice and oppression under California Civil Code Section 3294. Plaintiffs and

the Class members are therefore entitled to the recovery of punitive damages, in an amount to be determined at trial.

<u>COUNT VI</u>

**VIOLATION OF THE CALIFORNIA EQUITY IN HIGHER EDUCATION ACT**
**[CAL. EDUC. CODE § 66250]**
**(PLAINTIFFS JOHN DOES 1-3 AND THE CLASS AGAINST USF)**

589.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

590.    Section 66281.5 of the California Equity in Higher Education Act provides in pertinent part: "(a) It is the policy of the State of California, pursuant to Section 66251, that all persons, regardless of their sex, should enjoy freedom from discrimination of any kind in the postsecondary educational institution of the state. The purpose of this section is to provide notification of the prohibition against sexual harassment as a form of sexual discrimination and to provide notification of available remedies."

591.    Section 66281.5 goes on to detail the affirmative steps that schools must take to provide notification of the prohibition against sexual harassment and the available remedies.

592.    USF's conduct as alleged herein constitutes sexual harassment as a form of sexual discrimination against Plaintiffs and the Class and violated the Equity in Higher Education Act. Plaintiffs are entitled to enforce the Act through a civil action pursuant to Education Code Section 66292.4.

593.    Plaintiffs were never advised of any USF policy governing or prohibiting sexual harassment or other sexualized misconduct by coaches; never saw any such policies displayed on campus; never received or were told about such policies at any orientation conducted for new students; and never received a publication that contained such policies.

594.    Plaintiffs were never advised of any USF rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus; never saw any such rules or procedures displayed on campus; never received or were told about such rules or procedures at any orientation conducted for new students; and never received a publication that contained such rules or procedures.

595.    Because of Defendants' conduct, Plaintiffs and the Class have been damaged and

continue to be damaged in an amount to be proven at trial.

## COUNT VII

### GROSS NEGLIGENCE
### (PLAINTIFFS JOHN DOES 1-3 AND THE CLASS AGAINST USF AND COACH DEFENDANTS)

596.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

597.    The Class brings this claim pursuant to California law.

598.    USF and the Coach Defendants owed Plaintiffs and the Class a duty to use due care to ensure their safety and freedom from sexual harassment and abuse while interacting with their respective employees, representatives, and/or agents, including the Coach Defendants.

599.    The Coach Defendants owed Plaintiffs a duty of due care in carrying out their coaching responsibilities as employees, agents, and/or representatives of USF.

600.    The Plaintiffs and the Class's acceptance of USF's offers to join the baseball team and seek out coaching from the Coach Defendants in the course of their employment, agency, and/or representation of USF created a special, confidential, and fiduciary relationship between Plaintiffs and the Coach Defendants, resulting in both Coach Defendants owing Plaintiffs a duty to use due care.

601.    USF's failure to adequately supervise the Coach Defendants, especially after USF knew or should have known of complaints regarding their sexual harassment and abuse while coaching was so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs would be injured as a result.

602.    The Coach Defendants' conduct in sexually harassing Plaintiffs in the course of their employment, agency, and/or representation of USF as baseball coaches was so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs would be injured as a result.

603.    USF's conduct as described above demonstrated a willful disregard for precautions to ensure Plaintiffs' safety, as well as a willful disregard for substantial risks to Plaintiffs and the Class.

604.    USF breached duties owed to Plaintiffs and the Class and were grossly negligent when they conducted themselves as described above, said acts having been committed with

reckless disregard for Plaintiffs and the Class's health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether Plaintiffs would be injured as a result.

605.    USF is liable and vicariously liable for the Coach Defendants' conduct.

606.    As a direct and/or proximate result of Defendants' actions and inactions, Plaintiffs and the Class were damaged and continue to be damaged.

## COUNT VIII

### NEGLIGENCE
### (PLAINTIFFS JOHN DOES 1-3 AND THE CLASS AGAINST USF AND COACH DEFENDANTS)

607.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

608.    The Class brings this claim pursuant to California law.

609.    USF and the Coach Defendants owed Plaintiffs and the Class a duty to use due care to ensure their safety and freedom from sexual harassment and abuse while interacting with their respective employees, representatives, and/or agents, including the Coach Defendants.

610.    The Coach Defendants owed Plaintiffs a duty of due care in carrying out their coaching responsibilities as employees, agents, and/or representatives of USF.

611.    The Plaintiffs and the Class's acceptance of USF's offers to join the baseball team and seek out coaching from the Coach Defendants in the course of their employment, agency, and/or representation of USF created a special, confidential, and fiduciary relationship between Plaintiffs and the Coach Defendants, resulting in both Coach Defendants owing Plaintiffs a duty to use due care.

612.    USF's negligence in supervising the Coach Defendants, especially after USF knew or should have known of complaints regarding their sexual harassment and abuse while coaching were substantial factors in causing harm to Plaintiffs and the Class.

613.    The Coach Defendants' negligent conduct in sexually harassing Plaintiffs in the course of their employment, agency, and/or representation of USF as baseball coaches was so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs would be injured as a result.

614.    USF's conduct as described above demonstrated a negligent disregard for

precautions to ensure Plaintiffs' safety, as well as a negligent disregard for substantial risks to Plaintiffs and the Class.

615.  USF breached duties owed to Plaintiffs and the Class and were negligent when they conducted themselves as described above, said acts having been committed with disregard for Plaintiffs and the Class's health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether Plaintiffs would be injured as a result.

616.  USF is liable and vicariously liable for the Coach Defendants' conduct.

617.  As a direct and/or proximate result of Defendants' actions and inactions, Plaintiffs and the Class were damaged and continue to be damaged.

## COUNT IX

### NEGLIGENT FAILURE TO WARN, TRAIN, OR EDUCATE
### (PLAINTIFFS JOHN DOES 1-3 AND THE CLASS AGAINST USF)

618.  Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

619.  The Class brings this claim pursuant to California law.

620.  USF owed Plaintiffs and Class members a duty to take reasonable protective measures to protect them and other student-athletes from the risk of sexual harassment and abuse by the Coach Defendants by properly warning, training, and educating Plaintiffs and the Class members and others about how to avoid such a risk.

621.  USF breached its duty to take reasonable protective measures to protect Plaintiffs and other student-athletes from the risk of sexual harassment and abuse by the Coach Defendants, such as the failure to properly warn, train or educate Plaintiffs and Class members and other student-athletes about how to avoid the particular risk the Coach Defendants posed of sexual misconduct.

622.  USF breached its duty to take reasonable protective measures to protect Plaintiffs, Class members, and other student-athletes from the risk of sexual harassment and abuse by the Coach Defendants, by failing to supervise and stop their employees, agents and representatives, including the Coach Defendants, from committing wrongful harassment and abuse of student-athletes, including Plaintiffs and Class members.

623.     As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs and Class members were damaged and continue to be damaged.

## COUNT X

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (PLAINTIFFS JOHN DOES 1-3 AND THE CLASS AGAINST USF AND COACH DEFENDANTS)

624.     Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

625.     The Class brings this claim pursuant to California law.

626.     USF and the Coach Defendants' extreme and outrageous conduct intentionally or recklessly Plaintiffs and Class members to suffer severe emotional distress. This conduct was not the type of ordinary rude or obnoxious behavior student-athletes should be expected to weather— it exceeded all possible bounds of decency.

627.     USF and the Coach Defendants acted with the intention of causing, or with reckless disregard for the probability of causing, Plaintiffs to endure extreme emotional distress.

628.     Indeed, USF and the Coach Defendants used student-athletes' severe distress to subdue and threaten them; to force them to leave USF, give up their scholarships, and enter the NCAA transfer portal; and to prevent them from complaining or suing over the Coach Defendants' misconduct. They did so with deliberate disregard as to the high possibility such actions would result in Plaintiffs and the Class experiencing additional severe emotional distress.

629.     USF and the Coach Defendants' conduct intended to cause and caused Plaintiffs and the Class suffering exceeding all bound that are usually tolerated in a civilized community.

630.     A causal nexus existed between (i) the Coach Defendants' recruitment and grooming of student-athletes to join USF; and (ii) their abuse of power to coerce and harass those student-athletes.

631.     Each act of harassment and abuse was foreseeable given, *inter alia*, the use of USF materials to lure victims and the commission of the acts on USF property.

632.     The Coach Defendants' conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of USF's business. Assaults in the context of USF athletics by coaches and other athletics department personnel are exactly why

student-athletes would expect USF to take extra precautions.

633.    The Coach Defendants' conduct was committed within the scope of their positions as USF coaches. Holding USF liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the Class do not have separate remedies under Title VII because they are not (currently) considered employees of USF.

**COUNT XI**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(PLAINTIFFS JOHN DOES 1-3 AND THE CLASS AGAINST USF AND COACH DEFENDANTS)**

634.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

635.    The Class brings this claim pursuant to California law.

636.    USF and the Coach Defendants' conduct negligently caused emotional distress to Plaintiffs and the Class, and USF and the Coach Defendants could reasonably foresee that their actions would cause Plaintiffs and the Class to suffer emotional distress.

637.    Plaintiffs and the Class were in a specific zone of danger training with the Coach Defendants and at risk of physical harm, causing their fear.

638.    Plaintiffs and the Class, immediately or shortly after training with the Coach Defendants, suffered distress and emotional harm.

639.    A causal nexus existed between (i) the Coach Defendants' recruitment and grooming of student-athletes to join USF; and (ii) their abuse of power to coerce and harass those student-athletes.

640.    Each act of harassment and abuse was foreseeable given, *inter alia*, the use of USF materials to lure victims and the commission of the acts on USF property.

641.    The Coach Defendants' conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of USF's business. Assaults in the context of USF athletics by coaches and other athletics department personnel are exactly why student-athletes would expect USF to take extra precautions.

642.    The Coach Defendants' conduct was committed within the scope of their positions

as USF coaches. Holding USF liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the Class do not have separate remedies under Title VII because they are not (currently) considered employees of USF.

## COUNT XII

### RATIFICATION
### (PLAINTIFFS JOHN DOES 1-3 AND THE CLASS AGAINST USF)

643.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

644.    The Class brings this claim pursuant to California law.

645.    The Coach Defendants were USF coaches for several decades.

646.    At the time of the acts alleged herein, there was an actual or assumed agency relationship between the Coach Defendants and USF.

647.    All acts or omissions alleged herein were ratified by USF. USF had knowledge that the Coach Defendants were in sexual relationships with student-athletes and/or were sexually abusing or harassing student-athletes but refused to take any action to the Coach Defendants or other predators like them. Moreover, USF hid this information from the public so that the Coach Defendants could continue to work for USF until at least 2022.

648.    Despite USF, and/or its agents' knowledge of the Coach Defendants' sexual misconduct, the Coach Defendants were allowed to be alone with student-athletes while on USF business during the relevant time period.

## COUNT XIII

### BREACH OF CONTRACT
### (ALL PLAINTIFFS AND THE CLASS AGAINST USF)

649.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

650.    The Class brings this claim pursuant to California law.

651.    Each Plaintiff and Class member entered into two contracts with both USF and the NCAA: the National Letter of Intent ("NLI") and the DI Student-Athlete Eligibility Statement ("Student-Athlete Statement").

652.    Examples of the NLI, as well as the Student-Athlete Statement, are attached hereto as Exhibits B and C, respectively.[63] They are substantially the same forms that Plaintiffs signed. Upon information and belief, the NCAA and USF possess Plaintiffs' contracts.

653.    "The NLI is a binding agreement between a prospective student-athlete and an NLI member institution."[64]

654.    The NLI becomes null and void if the student has not met "NCAA initial eligibility requirements; NCAA, conference or institution's requirements for athletics financial aid; or two-year college transfer requirements" by the opening day of classes. Ex. B ¶ 7.b.

655.    The NLI incorporates the written offer of athletics financial aid for the relevant academic year. Ex. B ¶ 2.

656.    For consideration in return for the institution's undertakings in the NLI, each student-athlete agrees to attend the institution full-time for one academic year (two semesters or three quarters) (*id.* ¶ 3), participate in an NCAA sport, and abide by the NCAA's Bylaws and rules on eligibility and recruiting. *See, generally,* Ex. B.

657.    The Student-Athlete Statement is on NCAA letterhead and is "Required by: NCAA Constitution 3.2.4.6 and NCAA Bylaw § 12.7.2." *See* Exhibit C, p.1.

658.    NCAA Bylaw § 12.7.2 mandates that student-athletes sign the Student-Athlete Statement. NCAA Bylaw § 12.7.2.1 states: "Failure to complete and sign the statement shall result in the student-athletes ineligibility for participation in all intercollegiate competition."

659.    NCAA Constitution 3.2.4.7 requires that "[a]n active member institution shall administer annually, on a form prescribed by the Legislative Committee, a signed statement for each student-athlete that provides information prescribed in Bylaw 12.7.2."

660.    NCAA Bylaw § 12.7.2.2 states that "[t]he statement shall be administered to each student-athlete by the athletics director," and Form 19-1a states that the form must "be kept in the

---

[63] The exemplar for the NLI is one that John Doe 2 signed in 2019 for the 2020 academic year. Each Plaintiff signed substantially the same NLI. The exemplar Student-Athlete Statement is for the 2019-2020 academic year, called Form 19-1a ("Form 19-1a"). The Student-Athlete Statement is substantially the same form that Plaintiffs and the Class signed each year they competed at USF.
[64] *About the National Letter of Intent*, NLI, http://www.nationalletter.org/aboutTheNli/index.html (last visited Aug. 30, 2023).

director of athletics' office for six years." Exhibit C, p.7.

661. The Student-Athlete Statement requires the student-athlete to affirm that they have "knowledge of an understand the application of NCAA Division I bylaws related to eligibility, recruitment, financial aid, amateur status and involvement in sports wagering activities." *Id.,* p.2.

662. The Student-Athlete Statement requires Plaintiffs and the Class prior to participation as an NCAA athlete, affirm in writing that they "read the Summary of NCAA Regulations, . . . or read the bylaws of the NCAA Division I Manual that address [ ] eligibility." *Id.*, p.1. The student-athlete is "responsible for knowing and understanding the application of all NCAA Division I bylaws related to [their] eligibility." *Id.*

663. The Student-Athlete Statement provides that "[t]he conditions that you must meet to be eligible and the requirement that you sign this form are indicated" in Bylaws contained in the NCAA Manual. *Id.,* p.2.

664. The Student-Athlete Statement also requires Plaintiffs and the Class to "affirm that you understand that if you sign this statement falsely or erroneously, you violate NCAA legislation…." *Id.,* p.2.

665. Student-athletes are required to sign the Student-Athlete Statements each year they compete, and failure to sign the statement renders the student-athlete ineligible for participation in intercollegiate competition.

666. The NCAA Manual is referenced in both the NLI and the Student-Athlete Statement. The Manual is comprised of the NCAA Constitution and Bylaws and imposes on member institutions the following obligations to benefit student-athletes, including Plaintiffs and the Class:

   a. To require "each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3 (Adopted: 1/10/95);

   b. To require "each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach," NCAA Const., Art. 2, § 2.2.4 (Adopted: 1/10/95);

c.   To require that "each member institution . . . establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," NCAA Const., Art. 2, § 2.2 (Adopted: 1/10/95); and

d.   To "assist the institution in its efforts to achieve full compliance with all rules and regulations and shall afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance," NCAA Const., Art. 2, § 2.8.2.

667.   Plaintiffs also entered into contracts with USF to provide athletic and academic grants-in-aid (scholarships) in exchange for attending USF and participating in the USF baseball program. Exemplar scholarship contracts are attached hereto as Exhibit D.[65]

668.   The scholarship contracts specifically reference and must comply with NCAA Bylaws. *See, e.g.,* Exhibit D, pp. 2, 5 (references to NCAA Bylaws throughout).

669.   The NLI, the Student-Athlete Statement, and the agreements USF made regarding academic and athletic scholarships constitute the contracts between USF and Plaintiffs and the Class members.

670.   Each of these contracts incorporates a duty of good faith and fair dealing.

671.   Plaintiffs fulfilled their obligations under the contracts by, among other things, providing their services as student-athletes on the USF baseball team.

672.   USF breached its contractual obligations to Plaintiffs by, among other things, failing to:

a.   Provide scholarships as promised;

b.   provide athletics financial aid for one academic year (two semesters or three quarters);

c.   protect the health of, and provide a safe environment for, each of its participating student-athletes;

---

[65] For ease of reference, Plaintiffs have added page numbers to the lower right corner of the exhibit.

1          d.       establish and maintain an environment that fosters a positive relationship

2                   between the student-athlete and coach; and

3          e.       establish and maintain an environment in which a student-athlete's

4                   activities are conducted as an integral part of the student-athlete's

5                   educational experience.

6       673.    As a direct result of those breaches, Plaintiffs and the Class suffered harm as

7 described above, including but not limited to the amounts of tuition, financial-aid, and costs-of-

8 attendance and benefits paid because of loss of scholarship due to USF's actions and inactions.

9                                 **COUNT XIV**

10                   **BREACH OF ORAL CONTRACT**
**(ALL PLAINTIFFS AND THE CLASS AGAINST USF)**

11

12      674.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

13      675.    The Class brings this claim pursuant to California law.

14      676.    To the extent express contracts do not exist as alleged in Count XIII, Plaintiffs

15 entered into an oral contract with USF that afforded them athletic and academic grants-in-aid

16 (scholarships), financial aid, and other benefits in exchange for participating in USF's baseball

17 team.

18      677.    The oral contracts also incorporated the terms of the Manual, which imposes on

19 member institutions the following to benefit student-athletes, including Plaintiffs and the Class:

20          a.       To require "each member institution to protect the health of, and provide a

21                   safe environment for, each of its participating student-athletes," NCAA

22                   Const., Art. 2, § 2.2.3 (Adopted: 1/10/95);

23          b.       To require "each member institution to establish and maintain an

24                   environment that fosters a positive relationship between the student-athlete

25                   and coach," NCAA Const., Art. 2, § 2.2.4 (Adopted: 1/10/95);

26          c.       To require that "each member institution . . . establish and maintain an

27                   environment in which a student-athlete's activities are conducted as an

28                   integral part of the student-athlete's educational experience," NCAA

Const., Art. 2, § 2.2 (Adopted: 1/10/95); and

    d.    To "assist the institution in its efforts to achieve full compliance with all rules and regulations and shall afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance," NCAA Const., Art. 2, § 2.8.2.

678.    USF breached this oral contract by, among other things, failing to:

    a.    provide scholarships as promised;

    b.    provide the promised athletic and academic grants-in-aid (scholarships), financial aid, and other benefits;

    c.    provide a safe environment for, each of its participating student-athletes;

    d.    establish and maintain an environment that fosters a positive relationship between the student-athlete and coach; and

    e.    establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience.

679.    As a direct result of those breaches, Plaintiffs and the Class have suffered harm as described above, including but not limited to the amounts of tuition, financial-aid, and costs-of-attendance and benefits paid because of loss of scholarship due to USF's actions and inactions.

## COUNT XV

### BREACH OF CONTRACT AS THIRD-PARTY BENEFICIARIES
### (ALL PLAINTIFFS AND THE CLASS AGAINST USF)

680.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

681.    The Class brings this claim pursuant to California law.

682.    To the extent the Court finds no contract exists, either written or oral, between Plaintiffs and USF, then the NCAA and USF were parties to a contract. As an express condition of their membership in the NCAA, USF agreed to abide by the respective Manual, each of which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws.

683.    The NCAA agreed to promulgate and enforce certain rules and regulations,

including those set forth in the Manual to protect the safety and wellbeing of each student-athlete. NCAA member institutions, like USF, agreed to abide by and assist in the enforcement of NCAA rules and regulations to protect the safety and wellbeing of each student-athlete.

684. The Manual thus constitutes a contract between the NCAA and USF.

685. Plaintiffs and the Class are third-party beneficiaries of the contract between the NCAA and USF because the parties to the contract intended to benefit the student-athletes.

686. The Manual sets out specific commitments by the NCAA and its member institutions that expressly recognize that the NCAA rules are intended to benefit student-athletes like Plaintiffs.

687. For example, in the Manual, the NCAA promises the following for the student-athlete's benefit in its constitutions and bylaws:

    a.   "to initiate, stimulate and improve intercollegiate athletics programs for student athletes . . . ," NCAA Const., Art.1, § 1.2(a);

    b.   "to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association," NCAA Const., Art.1, § 1.2(b);

    c.   to conduct intercollegiate athletics programs "in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes," NCAA Const., Art. 2, § 2.2 (Revised: 11/21/05);

    d.   to require "each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3 (Adopted: 1/10/95);

    e.   to require "each member institution to establish and maintain an environment that fosters a positive relationship between the student-athlete and coach," NCAA Const., Art. 2, § 2.2.4 (Adopted: 1/10/95);

    f.   to require that "each member institution . . . establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience," NCAA

1    Const., Art. 2, § 2.2 (Adopted: 1/10/95); and

2    g.    to "assist the institution in its efforts to achieve full compliance with all

3         rules and regulations and shall afford the institution, its staff and student-

4         athletes fair procedures in the consideration of an identified or alleged

5         failure in compliance," NCAA Const., Art. 2, § 2.8.2.

6    688.    The NCAA and each DI school (including USF) intended to create contractual

7    obligations between themselves for the benefit of student-athletes by agreeing to abide by the

8    rules and regulations set forth in the DI Manual, which provided, *inter alia*, that:

9    a.    NCAA "[l]egislation governing the conduct of intercollegiate athletics

10        programs of member institutions shall apply to basic athletics issues such

11        as admissions, financial aid, eligibility and recruiting. Member institutions

12        shall be obligated to apply and enforce this legislation, and the infractions

13        process of the Association shall be applied to an institution when it fails to

14        fulfill this obligation." NCAA Const., Art. 1, § 1.3.2;

15   b.    "Division membership criteria constitute enforceable legislation. Each

16        member institution shall comply with all applicable criteria of its division."

17        NCAA Const., Art. 3, § 3.01.2;

18   c.    Member "institutions . . . must accept and observe the principles set forth

19        in the constitution and bylaws of the Association." NCAA Const., Art. 3, §

20        3.1.1;

21   d.    "The institution shall administer its athletics programs in accordance with

22        the constitution, bylaws and other legislation of the Association." NCAA

23        Const., Art. 3, § 3.2.1.2.

24   689.    USF breached its contractual obligations benefitting Plaintiffs and the Class by

25   failing to:

26   a.    prohibit sexual harassment and/or sexual abuse of student-athletes by

27        athletics department personnel;

28   b.    prohibit any romantic or sexual relationships between athletics department

personnel and student-athletes;

c.  prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

d.  report immediately any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel to the NCAA;

e.  maintain all reports about sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel in a centralized repository so that all complaints can be tracked by the NCAA and its member institutions;

f.  require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently investigated;

g.  implement public sanctions on athletics department personnel where allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel are substantiated;

h.  ban athletics department personnel from working or volunteering for any member institution where allegations of sexual relationships, harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

i.  mandate training of athletics department personnel regarding grooming, sexual relationships with student-athletes, sexual abuse and harassment, the prohibition thereof, and reporting obligations;

j.  mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

k.  protect Plaintiffs and the Class from such abuse and other foreseeable risks; and

1          l.       provide a safe environment for student-athletes free from sexual abuse

2                   and/or sexual harassment.

3          690.     As a direct result of those breaches, Plaintiffs and the Class have suffered harm

4   described above, including but not limited to the amounts of tuition, financial-aid, and costs-of-

5   attendance and benefits paid because of loss of scholarship due to USF's actions and inactions, as

6   well as out-of-pocket costs for therapy, counseling, and medication to address the mental anguish

7   and despair caused by USF's actions and inactions.

8          691.     Because Plaintiffs and the Class are at a continuing and substantial risk of harm by

9   virtue of USF's continuing breach, Plaintiffs seek injunctive or equitable relief.

10  **X.     PRAYER FOR RELIEF**

11         WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request

12  that the Court enter a judgment on their behalf and against the University of San Francisco, Nino

13  Giarratano, and Troy Nakamura, and further grant the following relief:

14         A.       Certify the proposed Class pursuant to the Rules 23(a), (b)(2), (b)(3) and/or (c)(4);

15         B.       Designate Plaintiffs as representatives of the proposed Class and Plaintiffs'

16  counsel as Class counsel;

17         C.       Award injunctive relief requiring USF to adopt, implement, and enforce

18  appropriate policies and procedures to prevent, or properly respond to, sexual misconduct and

19  psychological abuse of students and student-athletes, because: (1) there is a substantial likelihood

20  that Plaintiffs and the Class will prevail on the merits; (2) there is a real and substantial threat that

21  the Class will suffer irreparable injury if the injunction is not granted; (3) the Class's threatened

22  injury outweighs any threatened harm to USF; and (4) granting the injunction will serve the

23  public interest.

24         D.       Award Plaintiffs and the Class compensatory damages, punitive damages,

25  damages for pain and suffering and emotional distress, and any other relief to which they are

26  entitled under the law;

27         E.       Award Plaintiffs and the Class prejudgment interest, costs and attorneys' fees; and

28         F.       Award Plaintiffs and the Class such other and further relief as the Court deems just

and proper.

## XI.    <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs, individually and on behalf of the proposed Class, respectfully request a trial by jury as to all matters so triable.

Dated: August 30, 2023        Respectfully submitted,

By:     */s/ Jonathan Selbin*

Jonathan Selbin (Cal. Bar No. 170222)
jselbin@lchb.com
Michelle Lamy (Cal. Bar No. 308174)
mlamy@lchb.com
LIEFF CABRASER HEIMANN
  & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

JESSICA MOLDOVAN (admitted *pro hac vice*)
jmoldovan@lchb.com
LIEFF CABRASER HEIMANN
& BERNSTEIN
250 Hudson Street
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Elizabeth A. Fegan (admitted *pro hac vice*)
beth@feganscott.com
FEGAN SCOTT LLC
150 S. Wacker Drive, 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100

Lynn A. Ellenberger (admitted *pro hac vice*)
lynn@feganscott.com
FEGAN SCOTT LLC
500 Grant Street, Suite 2900
Pittsburgh, PA 15219
Telephone: (412) 346-4104
Facsimile: (312) 264-0100

*Attorneys for Plaintiffs and the Proposed Class*

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-01559-LB